## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Emergent Fidelity Technologies, Ltd., | Case No. 23-10149 (JTD) |
| Debtor.[1] | <u>**Hearing Date**</u>: <br> **March 14, 2023, at 10:00 a.m. (ET)** |
| | <u>**Objection Deadline**</u>: <br> **March 2, 2023, at 4:00 p.m. (ET)** |

## BLOCKFI'S MOTION FOR ENTRY OF AN
## <u>ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE</u>

---

[1]  The Debtor in this Chapter 11 case is Emergent Fidelity Technologies Ltd., a company formed under the laws of Antigua and Barbuda with registration number 17532 as identified by the Antigua and Barbuda Financial Services Regulatory Commission. The Debtor's principal place of business is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## TABLE OF CONTENTS

I.      Preliminary Statement ................................................................................................ 1

II.     Jurisdiction .................................................................................................................. 3

III.    Relevant Background .................................................................................................. 3

      A.      BlockFi had a lending relationship with FTX and Alameda. ................................3

      B.      SBF formed Emergent for a single purpose: hold Robinhood Shares. ...................5

      C.      Emergent pledged the Shares to BlockFi after Alameda defaulted under the US and International Loan Agreements. ..................................................................6

      D.      After Alameda defaulted under the Forbearance Agreement, BlockFi exercised its right to obtain title to and possession of the Shares. ..........................8

      E.      On November 18, an FTX creditor initiated an action in Antigua attempting to sidestep the FTX bankruptcy and obtain control over the Shares. ......................9

      F.      On November 28, BlockFi filed for bankruptcy, placing the Shares under the BlockFi Bankruptcy Court's protection. ...............................................................10

      G.      The JPLs—claiming to be neutral fiduciaries of Emergent's creditors— attempted to sidestep the BlockFi bankruptcy by starting a liquidation proceeding in Antigua. ........................................................................................12

      H.      The United States Government seized the Shares on January 4. ...........................14

      I.      Having racked up almost $2 million in fees, the JPLs continue to litigate— despite Emergent having no rights to the Shares and no other assets. ...................14

IV.     Relief Requested ....................................................................................................... 15

V.      Argument ................................................................................................................... 15

      A.      Emergent is ineligible for bankruptcy protection under 11 U.S.C. § 109 because it has no property in the United States. ...................................................16

      B.      The JPLs filed Emergent's petition in bad faith. .................................................19

            1.      Emergent's bankruptcy does not accomplish a legitimate bankruptcy purpose. .................................................................................................... 20

            2.      Emergent filed this bankruptcy case to seek litigation advantages........... 22

            3.      The Court's Primestone analysis confirms Emergent's bad-faith filing... 23

C.    The Court should dismiss Emergent's bad-faith petition with prejudice. .............29

VI.    Notice ..................................................................................................................... 30

VII.    No Prior Request..................................................................................................... 30

VIII.    Conclusion ............................................................................................................. 30

BlockFi Inc. ("BlockFi Inc."), BlockFi Lending LLC ("BlockFi Lending"), and BlockFi International Ltd. ("BlockFi International," together with BlockFi Inc. and BlockFi Lending, "BlockFi"), hereby move (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit C**, dismissing with prejudice the above-captioned chapter 11 case of Emergent Fidelity Technologies, Ltd. ("Emergent," or the "Debtor") pursuant to sections 109(a) and 1112(b) of the Bankruptcy Code. In support of this Motion, BlockFi relies on the declarations (and exhibits thereto) of Mark A. Renzi, attached hereto as **Exhibit A**, and Richard D. Anigian, attached hereto as **Exhibit B**, and respectfully represents as follows:

## I.    Preliminary Statement

1.    Neither law nor equity require the doing of a futile act. But this bankruptcy case asks the Court to do just that—to "reorganize" an empty shell. Emergent has no employees, no income, and no business; its sole assets were shares in Robinhood Markets Inc. (the "Shares") worth hundreds of millions of dollars. Emergent pledged the Shares and their proceeds[2] to secure repayment to BlockFi of over $600 million in loans and failed to deliver. Then the Government seized the Shares, allegedly for the benefit of the victims of the FTX Debtors[3] and Samuel Bankman-Fried's ("SBF") fraud. Those victims include BlockFi to the tune of approximately $1 billion. As a result, the Shares or the value thereof will eventually go to BlockFi and its clients, in whole or in part. And—importantly here—Emergent's only assets, its *raison d'être*, left Emergent's estate at least 30 days before its petition date and will never return.

2.    The law captures the futility of Emergent's bankruptcy in two ways. *First*, the Bankruptcy Code requires all debtors to have property—Emergent has none and is thus ineligible

---

[2]    In this Motion, the term "Shares" includes the proceeds, including cash, from the Shares. Ex. A-6, Emergent Pledge Agr. § 1 (defining "collateral" to include "the proceeds of all the foregoing," meaning the proceeds of the Shares).

[3]    *See In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Jointly Administered) (the "FTX Bankruptcy Cases").

to file. *Second*, under Third Circuit precedent, a bankruptcy case must be filed in good faith or must be dismissed. To file in "good faith," a debtor must seek to maximize the value of its assets or preserve itself as a going concern. Emergent seeks neither.

3.      So, why did Emergent file? As a last-ditch litigation tactic. Since November 21, 2022, Emergent has been controlled by Angela Barkhouse ("Barkhouse") and Toni Shukla ("Shukla"), first as receivers and later as joint provisional liquidators ("JPLs") appointed by a court in Antigua. In those three months, the JPLs and their hired professionals have managed to incur *at least* $1.7 million in fees.

4.      But since the JPLs' appointment, Emergent's claim to the Shares—and the JPLs' chance of payment—has grown steadily weaker. *First*, the Bankruptcy Court for the District of New Jersey "identified a property interest held by [BlockFi in the Shares as a result of the Emergent Pledge Agreement]," such that BlockFi's property interest "is deserving of protection under 11 U.S.C. § 362(a)." Ex. B-21, pp. 88–89. *Second*, the Government seized the Shares as part of its criminal investigation into SBF.

5.      Through this bankruptcy filing, however, the JPLs seek to obtain an advantage in the ongoing litigation over BlockFi's interest in the Shares. *First*, the automatic stay at least temporarily handcuffs the BlockFi court, which has before it the first-filed action concerning the Shares and has stated that it "intends to pursue its jurisdiction and authority in the pending adversary proceeding" concerning the Shares Ex. B-21, p. 88. *Second*, the JPLs keep alive their slim hopes of getting paid. Neither of these purposes constitute "good faith."

6.      Emergent's bankruptcy—existing solely to advance the JPLs' interests—was not filed in good faith. And more basically, Emergent has no property and is therefore ineligible for bankruptcy protection. Thus, BlockFi moves this Court to dismiss Emergent's case with prejudice.

## II.      Jurisdiction

7.       The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the District Court, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). BlockFi confirms its consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of these cases and this Motion in this district would be proper under 28 U.S.C. §§ 1408 and 1409, if Emergent had properly filed for bankruptcy under Delaware Law and the Bankruptcy Code.

8.       The statutory bases for the relief requested herein are Sections 105(a), 109, 305, 349, 365, 554(a), and 1112(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, Rule 6007 of the Federal Rules of Bankruptcy Procedure, and Local Rule 1017-2. The Court has authority to enter a final order on this Motion. *In re Conf. of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 222 (Bankr. D. Del. 1995) ("A bankruptcy court as a court of equity has the inherent power to dismiss a case when its jurisdiction has been improperly invoked."). This Motion presents a matter concerning the administration of the estate and is thus a core proceeding under the Bankruptcy Code. 28 U.S.C. § 157(b)(2)(A).

## III.      Relevant Background

### A.      BlockFi had a lending relationship with FTX and Alameda.

9.       Founded in 2017, BlockFi's vision is to bridge the worlds of traditional finance and blockchain technology. From the start, BlockFi has been a crypto-industry leader in client services

and protections. It has always sought to conduct its business safely by adopting corporate governance and risk-management processes to protect its clients, including cooperating with SEC oversight regarding its offerings.

10.    But like nearly everyone in the crypto industry, BlockFi had substantial ties to the FTX Debtors. This relationship began on July 15, 2019, when BlockFi executed the first of two loan agreements with one of the FTX Debtors, Alameda Research Ltd. ("Alameda"). Under this Master Digital Currency Loan Agreement (the "U.S. Loan Agreement"), BlockFi Lending agreed to lend digital currency to Alameda on a long-term basis. Ex. A-1. SBF signed the U.S. Loan Agreement as Alameda's Chief Executive Officer. A year later, on August 14, 2020, Alameda executed a Master Loan Agreement with BlockFi International (the "International Loan Agreement"). Ex. A-2. There, BlockFi International agreed to lend digital currency to Alameda on a long-term basis. Caroline Ellison signed the International Loan Agreement as Alameda's Co-Chief Executive Officer.[4] For more than two years, BlockFi and Alameda had a working relationship, with Alameda borrowing hundreds of millions of dollars from BlockFi under these agreements.

11.    But 2022 posed new challenges for the cryptocurrency industry—even before the FTX Debtors' historic collapse. First, the UST/Luna stablecoin ecosystem collapsed. Then, cryptocurrency hedge fund Three Arrows Capital and cryptocurrency brokerages Celsius Network Ltd. and Voyager Digital filed for bankruptcy. These and other events caused the price of cryptocurrencies to plummet. By the summer of 2022, BlockFi felt these market effects and faced a liquidity crisis. Yet the FTX Debtors' empire still appeared healthy, and SBF was enjoying his

---

[4]    The International Loan Agreement was amended on January 26, 2022, by the Amended and Restated Loan Agreement. Ex. A-3. References to the International Loan Agreement refer to the amended agreement.

reputation as the crypto-industry's savior.[5] When BlockFi needed help, SBF and one of the FTX Debtors supplied important liquidity.

**B.    SBF formed Emergent for a single purpose: hold Robinhood Shares.**

12.    In early 2022, SBF and Emergent co-founder Gary Wang ("Wang") decided to invest in Robinhood Markets, Inc. ("Robinhood"), which is publicly traded on the NASDAQ under the symbol HOOD. Ex. B-17 (the "12/12/22 SBF Affidavit"). Between April 30 and May 11, 2022, SBF and Wang claim to have personally borrowed approximately $546 million from Alameda to make this investment. *Id.* ¶ 9. To hold their Robinhood investment, SBF and Wang formed Emergent under the laws of Antigua and Barbuda. *Id.* ¶ 7; Exs. B-6–B-10. SBF and Wang own 90% and 10% of Emergent, respectively, and claim to have contributed all of the capital to Emergent using the borrowed Alameda funds. Ex. B-17, 12/12/22 SBF Affidavit ¶¶ 8, 11. According to Emergent's Articles of Incorporation and Notice of Directors, SBF is Emergent's sole director. Exs. B-8 § 23, B-10. Emergent's only known assets were the Shares. Barkhouse First Day Dec., D.I. 3, ¶ 10.

13.    Emergent is a lawful entity (irrespective of the legality of SBF and Wang's actions). Although Emergent has no employees, no operations, and no goodwill, it has taken all public steps to appear legitimate and complied with its reporting obligations with advice from able counsel. By May 2, 2022, Emergent owned enough Robinhood class A common stock to trigger an obligation to file a Schedule 13D (the "Schedule 13D") with the United States Securities and Exchange Commission. Ex. B-1. When Emergent's Schedule 13D was filed on May 11, 2022, Emergent indicated that it owned 56,273,469 shares of class A common stock. *Id.* Emergent's Schedule 13D

---

[5]    *E.g.*, Alexander Osipovich, *The 30-Year-Old Spending $1 Billion to Save Crypto*, WALL STREET JOURNAL (Aug. 23, 2022), https://www.wsj.com/articles/crypto-bitcoin-ftx-bankman-fried-11661206532?mod=article_inline.

also confirms that it purchased the Shares using its working capital (Item 3), acquired the Shares as an attractive investment (Item 4), and may pledge all or part of the Shares as loan collateral (Item 3). *Id.*

14.     This filing put the public on notice of Emergent's ownership of the Shares, and the first page of Emergent's Schedule 13D identifies FTX's then and current General Counsel Ryne Miller as the person authorized to receive notices and communications from the SEC with respect to Emergent's Schedule 13D. *Id.* To BlockFi's knowledge, Mr. Miller has never disputed any of the information in the Schedule 13D.

15.     Further, Emergent filed its Schedule 13D on advice from the FTX Debtors' current bankruptcy counsel—Sullivan & Cromwell LLP. Specifically, the firm "advised Mr. Sam Bankman-Fried in connection with Hart-Scott-Rodino compliance and public reporting obligations arising out of a position that had been established in the stock of Robinhood Markets, Inc." between April and August 2022. FTX Bankruptcy Cases, Dietderich Supp. Decl., D.I. 510, ¶ 52. Sullivan & Cromwell billed Alameda "approximately $195,000" for this work on Emergent's behalf, which Alameda apparently paid. *Id.*

16.     Once the Shares were held in Emergent's name, Emergent took no other actions until November 2022, when it pledged the Shares to BlockFi. It simply held the Shares at Marex Capital Markets Inc., formerly known as ED&F Man Capital Markets Inc. ("Marex").

**C.     Emergent pledged the Shares to BlockFi after Alameda defaulted under the US and International Loan Agreements.**

17.     On November 9, 2022, well after Emergent purchased the Shares, Alameda was in default under the U.S. Loan Agreement and the International Loan Agreement and, collectively, owed BlockFi Lending and BlockFi International over $600 million. Ex. A ¶ 9.

18.     At this time, neither the public nor BlockFi had knowledge of the FTX Debtors'

imminent collapse. SBF was assuring the public that the FTX Debtors were fine. Indeed, the FTX

Debtors' counsel—again, Sullivan & Cromwell—similarly believed the FTX Debtors were

solvent, even calling the FTX Debtors "rock solid." Ex. B-26. So confident of the FTX Debtors'

solvent position at the time, a Sullivan & Cromwell bankruptcy attorney advised another crypto

outfit that "FTX is rock solid, doesn't use customer funds or take credit risk at all. It cannot have

'liquidity' issues because it doesn't lend." *Id.* That same attorney further dismissed any suggestion

that the FTX Debtors were in trouble as "just Binance silliness." *Id.*

19.     Against this backdrop, BlockFi agreed to Alameda's request for forbearance on the

$600 million-plus in debt owed to BlockFi. In consideration for BlockFi's forbearance, Alameda

offered a repayment schedule plus additional collateral. On November 9, 2022, BlockFi entered

into an Amendment & Forbearance Agreement with Alameda. Ex. A-4.

20.     As a condition to the effectiveness of the Forbearance Agreement, Emergent

entered into a pledge agreement with BlockFi (the "Emergent Pledge Agreement") under which

Emergent guaranteed full repayment of Alameda's debt to BlockFi and pledged the Shares as

collateral for its guarantee. Ex. A-6. Specifically, Emergent "guarant[eed], irrevocably, absolutely

and unconditionally, as primary obligor and not merely as surety, to [BlockFi], the due and

punctual payment" of Alameda's debts to BlockFi International and BlockFi Lending. Ex. A-6,

§ 3. Emergent pledged the Shares as consideration for the Forbearance Agreement and as security

for Emergent's guaranty. *Id.* Emergent also acknowledged that it would receive a direct or indirect

benefit from BlockFi by entering into the Forbearance Agreement. *Id.*, p. 1.

21.     Caroline Ellison executed the Emergent Pledge Agreement on behalf of Emergent

after both SBF and Ellison indicated that Ellison had authority to sign it. Exs. A-6, A-7. SBF

instructed BlockFi to send the Emergent Pledge Agreement "to Caroline [Ellison] to docusign," and he later sought confirmation that Ellison had signed. Ex. A-7. Ellison herself represented that she had authority to pledge the Shares. And Emergent warranted that: "The execution, delivery and performance by Pledgor [Emergent] of this Agreement have been duly and validly authorized by all necessary company action, and this Agreement constitutes a legal, valid and binding obligation of Pledgor . . . ." Ex. A-6 § 4(b).

22.     The parties also confirmed that the Emergent Pledge Agreement is supported by ample consideration: Emergent represented and warranted to BlockFi that Emergent would "receive direct or indirect benefit from [BlockFi's] entry into the Forbearance Agreement" and that "the value of the consideration received and to be received by [Emergent] is reasonably worth at least as much as the liability and obligation of [Emergent] hereunder, and such liability and obligation may reasonably be expected to benefit [Emergent] directly or indirectly." Ex. A-6 §§ 4(a)-(d). In other words, Emergent's pledge of the Shares benefited both Emergent and Alameda.

23.     On November 10, BlockFi Inc. filed a UCC-1 Financing Statement concerning the Shares in the District of Columbia because Emergent's place of business is in Antigua. Exs. A-8 (UCC-1 Filing), A-6, § 4(g), B-7 (showing Emergent's address). Antigua and Barbuda law does not require owners of non-possessory security interests in marketable securities to file, record, or register the interest in any system to obtain priority over other creditors with respect to collateral.

**D.     After Alameda defaulted under the Forbearance Agreement, BlockFi exercised its right to obtain title to and possession of the Shares.**

24.     Alameda defaulted under the Forbearance Agreement on November 10, 2022. Ex. A ¶ 15. BlockFi then immediately notified Emergent and accelerated Emergent's obligations under the Emergent Pledge Agreement. *Id.* Emergent's obligation to pay BlockFi thus became

immediately due and payable in full on November 10. The next day, the FTX Debtors filed for bankruptcy in this Court.

25.     The Emergent Pledge Agreement identified Marex, Emergent's broker, as the party possessing the Shares. On November 14, BlockFi served a formal demand on Marex to transfer the Shares to BlockFi pursuant to the absolute and irrevocable power of attorney granted to BlockFi in the Emergent Pledge Agreement. Ex. B-2. Marex's counsel rejected BlockFi's demand the same day. Ex. B-3.

26.     Two days later, Marex further responded that it would retain custody of the Shares unless a court with jurisdiction over the Shares ordered otherwise. Ex. B-4. Thereafter, Marex consistently and repeatedly refused all of BlockFi's requests to transfer the Shares—BlockFi's rightful property—to BlockFi.

**E.     On November 18, an FTX creditor initiated an action in Antigua attempting to sidestep the FTX bankruptcy and obtain control over the Shares.**

27.     The FTX Debtors' bankruptcies caused many of their customers to fear that customer property was in jeopardy. One such customer of FTX Trading Ltd., Yonatan Ben Shimon ("Shimon"), read news stories about the Shares, Emergent's ownership of the Shares, and SBF's connection to Emergent. Ex. B-12 ¶¶ 32, 45. Based on that information, Shimon allegedly feared SBF would sell the Shares and deprive customers of the return of their property. *Id.* ¶ 32; Ex. B-11 ¶ 9. To prevent this, Shimon sought a receivership over Emergent in the Eastern Caribbean Supreme Court in the High Court of Justice Anitgua and Barbuda (the "Antiguan Court"). Shimon's receivership application relied entirely on his supposition that the funds Emergent used to acquire the Shares might have been "improperly diverted from those invested by [Shimon] and others with FTX." *Id.* ¶ 30.

28.     Yet Shimon acknowledged in his receivership application that he lacked any evidence for his theory, candidly averring that Emergent:

> acquired a 7.6% shareholding in Robinhood for about US$650 million, ***possibly using funds improperly diverted*** from those invested by me and others with FTX. ***I know nothing regarding the source of the funds used to acquire the 7.6% interest in Robinhood*** beyond the fact that it was allegedly "working capital."

Ex. B-12 ¶ 30 (emphasis added).

29.     Despite the complete lack of credible supporting evidence, on November 18 Shimon obtained an *ex parte* interim freezing order (the "Antiguan Receivership Order") and appointment of receivers Barkhouse and Shukla (the "Antiguan Receivers") over Emergent (the "Antiguan Receivership Action"). Ex. B-13. The Antiguan Receivership Order—by its own terms—had a limited reach. It expressly did "not affect or concern anyone outside" Antigua and Barbuda unless they had actual notice of the order and were subject to that court's jurisdiction. *Id.* ¶ 20. The Antiguan Receivership Order also did not prevent parties from complying with their legal duties regarding any of Emergent's assets located outside of Antigua. *Id.* ¶ 21.

30.     On November 21, the Antiguan Receivers—purportedly acting on behalf of Emergent—removed SBF as Emergent's sole director and appointed themselves directors. Ex. B-14 ¶ 5. SBF has challenged the validity and legitimacy of these actions in Antigua. Ex. B-23.

**F.     On November 28, BlockFi filed for bankruptcy, placing the Shares under the BlockFi Bankruptcy Court's protection.**

31.     On November 28, BlockFi and its affiliated debtors and debtors-in-possession (collectively, the "BlockFi Debtors") each filed petitions for relief under chapter 11 in the United States Bankruptcy Court for the District of New Jersey (the "BlockFi Bankruptcy Court"), which are jointly administered under case number 22-19361 (MBK) (the "BlockFi Chapter 11 Cases"). The BlockFi Chapter 11 Cases are pending before the Honorable Chief Bankruptcy Judge Michael B. Kaplan. The same day, BlockFi International, a Bermuda incorporated company, filed a petition

with the Supreme Court of Bermuda (case number 2022: No. 363) for the appointment of joint provisional liquidators.

32.     BlockFi also immediately commenced an adversary proceeding to protect and assert it rights to the Shares. *BlockFi Inc., et al. v. Emergent Fidelity Techs. Ltd.*, Adv. Pro. No. 22-01382 (MBK) (D.N.J. 2022) (the "BlockFi Action"). In the BlockFi Action, BlockFi filed a motion to preserve the Shares pending resolution of the BlockFi Action on the merits. BlockFi Action, D.I. 2.

33.     On November 30, the BlockFi Bankruptcy Court entered its Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code and (II) Granting Related Relief (the "Worldwide Stay Order"). BlockFi Chapter 11 Cases, D.I. 56. The Worldwide Stay Order acknowledged the automatic stay that arose upon the commencement of the BlockFi Chapter 11 Cases (the "BlockFi Automatic Stay") and further enjoined all persons from taking actions related to the Shares.[6] Worldwide Stay Order, BlockFi Chapter 11 Cases, D.I. 56.

34.     During a January 9 hearing, the BlockFi Bankruptcy Court "identified a property interest held by [BlockFi in the Shares as a result of the Emergent Pledge Agreement]." Ex. B-21, pp. 88–89. It further noted BlockFi's property interest is "subject to dispute but still a property interest under 11 U.S.C. § 541(a), that is deserving of protection under 11 U.S.C. § 362(a)." *Id.*, p. 89. The court added that it was "equipped to handle the litigation going forward" regarding the Shares and "intends to enforce [the Worldwide Stay Order] . . . ." *Id.* The court also stated with respect to further litigation involving the Shares that its "doors are open for parties seeking the appropriate relief from the automatic stay." *Id.*

---

[6]     The entry of the Worldwide Stay Order rendered Shimon's original fear that SBF would abscond with the Shares moot.

**G.** **The JPLs—claiming to be neutral fiduciaries of Emergent's creditors—attempted to sidestep the BlockFi bankruptcy by starting a liquidation proceeding in Antigua.**

35.    Sidestepping the door opened by the BlockFi Bankruptcy Court and after the BlockFi Court's Worldwide Stay went into effect, the Antiguan Receivers filed a new action in Antigua on December 2, seeking to liquidate Emergent and be appointed as Emergent's liquidators. Ex. B-15. In their application, the Antiguan Receivers acknowledged the existence of the pending BlockFi Chapter 11 Cases and the BlockFi Action. *Id.* ¶¶ 7–8. Three days later, the Antiguan Court appointed the Antiguan Receivers as Emergent's JPLs and awarded them sweeping powers, including subject to approval from the Antiguan Court, the power to "sell, realise and/or otherwise monetise [Emergent's] shares in Robinhood Markets, Inc." Ex. B-16 ¶ 4(c). The JPLs have abused this power since it was awarded.

36.    Armed with the Antiguan Liquidation Order, the JPLs moved against their main target: BlockFi. That the JPLs consider BlockFi their main adversary is evident from the JPLs' affidavit in support of the Antiguan Liquidation Order. Barkhouse states the purpose of the application is to "preserv[e] the assets of Emergent so that they would be preserved for the benefit of its creditors." Ex. B-15 ¶ 2. But her meaning of "creditors" does not include BlockFi— Emergent's only documented creditor[7]—whom Barkhouse designates as an "unscrupulous purported creditor[]." *Id.* ¶ 31.d. She goes on to describe the Emergent Pledge Agreement as an "alleged security interest over the Robinhood shares on the eve of FTX's bankruptcy, [which] bear[s] the indicia of fraud on the creditors of Emergent, such as Mr. Ben Shimon." *Id.* ¶ 32. The JPLs also acknowledged that BlockFi's security interest in the Shares, if valid, would cover all of Emergent's assets—leaving the JPLs with nothing. *Id.* ¶ 38.

---

[7]    Although Emergent's petition identifies two unsecured creditors, neither of these purported creditors have a direct claim against Emergent. *Infra*, ¶¶ 72-75.

37. After expressing their biased view of BlockFi's legal rights and claims, the JPLs immediately tried to delay the BlockFi Action. On December 27, the JPLs requested emergency relief from the BlockFi Bankruptcy Court to extend the January 9, 2023 hearing on BlockFi's Turnover Motion. Ex. B-27. At an evidentiary hearing the next day, the BlockFi Bankruptcy Court denied the Turnover Motion, stating the "orders entered by the Antiguan Court with respect to the powers of the JPLs and their authority was subsequent to [the Worldwide Stay Order]." Ex. B-19, p. 20. The BlockFi Bankruptcy Court also expressed concern about "the speed in which matters have and continue to proceed in Antigua with limited ability to place any controls." *Id.*, pp. 20–21.

38. Undeterred, the JPLs pushed on. In the FTX Debtors' cases, the JPLs filed a brief that supported the FTX Debtors' stalled attempt to stay the BlockFi Action. In their brief, the JPLs admitted that they do not know who has superior rights in the Shares but claimed that "BlockFi's asserted property interest is avoidable on several grounds." Ex. B-28 ¶ 6. The JPLs also implied that the BlockFi Bankruptcy Court was incapable of fairly determining the Shares' ownership, stating that such claims need to be "adjudicated equitably and efficiently" and the "JPLs do not believe the BlockFi Adversary Proceeding suits this goal." *Id.* ¶ 7.

39. Next, the JPLs filed yet another brief in the BlockFi Action—this time arguing BlockFi's right to the Shares is invalid and avoidable. Ex. B-29. And in Antigua, the JPLs have made multiple filings that question and deny BlockFi's rights in the Shares. On January 3, 2023, the JPLs secured a hearing in Antigua for January 27 to determine their authority to act on Emergent's behalf. Ex. B-20. The Antiguan Court approved that authority, and SBF appealed. Ex. B-23.

**H.     The United States Government seized the Shares on January 4.**

40.     While the JPLs pursued Emergent's wind-up and liquidation, criminal proceedings against SBF began in the United States. On December 9, a New York grand jury sitting in the Southern District of New York returned an eight-count Indictment against SBF, alleging a scheme to misappropriate money. Ex. B-30. The Indictment includes forfeiture allegations against any property that allegedly constitutes or was derived from proceeds traceable to the alleged crimes. According to the Government, this includes the Shares.

41.     The Honorable Katherine H. Parker, United States Magistrate Judge for the Southern District of New York, signed a Warrant of Seizure for the Shares on December 30. This warrant was purportedly executed on January 4. Ex. B-31. Two days later, the Government filed a Notice of Asset Seizures in the BlockFi Bankruptcy Case, stating it had seized the Shares. BlockFi Chapter 11 Cases, D.I. 203. The Government later filed a similar Notice of Asset Seizures in the FTX Debtors' cases. FTX Bankruptcy Cases, D.I. 477. On January 20, the Government filed its Forfeiture Bill of Particulars in the action captioned: *United States of America v. Samuel Bankman-Fried a/k/a "SBF"*, 1:22-cr-673 (LAK) (S.D.N.Y.) (the "SBF Criminal Proceedings"), identifying specific assets that it had seized, including approximately 55.2 million shares of Robinhood stock and approximately $20.7 million in cash. Ex. B-31. The Shares and the proceeds thereof are now under the Government's control.

**I.     Having racked up almost $2 million in fees, the JPLs continue to litigate—despite Emergent having no rights to the Shares and no other assets.**

42.     The Government's seizure placed Emergent's sole assets in the Government's possession. These assets are subject to BlockFi's claims, liens, and encumbrances and any future criminal or civil forfeiture actions—all of which are outside the JPLs' control. The JPLs admit that Emergent has no other assets and no ongoing business. Barkhouse First Day Dec., D.I. 3 ¶ 6; Ex.

B-15 ¶¶ 31(c), 38. And other than BlockFi, the only other "creditors" the JPLs have identified are parties whose claims arise derivatively, not directly, through general allegations of fraud against the FTX Debtors. These "creditors" include the FTX Debtors' customers like Shimon.

43.     Of course, the JPLs and their hired professionals want to be paid, so they continue to litigate, accruing additional fees.[8] In fact, the JPLs are so desperate to get paid that they have sought approval from the Antiguan Court for litigation financing. The JPLs' initial application requested $2 million, but they may return to the Antiguan Court to seek additional funding. Ex. B-22.

44.     On January 27, an Antiguan appellate court stayed the order giving the JPLs authority to act on Emergent's behalf. Ex. B-23. Four days later, the JPLs appealed on procedural grounds. On February 3, the Antiguan appellate court reversed its January 27 order, reinstated the Antiguan Court's prior order giving the JPLs authority over Emergent, and set the date for full appellate arguments for March 6, 2023. Exs. B-24, B-25. The same day their authority was restored, the JPLs filed this bankruptcy case.

## IV.     <u>Relief Requested</u>

45.     BlockFi seeks entry of an order, substantially in the form attached hereto as **<u>Exhibit C</u>**, dismissing this case pursuant to sections 109 and 1112(b) of the Bankruptcy Code.

## V.     <u>Argument</u>

46.     Emergent's bankruptcy suffers from two fundamental and incurable flaws. Both require dismissal. *First*, Emergent cannot seek this Court's protection because it has no "property" to reorganize or liquidate. 11 U.S.C. § 109. *Second*, Emergent cannot establish that its petition serves any legitimate bankruptcy purpose. *Id.* § 1112(b). Rather, the evidence shows Emergent's

---

[8]     As of January 13, the JPLs and their professionals had amassed fees totaling $1,796,500. Ex. B-22 ¶ 14.

JPLs filed their petition in bad faith in an attempt to leverage bankruptcy as a litigation tactic. The Court should dismiss Emergent's petition with prejudice.

A.    **Emergent is ineligible for bankruptcy protection under 11 U.S.C. § 109 because it has no property in the United States.**

47.    Only a person who "resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor." 11 U.S.C. § 109. Emergent has no domicile or place of business in the United States; thus, to be eligible for bankruptcy protection, Emergent must establish that it had "property in the United States at the time [it] actually file[d]." *In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 37 (Bankr. D. Del. 2000). Emergent may argue that either the Shares or its hypothetical claim to the Shares constitute "property in the United States." Not so.

48.    ***The Shares***. Property seized under a criminal warrant before a debtor files bankruptcy "is not includable as property of [its] estate." *In re Thena, Inc.*, 190 B.R. 407, 412 (D. Or. 1995); *In re VPH Pharm., Inc.*, 2018 WL 3574721, at *2–3 (Bankr. E.D. Mich. July 25, 2018). "Chapter 11 does not permit the estate's inclusion of property which did not exist, at the time of filing, for the debtor's beneficial . . . use." *In re Thena*, 190 B.R. at 412. A party "legally devested of possessory rights by the process of the seizure warrant, may have a legal interest in the property, but this interest is defeasible in the event of conviction" and—at most—constitutes bare legal title with no beneficial use. *Id.* at 411. The Government seized the Shares a month before Emergent filed its petition. FTX Bankruptcy Cases, D.I. 477. Thus, at the time of filing, Emergent only held—at best—bare legal title to the Shares, and such title was defeasible upon conviction. As a matter of law, the Shares were not part of Emergent's estate and cannot support Emergent's eligibility to file bankruptcy.[9] *Id.* (holding property seized prepetition is not property of the estate).

---

[9]    Additionally, upon Emergent's breach of the Emergent Pledge Agreement, the Shares became BlockFi's property. *See* Ex. A-6 § 8.

49.     ***Emergent's Claim to the Shares***. Emergent similarly cannot support its filing based on any claim to the Shares. An alleged legal "claim to [property]" situated in the United States must be "located" in the United States to establish the debtor's eligibility. *See In re Head*, 223 B.R. 648, 652 (Bankr. W.D.N.Y. 1998). But any alleged claim Emergent may have to the Shares is located in Antigua, not the United States. A foreign debtor's claim to property located in the United States "is located wherever the [debtor] resides, not where the [property] resides, even if the claims may only be asserted in the place where the [property] resides." *Id.* (emphasis omitted). Emergent is an Antiguan entity subject to the jurisdiction of the Antiguan Court, and it is controlled by Antiguan JPLs. Thus, Emergent hypothetical claim is located in Antigua—no matter where the Shares are held. *See id.*

50.     Additionally, a claim to property also "must be real," not "some type of remote or inchoate claim against property in the United States." *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) (quoting *In re Head*, 223 B.R. 648). Even if Emergent's alleged claim to the Shares was located in the United States, "whatever interest [Emergent] might have in the [Shares] is too tenuous, too inchoate, and too contrived" to support its petition. *In re Head*, 223 B.R. at 652. This is true for two reasons: (1) Emergent's hypothetical claim to the Shares is not ripe, and regardless; (2) Emergent's hypothetical claim is baseless.

51.     *First*, any alleged claim to the Shares is not yet ripe because it can only be asserted *after* the Southern District of New York, which authorized the seizure, enters a preliminary order of forfeiture. *United States v. White*, 2014 WL 3898378, at *7 (D. Md. Aug. 7, 2014) ("The appropriate—and only—time for [a third party to a criminal action] to assert [its] ownership interest in [seized property] is *after* the entry of a preliminary forfeiture order, as provided in 21 U.S.C. § 853(n).". Moreover, whatever claim Emergent may assert regarding the Shares must

comply with the directives and rulings of the BlockFi Court[10] and the forfeiture proceedings in the Southern District of New York. When lawsuits are brought in separate forums regarding the same property (here, the Shares), "the court first assuming jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other." *Penn Gen. Cas. Co. v. Pennsylvania*, 294 U.S. 189, 195 (1935). Thus, the BlockFi Bankruptcy Court and/or the Southern District of New York have exclusive jurisdiction to determine the validity of BlockFi's security interest in the Shares and whether the Shares will be forfeited and distributed to SBF's victims. *Id.* Although the JPLs would like this Court to ignore the BlockFi Action and Emergent's duty to contest the Emergent Pledge Agreement's legal consequences in that court, any request for this Court to determine rights in the Shares is impermissible. Hence, Emergent's unripe, hypothetical claim to the Shares is "too tenuous, too inchoate, and too contrived" to constitute property of the estate. *In re Head*, 223 B.R. at 652.

52.     *Second*, any claim Emergent makes to the Shares will fail. This is an independent basis to dismiss Emergent's filing. Putting aside the BlockFi Action, to recover the Shares in the forfeiture proceedings, Emergent must prove that either (1) its "possessory rights were superior to [SBF's] at the time of [SBF's] commission of the predicate crime," or (2) it "purchased the property for value and without notice that the property was subject to forfeiture." *In re Thena*, 190 B.R. at 411 (citing 21 U.S.C. § 853(n)(6)). Emergent can do neither. SBF's Indictment alleges his fraud began by "at least . . . 2019," well before Alameda transferred the funds that were used to purchase the Shares in 2022. Ex. B-30 ¶¶ 1, 3, 6, 21. And Emergent cannot credibly claim to be a purchaser for value "without notice" of SBF's crimes. It was SBF who formed Emergent, served as Emergent's sole director at the time of the purchase, borrowed money from Alameda,

---

[10]     *See* ¶ 33, *supra*, and Ex. B-21.

contributed funds to Emergent, and controlled Emergent when it acquired the Shares. Thus, this claim—even if located in the United States—is far "too contrived." *In re Head*, 223 B.R. at 652.

53.     For these reasons, Emergent lacks any property in the United States to support its eligibility to file. The Court should dismiss Emergent's petition on this basis. *Id.* (dismissing case because debtor's claims were too contrived to constitute property).

**B.      The JPLs filed Emergent's petition in bad faith.**

54.     Bankruptcy Code section 1112(b) provides another independent basis to dismiss Emergent's bankruptcy petition because it was not filed in good faith. *See In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999).

55.     "The ultimate touchstone" in making the good-faith inquiry "is whether the case is being used to accomplish one of the basic purposes of chapter 11—to preserve a going concern and/or maximize the property available to satisfy creditors' claims." *In re Team Sys. Int'l LLC*, 640 B.R. 296, 311 (Bankr. D. Del. 2022) (footnote omitted). Where it does not accomplish one of those purposes," one may infer that the petition is "being used improperly 'to obtain a tactical litigation advantage.'" *Id.* at 311 (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004)). Dismissal on bad-faith grounds is therefore proper when the bankruptcy does not "serve[] a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate," or when "the petition is filed merely to obtain a tactical litigation advantage." *In re Integrated Telecom Express*, 384 F.3d at 120; *see also In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298 (Bankr. D. Del. 2011); *In re GVS Portfolio I B, LLC*, No. 21-10690 (CSS), 2021 WL 2285285, at *6 (Bankr. D. Del. June 4, 2021).

56.     The good-faith determination is a "'fact-intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *In re Integrated Telecom*

*Express*, 384 F.3d at 118 (quoting *In re SGL Carbon*, 200 F.3d at 162). The inquiry is "based more on an objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than the subjective intent of the debtor." *In re JER/Jameson Mezz Borrower II*, 461 B.R. at 298 (quoting *In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 n.8 (3d Cir. 2009)).

57. Emergent bears the burden to show good faith. "Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith, and the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith." *In re Integrated Telecom Express*, 384 F.3d at 118; *see also In re SGL Carbon*, 200 F.3d at 162; *In re 15375 Mem'l*, 589 F.3d at 618. Specifically, Emergent must "establish that [it] filed [its] petition[] in good faith to preserve the Debtor['s] going concern value or to maximize the value of the Debtor['s] estate, rather than as a litigation tactic." *In re JER/Jameson Mezz Borrower II*, 461 B.R. at 298. In short, Emergent must produce evidence that the bankruptcy case accomplishes a legitimate bankruptcy purpose. *See In re LTL Mgmt., LLC*, 2023 WL 1098189, at *1 (3d Cir. Jan. 30, 2023) ("What counts to access the Bankruptcy Code's safe harbor is to meet its intended purposes.").

### 1. *Emergent's bankruptcy does not accomplish a legitimate bankruptcy purpose.*

58. The purposes of a chapter 11 bankruptcy are twofold: to "preserv[e] going concerns and maximiz[e] property available to satisfy creditors." *Bank of Am. Nat'l Tr. & Savs. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435 (1999). Neither is advanced here.

59. *First*, Emergent has no going concern to preserve. The JPLs have never argued otherwise. The JPLs admit Emergent has no employees, no business operations, and no goodwill. Accordingly, Emergent cannot seek use bankruptcy to protect going-concern value. Ex. B-15 ¶¶ 31(c), 38. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986) (holding that "[r]esort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve . . . [and] no employees to protect").

20

60. *Second*, Emergent has no property to maximize. "Where there is no going concern to preserve, a debtor must prove that liquidation under Chapter 11 maximizes value, specifically that the value would be lost outside of bankruptcy." *In re Stone Fox Cap. LLC*, 572 B.R. 582, 590 (Bankr. W.D. Pa. 2017). Emergent cannot meet this burden. The JPLs claim that bankruptcy will "preserv[e] the value of the Assets for the benefit of those who hold allowed claims or interests against the Debtor or in the Assets." Barkhouse First Day Dec., D.I. 3 ¶ 23. But this bankruptcy offers no means to preserve or maximize the Shares' value because they are not in Emergent's control and not property of the estate. *See In re Thena*, 190 B.R. 407, 412. In the BlockFi Action, the JPLs' counsel admitted they lack control, stating they "have no legal or practical ability to move these shares that everyone is fighting over or to freeze these shares that everyone is fighting over, to do anything with them." Ex. B-21, p. 72. And without any means to reach Emergent's only possible asset, this case fails to further the ends of preserving or maximizing the asset's value.

61. Further weighing against the JPLs' purported goal of preserving the value of the Shares is that two other courts are already serving this function. The Shares are currently in the custody and control of the Government, overseen by the Southern District of New York. And to the extent the Shares need additional protection, the BlockFi Action already provides it. This case adds no additional protection and does not otherwise preserve the value of the Shares. If anything, this case may *erode* the value of any purported property in Emergent's estate by increasing administrative expenses. *In re JER/Jameson Mezz Borrower II*, 461 B.R. at 303 (holding bankruptcy case was "eroding value by the incurrence of substantial administrative expenses").

62. In sum, Emergent's sole potential asset—the Shares—has already been seized by the Government and are adequately protected. Whatever slim interest Emergent may have in the Shares, Emergent will eventually lose, whether to BlockFi or via forfeiture, with value being

distributed to SBF's fraud victims, including BlockFi and its creditors. *See In re Thena*, 190 B.R. at 412 (holding seized property fails to qualify as property of the estate). As a result, this case fails to advance any bankruptcy purpose and actually frustrates them by adding needless costs.

### 2.   *Emergent filed this bankruptcy case to seek litigation advantages.*

63.   Absent a legitimate bankruptcy purpose, the Court may infer that the petition is "being used improperly 'to obtain a tactical litigation advantage.'" *In re Team Sys. Int'l*, 640 B.R. at 311 (quoting *In re Integrated Telecom Express*, 384 F.3d at 119). That inference makes sense here because the JPLs could achieve several litigation advantages through Emergent's petition.

64.   To begin, the filing seeks to decrease the JPLs' costs. In the short time since the JPLs were appointed, litigation concerning the Shares has been widespread, leading the JPLs to incur fees beyond what they are likely to ever realize. And since the Government seized the Shares, Emergent's odds of receiving the benefit of the Shares has shrunk to near zero. Emergent's petition thus benefits the JPLs by consolidating the widespread litigation through the automatic stay. This slows the growth of the JPLs' expenses, attempting to put a ceiling on their fees and expenses.

65.   The filing also represents forum shopping. It is no secret that the JPLs do not trust the BlockFi Bankruptcy Court. *See* Ex. B-28 ¶ 7. The JPLs much prefer to have this case heard in tandem with the FTX Debtors' cases. By filing here, the JPLs can now argue the Shares are under this Court's stay and power, hindering the BlockFi Bankruptcy Court's power to timely determine certain disputes over the Shares. Placing Emergent's fate in this Court also affords the JPLs a potential path to get paid. By filing as an affiliate of the FTX Debtors, the JPLs may hope the Court consolidates Emergent with the FTX Debtors. Moreover, the JPLs can argue that their post-petition fees accrued should be afforded administrative-expense status and be paid. None of these goals constitutes a legitimate bankruptcy purpose. *See In re 15375 Mem'l*, 589 F.3d at 624 (suggesting that the accrual of attorneys' and administrative fees may weigh in favor of dismissal).

### 3.    The Court's **Primestone** *analysis confirms Emergent's bad-faith filing.*

66.     The big-picture view just discussed suggests that Emergent's chapter 11 petition was made in bad faith. Upon a closer look, this conclusion grows clearer.

67.     When determining whether a petition was filed in good faith, courts in this district consider several factors. *In re JER/Jameson Mezz Borrower II*, 461 B.R. at 298–99 (citing *In re Primestone Inv. Partners, L.P.*, 272 B.R. 554, 557 (D. Del. 2002)). As relevant here, these factors include whether (1) it is a single asset case, (2) there are few unsecured creditors, (3) the filer has no ongoing business or employees, (4) the case presents a two-party dispute, (5) the debtor has no cash or income, (6) the debtor has not been pressured by non-moving creditors, (7) there is a previous bankruptcy petition, (8) the debtor's prepetition conduct was improper, and (9) there is no possibility of reorganization. *Id.*[11] The more factors are present, the more likely bad faith is found. *See id.* The subjective intent of the debtor (or those in control of it) is also a relevant consideration. *See In re 15375 Mem'l Corp.*, 589 F.3d at 618 n.8.

68.     Here, Emergent cannot show its chapter 11 petition was filed in good faith because each factor pertinent to the Court's analysis shows otherwise.

69.     ***Single Asset Debtor***. A petition filed by a debtor holding a single asset favors bad-faith dismissal. Emergent no longer has even that. *See In re Primestone*, 272 B.R. at 555, 558; *see In re JER/Jameson Mezz Borrower II*, 461 B.R. at 299 (concluding debtor's single asset indicated bad faith). Emergent's sole asset *was* the Shares. Indeed, SBF and Wang formed Emergent for the single purpose of acquiring and holding the Shares for investment. Ex. B-17. But the Government seized the Shares well before Emergent's filing. Although Emergent may retain a defeasible, bare-

---

[11]    The only factors not relevant here are whether (1) the petition was filed on the eve of foreclosure, (2) non-moving creditors pressured the debtor, and (3) whether the debtor was formed immediately prepetition. *See In re JER/Jameson Mezz Borrower II*, 461 B.R. at 298–99 (citing *In re Primestone Inv. Partners*, 272 B.R. at 557)).

legal interest in the Shares, that interest does not qualify as "property of the estate." *See In re Thena*, 190 B.R. at 412 (holding property seized pre-petition was not property of the estate).

70.     If Emergent argues its claim to the Shares constitutes an asset, that argument fails for the reasons stated above: the validity of BlockFi's security interest must be determined in the BlockFi Action, any forfeiture proceedings are likely years away from resolution, and Emergent's claim will fail in any event. *Supra*, ¶¶ 49–52. Accordingly, this is not even a single-asset case—it's a zero-asset case. Emergent's petition asks this Court to "reorganize" nothing.

71.     ***Few Unsecured Creditors***. Similarly, a petition filed by a debtor with "few" unsecured creditors shows bad faith. *In re Dewey Com. Invs., L.P.*, 503 B.R. 643, 651-52 (Bankr. E.D. Pa. 2013) (holding debtor with few or no unsecured creditors implied bankruptcy filing was made in bad faith). Here, Emergent has *no creditors* other than BlockFi, whose claim against Emergent is secured.[12]

72.     Lack of standing bars the purported claims of the two other claimants listed in Emergent's chapter 11 petition—Shimon and another customer or client of the FTX Debtors. Under well-settled law, any claim alleging that "third parties wrongfully depleted the debtors' assets" may *only* be pursued by that debtor's estate. *E.g.*, *In re Wilton Armetale*, 968 F.3d 273, 282 (3d Cir. 2020) (alterations adopted). This description encompasses any claim available to Shimon and the other FTX customers, who allege that one or more of the FTX Debtors wrongfully diverted their investments or property to Alameda, which wrongfully transferred money to SBF, which wrongfully capitalized Emergent to own and hold the Shares. Black-letter law dictates these claims

---

[12]    All claims herein that relate to BlockFi's security interest in the Shares are stated in the alternative to, and do not prejudice, BlockFi's claim of ownership of the Shares. Under the Emergent Pledge Agreement (Ex. A-6), Emergent's breach gave BlockFi an absolute and irrevocable power of attorney to act for Emergent in relation to the Shares, and then BlockFi, under that power of attorney, transferred the Shares to BlockFi. Marex, in breach of its duties, refused to comply with BlockFi's orders.

are "derivative because every creditor has a similar claim for the diversion of assets of the [FTX Debtors'] estate." *Id.* (alterations adopted); *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (holding that "respecting entity separateness is a fundamental ground rule" of bankruptcy). As shown below, Shimon and similarly situated customers of the FTX Debtors only hold derivative claims because they all funnel through Alameda:



73. This chart makes clear that the claims of Shimon and any other creditor of the FTX Debtors are "based on an injury to the [FTX Debtors'] estate that creates a secondary harm to all creditors." *In re Wilton Armetale*, 968 F.3d at 282 (quotation omitted). Alameda may have a claw-back claim against SBF—and maybe then against Emergent—but these claims all derive from the FTX Debtors' purported injury. Accordingly, Shimon and other FTX customers lack standing to sue Emergent. *Id.*; *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014).

74. The Bernie Madoff case provides a helpful analogy. After it was exposed as a Ponzi-scheme, Madoff's investment business, Bernard L. Madoff Investment Securities LLC ("BLMIS"), filed for bankruptcy. *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 66 (2d

Cir. 2013). On behalf of BLMIS's victims, the BLMIS trustee sued third-party banks for their handling of individual investor's accounts because the banks failed to catch BLMIS's fraud. These claims were dismissed because the BLMIS trustee lacked standing to assert "claims on behalf of thousands of [BLMIS] customers against third-party financial institutions for their handling of individual investments made on various dates in varying amounts." *Id.* at 71. BLMIS's customers' claims were "particularized" and therefore not derivative. *Id.* at 70-71. In contrast, many BLMIS victims asserted a separate, class-action suit directly against alleged Madoff co-conspirator Jeffrey Picower and other defendants based on their withdrawals of more than $6.7 billion from BLMIS. *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 85 (2d Cir. 2014). The class-action suit was enjoined because it derived from BLMIS's injury and the same injury was suffered by all BLMIS victims. *Id.* at 90-93. Any BLMIS creditor could assert the same claim—nothing about the claim was "particularized" to any victim. *Id.* These claims were therefore derivative and belonged exclusively to the BLMIS estate. *Id.*

75.     Here, the FTX Debtors' victims' claims, like BLMIS's victims' claims, are generalized claims that derive from harm to the FTX Debtors. *See In re Wilton Armetale*, 968 F.3d at 282 (holding that "claims alleging that third parties wrongfully depleted the debtor's assets are general or derivative because every creditor has a similar claim for the diversion of assets of the debtor's estate" (cleaned up)). Shimon and other customers of the FTX Debtors cannot bring claims directly against Emergent because they have no particularized harm. Indeed, because none of these victims of the FTX Debtors' fraud had any interactions with Emergent, no "particularized" injury is even possible. In contrast, BlockFi's harm is particularized to Emergent (it has a contract with Emergent); BlockFi's harm does not derive from the FTX Debtors. Accordingly, Emergent has not established it has any creditors other than BlockFi.

76.    ***No Ongoing Business***. Emergent likewise has no ongoing operations, employees, cash, or income. Ex. B-15 ¶¶ 31(c), 38. It never did. *See In re Dewey Com. Invs.*, 503 B.R. at 652 (holding the lack of an ongoing business "weighs strongly in favor of finding bad faith"). This, coupled with the seizure of Emergent's sole asset, means that Emergent "does not own anything that it can reorganize." *Id.* (quoting *In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 458–59 (Bankr. N.D. Fla. 2011)). This factor, too, indicates bad faith.

77.    ***Two Party Dispute***. Although this dispute appears to have multiple parties, it boils down to a dispute between Emergent and BlockFi on the validity of the Emergent Pledge Agreement. If the agreement is valid, BlockFi is entitled to the Shares. If it is not, claims by others including the JPLs and FTX Debtors may come into play. For this reason, these purported creditors seek to contest the Emergent Pledge Agreement, relying on a variety of bases: the JPLs rely on the Antiguan Court order appointing the JPLs; SBF relies on his ownership of Emergent; and the FTX Debtors rely on fraud allegations that, if proven, may substantively consolidate Emergent with SBF and the FTX Debtors. No matter who acts on Emergent's behalf, however, the key legal issue remains the validity of the Emergent Pledge Agreement. And that is a two-party dispute that will be resolved outside this Court. *See In re JER/Jameson Mezz Borrower II*, 461 B.R. at 299 (holding petition involving a two-party dispute was filed in bad faith).

78.    ***No Cash or Income***. Emergent never had income (or products or services or customers). It is a holding company. Although it has cash, that cash consists of proceeds from the Shares. Since its creation, Emergent's purpose has been to hold the Shares—nothing more. This factor favors dismissal. *See Primestone Inv. Partners*, 272 B.R. at 557 (holding company with "no cash" and "no operating income" filed in bad faith).

79. **_Prior Affiliate Bankruptcies_**. Previous bankruptcy petitions filed by the debtor or a related entity also indicate bad faith. *See In re EFL Partners X*, 2013 WL 4508423, at *4–5 (Bankr. E.D. Pa. Aug. 23, 2013). Emergent claims to be an affiliate of 102 FTX Debtors. D.I. 1, pp. 6–8. Thus, to the extent this factor applies, it implies bad faith. *See id.*

80. **_Improper Pre-Petition Conduct_**. From the start, the JPLs and their hired professionals recognized that BlockFi's claims against Emergent threatened their potential payday. So they have fought BlockFi claims at every turn. After the BlockFi Bankruptcy Court entered the Worldwide Stay Order—which enjoined all persons from taking any actions, initiating or continuing proceedings, or otherwise affecting the Shares—the Emergent Receivers applied for and secured their authorization to act as Emergent's JPLs. They justified their coup of Emergent so they could defend the "attack following the recent application made by BlockFi (details below) who are seeking to assert ownership over the Robinhood Shares." Ex. B-15 ¶ 3. They later describe BlockFi as "what appear[s] to be, [an] unscrupulous purported creditor[] . . . ." *Id.* ¶ 31.d. The JPLs have since tried to delay the BlockFi Action, attacked BlockFi's rights in the Shares, and sought to remove adjudication concerning the Shares from the BlockFi Bankruptcy Court. The JPLs' interference with BlockFi's proceedings belies any claim that they act as the fiduciary of Emergent's creditors—*BlockFi* is Emergent's sole creditor. *See In re GVS Portfolio I B*, 2021 WL 2285285, at *7 (noting presence of improper prepetition conduct suggests bad faith).

81. **_No Possibility of Reorganization_**. As stated above, there is no possibility that this bankruptcy will permit Emergent to reorganize. Indeed, Emergent has nothing to reorganize. *See In re JER/Jameson Mezz Borrower II*, 461 B.R. at 303 (holding filing was made in bad faith when "there [was] no benefit to be gained by having [the debtor] remain in bankruptcy").

82.     ***Filed Solely for Automatic Stay***. Although likely not filed *solely* for the automatic stay, the automatic stay provides the JPLs a litigation advantage. *See In re Dewey Com. Inv.*, 503 B.R. at 656 (noting that "a classic example of an abusive bankruptcy filing involves the debtor's attempt to obtain an injunction or restraining order that would not be otherwise available to the Debtor"). As discussed above, it appears Emergent's JPLs are seeking at least two litigation advantages: achieving their choice of venue and increasing their chances at recovering fees.

83.     ***Subjective Intent***. Although it is impossible to know the JPLs' reason for filing this case, the JPLs have one obvious motive: money. Whether BlockFi obtains the benefit of the Shares directly under the Emergent Pledge Agreement or indirectly as one of the many victims of SBF and the FTX Debtors' fraud, Emergent will get nothing. This case is a last-ditch effort to realize something. Hitching their hopes to the FTX Debtors at least gives the JPLs a narrow, if uncertain, path to fees. If the FTX Debtors ever seek substantive consolidation that includes SBF and Emergent, then the JPLs may have a claim to recoup some of their fees. This is not a legitimate bankruptcy purpose. *See In re JER/Jameson Mezz Borrower II*, 461 B.R. at 303 (explaining bankruptcy that "merely distributed to different stakeholder" was in bad faith).

**C.      The Court should dismiss Emergent's bad-faith petition with prejudice.**

84.     Filing bankruptcy without a valid purpose "is an abuse of the bankruptcy process" providing cause for dismissal under section 1112(b). *In re SGL Carbon*, 200 F.3d at 159 n.8. Though some "cause" determinations require the Court to decide between the remedies of conversion and dismissal (choosing whichever is in the "best interest of the creditors and the estate"), considering conversion in a bad-faith case such as this one is "inappropriate" and "unnecessary." *Id.* at 159 & n.8; 11 U.S.C. § 1112(b). Here, Emergent's petition serves no valid reorganization purpose. Dismissal is therefore the appropriate remedy in this no-asset case. *See id.*

85.     But even if conversion were an option, dismissal would still be warranted. Pre-filing, Emergent had no ongoing operations and the Government had seized its only assets, leaving Emergent an empty shell. Further, BlockFi is Emergent's sole creditor, and the disposition of the Shares is already being handled in its separate bankruptcy proceeding or possibly by the Government in potential future forfeiture proceedings. The best interest of the Emergent "estate" and its sole creditor, BlockFi, is served by dismissal, not conversion.

86.     Because the Court has ample cause to dismiss Emergent's proceeding, the dismissal should be with prejudice to Emergent's ability to re-file for 180 days. *See In re Real Veba Tr.*, 529 B.R. 839, 844 (Bankr. E.D. Pa. 2015) (citing 11 U.S.C. § 349(a)); *see also* 11 U.S.C. § 109(g); *In re Stone Fox*, 572 B.R. at 591-92. This is an appropriate penalty for Emergent's wrongdoing.

## VI.    Notice

87.     Notice of this Motion has been provided to the Debtor, the Office of the United States Trustee, and all other parties who have filed an appearance in this chapter 11 case and are entitled to notice under Bankruptcy Rule 2002. BlockFi submits that such notice is sufficient and no other and further notice need be provided.

## VII.    No Prior Request

88.     No prior request for relief sought in this Motion has been made by BlockFi to this or any other Court.

## VIII.    Conclusion

89.     WHEREFORE, BlockFi respectfully requests that the Court enter the order attached hereto as **Exhibit C** dismissing with prejudice the Debtor's above-captioned chapter 11 case pursuant to sections 109 and 1112(b) of the Bankruptcy Code and grant BlockFi such other relief as is just and proper.

Dated: February 16, 2023

**MORRIS NICHOLS ARSHIT & TUNNELL LLP**

*/s/  Derek C. Abbott*
Derek C. Abbott (No. 3376)
1201 North Market Street, Suite 1600
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbot@morrisnichols.com

and

**HAYNES AND BOONE, LLP**
Richard Kanowitz (*pro hac vice* pending)
30 Rockefeller Plaza
26th Floor
New York, NY 10112
Telephone: (212) 659-7300
Facsimile: (212) 918-8989
Email: Richard.Kanowitz@haynesboone.com

Richard D. Anigian (*pro hac vice* pending)
Charles M. Jones II (*pro hac vice* pending)
2323 Victory Avenue
Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
Email:  Rick.Anigian@haynesboone.com
          Charlie.Jones@haynesboone.com

*Counsel for BlockFi Inc.*