<u>**Exhibit A**</u>

**Renzi Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Emergent Fidelity Technologies, Ltd., | Case No. 23-10149 (JTD) |
| Debtor.[1] | |

**DECLARATION OF MARK A. RENZI
IN SUPPORT OF BLOCKFI'S MOTION FOR ENTRY
OF AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE**

I, Mark A. Renzi, hereby declare as follows under penalty of perjury:

1. My name is Mark Renzi. I am over eighteen and have never been convicted of a felony or other crime involving moral turpitude, and I do not suffer from any mental or physical disability that would render me incompetent to make this declaration (the "Declaration").

2. I am a Managing Director and the Head of the Corporate Finance Financial Institutions Group for Berkeley Research Group, LLC ("BRG"). I am also the Chief Restructuring Officer for BlockFi, Inc., BlockFi Lending LLC, and BlockFi International Ltd. (collectively, "BlockFi"). Accordingly, I am in all respects competent to make this Declaration.

3. In my duties as the Chief Restructuring Officer for BlockFi, I am familiar with BlockFi's record-keeping practices. Attached to this Declaration are nine documents from BlockFi's records. I understand that these records were made at or near the time of the act by, or from information transmitted by, someone with knowledge of the facts; were kept by BlockFi in

---

[1] The Debtor in this Chapter 11 case is Emergent Fidelity Technologies Ltd, a company formed under the laws of Antigua and Barbuda with registration number 17532 as identified by the Antigua and Barbuda Financial Services Regulatory Commission. The Debtor's principal place of business is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

the course of its regularly conducted activity; and were made as part of the regular practice of that activity. The attached records are exact duplicates of the original records.

4.      I submit this Declaration in support of the *BlockFi's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case* (the "<u>Motion</u>") filed contemporaneously herewith.

5.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my position as Chief Restructuring Officer of BlockFi, my review of relevant documents, information provided to me by BlockFi employees or officers, or my opinion based upon my experience, knowledge, and information concerning the BlockFi's operations. I am authorized to submit this Declaration on BlockFi's behalf. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.      BlockFi Lending and Alameda Research Limited ("<u>Alameda</u>") entered into a Master Digital Currency Loan Agreement (the "<u>US Loan Agreement</u>") as of July 15, 2019, whereby BlockFi Lending agreed to lend Digital Currency (as defined in the US Loan Agreement) to Alameda on the terms and conditions set forth in the US Loan Agreement.  A true and correct copy of the US Loan Agreement is attached hereto **<u>Exhibit A-1</u>**.

7.      BlockFi International and Alameda entered into a Master Loan Agreement as of August 14, 2020 (the "<u>Master Loan Agreement</u>"), whereby BlockFi International agreed to lend Digital Currency, Dollars, or Alternative Currency (as those terms are defined therein) to Alameda on the terms and conditions set forth in the Master Loan Agreement.  A true and correct copy of the Master Loan Agreement is attached hereto as **<u>Exhibit A-2</u>**.

8.      BlockFi International and Alameda entered into an Amended and Restated Master Loan Agreement (the "<u>International Loan Agreement</u>") as of January 26, 2022, that replaced the Master Loan Agreement.  Under the International Loan Agreement, BlockFi International agreed

to lend Digital Currency, Dollars, or Alternative Currency (as those terms are defined therein) to Alameda on the terms and conditions set forth in the International Loan Agreement.  A true and correct copy of the International Loan Agreement is attached hereto as **Exhibit A-3**.

9.      In early November 2022, Alameda was in default under the US Loan Agreement and the International Loan Agreement.

10.     Thereafter, BlockFi Lending and BlockFi International entered into an Amendment & Forbearance Agreement with Alameda (the "Forbearance Agreement") as of November 9, 2022. A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit A-4**.

11.     As a condition to the effectiveness of the Forbearance Agreement, BlockFi Inc., BlockFi Lending, and BlockFi International entered into a pledge agreement with Alameda as of November 9, 2022 (the "Alameda Pledge Agreement").  A true and correct copy of the Alameda Pledge Agreement is attached hereto as **Exhibit A-5**.

12.     As a condition to the effectiveness of the Forbearance Agreement, BlockFi Inc., BlockFi Lending, and BlockFi International entered into a pledge agreement with Emergent Fidelity Technologies Limited ("Emergent") as of November 9, 2022 (the "Emergent Pledge Agreement").  A true and correct copy of the Pledge Agreement is attached hereto as **Exhibit A-6**.

13.     On November 9, 2022, Samuel Bankman-Fried emailed Zac Prince and Flori Marquez, giving Caroline Ellison authority to sign the Emergent Pledge Agreement on Emergent's behalf. A true and correct copy of this email exchange is attached hereto as **Exhibit A-7**.

14.     On November 10, 2022, BlockFi Inc. filed a UCC-1 Financing Statement concerning the collateral Emergent pledged to BlockFi under the Emergent Pledge Agreement.  A

true and correct copy of the file stamped UCC-1 Financing Statement is attached hereto as **Exhibit A-8**.

15.    On November 10, 2022, BlockFi Lending and BlockFi International sent a letter (the "Notice Letter") to Emergent notifying it that the forbearance period under the Forbearance Agreement had ended due to an event of default, including Alameda's failure to timely make a required payment in accordance with the payment schedule set forth in the Forbearance Agreement and that all obligations were immediately due and payable by Emergent.  A true and correct copy of the Notice Letter, without the attachment, is attached hereto as **Exhibit A-9**.

16.    As of November 28, 2022, the amount due and owing to BlockFi International under the International Loan Agreement was approximately $540 million.

17.    As of November 28, 2022, the amount due and owing to BlockFi Lending under the US Loan Agreement was approximately $120 million.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. Section 1746, I hereby declare under the penalty of perjury that the foregoing is true and correct.

Executed on February 16 , 2023        By: _____

Mark A. Renzi
CRO to BlockFi

# EXHIBIT A-1

*Strictly Private & Confidential*

# <u>MASTER DIGITAL CURRENCY LOAN AGREEMENT</u>

This Master Digital Currency Loan Agreement ("<u>Agreement</u>") is made on this July 15th, 2019 (the "<u>Effective Date</u>") by and between Alameda Research LTD, ("<u>Borrower</u>"), a company organized and existing under [Delaware law] and BlockFi Lending LLC ("<u>Lender</u>") a limited liability company organized and existing under Delaware law.

## <u>RECITALS</u>

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend certain Digital Currency (defined herein) to Borrower and Borrower will return such Digital Currency to Lender upon the termination of the Loan pursuant to the terms and conditions in this Agreement.

Now, therefore, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and Lender hereby agree as follows:

**I.**        <u>**Definitions.**</u>   <u>For purposes of this Agreement, the following terms shall have the respective meanings set forth in this Article I.</u>

 "***Applicable Law***" means (regardless of jurisdiction) any applicable (i) federal, national, state and local laws, ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, decrees, injunctions, or judgments and any applicable (ii) ruling, declaration, regulation, requirement, or interpretation issued by any regulatory, judicial, administrative or governmental body or person;

"***Authorized Agent***" has the meaning set forth in Exhibit A.

"***Borrow Fee***" means the fee that is proposed by Borrower when making a Lending Request and accepted by Lender in connection with making the Loan; such Fee shall be paid by Borrower to the Lender for the Loan.

"***Borrower***" has the meaning set forth in the first paragraph of this Agreement.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which Lender is closed for business. For purposes of this Agreement and the transactions contemplated hereunder, Lender follows the New York Stock Exchange calendar of holidays.

"***Callable Option***" means the Borrower and Lender each have the option to redeliver or recall an Open Deal Loan at any time during the term of the Loan.

"***Confirmation Protocol***" means the requirement that the Transfer of a Digital Currency, may not be deemed settled and completed until (i) the transaction has been recorded in a block and five (5) consecutive subsequent blocks referring back to such block (meaning six (6) blocks in total) have

*Strictly Private & Confidential*

been added to the applicable blockchain; or (ii) the transaction has met a different protocol for a specific Digital Currency agreed to by the parties in writing and added hereto as **Exhibit C.**

"*Default Fee*" has the meaning set forth in Section III(b).

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), any New Currency and any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of 26-34 alphanumeric characters that represents a possible destination for a Transfer of Digital Currency.

"*Dollars*" and "*$*" mean lawful money of the United States of America.

"*Excluded Taxes*" means, with respect to the Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower under this Agreement, Taxes imposed on or measured by its overall net income, overall gross income or overall gross receipts (however denominated), and franchise taxes imposed on it (in lieu of net income taxes) or capital taxes, by the applicable jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized, in which it is resident for tax purposes or in which its principal office is located.

"**Fees**" mean the Borrow Fee and the Default Fee.

"*Fork*" means a permanent divergence in the relevant Digital Currency blockchain, that for example commonly occurs when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules.

"*Governmental Authority*" means the government of any nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Hard Fork*" has the meaning set forth in Section V.

"*Indemnified Taxes*" means Taxes other than Excluded Taxes.

"*Lender*" means BlockFi Lending LLC.

"*Liquidity Exchange*" means Coinbase in the first instance but if for any reason Coinbase is not available online (whether due to technical maintenance or otherwise), it shall then mean Gemini.

"*Loan*" means a loan of Digital Currency made pursuant to and subject to this Agreement.

"*Loan Documents*" shall collectively mean this Agreement, all Lending Requests that are accepted by the Lender, and all exhibits and schedules hereto.

"*Maturity Date*" means, with respect to a Loan, the specified maturity date with respect to such

*Strictly Private & Confidential*

Loan upon which such Loan will terminate, unless such Loan is (i) terminated prior to such maturity date pursuant to Section (II)(d) or (ii) as may be extended as agreed to by the parties.  In the case of an Open Deal Loan that is automatically renewed for a successive one-year term, the next anniversary of the Maturity Date shall be deemed to be the Maturity Date.

"*New Currency*" has the meaning set forth in Section V.

"*Open Deal*" means a Loan where Borrower may redeliver the Digital Currency and Lender may recall the Digital Currency at any time, subject to terms of this Agreement.  Unless otherwise agreed to in writing by the parties, each Open Deal Loan will automatically be renewed for successive one-year terms upon each anniversary of the Maturity Date, unless either party provides written notice to terminate such Open Deal Loan no less than ten (10) days prior to the end of the current one-year term.

"*Other Taxes*" means all present or future stamp, registration, documentation or other excise or property taxes, or similar taxes, charges or levies imposed by any Governmental Authority, including any interest, additions thereto or penalties applicable thereto

"**Stablecoin**" means any cryptocurrency pegged to the US Dollar, including, but not limited to the Gemini Dollar (GUSD), USD Coin (USDC) and Paxos Standard (PAX).

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to Tax or penalties applicable thereto.

"*Term*" shall have the meaning set forth in Section XX.

"*Term Deal*" means a Loan where only Borrower has the right to redeliver the Digital Currency prior to the Maturity Date subject to this Agreement (except in the case of a termination of such Loan pursuant to Section XX).

"*Transfer*" shall mean, as applicable, the delivery of Digital Currency by Lender or the redelivery of Digital Currency by Borrower hereunder and the crediting of such Digital Currency to the recipient's account in accordance with this Agreement.

"*Value*" means, with respect to any Collateral consisting of Dollars, the actual Dollar amount thereof, and with respect to any borrowed Digital Currency or any Collateral consisting of Stablecoins, the value of such Digital Currency or Stablecoin, as applicable, as determined by Lender in good faith and reasonable discretion by reference to recognized pricing sources for the relevant borrowed Digital Currency or Stablecoin, as applicable (provided that, for purposes of Section IV, the Value of Digital Currencies or Collateral consisting of Stablecoin will be determined based on the Spot Rate).

## II.   <u>**General Operation.**</u>

(a)   <u>Loans of Digital Currency</u>

DocuSign Envelope ID: 9A210870-83A5-2537-A9E9-8021FBC2726BB

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request for the Lender to Loan to Borrower a specified amount of Digital Currency, and Lender may, in its sole and absolute discretion, extend, or decline to extend, such Loan.

(b)   Loan Procedure

During the Term of this Agreement, on a Business Day (the "Request Day") an Authorized Agent may by email directed to ███████████████ request from Lender a Loan of a specific amount of Digital Currency (a "Lending Request"); provided that, if such Lending Request is received by Lender at or after 1:00 pm New York time on a Business Day, then the next Business Day will be deemed to be the Request Day. Lender shall by email directed to [*insert Borrower's email*] inform Borrower whether Lender agrees to make such a Loan. An email is deemed to be received immediately after the time sent (as recorded on the device or system from which the sender sent the email), unless the sender receives an automated message that the email has not been delivered. Once made, Lending Requests may not be withdrawn by Borrower and a Lending Request shall be deemed rejected unless accepted by Lender as set forth above on or before 5:00 pm New York time on the Request Day.

Unless the parties otherwise agree, each Lending Request submitted by Borrower shall provide the following information:

(i)      The type of Digital Currency requested;
(ii)     the amount of Digital Currency requested;
(iii)    whether the Loan is a Term Deal or an Open Deal;
(iv)    the proposed Borrow Fee for such Loan;
(v)     the Maturity Date; and
(vi)    the Collateral Requirements, if applicable

If Lender agrees to make a Loan on the terms set forth in the Lending Request or as otherwise agreed in writing between Borrower and Lender, Lender shall commence transmission to the Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request or otherwise agreed with Borrower (the "Borrowed Amount") on or before 5:00 pm New York Time on the Request Day.

Specifics of each Loan shall be memorialized using the form of Loan Term Sheet attached  hereto as **Exhibit B**, or such other form of written confirmation agreed to by and between Borrower and Lender (which may include email confirmation), which will supplement, form a part of and be subject to the terms of this Agreement, and constitute a binding agreement between Borrower and Lender, with respect to the related Loan.

(c)   Callable Option (for Open Deal Loans)

DocuSign Envelope ID: 9A210879-83A5-2597-A9F9-821FFE2726BB

*Strictly Private & Confidential*

Applicable solely to Open Deal Loans, Lender may at any time (the "<u>Recall Request Time</u>") from 9:00 am until 5:00 pm New York time on a Business Day exercise the Callable Option and recall all or any portion of a Digital Currency loaned to Borrower (the "<u>Recall Amount</u>"). Borrower will then have two (2) Business Days from the Recall Request Time (the "<u>Recall Delivery Time</u>") to deliver the Recall Amount.

Borrower, in its sole and absolute discretion, may also at any time from 9:00 am until 5:00 pm New York time on a Business Day (the "<u>Redelivery Day</u>") exercise the Callable Option and deliver all or any portion of any Digital Currency loaned to Borrower.  Upon receipt of such return of Digital Currency, Lender will promptly notify Borrower of any applicable Borrow Fee pursuant to the terms of the Lending Request on such returned amount accrued (but not yet paid) through such Redelivery Day, and Borrower shall have up to five (5) Business Days to pay such accrued Borrow Fee after the Redelivery Day (which due date will be deemed to be an "Invoice Due Date" for purposes of Section (III)(c)).

(d)    <u>Termination of a Loan</u>

Loans will terminate:

(i)    If a Term Deal, upon redelivery by Borrower of the Digital Currency at the Maturity Date or sooner;

(ii)    If an Open Deal, upon redelivery by Borrower of the Digital Currency once the Borrower or Lender exercises the Callable Option; or

(iii)    At the end of the Term as set forth in Section XX.

(e)    <u>Redelivery of Borrowed Digital Currency</u>

In connection with any termination of a Loan pursuant to the terms of this Agreement, Borrower shall effect redelivery of the relevant amount of borrowed Digital Currency on or before 5:00 pm New York time of the applicable Business Day (<u>i.e.</u>, the Maturity Date, the Business Day on which the Recall Delivery Time falls, the Redelivery Day, or such other date of termination pursuant to Section XX).

(f)    <u>Acts by Governmental Authorities and Changes in Applicable Laws</u>.

If because of enforcement actions by Governmental Authorities of competent jurisdiction or changes in Applicable Laws (collectively, "Government Restrictions"), a party's ability to transfer or own a Digital Currency that has been the subject of a Loan or Loans is eliminated, materially impaired or declared illegal:

*Strictly Private & Confidential*

(1) if legally permissible and/or possible under the Government Restrictions, including, without limitation, during any notice or grace period, Borrower shall repay to the Lender any outstanding balance of such Digital Currency and any accrued but unpaid Fees, such repayment to be made in the applicable Digital Currency;

(2) if return is not legally permissible and/or possible under the Government Restrictions, Borrower shall repay to the extent legally permissible to Lender an amount in Dollars equal to the greater of (i) the volume-weighted average price on the Liquidity Exchanges (measured at 4 p.m. New York time) of the borrowed Digital Currency during the 30 Business Day period prior to the effective date of the Government Restrictions, and (ii) the volume-weighted average price on the Liquidity Exchanges (measured at 4 p.m. New York time) of the borrowed Digital Currency during the 30 Business Day period commencing with the relevant day when the parties first entered into the applicable Loan.

## III.   **Borrow Fees and Transaction Fees.**

(a) Borrow Fee Calculation

When a Loan is executed, the Borrower will be responsible to pay the Borrow Fee as agreed to in the relevant Loan Term Sheet, and the Borrow Fee shall be annualized but calculated daily and is subject to change only if agreed to in writing (email sufficient) by Borrower and Lender. The Borrow Fee shall be payable, unless otherwise agreed in writing (email sufficient) by the Borrower and Lender, in the applicable Digital Currency.

Lender shall calculate any Borrow Fees owed on a daily basis and promptly provide Borrower with the calculation upon request.

(b) Default Fee

For each Business Day in excess of the third (3rd) Business Day following (i) the Maturity Date, (ii) the Recall Delivery Time or (iii) any date on which Lender terminates this Agreement pursuant to Section XX (whichever is applicable) as of which Borrower has not returned any Digital Currency by the relevant due date, or for each day during any period in which any Event of Default has occurred and is continuing with respect to Borrower, Borrower shall incur an additional fee (the "Default Fee") that is equal to the sum of (a) the greatest of (i) $2000 per day, (ii) an amount equal to 1% of the notional amount of the Loan per day, in each case, accruing daily until Borrower cures such failure to return Digital Currency or such other applicable Event of Default, however not higher than the highest rate of interest permitted to be charged under Applicable Law, and (b) any losses, costs, expenses or other damages reasonably incurred by Lender  (but for the avoidance of doubt, excluding consequential damages) as a result of such late payment or Event of Default, (including, in case of a failure by Borrower to return Digital Currency by the relevant due date, any

DocuSign Envelope ID: 9A210879-83A5-2537-4919-821FBE2720B5

*Strictly Private & Confidential*

relevant and reasonable borrowing costs or hedging costs (including any reasonable break costs, amounts required to be posted as collateral or borrowing costs incurred in order to borrow required collateral amounts in connection with such hedging arrangements) that are incurred by Lender in order to (x) borrow such Digital Currency, or (y) synthetically borrow, by purchasing and simultaneously entering into hedging arrangements to minimize its exposure to the purchased position in such Digital Currency, in each case in (x) and (y), in an amount up to the amount of the relevant insufficiency in such Digital Currency), which shall be reasonably calculated by Lender and payable by Borrower in addition to the Borrow Fee.

(c)   <u>Payment of Borrow Fees and Default Fees</u>

An invoice for Borrow Fees and any Default Fees (the "<u>Invoice Amount</u>") shall be sent out on the first (1st) Business Day of the month and shall include any Borrow Fees incurred from the previous month. Borrower shall have up to three (3) Business Days after such invoice is sent to submit payment for the invoice (the "<u>Invoice Due Date</u>"). Fees unpaid by the Invoice Due Date shall also become subject to the Default Fee commencing the day after the Invoice Due Date.

(d)   <u>Application of Payments</u>

Borrower shall, at the time of making each payment under this Agreement, specify to the Lender the Loan to which such payment is to be applied. In the event that the Borrower fails to so specify, or if an Event of Default has occurred and is continuing, the Lender may apply the payment in such manner as it may determine to be appropriate in its sole, reasonable discretion.

(e)   <u>Application of Insufficient Payments</u>

If at any time insufficient amounts are received by the Lender to pay fully all amounts of principal, applicable Fees, and other amounts then due and payable hereunder, the Lender may apply such Digital Currency payment received as it may determine to be appropriate in its sole reasonable discretion. Lender may, in its reasonable discretion and if there is more than one outstanding Loan between the parties, apply payments by Borrower in one Digital Currency towards the satisfaction of obligations outstanding with respect to a Loan in another Digital Currency, provided that Lender will make any conversions between such Digital Currencies based upon the applicable market rate at the Liquidity Exchanges.

(f)   <u>Non-Business Days</u>

If the due date of any payment or delivery or the Maturity Date of any Loan under this Agreement would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day and, in the case of any payment accruing Fees such Fees shall be payable for the period of such extension.

*Strictly Private & Confidential*

(g)  <u>Computations</u>

Fees shall be computed on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which payable.   For purposes of calculating Fees, Digital Currencies shall be deemed to have been Transferred by one party to the other when the applicable Confirmation Protocol for the relevant Digital Currency has been completed.  If the requirements of the Confirmation Protocol are not met by 5pm New York Time, the Transfer shall be deemed to have been made on the following Business Day.  Calculation of Fees shall be based on the date when the relevant Transfer is deemed to have occurred.

(h)  Taxes

(1) Payments Free of Taxes.  Any and all payments by or on account of any obligation of Borrower hereunder shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided that if Borrower shall be required by Applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions for Indemnified Taxes or Other Taxes (including deductions for Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section) the Lender shall receive an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(2) Payment of Other Taxes by Borrower. Without limiting the provisions of Section (1) above, Borrower shall timely pay any Other Taxes that arise from any payment made by it under, or otherwise with respect to, this Agreement to the relevant Governmental Authority if required and in accordance with Applicable Law.

(3) Indemnification by Borrower. Borrower shall indemnify the Lender for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section **Error! Reference source not found.**III(h)(3)) attributable to Borrower under this Agreement and paid by the Lender, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority against Lender. A certificate delivered to Borrower by Lender as to the amount of such payment or liability actually paid by Lender to the relevant Governmental Authority shall be conclusive and binding absent manifest error.

(4) Tax Reporting.  Borrower shall report, if and/or as required under Applicable Law, to the Internal Revenue Service ("IRS") all Fees paid to Lender under this Agreement and shall provide Lender Form 1099-INT annually documenting the amount reported to the IRS.

*Strictly Private & Confidential*

## IV.    Collateral Requirements

### (a) Collateral

Borrower shall provide and maintain cash collateral (the "Collateral", including any Additional Collateral and excluding any Returned Collateral as defined below) in accordance with the terms of this Section IV and any other such terms as agreed upon by the Borrower and Lender and memorialized using the Loan Term Sheet attached as Exhibit B.  Initially, the amount of Collateral required will be greater than or equal to the product of (i) Initial Margin Percentage as agreed upon in the Loan Term Sheet and (ii) the Value of the borrowed Digital Currency. Collateral shall be valued in Dollars. For the avoidance of doubt, upon the return of the borrowed Digital Currency at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited. Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Stablecoins in lieu of Dollars.

The Collateral transferred by Borrower to Lender shall be security for Borrower's obligations in respect of the Loans and for any other obligations of Borrower to Lender under this Agreement. Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the borrowed Digital Currencies by Lender to Borrower and which shall cease upon the transfer of the borrowed Digital Currencies by Borrower to Lender.  In addition to the rights and remedies given to Lender hereunder, Lender shall have all the rights and remedies of a secured party under the UCC. Lender shall be free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use the Collateral.

### (b) Margin Calls

If, at any time, the sum of the products of (i) Margin Requirement Percentage as agreed upon in the Loan Term Sheet, and (ii)  Value of the borrowed Digital Currency for each Loan exceeds the Value of the Collateral, Lender shall have the right to require Borrower to contribute additional collateral ("Additional Collateral") so that the Value of the Collateral (including the Additional Collateral) is equal to or greater than the sum of the products of (i) Initial Margin Percentage, and (ii)  Value of the borrowed Digital Currency for each Loan.

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "First Notification") to the Borrower at the email address indicated in Section XIII that sets forth the amount of Additional Collateral required. Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to deliver Additional Collateral to Lender in accordance with subsection (c) below; provided that, if at any time, the Value of the Collateral is at least equal to the sum of the products of (i) Initial Margin Percentage, and (ii) Value of the borrowed Digital Currency for each Loan, Lender will promptly notify Borrower, and no Additional Collateral shall be required from Borrower.

If Borrower fails to deliver the relevant amount of Additional Collateral to Lender within twenty (20) hours after Lender sends a First Notification, Lender shall send a second email notification (the

DocuSign Envelope ID: 9A210879-83A5-2597-A9E9-821FBE2726DB

*Strictly Private & Confidential*

"Second Notification") requesting Additional Collateral (provided that the required amount of Additional Collateral in the Second Notification will be determined based upon the Value of the Digital Currencies as of the time such Second Notification is sent). Borrower shall have four (4) hours from the time Lender sends the Second Notification to deliver Additional Collateral to Lender in accordance with subsection (c) below. Failure by Borrower to timely deliver the relevant amount of Additional Collateral by the time specified in the Second Notification shall be an Event of Default.

(c) Delivery of Additional Collateral

Borrower's obligation to deliver Additional Collateral to Lender shall be satisfied (i) in the case of Dollars, by bank wire to the account specified in the Loan Term Sheet, (ii) by an amount of Stablecoins transferred to the wallet address specified in the Loan Term Sheet, or (iii) by delivery of return amounts of borrowed Digital Currencies to Lender sufficient to cause the Value of the Collateral to be equal to or greater than the sum of the products of (i) Initial Margin Percentage, and (ii) Value of the borrowed Digital Currency for each Loan.

(d) Return of Collateral

If, as of any Business Day, the sum of the products of (i) Release Margin Percentage as agreed upon in the Loan Term Sheet, and (ii) Value of the borrowed Digital Currency for each Loan exceeds the Value of the Collateral, Borrower shall have the right, in its sole and absolute discretion, to require that Lender return an amount of Collateral, so that the Value of the Collateral is at least equal to the sum of the products of (i) Release Margin Percentage as agreed upon in the Loan Term Sheet, and (ii) Value of the borrowed Digital Currency for each Loan (such excess amount, the "Returned Collateral").

If Borrower requires Lender to repay Returned Collateral, it shall send an email notification (the "Return Notification") to the Lender at the email address indicated in Section XIII that sets forth the amount of Returned Collateral. Lender shall return the Returned Collateral to Borrower in accordance with subsection (e) below by 6:00 p.m. New York time on the Business Day on which the Return Notification is received, if received by Lender prior to 10:00 a.m. New York time on a Business Day, or otherwise by 6:00 p.m. New York time on the next Business Day.

(e) Delivery of Returned Collateral

Delivery of the Returned Collateral shall be made by bank wire to the account or a digital wallet address, in both instances specified in the Return Notification by the Borrower, as applicable.

(f) Default or Failure to Return Loan

In the event that Borrower fails to return borrowed Digital Currencies under a Loan upon Termination or upon the occurrence of an Event of Default, Lender may transfer that portion of the Collateral to Lender's operating account necessary for the payment of any reasonable liability or obligation or indebtedness created by this Agreement, including, but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency.

(g) Return of Collateral

*Strictly Private & Confidential*

Upon Borrower's redelivery of borrowed Digital Currencies under a Loan and acceptance by Lender of the Borrowed Digital Currencies into Lender's wallet address, with such delivery being confirmed on the relevant Digital Currency blockchain pursuant to the Confirmation Protocol, Lender shall return the relevant amount of Collateral to a bank account in the name of Borrower, or a digital wallet address specified by the Borrower, as applicable.

## V.    __Hard Fork__

(a)  <u>Notification</u>

In the event of a Hard Fork, Lender shall provide prompt email notification to Borrower of such event(s) to occur.

(b)  <u>No Immediate Termination of Loans Due to Hard Fork</u>

In the event of a Hard Fork, any outstanding Loans will not be immediately terminated.

(c)  <u>Redelivery of Borrowed Digital Currency</u>

On the Maturity Date or other date of termination of a Loan pursuant to this Agreement, notwithstanding anything to the contrary in the Agreement, Lender will receive any incremental cryptocurrencies generated as a result of any Hard Forks in the Digital Currency protocol during the term of such Loan that result in a new cryptocurrency (each, a "New Currency") being created, provided that the amount of such New Currency will be the appropriate amount of each such New Currency to which a holder of the Amount of Digital Currency (as agreed in the Loan Term Sheet) would be entitled in connection with such Hard Forks.  The determination of whether a Hard Fork has occurred will be made by the Lender in accordance with the CME CF Cryptocurrency Indices Hard Fork Policy (Version 1) as published by the CME Group in December 2017.

## VI.    __Representations and Warranties.__

(a)  Each party represents that on the date hereof and on the date of each Loan Request to be made by the Borrower hereunder that this Agreement has been duly and validly authorized, executed and delivered on behalf of each party and constitutes the legal, valid and binding obligations of each party enforceable against the party in accordance with its terms  and will not contravene (a) the constitutive documents of each party, (b) any Applicable Law, and (c) any judgment, award, injunction or similar legal restriction.

(b)  Each party represents that no license, consent, authorization or approval or other action by,

or notice to or filing or registration with, any Governmental Authority (including any foreign exchange approval), and no other third-party consent or approval, is necessary for the due execution, delivery and performance by such party of this Agreement or for the legality, validity or enforceability thereof against such party.

(c) Each party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received or to be received hereunder.

(d) Lender represents and warrants that it has, or will have at the time of transfer of any Digital Currency to Borrower, the full and unrestricted legal right to lend such Digital Currency subject to the terms and conditions hereof, that it is the sole and exclusive lawful owner of the Digital Currency, free and clear of all, encumbrances, claims (pending or threatened), pledges, legal actions (pending or threatened), charges or other limitations or restrictions whatsoever and that the Digital Currency has been acquired in accordance with all Applicable Laws.

(e) Borrower represents and warrants that it has, or will have at the time of return of any Digital Currency, the right to transfer such Digital Currency subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement and that the Digital Currency that it will return has been acquired in accordance with all Applicable Laws.

(f) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest therein and the right to transfer such Collateral subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement, and that the Collateral that it will transfer has been acquired in accordance with all Applicable Laws.

## VII.   **Default**

It is further understood that the following defaults shall constitute events of default hereunder and are hereinafter referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to (i) return any Borrowed Amount (including any Recall Amount), (ii) pay any Fees, (iii) transfer any required amount of Collateral or Additional Collateral by the time required under Section (IV), or (iv) make any payment or reimbursement specified in Section (V)(c) in the event of a Hard Fork or Applicable Airdrop, in each such case when due and/or required to do so by the time required under this Agreement and such failure by Borrower continues for a period of three (3) Business Days following written notice of such failure from Lender;

DocuSign Envelope ID: 9A210879-83A5-4597-A9F9-021FBE2726B5

*Strictly Private & Confidential*

(b)   the failure of Borrower to perform or observe any term, condition, covenant, provision, or agreement contained in any of the Loan Documents;

(c)   any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against the Borrower, and (solely in the case of proceedings instituted against the Borrower) shall not be dismissed within thirty (30) days or the applicable statutory time limit of their initiation;

(d)   any representation or warranty made by Borrower in any of the Loan Documents proves to be untrue in any material respect as of the date of making or deemed making thereof; or

(e)   Borrower notifies Lender of its inability to or its intention not to perform any of its obligations hereunder or otherwise disaffirms, rejects or repudiates any of its obligations hereunder.

## VIII.   <u>Remedies</u>

Upon the occurrence and during the continuation of any Event of Default, the Lender may, at its option (subject to the terms and conditions of this Agreement), (a) declare all Borrowed Amounts outstanding hereunder immediately due and payable, (b) terminate this Agreement and any other agreement or transaction between Borrower and Lender upon written notice to Borrower, and (c) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity; provided, that upon any Event of Default pursuant to Section VII all Borrowed Amounts and the amount of any Fees then outstanding hereunder shall automatically become and be immediately due and payable. Lender shall also have the right, at any time on or after Borrower fails to make sufficient payments to pay fully all Borrowed Amounts, Fees and other amounts then due and payable hereunder, or on or after the occurrence of an Event of Default, to purchase the relevant Digital Currency in the amount of any such insufficiency in a commercially reasonable manner, or foreclose on, liquidate, sell or collect on the Collateral that Lender or any affiliate may then hold, and apply the proceeds to satisfy any and all obligations of Borrower to Lender or any affiliate, whether arising under a different Loan, or net, set off and/or recoup any and all obligations of Lender or any affiliate of Lender to Borrower, against either the purchase price of such replacement Digital Currency or any such obligations of Borrower to Lender or any affiliate of Lender.  In connection with the exercise of such remedies, Lender and its affiliates are hereby authorized to apply or transfer any Collateral of Borrower interchangeably between Lender and its affiliates solely to satisfy any obligations of Borrower to Lender or its affiliates at any time with prior notice (email sufficient) to Borrower.

*Strictly Private & Confidential*

### IX. **Rights and Remedies Cumulative.**

No delay or omission by either party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each party stated herein are cumulative and in addition to all other rights provided by law, in equity.

### X. **Collection Costs.**

In the event Borrower fails to pay any amounts due or to return any Digital Currency hereunder, the Borrower shall pay to the Lender upon demand all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs incurred by the Lender in connection with the enforcement of its rights hereunder.

### XI. **Passwords and Security.**

Each party is responsible for maintaining adequate security and control of any and all passwords, private keys, and any other codes that it uses to Transfer or receive Digital Currencies hereunder. Each party will be solely responsible for the private keys that it uses to make the Transfers and maintaining secure back-ups. Each party will promptly notify the others of any security breach of its accounts, systems or networks as soon as possible. Each party will reasonably cooperate with the other party in the investigation of any suspected unauthorized Transfers or attempted Transfers using a party's account credentials or private keys, and any security breach of a party's accounts, systems, or networks, and provide the other party with the results of any third-party forensic investigation that it may undertake. Each party will be responsible for any unauthorized Transfers made utilizing its passwords, private keys, and any other codes it uses to make or receive Transfers.

### XII. **Governing Law; Dispute Resolution; Waiver of Consequential Damages.**

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of Delaware applicable to contracts made and to be performed wholly within such State, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which

it may be entitled.

Borrower shall indemnify and hold harmless Lender, its affiliates, and each such party's officers, directors, employees, representatives, and agents from and against any and all claims, demands, losses, expenses, obligations, damages, penalties, actions and liabilities of any and every nature (including attorneys' fees of an attorney of Lender's choosing to defend against any such claims, demands, losses, expenses and liabilities) that Lender may sustain or incur or that may be asserted against Lender arising out of Lender's lending of Digital Currency to Borrower under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Lender's bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement. This indemnity shall be a continuing obligation of Borrower, its successors and assigns, notwithstanding the termination of this Agreement.

## XIII.  **Notices.**

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

Lender:
>        BlockFi Lending LLC
>        ███████████████████████
>        Attn: ███████████
>        Email: ███████████████

Borrower:
>        Alameda Research LTD
>        Attn: ███████████████
>        Email: ███████████████████

Either party may change its address by giving the other party written notice of its new address as herein provided.

## XIV.  **Modifications.**

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XV. <u>Entire Agreement.</u>

This Agreement and each exhibit referenced herein constitutes the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.

### XVI. <u>Successors and Assigns.</u>

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that neither party may assign this Agreement or any rights or duties hereunder without the prior written consent of the other party.

### XVII. <u>Severability of Provisions.</u>

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

### XVIII. <u>Counterpart Execution.</u>

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

### XIX. <u>Relationship of Parties.</u>

Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XX.    __Term and Termination.__

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either party provides written notice (email sufficient) of a desire to terminate the contract no less than ten (10) days prior to the end of such one- year period. The foregoing notwithstanding, this Agreement may be terminated (i) as set forth in Section VII or (ii) upon 30 days' written notice (email sufficient) by either party to the other.  Notwithstanding the foregoing, if there are any Loans outstanding at the time either party sends a notice of termination pursuant to this Section XX, such termination of this Agreement will not be effective until all Loans are terminated on the relevant Maturity Date or pursuant to Section (II)(d).

## XXI.    Reserved.

## XXII.    __Miscellaneous.__

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement is the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

*Strictly Private & Confidential*

LENDER:

BLOCKFI LENDING LLC

By: _____
Name: Zac Prince
Title:   CEO

BORROWER:

Alameda Research LTD

By _____
Name: Sam Bankman-Fried
Title:   CEO

DocuSign Envelope ID: 9A210879-83A5-2527-A9F9-021FBE2726A3

*Strictly Private & Confidential*

## EXHIBIT A

Authorized Agents. The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section III hereof:

Name: Sam Bankman-Fried
Email ███████████████

Borrower may change its Authorized Agents by notice given to Lender as provided in Section XIII.

*Strictly Private & Confidential*

## EXHIBIT B LOAN TERM SHEET

The following loan agreement dated [*insert date*] incorporates all of the terms of the Master Digital Currency Loan Agreement entered into by Alameda Research LTD ("Borrower") and BlockFi Lending LLC ("Lender") on July 15th, 2019 and the following specific terms:

Borrower:   ALAMEDA RESEARCH LTD

Lender:   BLOCKFI LENDING LLC

Digital Currency   _____

Amount of Digital Currency:   _____

Borrow Fee:   _____

Loan Type:   Open Ended

Loan Term:   _____

Initial Margin Percentage   ___%

Margin Requirement Percentage   ___%

Release Margin Percentage   ___%

Allowable Stablecoin Collateral   [GUSD][USDC][PAX]

Digital Currency Payment to Lender:   [insert Lender's Digital Currency Address]

Dollar Payment to Lender:   [insert Lender's Bank Details and stable coin blockchain address]

ALAMEDA RESEARCH LTD                    BLOCKFI LENDING LLC

By:_____                    By: _____
Name: Sam Bankman-Fried                    Name: Kenneth DePre
Title: CEO                                          Title: Director of Operations

# EXHIBIT A-2

*Strictly Private & Confidential*
*BlockFi Draft __/__/20*

# MASTER LOAN AGREEMENT

Dated as of: <u>August 14th, 2020</u>

Between: <u>BlockFi International LLC, a limited liability company organized and existing under the law of the Cayman Islands ("*BlockFi*")</u>

and: <u>Alameda Research Ltd, a limited company organized and existing under the law of the British Virgin Islands ("*Alameda*", and BlockFi and Alameda, each a "*party*" and together, the "*parties*").</u>

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Master Loan Agreement (this "Agreement"), Borrower (defined herein) may, from time to time, seek to initiate a transaction pursuant to which Lender (defined herein) will lend certain Digital Currency, Dollars or Alternative Currency (each as defined herein) to Borrower and Borrower will return such Digital Currency, Dollars or Alternative Currency to Lender upon the termination of the Loan pursuant to the terms and conditions in this Agreement or as otherwise set forth herein.

Now, therefore, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and Lender hereby agree as follows:

**I.**        **Definitions.**   For purposes of this Agreement, the following terms shall have the respective meanings set forth in this Article I.

"*Additional Collateral*" has the meaning set forth in Section IV(b).

"*Affected Digital Currency*" has the meaning set forth in Section II(f).

"*Alternative Currency*" means (each other currency (other than Dollars) as may be agreed in writing between Borrower and Lender.

"*Applicable Law*" means (regardless of jurisdiction) any applicable (i) federal, national, state and local laws (including common law), ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, decrees, injunctions, or judgments and any applicable (ii) ruling, declaration, regulation, requirement, or interpretation issued by any regulatory, judicial, administrative or governmental body or person that, in either case, are applicable to or binding on any person or entity or any of its property or assets or to which such entity or person or any of its property or assets is subject;

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrow Rate*" has the meaning set forth in the Loan Term Sheet.

"*Borrowed Amount*" has the meaning set forth in Section II(b).

"*Borrower*" has the meaning set forth in the Loan Term Sheet.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which Lender is

closed for business. For purposes of this Agreement and the transactions contemplated hereunder, Lender follows the New York Stock Exchange calendar of holidays.

"*Callable Option*" means the option of Lender to recall a portion or the entirety of the Borrowed Amounts during the term of the Loan, subject to the terms of this Agreement.

"*Collateral*" has the definition assigned to such term in Section IV(a).

"*Collateral Requirements*" means the requirements to post Collateral pursuant to Section IV.

"*Confirmation Protocol*" means the requirement that the Transfer of a Digital Currency, may not be deemed settled and completed until (i) the transaction has been recorded in a block and five (5) consecutive subsequent blocks referring back to such block (meaning, for the avoidance of doubt, six (6) blocks in total) have been added to the applicable blockchain; or (ii) the transaction has met a different protocol for a specific Digital Currency agreed to by the parties in writing.

"*Default Rate*" has the meaning set forth in Section III(b).

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), any New Currency and any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of 26-34 alphanumeric characters (or such other market-standard identifier) that represents a possible destination for a Transfer of Digital Currency.

"*Dollars*" and "*$*" mean lawful currency of the United States of America.

"*Effective Date*" has the meaning set forth in Section VIII.

"*Excluded Taxes*" means, with respect to the Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower under this Agreement, Taxes imposed on or measured by its overall net income, overall gross income or overall gross receipts (however denominated), and franchise taxes imposed on it (in lieu of net income taxes) or capital taxes, by the applicable jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized, in which it is resident for tax purposes or in which its principal office is located.

"*Governmental Authority*" means the government of any nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Government Restrictions*" has the meaning set forth in Section II(f).

"*Hard Fork*" means a permanent divergence in the relevant Digital Currency blockchain, that for example commonly occurs when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules or an airdrop or any other events which results in the creation of a new token.

*Strictly Private & Confidential*

"*Indemnified Taxes*" means Taxes other than Excluded Taxes.

"*Initial Margin Level*" has the meaning set forth in Section IV(a).

"*Interest Rate*" has the meaning set forth in the Loan Term Sheet.

"*Lender*" has the meaning set forth in the Loan Term Sheet.

"*Lending Request*" has the meaning set forth in Section II(b).

"*Liquidity Exchange*" means Coinbase, but if for any reason Coinbase is not readily available (whether due to technical maintenance or otherwise), "Liquidity Exchange" shall mean Gemini or any other exchange as may be mutually agreed in writing between Borrower and Lender.

"*Loan*" means a loan of Digital Currency, Dollars or an Alternative Currency made pursuant to and subject to this Agreement.

"*Loan Documents*" shall collectively mean this Agreement, all Loan Term Sheets, all exhibits and schedules hereto and thereto, and any other document jointly identified by the Lender and Borrower as a "Loan Document".

"*Loan Term Sheet*" has the meaning set forth in Section II(b).

"*Loaned Assets*" means any Digital Currency, Dollars or Alternative Currency Transferred from Lender to Borrower pursuant to a Loan Term Sheet and which have not been redelivered to Lender.

"*Margin Call Level*" has the meaning set forth in Section IV(b).

"*Margin Notification*" has the meaning set forth in Section IV(b).

"*Maturity Date*" means, with respect to a Loan, the pre-determined specified maturity date in the relevant Loan Term Sheet, if any, upon which such Loan will terminate and the Loan becomes due in full, unless such Loan is (i) terminated prior to such maturity date pursuant to Section II(d) or (ii) as may be extended as agreed to by the parties.

"*New Currency*" has the meaning set forth in Section V.

"*Other Taxes*" means all present or future stamp, registration, documentation or other excise or property taxes, or similar taxes, charges or levies imposed by any Governmental Authority, including any interest, additions thereto or penalties applicable thereto.

"*party*" and "*parties*" have the meaning set forth in the introductory paragraph of this Agreement.

"*Prepayment Option*" means the option of Borrower to redeliver the Digital Currency, Dollars or Alternative Currency, as applicable, subject to the terms of this Agreement.

"*Proceeds*" shall have the meaning assigned to such term in the UCC.

"***Stablecoin***" means any cryptocurrency pegged to the US Dollar, including, but not limited to the Gemini Dollar (GUSD), USD Coin (USDC) and Paxos Standard (PAX).

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to Tax or penalties applicable thereto.

"***Term***" shall have the meaning set forth in Section XXII.

"***Transaction Payments***" mean each of the Borrow Rate and the Default Rate.

"***Transfer***" shall mean, as applicable, the delivery of Digital Currency, Dollars or Alternative Currency by Lender or the redelivery of Digital Currency, Dollars or Alternative Currency by Borrower hereunder and the crediting of such Digital Currency, Dollars or Alternative Currency to the recipient's account in accordance with this Agreement.  With respect to USD or an Alternative Currency, it shall mean when such funds have been deposited in the applicable bank account.

"***UCC***" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"***Value***" means, with respect to any Collateral consisting of Dollars, the actual Dollar amount thereof, and with respect to any borrowed Digital Currency, Alternative Currency or any Collateral consisting of Stablecoins, the value of such Digital Currency, Alternative Currency or Stablecoin, as applicable, as determined by Lender in good faith and in its reasonable discretion by reference to recognized pricing sources for the relevant borrowed Digital Currency, Alternative Currency or Stablecoin, as applicable.

## II.    General Operation.

### (a) Loans of Digital Currency, Dollars or Alternative Currency

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request for the Lender to Loan to Borrower a specified amount of Digital Currency, Dollars or Alternative Currency, and Lender may, in its sole and absolute discretion, extend, or decline to extend, such Loan.

### (b) Loan Procedure

During the Term of this Agreement, on a Business Day (the "Request Day") an Authorized Agent may by email directed to the email address indicated in Section XV request from Lender a Loan of a specific amount of Digital Currency, Dollars or Alternative Currency in accordance with the terms of this Section II(b) (a "Lending Request"); provided that, if such Lending Request is received by Lender at or after 1:00 p.m. New York time on a Business Day, then the next Business Day will be deemed to be the Request Day. Lender shall by email at the email address indicated in Section XV inform Borrower whether Lender agrees to make such a Loan. An email is deemed to be received immediately after the time sent (as recorded on the device or system from which the sender sent the email), unless the sender receives an automated message that the email has

*Strictly Private & Confidential*

not been delivered. Once made, Lending Requests may not be amended or withdrawn by Borrower and a Lending Request shall be deemed rejected unless affirmatively accepted by Lender as set forth above on or before 5:00 p.m. New York time on the Request Day.

Unless the parties otherwise agree, each Lending Request submitted by Borrower shall provide the following information:

(i)     The type of Loan (either Digital Currency, Dollars or an Alternative Currency) requested, and, if Digital Currency or an Alternative Currency, specifying the Digital Currency or Alternative Currency, as applicable

(ii)    the amount of Digital Currency, Dollars or Alternative Currency requested;

(iii)   whether the Loan shall have a Callable Option and/or Prepayment Option;

(iv)    the proposed Borrow Rate for such Loan;

(v)     the Maturity Date; and

(vi)    the Collateral Requirements, if applicable.

If Lender agrees to make a Loan on the terms set forth in the Lending Request or as otherwise agreed in writing between Borrower and Lender, the Lender and Borrower shall execute a term sheet using the form of Loan Term Sheet attached hereto as Exhibit B (with respect to a particular Loan, such term sheet, the "Loan Term Sheet"). After execution of such Loan Term Sheet, the Lender shall commence transmission of the Borrower's Digital Currency Address or bank account, as applicable, the amount of Digital Currency, Dollars or Alternative Currency, respectively, set forth in the Loan Term Sheet (such Digital Currency, Dollars or Alternative Currency, the "Borrowed Amount") on or before 5:00 p.m. New York Time on the Request Day.

In the event of a conflict of terms between this Agreement and a Loan Term Sheet, the terms in the executed Loan Term Sheet shall govern.

Notwithstanding anything to the contrary in this Agreement, if Borrower and Lender agree in writing, with respect to any Borrowed Amount in Dollars, Borrower may satisfy any repayment or redelivery obligations via delivery of Stablecoins in lieu of Dollars.

(c) Callable Option/Prepayment Option

Applicable solely to Loans with a Callable Option, Lender may at any time (the "Recall Request Time") exercise the Callable Option and recall all or any portion of a Digital Currency loaned to Borrower (the "Recall Amount"). Borrower will then have twenty-four (24) hours from the Recall Request Time (the "Recall Delivery Time") to deliver the Recall Amount.

Applicable solely to Loans with a Prepayment Option, Borrower, in its sole and absolute discretion, may at any time from 9:00 a.m. until 5:00 p.m. New York time on a Business Day (the "Redelivery Day") exercise the Prepayment Option and deliver all or any portion of any Digital Currency, Dollars or Alternative Currency loaned to Borrower by Lender. Upon receipt of such return of Digital Currency, Lender will promptly notify Borrower of any applicable Borrow Rate pursuant to the terms of the Loan Term Sheet on such returned amount accrued (but not yet paid) through such Redelivery Day, and Borrower shall have up to five (5) Business Days to pay such accrued Borrow Rate after the Redelivery Day (which due date will be deemed to be an "Invoice Due Date" for purposes of Section (III)(c)).

(d) Termination of a Loan

A Loan will terminate upon the earlier of:

    (i)    With respect to a Loan with a Prepayment Option but no Callable Option, upon redelivery by Borrower of all Borrowed Amounts at the Maturity Date or on such earlier date such that no such Borrowed Amount remains undelivered;

    (ii)    With respect to a Loan with both a Prepayment Option and a Callable Option, upon redelivery by Borrower of all Borrowed Amounts once the Borrower or Lender exercises the Callable Option such that no such Borrowed Amount remains undelivered; or

    (iii)    At the end of the Term as set forth in Section XXII.

(e) <u>Redelivery of Borrowed Amounts</u>

In connection with any termination of a Loan pursuant to the terms of this Agreement, Borrower shall effect redelivery of the relevant amount of borrowed Digital Currency, Dollars or Alternative Currency at or before 5:00 p.m. New York time of the applicable Business Day (<u>i.e.</u>, the Maturity Date, the Business Day on which the Recall Delivery Time falls, the Redelivery Day, or such other date of termination pursuant to Section XXII).

(f) <u>Acts by Governmental Authorities and Changes in Applicable Laws</u>.

If because of enforcement actions by Governmental Authorities of competent jurisdiction or changes in Applicable Laws (collectively, "<u>Government Restrictions</u>"), a party's ability to transfer or own a certain Digital Currency that has been the subject of a Loan or Loans is eliminated, materially impaired or declared illegal (such Digital Currency, "<u>Affected Digital Currency</u>"):

    (1)    if legally permissible and/or possible under the Government Restrictions, including, without limitation, during any notice or grace period, Borrower shall repay to the Lender any outstanding balance of such Digital Currency and any accrued but unpaid Transaction Payments, such repayment to be made in the applicable Digital Currency; and

    (2)    if return is not legally permissible and/or possible under the Government Restrictions (as mutually agreed by Lender and Borrower), Borrower shall repay (to the extent not legally impermissible) to Lender an amount in Dollars equal to the greater of (i) the volume-weighted average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the Affected Digital Currency during the thirty (30) Business Day period prior to the effective date of the relevant Government Restrictions, and (ii) the volume-weighted average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the borrowed Digital Currency during the thirty (30) Business Day period commencing with the relevant day when the parties first entered into the applicable Loan.

**III.**    **<u>Borrow Rates and Transaction Payments.</u>**

(a) <u>Borrow Rate Calculation</u>

*Strictly Private & Confidential*

When a Loan is executed, the Borrower will be responsible to pay the Borrow Rate as agreed in the relevant Loan Term Sheet, and the Borrow Rate shall be annualized but calculated daily and is subject to change only if agreed to in writing (email sufficient) by Borrower and Lender. The Borrow Rate shall be payable, unless otherwise agreed in writing (email sufficient) by the Borrower and Lender, in the applicable Digital Currency, Dollars or Alternative Currency; provided that, if agreed by Borrower and Lender, Borrower may satisfy its obligation to pay Borrow Rate in Dollars via payment of Stablecoin.

Lender shall calculate any Borrow Rates owed on a daily basis and promptly provide Borrower with the calculation upon request.  Except as Borrower and Lender may otherwise agree, the Borrow Rate shall accrue from and include the date on which the relevant Digital Currency is Transferred to Borrower to the date on which such Digital Currency is redelivered to Lender.

(b) Default Rate

For each day following (i) the Maturity Date, (ii) the Recall Delivery Time or (iii) any date on which Lender terminates this Agreement pursuant to Section XXII (whichever is applicable) as of which Borrower has not returned any Digital Currency by the relevant due date, or for each day during any period in which any Event of Default has occurred and is continuing with respect to Borrower, Borrower shall incur an additional fee (the "Default Rate") that is equal to the sum of (I) the greater of (1) $2000 per day and (2) an amount equal to 1% of the sum of the unreturned Borrowed Amounts and accrued and unpaid Borrow Rate with respect to the applicable Loan per day, in each case, accruing daily until Borrower cures such failure to return Digital Currency, Dollars or Alternative Currency, as applicable, or such other applicable Event of Default, however not higher than the highest rate of interest permitted to be charged under Applicable Law, and (II) any losses, costs, expenses or other damages reasonably incurred by Lender  (but for the avoidance of doubt, excluding consequential damages) as a result of such late payment or Event of Default, (including, in case of a failure by Borrower to return Digital Currency, Dollars or Alternative Currency by the relevant due date, any relevant and reasonable borrowing costs or hedging costs (including any reasonable breakage costs, amounts required to be posted as collateral or borrowing costs incurred in order to borrow required collateral amounts in connection with such hedging arrangements) that are incurred by Lender in order to (x) borrow such Digital Currency, Dollars or Alternative Currency, or (y) synthetically borrow, by purchasing and simultaneously entering into hedging arrangements to minimize its exposure to the purchased position in such Digital Currency, Dollars or Alternative Currency, in each case in (x) and (y), in an amount up to the amount of the relevant insufficiency in such Digital Currency, Dollars or Alternative Currency), which shall be reasonably calculated by Lender and payable by Borrower in addition to the Borrow Rate.

(c) Payment of Borrow Rates and Default Rates

An invoice for Borrow Rates and any Default Rates (the "Invoice Amount") shall be sent out on the first (1st) Business Day of each month prior to the Maturity Date and shall include any Borrow Rates incurred from the previous month. Borrower shall remit payment in full satisfaction of such invoice within three (3) Business Days after such invoice is sent to Borrower (such due date, the "Invoice Due Date"); provided that, failure of Lender to send an invoice by the Invoice Due Date shall not relieve Borrower of its obligation to pay the Invoice Amount upon delivery of an invoice.  Transaction Payments unpaid by the Invoice Due Date shall also become subject to the Default Rate commencing the day after the Invoice Due Date.

### (d) Application of Payments

Borrower shall, at the time of making each payment under this Agreement, specify to the Lender the Loan to which such payment is to be applied. In the event that the Borrower fails to so specify, or if an Event of Default has occurred and is continuing, the Lender may apply the payment in such manner as it may determine to be appropriate in its sole, reasonable discretion.

### (e) Application of Insufficient Payments

If at any time insufficient amounts are received by the Lender to pay fully all amounts of principal, applicable Transaction Payments, and other amounts then due and payable hereunder, the Lender may apply such payment received as it may determine to be appropriate in its sole reasonable discretion. Lender may, in its reasonable discretion and if there is more than one outstanding Loan between the parties, apply payments by Borrower in one Digital Currency or in Dollars or an Alternative Currency towards the satisfaction of obligations outstanding with respect to a Loan in another Digital Currency, Dollars or an Alternative Currency, provided that Lender will make any conversions between such Digital Currencies, Dollars or Alternative Currencies based upon the applicable market rate at the Liquidity Exchange.

### (f) Non-Business Days

If the due date of any payment or delivery or the Maturity Date of any Loan under this Agreement would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day and, in the case of any Transaction Payments, such Transaction Payments shall be payable for the period of such extension.

### (g) Computations

Transaction Payments shall be computed on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which payable. For purposes of calculating Transaction Payments, Digital Currencies shall be deemed to have been Transferred by one party to the other when the applicable Confirmation Protocol for the relevant Digital Currency has been completed. If the requirements of the Confirmation Protocol are not met by 5:00 p.m. New York Time, the Transfer shall be deemed to have been made on the following Business Day. Calculation of Transaction Payments shall be based on the date when the relevant Transfer is deemed to have occurred.

### (h) Taxes

    (1) Payments Free of Taxes. Any and all payments by or on account of any obligation of Borrower hereunder shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided that if Borrower shall be required by Applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions for Indemnified Taxes or Other Taxes (including deductions for Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section) the Lender shall receive an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in

*Strictly Private & Confidential*

accordance with Applicable Law.

(2) Payment of Other Taxes by Borrower. Without limiting the provisions of Section (1) above, Borrower shall timely pay any Other Taxes that arise from any payment made by it under, or otherwise with respect to, this Agreement to the relevant Governmental Authority if required and in accordance with Applicable Law.

(3) Indemnification by Borrower. Borrower shall indemnify the Lender for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section III(h)(3)) attributable to Borrower under this Agreement and paid by the Lender, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority against Lender. A certificate delivered to Borrower by Lender as to the amount of such payment or liability actually paid by Lender to the relevant Governmental Authority shall be conclusive and binding absent manifest error.

(4) Tax Reporting.  Borrower shall report, if and/or as required under Applicable Law.

## IV.    **Collateral Requirements**

(a) Collateral

Borrower shall provide as collateral an amount of Digital Currency, Dollars or Alternative Currency to be determined (the "Collateral", which shall include any Additional Collateral and excluding any Returned Collateral as defined below) in accordance with the terms of this Section IV and any other such terms as agreed upon by the Borrower and Lender and memorialized in a Loan Term Sheet attached as Exhibit B.  Initially, the amount of Collateral required will be greater than or equal to the product of (i) Initial Margin Percentage as agreed upon in the Loan Term Sheet and (ii) the Value of the borrowed Digital Currency, Dollars or Alternative Currency (such level, the "Initial Margin Level").  Collateral shall be valued in Dollars.  For the avoidance of doubt, upon the return of the Borrowed Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited.  Notwithstanding the foregoing, if mutually agreed in writing by both parties, Borrower may satisfy the Collateral Requirements (in whole or in part) to Lender in Stablecoins in lieu of Dollars or an Alternative Currency.

The Collateral transferred by Borrower to Lender shall be security for Borrower's obligations in respect of the Loans and for any other obligations of Borrower to Lender under this Agreement. Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, all of Borrower's right, title and interest in the Collateral and any Proceeds of any of the Collateral, whether now owned by or owing to, or hereafter acquired by or arising in favor of, the Borrower, or in which the Borrower has or at any time in the future may acquire and right, title, or interest, which shall attach upon the transfer of the Borrowed Assets by Lender to Borrower.

The pledge, assignment and security interest created by this paragraph shall automatically terminate and all rights to the Collateral shall revert to the Borrower upon termination of the Loan pursuant to the terms of the Agreement.   Upon any such termination, the Lender will, at its own expense and without any representations, warrantees or recourse of any kind whatsoever, execute

*Strictly Private & Confidential*

and deliver to Borrower such documents as Borrower shall reasonably request to evidence such termination.

In addition to the rights and remedies given to Lender hereunder, Lender shall have all the rights and remedies of a secured party under the UCC. Lender shall be free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use the Collateral.

(b) <u>Margin Calls</u>

If, during the term of a Loan, the sum of the products of (i) Margin Requirement Percentage as set forth in the Loan Term Sheet, and (ii) Value of the Loaned Assets for each Loan exceeds the Value of the Collateral (such product, the "<u>Margin Call Level</u>"), Lender shall have the right to require Borrower to contribute additional collateral ("<u>Additional Collateral</u>") so that the Value of the Collateral (including the Additional Collateral) is equal to or greater than the Initial Margin Level for each Loan.

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>Margin Notification</u>") to the Borrower at the email address indicated in Section XV that sets forth the amount of Additional Collateral required. Borrower shall have twenty-four (24) hours from the time Lender sends such Margin Notification to deliver such required Additional Collateral to Lender in accordance with subsection (c) below. Failure by Borrower to timely deliver the relevant amount of Additional Collateral by the time specified in the Margin Notification and in accordance with subsection (c) below shall constitute an Event of Default.

(c) <u>Delivery of Additional Collateral</u>

Borrower's obligation to deliver Additional Collateral to Lender shall be satisfied (i) in the case of Dollars, by bank wire to the account specified in the Loan Term Sheet, (ii) by an amount of Stablecoins transferred to the digital wallet address specified in the Loan Term Sheet, or (iii) by delivery of return amounts of borrowed Digital Currencies, Dollars or Alternative Currencies, as applicable, to Lender sufficient to cause the Value of the Collateral to be equal to or greater than the Initial Margin Level.

(d) <u>Return of Collateral</u>

If, as of any Business Day, the Value of the Collateral exceeds the sum of the products of (i) Release Margin Percentage as agreed upon in the Loan Term Sheet, and (ii) Value of the Loaned Assets for each Loan, Borrower shall have the right, in its sole and absolute discretion, to require that Lender return an amount of Collateral, so that the Value of the Collateral is at least equal to the sum of the products of (i) Release Margin Percentage as agreed upon in the Loan Term Sheet, and (ii) the Value of the Loaned Assets for each Loan (such excess amount, the "<u>Returned Collateral</u>").

If Borrower requires Lender to repay Returned Collateral, it shall send an email notification (the "<u>Return Notification</u>") to the Lender at the email address indicated in Section XV that sets forth the amount of Returned Collateral. Lender shall return the Returned Collateral to Borrower in accordance with subsection (e) below by 6:00 p.m. New York time on the Business Day on which the Return Notification is received, if received by Lender prior to 10:00 a.m. New York time on a Business Day, or otherwise by 6:00 p.m. New York time on the next Business Day.

*Strictly Private & Confidential*

(e) <u>Delivery of Returned Collateral</u>

Delivery of the Returned Collateral shall be made by bank wire to the account or a digital wallet address, in both instances specified in the Return Notification by the Borrower, as applicable.

(f) <u>Default or Failure to Return Loan</u>

In the event that Borrower fails to return borrowed Digital Currencies, Dollars or Alternative Currencies, as applicable, under a Loan upon Termination or upon the occurrence of an Event of Default, Lender may transfer that portion of the Collateral to Lender's operating account necessary for the payment of any reasonable liability or obligation or indebtedness created by this Agreement, including, but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency, Dollars or Alternative Currencies.

(g) <u>Return of Collateral</u>

Upon Borrower's redelivery of borrowed Digital Currencies, Dollars or Alternative Currencies, as applicable, under a Loan and acceptance by Lender of the Borrowed Digital Currencies into Lender's wallet address or bank account, as applicable, and, with respect to Digital Currencies, such delivery being confirmed on the relevant Digital Currency blockchain pursuant to the Confirmation Protocol, Lender shall return the relevant amount of Collateral to a bank account in the name of Borrower, or a digital wallet address specified by the Borrower, as applicable.

## V.    **Hard Fork**

(a) <u>Notification</u>

In the event of an upcoming Hard Fork in the Digital Currency of any Borrowed Assets, Lender shall not be required to provide notification to Borrower of such event(s) to occur.

(b) <u>No Immediate Termination of Loans Due to Hard Fork</u>

In the event of a Hard Fork, the terms set forth on a Loan Term Sheet for any outstanding Loans will not be affected and the Loans will not be immediately terminated as a result of the Hard Fork.

(c) <u>Redelivery of Borrowed Digital Currency</u>

On the Maturity Date or other date of termination of a Loan pursuant to the terms of this Agreement, notwithstanding anything to the contrary in the Agreement, Lender will receive the benefit of any incremental tokens generated as a result of any Hard Forks in the relevant Digital Currency protocol during the term of such Loan that result in a new cryptocurrency (each, a "<u>New Currency</u>") being created, provided that the amount of such New Currency will be the appropriate amount of each such New Currency to which a holder of the amount of Digital Currency (as agreed in the Loan Term Sheet) would be entitled in connection with such Hard Forks. The determination of whether a Hard Fork has occurred will be made by the Lender in accordance with the CME CF Cryptocurrency Indices Hard Fork Policy (Version 1) as published by the CME Group in December 2017.

*Strictly Private & Confidential*

## VI.   <u>Representations and Warranties.</u>

(a) (i) On the date hereof, each party represents and warrants that this Agreement and each other Loan Document executed on the date hereof have been duly and validly authorized, executed and delivered on behalf of each party and constitutes the legal, valid and binding obligations of such party enforceable against the party in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)), and will not contravene (1) its constituent documents, (2) any Applicable Law, and (3) any judgment, award, injunction or similar legal restriction and (ii) on the date of execution of each Loan Term Sheet, each party represents and warrants that such Loan Term Sheet and any Loan Documents executed on such date have been duly and validly authorized, executed and delivered on behalf of each party and constitutes the legal, valid and binding obligations of such party enforceable against the party in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)), and will not contravene (1) its constituent documents, (2) any Applicable Law, and (3) any judgment, award, injunction or similar legal restriction.

(a) Each party represents that on the date hereof and on the date of execution of each Loan Term Sheet that no license, consent, authorization or approval or other action by, or notice to or filing or registration with, any Governmental Authority (including any foreign exchange approval), and no other third-party consent or approval, is necessary for the due execution, delivery and performance by such party of this Agreement or for the legality, validity or enforceability thereof against such party.

(b) Each party hereto represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received or to be received hereunder.

(c) Lender represents and warrants that it has, or will have at the time of Transfer of any Digital Currency, Dollars or Alternative Currency to Borrower, the full and unrestricted legal right to lend such Digital Currency, Dollars or Alternative Currency subject to the terms and conditions hereof, that, with respect to any Transferred Digital Currency, it is the sole and exclusive lawful owner of the Digital Currency, free and clear of all, encumbrances, claims (pending or threatened), pledges, legal actions (pending or threatened), charges or other limitations or restrictions whatsoever and that such Digital Currency has been acquired in accordance with all Applicable Laws.

(d) Borrower represents and warrants on the date hereof and at the time of return of any Digital Currency, Dollars or Alternative Currency, the right to transfer such Digital Currency, Dollars or Alternative Currency, subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement and that the Digital Currency, Dollars or Alternative Currency that it will

return has been acquired in accordance with all Applicable Laws.

(e) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest therein and the right to transfer such Collateral subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement, and that the Collateral that it will transfer has been acquired in accordance with all applicable laws.

(f) Each party hereto represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that it is a sophisticated party and fully familiar with the inherent risks involved in the transactions contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(g) Borrower represents and warrants on the date of execution of each Loan Term Sheet that there has been no material adverse change in Borrower's financial condition or business operations since the Effective Date.

(h) Borrower represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that no Event of Default, nor any event or act which with notice or lapse of time would become an Event of Default which has not been remedied or waived, has occurred and is continuing.

(i) Each Party represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that there are no proceedings pending or, to its knowledge, threatened, which could reasonably be expected to have a material adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder.

(j) Each Party represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any Applicable Laws.

(k) On the date of execution of each Loan Term Sheet, Borrower represents and warrants that (i) the exact legal name of Borrower is as set forth in each Loan Term Sheet; (ii) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority, which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral; and (iii) without Lender's prior written consent, Borrower will not (A) change its name, its place of business, chief executive office, its mailing address, or tax identification number if it has one or (B) change its type of organization, jurisdiction of organization or other legal structure.  If Borrower does not have a tax identification number and later obtains one, Borrower shall promptly notify Lender of such taxpayer identification number.  Borrower further represents and agrees that Borrower will not, without Lender's prior written consent, (x) merge or consolidate with or into any other business entity or (y) enter into any joint venture or partnership with any person, firm or corporation.

## VII.    **Agreements**.

Borrower agrees that, so long as it has any obligations outstanding under this Agreement or any other Loan Document to which it is a party:

(a) It will comply in all material respects with all Applicable Laws and orders in which it may be subject if failure to so comply would materially impair its ability to perform its obligations under this Agreement or any Loan Document to which it is a party.

(b) It shall pay and discharge all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which the penalties attach thereto, and all lawful claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a material lien or encumbrance upon any properties of the Borrower, provided that the Borrower shall not be required to pay any such tax, assessment, charge, levy or claim with respect to which the failure to pay would not reasonably be expected to have a material adverse effect on its abilities to repay the Loans and perform all other obligations hereunder and under the other Loan Documents.

(c) It will use all reasonable efforts to maintain in full force and effect all consents of any Governmental Authority or otherwise that are required to be obtained by it with respect to this Agreement or any Loan Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(d) Borrower shall not, without providing Lender thirty (30) calendar days' prior written notice, change (i) its legal name, (ii) its jurisdiction of organization or, if not a registered organization, location for purposes of the UCC, (iii) in its type of organization that would impair the perfection and priority of the security interest granted by this Agreement and (iv) in the location of its chief executive office. Upon making any such change, Borrower shall promptly provide lender with certified organizational documents reflecting any change in (i)-(iv) above.

(e) It shall satisfy all agreements listed in Schedule A.

(f) It shall promptly provide such additional information and documents that the Lender may from time to time reasonably request.

## VIII.    **Conditions Precedent**.

This Agreement and the obligations set forth hereunder shall not become effective until the Business Day on which the following conditions are satisfied in a manner satisfactory to, or waived in writing by, the Lender (such date, the "Effective Date"):

(a) The Lender's receipt of executed counterparts of this Agreement, in each case, duly and property executed and delivered by each of the parties hereto;

(b) (i) receipt of any other Loan Documents and instruments as may be reasonably required by Lender, including but not limited to, for corporate borrowers, resolutions and

*Strictly Private & Confidential*

incumbency certificates, or other documents evidencing authority to enter into this Agreement and borrow the Loans, (ii) good standing certificates (to the extent such concept exists in the relevant jurisdiction of organization or incorporation) and true and complete copies of the certificate or articles of formation or incorporation and the bylaws or operating agreement (or equivalent or comparable constitutive documents, (iii) a certificate of an authorized officer dated as of the Effective Date certifying that the documents in clauses (i) and (ii) above are correct and complete and have not been amended or superseded prior to the Effective Date and (iv) each other Loan Document required by the Lender to be executed on or prior to the Effective Date, in each case, duly and properly executed by each of the parties thereto; provided that the requirements in clauses (i)-(iii) may be satisfied by delivering a fully executed certificate in form and substance set forth as **Exhibit C**, or as may otherwise be reasonably acceptable to Lender;

(c) The Borrower shall have provided such documentation and other information reasonably requested by the Borrower in connection with regulatory requirements under the applicable "know-your-customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act;

(d) Certified copies of UCC, insolvency, tax, judgment lien and execution searches, or equivalent reports or searches, each of a recent date;

(e) The Lender shall have received from Borrower all financing statements and other instruments as it reasonably requests in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Lender may deem necessary or desirable in order to perfect the security interest created hereunder.

## IX.    Default

It is further understood that the following defaults shall constitute events of default hereunder and are hereinafter referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to (i) return any Loaned Assets (including any Recall Amount), (ii) pay any Transaction Payments, (iii) transfer any required amount of Collateral or Additional Collateral by the time and/or in the manner required under Section IV, or (iv) make any payment or reimbursement specified in Section (V)(c) in the event of a Hard Fork, in each such case when due and/or required to do so by the time required under this Agreement;

(b) the failure of Borrower to perform or observe any other term, condition, covenant, provision, or agreement contained in any of the Loan Documents;

(c) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against the Borrower, and (solely in the case of proceedings instituted against the Borrower) shall not be dismissed within thirty (30) days or the applicable statutory time limit of their initiation;

(d) any representation or warranty made by Borrower in any of the Loan Documents proves to be untrue in any material respect as of the date of making or deemed making thereof;

*Strictly Private & Confidential*

or

(e) Borrower notifies Lender of its inability to or its intention not to perform any of its obligations hereunder or otherwise disaffirms, rejects or repudiates any of its obligations hereunder.

## X.    **Remedies**

(a) Upon the occurrence and during the continuation of any Event of Default, the Lender may, at its option (subject to the terms and conditions of this Agreement), (a) declare all Loaned Assets outstanding hereunder immediately due and payable, (b) terminate this Agreement and any other agreement or transaction between Borrower and Lender upon written notice to Borrower, and (c) exercise all other rights and remedies available to the Lender hereunder, under Applicable Law, or in equity; provided, that upon any Event of Default, the amount of any Transaction Payments then outstanding hereunder shall automatically become and be immediately due and payable. Lender shall also have the right, at any time on or after Borrower fails to make sufficient payments to pay fully all Transaction Payments and other amounts then due and payable hereunder, or on or after the occurrence of an Event of Default, to purchase the relevant Digital Currency in the amount of any such insufficiency in a commercially reasonable manner, or foreclose on, liquidate, sell or collect on the Collateral that Lender or any affiliate may then hold, and apply the proceeds to satisfy any and all obligations of Borrower to Lender or any affiliate, whether arising under a different Loan, or net, set off and/or recoup any and all obligations of Lender or any affiliate of Lender to Borrower, against either the purchase price of such replacement Digital Currency or any such obligations of Borrower to Lender or any affiliate of Lender.  In connection with the exercise of such remedies, Lender and its affiliates are hereby authorized to apply or transfer any Collateral of Borrower interchangeably between Lender and its affiliates solely to satisfy any obligations of Borrower to Lender or its affiliates at any time with prior notice (email sufficient) to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default by Lender, the Borrower may, at its option, (1) demand a return of any and all Collateral in the control or possession of Lender or its agents, (2) withhold repayment of the Loaned Assets and any outstanding Fees or other amounts claimed by Lender and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under Applicable Law, or in equity.

(c) In addition to its rights hereunder, the non-defaulting party shall have any rights otherwise available to it under any agreement or Applicable Law.

## XI.    **Rights and Remedies Cumulative.**

No delay or omission by either party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each party stated herein are cumulative and in addition to all other rights provided by law, in equity.

**XII.    Collection Costs.**

In the event Borrower fails to pay any amounts due or to return any Loaned Assets hereunder, the Borrower shall promptly pay to the Lender upon demand all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs incurred by the Lender in connection with the enforcement of its rights hereunder.

**XIII.   Passwords and Security.**

Each party is responsible for maintaining adequate security and control of any and all passwords, private keys, and any other codes that it uses to Transfer or receive Digital Currencies hereunder. Each party will be solely responsible for the private keys that it uses to make the Transfers and maintaining secure back-ups. Each party will promptly notify the others of any security breach of its accounts, systems or networks as soon as possible. Each party will reasonably cooperate with the other party in the investigation of any suspected unauthorized Transfers or attempted Transfers using a party's account credentials or private keys, and any security breach of a party's accounts, systems, or networks, and provide the other party with the results of any third-party forensic investigation that it may undertake. Each party will be responsible for any unauthorized Transfers made utilizing its passwords, private keys, and any other codes it uses to make or receive Transfers.

**XIV.   Governing Law; Dispute Resolution; Waiver of Consequential Damages.**

This Agreement is governed by, and shall be construed and enforced under, the laws of England and Wales, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in London by arbitration under the LCIA Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

Borrower shall indemnify and hold harmless Lender, its affiliates, and each such party's officers, directors, employees, representatives, and agents from and against any and all claims, demands, losses, expenses, obligations, damages, penalties, actions and liabilities of any and every nature (including attorneys' fees of an attorney (or to the extent multiple attorneys are required in Lender's sole reasonable discretion, attorneys' fees of such attorneys) of Lender's choosing to defend against any such claims, demands, losses, expenses and liabilities) that Lender may sustain or incur or that may be asserted against Lender arising out of Lender's lending of Digital Currency, Dollars or Alternative Currency to Borrower under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Lender's bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.  This indemnity and the provisions of this paragraph continuing obligations of Borrower, its successors and assigns,  and shall survive termination of this Agreement.

**XV.    Notices.**

*Strictly Private & Confidential*

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

BlockFi:
     BlockFi International LLC
     █████████████
     Attn: ████████████
     Email: █████████████████

Alameda:
     Alameda Research Ltd
     Attn: ██████████████████
     Email: ████████████████████████

Either party may change its address by giving the other party written notice of its new address as herein provided.

### XVI.   Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XVII. Entire Agreement.

This Agreement and each exhibit referenced herein constitutes the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.

### XVIII. Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that neither party may assign this Agreement or any rights or duties hereunder without the prior written consent of the other party.

### XIX.   Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

### XX.   Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XXI.    Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXII.    Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either party provides written notice (email sufficient) of a desire to terminate the contract no less than ten (10) days prior to the end of such one- year period. The foregoing notwithstanding, this Agreement may be terminated (i) as set forth in Section IX or (ii) upon 30 days' written notice (email sufficient) by either party to the other.  Notwithstanding the foregoing, if there are any Loans outstanding at the time either party sends a notice of termination pursuant to this Section XXII, such termination of this Agreement will not be effective until all Loans are terminated on the relevant Maturity Date or pursuant to Section (II)(d).

## XXIII. Miscellaneous.

 If an error is made hereunder in connection with a payment under any Loan Document or any other contractual arrangement, and such payment is an overpayment or a payment not anticipated hereunder or thereunder, the party receiving the payment in error shall refund the mistaken amount to the paying party as promptly as is commercially practicable; provided that the paying party may, in its sole discretion and upon written notice of the amount and basis for such offset, elect to set-off such amounts against future payments hereunder.

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement is the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

BLOCKFI INTERNATIONAL LLC

By: *Rene van kesteren*

Name: Rene van Kesteren

Title: Chief Risk Officer, Head of Global Digital Markets

Alameda Research Ltd

By: *Sam Bankman-Fried*

Name: Samuel Bankman-Fried

Title: CEO

*Strictly Private & Confidential*

## EXHIBIT A

Authorized Agents. The following are authorized to deliver Lending Requests on behalf of Alameda in accordance with Section II hereof:

Name: Samuel Bankman-Fried
Email: ███████████████████

Name: Ryan Salame
Email: ███████████████████

Authorized Agents. The following are authorized to deliver Lending Requests on behalf of BlockFi in accordance with Section II hereof:

Name: Zac Prince
Email ███████████████

Name: Rene van Kesteren
Email: ████████████

Name: Chris Yeung
Email ███████████████

Name: Jason Wilkinson
Email: █████████████

Name: Jessica Raybeck
Email ████████████████

Name: Yevgeniy Feldman
Email: █████████████

Either party may change its Authorized Agents by notice given to the other party as provided in Section XV.

*Strictly Private & Confidential*

## EXHIBIT B LOAN TERM SHEET

The following Loan Term Sheet dated [*insert date*] incorporates all of the terms of the Master Loan Agreement entered into by Alameda Research Ltd and BlockFi International LLC on [*insert date*] and the following specific terms:

| | |
|---|---|
| **Borrower:** | Alameda Research Ltd |
| **Lender** | BLOCKFI INTERNATIONAL LLC |
| **Digital Currency / Dollars / Alternative Currency** | BTC |
| **Amount** | [ ] |
| **Borrow Rate** | [ ] |
| **Callable Option** | [Yes][No] |
| **Prepayment Option** | [Yes][No] |
| **Maturity Date** | [Insert date][None] |
| **Loan Type** | [ ] |
| **Loan Term** | [ ] |
| **Initial Margin Percentage** | [ ]% |
| **Margin Requirement Percentage** | [ ]% |
| **Release Margin Percentage** | [ ]% |
| **Allowable Stablecoin Collateral** | [GUSD][USDC][PAX] |
| **Digital Currency Payment to Lender** | [insert Lender's Digital Currency Address] |
| **Dollar Payment to Lender** | [insert Lender's Bank Details and stable coin blockchain address] |

Alameda Research Ltd                    BLOCKFI INTERNATIONAL LLC

By:_____            By: _____
Name:                                   Name:
Title:                                  Title:

*Strictly Private & Confidential*

## EXHIBIT C

### Corporate Resolutions and Incumbency Certification

I certify that I am the duly elected and qualified [*secretary*] of [    ] a [  ] organized under the laws of [  ] (the "Company") and the keeper of the records of the Company; that the following is a true and correct copy of resolutions duly adopted by the [*members/managers/partners/board of managers/board of directors/other*]] of the Company in accordance with its [*bylaws/LLC agreement/other governing document*] as of _____, 20__.

Reference is made to that certain Master Loan Agreement entered into by [*Name*] and BlockFi on [*date*] (as amended, restated, supplemented or otherwise modified from time to time, the "Master Loan Agreement"). Terms capitalized but not defined herein shall have the meanings set forth in the Master Loan Agreement.

**Be it resolved** that:

1.  The Company be, and hereby is, authorized to enter into the Master Loan Agreement, and any other documents, agreements, instruments and amendments related thereto or required thereby containing such terms and conditions, setting forth such rights and obligations and otherwise addressing or dealing with such subjects or matters determined to be necessary, reasonable or desirable by such [*member/manager/partner/officer/other*] executing the same, the execution thereof by such [*member/manager/partner/officer/other*] to be conclusive evidence of such approval and determination.

2.  The Company be, and hereby is, authorized to extend and/or borrow the Borrowed Amounts under each Loan pursuant to the Agreement pursuant to the terms of the Agreement, having such terms and conditions as are approved or deemed necessary, appropriate or desirable by the [*member/manager/partner/officer/other*] executing the same, the execution thereof by such [*member/manager/partner/officer/other*] to be conclusive evidence of such approval and determination.

3.  The Company be, and hereby is, authorized to (i) secure payment of any Loans under the Agreement, interest thereon, and fees and expenses related thereto, and payment and performance of all other obligations and liability of the Company arising under, out of, or in connection with, the Agreement (collectively, the "Obligations") by pledging or granting a lien on, or security interest in, any or all portion of Company's assets (whether now owned or hereafter acquired) and (ii) enter into or cause to be entered into such security agreements, pledge agreements, mortgages, deeds of trust and other agreements as are necessary, appropriate or desirable to effectuate the intent of, or matters reasonably contemplated or implied by, these resolutions, in such form, covering such collateral and having such other terms and conditions as are approved or deemed necessary, appropriate or desirable by the [*member/manager/partner/officer/other*] executing the same (collectively, the "Security Agreements"), the execution thereof by such [*member/manager/partner/officer/other*] to be conclusive evidence of such approval or determination.

4.  The Company be, and hereby is, authorized to perform fully its obligations under the Master Loan Agreement, all Loan Confirmations and other Loan Documents, and any such other documents, agreements, instruments or amendments and to engage without limitation in such other transactions, arrangements or activities ("Activities") as are reasonably related or incident to, or which will serve to facilitate or enhance for the benefit of the Company and its subsidiaries the transactions contemplated by these resolutions, including without limitation any modification, extension or expansion (collectively, the "Changes") of any Activities or of any other transactions, arrangements or activities resulting from any of the Changes and to enter into such other agreements or understandings as are necessary, appropriate or desirable to effectuate the intent of, or matters reasonably contemplated by, this resolution and each of the foregoing resolutions.

5.  All documents, agreements and instruments previously executed and delivered, and any and all actions previously taken by any [*member/manager/partner/officer/other*], employee or agent of the Company in connection with or related to the matters set forth in, or reasonably contemplated or implied by, the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects and for all purposes as the acts and deeds of the Company.

6.  An executed copy of these resolutions shall be filed with the minutes of the proceedings of the [*members/managers/partners/board of managers/board of directors/other*] of the Company.

7. These resolutions shall continue in force, and BlockFi may consider the holders of said offices and their signatures to be and continue to be as set forth in a certified copy of these resolutions delivered to BlockFi, until notice to the contrary in writing is duly served on BlockFi (such notice to have no effect on any action previously taken by BlockFi in reliance on these resolutions).

I further certify that the above resolutions are in full force and effect as of the date hereof, that the transactions contemplated hereby have not been rescinded, annulled, revoked or modified; that neither the foregoing resolutions nor any actions to be taken pursuant to them are or will be in contravention of any provision of the [*articles of incorporation/other*] or [*bylaws/LLC agreement/other governing document*] or of any agreement or instrument to which the Company is a party or by which it is bound; and that neither the [*articles of incorporation/other*] nor [*bylaws/LLC agreement/other governing document*] of the Company nor any agreement or instrument to which the Company is a party or by which it is bound require the vote or consent of shareholders of the Company to authorize any act, matter, or thing described in the foregoing resolutions.

I further certify that the following named persons have been duly elected to the offices set opposite their respective names, that they continue to hold these offices at the present time, and that the signatures which appear below are genuine, original signatures of each respectively:

(PLEASE SUPPLY GENUINE SIGNATURES OF AUTHORIZED SIGNERS BELOW)[1]

_____                    _____
Name of [President]                                 Signature

_____                    _____
Name of [Secretary]                                 Signature

**In Witness Whereof**, I have affixed my name as Secretary and caused the corporate seal of said Corporation to be affixed as of the date first above referenced.

                                        _____

                                        _____, Secretary

_____
[SIGNATURE OF [OFFICER/MEMBER/MANAGER/SHAREHOLDER/OTHER]][2]

_____
[SIGNATURE OF [OFFICER/MEMBER/MANAGER/SHAREHOLDER/OTHER]]

_____
[SIGNATURE OF [OFFICER/MEMBER/MANAGER/SHAREHOLDER/OTHER]]

Failure to include signatures in the above when Secretary is authorized to sign alone shall constitute a certification by the Secretary that the Secretary is the sole [shareholder/director/other] of the Company.

---

[1] Please expand to include all authorized signatories.

[2] Please provide signatures of all parties necessary to effectuate the resolutions or, if none, a shareholder other than the secretary when secretary is authorized to act alone, adding or removing signature lines as necessary.

*Strictly Private & Confidential*

## SCHEDULE A

### Agreements

[*To be updated*]

# EXHIBIT A-3

*Strictly Private & Confidential*

## AMENDED AND RESTATED MASTER LOAN AGREEMENT

Dated as of: January 26, 2022

Between: <u>BlockFi International Ltd., a limited company organized and existing under the laws of Bermuda (f/k/a BlockFi International LLC, a limited liability company organized and existing under the laws of the Cayman Islands) (together with its successors and permitted assigns, "*BlockFi*")</u>

and: <u>Alameda Research Limited,  a limited company organized and existing under the law of the British</u> <u>Virgin Islands ("*Alameda*", and BlockFi and Alameda, each a "*party*" and together, the "*parties*").</u>

## RECITALS

**WHEREAS**, BlockFi and Alameda have entered into a Master Loan Agreement, dated as of August 14, 2020 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>Prior Agreement</u>") and the parties desire to amend and restate the Prior Agreement in its entirety and replace it with this Amended and Restated Master Loan Agreement (this "<u>Agreement</u>");

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower (defined herein) may, from time to time, seek to initiate a transaction pursuant to which Lender (defined herein) will lend certain Digital Currency, Dollars or Alternative Currency (each as defined herein) to Borrower and Borrower will return such Digital Currency, Dollars or Alternative Currency to Lender upon the termination of the Loan pursuant to the terms and conditions in this Agreement or as otherwise set forth herein.

Now, therefore, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and Lender hereby agree as follows:

I.          **Definitions.** For purposes of this Agreement, the following terms shall have the respective meanings set forth in this Article I.

"***Account Control Agreement (Digital Currency)***" means that certain Irish law-governed Security Agreement, dated as of the date hereof, by and among BlockFi, Alameda and Coinbase Custody International Limited.

"***Additional Collateral***" has the meaning set forth in Section IV(b).

"***Affected Digital Currency***" has the meaning set forth in Section II(f).

"***Alternative Currency***" means (each other currency (other than Dollars) as may be agreed in writing between Borrower and Lender.

"***Applicable Law***" means (regardless of jurisdiction) any applicable (i) federal, national, state and local laws (including common law), ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, decrees, injunctions, or judgments and any applicable (ii) ruling, declaration, regulation, requirement, or interpretation issued by any regulatory, judicial, administrative or governmental body or person that, in either case, are applicable to or binding on any person or entity or any of its property or assets or to which such entity or person or any of its property or assets is subject;

"***Authorized Agent***" has the meaning set forth in Exhibit A.

"***Borrow Rate***" has the meaning set forth in the Loan Term Sheet.

"***Borrowed Amount***" has the meaning set forth in Section II(b).

"***Borrower***" has the meaning set forth in the Loan Term Sheet.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which Lender is closed for business in New York City, United States and London, England. For purposes of this Agreement and the transactions contemplated hereunder, Lender follows the New York Stock Exchange calendar of holidays for the purposes of determining when Lender is closed for business in New York City, United States.

"***Callable Option***" means the option of Lender to recall a portion or the entirety of the Borrowed Amounts during the term of the Loan, subject to the terms of this Agreement.

"***Collateral***" has the definition assigned to such term in Section IV(a).

"***Collateral Account***" means one or more accounts that are subject to an Account Control Agreement (Digital Currency).

"***Collateral Requirements***" means the requirements to post Collateral pursuant to Section IV.

"***Confirmation Protocol***" means the requirement that the Transfer of a Digital Currency, may not be deemed settled and completed until (i) the transaction has been recorded in a block and five (5) consecutive subsequent blocks referring back to such block (meaning, for the avoidance of doubt, six (6) blocks in total) have been added to the applicable blockchain; or (ii) the transaction has met a different protocol for a specific Digital Currency agreed to by the parties in writing

"***Custodian***" means Coinbase Custody International Limited.

"***Custody Agreement***" means that certain Custodial Services Agreement between Alameda and the Custodian, executed as of December 21, 2020, together with all exhibits, schedules, addenda and other attachments thereto.

"***Default Rate***" has the meaning set forth in Section III(b).

*Strictly Private & Confidential*

"***Digital Currency***" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), Litecoin (LTC), or Solana (SOL), any New Currency and any digital currency that the Borrower and Lender agree upon.

"***Digital Currency Address***" means an identifier of 26-34 alphanumeric characters (or such other market-standard identifier) that represents a possible destination for a Transfer of Digital Currency.

"***Dollars***" and "***$***" mean lawful currency of the United States of America.

"***Effective Date***" has the meaning set forth in Section VIII.

"***Excluded Taxes***" means, with respect to the Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower under this Agreement, Taxes imposed on or measured by its overall net income, overall gross income or overall gross receipts (however denominated), and franchise taxes imposed on it (in lieu of net income taxes) or capital taxes, by the applicable jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized, in which it is resident for tax purposes or in which its principal office is located.

"***Governmental Authority***" means the government of any nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"***Government Restrictions***" has the meaning set forth in Section II(f).

"***Hard Fork***" means a permanent divergence in the relevant Digital Currency blockchain, that for example commonly occurs when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules or an airdrop or any other events which results in the creation of a new token.

"***Indemnified Taxes***" means Taxes other than Excluded Taxes.

"***Initial Margin Level***" has the meaning set forth in Section IV(a).

"***Interest Rate***" has the meaning set forth in the Loan Term Sheet.

"***Lender***" has the meaning set forth in the Loan Term Sheet.

"***Lending Request***" has the meaning set forth in Section II(b).

"***Liquidity Exchange***" means Coinbase, but if for any reason Coinbase is not readily available (whether due to technical maintenance or otherwise), "Liquidity Exchange" shall mean Gemini or any other exchange as may be mutually agreed in writing between Borrower and Lender.

*Strictly Private & Confidential*

"***Loan***" means a loan of Digital Currency, Dollars or an Alternative Currency made pursuant to and subject to this Agreement.

"***Loan Documents***" shall collectively mean this Agreement, each Account Control Agreement (Digital Currency), the Pledge Agreement, all Loan Term Sheets, all exhibits and schedules hereto and thereto, and any other document jointly identified by the Lender and Borrower as a "Loan Document".

"***Loan Term Sheet***" has the meaning set forth in Section II(b).

"***Loaned Assets***" means any Digital Currency, Dollars or Alternative Currency Transferred from Lender to Borrower pursuant to a Loan Term Sheet and which have not been redelivered to Lender.

"***Margin Call Level***" has the meaning set forth in Section IV(b).

"***Margin Notification***" has the meaning set forth in Section IV(b).

"***Material Adverse Change***" means a material adverse change from the Effective Date on (a) the business, assets, liabilities, prospects or financial condition of Borrower, (b) the ability of Borrower to perform any of its Obligations under the Loan Documents, (c) the Lender's lien and/or security on the Collateral or the priority of such lien and/or security (including the resignation or notice of resignation of any applicable securities intermediary), (d) the rights of or benefits available to Lender under the Loan Documents or (e) the enforceability of any Staking Contract or the rights or benefits available to Borrower or Lender under any Staking Contract.

"***Maturity Date***" means, with respect to a Loan, the pre-determined specified maturity date in the relevant Loan Term Sheet, if any, upon which such Loan will terminate and the Loan becomes due in full, unless such Loan is (i) terminated prior to such maturity date pursuant to Section II(d) or (ii) as may be extended as agreed to by the parties.

"***New Currency***" has the meaning set forth in Section V.

"***Other Taxes***" means all present or future stamp, registration, documentation or other excise or property taxes, or similar taxes, charges or levies imposed by any Governmental Authority, including any interest, additions thereto or penalties applicable thereto.

"***party***" and "***parties***" have the meaning set forth in the introductory paragraph of this Agreement.

"***Pledge Agreement***" means collectively, each pledge agreement, between Lender and Borrower, acceptable to Lender, that provides for a pledge and security interest in, among other things, the Staking Contracts Collateral, dated the date hereof.

"***Prepayment Option***" means the option of Borrower to redeliver the Digital Currency, Dollars or Alternative Currency, as applicable, subject to the terms of this Agreement.

*Strictly Private & Confidential*

"***Proceeds***" shall have the meaning assigned to such term in the UCC.

"***Required Collateral Amount***" means, with respect to any Loan as of any date, the amount obtained by multiplying (x) the Initial Margin Percentage by (y) the sum of the Borrowed Amount for such Loan, plus all accrued and unpaid interest and fees thereon, in each case, as of such date.

"***Stablecoin***" means any cryptocurrency pegged to the US Dollar, including, but not limited to the Gemini Dollar (GUSD), USD Coin (USDC) and Paxos Standard (PAX).

"***Staking Contract***" means that certain Coinbase Custody Staking Services Addendum, made on October 7, 2021 by and between Custodian and Borrower that supplements, and forms part of, the Custody Agreement.

"***Staking Contracts Collateral***" means the Staking Contract, all digital assets staked pursuant thereto and all proceeds of any of the foregoing.

"***Staking Contract Counterparty***" means Custodian.

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to Tax or penalties applicable thereto.

"***Term***" shall have the meaning set forth in Section XXII.

"***Transaction Payments***" mean each of the Borrow Rate and the Default Rate.

"***Transfer***" shall mean, as applicable, the delivery of Digital Currency, Dollars or Alternative Currency by Lender or the redelivery of Digital Currency, Dollars or Alternative Currency by Borrower hereunder and the crediting of such Digital Currency, Dollars or Alternative Currency to the recipient's account in accordance with this Agreement. With respect to USD or an Alternative Currency, it shall mean when such funds have been deposited in the applicable bank account.

"***UCC***" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"***Value***" means, with respect to any Collateral consisting of Dollars, the actual Dollar amount thereof, and with respect to any borrowed Digital Currency, Alternative Currency or any Collateral consisting of Stablecoins, the value of such Digital Currency, Alternative Currency or Stablecoin, as applicable, as determined by Lender in good faith and in its reasonable discretion by reference to recognized pricing sources for the relevant borrowed Digital Currency, Alternative Currency or Stablecoin, as applicable.

## II.    <u>**General Operation.**</u>

DocuSign Envelope ID: 55E26B6C-EF18-41EC-9E5E-4D99D68698D3

*Strictly Private & Confidential*

(a)  <u>Loans of Digital Currency, Dollars or Alternative Currency</u>

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request for the Lender to Loan to Borrower a specified amount of Digital Currency, Dollars or Alternative Currency, and Lender may, in its sole and absolute discretion, extend, or decline to extend, such Loan.

(b)  <u>Loan Procedure</u>

During the Term of this Agreement, on a Business Day (the "<u>Request Day</u>") an Authorized Agent may by email directed to the email address indicated in Section XV request from Lender a Loan of a specific amount of Digital Currency, Dollars or Alternative Currency in accordance with the terms of this Section II(b) (a "<u>Lending Request</u>"); provided that, if such Lending Request is received by Lender at or after 1:00 p.m. New York time on a Business Day, then the next Business Day will be deemed to be the Request Day. Lender shall by email at the email address indicated in Section XV inform Borrower whether Lender agrees to make such a Loan. An email is deemed to be received immediately after the time sent (as recorded on the device or system from which the sender sent the email), unless the sender receives an automated message that the email has not been delivered. Once made, Lending Requests may not be amended or withdrawn by Borrower and a Lending Request shall be deemed rejected unless affirmatively accepted by Lender as set forth above on or before 5:00 p.m. New York time on the Request Day.

Unless the parties otherwise agree, each Lending Request submitted by Borrower shall provide the following information:

(i)      The type of Loan (either Digital Currency, Dollars or an Alternative Currency) requested, and, if Digital Currency or an Alternative Currency, specifying the Digital Currency or Alternative Currency, as applicable

(ii)     the amount of Digital Currency, Dollars or Alternative Currency requested;

(iii)    whether the Loan shall have a Callable Option and/or Prepayment Option;

(iv)     the proposed Borrow Rate for such Loan;

(v)      the Maturity Date; and

(vi)     the Collateral Requirements, if applicable.

If Lender agrees to make a Loan on the terms set forth in the Lending Request or as otherwise agreed in writing between Borrower and Lender, the Lender and Borrower shall execute a term sheet using the form of Loan Term Sheet attached hereto as Exhibit B (with respect to a particular Loan, such term sheet, the "<u>Loan Term Sheet</u>"). After execution of such Loan Term Sheet, the Lender shall commence transmission of the Borrower's Digital Currency Address or bank account, as applicable, the amount of Digital Currency, Dollars or Alternative Currency, respectively, set forth in the Loan Term Sheet (such Digital Currency, Dollars or Alternative Currency, the "<u>Borrowed Amount</u>") on or before 5:00 p.m. New York Time on the Request Day.

In the event of a conflict of terms between this Agreement and a Loan Term Sheet, the terms in the executed Loan Term Sheet shall govern.

*Strictly Private & Confidential*

Notwithstanding anything to the contrary in this Agreement, if Borrower and Lender agree in writing, with respect to any Borrowed Amount in Dollars, Borrower may satisfy any repayment or redelivery obligations via delivery of Stablecoins in lieu of Dollars.

(c) <u>Callable Option/Prepayment Option</u>

Applicable solely to Loans with a Callable Option, Lender may at any time (the "<u>Recall Request Time</u>") exercise the Callable Option and recall all or any portion of a Digital Currency loaned to Borrower (the "<u>Recall Amount</u>"). Borrower will then have twenty-four (24) hours from the Recall Request Time (the "<u>Recall Delivery Time</u>") to deliver the Recall Amount.

Applicable solely to Loans with a Prepayment Option, Borrower, in its sole and absolute discretion, may at any time from 9:00 a.m. until 5:00 p.m. New York time on a Business Day (the "<u>Redelivery Day</u>") exercise the Prepayment Option and deliver all or any portion of any Digital Currency, Dollars or Alternative Currency loaned to Borrower by Lender. Upon receipt of such return of Digital Currency, Lender will promptly notify Borrower of any applicable Borrow Rate pursuant to the terms of the Loan Term Sheet on such returned amount accrued (but not yet paid) through such Redelivery Day, and Borrower shall have up to five (5) Business Days to pay such accrued Borrow Rate after the Redelivery Day (which due date will be deemed to be an "Invoice Due Date" for purposes of Section (III)(c)).

(d) <u>Termination of a Loan</u>

A Loan will terminate upon the earlier of:

(i)     With respect to a Loan with a Prepayment Option but no Callable Option, upon redelivery by Borrower of all Borrowed Amounts at the Maturity Date or on such earlier date such that no such Borrowed Amount remains undelivered;

(ii)    With respect to a Loan with both a Prepayment Option and a Callable Option, upon redelivery by Borrower of all Borrowed Amounts once the Borrower or Lender exercises the Callable Option such that no such Borrowed Amount remains undelivered; or

(iii)   At the end of the Term as set forth in Section XXII.

(e) <u>Redelivery of Borrowed Amounts</u>

In connection with any termination of a Loan pursuant to the terms of this Agreement, Borrower shall effect redelivery of the relevant amount of borrowed Digital Currency, Dollars or Alternative Currency at or before 5:00 p.m. New York time of the applicable Business Day (<u>i.e.</u>, the Maturity Date, the Business Day on which the Recall Delivery Time falls, the Redelivery Day, or such other date of termination pursuant to Section XXII).

(f) <u>Acts by Governmental Authorities and Changes in Applicable Laws</u>.

If because of enforcement actions by Governmental Authorities of competent jurisdiction or

*Strictly Private & Confidential*

changes in Applicable Laws (collectively, "<u>Government Restrictions</u>"), a party's ability to transfer or own a certain Digital Currency that has been the subject of a Loan or Loans is eliminated, materially impaired or declared illegal (such Digital Currency, "<u>Affected Digital Currency</u>"):

    (1) if legally permissible and/or possible under the Government Restrictions, including, without limitation, during any notice or grace period, Borrower shall repay to the Lender any outstanding balance of such Digital Currency and any accrued but unpaid Transaction Payments, such repayment to be made in the applicable Digital Currency; and

    (2) if return is not legally permissible and/or possible under the Government Restrictions (as mutually agreed by Lender and Borrower), Borrower shall repay (to the extent not legally impermissible) to Lender an amount in Dollars equal to the greater of (i) the volume-weighted average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the Affected Digital Currency during the thirty (30) Business Day period prior to the effective date of the relevant Government Restrictions, and (ii) the volume-weighted average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the borrowed Digital Currency during the thirty (30) Business Day period commencing with the relevant day when the parties first entered into the applicable Loan.

## III.   <u>Borrow Rates and Transaction Payments.</u>

  (a)  <u>Borrow Rate Calculation</u>

When a Loan is executed, the Borrowed Amount shall accrue interest at a rate per annum equal to the Borrow Rate as agreed to in the relevant Loan Term Sheet, and such interest shall be payable in accordance with subsection (c) below and is subject to change only if agreed to in writing (email sufficient) by Borrower and Lender. The Borrow Rate shall be payable, unless otherwise agreed in writing (email sufficient) by the Borrower and Lender, in the applicable Digital Currency, Dollars or Alternative Currency; provided that, if agreed by Borrower and Lender, Borrower may satisfy its obligation to pay Borrow Rate in Dollars via payment of Stablecoin.

Lender shall calculate any Borrow Rates owed on a daily basis and promptly provide Borrower with the calculation upon request. Except as Borrower and Lender may otherwise agree, the Borrow Rate shall accrue from and include the date on which the relevant Digital Currency is Transferred to Borrower to the date on which such Digital Currency is redelivered to Lender.

  (b)  <u>Default Rate</u>

For each day following (i) the Maturity Date, (ii) the Recall Delivery Time or (iii) any date on which Lender terminates this Agreement pursuant to Section XXII (whichever is applicable) as of which Borrower has not returned any Digital Currency by the relevant due date, or for each day during any period in which any Event of Default has occurred and is continuing with respect to Borrower, Borrower shall incur an additional fee (the "<u>Default Rate</u>") that is equal to the sum of (I) the greater of (1) $2000 per day and (2) an amount equal to 1% of the sum of the unreturned

*Strictly Private & Confidential*

Borrowed Amounts and accrued and unpaid Borrow Rate with respect to the applicable Loan per day, in each case, accruing daily until Borrower cures such failure to return Digital Currency, Dollars or Alternative Currency, as applicable, or such other applicable Event of Default, however not higher than the highest rate of interest permitted to be charged under Applicable Law, and (II) any losses, costs, expenses or other damages reasonably incurred by Lender (but for the avoidance of doubt, excluding consequential damages) as a result of such late payment or Event of Default, (including, in case of a failure by Borrower to return Digital Currency, Dollars or Alternative Currency by the relevant due date, any relevant and reasonable borrowing costs or hedging costs (including any reasonable breakage costs, amounts required to be posted as collateral or borrowing costs incurred in order to borrow required collateral amounts in connection with such hedging arrangements) that are incurred by Lender in order to (x) borrow such Digital Currency, Dollars or Alternative Currency, or (y) synthetically borrow, by purchasing and simultaneously entering into hedging arrangements to minimize its exposure to the purchased position in such Digital Currency, Dollars or Alternative Currency, in each case in (x) and (y), in an amount up to the amount of the relevant insufficiency in such Digital Currency, Dollars or Alternative Currency), which shall be reasonably calculated by Lender and payable by Borrower in addition to the Borrow Rate.

(c)  Payment of Borrow Rates and Default Rates

An invoice for interest that accrues at the Borrow Rates and any Default Rates (the "Invoice Amount") shall be sent out on the first (1st) Business Day of each month prior to the Maturity Date and shall include any interest incurred from the previous month. Borrower shall remit payment in full satisfaction of such invoice within three (3) Business Days after such invoice is sent to Borrower (such due date, the "Invoice Due Date"); provided that, failure of Lender to send an invoice by the Invoice Due Date shall not relieve Borrower of its obligation to pay the Invoice Amount upon delivery of an invoice. Transaction Payments unpaid by the Invoice Due Date shall also become subject to the Default Rate commencing the day after the Invoice Due Date.

(d)  Application of Payments

Borrower shall, at the time of making each payment under this Agreement, specify to the Lender the Loan to which such payment is to be applied.  In the event that the Borrower fails to so specify, or if an Event of Default has occurred and is continuing, the Lender may apply the payment in such manner as it may determine to be appropriate in its sole, reasonable discretion.

(e)  Application of Insufficient Payments

If at any time insufficient amounts are received by the Lender to pay fully all amounts of principal, applicable Transaction Payments, and other amounts then due and payable hereunder, the Lender may apply such payment received as it may determine to be appropriate in its sole reasonable discretion.  Lender may, in its reasonable discretion and if there is more than one outstanding Loan between the parties, apply payments by Borrower in one Digital Currency or in Dollars or an Alternative Currency towards the satisfaction of obligations outstanding with respect to a Loan in another Digital Currency, Dollars or an Alternative Currency, provided that Lender will make any

*Strictly Private & Confidential*

conversions between such Digital Currencies, Dollars or Alternative Currencies based upon the applicable market rate at the Liquidity Exchange.

(f)    Non-Business Days

If the due date of any payment or delivery or the Maturity Date of any Loan under this Agreement would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day and, in the case of any Transaction Payments, such Transaction Payments shall be payable for the period of such extension.

(g)    Computations

Transaction Payments shall be computed on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which payable. For purposes of calculating Transaction Payments, Digital Currencies shall be deemed to have been Transferred by one party to the other when the applicable Confirmation Protocol for the relevant Digital Currency has been completed. If the requirements of the Confirmation Protocol are not met by 5:00 p.m. New York Time, the Transfer shall be deemed to have been made on the following Business Day. Calculation of Transaction Payments shall be based on the date when the relevant Transfer is deemed to have occurred.

(h)    Taxes

(1)    Payments Free of Taxes. Any and all payments by or on account of any obligation of Borrower hereunder shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided that if Borrower shall be required by Applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions for Indemnified Taxes or Other Taxes (including deductions for Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section) the Lender shall receive an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(2)    Payment of Other Taxes by Borrower. Without limiting the provisions of Section (1) above, Borrower shall timely pay any Other Taxes that arise from any payment made by it under, or otherwise with respect to, this Agreement to the relevant Governmental Authority if required and in accordance with Applicable Law.

(3)    Indemnification by Borrower. Borrower shall indemnify the Lender for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section III(h)(3)) attributable to Borrower under this Agreement and paid by the Lender, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority against Lender.

*Strictly Private & Confidential*

A certificate delivered to Borrower by Lender as to the amount of such payment or liability actually paid by Lender to the relevant Governmental Authority shall be conclusive and binding absent manifest error.

(4) Tax Reporting. Borrower shall report, if and/or as required under Applicable Law.

## IV.    <u>**Collateral Requirements**</u>

(a)  <u>Collateral</u>

Borrower shall provide as collateral an amount of Digital Currency, Dollars or Alternative Currency to be determined (together with each Collateral Account, the Staking Contracts Collateral, and any Additional Collateral and excluding any Returned Collateral as defined below, collectively, the "<u>Collateral</u>") in accordance with the terms of this Section IV and any other such terms as agreed upon by the Borrower and Lender and memorialized in a Loan Term Sheet attached as Exhibit B.  Initially, the amount of Collateral required will be greater than or equal to the product of (i) Initial Margin Percentage as agreed upon in the Loan Term Sheet and (ii) the Value of the borrowed Digital Currency, Dollars or Alternative Currency (such level, the "<u>Initial Margin Level</u>"). Collateral shall be valued in Dollars. For the avoidance of doubt, upon the return of the Borrowed Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited. Notwithstanding the foregoing, if mutually agreed in writing by both parties, Borrower may satisfy the Collateral Requirements (in whole or in part) to Lender in Stablecoins in lieu of Dollars or an Alternative Currency.

The Collateral shall be security for Borrower's obligations in respect of the Loans and for any other obligations of Borrower to Lender under this Agreement and the other Loan Documents. Borrower hereby pledges, collaterally assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, and right of setoff against, all of Borrower's right, title and interest in the Collateral (which includes the Collateral Account and all assets held therein, credited thereto and security entitlements and all economic and non-economic rights related thereto) and any Proceeds of any of the Collateral (including, for the avoidance of doubt, any New Currency), whether now owned by or owing to, or hereafter acquired by or arising in favor of, the Borrower, or in which the Borrower has or at any time in the future may acquire and right, title, or interest, which shall attach upon the transfer of the Borrowed Assets by Lender to Borrower.

Borrower hereby charges to the Lender with full title guarantee, all right, title, ownership and interest in and to the Collateral and all cash, or other property representing a distribution in respect of the Collateral, or resulting from a split-up, revision, reclassification or other like change of the Collateral or otherwise received in exchange therefore by way of first fixed charge.

The pledge, assignment, charge and security interest created by this paragraph shall automatically terminate and all rights to the Collateral shall revert to the Borrower upon termination of the Loan pursuant to the terms of the Agreement. Upon any such termination, the Lender will, at Borrower's expense and without any representations, warrantees or recourse of any kind whatsoever, execute and deliver to Borrower such documents as Borrower shall

*Strictly Private & Confidential*

reasonably request to evidence such termination.

In addition to the rights and remedies given to Lender hereunder, Lender shall have all the rights and remedies of a secured party under Applicable Law. Lender shall be free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use the Collateral.

In addition to the pledge, assignment, charge and security interest granted pursuant to the foregoing, Borrower and Lender will enter into the Account Control Agreement (Digital Currency) to govern the pledge and collateral assignment of and security interest in Collateral consisting of the Collateral Account and the Staking Contracts Collateral.

(b) <u>Margin Calls</u>

If, during the term of a Loan, the sum of the products of (i) Margin Requirement Percentage as set forth in the Loan Term Sheet, and (ii) Value of the Loaned Assets for each Loan exceeds the Value of the Collateral (such product, the "<u>Margin Call Level</u>"), Lender shall have the right to require Borrower to contribute additional collateral ("<u>Additional Collateral</u>") so that the Value of the Collateral (including the Additional Collateral) is equal to or greater than the Initial Margin Level for each Loan.

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>Margin Notification</u>") to the Borrower at the email address indicated in Section XV that sets forth the amount of Additional Collateral required. Borrower shall have twenty-four (24) hours from the time Lender sends such Margin Notification to deliver such required Additional Collateral to Lender in accordance with subsection (c) below. Failure by Borrower to timely deliver the relevant amount of Additional Collateral by the time specified in the Margin Notification and in accordance with subsection (c) below shall constitute an Event of Default.

(c) <u>Delivery of Additional Collateral</u>

Borrower's obligation to deliver Additional Collateral to Lender shall be satisfied (i) in the case of Dollars, by bank wire to the account specified in the Loan Term Sheet, (ii) by an amount of Stablecoins transferred to the digital wallet address specified in the Loan Term Sheet, or (iii) by delivery of return amounts of borrowed Digital Currencies, Dollars or Alternative Currencies, as applicable, to Lender sufficient to cause the Value of the Collateral to be equal to or greater than the Initial Margin Level.

(d) <u>Return of Collateral</u>

If, as of any Business Day, the Value of the Collateral exceeds the sum of the products of (i) Release Margin Percentage as agreed upon in the Loan Term Sheet, and (ii) Value of the Loaned Assets for each Loan, Borrower shall have the right, in its sole and absolute discretion, to require that Lender return an amount of Collateral, so that the Value of the Collateral is at least equal to the sum of the products of (i) Release Margin Percentage as agreed upon in the Loan Term Sheet, and (ii) the Value of the Loaned Assets for each Loan (such excess amount, the "<u>Returned Collateral</u>"); provided, however, that notwithstanding the foregoing, Lender shall not be required

*Strictly Private & Confidential*

pursuant to this paragraph to return Collateral that consists of staked assets.

(i)     If Borrower requires Lender to repay Returned Collateral, it shall send an email notification (the "Return Notification") to the Lender at the email address indicated in Section XV that sets forth the amount of Returned Collateral. Lender shall return the Returned Collateral to Borrower in accordance with subsection (e) below by 6:00 p.m. New York time on the Business Day on which the Return Notification is received, if received by Lender prior to 10:00 a.m. New York time on a Business Day, or otherwise by 6:00 p.m. New York time on the next Business Day; provided, that, if the Returned Collateral is subject to any unbonding period or other requirements or limitations imposed by the relevant network or its protocol that would prevent the return of the Returned Collateral in accordance with the foregoing timeframes, Lender's obligation to return any Returned Collateral following its receipt of a Return Notification shall be satisfied if (a) Lender requests the release of such Returned Collateral from the applicable custodian, sub-custodian or exchange (or its administrator) no later than (1) 6:00 p.m. New York time on the Business Day on which such Return Notification is received, if received by Lender prior to 10:00 a.m. New York on a Business Day or (2) otherwise, 6:00 p.m. New York time on the next Business Day and (b) such Returned Collateral is delivered to Borrower by 6:00 p.m. New York time on the Business Day following the date on which such Returned Collateral is no longer subject to such unbonding period or other requirement or limitation.

(e)  Delivery of Returned Collateral

Delivery of the Returned Collateral shall be made by bank wire to the account or a digital wallet address, in both instances specified in the Return Notification by the Borrower, as applicable.

(f)  Default or Failure to Return Loan

In the event that Borrower fails to return borrowed Digital Currencies, Dollars or Alternative Currencies, as applicable, under a Loan upon Termination or upon the occurrence of an Event of Default, Lender may transfer that portion of the Collateral to Lender's operating account necessary for the payment of any reasonable liability or obligation or indebtedness created by this Agreement, including, but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency, Dollars or Alternative Currencies.

(g)  Return of Collateral

Upon Borrower's redelivery of borrowed Digital Currencies, Dollars or Alternative Currencies, as applicable, under a Loan and acceptance by Lender of the Borrowed Digital Currencies into Lender's wallet address or bank account, as applicable, and, with respect to Digital Currencies, such delivery being confirmed on the relevant Digital Currency blockchain pursuant to the Confirmation Protocol, Lender shall return the relevant amount of Collateral to a bank account in the name of Borrower, or a digital wallet address specified by the Borrower, as applicable.

(h)  Staking of Collateral.  Borrower may stake Collateral consisting of Solana or such other assets as Lender may approve in writing, in each case, so long as:

*Strictly Private & Confidential*

(i)     Such staking activity is consummated in accordance with the terms of the applicable Staking Contracts and the applicable Custody Agreement;

(ii)    Lender provides its written approval to such staking activity pursuant to the applicable Account Control Agreement (Digital Currency);

(iii)   all of the Proceeds of such staking activity (including any rewards) are credited to a Collateral Account; and

(iv)    (A) No Event of Default, or any event that with the giving of notice or lapse of time or both would become an Event of Default, shall have occurred and be continuing or would result from such staking activity, (B) no Material Adverse Change shall have occurred and be continuing or would result from such staking activity, and (C) immediately after giving effect to such staking activity, the amount of Collateral shall be at least equal to the Required Collateral Amount.

For the avoidance of doubt, at any time of determination, any assets staked pursuant to this Section, and all Proceeds thereof, shall constitute Collateral, regardless of whether such assets or Proceeds are credited to a Collateral Account at such time, and Lender's security interest in such assets or Proceeds will be undisturbed and continue until terminated pursuant to the terms hereof.

## V.    **Hard Fork**

(a)  Notification

In the event of an upcoming Hard Fork in the Digital Currency of any Borrowed Assets, Lender shall not be required to provide notification to Borrower of such event(s) to occur.

(b)  No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork, the terms set forth on a Loan Term Sheet for any outstanding Loans will not be affected and the Loans will not be immediately terminated as a result of the Hard Fork.

(c)  Redelivery of Borrowed Digital Currency

On the Maturity Date or other date of termination of a Loan pursuant to the terms of this Agreement, notwithstanding anything to the contrary in the Agreement, Lender will receive the benefit of any incremental tokens generated as a result of any Hard Forks in the relevant Digital Currency protocol during the term of such Loan that result in a new cryptocurrency (each, a "New Currency") being created, provided that the amount of such New Currency will be the appropriate amount of each such New Currency to which a holder of the amount of Digital Currency (as agreed in the Loan Term Sheet) would be entitled in connection with such Hard Forks. The determination of whether a Hard Fork has occurred will be made by the Lender in accordance

*Strictly Private & Confidential*

with the CME CF Cryptocurrency Indices Hard Fork Policy (Version 1) as published by the CME Group in December 2017.

## VI.    <u>Representations and Warranties.</u>

(a)  (i) On the date hereof, each party represents and warrants that this Agreement and each other Loan Document executed on the date hereof have been duly and validly authorized, executed and delivered on behalf of each party and constitutes the legal, valid and binding obligations of such party enforceable against the party in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)), and will not contravene (1) its constituent documents, (2) any Applicable Law, and (3) any judgment, award, injunction or similar legal restriction and (ii) on the date of execution of each Loan Term Sheet, each party represents and warrants that such Loan Term Sheet and any Loan Documents executed on such date have been duly and validly authorized, executed and delivered on behalf of each party and constitutes the legal, valid and binding obligations of such party enforceable against the party in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)), and will not contravene (1) its constituent documents, (2) any Applicable Law, and (3) any judgment, award, injunction or similar legal restriction.

(b)  Each party represents that on the date hereof and on the date of execution of each Loan Term Sheet that no license, consent, authorization or approval or other action by, or notice to or filing or registration with, any Governmental Authority (including any foreign exchange approval), and no other third-party consent or approval, is necessary for the due execution, delivery and performance by such party of this Agreement or for the legality, validity or enforceability thereof against such party.

(c)  Each party hereto represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received or to be received hereunder.

(d)  Lender represents and warrants that it has, or will have at the time of Transfer of any Digital Currency, Dollars or Alternative Currency to Borrower, the full and unrestricted legal right to lend such Digital Currency, Dollars or Alternative Currency subject to the terms and conditions hereof, that, with respect to any Transferred Digital Currency, it is the sole and exclusive lawful owner of the Digital Currency, free and clear of all, encumbrances, claims (pending or threatened), pledges, legal actions (pending or threatened), charges, mortgages, security interests or other limitations or restrictions whatsoever and that such Digital Currency has been acquired in accordance with all Applicable Laws.

(e)  Borrower represents and warrants on the date hereof and at the time of return of any

*Strictly Private & Confidential*

Digital Currency, Dollars or Alternative Currency, the right to transfer such Digital Currency, Dollars or Alternative Currency, subject to the terms and conditions hereof, and, free and clear of all liens, charges, mortgages, security interests and encumbrances other than those arising under this Agreement and that the Digital Currency, Dollars or Alternative Currency that it will return has been acquired in accordance with all Applicable Laws.

(f)  Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest therein and the right to transfer such Collateral subject to the terms and conditions hereof, and, free and clear of all liens, charges, mortgages, security interests and encumbrances other than those arising under this Agreement, and that the Collateral that it will transfer has been acquired in accordance with all applicable laws.

(g)  Each party hereto represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that it is a sophisticated party and fully familiar with the inherent risks involved in the transactions contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(h)  Borrower represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that no Event of Default, nor any event or act which with notice or lapse of time would become an Event of Default which has not been remedied or waived, has occurred and is continuing.

(i)  Each Party represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that there are no proceedings pending or, to its knowledge, threatened, which could reasonably be expected to have a material adverse effect on the transactions contemplated by this Agreement (including, without limitation, the enforceability of any Staking Contract or the rights or benefits available to Borrower or Lender under any Staking Contract) or the accuracy of the representations and warranties hereunder.

(j)  Each Party represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that it is not insolvent and no formal procedure or step or creditors' process has been taken or, to its knowledge, been threatened in writing (and is, in each case, outstanding) against it.

(k)  On the date of execution of each Loan Term Sheet, Borrower represents and warrants that (i) the exact legal name of Borrower is as set forth in each Loan Term Sheet; (ii) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority, which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects, the value of the Collateral or the enforceability of any Staking Contract or the rights or benefits available to Borrower or Lender under any Staking Contract; and (iii) without Lender's prior written consent, Borrower will not (A)

*Strictly Private & Confidential*

change its name, its place of business, chief executive office, its mailing address, or tax identification number if it has one or (B) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have a tax identification number and later obtains one, Borrower shall promptly notify Lender of such taxpayer identification number. Borrower further represents and agrees that Borrower will not, without Lender's prior written consent, (x) merge or consolidate with or into any other business entity or (y) enter into any joint venture or partnership with any person, firm or corporation.

(l)  Borrower represents and warrant that:

(i) Neither it, nor any of its subsidiaries or any director, officer, employee, agent, or affiliate of it or any of its subsidiaries is an individual or entity that is, or is owned or controlled by persons that are: (i) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including at the date of this Agreement, Crimea, Cuba, Iran, North Korea and Syria) (a "Sanctioned Country");

(ii)     It and its subsidiaries and their respective directors, officers and employees and, to its knowledge, its agents and their subsidiaries, are in compliance with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA") and any other applicable anti-corruption law; and

(iii)     It and its subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with applicable Sanctions, the FCPA and any other applicable anti-corruption laws.

(m) Borrower represents and warrants that:

(i) There are no lien, security interest, charge, mortgage or other encumbrances on the Collateral except in favor of Lender pursuant to the Loan Documents;

(ii)     The execution, delivery and performance of this Agreement and, if applicable, each other Loan Document does not contravene the terms of any Staking Contract or the Custody Agreement;

(iii)     Borrower has furnished to Lender true and complete copies of all Staking Contracts and the Custody Agreement and all amendments, supplements, waivers or similar agreements or arrangements to the Staking Contracts and the Custody Agreement, as the case may be;

(iv)     There has been no Material Adverse Change since the Effective Date; and

*Strictly Private & Confidential*

(v) Each Staking Contract has been duly authorized, executed and delivered by, and constitutes the legal, valid and binding obligation of, all parties thereto. Each Staking Contract is in full force and effect and is enforceable in accordance with its terms. Each Staking Contract is and will be in compliance with Applicable Law. No default, breach or potential default or breach by any person has occurred and is continuing under any Staking Contract. No event has occurred and no circumstances exist that would entitle any Staking Contract Counterparty to cease, cancel, suspend or delay the payment to Borrower of any staking rewards attributable to Borrower's Digital Currency or Alternative Currency. The Staking Contracts do not permit any setoffs, defenses, taxes or counterclaims. The Staking Contracts do not prohibit assignment or require consent of or notice to any Person in connection with the collateral assignment to Lender of the Staking Contracts Collateral, other than such consents as have been obtained in writing and are in full force and effect.

## VII.    <u>**Agreements**</u>.

Borrower agrees that, so long as it has any obligations outstanding under this Agreement or any other Loan Document to which it is a party:

(a) It will comply in all material respects with all Applicable Laws and orders in which it may be subject if failure to so comply would materially impair its ability to perform its obligations under this Agreement or any Loan Document to which it is a party.

(b) It shall pay and discharge all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which the penalties attach thereto, and all lawful claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a material lien or encumbrance upon any properties of the Borrower, provided that the Borrower shall not be required to pay any such tax, assessment, charge, levy or claim with respect to which the failure to pay would not reasonably be expected to have a material adverse effect on its abilities to repay the Loans and perform all other obligations hereunder and under the other Loan Documents.

(c) It will use all reasonable efforts to maintain in full force and effect all consents of any Governmental Authority or otherwise that are required to be obtained by it with respect to this Agreement or any Loan Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(d) Borrower shall not, without providing Lender thirty (30) calendar days' prior written notice, change (i) its legal name, (ii) its jurisdiction of organization, (iii) in its type of organization that would impair the perfection and priority of the security interest and charge granted pursuant to this Agreement and the other Loan Documents and (iv) in the location of its chief executive office. Upon making any such change, Borrower shall promptly provide lender with certified organizational documents reflecting any change in (i)-(iv) above.

(e) It shall satisfy all agreements listed in Schedule A.

DocuSign Envelope ID: 55E26B6C-EF18-41EC-9E5E-4D99D68690D3

*Strictly Private & Confidential*

(f)  If requested and required by Lender, in connection with a pledge of (or maintenance of an existing pledge of) Collateral consisting of Digital Currency or Alternative Currency, Borrower shall enter into one or more Account Control Agreements (Digital Currency).

(g)  It shall promptly provide such additional information and documents that the Lender may from time to time reasonably request.

(h)  It shall promptly provide such additional information and documents that the Lender may from time to time reasonably request.

(i)  It shall comply with the terms of each Staking Contract to which it is a party and perform all of its obligations thereunder to the Staking Contract Counterparties.

(j)  It shall comply with the terms of the Custody Agreement and perform all of its obligations thereunder to the Custodian.

(k)  All payments, funds and other Proceeds in respect of any Collateral consisting of Digital Currency or Alternative Currency (including, without limitation, any staking rewards) shall be promptly credited to a Collateral Account.  On or prior to the Closing Date, Borrower shall instruct in writing the Custodian and each Staking Contract Counterparty to credit all such payments, funds, and other Proceeds directly to a Collateral Account. Borrower shall not modify such instructions without Lender's prior written consent.

(l)  Borrower shall not, without Lender's prior written consent, (i) terminate or permit the termination, of any Staking Contract or the Custody Agreement or (ii) make, or permit the making of, any amendment or modification of any Staking Contract or the Custody Agreement.

## VIII.  <u>**Conditions Precedent**</u>.

This Agreement and the obligations set forth hereunder shall not become effective until the Business Day on which the following conditions are satisfied in a manner satisfactory to, or waived in writing by, the Lender (such date, the "<u>Effective Date</u>"):

(a)  The Lender's receipt of executed counterparts of this Agreement, in each case, duly and property executed and delivered by each of the parties hereto;

(b)  (i) receipt of any other Loan Documents and instruments as may be reasonably required by Lender, including but not limited to, for corporate borrowers, resolutions and incumbency certificates, or other documents evidencing authority to enter into this Agreement and borrow the Loans, (ii) good standing certificates (to the extent such concept exists in the relevant jurisdiction of organization or incorporation) and true and complete copies of the certificate or articles of formation or incorporation and the bylaws or operating agreement (or equivalent or comparable constitutive documents), (iii) a certificate of an authorized officer dated as of the Effective Date (A) certifying that the documents in clauses (i) and (ii) above are correct and complete and have not been amended or superseded prior to the Effective Date and (B) attaching copies of each Staking Contract and the Custody Agreement and (iv) each other Loan Document required by the Lender to be executed on or prior to the Effective Date, in each case, duly

*Strictly Private & Confidential*

and properly executed by each of the parties thereto; provided that the requirements in clauses (i)-(iii) may be satisfied by delivering a fully executed certificate in form and substance set forth as **Exhibit C**, or as may otherwise be reasonably acceptable to Lender;

(c)  The Borrower shall have provided such documentation and other information reasonably requested by the Borrower in connection with regulatory requirements under the applicable "know-your-customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act;

(d)  Certified copies of UCC, insolvency, tax, judgment lien and execution searches, or equivalent reports or searches, each of a recent date;

(e)  The Lender shall have received from Borrower all financing statements and other instruments as it reasonably requests in form appropriate for filing in all jurisdictions that the Lender may deem necessary or desirable in order to perfect the security interest created in connection with this Agreement.

## IX.    <u>Default</u>

It is further understood that the following defaults shall constitute events of default hereunder and are hereinafter referred to as an "Event of Default" or "Events of Default":

(a)  the failure of the Borrower to (i) return any Loaned Assets (including any Recall Amount), (ii) pay any Transaction Payments, (iii) transfer any required amount of Collateral or Additional Collateral by the time and/or in the manner required under Section IV, or (iv) make any payment or reimbursement specified in Section (V)(c) in the event of a Hard Fork, in each such case when due and/or required to do so by the time required under this Agreement;

(b)  the failure of Borrower to perform or observe any other term, condition, covenant, provision, or agreement contained in any of the Loan Documents;

(c)  the Borrower:

(i) is unable (or deemed or declared to be unable under any applicable law) or admits inability to pay its debts as they fall due;

(ii) ceases or suspends making payment on any of its debts or publicly announces an intention to do so; or

(iii) by reason of actual or anticipated financial difficulties commences negotiations with, or makes a proposal to do so, with any creditors (other than negotiations with Lender) with a view to the general readjustment or rescheduling of its indebtedness or makes a general assignment for the benefit of or a composition with its creditors;

*Strictly Private & Confidential*

(d)  a moratorium is declared in respect of the indebtedness of Borrower;

(e)

    (i) any corporate action or legal proceedings are taken in relation to:

        (A) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, bankruptcy, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of Borrower;

        (B) a composition, compromise, assignment or arrangement with financial creditors generally (other than Lender) of Borrower in connection with or as a result of any financial difficulty on the part of Borrower;

        (C) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of, or all or any part of the business or assets of Borrower;

        (D) the enforcement of any liens, pledges, charges, mortgages, security interests or other encumbrances over, or over all or any part of the business or assets of, Borrower; or

        (E)  any analogous procedure or step is taken in any jurisdiction;

    (ii) paragraph (i) above shall not apply to any proceedings which are frivolous or vexatious and which, if capable of remedy, are discharged, stayed or dismissed within thirty (30) days or the applicable statutory time limit of their initiation;

(f)  any representation or warranty made by Borrower in any of the Loan Documents proves to be untrue in any material respect as of the date of making or deemed making thereof;

(g)  any Staking Contract or the Custody Agreement shall be amended or modified other than in accordance with Section VII(n) or any Staking Contract or the Custody Agreement shall terminate; or

(h)  Borrower notifies Lender of its inability to or its intention not to perform any of its obligations hereunder or otherwise disaffirms, rejects or repudiates any of its obligations hereunder.


## X.    <u>Remedies</u>

(a)  Upon the occurrence and during the continuation of any Event of Default, the Lender may, at its option (subject to the terms and conditions of this Agreement), (a) declare all Loaned Assets outstanding hereunder immediately due and payable, (b) terminate this Agreement and any other agreement or transaction between Borrower and Lender upon written notice to Borrower, and (c) exercise all other rights and remedies available to the Lender hereunder, under Applicable Law, or in equity; provided, that upon any Event of

*Strictly Private & Confidential*

Default, the amount of any Transaction Payments then outstanding hereunder shall automatically become and be immediately due and payable. Lender shall also have the right, at any time on or after Borrower fails to make sufficient payments to pay fully all Transaction Payments and other amounts then due and payable hereunder, or on or after the occurrence of an Event of Default, to purchase the relevant Digital Currency in the amount of any such insufficiency in a commercially reasonable manner, or foreclose on, liquidate, sell or collect on the Collateral that Lender or any affiliate may then hold, and apply the proceeds to satisfy any and all obligations of Borrower to Lender or any affiliate, whether arising under a different Loan, or net, set off and/or recoup any and all obligations of Lender or any affiliate of Lender to Borrower, against either the purchase price of such replacement Digital Currency or any such obligations of Borrower to Lender or any affiliate of Lender. In connection with the exercise of such remedies, Lender and its affiliates are hereby authorized to apply or transfer any Collateral of Borrower interchangeably between Lender and its affiliates solely to satisfy any obligations of Borrower to Lender or its affiliates at any time with prior notice (email sufficient) to Borrower.

(b)  Upon the occurrence and during the continuation of any Event of Default by Lender, the Borrower may, at its option, (1) demand a return of any and all Collateral in the control or possession of Lender or its agents, (2) withhold repayment of the Loaned Assets and any outstanding Fees or other amounts claimed by Lender and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under Applicable Law, or in equity.

(c)  In addition to its rights hereunder, the non-defaulting party shall have any rights otherwise available to it under any agreement or Applicable Law.

## XI.    <u>Rights and Remedies Cumulative.</u>

In addition to and not in lieu of the rights set forth in <u>Section X</u> above, upon the occurrence of an Event of Default, Lender may, without notice of any kind, which Borrower hereby expressly waives (except for any notice that may not be waived under Applicable Law), at any time thereafter exercise and/or enforce any of the following rights and the remedies, at Lender's option: (i) deliver or cause to be delivered from the Collateral Account to itself or to an affiliate, the Collateral or (ii) sell, lease, assign or otherwise dispose of all or any part of the Collateral, at such place or places and at such time or times as Lender deems best, and for cash or for credit or for future delivery, at public or private sale, upon such terms and conditions as it deems advisable. The parties agree and acknowledge that the relevant Digital Currency pledged as Collateral are traded on a "recognized market" as such term is used in the UCC and the price at which the relevant Digital Currency is traded on the relevant Liquidity Exchange may be the price at which Lender purchases for itself or sells for future delivery pursuant to its exercise of remedies hereunder.  No delay or omission by either party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each party stated herein are cumulative and in addition to all other rights provided by law, in equity.

*Strictly Private & Confidential*

## XII.    Collection Costs.

In the event Borrower fails to pay any amounts due or to return any Loaned Assets hereunder, the Borrower shall promptly pay to the Lender upon demand all reasonable fees, costs and expenses, including without limitation, reasonable attorneys' fees and court costs incurred by the Lender in connection with the enforcement of its rights hereunder.

## XIII.    Passwords and Security.

Each party is responsible for maintaining adequate security and control of any and all passwords, private keys, and any other codes that it uses to Transfer, receive or stake Digital Currencies hereunder or under the Staking Contracts or Custody Agreement. Each party will be solely responsible for the private keys that it uses to make the Transfers, staking and maintaining secure back-ups. Each party will promptly notify the others of any security breach of its accounts, systems or networks as soon as possible. Each party will reasonably cooperate with the other party in the investigation of any suspected unauthorized Transfers or attempted Transfers using a party's account credentials or private keys, and any security breach of a party's accounts, systems, or networks, and provide the other party with the results of any third-party forensic investigation that it may undertake. Each party will be responsible for any unauthorized Transfers or staking made utilizing its passwords, private keys, and any other codes it uses to make or receive Transfers or staking.

## XIV.    Governing Law; Dispute Resolution; Waiver of Consequential Damages.

This Agreement is governed by, and shall be construed and enforced under, the laws of England and Wales, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in London by arbitration under the LCIA Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

Borrower shall indemnify and hold harmless Lender, its affiliates, and each such party's officers, directors, employees, representatives, and agents from and against any and all claims, demands, losses, expenses, obligations, damages, penalties, actions and liabilities of any and every nature (including attorneys' fees of an attorney (or to the extent multiple attorneys are required in Lender's sole reasonable discretion, attorneys' fees of such attorneys) of Lender's choosing to defend against any such claims, demands, losses, expenses and liabilities) that Lender may sustain or incur or that may be asserted against Lender arising out of Lender's lending of Digital Currency, Dollars or Alternative Currency to Borrower under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Lender's bad faith, gross negligence or willful misconduct in the performance of its duties under this

Agreement. This indemnity and the provisions of this paragraph continuing obligations of Borrower, its successors and assigns, and shall survive termination of this Agreement.

### XV.    (a) Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

BlockFi:

      BlockFi International Ltd.

      Attn:

      Email:

Alameda:

      Alameda Research Limited

      Attn:

      Email:

Either party may change its address by giving the other party written notice of its new address as herein provided.

### (b) Delivery.

Any communication or document made or delivered by one person to another under or in connection with the Loan Documents will only be effective:

(i) if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address; or

(ii) if by way of email, immediately after the time sent (as recorded on the device or system from which the sender sent the email), unless the sender receives an automated message that the email has not been delivered.

### (c) English language.

All other documents provided under or in connection with any Finance Document must be:

(i) in English; or

(ii) if not in English, and if so required by Lender, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## XVI.  Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

## XVII.  Entire Agreement.

This Agreement and each exhibit referenced herein constitutes the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.

## XVIII. Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that neither party may assign this Agreement or any rights or duties hereunder without the prior written consent of the other party.

## XIX.  Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XX.  Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

*Strictly Private & Confidential*

### XXI.  **Relationship of Parties.**

Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

### XXII.  **Term and Termination.**

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either party provides written notice (email sufficient) of a desire to terminate the contract no less than ten (10) days prior to the end of such one- year period. The foregoing notwithstanding, this Agreement may be terminated (i) as set forth in Section IX or (ii) upon 30 days' written notice (email sufficient) by either party to the other.  Notwithstanding the foregoing, if there are any Loans outstanding at the time either party sends a notice of termination pursuant to this Section XXII, such termination of this Agreement will not be effective until all Loans are terminated on the relevant Maturity Date or pursuant to Section (II)(d).

### XXIII. **Miscellaneous.**

(a) If an error is made hereunder in connection with a payment under any Loan Document or any other contractual arrangement, and such payment is an overpayment or a payment not anticipated hereunder or thereunder, the party receiving the payment in error shall refund the mistaken amount to the paying party as promptly as is commercially practicable; provided that the paying party may, in its sole discretion and upon written notice of the amount and basis for such offset, elect to set-off such amounts against future payments hereunder.

(b) Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement is the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

(c) Unless a contrary indication appears, any reference in this Agreement to:

(i) "assets" includes present and future properties, revenues and rights of every description;

(ii) a "person" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

*Strictly Private & Confidential*

(iii) a "regulation" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organization;

(iv) a provision of law is a reference to that provision as amended or re-enacted from time to time; and

(v) a time of day is a reference to New York time.

(d) Unless a contrary indication appears, a term used in any other Loan Document or in any notice given under or in connection with any Loan Document has the same meaning in that Loan Document or notice as in this Agreement.

### XXIV. **Amendment and Restatement; Ratification.**

This Agreement is executed in renewal, and not in extinguishment, of the Prior Agreement and the Loans made thereunder. Nothing contained herein or in the other Loan Documents is intended to or may be deemed to evidence the repayment, satisfaction or novation of Borrower's obligations to the Lender under the superseded Loan Documents, including the Prior Agreement, all of which obligations are hereby ratified and affirmed and all of which, including the Loans made thereunder, will hereafter be deemed outstanding under, and evidenced by, this Agreement and the other Loan Documents.

Borrower hereby (a) ratifies and confirms all provisions of Loan Documents as amended hereby, and (b) ratifies and confirms that all guaranties, assurances, and liens and security interests pledged, granted, conveyed, or assigned to Lender under such Loan Documents are not released, reduced, or otherwise adversely affected by this Agreement and continue to guarantee, assure, and secure full payment and performance of the present and future obligations of Borrower under the Loan Documents.

### XXV. **Third Party Rights.**

(a) Unless expressly provided to the contrary in a Finance Document a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

(b) Notwithstanding any term of any Loan Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

### XXVI. **Calculations, Certificates and Monitoring.**

(a) In any litigation or arbitration proceedings arising out of or in connection with a Loan Document, the entries made in the accounts maintained by Lender are prima facie evidence of

*Strictly Private & Confidential*

the matters to which they relate.

 (b) Any certification or determination by Lender of a rate or amount under any Loan Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

 (c) Lender is not bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

## XXVII.  **Partial Invalidity.**

 If, at any time, any provision of the Loan Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## XXVIII.  **FTX Exchange Indemnity.**

 Borrower (including its successors and assigns) shall indemnify and hold harmless Lender and its affiliates from and against any direct damages Lender incurs solely resulting from Lender's inability to withdraw Collateral from FTX exchange. This indemnity and the provisions of this paragraph shall survive termination of this Agreement.

## XXIX. **Service of Process.**

Borrower agrees that the documents which start any proceedings before English Courts in relation to any Loan Document, and any other documents required to be served in connection with those proceedings, may be served on it by being delivered to an address in England and Wales as Borrower may specify by notice in writing to Lender; provided, Borrower shall provide such address to Lender within a reasonable time following the date of this Agreement. Nothing in this paragraph shall affect the right of Lender to serve process in any other manner permitted by law. This clause applies to proceedings in England and proceedings elsewhere.

*[Signatures follow]*

*Strictly Private & Confidential*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

**BLOCKFI INTERNATIONAL LTD.**

By: _____

Name: _____ David Olsson _____

Title: _____ Senior Vice President _____

**ALAMEDA RESEARCH LIMITED**

By: _____

Name: _____ Caroline Ellison _____

Title: _____ Co-CEO _____

*Strictly Private & Confidential*

# EXHIBIT A

Authorized Agents. The following are authorized to deliver Lending Requests on behalf of Alameda in accordance with Section II hereof:

Name: Samuel Bankman-Fried
Email: ███████████████████

Name: Ryan Salame
Email: ███████████████████

Authorized Agents. The following are authorized to deliver Lending Requests on behalf of BlockFi in accordance with Section II hereof:

Name: Zac Prince
Email: ██████████████

Name: Chris Yeung
Email: ██████████████

Name: Jason Wilkinson
Email: ██████████████

Name: Jessica Raybeck
Email: ██████████████

Name: Yevgeniy Feldman
Email: ██████████████

Name: Joe Hickey
Email: ██████████████

Either party may change its Authorized Agents by notice given to the other party as provided in Section XV.

*Strictly Private & Confidential*

## EXHIBIT B LOAN TERM SHEET

The following Loan Term Sheet dated [*insert date*] incorporates all of the terms of the Amended and Restated Master Loan Agreement entered into by Alameda Research Limited and BlockFi International Ltd. on January 26, 2022 and the following specific terms:

| | |
|---|---|
| **Borrower:** | Alameda Research Limited |
| **Lender** | BlockFi International Ltd. (together with its successors and permitted assigns) |
| **Digital Currency / Dollars / Alternative Currency** | BTC |
| **Amount** | [ ] |
| **Borrow Rate** | [ ] |
| **Callable Option** | [Yes][No] |
| **Prepayment Option** | [Yes][No] |
| **Maturity Date** | [Insert date][None] |
| **Loan Type** | [ ] |
| **Loan Term** | [ ] |
| **Initial Margin Percentage** | [ ]% |
| **Margin Requirement Percentage** | [ ]% |
| **Release Margin Percentage** | [ ]% |
| **Allowable Stablecoin Collateral** | [GUSD][USDC][PAX] |
| **Digital Currency Payment to Lender** | [insert Lender's Digital Currency Address] |
| **Dollar Payment to Lender** | [insert Lender's Bank Details and stable coin blockchain address] |

Alameda Research Limited                         BLOCKFI INTERNATIONAL LTD.


By:_____                         By: _____
Name:                                            Name:
Title:                                           Title:

*Strictly Private & Confidential*

**EXHIBIT C**

**Corporate Resolutions and Incumbency Certification**

I certify that I am the duly elected and qualified [*secretary*] of [    ] a [ ] organized under the laws of [ ] (the "Company") and the keeper of the records of the Company; that the following is a true and correct copy of resolutions duly adopted by the [*members/managers/partners/board of managers/board of directors/other*]] of the Company in accordance with its [*bylaws/LLC agreement/other governing document*] as of_____, 20_.

Reference is made to that certain Amended and Restated Master Loan Agreement entered into by [*Name*] and BlockFi on [*date*] (as amended, restated, supplemented or otherwise modified from time to time, the "Master Loan Agreement"). Terms capitalized but not defined herein shall have the meanings set forth in the Master Loan Agreement.

**Be it resolved** that:

1.  The Company be, and hereby is, authorized to enter into the Master Loan Agreement, and any other documents, agreements, instruments and amendments related thereto or required thereby containing such terms and conditions, setting forth such rights and obligations and otherwise addressing or dealing with such subjects or matters determined to be necessary, reasonable or desirable by such [*member/manager/partner/officer/other*] executing the same, the execution thereof by such [*member/manager/partner/officer/other*] to be conclusive evidence of such approval and determination.

2.  The Company be, and hereby is, authorized to extend and/or borrow the Borrowed Amounts under each Loan pursuant to the Agreement pursuant to the terms of the Agreement, having such terms and conditions as are approved or deemed necessary, appropriate or desirable by the [*member/manager/partner/officer/other*] executing the same, the execution thereof by such [*member/manager/partner/officer/other*] to be conclusive evidence of such approval and determination.

3.  The Company be, and hereby is, authorized to (i) secure payment of any Loans under the Agreement, interest thereon, and fees and expenses related thereto, and payment and performance of all other obligations and liability of the Company arising under, out of, or in connection with, the Agreement (collectively, the "Obligations") by pledging or granting a lien on, or security interest in, any or all portion of Company's assets (whether now owned or hereafter acquired) and (ii) enter into or cause to be entered into such security agreements, pledge agreements, mortgages, deeds of trust and other agreements as are necessary, appropriate or desirable to effectuate the intent of, or matters reasonably contemplated or implied by, these resolutions, in such form, covering such collateral and having such other terms and conditions as are approved or deemed necessary, appropriate or desirable by the [*member/manager/partner/officer/other*] executing the same (collectively, the "Security Agreements"), the execution thereof by such [*member/manager/partner/officer/other*] to be conclusive evidence of such approval or determination.

4.  The Company be, and hereby is, authorized to perform fully its obligations under the Master Loan Agreement, all Loan Confirmations and other Loan Documents, and any such other documents, agreements, instruments or amendments and to engage without limitation in such other transactions, arrangements or activities ("Activities") as are reasonably related or incident to, or which will serve to facilitate or enhance for the benefit of the Company and its subsidiaries the transactions contemplated by these resolutions, including without limitation any modification, extension or expansion (collectively, the "Changes") of any Activities or of any other transactions, arrangements or activities resulting from any of the Changes and to enter into such other agreements or understandings as are necessary, appropriate or desirable to effectuate the intent of, or matters reasonably contemplated by, this resolution and each of the foregoing resolutions.

5.  All documents, agreements and instruments previously executed and delivered, and any and all actions previously taken by any [*member/manager/partner/officer/other*], employee or agent of the Company in

*Strictly Private & Confidential*

connection with or related to the matters set forth in, or reasonably contemplated or implied by, the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects and for all purposes as the acts and deeds of the Company.

6.  An executed copy of these resolutions shall be filed with the minutes of the proceedings of the [*members/managers/partners/board of managers/board of directors/other*] of the Company.

7.  These resolutions shall continue in force, and BlockFi may consider the holders of said offices and their signatures to be and continue to be as set forth in a certified copy of these resolutions delivered to BlockFi, until notice to the contrary in writing is duly served on BlockFi (such notice to have no effect on any action previously taken by BlockFi in reliance on these resolutions).

I further certify that the above resolutions are in full force and effect as of the date hereof, that the transactions contemplated hereby have not been rescinded, annulled, revoked or modified; that neither the foregoing resolutions nor any actions to be taken pursuant to them are or will be in contravention of any provision of the [*articles of incorporation/other*] or [*bylaws/LLC agreement/other governing document*] or of any agreement or instrument to which the Company is a party or by which it is bound; and that neither the [*articles of incorporation/other*] nor [*bylaws/LLC agreement/other governing document*] of the Company nor any agreement or instrument to which the Company is a party or by which it is bound require the vote or consent of shareholders of the Company to authorize any act, matter, or thing described in the foregoing resolutions.

I further certify that the following named persons have been duly elected to the offices set opposite their respective names, that they continue to hold these offices at the present time, and that the signatures which appear below are genuine, original signatures of each respectively:

(PLEASE SUPPLY GENUINE SIGNATURES OF AUTHORIZED SIGNERS BELOW)[1]

| | |
|---|---|
| _____ | _____ |
| Name of [President] | Signature |
| _____ | _____ |
| Name of [Secretary] | Signature |

**In Witness Whereof**, I have affixed my name as Secretary and caused the corporate seal of said Corporation to be affixed as of the date first above referenced.

_____

_____, Secretary

---

_____
[SIGNATURE OF [OFFICER/MEMBER/MANAGER/SHAREHOLDER/OTHER]][2]

_____
[SIGNATURE OF [OFFICER/MEMBER/MANAGER/SHAREHOLDER/OTHER]]

[SIGNATURE OF [OFFICER/MEMBER/MANAGER/SHAREHOLDER/OTHER]]

Failure to include signatures in the above when Secretary is authorized to sign alone shall constitute a certification by the Secretary that the Secretary is the sole [shareholder/director/other] of the Company.

---

*Strictly Private & Confidential*

---

[1] Please expand to include all authorized signatories.

[2] Please provide signatures of all parties necessary to effectuate the resolutions or, if none, a shareholder other than the secretary when secretary is authorized to act alone, adding or removing signature lines as necessary.

DocuSign Envelope ID: 55E26B6C-EF18-44EC-9E5F-4D99D68689D3

*Strictly Private & Confidential*

# **SCHEDULE A**

## Agreements

[*To be updated*]

# EXHIBIT A-4

## AMENDMENT & FORBEARANCE AGREEMENT

**AMENDMENT & FORBEARANCE AGREEMENT** (this "*Agreement*") dated as of November 9, 2022, by and among **ALAMEDA RESEARCH LIMITED**, a limited company organized and existing under the law of the British Virgin Islands, as Borrower ("*Borrower*"), **BLOCKFI LENDING LLC**, as Lender ("*US Lender*") under the US Loan Agreement (as defined below), and **BLOCKFI INTERNATIONAL LTD.**, as Lender ("*International Lender*") under the International Loan Agreement (as defined below).

## R E C I T A L S:

**WHEREAS**, Borrower and Lender entered into that certain Master Digital Currency Loan Agreement dated as of July 15, 2019 (as amended hereby, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced) (the "**US Loan Agreement**");

**WHEREAS,** Borrower and International Lender entered into that certain Amended and Restated Master Loan Agreement dated as of January 26, 2022 (as amended hereby, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced) (the "**International Loan Agreement**");

**WHEREAS**, in connection with the International Loan Agreement, Borrower, International Lender and Coinbase Custody International Limited entered into that certain Security Agreement over a Custody Account dated as of January 26, 2022 (as amended hereby, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced) (the "**Irish Security Agreement**");

**WHEREAS**, as of the date hereof, the Borrower is in default under the Loan Agreement and the International Loan Agreement as more particularly described below;

**WHEREAS**, the circumstances described herein constitute multiple Events of Default under the Loan Agreement, the International Loan Agreement and the other Loan Documents (used herein as defined in each of the US Loan Agreement and the International Loan Agreement);

**WHEREAS**, Borrower has requested that US Lender and International Lender forbear from exercising their rights under the Loan Agreement, the International Loan Agreement and the other Loan Documents or applicable law, as applicable in respect of such Events of Default, which are continuing, notwithstanding such Events of Default; and

**WHEREAS**, subject to the terms and conditions herein, US Lender and International Lender are willing to forbear from exercising their rights under the Loan Agreement, the International Loan Agreement and the other Loan Documents or applicable law, as applicable, in respect of the Existing Default (as defined below) solely for the period and on the terms and conditions specified herein.

**NOW, THEREFORE**, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS.

1.1.    **Interpretation**. All capitalized terms used herein (including the recitals hereto) shall have the respective meanings ascribed thereto in the US Loan Agreement and the International Loan Agreement unless otherwise defined herein.

1.2.    **Additional Definitions**. As used herein, the following terms shall have the respective meanings given to them below, and to the extent applicable, the US Loan Agreement and the International Loan Agreement are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "**Emergent**" Emergent Fidelity Technologies Ltd.

(b)    "**Existing Defaults**" shall mean the Events of Default more particularly identified on Exhibit A hereto.

(c)    "**Forbearance Period**" means the period commencing on the date on which Section 3.2 of this Agreement becomes effective pursuant to Section 6.1 hereof and ending on the date which is the earliest of (i) the 5:00 P.M. (NYC Time) on November 16, 2022; (ii) the occurrence or existence of any Event of Default, other than the Existing Defaults; or (iii) the occurrence of any Termination Event.

(d)    "**Payment Schedule**" means the schedule of payments and asset transfers set forth on Exhibit B; provided, US Lender and International Lender may agree to allow for payments in different form than identified on Exhibit B from time to time in their sole discretion.

(e)    "**Pledge Agreement**" means that certain Pledge Agreement dated as of the date hereof by and among Borrower, US Lender and International Lender.

(f)    "**Pledge Agreement (Emergent)**" means that certain Pledge Agreement dated as of the date hereof by and among Emergent, US Lender and International Lender.

(g)    "**Termination Event**" means the occurrence of any of the following: (i) the initiation of any action by Borrower or any other Releasing Party (as defined herein) to invalidate or limit the enforceability of any of terms hereof, (ii) the occurrence of any fraud and/or willful misconduct in the production and/or presentation of any reports, financial statements, certificates or other written information furnished by or on behalf of Borrower to US Lender or International Lender, (iii) any action or inaction by Borrower or any other Releasing Party that may hinder or delay repayment of payments or transfers under the Payment Schedule, as determined by US Lender or International Lender or (iv) Borrower fails to make any payment or transfer any assets when and as the same shall become due and payable pursuant to the Payment Schedule or any required by the Pledge Agreement or Emergent fails to transfer any assets when and as the same shall be required by the Pledge Agreement (Emergent).

## SECTION 2. ACKNOWLEDGMENTS

2.1.    **Acknowledgment of Obligations**. Borrower hereby acknowledges, confirms and agrees that as of the date hereof Borrower owes to US Lender Borrowed Amounts set forth on Schedule 1 plus accrued and unpaid interest calculated pursuant to the US Loan Agreement. Borrower hereby acknowledges, confirms and agrees that as of the date hereof Borrower owes to International Lender Borrowed Amounts set forth on Schedule 1 plus accrued and unpaid interest calculated pursuant to the International Loan Agreement. Borrower hereby acknowledges, confirms and agrees that such Borrowed Amounts, together with interest accrued and accruing thereon, and all fees, costs, expenses and other charges now or hereafter payable by Borrower to US Lender and International Lender, are unconditionally owing by

Borrower, without offset, defense or counterclaim of any kind, nature or description whatsoever.

   **2.2.**  **Acknowledgment of Security Interests**. Borrower hereby acknowledges, confirms and agrees that each of US Lender and International Lender has and shall continue to have valid, enforceable and perfected first-priority liens upon and security interests in and charge over the Collateral granted to US Lender and International Lender, as applicable, pursuant to the US Loan Agreement, the International Loan Agreement, the Irish Security Agreement and the other Loan Documents or otherwise granted to or held by US Lender or International Lender.

   **2.3.**  **Binding Effect of Documents**. Borrower hereby acknowledges, confirms and agrees that: (a) each of the Loan Agreement, the International Loan Agreement and the other Loan Documents to which it is a party has been duly executed and delivered to US Lender and/or International Lender, and each is and shall remain in full force and effect as of the date hereof except as modified pursuant hereto, (b) the agreements and obligations of Borrower contained in such documents and in this Agreement constitute the legal, valid and binding obligations of Borrower, enforceable against it in accordance with their respective terms, and Borrower has no valid defense to the enforcement of such obligations, and (c) US Lender and International Lender are and shall be entitled to the rights, remedies and benefits provided for under the Loan Agreement, the International Loan Agreement and the other Loan Documents and applicable law.

## SECTION 3.  FORBEARANCE IN RESPECT OF EXISTING DEFAULTS

   **3.1.**  **Acknowledgment of Default**. Borrower hereby acknowledges and agrees that, as of the date hereof, the Existing Defaults have occurred and are continuing, each of which constitutes an Event of Default and entitles US Lender and International Lender to exercise their rights and remedies under the US Loan Agreement, the International Loan Agreement and the other Loan Documents, applicable law or otherwise, Borrower represents and warrants that as of the date hereof, no Event of Default exists other than the Existing Defaults.

   **3.2.**  **Forbearance**.

   (a)  In consideration for the payments and transfers to be made in accordance with the Payments Schedule and in reliance upon the representations, warranties and covenants of Borrower contained in this Agreement, the Pledge Agreement and the Pledge Agreement (Emergent), and subject to the terms and conditions of this Agreement and any documents or instruments executed in connection herewith, US Lender and International Lender agree to provide new value to Borrower by forbearing during the Forbearance Period from the exercise of their rights and remedies under the US Loan Agreement, the International Loan Agreement and the other Loan Documents or applicable law in respect of the Existing Defaults.

   (b)  Upon the expiration or termination of the Forbearance Period, the agreement of US Lender and International Lender to forbear in Section 3.2(a) hereof shall automatically and without further action terminate and be of no force or effect, it being expressly agreed that the effect of such expiration or termination will be to permit US Lender and International Lender to exercise immediately all rights and remedies under the US Loan Agreement, the International Loan Agreement and the other Loan Documents and applicable law, including, but not limited to, accelerating all of the Borrowed Amount and all other obligations under each of the US Loan Agreement, the International Loan Agreement and the other Loan Documents in each case without any further notice to Borrower or any other Person, passage of time or forbearance of any kind.

   **3.3.**  **No Waivers; Reservation of Rights**.

(a)    US Lender and International Lender have not waived, are not by this Agreement waiving, and have no intention of waiving, any Events of Default which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Existing Defaults or otherwise), and US Lender and International Lender have not agreed to forbear with respect to any of their rights or remedies concerning any Events of Default (other than, during the Forbearance Period, the Existing Defaults to the extent expressly set forth herein) occurring at any time. US Lender and International Lender shall not forbear or otherwise be precluded from exercising any right, power or privilege available under the US Loan Agreement, the International Loan Agreement and the other Loan Documents except as specifically set forth in Section 3.2(a) hereof.

(b)    Subject to Section 3.2 above (solely with respect to the Existing Defaults), US Lender and International Lender reserve the right, in their discretion, to exercise any or all of their rights and remedies under the Loan Agreement, International Loan Agreement and the other Loan Documents as a result of any other Events of Default occurring at any time. US Lender and International Lender have not waived any of such rights or remedies, and nothing in this Agreement, and no delay on their part in exercising any such rights or remedies, shall be construed as a waiver of any such rights or remedies.

3.4.    **Additional Events of Default**. The parties hereto acknowledge, confirm and agree that any misrepresentation by Borrower, or any failure of (i) Borrower to comply with the covenants, conditions and agreements contained in this Agreement or the Pledge Agreement and any other agreement, document or instrument at any time executed and/or delivered by Borrower in connection therewith or (i) Emergent to comply with the covenants, conditions and agreements contained in the Pledge Agreement (Emergent) and any other agreement, document or instrument at any time executed and/or delivered by Emergent in connection therewith shall constitute an Event of Default under the US Loan Agreement, the International Loan Agreement and the other Loan Documents. In the event any Person, other than US Lender and International Lender, shall at any time exercise for any reason any of its rights or remedies against Borrower or Emergent or any obligor providing credit support for any Borrower's obligations to such other Person, or against any Releasing Party's or such obligor's properties or assets, such event shall constitute an Event of Default under the US Loan Agreement and the International Loan Agreement.

3.5.    **Waivers**. Borrower hereby waives (a) its right to notification of disposition of the Collateral under Section 9-611 of the UCC, (b) its right to require disposition of Collateral under Section 9-620(e) of the UCC, (c) its right to redeem any Collateral under Section 9-623 of the UCC, and (d) any other right that it may have that may be waived under the Article 9 of the UCC. Furthermore, Borrower hereby consents to US Lender and International Lender electing, in its sole and absolute discretion, the acceptance of the Collateral in full or partial satisfaction of the Borrowed Amount and all other obligations and any interest accrued thereon (a "***Strict Foreclosure***") upon the expiration or termination of the Forbearance Period. Borrower hereby acknowledges that Agent and Lender have provided requisite notice to such Person pursuant to Section 9-620 of the UCC. Furthermore, upon notice from US Lender and International Lender of its elections to conduct a Strict Foreclosure, Borrower shall execute all documents reasonably requested by US Lender and International Lender to evidence the Strict Foreclosure and any ancillary matters.

## SECTION 4. COVENANTS

Notwithstanding anything to the contrary in the US Loan Agreement, the International Loan Agreement or any other Loan Document, Borrower hereby covenants and agrees as follows:

4.1.    **Post-Default Interest**. US Lender and International Lender hereby notifies Borrower that the Borrowed Amount and all other obligations of Borrower under the Loan Agreement and the International Loan Agreement, the other Loan Documents and this Agreement, shall accrue, commencing on the date hereof at (a) in the case of the US Loan Agreement, the Default Fee rate and (b) in the case of the

DocuSign Envelope ID: D4BC416E-011E-4807-A45F-A85FBA068B5C

International Loan Agreement, the Default Rate, and such amounts shall continue to accrue interest at such increased rates, due and payable upon demand, until such time that all Events of Default (including the Existing Defaults) have been cured or waived in writing.

      4.2.    **Payments**. Borrower shall make all payments and transfers set forth on the Payment Schedule in the amount and by the times indicated therein.

      Failure by Borrower to comply with any of the provisions in this Section 4 shall constitute an immediate Event of Default under the US Loan Agreement and the International Loan Agreement without any grace period or notice from US Lender and International Lender.

## SECTION 5. REPRESENTATIONS AND WARRANTIES

      Borrower hereby represents and warrants to US Lender and International Lender as follows:

      5.1.    **Representations in the Loan Agreements and the other Loan Documents**. Other than with respect to the Existing Defaults, each of the representations and warranties made by or on behalf of Borrower in the US Loan Agreement, the International Loan Agreement or any of the other Loan Documents is true and correct in all material respects on and as of the date hereof with the same effect as if made on the date hereof, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

      5.2.    **Binding Effect of Documents**. This Agreement has been duly authorized, executed and delivered to US Lender and International Lender by Borrower, is enforceable in accordance with its terms and is in full force and effect.

      5.3.    **No Conflict**. The execution, delivery and performance of this Agreement by Borrower will not violate any requirement of law or contractual obligation of Borrower and will not result in, or require, the creation or imposition of any lien, charge or other encumbrance on any of their respective properties or revenues.

      It shall constitute an immediate Event of Default under the US Loan Agreement and International Loan Agreement without any grace period or notice from US Lender and International Lender if any representation, warranty, or statement made by or on behalf of Borrower in this Agreement or in any document delivered in connection herewith shall be incorrect or misleading in any respect when made or deemed made.

## SECTION 6. CONDITIONS TO EFFECTIVENESS

      6.1.    **Effectiveness of this Agreement**. This Agreement shall become effective upon (a) receipt by US Lender and International Lender, on or prior to November __, 2022, of (i) a copy of this Agreement, duly authorized, executed and delivered by Borrower, (ii) a copy of the Pledge Agreement duly authorized, executed and delivered by Borrower, and (iii) a copy of the Pledge Agreement (Emergent) duly authorized, executed and delivered by Emergent and (b) no Event of Default (excluding the Existing Defaults, but including any Event of Default arising out of Section 4 or 5 of this Agreement) shall have occurred.

## SECTION 7. MISCELLANEOUS

DocuSign Envelope ID: D4BC416E-0115-4807-A45F-A85FDA068B5C

7.1.    **Continuing Effect of Loan Agreement**. Except as modified pursuant hereto, no other changes or modifications to the US Loan Agreement, the International Loan Agreement and the other Loan Documents are intended or implied by this Agreement and in all other respects the Loan Agreement, the International Loan Agreement and the other Loan Documents are hereby ratified, restated and confirmed by all parties hereto as of the date hereof. To the extent of any conflict between the terms of this Agreement, the US Loan Agreement, the International Loan Agreement and the other Loan Documents, the terms of this Agreement shall govern and control. The US Loan Agreement, the International Loan Agreement and this Agreement shall be read and construed as one agreement. For the avoidance of doubt, US Lender and International Lender shall not forbear or otherwise be precluded from exercising any right, power or privilege accruing under the Loan Documents except as specifically set forth in Section 3.2(a) of this Agreement.

7.2.    **Costs and Expenses**. Borrower absolutely and unconditionally agrees to pay to US Lender and International Lender, on demand by US Lender and International Lender at any time, whether or not all or any of the transactions contemplated by this Agreement are consummated, all fees and disbursements of any counsel to US Lender and International Lender connected with the preparation, negotiation, execution or delivery of this Agreement and any agreements contemplated hereby and any expenses which shall at any time be incurred or sustained by US Lender, International Lender, any participant of any Lender or any of their respective directors, officers, employees or agents as a consequence of or in any way in connection with the preparation, negotiation, execution, or delivery of this Agreement and any agreements contemplated hereby. The provisions of this Section 7.2 shall survive the termination of this Agreement and the Loan Documents, or the payment in full of all other obligations.

7.3.    **Further Assurances**. At the expense of the Borrower, the parties hereto shall execute and deliver such additional documents and take such further action as may be necessary or desirable to effectuate the provisions and purposes of this Agreement.

7.4.    **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

7.5.    **Survival of Representations, Warranties and Covenants**. All representations, warranties, covenants and releases of Borrower made in this Agreement or any other document furnished in connection with this Agreement shall survive the execution and delivery of this Agreement and the Forbearance Period, and no investigation by a Lender shall affect the representations and warranties or the right of a Lender to rely upon them.

7.6.    **RELEASE**.

(a)    IN CONSIDERATION OF THE AGREEMENTS OF US LENDER AND INTERNATIONAL LENDER CONTAINED HEREIN AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, BORROWER, ON BEHALF OF ITSELF AND ITS SUCCESSORS AND ASSIGNS, AND ITS PRESENT AND FORMER MEMBERS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, DIVISIONS, PREDECESSORS, DIRECTORS, OFFICERS, ATTORNEYS, EMPLOYEES, AGENTS, LEGAL REPRESENTATIVES AND OTHER REPRESENTATIVES (BORROWER AND ALL SUCH OTHER PERSONS BEING HEREINAFTER REFERRED TO COLLECTIVELY AS THE "**RELEASING PARTIES**" AND INDIVIDUALLY AS A "**RELEASING PARTY**"), DOES HEREBY ACKNOWLEDGE THAT IT HAS NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR ELIMINATE ALL OR ANY PART OF ITS LIABILITY TO REPAY THE ADVANCE OR EXTENSIONS OF CREDIT FROM US LENDER OR INTERNATIONAL LENDER TO BORROWER UNDER THE US LOAN AGREEMENT, THE INTERNATIONAL LOAN AGREEMENT OR THE OTHER LOAN

DOCUMENTS OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM ANY RELEASEE. EACH RELEASING PARTY HEREBY VOLUNTARILY, KNOWINGLY, ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY RELEASES, REMISES AND FOREVER DISCHARGES US LENDER, INTERNATIONAL LENDER, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND THEIR RESPECTIVE PRESENT AND FORMER SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, DIVISIONS, PREDECESSORS, DIRECTORS, OFFICERS, ATTORNEYS, EMPLOYEES, AGENTS, LEGAL REPRESENTATIVES AND OTHER REPRESENTATIVES (US LENDER, INTERNATIONAL LENDER AND ALL SUCH OTHER PERSONS BEING HEREINAFTER REFERRED TO COLLECTIVELY AS THE "**RELEASEES**" AND INDIVIDUALLY AS A "**RELEASEE**"), FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, AND LIABILITIES WHATSOEVER, KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT, OR CONDITIONAL, AT LAW OR IN EQUITY, ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AGREEMENT IS EXECUTED, WHICH SUCH RELEASING PARTY MAY NOW OR HEREAFTER HAVE AGAINST ANY RELEASEE, IF ANY, AND IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS OR OTHERWISE, OR ARISE FROM ANY ACTIONS TAKEN WITH RESPECT TO BORROWER, ANY COLLATERAL OR ANY CREDIT ACCOMMODATIONS UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE LOAN DOCUMENTS, ANY ACTIONS RESULTING FROM NEGOTIATION FOR AND EXECUTION OF THIS AGREEMENT OR ANY OTHER DOCUMENTS IN CONNECTION WITH THIS AGREEMENT OR ANY PREVIOUS AMENDMENTS, INCLUDING, WITHOUT LIMITATION, ALL CLAIMS AND DEFENSES BASED ON WAIVER (OTHER THAN AS EXPRESSLY PROVIDED PURSUANT TO A WRITTEN INSTRUMENT SIGNED BY A LENDER), FRAUD, MISTAKE, DURESS, USURY, FAILURE OR LACK OF CONSIDERATION, CAPACITY OR AUTHORIZATION, UNENFORCEABILITY OF AGREEMENTS, SURETYSHIP RIGHTS AND DEFENSES, EQUITABLE SUBORDINATION, CONFLICTS OF INTEREST, SELF DEALING, BREACH OF DUTY (FIDUCIARY OR OTHERWISE), FAILURE TO ACT IN A COMMERCIALLY REASONABLE MANNER OR IN A MANNER CONSISTENT WITH GOOD FAITH AND FAIR DEALING, AND/OR ANY OTHER CLAIM OF SO-CALLED "LENDER LIABILITY".

(b)    BORROWER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT THE RELEASE SET FORTH ABOVE MAY BE PLEADED AS A FULL AND COMPLETE DEFENSE TO ANY CLAIM AND MAY BE USED AS A BASIS FOR AN INJUNCTION AGAINST ANY ACTION, SUIT OR OTHER PROCEEDING WHICH MAY BE INSTITUTED, PROSECUTED OR ATTEMPTED IN BREACH OF THE PROVISIONS OF SUCH RELEASE.

(c)    BORROWER AGREES THAT NO FACT, EVENT, CIRCUMSTANCE, EVIDENCE OR TRANSACTION WHICH COULD NOW BE ASSERTED OR WHICH MAY HEREAFTER BE DISCOVERED SHALL AFFECT IN ANY MANNER THE FINAL, ABSOLUTE AND UNCONDITIONAL NATURE OF THE RELEASE SET FORTH ABOVE. THE PROVISIONS OF THIS SECTION 7.6 SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT AND THE US LOAN AGREEMENT, OR THE PAYMENT IN FULL OF ALL OTHER OBLIGATIONS.

7.7.    **Covenant Not to Sue**. EACH OF THE RELEASING PARTIES HEREBY ABSOLUTELY, UNCONDITIONALLY AND IRREVOCABLY, COVENANTS AND AGREES WITH AND IN FAVOR OF EACH RELEASEE THAT IT WILL NOT SUE (AT LAW, IN EQUITY, IN ANY REGULATORY PROCEEDING OR OTHERWISE) ANY RELEASEE ON THE BASIS OF ANY CLAIM RELEASED, REMISED AND DISCHARGED BY ANY RELEASING PARTY PURSUANT TO

SECTION 7.6 ABOVE. IF ANY RELEASING PARTY VIOLATES THE FOREGOING COVENANT, BORROWER, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, AND ITS PRESENT AND FORMER MEMBERS, SHAREHOLDERS, AFFILIATES, SUBSIDIARIES, DIVISIONS, PREDECESSORS, DIRECTORS, OFFICERS, ATTORNEYS, EMPLOYEES, AGENTS, LEGAL REPRESENTATIVES AND OTHER REPRESENTATIVES, AGREES TO PAY, IN ADDITION TO SUCH OTHER DAMAGES AS ANY RELEASEE MAY SUSTAIN AS A RESULT OF SUCH VIOLATION, ALL ATTORNEYS' FEES AND COSTS INCURRED BY ANY RELEASEE AS A RESULT OF SUCH VIOLATION. THE PROVISIONS OF THIS SECTION 7.7 SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT AND THE LOAN AGREEMENT, OR THE PAYMENT IN FULL OF ALL OTHER OBLIGATIONS.

7.8.    **Severability**. Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement.

7.9.    **Reviewed by Attorneys**. Borrower represents and warrants to US Lender and International Lender that it (a) understands fully the terms of this Agreement and the consequences of the execution and delivery of this Agreement, (b) has been afforded an opportunity to discuss this Agreement with, and have this Agreement reviewed by, such attorneys and other persons as Borrower and its affiliates may wish, and (c) has entered into this Agreement and executed and delivered all documents in connection herewith of its own free will and accord and without threat, duress or other coercion of any kind by any Person. The parties hereto acknowledge and agree that neither this Agreement nor the other documents executed pursuant hereto shall be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation and preparation of this Agreement and the other documents executed pursuant hereto or in connection herewith.

7.10.    **Disgorgement**. If US Lender or International Lender is, for any reason, compelled by a court or other tribunal of competent jurisdiction to surrender or disgorge any payment, interest or other consideration described hereunder to any person because the same is determined to be void or voidable as a preference, fraudulent conveyance, impermissible set-off or for any other reason, such indebtedness or part thereof intended to be satisfied by virtue of such payment, interest or other consideration shall be revived and continue as if such payment, interest or other consideration had not been received by US Lender or International Lender, and Borrower shall be liable to, and shall indemnify, defend and hold US Lender or International Lender harmless for, the amount of such payment or interest surrendered or disgorged. The provisions of this Section 7.10 shall survive execution and delivery of this Agreement and the documents, agreements and instruments to be executed or delivered herewith, and the termination of this Agreement and the US Loan Agreement and the International Loan Agreement, or the payment in full of the Borrowed Amount and all other obligations.

7.11.    **Governing Law: Consent to Jurisdiction and Venue**. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE US LOAN AGREEMENT, INTERNATIONAL LOAN AGREEMENT AND ANY OF THE ADDITIONAL LOAN DOCUMENTS, THIS AGREEMENT AND ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. BORROWER IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST LENDER, AGENT OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN

NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT LENDER OR AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

7.12.    **Mutual Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND CONSENT AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

7.13.    **Counterparts**. This Agreement may be executed in any number of counterparts, but all of such counterparts shall together constitute but one and the same agreement.

*[signatures on following page]*

IN WITNESS WHEREOF, this Agreement is executed and delivered as of the day and year first above written.

**BORROWER:**

**ALAMEDA RESEARCH LTD.**

By: _Caroline Ellison_ _____
Name: Caroline Ellison
Title: Co-CEO

-10-

DocuSign Envelope ID: D4BC446E-0115-4807-A45E-A85FBA068D5C

**BLOCKFI LENDING LLC**, as US Lender

By: _____

Name: Zachary Prince

Title: President

-11-

**BLOCKFI      INTERNATIONAL      LTD.,**      as
International Lender

By: _____

Name: Zachary Prince

Title: CEO

-12-

DocuSign Envelope ID: D4BC446E-0115-4897-A45E-A85FBA068D5C

**EXHIBIT A to FORBEARANCE AGREEMENT**

**<u>Existing Defaults</u>**

1. Under the US Loan Agreement, an Event of Default under Section IV(b) arising from Borrower's failure to deliver Additional Collateral.

2. Under the International Loan Agreement, an Event of Default under Section IX(a) arising from Borrower's failure to return the Loaned Asset upon exercise by Lender of the Callable Option.

4896-0111-8270 v.3

**EXHIBIT B to FORBEARANCE AGREEMENT**

**<u>Payment Schedule</u>**

| Due Date (Eastern Standard Time) | USD | BTC | ETH |
|---|---|---|---|
| 11/10/22 5:00 PM | 90,000,000 | 5000 | |
| 11/11/22 5:00 PM | | 6000 | |
| 11/12/22 5:00 PM | | 3000 | 13960 |
| 11/13/22 5:00 PM | | 3000 | 30000 |
| 11/14/22 5:00 PM | | 3000 | 30000 |
| 11/15/22 5:00 PM | | 3000 | 30000 |
| 11/16/22 5:00 PM | | 2466 | 30000 |

-14-

## SCHEDULE 1 to FORBEARANCE AGREEMENT

Borrowed Amounts due under BlockFi Lending LLC Loan Agreement

- 1,800 BTC
- 90,000,000 USDC

Borrowed Amounts due under BlockFi International Ltd. Loan Agreement

- 23,666 BTC
- 133,960 ETH

-15-

# EXHIBIT A-5

# PLEDGE AGREEMENT

This **PLEDGE AGREEMENT** ("*Agreement*") is entered into as of November 9, 2022,  by and among BlockFi Inc, a Delaware corporation, as collateral agent ("*Collateral Agent*") for **BLOCKFI LENDING LLC** ("*BlockFi Lending*") and **BLOCKFI INTERNATIONAL LTD.** ("*BlockFi International*" and, together with BlockFi Lending, the "*Lenders*" and, together with Collateral Agent, the, "*Secured Party*") and **ALAMEDA RESEARCH LIMITED** ("*Pledgor*").

    **WHEREAS**, Pledgor and BlockFi Lending entered into that certain Master Digital Currency Loan Agreement dated as of July 15, 2019 (together with any loan agreement and any loan term sheet thereunder, and as amended by the Forbearance Agreement referred to below and as amended hereby, and as may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced) (the "*BlockFi Lending Master Agreement*");

    **WHEREAS,** Pledgor and BlockFi International entered into that certain Amended and Restated Master Digital Currency Loan Agreement dated as of January 26, 2022 (together with any loan agreement and any loan term sheet thereunder, and as amended by the Forbearance Agreement referred to below and as amended hereby, and as may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced) (the "*BlockFi International Master Agreement*" and, together with the BlockFi Lending Master Agreement, each, a "*Master Agreement*"" and, collectively, the "*Master Agreements*"; unless specified otherwise, capitalized terms used but not defined herein shall have the meanings assigned in each Master Agreement); and

    **WHEREAS**, certain defaults and events of default have occurred under each Master Agreement, and in connection therewith, Pledgor and Lenders have entered into that certain Amendment & Forbearance Agreement dated as of even date herewith (as amended from time to time, the "*Forbearance Agreement*") pursuant to which, among other things, subject to the terms therein, Lenders agreed to forbear from exercising its rights under each Master Agreement and Pledgor has agreed to enter in to this Agreement to grant Secured Party a security interest over additional collateral as security for the Secured Obligations (as hereinafter defined):

    **NOW, THEREFORE**, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto agree as follows:

1.    <u>**Security Interest**</u>.  To secure the payment and the performance of the Secured Obligations (hereinafter defined), Pledgor hereby pledges, assigns and grants to Secured Party a first priority security interest and lien in all of Pledgor's rights, titles, interests in the following, whether now existing or hereafter acquired (collectively, the "*Collateral*"): (a) the Equity Interests (hereinafter defined) in the trusts (the "*Collateral Shares*") listed on Schedule A (as the same may be updated from time to time) (each, a "*Trust*", and collectively, the "*Trusts*"), (b) any security entitlements in respect of the Collateral Shares credited to the Current Collateral Account or the Perfection Collateral Account, (c)  all dividends, distributions or return of capital, including any extraordinary dividend, split-off, spin-off or other exchange on or form the Collateral Shares, (d) the accounts set forth on Schedule A (as the same may be updated from time to time) (the "*Current Collateral Account*" and the "*Perfection Collateral Account*") and any cash, cash equivalents, securities (including the Collateral Shares), general intangibles, investment property, financial assets, and other property that may from time to time be deposited, credited, held or carried in the Current Collateral Account or Perfection Collateral Account and all security entitlements, as defined in §8-102(a)(17) of the UCC with respect to any of the foregoing and (d) the proceeds of all of the foregoing.

2.    <u>**Secured Obligations**</u>.  "*Secured Obligations*" means, in each case, whether now in existence or hereafter arising: (a) all obligations and any applicable interest thereon (including interest accruing after the filing of any bankruptcy or similar petition) under any Master Agreement or any other Loan Document, (b) all obligations of Pledgor or any affiliate thereof to Secured Party or any affiliate thereof under any

other agreement or arrangement (including, without limitation, any return obligations of Pledgor or any of its affiliates in respect of any assets of Secured Party or any of its affiliates and any obligation of Pledgor or any of its affiliates to fund any committed loan to Secured Party or its affiliates) and (c) all other fees and commissions (including attorneys' fees in connection with Secured Party's or any of its affiliate's enforcement or protection of its rights under any Master Agreement or any Loan Document or any such other agreement or arrangement), charges, indebtedness, loans, liabilities, financial accommodations, obligations, covenants and duties, in each case owing by Pledgor or any of its affiliates to Secured Party or any of its affiliates under any Master Agreement, any Loan Document or any such other agreement or arrangement, and whether or not evidenced by any note and including interest and fees that accrue after the commencement by or against Pledgor or any of its affiliates of any proceeding under any bankruptcy or insolvency law or other similar law affecting creditors' rights, naming Pledgor or any such affiliate as the debtor in such proceeding, including fees, indemnification obligations, expenses or otherwise, and all costs and expenses of administering or maintaining the Collateral and of enforcing the rights of Secured Party or any affiliates under this Agreement, each Master Agreement and the other Loan Documents and any such other agreement or arrangement.

3.    **Pledgor's Warranties**.  Pledgor represents and warrants to Secured Party as follows:

(a)    Pledgor owns the Collateral Shares, all of which have been duly and validly issued and are fully paid and non-assessable. Pledgor owns all Collateral free and clear from any set-off, claim, restriction, lien, security interest or encumbrance, except the security interest hereunder, and has full power and authority to grant to Secured Party the security interest in such Collateral pursuant hereto. The execution, delivery and performance by Pledgor of this Agreement have been duly and validly authorized by all necessary company action, and this Agreement constitutes a legal, valid, and binding obligation of Pledgor and creates a security interest which is enforceable against Pledgor in all now owned and hereafter acquired Collateral, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity.

(b)    Neither the execution and delivery by Pledgor of this Agreement, the creation and perfection of the security interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof will violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Pledgor or any contracts or agreements to which Pledgor is a party or is subject, or by which Pledgor, or its property, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any lien pursuant to the terms of any such contract or agreement (other than any lien of Secured Party). There is no litigation, investigation or governmental proceeding threatened against Pledgor or any of its properties which if adversely determined would result in a material adverse effect on the Collateral or Pledgor.

4.    **Pledgor's Covenants.**  Until full payment and performance of all of the Secured Obligations:

(a)    Secured Obligations and this Agreement. Pledgor shall perform all of its agreements herein, in the Forbearance Agreement, each Master Agreement and the other Loan Documents.

(b)    Pledgor Remains Liable.  Notwithstanding anything to the contrary contained herein, (i) Pledgor shall remain liable under the Forbearance Agreement, each Master Agreement and the other Loan Documents to the extent set forth therein to perform all duties and obligations thereunder to the same extent as if this Agreement had not been executed; (ii) the exercise by Secured Party of any of its rights hereunder shall not release Pledgor from any of its duties or obligations under the Forbearance Agreement, each Master Agreement and the other Loan Documents; and (iii) Secured Party shall not have any obligation or liability under the by reason of this Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of

Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(c)     Collateral.   The security interest in the Collateral granted pursuant to this Agreement is a valid and binding first priority security interest in the Collateral subject to no other liens or security interests, and Pledgor shall keep the Collateral free from all liens and security interests, except those for taxes not yet due and payable and the security interest hereby created. Pledgor shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein adverse to Secured Party.

(d)     Secured Party's Costs.   Pledgor shall pay all costs necessary to obtain, preserve, perfect, defend and enforce the security interest created by this Agreement (including the preparation of this Agreement), collect the Secured Obligations, and preserve, defend, enforce and collect the Collateral, including but not limited to payment of taxes, assessments, reasonable attorney's fees, legal expenses and expenses of sales. Whether the Collateral is or is not in Secured Party's possession, and without any obligation to do so and without waiving Pledgor's default for failure to make any such payment, Secured Party, at its option, may pay any such costs and expenses and discharge encumbrances on the Collateral, and such payments shall be a part of the Secured Obligations and bear interest at the rate set for the Secured Obligations. Pledgor agrees to reimburse Secured Party on demand for any costs so incurred.

(e)     Financing Statements.   No financing statement, register of mortgages, charges and other encumbrances or similar document covering the Collateral or any part thereof is or shall be maintained at the registered office of Pledgor or on file in any public office (except in favor of Secured Party), and Pledgor will, at the request of Secured Party, join the Secured Party in (i) filing one or more financing statements pursuant to the UCC (as defined below) naming Secured Party as secured party, and/or (ii) executing and/or filing such other documents required under the laws of all jurisdictions necessary or appropriate in the judgment of Secured Party to obtain, maintain and perfect its first priority security interest in, and lien on, the Collateral.

(f)     Information.   Pledgor shall promptly furnish Secured Party any information with respect to the Collateral requested by Secured Party.

(g)     Notice of Changes.   Pledgor is a limited company organized and existing under the law of the British Virgin Islands. Pledgor shall promptly (and in any event at least fifteen (15) Business Days prior) notify Secured Party in writing of (i) any change in his legal name, address, or jurisdiction of formation or (ii) a change in any matter warranted or represented by Pledgor in this Agreement.

(h)     Possession of Collateral.   Pledgor shall deliver all Collateral Shares to Secured Party promptly, as instructed by the Secured Party, to the Perfection Collateral Account, or if hereafter acquired, promptly following acquisition, to the Perfection Collateral Account.

(i)     Voting Rights.   After the occurrence of an Event of Default (as defined below), Secured Party is entitled to exercise all voting rights pertaining to any Collateral. Prior to the occurrence of an Event of Default, Pledgor may vote the Collateral, *provided, however,* that no vote shall be cast or consent, waiver, or ratification given or action taken without the prior written consent of Secured Party which would (i) be inconsistent with or violate any provision of this Agreement or any other Loan Document or (ii) amend, modify, or waive any term, provision or condition of any charter document, or other agreement relating to, evidencing, providing for the issuance of, or securing any Collateral. If an Event of Default occurs and if Secured Party elects to exercise such right, the right to vote any pledged securities shall be vested exclusively in Secured Party. To this end, Pledgor hereby irrevocably constitutes and appoints Secured Party the proxy

DocuSign Envelope ID: D4BC446F-0115-4897-A45C-A85FBA068D5C

and attorney-in-fact of Pledgor, with full power of substitution, to vote, and to act with respect to, any and all Collateral standing in the name of Pledgor or with respect to which Pledgor is entitled to vote and act, subject to the understanding that such proxy may not be exercised unless an Event of Default has occurred. The proxy herein granted is coupled with an interest, is irrevocable, and shall continue until the Secured Obligations have been paid and performed in full or the Event of Default has been cured or waived, whichever comes first.

(j)    Other Parties and Other Collateral.  No renewal or extensions of or any other indulgence with respect to the Secured Obligations or any part thereof, no modification of the document(s) evidencing the Secured Obligations, no release of any security, no release of any person (including any maker, indorser, guarantor or surety) liable on the Secured Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Secured Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Secured Party under any law, hereunder, or under any other agreement pertaining to the Collateral. Secured Party need not file suit or assert a claim for personal judgment against any person for any part of the Secured Obligations or seek to realize upon any other security for the Secured Obligations, before foreclosing or otherwise realizing upon the Collateral.

(k)    Waivers by Pledgor.  Pledgor waives notice of the creation, advance, increase, existence, extension or renewal of, and of any indulgence with respect to, the Secured Obligations; waives notice of any change in financial condition of any person liable for the Secured Obligations or any part thereof, notice of any Event of Default, and all other notices respecting the Secured Obligations; and agrees that maturity of the Secured Obligations and any part thereof may, in accordance with the applicable Master Agreement and the other Loan Documents, be accelerated, extended or renewed one or more times by Secured Party in its discretion, without notice to Pledgor. Pledgor waives any right to require that any action be brought against any other person or to require that resort be had to any other security or to any balance of any deposit account. Pledgor further waives any right of subrogation or to enforce any right of action against any other pledgor until the Secured Obligations are paid in full.

(l)    Schedules.  Pledgor shall immediately update any Schedules hereto if any information therein shall become inaccurate or incomplete.  The failure of descriptions of any property to be accurate or complete on any Schedule hereto shall not impair Secured Party's security interest in such property.

(m)    Further Assurances.  Pledgor agrees that, from time to time upon the written request of Secured Party, Pledgor will execute and deliver such further documents and diligently perform such other acts and things in any jurisdiction (including, without limitation, British Virgin Islands) as Secured Party may reasonably request to fully effect the purposes of this Agreement, to further assure the first priority status of the Lien granted pursuant hereto or to enable Secured Party to exercise or enforce its rights under this Agreement or under each Master Agreement with respect to the Collateral or the other collateral posted under each Master Agreement or any other Loan Document.

5.    **Power of Attorney**.  Pledgor hereby irrevocably constitutes and appoints Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the name of Pledgor or in its own name any and all action and to execute any and all documents and instruments which Secured Party at any time and from time to time deems necessary or desirable to accomplish the purposes of this Agreement, including, without limitation, selling, in the manner set forth herein, any of the Collateral on behalf of Pledgor as agent or attorney in fact for Pledgor and applying the proceeds received therefrom in Secured Party's discretion; *provided, however*, nothing in this paragraph shall be construed to obligate Secured Party to take any action hereunder nor shall

Secured Party be liable to Pledgor for failure to take any action hereunder and, upon request, Secured Party shall promptly furnish Pledgor with a written summary of all sales hereunder. This appointment shall be deemed a power coupled with an interest, is irrevocable, and shall continue until the Secured Obligations have been paid and performed in full.

6.    **Rights and Powers of Secured Party**.  Secured Party shall be free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use any Collateral.  Upon the occurrence of an Event of Default, Secured Party, without liability to Pledgor, may: vote the Collateral; take control of proceeds, including stock received as dividends or by reason of stock splits; take control of funds generated by the Collateral, such as cash dividends, interest and proceeds, and use same to reduce any part of the Secured Obligations and exercise all other rights which an owner of such Collateral may exercise; and, at any time, transfer any of the Collateral or evidence thereof into its own name or that of its nominee. Secured Party shall not be liable for failure to collect any account or instruments, or for any act or omission on the part of Secured Party, its officers, agents or employees, except for any act or omission arising out of their own willful misconduct or fraud. The foregoing rights and powers of Secured Party will be in addition to, and not a limitation upon, any rights and powers of Secured Party given by law, elsewhere in this Agreement, or otherwise.

7.    **Default**.

        (a)    Event of Default.  As used in this Agreement, "***Event of Default***" means (i) any "Event of Default" under each Master Agreement with respect to which Pledgor is the defaulting party other than the Existing Defaults (as defined in the Forbearance Agreement), (ii) any "Event of Default" under the Pledge and Guaranty Agreement dated on or about the date hereof between Emergent Fidelity Technologies Ltd. and Secured Party, as amended, and (iii) any expiration or termination of the Forbearance Period (as defined in the Forbearance Agreement).

        (b)    Rights and Remedies.  If any Event of Default occurs, in each and every such case, Secured Party may, without (i) presentment, demand, or protest, (ii) notice of default, dishonor, demand, non-payment, or protest, (iii) notice of intent to accelerate all or any part of the Secured Obligations, (iv) notice of acceleration of all or any part of the Secured Obligations, or (v) notice of any other kind, all of which Pledgor hereby expressly waives (except for any notice required under this Agreement, any other Loan Document, or which may not be waived under applicable law), at any time thereafter exercise and/or enforce any of the following rights and remedies, at Secured Party's option:

                (i)    *Acceleration*.  The Secured Obligations under any Master Agreement and the other Loan Documents shall, at Secured Party's option, become immediately due and payable, and the obligation, if any, of Secured Party to permit further borrowings under any Master Agreement shall, at Secured Party's option, immediately cease and terminate.

                (ii)    *Liquidation of Collateral*.  Sell, or instruct any agent or broker to sell, all or any part of the Collateral in a public or private sale, direct any agent or broker to liquidate all or any part of any account and deliver all proceeds thereof to Secured Party, and apply all proceeds to the payment of any or all of the Secured Obligations in such order and manner as Secured Party shall, in its discretion, choose.

                (iii)    *Uniform Commercial Code*.  All of the rights, powers and remedies of a secured creditor under the Uniform Commercial Code ("***UCC***") as the same may, from time to time, be in effect in the State of New York, *provided*, *however*, in any event that, by reason of mandatory provisions of Law, any or all of the attachment, perfection and priority (or terms of similar import in any applicable jurisdiction) of Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code (or other

similar Law) as in effect in a jurisdiction (whether within or outside the United States) other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code (or other similar Law) as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority (or terms of similar import in such jurisdiction) and for purposes of definitions related to such provisions, and any and all rights and remedies available to it as a result of this Agreement or any other Loan Document, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral (including, without limitation, the right to sell, transfer, pledge or redeem any and all of the Collateral, which right shall be exercised in a commercially reasonable manner) as if Secured Party was the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right).

(iv)     *Collateral Accounts*.  Without limiting the foregoing, Secured Party shall have, and Pledgor hereby grants to Secured Party, the right and authority to transfer all assets held in or credited to the Current Collateral Account or Perfection Collateral Account to Secured Party or as Secured Party may otherwise direct.

(v)     *Deficiencies*.  If any Secured Obligations remain after the application of the proceeds of the Collateral, Secured Party may continue to enforce its remedies under this Agreement or the other Loan Documents to collect the deficiency.

Pledgor specifically understands and agrees that any sale by Secured Party of all or any part of the Collateral pursuant to the terms of this Agreement may be effected by Secured Party at times and in manners which could result in the proceeds of such sale being significantly and materially less than what might have been received if such sale had occurred at different times or in different manners, and Pledgor hereby releases Secured Party and its officers and representatives from any and all obligations and liabilities arising out of or related to the timing or manner of any such sale; provided, however, that any such sale shall be conducted in a commercially reasonable manner. If, in the opinion of Secured Party, there is any question that a public sale or distribution of any Collateral will violate any state or federal securities law, Secured Party may offer and sell such Collateral in a transaction exempt from registration under federal securities law, and any such sale made in good faith by Secured Party shall be deemed "commercially reasonable." Furthermore, Pledgor acknowledges that any such restricted or private sales may be at prices and on terms less favorable to Pledgor than those obtainable through a public sale without such restrictions, but agrees that such sales are commercially reasonable. Pledgor further acknowledges that any specific disclaimer of any warranty of title or the like by Secured Party will not be considered to adversely affect the commercial reasonableness of any sale of Collateral. Any notice made shall be deemed reasonable if sent to Pledgor at the address set forth in *Article XV* of the BlockFi International Master Agreement at least ten (10) days prior to (i) the date of any public sale or (ii) the time after which any private sale or other disposition may be made.

Secured Party's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically safekeeping such Collateral or, in the case of Collateral in the custody or possession of a bailee or other third party, exercises reasonable care in the selection of the bailee or other third party, and the Secured Party need not otherwise preserve, protect, insure or care for any Collateral.  Secured Party shall not be obligated to preserve any rights Pledgor may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of Collateral in any particular order of application.

Notwithstanding anything to the contrary herein or in any other Loan Document, BlockFi Lending and BlockFi International hereby agree that all payments and other amounts received on account of the Secured Obligations under this Agreement shall be distributed ratably between BlockFi Lending and BlockFi International based upon the respective aggregate amounts owing to BlockFi Lending under the

BlockFi Lending Master Agreement and the Loan Documents relating thereto and to BlockFi International under the BlockFi International Master Agreement and the Loan Documents relating thereto or in such other proportions as BlockFi Lending and BlockFi International may agree.

8.    **General.**

(a)    <u>Parties Bound</u>.  Secured Party's rights hereunder shall inure to the benefit of its successors and assigns, and in the event of any assignment or transfer of any of the Secured Obligations or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Secured Obligations or the Collateral not so assigned or transferred. Secured Party may assign all or a portion of its rights and obligations under this Agreement in connection with the assignment of its rights and obligations under each applicable Master Agreement.  Pledgor may not assign any of its rights and obligations under this Agreement to any person or entity without the prior written consent of Secured Party. All representations, warranties and agreements of Pledgor shall be binding upon the personal representatives, heirs, successors and assigns of Pledgor.

(b)    <u>Discretion by Secured Party</u>.  Any determinations made by Secured Party shall be made, in each case, in its sole discretion exercised in good faith unless otherwise stated herein.

(c)    <u>Secured Party Actions</u>.  Any action taken by Secured Party hereunder may be taken by either BlockFi Lending or BlockFi International acting individually or by BlockFi Lending and BlockFi International acting jointly.

(d)    <u>Termination</u>.  This Agreement shall remain in full force and effect until all of the Secured Obligations and any other amounts payable hereunder are indefeasibly paid and performed in full and the Loan Documents are terminated.

(e)    <u>Waiver</u>.  No delay of Secured Party in exercising any power or right shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Secured Party of any right hereunder or of any default by Pledgor shall be binding upon Secured Party unless in writing, and no failure by Secured Party to exercise any power or right hereunder or waiver of any default by Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default. Each right, power and remedy of Secured Party as provided for herein related to the Secured Obligations, or which shall now or hereafter exist at law or in equity or by statute or otherwise, shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by Secured Party of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by Secured Party of any or all other such rights, powers or remedies.

(f)    <u>Definitions</u>.  Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, Article 8 and/or 9 definitions apply.  The following terms, when used in this Agreement, shall have the meanings assigned to them below:

(i)    "***Equity Interests***" means, with respect to any corporation, limited liability company, trust, joint venture, association, company, partnership or other entity, all of the shares of capital stock thereof (or other ownership or profit interests therein), all of the warrants, options or other rights for the purchase or acquisition from such corporation, limited liability company, trust, joint venture, association, company, partnership or other entity of shares of capital stock thereof (or other ownership or profit interests therein), all

of the securities convertible into or exchangeable for shares of capital stock thereof (or other ownership or profit interests therein) or warrants, rights or options for the purchase or acquisition from such corporation, limited liability company, trust, joint venture, association, company, partnership or other entity of such shares (or such other interests), and all of the other ownership or profit interests in such corporation, limited liability company, trust, joint venture, association, company, partnership or other entity (including partnership, member or trust interests therein), whether voting or nonvoting, whether economic or non-economic, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

(ii)    "*Organizational Documents*" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the limited liability company agreement or operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable governmental authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

(g)    Notice.  All notices and other communications to Pledgor under this Pledge Agreement shall be in writing and shall be delivered in accordance with *Article XV* of the BlockFi International Master Agreement to Pledgor at its address set forth in *Article XV* of the BlockFi International Master Agreement or at such other address in the United States as may be specified by Pledgor in a written notice delivered to Lender at such office as Lender may designate for such purpose from time to time in a written notice to Pledgor.

(h)    Modifications.  No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Pledgor and Secured Party.  The provisions of this Agreement shall not be modified or limited by course of conduct or usage of trade.

(i)    Severability.  In case any provision in this Agreement shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Agreement, as the case may be, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(j)    Applicable Law.  This Agreement is a "Loan Document" with respect to Pledgor for purposes of, and is entered into in connection with, each Master Agreement.  This Agreement is governed by, and shall be construed and enforced under, the laws of the State of Delaware applicable to contracts made and to be performed wholly within such State, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

DocuSign Envelope ID: D4BC416F-0115-4897-A45F-A85FBA068D5C

(k)     Financing Statement.  Pledgor hereby irrevocably authorizes Secured Party (or its designee) at any time and from time to time to file in any jurisdiction any financing or continuation statement and amendment thereto or any registration of charge, mortgage or otherwise, containing any information required under the UCC or the Law of any other applicable jurisdiction, necessary or appropriate in the judgment of Secured Party to perfect or evidence its first priority security interest in and lien on the Collateral.  Pledgor hereby irrevocably ratifies and approves any such filing, registration or recordation in any jurisdiction by Secured Party (or its designee) that has occurred prior to the date hereof, of any financing statement, registration of charge, mortgage or otherwise.  Pledgor agrees to provide to the Secured Party (or its designees) any and all information required under the UCC or the law of any other applicable jurisdiction for the effective filing of a financing statement and/or any amendment thereto or any registration of charge, mortgage or otherwise.

(l)     Additional Security Interests.  The security interests granted under this Agreement are in addition to any other security interest granted by Pledgor or any of its affiliates to Secured Party or any of its affiliates.  This Agreement and the grant of security interests hereunder shall not impair or release any security interests granted by Pledgor or its affiliates to Secured Party or its affiliates.

(m)     Release of Security Interest Upon Satisfaction of Master Agreement Obligations.  Upon the termination of all transactions and full and final satisfaction of all obligations under and in accordance with each Master Agreement, the parties irrevocably agree that (i) the security interest, lien, pledge, and assignment of the Collateral hereunder, together with all rights and powers of the Secured Party hereunder, shall immediately be deemed to be void and (ii) the Secured Party shall immediately return to the Pledgor all Collateral in its possession or control.

**NOTICE OF FINAL AGREEMENT.  THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS, ORAL OR WRITTEN, BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF.**

[Signature Pages Follow]

DocuSign Envelope ID: D4BC446F-0115-4897-A45E-A85FBA068D5C

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives as of the date first above written.

**Signature Page to Pledge Agreement**

**PLEDGOR:**

**ALAMEDA RESEARCH LIMITED**

By: _Caroline Ellison_

Name: FF8633D9656F4A5...

Title: Co-CEO


**SECURED PARTY:**

**BLOCKFI INC., in its capacity as Collateral Agent**

By: _Zachary Prince_

Name: Zachary Prince

Title: CEO


**BLOCKFI LENDING LLC**

By: _Zachary Prince_

Name: Zachary Prince

Title: President


**BLOCKFI INTERNATIONAL LTD.**

By: _Zachary Prince_

Name: Zachary Prince

Title: CEO

**Schedule A**

Pledged Equity Interests in Trusts

All of Pledgor's Equity Interests in the following Trusts:

| Trust or Common Shares |
|---|
| Grayscale Bitcoin Trust (GBTC) |
| Grayscale Ethereum Trust (ETHE) |
| Bitwise 10 Crypto Index Fund (BITW) |

Collateral Accounts

| Current Collateral Account | |
|---|---|
| **Name of Banking or Custodial Entity** | **Account Number** |
| ED&F Man Capital Markets Inc. | ██████████████ |

Perfection Collateral Account

| Name of Banking or Custodial Entity | Account Number | Account Name |
|---|---|---|
| To Come | To Come | **BlockFi Inc.** |

# EXHIBIT A-6

DocuSign Envelope ID: D4BC446F-0115-4897-A45C-A85FBA068D5C

**PLEDGE AGREEMENT**

This **PLEDGE AGREEMENT** ("***Agreement***") is entered into as of November 9, 2022,  by and among BlockFi Inc, a Delaware corporation, as collateral agent ("***Collateral Agent***") for **BLOCKFI LENDING LLC** ("***BlockFi Lending***") and **BLOCKFI INTERNATIONAL LTD.** ("***BlockFi International***" and, together with BlockFi Lending, the "***Lenders***" and, together with Collateral Agent, the, "***Secured Party***") and **EMERGENT FIDELITY TECHNOLOGIES LTD.,** a company incorporated under the laws of Antigua and Barbuda ("***Pledgor***").

      **WHEREAS**, **ALAMEDA RESEARCH LIMITED** ("***Borrower***") and BlockFi Lending entered into that certain Master Digital Currency Loan Agreement dated as of July 15, 2019 (together with any loan agreement and any loan term sheet thereunder, and as amended by the Forbearance Agreement referred to below and as amended hereby, and as may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced) (the "***BlockFi Lending Master Agreement***");

      **WHEREAS,** Borrower and BlockFi International entered into that certain Amended and Restated Master Digital Currency Loan Agreement dated as of January 26, 2022 (together with any loan agreement and any loan term sheet thereunder, and as amended by the Forbearance Agreement referred to below and as amended hereby, and as may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced) (the "***BlockFi International Master Agreement***" and, together with the BlockFi Lending Master Agreement, each, a "***Master Agreement***'" and, collectively, the "***Master Agreements***"; unless specified otherwise, capitalized terms used but not defined herein shall have the meanings assigned in each Master Agreement);

      **WHEREAS**, certain defaults and events of default have occurred under each Master Agreement, and in connection therewith, Borrower, Pledgor and Lenders are entering into that certain Amendment & Forbearance Agreement dated as of even date herewith (as amended from time to time, the "***Forbearance Agreement***") pursuant to which, among other things, subject to the terms therein, Lenders have agreed to forbear from exercising its rights under each Master Agreement and Pledgor has agreed to enter in to this Agreement to grant to Secured Party a security interest over additional collateral as security for the Secured Obligations (as hereinafter defined); and

      **WHEREAS**, the Pledgor and Borrower are owned, directly or indirectly, in part by the same individual, and Pledgor will receive direct or indirect benefit from Secured Party's entry into the Forbearance Agreement;

      **NOW, THEREFORE**, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the parties hereto agree as follows:

1.     <u>**Security Interest**</u>.  To secure the payment and the performance of the Secured Obligations (hereinafter defined), Pledgor hereby pledges, assigns and grants to Secured Party a first priority security interest and lien in all of Pledgor's rights, titles, interests in the following, whether now existing or hereafter acquired (collectively, the "***Collateral***"): (a) the shares of common equity of the entity or entities (the "***Collateral Shares***") listed on Schedule A, (b) any security entitlements in respect of the Collateral Shares credited to the Current Collateral Account or the Perfection Collateral Account, (c) all dividends, distributions or return of capital, including any extraordinary dividend, split-off, spin-off or other exchange on or form the Collateral Shares, (d) the accounts set forth on Schedule A (as the same may be updated from time to time) (the "***Current Collateral Account***" and the ***Perfection Collateral Account***) and any cash, cash equivalents, securities (including the Collateral Shares), general intangibles, investment property, financial assets, and other property that may from time to time be deposited, credited, held or carried in the Current Collateral Account or Perfection Collateral Account and all security entitlements, as

DocuSign Envelope ID: D4BC446E-0115-4897-A45E-A85FBA068D5C

defined in §8-102(a)(17) of the UCC with respect to any of the foregoing and (d) the proceeds of all of the foregoing.

2.     **Secured Obligations**.  "*Secured Obligations*" means, in each case, whether now in existence or hereafter arising: (a) all obligations and any applicable interest thereon (including interest accruing after the filing of any bankruptcy or similar petition) under any Master Agreement or any other Loan Document, (b) all obligations of Pledgor, Borrower or any affiliate thereof to Secured Party or any affiliate thereof under any other agreement or arrangement (including, without limitation, any return obligations of Pledgor, Borrower or any of its affiliates in respect of any assets of Secured Party or any of its affiliates and any obligation of Borrower or any of its affiliates to fund any committed loan to Secured Party or its affiliates)) and (c) all other fees and commissions (including attorneys' fees in connection with Secured Party's or any of its affiliate's enforcement or protection of its rights under any Master Agreement or any Loan Document or any such other agreement or arrangement), charges, indebtedness, loans, liabilities, financial accommodations, obligations, covenants and duties, in each case owing by Pledgor, Borrower or any of its affiliates to Secured Party or any of its affiliates under any Master Agreement, any Loan Document or any such other agreement or arrangement, and whether or not evidenced by any note and including interest and fees that accrue after the commencement by or against Pledgor, Borrower or any of its affiliates of any proceeding under any bankruptcy or insolvency law or other similar law affecting creditors' rights, naming Pledgor, Borrower or any such affiliate as the debtor in such proceeding, including fees, indemnification obligations, expenses or otherwise, and all costs and expenses of administering or maintaining the Collateral and of enforcing the rights of Secured Party or any affiliates under this Agreement, each Master Agreement and the other Loan Documents and any such other agreement or arrangement.

3.     **Guaranty**.

3.01     Pledgor hereby guarantees, irrevocably, absolutely and unconditionally, as primary obligor and not merely as surety, to Secured Party, the due and punctual payment (now existing or hereinafter incurred, direct or indirect, matured or unmatured, absolute or contingent, whether at stated maturity, by acceleration or otherwise) of (a) the Secured Obligations and (b) all costs and expenses incurred by Secured Party in connection with the administration, maintenance, preservation, protection, collection, enforcement or exercise of any other right or remedy (including, without limitation, with respect to any action, suit or proceeding, against Pledgor or any other relevant party, which may be instituted by Secured Party in connection with the preservation, protection, collection or enforcement) in respect of this Agreement, in each case, whether or not ARISING OR ACCRUING BEFORE OR AFTER THE FILING BY OR AGAINST PLEDGOR OF A PETITION UNDER THE BANKRUPTCY CODE OR ANY SIMILAR FILING BY OR AGAINST PLEDGOR UNDER THE LAWS OF ANY JURISDICTION OR (iii) ALLOWABLE UNDER SECTION 502(b)(2) OF THE BANKRUPTCY CODE (collectively, the "*Guaranteed Obligations*").  The amount of the Guaranteed Obligations shall be limited to an aggregate amount equal to the largest amount that would not render Pledgor's guaranty obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code or any comparable provision of any applicable state law.

3.02     The guaranty made pursuant to this Agreement is an absolute, unconditional, irrevocable, present and continuing joint and several guarantee of payment and not of collection, and the obligations of Pledgor hereunder shall be primary, absolute and unconditional, irrespective of, and unaffected by: (a) the genuineness, validity, regularity or enforceability of the Guaranteed Obligations, the Secured Obligations, or any part thereof, or any other guaranty thereof or any security interest for any of the foregoing; (b) the absence of any action to enforce this Agreement, the any other Loan Document the Guaranteed Obligations or any other guaranty thereof or any security for any of the foregoing; (c) the existence, value or condition of, or failure to perfect its lien against, any security for the Guaranteed Obligations, the Secured Obligations or any other guaranty thereof or any action, or the absence of any action, by Secured Party in respect thereof (including, without limitation, the release of any such security); or (d) any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor

3.03    Notwithstanding any or all of the Guaranteed Obligations becoming unenforceable or the determination that any or all of the Guaranteed Obligations shall have become discharged, disallowed, invalid, illegal, void or otherwise unenforceable as against Pledgor (whether by operation of any present or future law or by order of any court or governmental agency), the Guaranteed Obligations shall, for the purposes of this Agreement, continue to be outstanding and in full force and effect.

"<u>Bankruptcy Code</u>" means the United States Bankruptcy Code of 1978, Title 11 of the United States Code, as amended from time to time.

4.    **Pledgor's Warranties**.  Pledgor represents and warrants to Secured Party as follows:

(a)    Pledgor will receive direct or indirect benefit from Secured Party's entry into the Forbearance Agreement.

(b)    Pledgor owns the Collateral Shares, all of which have been duly and validly issued and are fully paid and non-assessable. Pledgor owns all Collateral free and clear from any set-off, claim, restriction, lien, security interest or encumbrance, except the security interest hereunder, and has full power and authority to grant to Secured Party the security interest in such Collateral pursuant hereto. The execution, delivery and performance by Pledgor of this Agreement have been duly and validly authorized by all necessary company action, and this Agreement constitutes a legal, valid, and binding obligation of Pledgor and creates a security interest which is enforceable against Pledgor in all now owned and hereafter acquired Collateral, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity.

(c)    Neither the execution and delivery by Pledgor of this Agreement, the creation and perfection of the security interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof will violate any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Pledgor or any contracts or agreements to which Pledgor is a party or is subject, or by which Pledgor, or its property, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any lien pursuant to the terms of any such contract or agreement (other than any lien of Secured Party). There is no litigation, investigation or governmental proceeding threatened against Pledgor or any of its properties which if adversely determined would result in a material adverse effect on the Collateral or Pledgor.

(d)    (i) The guaranty of the Guaranteed Obligations and the incurrence by Pledgor of each of its other obligations hereunder will not render Pledgor insolvent or unable to pay its debts as they mature or leave Pledgor with unreasonably small capital, (ii) the value of the consideration received and to be received by Pledgor is reasonably worth at least as much as the liability and obligation of Pledgor hereunder, and such liability and obligation may reasonably be expected to benefit Pledgor directly or indirectly, and (iii) it is solvent.

5.    **Pledgor's Covenants.**  Until full payment and performance of all of the Guaranteed Obligations:

(a)    <u>This Agreement</u>. Pledgor shall perform all of its agreements herein.

(b)    <u>Pledgor Remains Liable</u>.  Notwithstanding anything to the contrary contained herein, (i) Pledgor shall remain liable under the Forbearance Agreement, each Master Agreement and the other Loan Documents to the extent set forth therein to perform all duties and obligations thereunder to the same extent as if this Agreement had not been executed; (ii) the exercise by Secured Party of any of its rights hereunder shall not release Pledgor from any of its duties or obligations under the Forbearance Agreement, each Master Agreement and the other Loan Documents; and (iii) Secured Party shall not have any obligation or liability under the by reason of

this Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(c)    Collateral.    The security interest in the Collateral granted pursuant to this Agreement is a valid and binding first priority security interest in the Collateral subject to no other liens or security interests, and Pledgor shall keep the Collateral free from all liens and security interests, except those for taxes not yet due and payable and the security interest hereby created. Pledgor shall not sell or otherwise dispose of any interest in any Collateral.  Pledgor shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein adverse to Secured Party.

(d)    Secured Party's Costs.  Pledgor shall pay all costs necessary to obtain, preserve, perfect, defend and enforce the security interest created by this Agreement (including the preparation of this Agreement), collect the Guaranteed Obligations, and preserve, defend, enforce and collect the Collateral, including but not limited to payment of taxes, assessments, reasonable attorney's fees, legal expenses and expenses of sales.  Whether the Collateral is or is not in Secured Party's possession, and without any obligation to do so and without waiving Pledgor's default for failure to make any such payment, Secured Party, at its option, may pay any such costs and expenses and discharge encumbrances on the Collateral, and such payments shall be a part of the Guaranteed Obligations and bear interest at the rate set for the Guaranteed Obligations. Pledgor agrees to reimburse Secured Party on demand for any costs so incurred.

(e)    Financing Statements.  No financing statement, register of mortgages, charges and other encumbrances or similar document covering the Collateral or any part thereof is or shall be maintained at the registered office of Pledgor or on file in any public office (except in favor of Secured Party), and Pledgor will, at the request of Secured Party, join the Secured Party in (i) filing one or more financing statements pursuant to the UCC (as defined below) naming Secured Party as secured party, and/or (ii) executing and/or filing such other documents required under the laws of all jurisdictions necessary or appropriate in the judgment of Secured Party to obtain, maintain and perfect its first priority security interest in, and lien on, the Collateral.

(f)    Information.  Pledgor shall promptly furnish Secured Party any information with respect to the Collateral requested by Secured Party.

(g)    Notice of Changes.  Pledgor is a company incorporated under the laws of Antigua and Barbuda with its principal place of business and chief executive office located at Unit 3B Bryson's Commercial Complex, Friars Hill Road, St. Johns, Antigua.  Pledgor shall promptly (and in any event at least fifteen (15) Business Days prior) notify Secured Party in writing of (i) any change in his legal name, address, or jurisdiction of formation or (ii) a change in any matter warranted or represented by Pledgor in this Agreement.

(h)    Possession of Collateral.  Pledgor shall deliver all Collateral Shares to Secured Party promptly, as instructed by the Secured Party, to the Perfection Collateral Account, or if hereafter acquired, promptly following acquisition, to the Perfection Collateral Account

(i)    Voting Rights.  After the occurrence of an Event of Default (as defined below), Secured Party is entitled to exercise all voting rights pertaining to any Collateral. Prior to the occurrence of an Event of Default, Pledgor may vote the Collateral, *provided, however*, that no vote shall be cast or consent, waiver, or ratification given or action taken without the prior written consent of Secured Party which would (i) be inconsistent with or violate any provision of this Agreement or any other Loan Document or (ii) amend, modify, or waive any term, provision or condition of any charter document, or other agreement relating to, evidencing, providing for the

issuance of, or securing any Collateral. If an Event of Default occurs and if Secured Party elects to exercise such right, the right to vote any pledged securities shall be vested exclusively in Secured Party. To this end, Pledgor hereby irrevocably constitutes and appoints Secured Party the proxy and attorney-in-fact of Pledgor, with full power of substitution, to vote, and to act with respect to, any and all Collateral standing in the name of Pledgor or with respect to which Pledgor is entitled to vote and act, subject to the understanding that such proxy may not be exercised unless an Event of Default has occurred. The proxy herein granted is coupled with an interest, is irrevocable, and shall continue until the Guaranteed Obligations have been paid and performed in full or the Event of Default has been cured or waived, whichever comes first.

(j)     Other Parties and Other Collateral.   No renewal or extensions of or any other indulgence with respect to the Guaranteed Obligations or any part thereof, no modification of the document(s) evidencing the Guaranteed Obligations, no release of any security, no release of any person (including any maker, indorser, guarantor or surety) liable on the Guaranteed Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Guaranteed Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Secured Party under any law, hereunder, or under any other agreement pertaining to the Collateral, the Secured Obligations or the Guaranteed Obligations. Secured Party need not file suit or assert a claim for personal judgment against any person for any part of the Guaranteed Obligations or seek to realize upon any other security for the Guaranteed Obligations, before foreclosing or otherwise realizing upon the Collateral.

(k)     Waivers by Pledgor.   Pledgor waives notice of the creation, advance, increase, existence, extension or renewal of, and of any indulgence with respect to, the Guaranteed Obligations; waives notice of any change in financial condition of any person liable for the Guaranteed Obligations or any part thereof, notice of any Event of Default, and all other notices respecting the Guaranteed Obligations or any part thereof; and agrees that maturity of the Guaranteed Obligations and any part thereof may, in accordance with the applicable Master Agreement and the other Loan Documents, be accelerated, extended or renewed one or more times by Secured Party in its discretion, without notice to Pledgor. Pledgor all defenses to, and all setoffs, counterclaims and claims of recoupment against, the Guaranteed Obligations that may at any time be available to it.   Pledgor waives any right to require that any action be brought against Borrower or any other person or to require that resort be had to any other security or to any balance of any deposit account. Pledgor further waives any right of subrogation or to enforce any right of action against Borrower or any other pledgor until the Guaranteed Obligations are paid in full.

(l)     Schedules.   Pledgor shall immediately update any Schedules hereto if any information therein shall become inaccurate or incomplete.  The failure of descriptions of any property to be accurate or complete on any Schedule hereto shall not impair Secured Party's security interest in such property.

(m)     Further Assurances.   Pledgor agrees that, from time to time upon the written request of Secured Party, Pledgor will execute and deliver such further documents and diligently perform such other acts and things in any jurisdiction (including, without limitation, British Virgin Islands) as Secured Party may reasonably request to fully effect the purposes of this Agreement, to further assure the first priority status of the Lien granted pursuant hereto or to enable Secured Party to exercise or enforce its rights under this Agreement or under each Master Agreement with respect to the Collateral or the other collateral posted under each Master Agreement or any other Loan Document.

6.     **Power of Attorney**.  Pledgor hereby irrevocably constitutes and appoints Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full

4894-8184-6846 v.2

irrevocable power and authority in the name of Pledgor or in its own name, to take after the occurrence of an Event of Default and from time to time thereafter, any and all action and to execute any and all documents and instruments which Secured Party at any time and from time to time deems necessary or desirable to accomplish the purposes of this Agreement, including, without limitation, selling, in the manner set forth herein, any of the Collateral on behalf of Pledgor as agent or attorney in fact for Pledgor and applying the proceeds received therefrom in Secured Party's discretion; *provided, however*, nothing in this paragraph shall be construed to obligate Secured Party to take any action hereunder nor shall Secured Party be liable to Pledgor for failure to take any action hereunder and, upon request, Secured Party shall promptly furnish Pledgor with a written summary of all sales hereunder. This appointment shall be deemed a power coupled with an interest, is irrevocable, and shall continue until the Guaranteed Obligations have been paid and performed in full or the Event of Default has been cured or waived, whichever comes first.

7.    **Rights and Powers of Secured Party**.  Secured Party shall be free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use any Collateral.  Upon the occurrence of an Event of Default, Secured Party, without liability to Pledgor, may: vote the Collateral; take control of proceeds, including stock received as dividends or by reason of stock splits; take control of funds generated by the Collateral, such as cash dividends, interest and proceeds, and use same to reduce any part of the Guaranteed Obligations and exercise all other rights which an owner of such Collateral may exercise; and, at any time, transfer any of the Collateral or evidence thereof into its own name or that of its nominee. Secured Party shall not be liable for failure to collect any account or instruments, or for any act or omission on the part of Secured Party, its officers, agents or employees, except for any act or omission arising out of their own willful misconduct or fraud. The foregoing rights and powers of Secured Party will be in addition to, and not a limitation upon, any rights and powers of Secured Party given by law, elsewhere in this Agreement, or otherwise.

8.    **Default**.

(a)    Event of Default.  As used in this Agreement, "***Event of Default***" means any of the following: (i) any "Event of Default" under each Master Agreement with respect to which Pledgor is the defaulting party other than the Existing Defaults (as defined in the Forbearance Agreement); (ii) any expiration or termination of the Forbearance Period (as defined in the Forbearance Agreement); (iii) the failure of Pledgor to pay any of the Guaranteed Obligations when due; (iv) the breach of any representation, warranty, covenant or agreement made by Pledgor hereunder; or (v) any corporate action or legal proceedings are taken in relation to: (A) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, bankruptcy, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of Pledgor; (B) a composition, compromise, assignment or arrangement with financial creditors generally (other than Secured Party) of Pledgor in connection with or as a result of any financial difficulty on the part of Pledgor; (C) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of, or all or any part of the business or assets of Pledgor; (D) the enforcement of any liens, pledges, charges, mortgages, security interests or other encumbrances over, or over all or any part of the business or assets of, Pledgor; or (E) any analogous procedure or step is taken in any jurisdiction.

(b)    Rights and Remedies.  If any Event of Default occurs, in each and every such case, Secured Party may, without (i) presentment, demand, or protest, (ii) notice of default, dishonor, demand, non-payment, or protest, (iii) notice of intent to accelerate all or any part of the Guaranteed Obligations, (iv) notice of acceleration of all or any part of the Guaranteed Obligations, or (v) notice of any other kind, all of which Pledgor hereby expressly waives (except for any notice required under this Agreement, any other Loan Document, or which may not be waived under applicable law), at any time thereafter exercise and/or enforce any of the following rights and remedies, at Secured Party's option:

(i)      *Acceleration*.  The Secured Obligations under any Master Agreement and the other Loan Documents shall, at Secured Party's option, become immediately due and payable, and the obligation, if any, of Secured Party to permit further borrowings under any Master Agreement shall, at Secured Party's option, immediately cease and terminate.

(ii)     *Liquidation of Collateral*.  Sell, or instruct any agent or broker to sell, all or any part of the Collateral in a public or private sale, direct any agent or broker to liquidate all or any part of any account and deliver all proceeds thereof to Secured Party, and apply all proceeds to the payment of any or all of the Guaranteed Obligations in such order and manner as Secured Party shall, in its discretion, choose.

(iii)    *Uniform Commercial Code*.  All of the rights, powers and remedies of a secured creditor under the Uniform Commercial Code ("***UCC***") as the same may, from time to time, be in effect in the State of New York, *provided*, *however*, in any event that, by reason of mandatory provisions of Law, any or all of the attachment, perfection or priority (or terms of similar import in any applicable jurisdiction) of Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code (or other similar Law) as in effect in a jurisdiction (whether within or outside the United States) other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code (or other similar Law) as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority (or terms of similar import in such jurisdiction) and for purposes of definitions related to such provisions, and any and all rights and remedies available to it as a result of this Agreement or any other Loan Document, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral (including, without limitation, the right to sell, transfer, pledge or redeem any and all of the Collateral, which right shall be exercised in a commercially reasonable manner) as if Secured Party was the sole and absolute owner thereof (and Pledgor agrees to take all such action as may be appropriate to give effect to such right).

(iv)     *Guaranteed Obligations*.  Secured Party may, at its sole option, declare all of the Guaranteed Obligations or any of them, notwithstanding any provisions thereof, immediately due and payable without demand or notice of any kind (except as required by applicable law) and the same thereupon shall immediately become due and payable without demand or notice provided that upon the occurrence of an Event of Default under Section 9(a)(v), the Guaranteed Obligations shall automatically become due and payable without any further act by Secured Party.

(v)      *Collateral Accounts*.  Without limiting the foregoing, Secured Party shall have, and Pledgor hereby grants to Secured Party, the right and authority to transfer all assets held in or credited to the Current Collateral Account or Perfection Collateral Account to Secured Party or as Secured Party may otherwise direct

(vi)     *Deficiencies*.  If any Guaranteed Obligations remain after the application of the proceeds of the Collateral, Secured Party may continue to enforce its remedies under this Agreement or the other Loan Documents to collect the deficiency.

Pledgor specifically understands and agrees that any sale by Secured Party of all or any part of the Collateral pursuant to the terms of this Agreement may be effected by Secured Party at times and in manners which could result in the proceeds of such sale being significantly and materially less than what might have been received if such sale had occurred at different times or in different manners, and Pledgor hereby releases Secured Party and its officers and representatives from any and all obligations and liabilities arising out of or related to the timing or manner of any such sale; provided, however, that any such sale shall be

DocuSign Envelope ID: D4BC446E-0115-4807-A45E-A85FBA068D5C

conducted in a commercially reasonable manner. If, in the opinion of Secured Party, there is any question that a public sale or distribution of any Collateral will violate any state or federal securities law, Secured Party may offer and sell such Collateral in a transaction exempt from registration under federal securities law, and any such sale made in good faith by Secured Party shall be deemed "commercially reasonable." Furthermore, Pledgor acknowledges that any such restricted or private sales may be at prices and on terms less favorable to Pledgor than those obtainable through a public sale without such restrictions, but agrees that such sales are commercially reasonable. Pledgor further acknowledges that any specific disclaimer of any warranty of title or the like by Secured Party will not be considered to adversely affect the commercial reasonableness of any sale of Collateral. Any notice made shall be deemed reasonable if sent to Pledgor at the address set forth in Section 9(g) at least ten (10) days prior to (i) the date of any public sale or (ii) the time after which any private sale or other disposition may be made.

Secured Party's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically safekeeping such Collateral or, in the case of Collateral in the custody or possession of a bailee or other third party, exercises reasonable care in the selection of the bailee or other third party, and the Secured Party need not otherwise preserve, protect, insure or care for any Collateral. Secured Party shall not be obligated to preserve any rights Pledgor may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of Collateral in any particular order of application.

Notwithstanding anything to the contrary herein or in any other Loan Document, BlockFi Lending and BlockFi International hereby agree that all payments and other amounts received on account of the Secured Obligations under this Agreement shall be distributed ratably between BlockFi Lending and BlockFi International based upon the respective aggregate amounts owing to BlockFi Lending under the BlockFi Lending Master Agreement and the Loan Documents relating thereto and to BlockFi International under the BlockFi International Master Agreement and the Loan Documents relating thereto or in such other proportions as BlockFi Lending and BlockFi International may agree.

9.    **General.**

(a)    Parties Bound. Secured Party's rights hereunder shall inure to the benefit of its successors and assigns, and in the event of any assignment or transfer of any of the Guaranteed Obligations or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Guaranteed Obligations or the Collateral not so assigned or transferred. Secured Party may assign all or a portion of its rights and obligations under this Agreement in connection with the assignment of its rights and obligations under each applicable Master Agreement. Pledgor may not assign any of its rights and obligations under this Agreement to any person or entity without the prior written consent of Secured Party. All representations, warranties and agreements of Pledgor shall be binding upon the personal representatives, heirs, successors and assigns of Pledgor.

(b)    Discretion by Secured Party. Any determinations made by Secured Party shall be made, in each case, in its sole discretion exercised in good faith unless otherwise stated herein.

(c)    Secured Party Actions. Any action taken by Secured Party hereunder may be taken by either BlockFi Lending or BlockFi International acting individually or by BlockFi Lending and BlockFi International acting jointly.

(d)    Termination. This Agreement shall remain in full force and effect until all of the Guaranteed Obligations and any other amounts payable hereunder are indefeasibly paid and performed in full and the Loan Documents are terminated.

DocuSign Envelope ID: D4BC446E-0115-4807-A45C-A85FBA068D5C

(e)    Waiver.  No delay of Secured Party in exercising any power or right shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Secured Party of any right hereunder or of any default by Pledgor shall be binding upon Secured Party unless in writing, and no failure by Secured Party to exercise any power or right hereunder or waiver of any default by Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default. Each right, power and remedy of Secured Party as provided for herein related to the Guaranteed Obligations, or which shall now or hereafter exist at law or in equity or by statute or otherwise, shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by Secured Party of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by Secured Party of any or all other such rights, powers or remedies.

(f)    Definitions.  Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, Article 8 and/or 9 definitions apply.

(g)    Notice.  Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

Secured Party:

BlockFi Lending LLC
BlockFi International Ltd.



Attn:
Email:

Pledgor:

Attn:
Email:

Any party may change its address by giving the other party written notice of its new address as herein provided.

(h)    Modifications.  No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Pledgor and Secured Party.  The provisions of this Agreement shall not be modified or limited by course of conduct or usage of trade.

(i)    Severability.  In case any provision in this Agreement shall be held to be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Agreement, as the case may be, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

DocuSign Envelope ID: D4BC446E-0115-4807-A45E-A95FBA069D5C

(j)        Applicable Law.  This Agreement is a "Loan Document" for purposes of, and is entered into in connection with, each Master Agreement.  This Agreement is governed by, and shall be construed and enforced under, the laws of the State of Delaware applicable to contracts made and to be performed wholly within such State, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

(k)        Financing Statement.  Pledgor hereby irrevocably authorizes Secured Party (or its designee) at any time and from time to time to file in any jurisdiction any financing or continuation statement and amendment thereto or any registration of charge, mortgage or otherwise, containing any information required under the UCC or the Law of any other applicable jurisdiction, necessary or appropriate in the judgment of Secured Party to perfect or evidence its first priority security interest in and lien on the Collateral.  Pledgor hereby irrevocably ratifies and approves any such filing, registration or recordation in any jurisdiction by Secured Party (or its designee) that has occurred prior to the date hereof, of any financing statement, registration of charge, mortgage or otherwise.  Pledgor agrees to provide to the Secured Party (or its designees) any and all information required under the UCC or the law of any other applicable jurisdiction for the effective filing of a financing statement and/or any amendment thereto or any registration of charge, mortgage or otherwise.

(l)        Additional Security Interests.  The security interests granted under this Agreement are in addition to any other security interest granted by Pledgor or any of its affiliates to Secured Party or any of its affiliates.  This Agreement and the grant of security interests hereunder shall not impair or release any security interests granted by Pledgor or its affiliates to Secured Party or its affiliates.

(m)        Release of Security Interest and Guaranty Upon Satisfaction of Master Agreement Obligations.  Upon the termination of all transactions and full and final satisfaction of all obligations under and in accordance with each Master Agreement, the parties irrevocably agree that (i) the security interest, lien, pledge, and assignment of the Collateral and guaranty hereunder, together with all rights and powers of the Secured Party hereunder, shall immediately be deemed to be void and (ii) the Secured Party shall immediately return to the Pledgor all Collateral in its possession or control.

**NOTICE OF FINAL AGREEMENT.  THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY AND ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS, ORAL OR WRITTEN, BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF.**

[Signature Pages Follow]

4894-8184-6846 v.2

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives as of the date first above written.

DocuSign Envelope ID: D4BC446F-0415-4897-A45F-A85FBA068D5C

**PLEDGOR:**

**EMERGENT FIDELITY TECHNOLOGIES LTD.**

By: _Caroline Ellison_ _____

Name: Caroline Ellison

Title: Co-CEO

**SECURED PARTY:**

**BLOCKFI INC., in its capacity as Collateral Agent**

By: _Zachary Prince_ _____

Name: Zachary Prince

Title: CEO

**BLOCKFI LENDING LLC**

By: _Zachary Prince_ _____

Name: Zachary Prince

Title: President

**BLOCKFI INTERNATIONAL LTD.**

By: _Zachary Prince_ _____

Name: Zachary Prince

Title: CEO

DocuSign Envelope ID: D4BC446E-0115-4897-A45E-A95FBA068D5C

**Schedule A**

Collateral Shares

All of the Pledgor's shares listed below:

| **Collateral Shares** |
| --- |
| Class A Common Stock of Robinhood (Ticker: HOOD) |

Collateral Accounts

| **Current Collateral Account** | |
| --- | --- |
| **Name of Banking or Custodial Entity** | **Account Number** |
| ED&F Man Capital Markets Inc. | ███████████ |

Perfection Collateral Account

| **Name of Banking or Custodial Entity** | **Account Number** | **Account Name** |
| --- | --- | --- |
| To Come | To Come | **BlockFi Inc.** |

# EXHIBIT A-7

**To:**    Zac Prince ████████████████ ]
**Cc:**    Flori Marquez ████ [, Jonathan Mayers ████████████ ], Usec ████ ████████ ]
**From:**  Sam Bankman-Fried ████████ ]
**Sent:**  Thur 11/10/2022 2:31:51 AM (UTC-05:00)
**Subject:** Re: loan repayment

I think this was signed now -- right?

—

Sam Bankman-Fried

.

> On November 9, 2022 at 9:46 PM EST ████████████ wrote:
>
> Hi Sam,
>
> Yes we also sent to Caroline but haven't received a signature or response from her yet.
>
> Our preference would be if you could sign since you are online
>
> Zac
>
> On Wed, Nov 9, 2022 at 9:33 PM Sam Bankman-Fried <s████████> wrote:
>
> Hey realy sorry about the delay -- did this get singed?  If not could you also send one to Caroline to docusign?
>
> —
>
> Sam Bankman-Fried
>
> .
>
>> On November 9, 2022 at 7:24 PM EST f████████████ wrote:
>>
>> Thanks for the quick response - just sent via docusign. Zac is signing.
>>
>> 
>>
>> **Flori Marquez**
>> Founder, COO
>>
>> 
>>
>> On Wed, Nov 9, 2022 at 7:10 PM Sam Bankman-Fried <██████████ wrote:
>>
>> Can you send via DocuSign?
>>
>> —
>>
>> Sam Bankman-Fried
>>
>> .
>>
>>> On November 9, 2022 at 7:03 PM EST ████████████ wrote:
>>>
>>> Sam - sharing the documents that we sent to Caroline regarding signatures for the

pledge of trust shares and Hood stock. She confirmed over email. Please let us know if you are able to review / sign.

Zac



**Zac Prince**
CEO

Twitter: @blockfizac

---------- Forwarded message ---------
From: <​ ​ ​>
Date: Wed, Nov 9, 2022 at 6:56 PM
Subject: RE: loan repayment
To: Flori Marquez <​ ​ ​>, Zac Prince <​ ​ ​>, <​ ​ ​>
Cc: Amit Cheela <​ ​ ​>, Yuri Mushkin <​ ​ ​>

Caroline,

Attached please find the following agreements:

1.  Amendment and Forbearance Agreement between BF Lending, BF International and Alameda.
    a.  BF forbears exercising remedies in return for additional pledge and payments made per the payment schedule in Exhibit B

2.  Pledge Agreement between BF Lending, BF International, and Alameda
    a.  Pledges GBTC, ETHE, and BITW Shares. **We need the Number of Shares filled in Schedule A**

3.  Pledge Agreement between BF Lending, BF International and Emergent Fidelity Technologies Ltd (who we assume holds HOOD shares, please confirm)
    a.  Pledges HOOD Shares. **We need Notice information on page 8, and the number of shares in Schedule A**

Please note that we are in the process of setting up a brokerage account to accept the additional collateral. The Pledge Agreements contemplate that the shares will be transferred to the account upon notice from BlockFi that set up is done.



**From:** Flori Marquez ▮▮▮▮▮▮▮▮>
**Sent:** Wednesday, November 9, 2022 6:47 PM
**To:** Zac Prince <▮▮▮▮▮▮▮▮>
**Cc:** ▮▮▮▮▮▮▮▮; Amit Cheela <▮▮▮▮▮▮▮▮>; Yuri Mushkin <▮▮▮▮▮▮▮▮>;
Usec Rho <▮▮▮▮▮▮▮▮>
**Subject:** Re: loan repayment

+Usec Rho docs incoming caroline.



**Flori Marquez**
Founder, COO

@founderflori

On Wed, Nov 9, 2022 at 5:14 PM Zac Prince <▮▮▮▮▮▮▮▮> wrote:

Got it - any commentary you can give us on next steps re timing for the remaining 75M for today or payments for tomorrow? We have our next board session at 630 and would love to speak before then if you are available



**Zac Prince**
CEO

Twitter: @blockfizac

On Wed, Nov 9, 2022 at 4:35 PM Caroline Ellison <​⬛⬛⬛⬛⬛⬛⬛⬛​> wrote:

Hi sorry, hearing that we can do another 75m today. One of our exchange accounts that we were counting on just got frozen so we aren't able to withdraw.

Sorry if this makes things tougher with the board

—

Caroline Ellison

.

On November 9, 2022 at 3:14 PM EST ⬛⬛⬛⬛⬛⬛⬛ wrote:

Hey Caroline,

Thank you for completing the first repayment. We're meeting with the board again tonight because at the time of the meeting we had not received the $50M. Can you give us an estimate on timing for the $150M so that we can communicate that to them? Does 5PM EST work?

Best,

Flori

**Flori Marquez**
Founder, COO

@founderflori

On Wed, Nov 9, 2022 at 11:06 AM Zac Prince <​████████> wrote:

Hi Caroline - we just heard from our trading team that Terence communicated that you would only be able to send 50M USDT by 12 ET. Is that correct? We have critical decisions and regulatory conversations happening starting at 12 so an update would be appreciated.



**Zac Prince**
CEO

Twitter: @blockfizac

On Wed, Nov 9, 2022 at 10:30 AM Zac Prince <​████████> wrote:

Hi Caroline - one small adjustment we need to make to the repayment schedule would be the timing - 5 PM is a bit too late, could we move that to 9 (preferred) or 12 ET for each repayment?



**Zac Prince**
CEO

Twitter: @blockfizac

On Wed, Nov 9, 2022 at 7:15 AM Zac Prince < ███████████ > wrote:

> Sounds good, just sent an invite
>
>> On Wed, Nov 9, 2022 at 6:59 AM Caroline Ellison
>> < ███████████████████ > wrote:
>>
>> Great news, sounds good!
>>
>> A call at 9 am ET sounds good; feel free to invite me and I can
>> add whoever is relevant from our side.
>>
>>> On Wed, Nov 9, 2022 at 7:56 PM Zac Prince
>>> < ██████████ > wrote:
>>>
>>> Hi Caroline,
>>>
>>> Thanks for sharing this information.  We should be able to
>>> make the repayment schedule work if we can get the
>>> HOOD/GBTC/ETHE/BITW shares pledged and the first
>>> payment done today.  Ideally before 12 ET.
>>>
>>> Would a call at 9 or 10 ET work? if we are agreed on what
>>> needs to happen it could maybe just be a call w lawyers to
>>> make sure the paperwork is in order.
>>>
>>> Don't hesitate to ping / call us anytime and thanks for the
>>> attention here.
>>>
>>> Best,
>>>
>>> Zac
>>>
>>>> On Wed, Nov 9, 2022 at 4:21 AM Caroline Ellison
>>>> < █████████████████ > wrote:
>>>>
>>>> We've put together a spreadsheet of our liquid assets and our

outstanding loans

We have $1.1b of shares in HOOD+GBTC+ETHE+BITW that we could post as collateral.

Here's a proposed repayment schedule; would this work?

—

Caroline Ellison

.

--



**Zac Prince**
CEO

Twitter: @blockfizac

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

--



**Zac Prince**
CEO

Twitter: @blockfizac

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

--



**Zac Prince**
CEO

Twitter: @blockfizac

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the

time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

# EXHIBIT A-8

Doc #: 2022112093
11/10/2022 10:08 AM

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) | |

Return Acknowledgement to:
Capitol Services, Inc.
PO Box 1831
Austin, TX 78767
800.345.4647

**CAPITOL SERVICES**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **EMERGENT FIDELITY TECHNOLOGIES LTD.** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **Bryson's Commercial Complex, Friars Hill Road, Unit 3B** | **St. John's** | | **VG1110** | **ATG** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BlockFi Inc.** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **201 Montgomery St., Suite 263** | **Jersey City** | **NJ** | **07302** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**Exhibit A attached hereto contains the description of the collateral and is fully incorporated herein by reference.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**File with D.C. Recorder of Deeds**                                          **Page 1 of 3**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)        International Association of Commercial Administrators (IACA)

## UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 18a. ORGANIZATION'S NAME | |
| OR 18b. INDIVIDUAL'S SURNAME | |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

22. ☑ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BLOCKFI LENDING LLC** | | | |
| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 22c. MAILING ADDRESS **201 Montgomery St., Suite 263** | CITY **Jersey City** | STATE **NJ** | POSTAL CODE **07302** | COUNTRY **USA** |

23. ☑ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BLOCKFI INTERNATIONAL LTD.** | | | |
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 23c. MAILING ADDRESS **201 Montgomery St., Suite 263** | CITY **Jersey City** | STATE **NJ** | POSTAL CODE **07302** | COUNTRY **USA** |

24. MISCELLANEOUS:

# EXHIBIT A
# TO
# UNIFORM COMMERCIAL CODE FINANCING STATEMENT

| | |
|---|---|
| Debtor: | EMERGENT FIDELITY TECHNOLOGIES LTD. |
| Secured Party: | BLOCKFI INC., as collateral agent |
| Additional Secured Party: | BLOCKFI LENDING LLC |
| Additional Secured Party: | BLOCKFI INTERNATIONAL LTD. |

This financing statement covers all of Debtor's right, title and interest in, to and under all of the following property, in each case whether now owned or existing or hereafter acquired or arising, and wherever located (collectively, the "*Collateral*"):

   a) all shares of common equity of Robinhood Markets, Inc. (ticker: HOOD) (the "*Collateral Shares*");
   b) any security entitlements in respect of the Collateral Shares credited to the Current Collateral Account or the Perfection Collateral Account;
   c) all dividends, distributions or return of capital, including any extraordinary dividend, split-off, spin-off or other exchange on or from the Collateral Shares;
   d) the Current Collateral Account, the Perfection Collateral Account, and any cash, cash equivalents, securities (including the Collateral Shares), general intangibles, investment property, financial assets, and other property that may from time to time be deposited, credited, held or carried in the Current Collateral Account or Perfection Collateral Account and all security entitlements, as defined in §8-102(a)(17) of the UCC with respect to any of the foregoing; and
   e) the proceeds of all of the foregoing.

The capitalized terms in the above-described Collateral shall have the following meanings:

"*Current Collateral Account*" means the account of Debtor with account number 499-30500COMBINED maintained with ED&F Man Capital Markets Inc. or any affiliate thereof.

"*Perfection Collateral Account*" has the meaning set forth in the Pledge Agreement.

"*Pledge Agreement*" means that certain Pledge Agreement, dated on or about November 9, 2022, by and among Debtor, BlockFi Inc., as collateral agent, BLOCKFI LENDING LLC and BLOCKFI INTERNATIONAL LTD.

"*UCC*" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York,  *provided*, *however*, in any event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority (or terms of similar import in any applicable jurisdiction) of any Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code (or other similar law) as in effect in a jurisdiction (whether within or outside the United States) other than the State of New York, the term "*UCC*" shall mean the Uniform Commercial Code (or other similar law) as in effect in such other jurisdiction for purposes of the provisions of the Pledge Agreement relating to such attachment, perfection or priority (or terms of similar import in such jurisdiction) and for purposes of definitions related to such provisions.

```
Doc #: 2022112093
Filed & Recorded
11/10/2022 10:08 AM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS
  RECORDING FEES          $25.00
  SURCHARGE               $6.50
TOTAL:                    $31.50
```

# EXHIBIT A-9

**BLOCKFI LENDING LLC**
**201 Montgomery St., Suite 263**
**Jersey City, NJ 07302**

**BLOCKFI INTERNATIONAL LTD.**
**201 Montgomery St., Suite 263**
**Jersey City, NJ 07302**

November 10, 2022

*VIA EMAIL*

Emergent Fidelity Technologies Ltd.
Unit 3B Bryson's Commercial Complex
Friars Hill Road
St. Johns, Antigua
Attn: Sam Bankman-Fried
Email: sam@ftx.com

   **Re: Notice of Event of Default and Acceleration**

Ladies and Gentlemen:

   Reference is made to

(i)  the Pledge Agreement, dated as of November 9, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Pledge Agreement") by and among BlockFi Inc., a Delaware corporation ("Collateral Agent") for BlockFi Lending LLC, a Delaware limited liability company ("BlockFi Lending") and BlockFi International Ltd., a limited company organized and existing under the laws of Bermuda ("BlockFi International" and, together with BlockFi Lending, the "Lenders" and, together with Collateral Agent, the "Secured Party" or "we" or "us") and Emergent Fidelity Technologies Ltd., a company incorporated under the laws of Antigua and Barbuda ("Pledgor" or "you");

(ii)  the Master Digital Currency Loan Agreement, dated as of July 15, 2019 (together with any loan agreement and any loan term sheet thereunder, and as amended by the Forbearance Agreement referred to below and as amended by the Pledge Agreement, and as may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced, the ("BlockFi Lending Master Agreement") between Alameda Research Limited, a limited company organized and existing under the law of the British Virgin Islands ("Borrower") and BlockFi Lending, as Lender;

(iii)  the Amended and Restated Master Loan Agreement, dated as of January 26, 2022 (together with any loan agreement and any loan term sheet thereunder, and as amended by the Forbearance Agreement referred to below and as amended by the Pledge Agreement, and as may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced, the "BlockFi International Master Agreement" and, together with the BlockFi Lending Master Agreement, each, a "Master Agreement" and, collectively, the "Master Agreements") between Borrower and BlockFi International, as Lender; and

(iv)  the  Amendment  &  Forbearance  Agreement,  dated  as  of November 9, 2022 (as amended, restated, amended and restated, supplemented, or otherwise

modified from time to time, the "Forbearance Agreement") by and among Borrower, BlockFi Lending and BlockFi International.

Unless specified otherwise, capitalized terms not defined herein shall have the meanings assigned in the Pledge Agreement.

We hereby notify you that (i) Borrower has failed to make a payment or transfer of assets when due and payable pursuant to the Payment Schedule (as defined in the Forbearance Agreement) and, as a result of such failure, a Termination Event (as defined in the Forbearance Agreement) has occurred under the Forbearance Agreement, (ii) Borrower has failed to comply with the covenants, conditions and agreements contained in the Forbearance Agreement and, pursuant to Section 3.4 of the Forbearance Agreement, such failure constitutes an Event of Default under the BlockFi Lending Master Agreement, the BlockFi International Master Agreement and the other Loan Documents, and (iii) as a result of the foregoing, the Forbearance Period (as defined in the Forbearance Agreement) has terminated.

As a result of the foregoing, an Event of Default occurred and exists pursuant to Section 8(a)(ii) of the Pledge Agreement.

Pursuant to the foregoing and Section 8(b) of the Pledge Agreement, we hereby notify you that:

(i)     we are declaring the Secured Obligations to be hereby immediately due and payable;

(ii)    we are declaring all of the Guaranteed Obligations to be hereby immediately due and payable; and

(iii)   we intend to exercise all remedies available to us under the Pledge Agreement, including, without limitation, (a) to sell, or instruct any agent or broker to sell, all or any part of the Collateral in a public or private sale, (b) to direct any agent or broker to liquidate all or any part of any account and deliver all proceeds thereof to Secured Party, (c) to apply all proceeds to the payment of any or all of the Guaranteed Obligations in such order and manner as Secured Party, in its direction, chooses and (d) to transfer all or any assets held in or credited to the Current Collateral Account or Perfection Collateral Account to Secured Party or as Secured Party may otherwise direct.

Nothing contained in this notice is intended to waive any default, or waive any rights, remedies, or recourses available to the Secured Party, nor be an exclusive election of remedies resulting from any default with respect to the Pledge Agreement, the Master Agreements and the other Loan Documents.

This notice is without prejudice to the Secured Party, and the Secured Party reserves any and all rights, powers, privileges and remedies under the Pledge Agreement, the Master Agreements and the other Loan Documents.

Yours truly,

BLOCKFI LENDING LLC

BLOCKFI INTERNATIONAL LTD.