**<u>Exhibit B</u>**

**Anigian Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Emergent Fidelity Technologies, Ltd., | Case No. 23-10149 (JTD) |
| Debtor.[1] | |

**DECLARATION OF RICHARD D. ANIGIAN**
**IN SUPPORT OF BLOCKFI'S MOTION FOR ENTRY**
**OF AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE**

I, Richard D. Anigian, hereby declare as follows under penalty of perjury:

1.       I am over eighteen and have never been convicted of a felony or other crime involving moral turpitude, and I do not suffer from any mental or physical disability that would render me incompetent to make this declaration. I am able to swear, and I hereby do swear, that all of the statements in this declaration are true and correct and within my personal knowledge or are known to me by reason of my position and involvement as counsel for BlockFi in this proceeding, the BlockFi bankruptcy cases, the consolidated FTX bankruptcy cases pending before this Court, and/or through other counsel for BlockFi who has appeared in the actions described below in Antigua.

2.       I am an attorney licensed to practice in the State of Texas since November 1985. I have at all times thereafter been a member in good standing with the State Bar of Texas.

3.       I am a partner in the law firm of Haynes and Boone, LLP and have been a member of the law firm's litigation department since 1987.

---

[1]The Debtor in this Chapter 11 case is Emergent Fidelity Technologies Ltd, a company formed under the laws of Antigua and Barbuda with registration number 17532 as identified by the Antigua and Barbuda Financial Services Regulatory Commission. According to its corporation filings, the Debtor's principal place of business is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

4.      I submit this declaration to present documents relevant to and in support of *BlockFi's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case* (the "Motion"), on behalf of BlockFi Inc. ("BlockFi Inc."), BlockFi Lending LLC ("BlockFi Lending"), and BlockFi International Ltd. ("BlockFi International" and together with BlockFi Inc. and BlockFi Lending, "BlockFi"). If I were called upon to testify, I could and would competently testify to the facts set forth herein.

5.      On May 12, 2022, Emergent Fidelity Technologies, Ltd ("Emergent") filed a Schedule 13D with the United States Securities and Exchange Commission ("SEC"), reflecting its ownership of 56,273,469 Class A Common Stock in Robinhood Markets, Inc. A certified copy of the SEC Schedule 13D is attached hereto as **Exhibit B-1**.

6.      On November 14, 2022, I sent a letter on behalf of BlockFi Lending and BlockFi International (the "BlockFi Letter") to Marex Capital Markets Inc., formerly known as ED&F Man Capital Markets Inc. ("Marex") notifying it of the exercise of a power of attorney and demanding that Marex transfer the Collateral (as defined in the BlockFi Letter) to an account in BlockFi Lending's and BlockFi International's name. A true and correct copy of the BlockFi Letter (without the attachment) is attached hereto as **Exhibit B-2**.

7.      That same day, I received a letter from Therese M. Doherty, with Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., who represents Marex, rejecting BlockFi Lending's and BlockFi International's demand to transfer the Collateral. A true and correct copy of Ms. Doherty's letter that I received is attached hereto as **Exhibit B-3**.

8.      On November 16, 2022, following a conversation I had with counsel for Marex, I received further confirmation from Marex's counsel that Marex would retain custody of the Collateral until otherwise ordered by a court with jurisdiction over the assets. A true and correct

copy of my email exchange with counsel for Marex is attached hereto as **Exhibit B-4**.

9.      On December 2, 2022, Marex's counsel Ms. Doherty informed me of the apparent appointment of interim receivers in the "BVI." On December 7, 2022, Ms. Doherty informed me that she had been in contact with U.S. lawyers (Morgan Lewis) representing the Joint Receivers of Emergent, and that the Eastern Caribbean Supreme Court in the High Court of Justice, Antigua and Barbuda (the "Antiguan Court") had apparently appointed the Joint Receivers as Joint Provisional Liquidators of Emergent. Ms. Doherty also provided a copy of the Antigua Court's December 5 Order. A true and correct copy of my email exchange with Ms. Doherty, without a copy of the December 5 Order, is attached hereto as **Exhibit B-5**.

10.     In December, our firm requested and received copies of the following documents from the Antigua and Barbuda Financial Services Regulatory Commission (where I understand items of this kind are filed and maintained) that reflect the application and associated documents to certify the incorporation of Emergent as an International Business Corporation in Antigua and Barbuda:

- Certificate of Incorporation for Emergent, a copy of the certificate with seal is attached hereto as **Exhibit B-6**;

- Application for International Business Charter for Emergent, a file-stamped copy of which is attached hereto as **Exhibit B-7;**

- Articles of Incorporation and General By-Law (No. 1) of Emergent, a file-stamped copy of which is attached hereto as **Exhibit B-8**;

- Notice of Registered Office for Emergent, a file-stamped copy of which is attached hereto as **Exhibit B-9**; and

- Notice of Directors of Emergent, a file-stamped copy of which is attached hereto as **Exhibit B-10**.

11.     Attached hereto as **Exhibit B-11** is a file-marked copy of Yonatan Ben Shimon's Notice of Application for an interim freezing order and interim receivership that appears to have

been filed on November 18, 2022, in the Antiguan Court in claim number ANUHCV2022/0456 (the "0456 Action").

13.     Attached hereto as **Exhibit B-12** is a file-marked copy of Shimon's Affidavit that appears to have been filed on November 18, 2022, in the 0456 Action in support of Exhibit B-11.

13.     Attached hereto as **Exhibit B-13** is a file-marked copy of an order, dated November 18, 2022, from the Antiguan Court in the 0456 Action, that purports to have appointed Angela Barkhouse and Toni Shukla as receivers over Emergent (the "Antiguan Receivership Order").

14.     Attached hereto as **Exhibit B-14** is a file-marked copy of Angela Barkhouse's and Toni Shukla's, as interim receivers of Emergent, Petition to be appointed Joint Liquidators of Emergent, claim number ANUHCV2022/0480 (the "0480 Action"), which appears to have been filed on December 2, 2022, in the Antiguan Court.

15.     Attached hereto as **Exhibit B-15** is a file-marked copy of JPL Barkhouse's Affidavit that appears to have been filed on December 2, 2022, in the Antiguan Court in the 0480 Action.

16.     Attached hereto as **Exhibit B-16** is a file-marked copy of an order, dated December 5, 2022, from the Antiguan Court in the 0480 Action that purports to appoint Angela Barkhouse and Toni Shukla as joint provisional liquidators ("JPLs") over Emergent (the "Antiguan Liquidation Order").

17.     Attached hereto as **Exhibit B-17** is a file-marked copy of Samuel Benjamin Bankman-Fried's Affidavit that appears to have been filed on December 12, 2022, in the Antiguan Court in the 0456 Action.

18.     Attached hereto as **Exhibit B-18** is a file-marked copy of JPL Barkhouse's Third Affidavit that appears to have been filed on December 19, 2022, in the Antiguan Court in the 0480

Action. To conserve space, only Ms. Barkhouse's Third Affidavit has been attached hereto, and the approximately 576 pages of attachments to Ms. Barkhouse's Third Affidavit have been omitted and can be supplied at the Court's request.

19.     Attached hereto as **<u>Exhibit B-19</u>** is a true and correct copy of the *Transcript of Hearing on the Emergent Motion Seeking an Extension of Time with Respect to Answering; Continue the January 9 Turnover Complaint*, recording the hearing held before the Honorable Michael B. Kaplan, Chief United States Bankruptcy Court Judge, on December 28, 2022, at 1:00 p.m. EST, in Adversary Proceeding No. 22-01382 (MBK).

20.     Attached hereto as **<u>Exhibit B-20</u>** is a true and correct copy of a signed order from the in the Antiguan Court in the 0480 Action, emanating from hearings held on December 23 and December 28, 2022, that appears to have been entered on January 12, 2023.

21.     Attached hereto as **<u>Exhibit B-21</u>** is a true and correct copy of the *Transcript of Hearing on the Debtor's [BlockFi's] Motion for Turnover Order*, improperly titled as Transcript on Emergent Motion for Extension, which records the hearing held before the Honorable Michael B. Kaplan, Chief United States Bankruptcy Court Judge, on January 9, 2023, at 10:00 a.m. EST, in Adversary Proceeding No. 22-01382 (MBK).

22.     Attached hereto as **<u>Exhibit B-22</u>** is a file-marked copy of JPL Shukla's First Affidavit that appears to have been filed on January 15, 2023, in the Antiguan Court in the 0480 Action. To conserve space, only Ms. Shukla's First Affidavit and a single attachment, the Liquidation Funding Agreement, have been attached hereto. The other 71 pages of attachments to Ms. Shukla's First Affidavit have been omitted and can be supplied at the Court's request.

23.     Attached hereto as **<u>Exhibit B-23</u>** is a file-marked copy of an order dated January 27, 2023, from the Court of Appeal of the Eastern Caribbean Supreme Court Antigua and Barbuda

(the "Antiguan Court of Appeal") in ANUHCVAP2023/0002 (the "0002 Appeal") that, among

other things, stayed the 0480 Action in Antiguan Court.

24.     Attached hereto as **Exhibit B-24** is a file-marked copy of an order, dated February

3, 2023, from the Antiguan Court of Appeal in the 0002 Appeal that reverses the stay imposed on

January 27, in the 0002 Appeal.

25.     Attached hereto as **Exhibit B-25** is a file-marked copy of an order dated February

3, 2023, from the Antiguan Court of Appeal in the 0002 Appeal that purports to set a hearing on

the interlocutory appeal for March 6, 202[3].

26.     Attached hereto as **Exhibit B-26** is a file-marked copy of the *Declaration of Joseph*

*B. Evans in Support of the Objection of the Official Committee of Unsecured Creditors to Proofs*

*of Claims Nos. 11206, 11209, and 11213*, dated January 31, 2023, from the United States

Bankruptcy Court for the Southern District of New York, Case No. 22-10943 (MEW) [D.I. 937],

that swears to the authenticity of a November 7, 2022 email exchange between the FTX Debtors'

Counsel, Andrew G. Dietderich, and counsel for the Voyager Digital Holdings, Inc. To conserve

space, only Exhibit 13 of Mr. Evans's declaration (the November 7, 2022 email) has been attached

hereto. The other 260 pages of attachments to Mr. Evans' declaration have been omitted and can

be supplied at the Court's request.

27.     Attached hereto as **Exhibit B-27** is a file-marked copy of the JPLs' *Emergency*

*Motion for Extension of Time to Respond to Complaint and Turnover Motion and for Continuance*

*of Hearing and Pretrial Conference* (the "JPL Extension Motion"), filed on December 27, 2022, in

the United States Bankruptcy Court for the District of New Jersey, Adversary Proceeding Number

22-01382 (MBK) [D.I. 19]. To conserve space, only the JPL Extension Motion has been attached

hereto, and the other 91 pages of attachments to the JPL Extension Motion have been omitted and can be supplied at the Court's request.

28.     Attached hereto as **Exhibit B-28** is a file-marked copy of the *Response of Joint Provisional Liquidators of Emergent to Debtors' Motion to Enforce or Extend the Automatic Stay*, filed on January 5, 2023, in the United States Bankruptcy Court for the District of Delaware, Case No. 22-11068 (JTD) [D.I. 377].

29.     Attached hereto as **Exhibit B-29** is a file-marked copy of the JPLs' *Opposition of Joint Provisional Liquidators of Emergent Fidelity Technologies Ltd to BlockFi Turnover Motion*, filed on January 5, 2023, in the United States Bankruptcy Court for the District of New Jersey, Adversary Proceeding Number 22-01382 (MBK) [D.I. 34].

30.     Attached hereto as **Exhibit B-30** is a file-marked copy of the indictment of Samuel Bankman-Fried, filed on December 9, 2022, in the Southern District of New York, cause number 1:22-cr-673 (LAK).

31.     Attached hereto as **Exhibit B-31** is a file-marked copy of the Government's Bill of Particulars, filed on January 20, 2023, in the Southern District of New York, cause number 1:22-cr-673 (LAK).

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on February 16, 2023

By: _____
Name: Richard D. Anigian
Title: Partner, Haynes and Boone, LLP

# EXHIBIT B-1



# UNITED STATES OF AMERICA

SECURITIES AND EXCHANGE COMMISSION

## ATTESTATION

IT IS HEREBY ATTESTED THAT:

The attached SC 13D was received in this Commission on 2022-05-12, under the name of Robinhood Markets, Inc., File No. 005-92819, pursuant to the relevant Act(s) of the Commission.

This certified document (ID e90568a2-5f12-4bf7-90bc-f921e7647091) was produced from the files of this Commission on

For the Commission

| Tue Dec 13 2022 |
| --- |
| *Date* |

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, DC, which Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is official custodian of the records and files of said Commission and was such official custodian at the time of executing the above attestation.

Secretary

SC 13D 1 brhc10037465_sc13d.htm SC 13D

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C.  20549

# SCHEDULE 13D

**Under the Securities Exchange Act of 1934**

# Robinhood Markets, Inc.

(Name of Issuer)

Class A Common Stock, par value $0.0001 per share
(Title of Class of Securities)

770700102
(CUSIP Number)

Ryne Miller
60 Broad Street, Suite 2501
New York, NY 10004
(405) 517-7570

(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

May 2, 2022
(Date of Event Which Requires Filing of This Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☐

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

SCHEDULE 13D

| 1 | **NAMES OF REPORTING PERSONS** <br><br> Emergent Fidelity Technologies Ltd. | |
|---|---|---|
| 2 | **CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP** | (a) ☐ <br> (b) ☒ |
| 3 | **SEC USE ONLY** | |
| 4 | **SOURCE OF FUNDS (SEE INSTRUCTIONS)** <br><br> WC | |
| 5 | **CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(D) OR 2(E)** | ☐ |
| 6 | **CITIZENSHIP OR PLACE OF ORGANIZATION** <br><br> Antigua and Barbuda | |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | **SOLE VOTING POWER** <br><br> 0 |
|---|---|---|
| | 8 | **SHARED VOTING POWER** <br><br> 56,273,469 |
| | 9 | **SOLE DISPOSITIVE POWER** <br><br> 0 |
| | 10 | **SHARED DISPOSITIVE POWER** <br><br> 56,273,469 |

| 11 | **AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON** <br><br> 56,273,469 | |
|---|---|---|
| 12 | **CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS)** | ☐ |
| 13 | **PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)** <br><br> 7.6% | |
| 14 | **TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)** <br><br> FI | |

| 1 | **NAMES OF REPORTING PERSONS** <br><br> Samuel Benjamin Bankman-Fried | |
|---|---|---|
| 2 | **CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP** | (a) ☐ <br> (b) ☒ |
| 3 | **SEC USE ONLY** | |
| 4 | **SOURCE OF FUNDS (SEE INSTRUCTIONS)** <br><br> AF | |
| 5 | **CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(D) OR 2(E)** | ☐ |
| 6 | **CITIZENSHIP OR PLACE OF ORGANIZATION** <br><br> United States | |

| | | |
|---|---|---|
| **NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH** | **7** | **SOLE VOTING POWER** <br><br> 0 |
| | **8** | **SHARED VOTING POWER** <br><br> 56,273,469 |
| | **9** | **SOLE DISPOSITIVE POWER** <br><br> 0 |
| | **10** | **SHARED DISPOSITIVE POWER** <br><br> 56,273,469 |

| 11 | **AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON** <br><br> 56,273,469 | |
|---|---|---|
| 12 | **CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS)** | ☐ |
| 13 | **PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)** <br><br> 7.6% | |
| 14 | **TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)** <br><br> IN | |

**Item 1. Security and Issuer**

This statement on Schedule 13D (this "Statement") relates to the Class A Common Stock, $0.00001 par value per share (the "Shares"), of Robinhood Markets, Inc., a Delaware corporation (the "Issuer"). The address of the principal executive offices of the Issuer is 85 Willow Road, Menlo Park, California 94025, U.S.A.

**Item 2. Identity and Background**

This Statement is filed on behalf of each of the following persons (collectively, the "Reporting Persons"): Emergent Fidelity Technologies Ltd. a company incorporated under the laws of Antigua and Barbuda ("Emergent"), and Samuel Benjamin Bankman-Fried, a United States citizen. This Statement relates to the Shares held by Emergent.

The principal business address of Emergent is Unit 3B Bryson's Commercial Complex, Friars Hill Road, St. Johns, Antigua. The principal business of Emergent is the making of investments in securities and other assets. Mr. Bankman-Fried is the sole director and majority owner of Emergent. The principal business addresses of Mr. Bankman-Fried are 27 Veridian Corporate Center, Western Road, New Providence, Nassau, Bahamas and 167 N Green St, Floor 11 Suite 2, Chicago IL 60607. Mr. Bankman-Fried is the co-founder and Chief Executive Officer of each of FTX Trading Ltd. and West Realm Shires Services Inc. d/b/a FTX US. The agreement between the Reporting Persons to file this Statement jointly in accordance with Rule 13d-1(k) under the Exchange Act is attached as Exhibit 1 hereto.

During the last five years, none of the Reporting Persons has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or has been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

**Item 3. Source and Amount of Funds or Other Consideration**

The responses to Items 4, 5 and 6 of this Statement are incorporated herein by reference.

The Shares reported herein were purchased by Emergent using working capital. The total purchase price for the Shares reported herein was $648,293,886.33. All or part of the Shares owned by the Reporting Persons may from time to time be pledged with one or more banking institutions or brokerage firms as collateral for loans made by such bank(s) or brokerage firm(s) to the Reporting Persons. Such indebtedness may be refinanced with other banks or broker dealers.

**Item 4. Purpose of Transaction**

The responses to Items 3, 5 and 6 of this Statement are incorporated herein by reference.

The Reporting Persons acquired the Shares in the belief that the Shares represent an attractive investment. The Reporting Persons intend to hold the Shares as an investment, and do not currently have any intention of taking any action toward changing or influencing the control of the Issuer, participating in any transaction having that purpose or effect or taking any action listed in Item 4 of Schedule 13D. The Reporting Persons review their investments on an ongoing basis, including their investment in the Issuer. As a result of that review, and depending on many factors, the Reporting Persons may from time to time engage in discussions as a stockholder with representatives of the Issuer, other stockholders of the Issuer or third parties regarding the performance of the Issuer and its business and investment returns. Additionally, although the Reporting Persons currently have no intention to do so, in the future, and based on circumstances as they may develop, the Reporting Persons might determine to take other actions with respect to their investment in the Issuer as they deem appropriate, including, without limitation: reviewing options for enhancing stockholder value through, among other things, various strategic alternatives or operational or management initiatives; acquiring additional Shares and/or other securities of the Issuer or securities that are based upon or relate to the value of the Shares or otherwise relate to the Issuer (collectively, "Securities"), or disposing of, hedging or otherwise transacting in Securities; and proposing or considering, or changing their intention with respect to, one or more of the actions described in Item 4 of Schedule 13D.

**Item 5. Interest in Securities of the Issuer**

(a) – (b) Each of Emergent and Mr. Bankman-Fried may be deemed the beneficial owner of all of the Shares reported herein, which represent approximately 7.6% of the Issuer's outstanding Shares. The percentage in the immediately preceding sentence is calculated based on a total of 743,881,607 Shares issued and outstanding as of April 29, 2022, as reported in the Issuer's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on May 6, 2022.

(c) Except as set forth on Exhibit 2 attached hereto, there have been no transactions with respect to the Shares during the sixty days prior to the date hereof by any of the Reporting Persons.

(d) In addition to the Reporting Persons, members of Emergent may have the right to participate in the receipt of dividends from, or proceeds from the sale of, the Shares reported herein in accordance with their respective membership percentages.

(e) Not applicable.

**Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

Not applicable.

**Item 7. Materials to be Filed as Exhibits**

| Exhibit Number | Description |
|---|---|
| 1 | Joint Filing Agreement between Emergent Fidelity Technologies Ltd. and Samuel Benjamin Bankman-Fried. |
| 2 | Transactions in the Shares effected in the past 60 days. |

**SIGNATURES**

After reasonable inquiry and to the best of the undersigned's knowledge and belief, each of the undersigned certifies that the information set forth in this statement is true, complete and correct.

Dated: May 12, 2022

**Emergent Fidelity Technologies Ltd.**

By: /s/Samuel Benjamin Bankman-Fried
    Name: Samuel Benjamin Bankman-Fried
    Title:   Director

**Samuel Benjamin Bankman-Fried**

By: /s/Samuel Benjamin Bankman-Fried

-6-

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 1 | Joint Filing Agreement between Emergent Fidelity Technologies Ltd. and Samuel Benjamin Bankman-Fried. |
| 2 | Transactions in the Shares effected in the past 60 days. |

-7-

**Exhibit 1**

**AGREEMENT**
**JOINT FILING OF SCHEDULE 13D**

The undersigned hereby agree to jointly prepare and file with regulatory authorities this Schedule 13D and any future amendments thereto reporting each of the undersigned's ownership of securities of Robinhood Markets, Inc., and hereby affirm that such Schedule 13D is being filed on behalf of each of the undersigned pursuant to and in accordance with the provisions of Rule 13d-1(k) under the Securities Exchange Act of 1934. The undersigned acknowledge that each shall be responsible for the timely filing of such amendments, and for the completeness and accuracy of the information concerning him or it contained therein, but shall not be responsible for the completeness and accuracy of the information concerning the other, except to the extent that he or it knows or has reason to believe that such information is inaccurate.

Date: May 12, 2022

**Emergent Fidelity Technologies Ltd.**

By:     /s/ Samuel Benjamin Bankman-Fried
        Name: Samuel Benjamin Bankman-Fried
        Title:  Director

Date: May 12, 2022

**Samuel Benjamin Bankman-Fried**

By:     /s/ Samuel Benjamin Bankman-Fried

**Exhibit 2**

**TRANSACTIONS**

The following table sets forth all transactions with respect to Shares effected in the last 60 days by or on behalf of the Reporting Persons, inclusive of any transactions effected through 4:00 p.m., New York City time, on May 12, 2022. All such transactions were open-market purchases of Shares made through an affiliate of the Reporting Persons that transferred such Shares to Emergent Fidelity Technologies Ltd. at those Shares' respective purchase prices. The Reporting Persons undertake to provide, upon request of the staff of the Securities and Exchange Commission, full information regarding the number of Shares purchased at each separate price within the price ranges set forth on the table below.

| Transaction Date | Buy/Sell | Quantity | Weighted Avg. Price | Price Range |
|---|---|---|---|---|
| 03/14/2022 | Buy | 800,000 | 10.7092 | 10.4450 - 11.1300 |
| 03/15/2022 | Buy | 800,000 | 10.8915 | 10.5050 - 11.1100 |
| 03/16/2022 | Buy | 800,000 | 12.5464 | 11.9300 - 12.8400 |
| 03/17/2022 | Buy | 800,000 | 13.4212 | 12.7200 - 13.7000 |
| 03/22/2022 | Buy | 400,000 | 13.5252 | 13.2950 - 13.8500 |
| 03/23/2022 | Buy | 800,000 | 13.1211 | 12.8200 - 13.3350 |
| 03/24/2022 | Buy | 600,000 | 12.9467 | 12.8250 - 13.0400 |
| 03/25/2022 | Buy | 400,000 | 12.4069 | 12.2700 - 12.5200 |
| 03/28/2022 | Buy | 400,000 | 12.5177 | 12.2750 - 12.8000 |
| 04/11/2022 | Buy | 400,000 | 11.2423 | 11.0100 - 11.4650 |
| 04/12/2022 | Buy | 400,000 | 11.5911 | 11.3550 - 11.8300 |
| 04/13/2022 | Buy | 400,000 | 11.7531 | 11.4200 - 11.9300 |
| 04/14/2022 | Buy | 400,000 | 11.5851 | 11.3050 - 11.8800 |
| 04/18/2022 | Buy | 400,000 | 11.0111 | 10.9050 - 11.2700 |
| 04/19/2022 | Buy | 400,000 | 11.3910 | 11.2350 - 11.6300 |
| 04/20/2022 | Buy | 400,000 | 10.8683 | 10.6950 - 11.1050 |
| 04/27/2022 | Buy | 900,000 | 9.5583 | 9.3950 - 9.7600 |
| 04/28/2022 | Buy | 900,000 | 9.7489 | 9.2700 - 10.1900 |
| 05/02/2022 | Buy | 2,400,000 | 10.1458 | 9.5400 - 10.4800 |
| 05/03/2022 | Buy | 2,800,000 | 10.0107 | 9.6450 - 10.4900 |
| 05/04/2022 | Buy | 1,515,910 | 10.2058 | 9.8950 - 10.4950 |
| 05/04/2022 | Buy | 522,559 | 10.6816 | 10.5000 - 10.9050 |
| 05/05/2022 | Buy | 2,400,000 | 10.6365 | 10.3650 - 10.9500 |
| 05/06/2022 | Buy | 1,450,000 | 10.2339 | 9.9200 - 10.6500 |
| 05/09/2022 | Buy | 2,400,000 | 9.7423 | 9.4250 - 10.2300 |
| 05/10/2022 | Buy | 2,800,000 | 9.3580 | 8.9200 - 9.8800 |
| 05/11/2022 | Buy | 1,590,165 | 8.2786 | 8.0100 - 8.4950 |
| 05/11/2022 | Buy | 1,609,835 | 8.9340 | 8.5000 - 9.3500 |

# EXHIBIT B-2

# HAYNES BOONE



November 14, 2022

Thomas A. Hayes Jr.    *via email*
Senior Vice President
General Counsel
E D & F Man Capital Markets Inc.
140 East 45th Street, 10th Floor
New York, New York 10017
thayes@edfmancapital.com

RE:    E D & F Man Capital Markets Inc ("**EDFM**"). Account Number 49*-305**COMBINED (the "**Account**") holding Collateral Shares of Class A Common Stock of Robinhood (Ticker: HOOD) (the "**Collateral**") securing that certain Pledge Agreement (the "**Emergent Pledge Agreement**") entered into as of November 9, 2022, by and among BlockFi Lending LLC ("**BlockFi Lending**"), BlockFi International Ltd ("**BlockFi International**" and together, "**BlockFi**")), and Emergent Fidelity Technologies Ltd. ("**Emergent**").  Unless specified otherwise, capitalized terms not defined herein shall have the same meanings assigned in the Emergent Pledge Agreement.

Dear Mr. Hayes:

We represent BlockFi Lending and BlockFi International.  Emergent has guaranteed the repayment of certain obligations of Alameda Research Limited to BlockFi and has pledged a first priority security interest in and to all of Emergent's rights, titles and interests in the Collateral pursuant to the terms of the Emergent Pledge Agreement, a copy of which is attached.  This notice follows up on your email communications with, among others, Jonathan Mayers and Zac Prince at BlockFi on November 10 and 11, 2022 (the "**Communications**").

As EDFM was notified in the Communications, BlockFi notified Emergent of an Event of Default under the Emergent Pledge Agreement, that Emergent's Guaranteed Obligations were immediately due and payable, and that BlockFi intended to exercise all available remedies thereunder.

Pursuant to Section 6 of the Emergent Pledge Agreement, Emergent irrevocably appointed BlockFi and any of its officers or agents as its lawful attorney-in-fact with irrevocable power and authority in the name of Emergent or in its own name, to cause, among other things, the Collateral to be transferred or sold after the occurrence of an Event of Default.  BlockFi hereby demands, pursuant to the powers granted to it as attorney-in-fact for Emergent pursuant to Section 6 of the Emergent Pledge Agreement that EDFM immediately transfer to it all of the Collateral.  Upon EDFM's confirmation that it will comply with this demand, BlockFi will provide written instructions for the transfer of the Collateral.

# HAYNES BOONE

HB

Thomas A. Hayes Jr.
November 14, 2022
Page 2

In the event that EDFM refuses to comply with this demand, BlockFi hereby demands based on its first priority security interest in the Collateral, that EDFM take all steps necessary to preserve the Collateral and to confirm that none of the Collateral will be transferred to any party other than BlockFi absent a valid, enforceable, and non-appealable order from a court of competent jurisdiction. The transfer of all or any part of the Collateral to any party other than BlockFi will cause BlockFi to suffer irreparable harm.

Please confirm that EDFM will either (i) comply with our demand to transfer the Collateral to us, or (ii) hold all Collateral subject to (a) further instructions from BlockFi in accordance with its rights as attorney-in-fact under Section 6 of the Emergent Pledge Agreement (which may include instructions to liquidate the Collateral) and/or (b) court order as described herein.

Time is of the essence with respect to these matters. Therefore, BlockFi requests a response to this demand and request at your earliest convenience, but no later than 12 noon, New York time, on Tuesday, November 15, 2022.

Should you have any questions or wish to discuss this matter in more detail, please do not hesitate to contact me.

Very truly yours,

Richard D. Anigian
Direct Phone Number: (214) 651-5633
Direct Fax Number: (214) 200-0354
rick.anigian@haynesboone.com

RDA/pam

cc: Emergent Fidelity Technologies Ltd.    *via email*
    Unit 3B Bryson's Commercial Complex
    Friars Hill Road
    St. Johns, Antigua
    Attn: Sam Bankman-Fried
    sam@ftx.com

Attachment

# EXHIBIT B-3

**Therese M. Doherty**
212 692 6722
tdoherty@mintz.com



**MINTZ**

Chrysler Center
666 Third Avenue
New York, NY
212 935 3000
mintz.com

November 14, 2022

**VIA EMAIL:  rick.anigian@haynesboone.com**

Richard D. Anigian, Esq.
Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX  75219

      Re:    E D & F Man Capital Markets Inc. Account Number 49*-305**COMBINED /
               BlockFi / Alameda Research Limited / Emergent Fidelity Technologies Inc.

Dear Mr. Anigian:

      This firm is counsel to E D & F Man Capital Markets Inc. ("MCM").  We write in response to your letter to Thomas A. Hayes, Jr., Esq. dated November 14, 2022.

      In light of the Chapter 11 petitions filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") by FTX Trading Ltd,, Case No. 22-11068, Alameda Research Limited, Case No. 22-11067, and their affiliated entities (the "Bankruptcy"), and the automatic stay pursuant to 11 U.S.C. § 362, MCM hereby rejects the demand made on behalf of of BlockFi Lending LLC and/or BlockFi International Ltd. (collectively, "BlockFi") to transfer to BlockFi assets held at MCM in account number 499-30500 (the "Assets").

      MCM hereby confirms that MCM will not transfer, or grant control over, to any third party any of the Assets absent an order from the Bankruptcy Court or other court with jurisdiction over the Assets.

      Please direct all future communications regarding this matter to me.

               Sincerely,

               /s/ Therese M. Doherty

cc:  Thomas A. Hayes, Jr., Esq.

---

# EXHIBIT B-4

| | |
|---|---|
| **From:** | Collins, LisaMarie |
| **To:** | Anigian, Rick |
| **Cc:** | Walsh, Kaitlin; Jones, Charlie; Doherty, Therese |
| **Subject:** | RE: BlockFi Lending and BlockFi International |
| **Date:** | Wednesday, November 16, 2022 4:59:49 PM |

---

**EXTERNAL:** Sent from outside Haynes and Boone, LLP

---

Rick-

This will confirm that it appears that Emergent Fidelity Technologies Ltd. is an affiliate of Alameda Research Ltd. and that the assets in the accounts at ED&F in the names of Alameda Research Ltd. and Emergent Fidelity Technologies Ltd. are property of the estate of one or more debtors in bankruptcy and subject to the automatic stay imposed by 11 U.S.C. § 362.  In all events, all assets in accounts at ED&F in the name of Alameda Research Ltd. and Emergent Fidelity Technologies Ltd. will remain at ED&F until ordered otherwise by a court with jurisdiction over the assets.

Regards,

**LisaMarie Collins** (*she/her/hers*)
*Member*

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
666 Third Avenue, New York, NY 10017
+1.212.692.6252
LCollins@mintz.com | Mintz.com

---

**From:** Anigian, Rick <Rick.Anigian@haynesboone.com>
**Sent:** Wednesday, November 16, 2022 8:45 AM
**To:** Doherty, Therese <TDoherty@mintz.com>
**Cc:** Collins, LisaMarie <LCollins@mintz.com>; Walsh, Kaitlin <KRWalsh@mintz.com>; Jones, Charlie <Charlie.Jones@haynesboone.com>
**Subject:** RE: BlockFi Lending and BlockFi International

Therese,

Thanks for your response.  Do you have some time this afternoon to discuss this matter?  If so, please let us know your availability.

Thanks,

Rick

**Rick Anigian** | Partner
rick.anigian@haynesboone.com | (t) +1 214.651.5633

**From:** Doherty, Therese <TDoherty@mintz.com>
**Sent:** Monday, November 14, 2022 1:43 PM
**To:** Anigian, Rick <Rick.Anigian@haynesboone.com>
**Cc:** Thomas A. Hayes (thayes@edfmancapital.com) <thayes@edfmancapital.com>; Collins, LisaMarie
<LCollins@mintz.com>; Walsh, Kaitlin <KRWalsh@mintz.com>
**Subject:** BlockFi Lending and BlockFi International

**EXTERNAL:** Sent from outside Haynes and Boone, LLP

Dear Mr. Angian,

Please see the attached letter.

Sincerely,

**Therese M. Doherty**
*Member / Co-Chair, Financial Services Practice*
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
666 Third Avenue, New York, NY 10017
+1.212.692.6722 Direct
+1.646.379.2780 Cell
TDoherty@mintz.com | Mintz.com



STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments
to this message are intended for the exclusive use of the addressee(s)
and may contain confidential or privileged information. If you are not
the intended recipient, or the person responsible for delivering the
email to the intended recipient, be advised you have received this
message in error and that any use, dissemination, forwarding, printing,
or copying is strictly prohibited. Please notify the Mintz, Levin, Cohn,
Ferris, Glovsky and Popeo sender immediately, and destroy all copies
of this message and any attachments.

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential,
may be privileged and should be read or retained only by the intended
recipient. If you have received this transmission in error, please
immediately notify the sender and delete it from your system.

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments
to this message are intended for the exclusive use of the addressee(s)
and may contain confidential or privileged information. If you are not
the intended recipient, or the person responsible for delivering the
email to the intended recipient, be advised you have received this
message in error and that any use, dissemination, forwarding, printing,
or copying is strictly prohibited. Please notify the Mintz, Levin, Cohn,
Ferris, Glovsky and Popeo sender immediately, and destroy all copies
of this message and any attachments.

# EXHIBIT B-5

| | |
|---|---|
| **From:** | Doherty, Therese <TDoherty@mintz.com> |
| **Sent:** | Wednesday, December 7, 2022 3:46 PM |
| **To:** | Anigian, Rick |
| **Cc:** | Collins, LisaMarie; Walsh, Kaitlin; Jones, Charlie; Kanowitz, Richard; Asaro, Amanda; Taylor, Dallas; Baumstein, Douglas |
| **Subject:** | RE: BlockFi, et al. v. Emergent and EDFM |
| **Attachments:** | Order 12.5.2022.pdf |

---

**EXTERNAL:** Sent from outside Haynes and Boone, LLP

---

Rick-

I have finally been in contact with US lawyers representing the Joint Receivers of Emergent Fidelity Technologies Ltd.  They are represented by Matthew Ziegler at Morgan Lewis (contact info below).  Apparently, the Joint Receivers have now been appointed as Joint Provisional Liquidators of Emergent according to the attached order.

Best regards,
Therese

> Matthew C. Ziegler
> Morgan, Lewis & Bockius LLP
> 1701 Market Street | Philadelphia, PA 19103-2921
> Mobile: +1.314.707.4627 | Direct: +1.215.963.5064 | Fax: +1.215.963.5001
> 101 Park Avenue | New York, NY 10178-0060
> Direct: +1.212.309.6027 | Fax: +1.212.309.6001

---

**From:** Doherty, Therese
**Sent:** Friday, December 2, 2022 4:21 PM
**To:** 'Anigian, Rick' <Rick.Anigian@haynesboone.com>
**Cc:** Collins, LisaMarie <LCollins@mintz.com>; Walsh, Kaitlin <KRWalsh@mintz.com>; Jones, Charlie <Charlie.Jones@haynesboone.com>; Kanowitz, Richard <Richard.Kanowitz@haynesboone.com>; Asaro, Amanda <ABAsaro@mintz.com>; Taylor, Dallas <DGTaylor@mintz.com>
**Subject:** RE: BlockFi, et al. v. Emergent and EDFM

Rick-

I acknowledge receipt.   Please let me know if you know of any US or foreign lawyers who purport to be acting on behalf of Emergent Fidelity Technology Ltd.   I see that interim receivers apparently were appointed in BVI but we have been unable to confirm whether any lawyers are acting on behalf of the entity or the receivers.

Thank you
Therese

---

**From:** Anigian, Rick <Rick.Anigian@haynesboone.com>
**Sent:** Friday, December 2, 2022 4:17 PM
**To:** Doherty, Therese <TDoherty@mintz.com>

**Cc:** Collins, LisaMarie <LCollins@mintz.com>; Walsh, Kaitlin <KRWalsh@mintz.com>; Jones, Charlie
<Charlie.Jones@haynesboone.com>; Kanowitz, Richard <Richard.Kanowitz@haynesboone.com>; Asaro, Amanda
<ABAsaro@mintz.com>; Taylor, Dallas <DGTaylor@mintz.com>
**Subject:** BlockFi, et al. v. Emergent and EDFM

Therese,

Please see the attached World Wide Stay Order and document preservation notice we are
sending on behalf of the BlockFi Debtors.

Let me know if you have any problems with the attachment.

Thanks,

Rick

**HAYNES BOONE**

**Rick Anigian** | Partner
rick.anigian@haynesboone.com | (t) +1 214.651.5633

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential,
may be privileged and should be read or retained only by the intended
recipient. If you have received this transmission in error, please
immediately notify the sender and delete it from your system.

---

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments
to this message are intended for the exclusive use of the addressee(s)
and may contain confidential or privileged information. If you are not
the intended recipient, or the person responsible for delivering the
email to the intended recipient, be advised you have received this
message in error and that any use, dissemination, forwarding, printing,
or copying is strictly prohibited. Please notify the Mintz, Levin, Cohn,
Ferris, Glovsky and Popeo sender immediately, and destroy all copies
of this message and any attachments.

# EXHIBIT B-6

IBC No.: **17532**



**ANTIGUA AND BARBUDA**
**FINANCIAL SERVICES REGULATORY COMMISSION**

# CERTIFICATE OF INCORPORATION

## EMERGENT FIDELITY TECHNOLOGIES LTD.

The undersigned **HEREBY CERTIFIES**, pursuant to Section 9 of the International Business Corporations Act, Cap. 222, of the Revised Laws of Antigua and Barbuda, that the above named company was incorporated under the laws of Antigua and Barbuda having complied with the applicable requirements of the said Act.

**Chief Executive Officer**
Financial Services Regulatory Commission

**REGISTERED AT:** ST. JOHN'S ANTIGUA, ON APRIL 22, 2022

# EXHIBIT B-7



FINANCIAL SERVICES
REGULATORY COMMISSION

**APR 2 2 2022**

FILED



# Antigua and Barbuda
# Financial Services Regulatory Commission

### THE INTERNATIONAL BUSINESS CORPORATIONS ACT
### APPLICATION FOR INTERNATIONAL BUSINESS CHARTER

This form must be submitted with all supporting documentation and a fee of US$302.00 and can be downloaded from our website in Adobe Acrobat format and information can be entered directly into the form. Alternatively, the form can be printed and completed with the use of a typewriter. Any information provided on additional sheets must be signed and dated. Where there is a question which is not applicable, please write "N/A" beside the question. All dates should be completed in the form: Day/Month/Year.

We hereby submit an application for International Business Charter for the below-named International Business Corporation.

| 1. Date of Application: | 20/4/2022 |
|---|---|

## SECTION: I  DETAILS OF CORPORATE MANAGEMENT & TRUST SERVICE PROVIDER (CMTSP)

**2. Name and address of Corporate Management and Trust Service Provider:**

| Name of CMTSP: | Corporate & Trust Services (Caribbean) Limited | | |
|---|---|---|---|
| Licence Number: | CMTSP0015 | | |
| Contact Person: | Arthur G. B. Thomas | | |
| Address: | Lower Factory Road, St. John's, Antigua | | |
| Telephone Number: | 460-5860 | Mobile Number: | (268) 764-0592 |
| Fax Number: | 562-1810 | E-mail Address: | athomas@thomasjohnlawyers.com |
| Website address, if any: | www.thomasjohn.com | | |

## SECTION: II  DETAILS OF INTERNATIONAL BUSINESS CORPORATION (IBC)

**3. Name and address of International Business Corporation:**

| Name of IBC to be incorporated: | Emergent Fidelity Technologies Ltd. |
|---|---|
| Operating address: | Unit 3B Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua |

**4. Name and address of Registered Office:**

| Name of Registered Office: | Corporate & Trust Services (Caribbean) Limited |
|---|---|
| Address of Registered Office: | Lower Factory Road, St. John's, Antigua |

**5. Authorised number of shares by class (Bearer Shares are not allowed for licensed institutions):**

| ☑ No. of Registered Shares | 5,000 | ☐ No. of Common Shares | | ☐ No. of Other | |
|---|---|---|---|---|---|
| ☐ No. of Preferred Shares | | ☐ No. of Bearer Shares | | ☐ No. of Other | |

**6. Transferability restrictions on shares:**  ☐ Yes  ☑ No

| 7. Number of Directors - Maximum: | 1 | Number of Directors - Minimum | 3 |
|---|---|---|---|

**APPLICATION FOR INTERNATIONAL BUSINESS CHARTER**

**8.  Restrictions to Corporate purpose Clause:**  ☑ Yes (Please specify below)  ☐ No

The Company shall not engage in International Banking, Trust, Insurance, Betting and Bookmaking or any other activity which requires a Licence under the IBC Act.

**9.  Securities Regulations Documents:**  ☐ Attached if applicable   ☑ Not applicable

**10.  Licence Application**

☐ Banking     ☐ Trust     ☐ Insurance     ☐ Gaming

**11.  Unanimous shareholder Agreement:**  ☐ Attached if applicable   ☑ Not applicable

## SECTION: III  DOCUMENTATION WHICH FORMS PART OF THIS APPLICATION

| Documents | Attached |
|---|---|
| 1. Application for International Business Corporation Charter [original & two (2) copies (one certified copy returned)] | ☑ |
| 2. Article of Incorporation [Original & two (2) copies] | ☑ |
| 3. Licence Application [original & (2) copies] | ☐ |
| 4. Unanimous Shareholders Agreement [original & two (2) copies] | ☐ |

## SECTION: IV  AUTHORIZATION

| Authorized Name: | Arthur G. B. Thomas | Signature: | |
|---|---|---|---|
| Title: | for Corporate & Trust Services (Caribbean) Ltd. | Date: | 20/04/2022 |

## SECTION: V  CONTACT DETAILS

Please forward completed form with any supporting material to:
**Manager of International Business Corporations and Other Non-Banking Financial Institutions**
**Financial Services Regulatory Commission**
P.O. Box 2674
St. John's, Antigua
**Tel:** (268)481-1194 ● **Fax:** (268)463-0422
**Email:** terry.smith@fsrc.gov.ag
Website: http://www.fsrc.gov.ag

FINANCIAL SERVICES
REGULATORY COMMISSION

APR 2 2 2022

FILED

# EXHIBIT B-8

**ANTIGUA AND BARBUDA**
**International Business Corporations Act, CAP. 222**
**A Company Limited by Shares**

**ARTICLES OF INCORPORATION**
**OF**
**EMERGENT FIDELITY TECHNOLOGIES LTD.**



FINANCIAL SERVICES
REGULATORY COMMISSION

APR 2 2 2022

FILED

## ARTICLE I

1.  The name of the Company is **EMERGENT FIDELITY TECHNOLOGIES LTD.**

## ARTICLE II

2.  **REGISTERED OFFICE & AGENT**

    The Registered Agent of the Company shall be **CORPORATE & TRUST SERVICES (CARIBBEAN) LIMITED**, whose office is situated at Lower Factory Road, in the city of Saint John's, Antigua and Barbuda, the said office shall be the Registered Office of the Company.

## ARTICLE III

3.  **CAPITAL**

    The Share Capital of the Company shall be 5,000 registered shares divided into 5,000 shares of US$1.00 each par value common stock, which shall be designated "Registered Shares". The Company shall have the power to increase or reduce said capital, and to issue any part of its capital as special privilege, or subject to any postponement of rights, or to any conditions or restrictions; and so that unless the conditions of issue shall otherwise expressly declare, every issue of shares, whether declared to be preference or otherwise, shall be subject to the power therein contained.

## ARTICLE IV

4.  **BOARD OF DIRECTORS**

    The powers of the Company shall be exercised by the Board of Directors of the Company, which shall be empowered to name one or more Managing Directors. Subject to  any restrictions  in the appointing resolution, an act of a Managing Director shall bind the Company as if said act had been approved by the Board of Directors. Only a member of the Board of Directors shall serve as a Managing Director. The Company shall have a minimum of 1 and a maximum of 3 directors.

-2-



### ARTICLE V

5. **CORPORATE PURPOSE**

The objects for which the Company is established are:

a. Software Development; and all business activities permitted by the laws of the State of Antigua and Barbuda other than International Banking, Trust and Insurance, Betting and Bookmaking or any activity which requires a Licence under the International Business Corporations Act.

b. To acquire and deal with any property, real or personal, to erect any buildings, and generally to do all acts and things which, in the opinion of the Company or the Directors, may be conveniently or profitably, or usefully acquired and dealt with, carried on, erected or done by the Company in connection with said property.

c. To generally have and exercise all powers, rights and privileges necessary and incident to carrying out properly the objects herein mentioned.

### ARTICLE VI

6. **EXISTENCE**

The Company shall have perpetual existence unless sooner dissolved in accordance with the laws of the Antigua and Barbuda. The date on which corporate existence shall begin is the date on which these Articles of Incorporation are filed with the Director of International Business Corporations of Antigua and Barbuda.

### ARTICLE VII

7. **LIABILITY OF SHAREHOLDERS**

The liability of a shareholder is limited to the amount, if any, unpaid on the shares held or subscribed to by said shareholder.

### ARTICLE VIII

8. **INDEMNIFICATIONS**

The Company shall indemnify any and all of its Directors, officers, employees or agents or former Directors, officers, employees or agents or any person or persons who may have served at its request as a Director, officer, employee or agent of another corporation, partnership, joint venture, trust or other

-3-

enterprise in which it owns shares of capital stock or of which it is a creditor, to the full extent permitted by law.  Said indemnification shall include, but not limited to, the expenses, including the cost of any judgements, fines settlements and counsel's fees, actually and necessarily paid or incurred in connection with any action, suit or proceeding, whether civil, criminal, administrative or investigative, and any appeals thereof, to which any such person or his legal representative may be a party or may be threatened to be made a party by reason of his being or having been a Director, officer, employee or agent as herein provided.  The foregoing right of indemnification shall not be exclusive of any rights to which any Director, officer, employee or agent may be entitled as a matter of law or which he may be lawfully granted.

## ARTICLE IX

**9.    CHARTER CONTINUANCE**

The Company is authorised to transfer its charter to any jurisdiction, which permits continuation of a foreign corporation.

**10.    SECURITIES**

No Securities of the Company will be distributed to the public in the Antigua and Barbuda in contravention of Section 365 of the International Business Corporations Act, 1982.

## ARTICLE XI

**11.    INCORPORATORS**

The name and address of the Company's incorporators are: -

**ARTHUR G. B. THOMAS**
Clarkes Hill
St. John's
Antigua

**KELVIN JOHN**
Friars Hill Development
St. John's
Antigua

Dated this 20th day of April, 2022 at St. John's, Antigua

ANTIGUA AND BARBUDA

INTERNATIONAL BUSINESS CORPORATIONS ACT CAP. 222

GENERAL BY-LAW

TABLE OF CONTENTS

|  | Chapter |
|---|---|
| INTERPRETATION | 1 |
| REGISTERED OFFICE | 2 |
| SEAL | 3 |
| DIRECTORS | 4 |
| BORROWING POWERS OF DIRECTORS | 5 |
| MEETINGS OF DIRECTORS | 6 |
| REMUNERATION OF DIRECTORS | 7 |
| SUBMISSION OF CONTRACTS OF SHAREHOLDERS | 8 |
| FOR THE PROTECTION OF DIRECTORS AND OFFICERS | 9 |
| INDEMNITIES TO DIRECTORS AND OFFICERS | 10 |
| OFFICERS | 11 |
| SHAREHOLDERS' MEETINGS | 12 |
| SHARES | 13 |
| TRANSFERS OF SHARES AND DEBENTURES | 14 |
| DIVIDENDS | 15 |
| VOTING IN OTHER COMPANIES | 16 |
| INFORMATION AVAILABLE TO SHAREHOLDERS | 17 |
| NOTICES | 18 |
| CHEQUES, DRAFTS AND NOTES | 19 |
| EXECUTION OF INSTRUMENTS | 20 |
| SIGNATURES | 21 |
| FINANCIAL YEAR | 22 |
| INITIAL DIRECTORS | 23 |

FINANCIAL SERVICES
REGULATORY COMMISSION

APR 2 2 2022

FILED

**ANTIGUA AND BARBUDA**
**INTERNATIONAL BUSINESS CORPORATIONS ACT Cap. 222**

**A COMPANY LIMITED BY SHARES**
**GENERAL BY-LAW (NO. 1)**



A by-law relating generally to the conduct of the affairs of **EMERGENT FIDELITY TECHNOLOGIES LTD.** (hereinafter called the "Company")

**BE IT ENACTED** as the general by-law of the Company as follows:

1.  **INTERPRETATION**
1.1.  In this by-law and all other by-laws of the Company, unless the context otherwise requires:
    (a)    "Act" means the International Business Corporations Act 1982 as from time to time amended and every statute substituted therefor and, in the case of such substitution, any references in the by-laws of the Company to provisions of the Act shall be read as references to the substituted provisions therefor in the new statute or statutes;
    (b)    "Regulations" means any Regulations made under the Act, and every regulation substituted therefor and, in the case of such substitution, any references in the by-laws of the Company to provisions of the Regulations shall be read as references to the substituted provisions therefor in the new regulations;
    (c)    "By-Laws" means any by-law of the Company from time to time in force;
    (d)    all terms contained in the by-laws and defined in the Act or the Regulations shall have the meanings given to such terms in the Act or the Regulations; and
    (e)    the singular includes the plural and the plural includes the singular; the masculine gender includes the feminine and neuter genders; the word "person" includes bodies corporate , companies, partnerships, syndicates, trusts and any association of persons; and the word "individual" means a natural person.

2.  **REGISTERED OFFICE**
2.1  The registered office of the company shall be in Antigua and Barbuda at such address as the directors may fix from time to time by resolution.

3.  **SEAL**
3.1  The common seal of the Company shall be such as the directors may by resolution from time to time adopt.

4.  **DIRECTORS**
4.1  Powers: Subject to any unanimous shareholder agreement, the business and affairs of the Company shall be managed by the directors.

FILED

FINANCIAL SERVICES
REGULATORY COMMISSION

APR 2 2 2022

-2-

4.2  Number: There shall be not less than 1 and no more than 3 directors.

4.3  Election: Directors shall be elected by the shareholders on a show of hands unless a ballot is demanded in which case such election shall be by ballot.

4.4  Tenure: Unless his tenure is sooner determined, a director shall hold office from the date on which he is elected or appointed until the close of the annual meeting of the shareholders next following but he shall be eligible for re-election if qualified.

4.4.1. A director who is also an officer shall continue to be a director until he ceases to be an officer.

4.4.2. A director shall cease to be a director:
(a)  if he becomes bankrupt or compounds with his creditors or is declared insolvent;
    (b)  if he is found to be of unsound mind; or
    (c)  if by notice in writing to the Company he resigns his office and any such resignation shall be effective at the time it is sent to the Company or at the time specified in the notice whichever is later.

4.4.3  The shareholders of the Company may, by ordinary resolution passed at a special meeting of the shareholders, remove any director from office and a vacancy created by the removal of a director may be filled at the meeting of the shareholders at which the director is removed.

4.5  Committee of Directors: The directors may appoint from among their number a committee of directors and subject to section 80 of the Act may delegate to such committee any of the powers of the directors.

5.  **BORROWING POWERS OF DIRECTORS**
5.1  The directors may from time to time:
    (a)  borrow money upon the credit of the Company;
    (b)  issue, reissue, sell or pledge debentures of the Company
    (c)  subject to section 53 of the Act, give a guarantee on behalf of the Company to secure performance of an obligation of any person; and
    (d)  mortgage, charge, pledge or otherwise create a security interest in all or any property of the Company, owned or subsequently acquired, to secure any obligation of the Company.

5.2.  The directors may from time to time by resolution delegate to any officer of the Company all or any of the powers conferred on the directors by paragraph 5.1 hereof to the full extent thereof or such lesser extent as the directors may in any such resolution provide.

5.3.  The powers conferred by paragraph 5.1 hereof shall be in supplement of and not in substitution for any powers to borrow money for the purposes of the Company possessed by its directors or officers independently of a borrowing by-law.

-3-

FILED

FINANCIAL SERVICES
REGULATORY COMMISSION

APR 2 2 2022

## 6. **MEETINGS OF DIRECTORS**

6.1   Place of Meeting: Meeting of the directors and of any committee of the directors may be held within, or outside Antigua and Barbuda, at a place to be determined by the Board of Directors.

6.2   Notice: A meeting of the directors may be convened at any time by any director or the Secretary, when directed or authorised by any director. Subject to subsection 76 (1) of the Act the notice of any such meeting need not specify the purpose of or the business to be transacted at the meeting.   Notice of any such meeting shall be served in the manner specified in  paragraph 18.1 hereof not less than two days (exclusive of the day on which the notice is delivered or sent but inclusive of the day for which notice is given) before the meeting is to take place. A director may in any manner waive notice of a meeting of the directors and attendance of a director at a meeting of the directors shall constitute a waiver of notice of the meeting except where a director attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

6.2.1   It shall not be necessary to give notice of a meeting of the directors to a newly elected or appointed director for meeting held immediately following the election of directors by the shareholders or the appointment to fill a vacancy among the directors.

6.3   Quorum: One (1) Director shall form a quorum for the transaction of business and, notwithstanding any vacancy among the directors; a quorum may exercise all the powers of the directors.   No business shall be transacted at a meeting of directors unless a quorum is present.

6.3.1   A director may, if all the directors consent, participate in a meeting of directors or of any committee of the directors by means of such telephone or other communications facilities as permit all persons participating in the meeting to hear each other and a director participating in such a meeting by such means is deemed to be present at that meeting.

6.4   Voting: Questions arising at any meeting of the directors shall be decided by a majority of votes.  In case of an equality of votes the chairman of the meeting in addition to his original vote shall have a second or casting vote.

6.5   Resolution in lieu of meeting: Notwithstanding any of the foregoing provisions of this by-law a resolution in writing signed by all the directors entitled to vote on that resolution at a meeting of the directors or any committee of the directors is as valid as if it had been passed at a meeting of the directors or any committee of the directors.

## 7. **REMUNERATION OF DIRECTORS**

7.1   The remuneration to be paid to the directors shall be such as the directors may from time to time determine and such remuneration may be in addition to the salary paid to any officer or employee of the

-4-

Company who is also a director.  The directors may also award special remuneration to any director undertaking any special services on the Company's behalf other than the routine work ordinarily required of a director and the confirmation of any such resolution or resolutions by the shareholders shall not be required.   The directors shall also be entitled to be paid their travelling and other expenses properly incurred by them in connection with the affairs of the Company.

8.    **SUBMISSION    OF    CONTRACTS    OR    TRANSACTIONS    TO SHAREHOLDERS FOR APPROVAL**

8.1    The directors in their discretion may submit any contract, act or transaction for approval or ratification at any annual meeting of the shareholders or at any special meeting of the shareholders called for the purpose of considering the same and, subject to the provisions of section 89 of the Act, any such contract, act or transaction that is approved or ratified or confirmed by a resolution passed by a majority of the votes cast at any such meeting (unless any different or additional requirement is imposed by the Act or by the Company's articles or any other by-law) shall be as valid and as binding upon the Company and upon all the shareholders as though it had been approved, ratified or confirmed by every shareholder of the Company.

9.    **FOR THE PROTECTION OF DIRECTORS AND OFFICERS**

9.1    No director or officer of the Company shall be liable to the Company for:-

(a)    the acts, receipts, neglects or defaults of any other director or employee or for joining in any receipt or act for conformity;

(b)    any loss, damage or expense incurred by the Company through the insufficiency or deficiency of title to any property acquired by the Company or for or on behalf of the Company;

(c)    the insufficiency or deficiency of any security in or upon which any of the monies of or belonging to the Company shall be placed out or invested;

(d)    any loss or damage arising from the bankruptcy, insolvency or tortuous act of any person, including any person with whom any monies securities or effects shall be lodged or deposited;

(e)    any loss, conversion, misapplication or misappropriation of or any damage resulting from any dealings with any monies, securities or other assets belonging to the Company;

(f)    any other loss, damage or misfortune whatever which may happen in the execution of the duties of his respective office or trust or in relation thereto; unless the same happens by or through his failure to exercise the powers and to discharge the duties of his office honestly and in good faith with a view to the best interests of the Company and in connection therewith to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

BANK SERVICES
GOVERNMENT COMMISSION
APR 2 2 2022
FILED

-5-

9.2   Nothing herein contained shall relieve a director or officer from the duty to act in accordance with the Act or regulations made thereunder or relieve him from liability for a breach thereof.

9.2.1  The directors for the time being of the Company shall not be under any duty or responsibility in respect of any contract, act or transaction whether or not made, done or entered into in the name or behalf of the Company, except such as are submitted to and authorised or approved by the directors.

9.2.2  If any director or officer of the Company is employed by or performs services for the Company otherwise than as a director or officer or is a member of a firm or a shareholder, director or officer of a body corporate which is employed by or performs services for the Company, the fact of his being a shareholder, director of officer of the Company shall not disentitle such director or officer or such firm or body corporate, as the case may be from receiving proper remuneration for such services.

10.   **INDEMNITIES TO DIRECTORS AND OFFICERS**

10.1  Subject to section 97 of the Act, except in respect of an action by or on behalf of the Company to obtain a judgement in its favour, the Company shall indemnify a director or officer of the Company, a former director or officer of the Company or a person who acts or acted at the Company's request as a director or officer of a body corporate of which the Company is or was a shareholder or creditor, and his personal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgement, reasonably incurred by him in respect of any civil, criminal or administrative action or proceeding to which he is made party by reason of being or having been a director or officer of such company, if:

(a)   he acted honestly and in good faith with a view to the best interests of the Company; and

(b)   in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, he had reasonable grounds for believing that his conduct was lawful.

11.   **OFFICERS**

11.1  Appointment: The directors shall as often as may be required appoint a Secretary and, if deemed advisable, may as often as may be required appoint any or all of the following officers: a Chairman, a Deputy Chairman, a President, one or more Vice-Presidents, a Treasurer, one or more Assistant Secretaries or one or more Assistant Treasurers.   A director may be appointed to any office of the Company but none of the officers except the Chairman, the Deputy Chairman, the President and Vice-President need be a director. Two or more of the aforesaid offices may be held by the same person. In case and whenever the same person holds the offices of Secretary and Treasurer he may but need not be known as the Secretary-Treasurer. The directors may from time to time appoint such other officers and agents as they deem necessary who shall

-6-

have such authority and shall perform such duties as may from time to time be prescribed by the directors.

11.2   Remuneration: The remuneration of all officers appointed by the directors shall be determined from time to time by resolution of the directors.   The fact that any officer or employee is a director or shareholder of the Company shall not disqualify him from receiving such remuneration as may be determined.

11.3   Powers and Duties:  All officers shall sign such contracts, documents or instruments in writing as require their respective signatures and shall respectively have and perform all powers and duties incident to their respective offices and such other powers and duties respectively as may from time to time be assigned to them by the directors.

11.4   Delegation: In case of the absence or inability to act of any officer of the Company or for any other reason that the directors may deem sufficient the directors may delegate all or any of the powers of such officer to any other officer or to any director.

11.5   Chairman:  A chairman shall, when present, preside at all meetings of the directors, and any committee of the directors or the shareholders.

11.6   Deputy Chairman: If the Chairman is absent or is unable or refuses to act, the Deputy Chairman (if any) shall, when present, preside at all meetings of the directors, and any committee of the directors, or the shareholders.

11.7   President: A President shall be the Chief Executive Officer, Managing Director, of the Company and shall exercise such powers and have such authority as may be delegated to him by the directors in accordance with the provisions of section 80 of the Act.  He shall be vested with and may exercise all the Powers and shall perform all the duties of a Chairman and Deputy Chairman if none be appointed or if the Chairman and the Deputy Chairman are absent or are unable or refuse to act.

11.8   Vice-President: A Vice President or, if more than one, the Vice-Presidents, in of order seniority, shall be vested with all the powers and shall perform all the duties of the President in the absence or inability or refusal to act of the President.

11.9   Secretary:   The Secretary shall give or cause to be given notices for all meetings of the directors, any committee of the directors and the shareholders when directed to do so and shall have charge of the minute books and seal of the Company and, subject to the provisions of paragraph 14.1 hereof, of the records (other than accounting records) referred to in section 130 of the Act.

11.10  Treasurer: Subject to the provisions of any resolution of the directors, a Treasurer shall have the care and custody of all the funds and securities of the Company and shall deposit the same in the name of the Company



-7-

in such bank or banks or with such other depository or depositories as the directors may direct. He shall keep or cause to be kept the accounting records referred to in section 132 of the Act. He may be required to give such bond for the faithful performance of his duties as the directors in their uncontrolled discretion may require but no director shall be liable for failure to require any such bond or for the insufficiency of any such bond or for any loss by reason of the failure of the Company to receive any indemnity thereby provided.

11.11  Assistant Secretary and Assistant Treasurer: The Assistant Secretary or, if more than one, the Assistant Secretaries in order of seniority, and the Assistant Treasurer or, if more than one, the Assistant Treasurers in order of seniority, shall respectively perform all the duties of the Secretary and the Treasurer, respectively, in the absence or inability or refusal to act of the Secretary or the Treasurer, as the case may be.

11.12  General Manager or Manager: The directors may from time to time appoint one or more General Manager or Managers and may delegate to him or them full power to manage and direct the business and affairs of the Company (except such matters and duties as by law must be transacted or performed by the directors or by the shareholders) and to employ and discharge agents and employees of the Company or may delegate to him or them any lesser authority. A General Manager or Manager shall conform to all lawful orders given to him by the directors of the Company and shall at all reasonable times give to the directors or any of them all information they may require regarding the affairs of the Company. Any agent or employee appointed by the General Manager or Manager may be discharged by the directors.

11.13  Vacancies: If the office of any officer of the Company becomes vacant by reason of death, resignation, disqualification or otherwise, the directors by resolution shall, in the case of the Secretary, and may, in the case of any office, appoint a person to fill such vacancy.

12.  **SHAREHOLDERS' MEETINGS**

12.1  Annual Meeting: Subject to the provisions of section 102 of the Act, the annual meeting of the shareholders shall be held on such day in each year and at such time and place as to be determined by the directors.

12.2  Special Meetings: Special meetings of the shareholders may be convened by order of the Chairman, the Deputy Chairman, the President, Vice-President or by the directors at any date and time and at any place within Antigua and Barbuda or, if all the shareholders entitled to vote at such meeting so agree, outside the Antigua and Barbuda.

12.2.1 The directors shall on the requisition of the holders of not less than five percent of the issued shares of the Company that carry a right to vote at the meeting requisitioned, forthwith convene a meeting of shareholders and in the case of such requisition the following provisions shall have effect: -

FINANCIAL SERVICES REGULATORY COMMISSION
APR 2 2 2022
FILED

-8-

(1)    The requisition must state purposes of the meeting and must be signed by the requisitionist and deposited at the Registered Office, and may consist of several documents in like form each signed by one or more of the requisitionists.

(2)    If the directors do not, within twenty-one days from the date of the requisition being so deposited, proceed to convene a meeting, the requisitionists or any of them may themselves convene the meeting, but any meeting so convened shall not be held after three months from the date of such deposit.

(3)    Unless subsection (3) of section 120 of the Act applies, the directors shall be deemed not to have duly convened the meeting if they do not give such notice as is required by the Act within fourteen days from the deposit of the requisition.

(4)    Any meeting convened under this paragraph by the requisitions shall be called as nearly as possible in the manner in which meetings are to be called pursuant to the by-laws and Division E of the Act.

(5)    A requisition by joint holders of shares must be signed by all such holders.

12.3    Notice: A printed, written or typewritten notice stating the day, hour and place of meeting shall be given by serving such notice on each shareholder entitled to vote at such meeting, on each director and on the auditor of the Company in the manner specified in paragraph 18.1 hereof, not less than fifteen days or more than sixty days (in each case exclusive of the day for which the notice is delivered or sent and of the day for which notice is given) before the date of the meeting. Notice of a meeting at which special business is to be transacted shall state (a) the nature of that business in sufficient detail to permit the shareholder to form a reasoned judgement thereon, and (b) the text of any special resolution to be submitted to the meeting.

12.4    Waiver of Notice: A shareholder and any other person entitled to attend a meeting of shareholders may in any manner waive notice of a meeting of shareholders and attendance of any such person at a meeting of shareholders shall constitute a waiver of notice of the meeting except where such person attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

12.5    Omission of Notice:  The accidental omission to give notice at any meeting or any irregularity in the notice of any meeting or the non-receipt of any notice by any shareholder, director or the auditor of the Company shall not invalidate any resolution passed or any proceedings taken at any meeting of the shareholders.

Votes: Every question submitted to any meeting of shareholders shall be decided in the first instance by a show of hands unless a person entitled to vote at the meeting has demanded a ballot and, if the articles so provide, in the case of an equality of votes the Chairman of the meeting shall on a ballot have a casting vote in addition to any votes to which he may be otherwise entitled.

FINANCIAL SERVICES
REGULATORY COMMISSION
APR 2 2 2022
FILED

-9-

12.6.1. At every meeting at which he is entitled to vote, every shareholder, proxy holder or individual authorised to represent a shareholder who is present in person shall have one vote on a show of hands.  Upon a ballot at which he is entitled to vote, every shareholder, proxy holder or individual authorised to represent a shareholder shall, subject to the articles, have one vote for every share held by the shareholder.

12.6.2 At any meeting unless a ballot is demanded, a declaration by the Chairman of the meeting that a resolution has been carried or carried unanimously or by a particular majority or lost or not carried by a particular majority shall be conclusive evidence of the fact.

12.6.3 When the Chairman, the Deputy Chairman, the President and the Vice-President are absent, the persons who are present and entitled to vote shall choose another director as Chairman of the meeting; but if no director is present or all the directors present decline to take the chair, the persons who are present and entitled to vote shall choose one of their number to be Chairman.

12.6.4 A ballot, either before or after any vote by a show of hands, may be demanded by any person entitled to vote at the meeting.  If at any meeting a ballot is demanded on the election of a Chairman or on the question of adjournment it shall be taken forthwith without adjournment.  If at any meeting a ballot is demanded on any other question or as to the election of directors, the vote shall be taken by ballot in such manner and either at once, later in the meeting or after adjournment as the Chairman of the meeting directs.  The result of a ballot shall be deemed to be the resolution of the meeting at which the ballot was demanded.  A demand for a ballot may be withdrawn.

12.6.5 If two or more persons hold shares jointly, one of those holders present at a meeting of shareholders may, in the absence of the other, vote the shares; but if two or more of those persons who are present, in person or by proxy vote, they must vote as one on the shares jointly held by them.

12.7    Proxies: Votes at meetings of shareholders may be given either personally or by proxy or, in the case of a shareholder who is a body corporate or association, by an individual authorised by a resolution of the directors or governing body of that body corporate or association to represent it at meetings of shareholders of the Company.

12.7.1 A proxy shall be executed by the shareholder or his attorney-in-fact authorised in writing and shall not be valid after the expiration of eleven months from the date thereof unless otherwise provided in the proxy.

12.7.2 A person appointed by proxy need not be a shareholder.

12.7.3 Subject to the provisions of sections 13-15 inclusive of the Regulations a proxy may be in the following form or as near thereto as circumstances require or permit:

FINANCIAL SERVICES
REGULATORY COMMISSION
APR 2 2 2022
FILED

-10-

The undersigned shareholder of             hereby appoints             of
              , or failing him,             of
        as the nominee of the undersigned to attend and act for the
undersigned and on behalf of the undersigned at the meeting of the
shareholders of the said Company to be held on the             day of
        201     and at any adjournment or adjournments thereof in the
same manner, to the same extent and with the same powers as if the
undersigned were present at the said meeting or such adjournment or
adjournments thereof.

Dated this             day of             20

Signature of shareholder

_____



12.8   Adjournment: The Chairman of any meeting may with the consent of the
        meeting adjourn the same from time to time to a fixed time and place
        and no notice of such adjournment need be given to the shareholders
        unless the meeting is adjourned by one or more adjournments for an
        aggregate of thirty days or more in which case notice of the adjourned
        meeting shall be given as for an original meeting.  Any business that
        might have been brought before or dealt with at the original meeting in
        accordance with the notice calling the same may be brought before or
        dealt with at any adjourned meeting for which no notice is required.

12.9   Quorum: Subject to the Act, and except in the case of a Company having
        only one shareholder a quorum for the transaction of business at any
        meeting of the shareholders shall not consist of fewer than one- third of
        the shares  entitled to vote thereat, or a duly appointed proxy holder or
        representative of a shareholder so entitled.  If a quorum is present at the
        opening of any meeting of the shareholders, the shareholders present or
        represented may proceed with the business of the meeting
        notwithstanding a quorum is not present throughout the meeting.  If a
        quorum is not present within 30 minutes of the time fixed for a meeting
        of shareholders, the persons present and entitled to vote may adjourn
        the meeting to a fixed time and place but may not transact any other
        business.

12.10  Resolution in lieu of meeting: Notwithstanding any of the foregoing
        provisions of this by-law a resolution in writing signed by all the
        shareholders entitled to vote on that resolution at a meeting of the
        shareholders is subject to section 119 of the Act as valid as if it had been
        passed at a meeting of the shareholders.

13.    **SHARES**
13.1   Allotment and Issuance: Subject to the Act, the articles and any
        unanimous shareholder agreement, shares in the capital of the Company
        may be allotted and issued by resolution of the directors at such times

-11-

and on such terms and conditions and to such person or class of persons as the directors determine.

13.2   Certificates: Share certificates and the form of share transfer shall (subject to section 138 of the Act) be in such form as the directors may by resolution approve and such certificates shall be issued in registered form only and signed by a Chairman or a Deputy Chairman or a President or a Vice-President and the Secretary or an Assistant Secretary holding office at the time of signing.

13.2.1 The directors or any agent designated by the directors may in their or his discretion direct the issuance of a new share or other such certificate in lieu of and upon cancellation of a certificate that has been mutilated or in substitution for a certificate claimed to have been lost, destroyed or wrongfully taken, on payment of such reasonable fee and on such terms as to indemnity, re-imbursement of expenses and evidence of loss and of title as the directors may from time to time prescribe, whether generally or in any particular case.

## 14.   TRANSFER OF SHARES AND DEBENTURES

14.1   Transfer: The shares or debentures of a Company may be transferred by a written instrument of transfer signed by the transferor and naming the transferee.

14.2   Registers:   Registers of shares and debentures issued by the Company shall be kept at the registered office of the Company or at such other place in the island of Antigua as may from time to time be designated by resolution of the directors.

14.3   Surrender of Certificates:  Subject to Section 136 of the Act, no transfer of shares or debentures shall be registered unless or until the certificate representing the shares or debentures to be transferred has been surrendered for cancellation.

14.4   Shareholder indebted to the Company:  If so provided in the articles, the Company has a lien on a share registered in the name of a shareholder or his personal representative for a debt of that shareholder to the Company. By way of enforcement of such lien the directors may refuse to permit the registration of a transfer of such share.

## 15.   DIVIDENDS

15.1   The directors may from time to time by resolution declare and the company may pay dividends on the issued and outstanding shares in the capital of the Company subject to the provisions (if any) of the articles and sections 51 and 52 of the Act.

15.1.1 In case several persons are registered as the joint holders of any shares, any one of such persons may give effectual receipts for all dividends and payments on account of dividends.

FINANCIAL SERVICES REGULATORY COMMISSION

APR 2 2 2022

FILED

-12-

16. **VOTING IN OTHER COMPANIES**

16.1 All shares or debentures carrying voting rights in any other body corporate that are held from time to time by the Company may be voted at any and all meetings of shareholders, debenture holders (as the case may be) of such other body corporate and in such manner and by such person or persons as the directors of the Company shall from time to time determine. The officers of the Company may for and on behalf of the Company from time to time:

(a)      execute and deliver proxies; and

(b)      arrange for the issuance of voting certificates or other evidence of the right to vote; in such names as they may determine without the necessity of a resolution or other action by the directors.

17. **INFORMATION AVAILABLE TO SHAREHOLDERS**

17.1 Except as provided by the Act, no shareholder shall be entitled to any information respecting any details or conduct of the company's business which in the opinion of the directors it would be inexpedient in the interest of the Company to communicate to the public.

17.2 The directors may from time to time, subject to rights conferred by the Act, determine whether and to what extent and at what time and place and under what conditions or regulations the documents, books and registers and accounting records of the Company or any of them shall be open to the inspection of shareholders and no shareholder shall have any right to inspect any document or book or register or accounting record of the Company except as conferred by statute or authorised by the directors or by a resolution of the shareholders.

18. **NOTICES**

18.1 Method of giving notice: Any notice or other document required by the Act, the Regulations, the articles or the by-laws to be sent to any shareholder, debenture holder, director or auditor may be delivered personally or sent by prepaid mail or cable or telex to any person at his latest address as shown in the records of the Company or its transfer agent and to any such director at his latest address as shown in the records of the Company or in the latest notice filed under section 74 of the Act, and to the auditor at his business address.

18.2 Waiver of notice: Notice may be waived or the time for the notice may be waived or abridged at any time with the consent in writing of the person entitled thereto.

18.3 Undelivered notices: If a notice or document is sent to a shareholder or debenture holder by prepaid mail in accordance with this paragraph and the notice or document is returned on three consecutive occasions because the shareholder or debenture holder cannot be found, it shall not be necessary to send any further notices or documents to the shareholder or debenture holder until he informs the Company in writing of his new address.

FINANCIAL SERVICES
REGULATORY COMMISSION

APR 2 2 2022

FILED

-13-

18.4    Shares and debentures registered in more than one name: All notices or other documents with respect to any shares or debentures registered in more than one name shall be given to whichever of such persons is named first in the records of the Company and any notice or other documents so given shall be sufficient notice of delivery to all the holders of such shares or debentures.

18.5    Persons becoming entitled by operation of law: Subject to section 184 of the Act every person who by operation of law, transfer or by any other means whatsoever becomes entitled to any share is bound by every notice or other document in respect of such share that, previous to his name and address being entered in the records of the Company is duly given to the person from whom he derives his title to such share.

18.6    Deceased Shareholders:  Subject to section 141 of the Act, any notice or other document delivered or sent by prepaid mail, cable or telex or left at the address of any shareholder as the same appears in the record of the Company shall, notwithstanding that such shareholder is deceased, and whether or not the Company has notice of his death, be deemed to have been duly served in respect of the shares held by him (whether held solely or with any other person) until some other person is entered in his stead in the records of the Company  as the holder or one of the holders thereof and such service shall for all purposes be deemed sufficient service of such notice or document on his personal representative and on all persons, if any, interested with him in such shares.

18.7    Signature to notices: The signature of any director or officer of the Company to any notice or document to be given by the Company may be written, stamped, typewritten or printed or partly written, stamped, typewritten or printed.

18.8    Computation of time: Where a notice extending over a number of days or other period is required under any provision of the articles or the by-laws the day of sending the notice shall, unless it is otherwise provided, be counted in such number of days or other period.

18.9    Proof of service:  where a notice required under paragraph 18.1 hereof is delivered personally to the person to whom it is addressed or delivered to his address as mentioned in paragraph 18.1 hereof, service shall be deemed to be at the time of delivery of such notice.

18.9.1  Where such notice is sent by post, service of the notice shall be deemed to be effected forty-eight hours after posting if the notice was properly addressed and posted by prepaid mail.

18.9.2  Where the notice is sent by cable or telex, service is deemed to be effected on the date on which the notice is so sent.

18.9.3  A certificate of an officer of the Company in office at the time of the making of the certificate or of any transfer agent of shares of any class of

-14-

the Company as to facts in relation to the delivery or sending of any notice shall be conclusive evidence of those facts.

19.   **CHEQUES, DRAFTS AND NOTES**

19.1   All cheques, drafts or orders for the payment of money and all notes and acceptances and bills of exchange shall be signed by such officers or persons and in such manner as the directors may from time to time designate by resolution.

20.   **EXECUTION OF INSTRUMENTS**

20.1   Contracts, documents or instruments in writing requiring the signature of the Company may be signed by:

(a)       a Chairman, a Deputy Chairman, a President or a Vice-President together with the Secretary or the Treasurer; or

(b)       any one Directors and all contracts, documents and instruments in writing so signed shall be binding upon the Company without any further authorization or formality.  The directors shall have power from time to time by resolution to appoint any officers or persons on behalf of the Company either to sign certificates for shares in the Company and contracts, documents and instruments in writing generally or to sign specific contracts, documents or instruments in writing.

20.1.1.  The common seal of the Company may be affixed to contracts, documents and instruments in writing signed as aforesaid or by any officers specified in paragraph 20.1 hereof.

20.1.2  Subject to section 125 of the Act, a Chairman, a Deputy Chairman, a President or a Vice-President together with the Secretary or the Treasurer; or any two directors shall have authority to sign execute (under the seal of the Company or otherwise) all the instruments that may be necessary for the purpose of selling,

assigning, transferring, exchanging, converting or conveying any such shares, stocks, bonds, debentures, rights, warrants or other securities.

21.   **SIGNATURES**

21.1   The signature of a Chairman, a Deputy Chairman, a President, a Vice-President, the Secretary, the Treasurer, an Assistant Secretary or an Assistant Treasurer or any director of the Company or of any officer or person, appointed pursuant to paragraph 20 hereof by resolution of the directors may, if specifically authorised by resolution of the directors, be printed, engraved, lithographed or otherwise mechanically reproduced upon any certificate for shares in the Company or contract, document or in writing, bond, debenture or other security  of the Company executed or issued by or on behalf of the Company. Any document or instrument in writing on which the signature of any such officer or person is so reproduced shall be deemed to have been manually signed by such officer or person whose signature is so reproduced and shall be as valid to all intents and purposes as if such document or instrument in writing

Financial Services Regulatory Commission

APR 2 2 2022

FILED

-15-

had been signed manually and notwithstanding that the officer or person whose signature is so reproduced has ceased to hold office at the date on which such document or instrument in writing is delivered or issued.

22.    **FINANCIAL YEAR**
22.1   The directors may from time to time by resolution establish the financial year of the Company.

23.    **INITIAL DIRECTORS**
23.1   The initial Board of Directors shall be composed of the following members:-

**SAMUEL BANKMAN-FRIED**

# EXHIBIT B-9



# Antigua and Barbuda
# Financial Services Regulatory Commission



FINANCIAL SERVICES
REGULATORY COMMISSION

APR 2.2 2022

FILED

## THE INTERNATIONAL BUSINESS CORPORATIONS ACT, [ Section 129]
## FORM 2 (a): NOTICE OF REGISTERED OFFICE

The form can be downloaded from our website in Adobe Acrobat format and information can be entered directly into the form. Alternatively, the form can be printed and completed with the use of a typewriter. Any information provided on additional sheets must be signed and dated. Where there is a question which is not applicable, please write "N/A" beside the question. All dates should be completed in the form: Day/Month/Year.

We hereby submit a notice of registered office for the below-named International Business Corporation.

| 1. Date Submitted: | 20/04/2022 |
|---|---|

## SECTION: I  DETAILS OF CORPORATE MANAGEMENT & TRUST SERVICE PROVIDER (CMTSP)

**2.  Name and address of Corporate Management and Trust Service Provider:**

| Name of CMTSP: | Corporate & Trust Services (Caribbean) Limited | | |
|---|---|---|---|
| Licence Number: | CMTSP0015 | | |
| Contact Person: | Arthur G. B. Thomas | | |
| Address: | Lower Factory Rd., St. John's, Antigua | | |
| Telephone Number: | (268) 460-5860 | Mobile Number: | (268) 764-0592 |
| Fax Number: | (268) 562-1810 | E-mail Address: | a.thomas@thomasjohnlawyers.com |
| Website address, if any: | www.thomasjohn.com | | |

## SECTION: II  DETAILS OF INTERNATIONAL BUSINESS CORPORATION (IBC)

**3.  Name and address of International Business Corporation:**

| Name of IBC: | Emergent Fidelity Technologies Ltd. |
|---|---|
| Operating Address: | Unit 3B Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua |

**4.  Name and address of Registered Office:**

| Name of Registered Office: | Corporate & Trust Services (Caribbean) Limited |
|---|---|
| Address of Registered Office: | Lower Factory Rd., St. John's, Antigua |

## SECTION: III  AUTHORIZATION

| Authorised Name: | Arthur G. B. Thomas | Signature: | |
|---|---|---|---|
| Title: | for Corporate & Trust Services (Caribbean) Limited | Date: | 20/04/2022 |

## SECTION: IV  CONTACT DETAILS

Please forward completed form with any supporting material to:

# EXHIBIT B-10



# Antigua and Barbuda
# Financial Services Regulatory Commission



FINANCIAL SERVICES
REGULATORY COMMISSION

APR 2 2 2022

FILED

### THE INTERNATIONAL BUSINESS CORPORATIONS ACT, [ Section 67 (7) & 129]
### FORM 5 (a):  NOTICE OF DIRECTORS

The form can be downloaded from our website in Adobe Acrobat format and can be completed by entering information directly into the form. Alternatively, the form can be printed and completed with the use of a typewriter. Any information provided on additional sheets must be signed and dated. Where there is a question which is not applicable, please write "N/A" beside the question. All dates should be completed in the form: Day/Month/Year.

We hereby submit a notice of appointment or removal of Directors for the below-named International Business Corporation.

| 1.  Date of Notice: | 20/04/2022 |
|---|---|

## SECTION: I  DETAILS OF CORPORATE MANAGEMENT & TRUST SERVICE PROVIDER (CMTSP)

**2.   Name and address of Corporate Management and Trust Service Provider:**

| Name of CMTSP: | Corporate & Trust Services (Caribbean) Limited | | |
|---|---|---|---|
| Licence Number: | CMTSP0015 | | |
| Contact Person: | Arthur G. B. Thomas | | |
| Address: | Lower Factory Rd., St. John's, Antigua | | |
| Telephone Number: | (268) 460-5860 | Mobile Number: | (268) 164-0592 |
| Fax Number: | (268) 562-1810 | E-mail Address: | a.thomas@thomasjohnlawyers.com |

| Website address, if any: | www.thomasjohn.com |
|---|---|

## SECTION: II  DETAILS OF INTERNATIONAL BUSINESS CORPORATION (IBC)

**3.   Name and address of International Business Corporation:**

| Name of IBC: | Emergent Fidelity Technologies Ltd. |
|---|---|
| IBC Number: | |
| Operating Address: | Unit 3B Bryson's Commercial Complex, Friar's Hill Road, St. John's, Antigua |

**4.   Name and address of Registered Office:**

| Name of Registered Office: | Corporate & Trust Services (Caribbean) Limited |
|---|---|
| Address of Registered Office: | Lower Factory Rd., St. John's, Antigua |

## SECTION: III  DETAILS OF DIRECTORS

**5.   The Directors of the above-named Corporation are:**

| Director Name 1: | Samuel Bankman-Fried |
|---|---|
| Residential Address: | Albany, New Providence, Bahamas |

**FORM 5 (a):  NOTICE OF DIRECTORS FOR INTERNATIONAL BUSINESS CORPORATION**

| | |
|---|---|
| Occupation: | Businessman |
| Citizenship: | USA |
| Effective Date: | 20/04/2022 |
| **Director Name 2:** | N/A |
| Residential Address: | |
| Occupation: | |
| Citizenship: | |
| Effective Date: | |
| **Director Name 3:** | N/A |
| Residential Address: | |
| Occupation: | |
| Citizenship: | |
| Effective Date: | |
| **Director Name 4:** | N/A |
| Residential Address: | |
| Occupation: | |
| Citizenship: | |
| Effective Date: | |

## SECTION: IV  AUTHORIZATION

| | | | |
|---|---|---|---|
| Authorised Name: | Arthur Thomas | Signature: | |
| Title: | for Corporate & Trust Services (Caribbean) Limited | Date: | 20/04/2022 |



## SECTION: V  CONTACT DETAILS

Please forward completed form with any supporting material to:
**Manager of International Business Corporations and Other Non-Banking Financial Institutions**
**Financial Services Regulatory Commission**
P.O. Box 2674, St. John's, Antigua
**Tel:** (268)481-1194
**Fax:** (268)463-0422
**Email:** terry.smith@fsrc.gov.ag
Website: http://www.fsrc.gov.ag

FINANCIAL SERVICES
REGULATORY COMMISSION

APR 2 2 2022

FILED

# EXHIBIT B-11

**FILED**

HIGH COURT

ANTIGUA AND BARBUDA

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**Submitted Date:17/11/2022 17:30**

**CLAIM NO. ANUHCV 2022/**

**Filed Date:18/11/2022 08:30**

**BETWEEN:**

**Fees Paid:42.00**

**YONATAN BEN SHIMON**

**Claimant / Applicant**

**-and-**

**(1) EMERGENT FIDELITY TECHNOLOGIES LTD**
**(2) SAMUEL BENJAMIN BANKMAN-FRIED**

**Defendants / Respondents**

_____

**NOTICE OF APPLICATION**

_____

The Applicant, Yonatan Ben Simon, of Zabutinski 8, Tel Aviv, Israel, applies to the Court under rules 7.3(1), 7.8A(1), 8.2(1) and 17.1(1) of the Eastern Caribbean Supreme Court Civil Procedure Rules, section 24(1) of the Eastern Caribbean Supreme Court Act (CAP. 143) and in the Court's inherent jurisdiction for the orders set out in the draft order attached hereto.

The grounds of the application are:

Service out of the jurisdiction

1. The Applicant should be granted permission under rule 7.3(1) of the Eastern Caribbean Supreme Court Rules (the "**CPR**") to serve the claim form on the Second Respondent out of the jurisdiction. The claim fits through the gateway in CPR rule 7.3(2) because:

    (a) The claim will be served on the First Respondent, which is a company incorporated in Antigua and Barbuda and which has its principal business address in Antigua;

    (b) There is between the Claimant and the First Respondent a real issue which it is reasonable for the Court to try; and

1

(c)   The Claimant now wishes to serve the claim on the Second Respondent, who is outside the jurisdiction and who is a necessary or proper party to the claim.

2.   There is a serious question to be tried on the merits because the Applicant has a good arguable case that:

(a)   Funds invested by the Applicant with FTX Trading Ltd ("**FTX**") (of which the Second Respondent was a founder and director) have been improperly diverted to the First Respondent (of which the Second Respondent is the sole director and majority owner) in circumstances which give rise to the Applicant having a proprietary tracing claim against those funds and/or claims against the First and/or Second Respondents in knowing receipt and/or dishonest assistance; and

(b)   The First and Second Respondents conspired to perform and did perform lawful and/or unlawful acts, involving the improper diversion of funds invested by the Applicant and other investors with FTX to the First Respondent, for the predominant purpose of injuring the Applicant and other investors by expropriating those funds to the personal benefit of the Second Respondent, and thereby causing loss to the Applicant.

3.   Antigua and Barbuda is clearly or distinctly the appropriate forum because it is the principal place of business of the First Respondent, which received the misappropriated funds. Insofar as the claim seeks non-monetary relief with respect to those funds, including declaratory relief and the taking of an account, such relief would not be enforceable against the First Respondent in its jurisdiction of incorporation at common law or under the Reciprocal Enforcement of Judgments Act (CAP. 369) if granted by a foreign court. Accordingly, to ensure the efficacy of the relief sought, the claim must be tried here.

<u>Alternative service</u>

4.   The Applicant should be granted permission under CPR rule 7.8A(1) for the claim to be served on the Second Respondent by the alternative method of delivery to his US counsel (Paul, Weiss, Rifkind, Wharton & Garrison LLP) as identified in the corporate authority signed by him and filed with FTX's Chapter 11 petition. Service under CPR rule 7.8 is impracticable

because it is unclear whether the Second Respondent is currently resident in or may be found in the United States or the Bahamas, and the urgency of the matter requires that notice of the claim be brought to his attention as soon as possible.

Permission to serve the claim without a statement of claim

5.   In view of the urgency of the application for the interim relief sought below and the fast-moving situation that is unfolding across multiple jurisdictions, it is not practicable for the Applicant to prepare a statement of claim in the time available. Permission should be granted under CPR rule 8.2(1) to serve the claim form now without a statement of claim, so that there is a jurisdictional basis for that grant of that interim relief, with a direction that the statement of claim must be filed within 14 days.

6.   Under rule 7.4 of the English Civil Procedure Rules, a claimant would ordinarily have 14 days from the service of a claim form to serve particulars of claim. A 14-day period in the present case would allow the Respondents sufficient time to prepare for the return date hearing to be fixed within 28 days of the making of the orders sought, in accordance with CPR rules 17.4(4) and (5).

Interim freezing order

7.   The Court should issue an interim freezing order under CPR rule 17.1(1) and section 24(1) of the Eastern Caribbean Supreme Court Act (CAP. 143) directed to:

(a)  The First Respondent, in respect of its worldwide assets, up to the value of the Applicant's investment with FTX; and

(b)  The Second Respondent, in respect of his equity and/or debt interests in the First Respondent, up to the value of the Applicant's investment with FTX.

8.   As stated above in paragraph 2, the Applicant has a good arguable case against for the relief claimed.

9.   There is a real risk that a judgment against the First and Second Respondents will go unsatisfied unless a freezing order is made to prevent them from dissipating their assets in the interim. In May 2022, the First Respondent acquired a 7.6% shareholding in a NASDAQ-

listed company named Robinhood Markets, Inc ("**Robinhood**") for about US$650 million, possibly using funds improperly diverted from those invested by the Applicant and others with FTX. According to media reports, when FTX was placed into Chapter 11 bankruptcy in the United States on 11 November 2022, the Second Respondent was attempting to sell those Robinhood shares at about a 20% discount to their volume-weighted average price. Once liquidated, the sale proceeds may be impossible to recover.

10. In all the circumstances, it would be just and convenient to grant the freezing order sought. The First Respondent is not a trading company and there is no reason to believe that a freezing order would cause any disruption to any operating businesses. There is no reason to suppose that any other third parties would be adversely affected.

Interim receivership

11. In all the circumstances, it would further be just and convenient to appoint receivers over the Second Respondent's equity and/or debt interests in the First Respondent, and over the First Respondent's worldwide assets, to prevent their dissipation or encumbrance. The Second Defendant is outside the Court's territorial jurisdiction and the circumstances of FTX's collapse (as disclosed to date) are sufficiently concerning that there is a measurable risk that a freezing order alone may offer insufficient protection of the assets against which a judgment in favour of the Applicant may eventually be enforced.

The affirmation of Yonatan Ben Simon dated 17 November 2022 accompanies this application.

This application is made without notice to the Respondents.

Dated: 17 November 2022

_____

Kendrickson Kentish

Lake, Kentish & Bennett Inc.

Legal Practitioners for the Claimant

**NOTICE:**

This application will be heard by the Judge on the          day of                    at

If you do not attend this hearing an order may be made in your absence.

The court office is located at the Registry of the Supreme Court, High Street, Parliament Drive, St John's, Antigua; telephone +1 268 462 0609; fax +1 268 462 3929. The office is open between 8:30 a.m. and 4:30 p.m. from Monday to Friday except on public holidays.

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**CLAIM NO. ANUHCV 2022/**

**BETWEEN:**

**YONATAN BEN SHIMON**
**Claimant / Applicant**
**-and-**

**(1) EMERGENT FIDELITY TECHNOLOGIES LTD**
**(2) SAMUEL BENJAMIN BANKMAN-FRIED**
**Defendants / Respondents**

_____

**NOTICE OF APPLICATION**

_____

**Lake, Kentish & Bennett Inc.**
**Temple Chambers**
**36 Long St**
**St John's**
**Antigua**
**Tel: +1 268 462 1012**
**Fax: +1 268 462 2568**

**Legal Practitioners for the Claimant**

# EXHIBIT B-12

Serial No. 54/2022

HIGH COURT
ANTIGUA AND BARBUDA

**Form No. 1**

**AUTHENTICATION OF SIGNATURE**

I, the undersigned **Shahar Ronen**

Notary holding license no **222437**

hereby certify that on **18.11.2022** appeared
before me at my offices located at 4 Berkowitz St.
Museum Tower, Floor 6, Tel Aviv 6423806, Israel.

Mr. / Ms.   **YONATAN BEN SHIMON**

☐ who is known to me personally

✓ whose identity has been proven to me by id (Israel)
number **301757076**

issued on 15.02.2021 expiry date 14.02.2026

And I am convinced that the person standing before
me understood fully the significance of the action
and voluntarily signed the attached document
marked with the letter **"A"**

In witness whereof, I hereby authenticate the
signature of Mr. / Ms. **YONATAN BEN SHIMON** by
my own signature and seal this day 18.11.2022

Notary fee 297NIS. Including VAT

Signature..................

Notary's seal

טופס מס' 1

אני החתום מטה **שחר רונן**

נוטריון בעל רישיון מספר **222437**

מאשר כי ביום **18.11.2022**

ניצב/ה לפני במשרדי שבמגדל ברקוביץ 4 מגדל
חמוזיאון קומה 6 תל אביב 6423806, ישראל.

מרת יהונתן בן שמעון

☐ המוכרת לי באופן אישי

✓ שזהותו/ה הוכחה לי על פי תעודת זהות ישראלית מספר
**301757076** שהונפק/ה ביום 15.02.2021 תוקף 14.02.2026

ושוכנעתי כי הניצבת בפני הבינה הבנה מלאה את משמעות
הפעולה וחתם/ה מרצונו/ה החופשי על המסמך המצורף
והמסומן באות "א".

ראיה אני מאמת את חתימתו/ה של מרת

יהונתן בן שמעון

חתימת ידי ובחותמי, היום 18.11.2022

שכר נוטריון 297 ₪ כולל מע"מ.

חותם ה

Scanned with CamScanner

A

Filed on behalf of: Claimant
Affidavit of: Yonatan Ben Shimon
Affidavit number: first
Exhibit reference: YBS-1
Date affirmed: 17 November 2022
Date filed: 17 November 2022

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV2022/

BETWEEN:

YONATAN BEN SHIMON

**Claimant / Applicant**

-and-

(1) EMERGENT FIDELITY TECHNOLOGIES LTD
(2) SAMUEL BENJAMIN BANKMAN-FRIED

**Defendants / Respondents**

---

**AFFIRMATION OF YONATAN BEN SHIMON**

---

I, YONATAN BEN SHIMON, of Zabutinski 8, Tel Aviv, Israel, do solemnly and sincerely affirm and say as follows:

1. I make this affirmation in support of my application for:

   a. An urgent interim freezing injunction pending the determination of the claim;

   b. The appointment of interim receivers over the First Defendant's assets and over any equity and/or debt interests held by the Second Defendant in the First Defendant;

   c. Orders relating to service, including permission to serve the claim out of the jurisdiction on the Second Defendant.

1

Scanned with CamScanner

2. Unless otherwise stated, the facts and matters deposed to in this affirmation are within my personal knowledge and I believe them to be true. Where such facts and matters are outside my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from sources to which I refer.

3. There is produced to me, exhibited hereto and marked "YBS-1" a paginated bundle of true copies of documents to which I refer in this affirmation. Numbers appearing in square brackets in this affirmation are references to page numbers in that bundle.

## A. Background

4. I am an Israeli citizen and a cryptocurrency entrepreneur who has been active in this business since 2013.

5. FTX describes itself as a "crypocurrency exchange built by traders, for traders". It purports to offer "innovative products including industry-first derivatives, options, volatility products and leveraged tokens". According to its website, its founders are the Second Defendant and Gary Wang who also serve as FTX's Chief Operating Officer and Chief Technology Officer respectively.

6. The manner in which FTX's business is organised is opaque and unclear. I have reviewed the article published by the Financial Times on 10 November 2022 entitled "Untangling the knotty empire of Bankman-Fried and FTX", a copy of which may be found at pages 1-4 and I understand that the foundation company referred to in FTX's legal disclaimers is FTX Trading Ltd, duly incorporated in Antigua and Barbuda. The cryptocurrency business overseen by the Second Defendant is split into two parts:

   a. The FTX business (a cryptocurrency exchange); and

   b. Alameda Research Ltd, which is the Second Defendant's cryptocurrency trading firm.

7. According to filings with the US Securities and Exchange Commission ("SEC"), the First Defendant is a company incorporated in Antigua and Barbuda with its principal place of business at Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. Johns, Antigua and its principal business being the making of investments in securities and other assets. In May

2

Scanned with CamScanner

2022, the First Defendant acquired 56,273,469 shares in Robinhood Markets, Inc. at a cost of US$648,293,886.33. This acquisition was sourced from "working capital". Robinhood Markets, Inc. is a company listed on NASDAQ (Ticker: HOOD) ("Robinhood"). The 56 million shares in question represent a 7.6% interest in Robinhood and at today's market prices have an approximate value of US$571,175,710 (56,273,469 at US$10.15 per share). In the SEC filing in question, the First and Second Defendants are described as the beneficial owners of the 56 million shares in Robinhood and the Second Defendant is described as the sole director and majority owner of the First Defendant. A copy of the SEC filing in question may be found at pages 5-13.

8.  The Second Defendant is a United States citizen with his principal business addresses at 27 Veridian Corporate Center, Western Road, New Providence, Nassau, Bahamas and 167 N Green St, Floor 11 Suite 2, Chicago, IL 60607. As outlined above, he is the co-founder of FTX and I understand that he owns and runs the cryptocurrency trading company, Alameda Research Ltd also.

9.  In and around 2021, I started using FTX, as I believed it to be a reputable exchange. On 13 October 2021, I deposited 3,000 Ethereum with FTX. As of today's date, my Ethereum has a market value of approximately US$3.5 million. Screenshots from my account with FTX evidencing my position and evidence of the current value of Ethereum may be found at pages 14-16. According to data provided by Coinmarketcap.com, the value of my 3,000 Ethereum at close of business on 13 October 2021 was US$10,818,600 (US$3,606.20 per Ethereum) [page 117].

## B. The Coinbase Article and Subsequent Events

10. On 2 November 2022, CoinDesk published an article entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet" which disclosed that the balance sheet of Alameda Research Ltd, the crypocurrency trading firm owned by Sam Bankman-Fried, is made up of FTT token which is a digital asset invented by its sister business, FTX. While the article noted that there was nothing "per se untoward or wrong" about this state of affairs, it added to evidence that the ties between the FTX business and Alameda Research Ltd were unusually close. A copy of the article in question may be found at pages 17-20.

3

11. On 6 November 2022, Zhao Changpeng, the Chief Executive Officer of Binance Holdings ("Binance") (a rival cryptocurrency exchange) took to Twitter to announce Binance's plans to sell its US$530 million holding of FTT Tokens in light of "recent revelations". A copy of the tweet in question may be found at page 21.

12. Mr Zhao's tweet precipitated both a fall in the price of FTT Tokens and a run on FTX's business with customers rushing to withdraw as much as US$6 billion over the course of three days according to a Financial Times article [pages 22-24] though the figure may, in fact, be larger. Mr Bankman-Fried has admitted that customers withdrew over US$5 billion on Sunday alone [page 50]. I understand from media reports that this financial crisis prompted Mr Bankman-Fried to request assistance from Mr Zhao which resulted in an announcement on 8 November by Mr Zhao that Binance had "*signed a non-binding [letter of intent], intending to fully acquire FTX.com*". A copy of the media report in question may be found at page 25.

13. However, Binance issued a statement on 9 November notifying the markets that it was abandoning the proposed acquisition of FTX in the following terms "[a]*s a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com*". A copy of the article published by the Financial Times on 10 November 2022 which relayed this information may be found at pages 26-28.

14. I have tried to withdraw my 3,000 Etherium from FTX but my request was denied.

**C. Regulatory Investigations and Interventions**

15. I believe that the 'agency investigations' referred to by Binance in its statement dated 9 November *pertained* to investigations by the US Securities and Exchange Commission and the US Justice Department. A copy of an article published by the Wall Street Journal on 9 November 2022 makes reference to the investigations in question, including to the expansion of the investigations to cover "*the relationship between FTX.US and the parent company, based in the Caribbean.*" [pages 29-31].

16. The regulatory investigations and interventions have not been limited to the US and have grown to include the suspension of FTX's EU licence by the Cypriot authorities, the appointment of provisional liquidators to FTX's business in the Bahamas, a direction issued by

4

the Financial Services Agency of Japan to suspend all business pursuant to Japan's Payments Services Act and Financial Instruments and Exchange Act and regulatory action/investigations in Turkey, Australia, California, and New York. Media articles reporting on these regulatory actions/investigations may be found at pages 32-47. On Friday, 11 November, FTX Trading Ltd and 134 affiliated entities presented a bankruptcy petition pursuant to Chapter 11 of the US Bankruptcy Code in the United District Court for the District of Delaware. The Chapter 11 proceedings will be addressed further below at Section E.

### D. Chaos and Desperation

17. Following Binance's decision to withdraw from acquiring FTX, the Second Defendant scrambled to secure alternative funding. The desperation and chaos may be seen in a series of 22 tweets made on 10 November 2022 in which the Second Defendant states that:

    i. He *"fucked up, and should have done better."*

    ii. *"FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!). But that's different from liquidity for delivery — as you can tell from the state of withdrawals. The liquidity varies widely, from very to very little."*

    iii. *"I fucked up twice. The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin. I thought it was way lower."*

    iv. *"We saw roughly US$5 billion of withdrawals on Sunday".*

    v. *"There are a number of players who [FTX is] in talks with, LOIs, terms sheets, etc."*

Screenshots of the tweets in question may be found at pages 48-56.

18. Media outlets also reported that the Second Defendant had been desperately trying to secure fresh investment both prior to and after the filing of the bankruptcy petition on 11 November. A copy of the articles published by the Wall Street Journal and Financial Times in this regard may be found at pages 57-62. These efforts also purportedly extended to selling the 56 million shares in Robinhood which were described in the Financial Times article in the following terms:

    " *Bankman-Fried had been racing to raise emergency funding but was unable to persuade investors to rescue his collapsed business empire. The new investment materials show that he was seeking to raise $6bn-$10bn, including from a convertible*

5

Scanned with CamScanner

*preferred stock paying a 10 per cent dividend that could later be converted into common equity in FTX International at a valuation of between $12bn-$15bn. "This is just a lower bound on the terms investors can get," the materials add. Until Friday afternoon, Bankman-Fried was looking to sell the $472mn of Robinhood shares, the largest liquid asset listed for FTX Trading, in privately negotiated deals he was arranging on the messaging app Signal, according to a person directly involved in the negotiations. The person noted that the Robinhood shares were held by an Antigua and Barbuda entity called Emergent Fidelity, which is personally controlled by Bankman-Fried, according to US securities filings. Emergent Fidelity is not among the entities listed in Friday's bankruptcy filing. Bankman-Fried was entertaining offers at an about 20 per cent discount to Robinhood's volume-weighted average price, or about $9 per share, said the investor, who ultimately declined to buy due to perceived legal risks."*

A copy of the balance sheet referred to in the same article may be found at page 63.

19. I note that the 56 million shares in Robinhood are described as assets of FTX Trading in both the article identified above and the balance sheet found at page 63. I believe this to be an error as the SEC filing made in May 2022 clearly describes the shares in question as assets beneficially owned by the First and Second Defendants [page 9].

### E. Chapter 11 Bankruptcy Proceedings

20. On Friday, 11 November 2022, FTX Trading Ltd and 134 affiliated entities (the "**FTX Debtors**") presented a bankruptcy petition pursuant to Chapter 11 of the US Bankruptcy Code in the United States District Court for the District of Delaware.  A copy of the petition may be found at pages 64-86.

21. I note that on page 75 Mr Bankman-Fried states that his personal US lawyers are Paul, Weiss, Rifkind, Wharton & Garrison LLP.

22. It is unclear whether FTX has filed its "first-day motions" to formally commence the Chapter 11 bankruptcy proceedings with one media publication stating that the "FTX bankruptcy co stalls as lawyers confront crypto chaos." [pages 87-89].

6

Scanned with CamScanner

23. The FTX Debtors have, however, filed a motion to modify certain creditor lists and authorizing the debtors to serve certain parties by email.  A copy of this motion to modify may be found at pages 90-98.

24. Immediately following the presentation of the bankruptcy petition, FTX was the victim of a hack with experts estimating that in excess of US$600 million was siphoned from FTX's crypto wallets on Friday, 11 November 2022 [see pages 99-103].

25. As far as I am aware, the First Defendant is not an FTX Debtor.

**F. Revelations Following the Bankruptcy Proceedings**

26. On Monday, 7 November 2022, the Second Defendant tweeted that "*FTX has enough to cover all client holdings.  We don't invest client assets (even in treasuries).*"  The tweet in question has since been deleted but it has been reproduced in an article published by the Wall Street Journal on 11 November 2022 [pages 104-108].

27. The statement made by the Second Defendant in his tweet on 7 November 2022 regarding client assets has since been shown to be incorrect.  In the article published by the Wall Street Journal on 11 November 2022, it was revealed that FTX had loaned US$8 billion of client assets to Alameda for trading purposes [pages 60-62].  This represented half of all client assets (US$16 billion) held by FTX and this liability of US$8 billion can be seen in the balance sheet referred to above at paragraph 18 where it is described as the "*hidden, poorly internally labled 'fiat@' account*" (sic) [page 61].  In communications with the Financial Times, the Second Defendant has allegedly stated that the US$8 billion liability related to "*funds "accidentally" extended to his trading firm, Alameda.*" [page 61].

28. It is not clear whether FTT was provided as collateral for these loans or whether those loans were unsecured. At this time, there is no clarity to ordinary customers such as myself regarding which customers' assets were, in fact, lent to Alameda.  For the avoidance of doubt representatives of FTX never asked me whether I was willing to lend my 3,000 Ethereum and if so, on what terms I would be willing to do so.  If it transpires that my 3,000 Ethereum has been lent to Alameda for its trading activities, then that occurred without my knowledge permission.

7

Scanned with CamScanner

**F. Antiguan Proceedings**

29. In these proceedings, I claim against the First and Second Defendants on a proprietary basis, for breach of trust and dishonestly assisting breaches of trust and seek the following primary relief:

    i.    A declaration that the First and/or Second Defendants hold funds which I invested with FTX Trading Ltd or their traceable proceeds on trust for me;

    ii.    Such amount as the Court may assess on the basis that funds which I invested with FTX Trading Ltd were knowingly received by the First and/or Second Defendants in breach of trust and/or that the First and/or Second Defendants dishonestly assisted breaches of trust;

    iii.    The taking of an account and consequential orders thereupon; and

    iv.    Damages in tort for lawful and/or unlawful means conspiracy.

30. As for the interim relief, I seek the following, namely:

*Interim Freezing Injunction*

    i.    An interim freezing order directed to:

        a)    The First Defendant, in respect of its worldwide assets, up to the value of my investment with FTX; and

        b)    The Second Defendant, in respect of his equity and/or debt interests in the First Defendant, up to the value of my investment with FTX.

    ii.    Without waiving privilege, I am advised that I have a good arguable case against the First and Second Defendants for the relief claimed.

    iii.    There is a real risk that a judgment against the First and Second Defendants will unsatisfied unless a freezing order is made to prevent them from dissipating t assets in the interim. As outlined above at paragraph 7, the First Defendant ac a 7.6% shareholding in Robinhood for about US$650 million, possibly using

8

Scanned with CamScanner

improperly diverted from those invested by me and others with FTX. I know nothing regarding the source of the funds used to acquire the 7.6% interest in Robinhood beyond the fact that it was allegedly "working capital" [page 8]. According to media reports and as outlined at paragraph 18 above, when FTX was placed into Chapter 11 bankruptcy in the United States on 11 November 2022, the Second Defendant was attempting to sell those Robinhood shares at about a 20% discount to their volume-weighted average price. Once liquidated, the sale proceeds may be impossible to recover, particularly if they are converted into crypto currency and stored in a digital wallet (not another crypto exchange).

iv.    In all the circumstances, it would be just and convenient to grant the freezing order sought. The First Defendant is not a trading company and there is no reason to believe that a freezing order would cause any disruption to any operating businesses. There is no reason to suppose that any other third parties would be adversely affected.

### Interim Receivership

i.    The appointment of receivers over the Second Defendant's equity and/or debt interests in the First Defendant, and over the First Defendant's worldwide assets, to prevent their dissipation or encumbrance. The Second Defendant is outside the Court's territorial jurisdiction and the circumstances of FTX's collapse (as disclosed to date) are sufficiently concerning that there is a measurable risk that a freezing order alone may offer insufficient protection of the assets against which a judgment in favour of me may eventually be enforced.

31. I understand that I must give the Court, as the price of an injunction, an undertaking to pay any damages which the Defendants sustain which the Court considers that I should pay. I confirm that I will instruct my counsel to give the required undertaking on my behalf at the hearing.

32. In the meantime, if no injunction is granted, then there is a real risk that any future judgment will go unsatisfied. The evidence suggests that the Second Defendant's efforts to sell the 56 million shares in Robinhood continued after the Chapter 11 bankruptcy filing and may be ongoing as part of his efforts to raise liquidity [pages 57-62]. Even if the Second Defendant's

9

efforts in this regard are to provide cash to FTX, this is misguided. It is not open to the Second Defendant, in his capacity as sole director of the First Defendant, to gift the latter's assets to FTX. Those assets should be safeguarded for the benefit of those who have a claim to the assets, including myself.

33. A less charitable assessment of the Second Defendant's efforts to raise liquidity might focus on the potentially fraudulent aspect to this crypto platform collapse. The former US Treasury Secretary, Larry Summers, has compared the collapse of FTX to the Enron scandal stating that both were cases where people detected 'whiffs of fraud.' [pages 109-110]. The Second Defendant claims that US$8 billion was "accidentally" lent to his firm's cryptocurrency trading entity but this highly improbable and media reports have circulated that the Second Defendant has fled to Argentina though these reports have been denied by him [pages 111-112]. In the circumstances, the balance of convenience clearly lies in favour of granting the relief sought.

34. This application is proceeding *ex parte* to safeguard the assets held by the First Defendant and prevent the Second Defendant from executing a stock transfer form transferring the shares to a third party. Were the Defendants to be notified of these proceedings, it would most likely defeat the very purpose of the application.

35. The proposed receivers, Ms Angela Barkhouse of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman and Ms Toni Shukla of Quantuma (BVI) Ltd, PO Box 4171, Road Town, Tortola, British Virgin Islands, VG110 have both consented to act. A copy of their respective consents to act and the curriculum vitae may be found at pages 113-116.

## F. Service out of the jurisdiction

36. The Second Defendant is not resident in Antigua and Barbuda. The SEC filing made by him in May 2022 suggests that he is either resident in Bahamas or the United States (see paragraph 8 above).

10



Scanned with CamScanner

37. Having taken legal advice, privilege in which is not waived, I believe that the claim against the Second Defendant has a realistic prospect of success and that the grounds on which the service out application is made are:

    a.  The claim will be served on the First Defendant, which is a company incorporated in Antigua and Barbuda and which has its principal business address in Antigua;

    b.  There is between me and the First Defendant a real issue which it is reasonable for the Court to try; and

    c.  I wish to serve the claim on the Second Defendant, who is outside the jurisdiction and I am advised, without waiving privilege, that he is a necessary or proper party to the claim.

38. There is a serious question to be tried on the merits because I have a good arguable case that:

    a.  Funds invested by me with FTX Trading Ltd (of which the Second Defendant was a founder and director) have been improperly diverted to the First Defendant (of which the Second Defendant is the sole director and majority owner) in circumstances which give rise to my having a proprietary tracing claim against those funds and/or claims against the First and/or Second Defendants in knowing receipt and/or dishonest assistance; and

    b.  The First and Second Defendants conspired to perform and did perform lawful and/or unlawful acts, involving the improper diversion of funds invested by me and other investors with FTX to the First Defendant, for the predominant purpose of injuring me and other investors by expropriating those funds to the personal benefit of the Second Defendant, and thereby causing loss to me.

39. I am advised, without waiving privilege, that Antigua and Barbuda is clearly or distinctly the appropriate forum because it is the principal place of business of the First Defendant, whi received the misappropriated funds. Insofar as the claim seeks non-monetary relief respect to those funds, including declaratory relief and the taking of an account, such would not be enforceable against the First Defendant in its jurisdiction of incorpor common law or under the Reciprocal Enforcement of Judgments Act (CAP. 369) if gr

11

שחר
רונן

SHAHAR
RONEN

NOTAIRE

a foreign court. Accordingly, to ensure the efficacy of the relief sought, the claim must be tried here.

40. In light of the urgency of this matter and the need to move the application seeking the freezing injunction and the appointment of receivers without delay to prevent dissipation of assets, it has not been possible, in the available time, to prepare a statement of claim. The application seeks an additional 14 days in which to do this.

41. The application also seeks permission to serve the claim by delivery to the Second Defendant's personal US lawyers as identified in the Chapter 11 filing (Paul, Weiss, Rifkind, Wharton & Garrison LLP). The reason for this is that service through the ordinary channels would be impracticable in these circumstances because it is unclear whether the Second Respondent is currently resident in or may be found in the United States or the Bahamas, and the urgency of the matter requires that notice of the claim be brought to his attention as soon as possible. Effecting service on his personal US lawyers will doubtless have that effect.

## G. Full and frank disclosure

42. I understand that the First Defendant is not an FTX Debtor which is protected by the Chapter 11 worldwide moratorium. While my counsel has diligently checked the available US filings in this regard, there may be filings in the US bankruptcy of which I am unaware which would mean that the First Defendant is an FTX Debtor and, therefore, protected by the worldwide moratorium.

43. There is conflicting evidence regarding ownership of the 56 million Robinhood shares. The balance sheet produced at page 63 suggests that these shares are owned by FTX. However, the Second Defendant has stated in his SEC filing dated May 2022 that the shares are held by the First Defendant and they are beneficially owned by the First and Second Defendants. As far as I am aware, neither FTX nor any other entity has filed a further form SC 13-D with the SEC notifying it of any change in ownership. Moreover, the fact that the First Defendant was not included in the bankruptcy petition filing suggests that its assets do not form part of the bankruptcy estate. However, I cannot entirely discount the possibility that FTX or authorised representatives may in future claim that these shares form part of its bankru estate.

12

Scanned with CamScanner

44. The First Defendant may claim that Antigua is not the appropriate forum. I understand that my lawyers will argue that it is clearly or distinctly the appropriate forum because it is the First Defendant's principal place of business, and also because non-monetary relief granted by a foreign court (if the claim were tried elsewhere) would not be enforceable against Emergent in Antigua.

45. In preparing this affirmation with the assistance of my legal counsel, it has been necessary to rely on articles published by the media. There may be errors in those articles. My lack of first-hand knowledge is due to the fact that I am an ordinary retail customer of FTX and it is not within my power to provide first-hand knowledge of what has occurred. I am not privy to that information.

46. The Defendants may argue that there is an innocent explanation for the collapse of FTX and that the working capital (US$648,293,886.33) used to acquire the 56 million shares in Robinhood is unrelated to the client funds unlawfully lent to Alameda Research Ltd. This may be the case. It is too soon to tell. However, the collapse of the trading platform and the discovery that over half of its assets were unlawfully lent to a related third party subject to the control of the Second Defendant undermines any argument that there could be an innocent explanation.

47. The Defendants may complain that they have not been provided with any notice of these proceedings nor the application to freeze their assets and have receivers appointed. This is by necessity. Given the speed at which FTX has collapsed, the subsequent hack, the Second Defendant's facility with crypto currencies and the transfer of same and the disclosure that the Second Defendant continued to try to sell the 56 million Robinhood shares for his benefit or the benefit of FTX following the filing of the Chapter 11 bankruptcy proceedings and may be continuing in his efforts to dispose of the Robinhood shares, it is incumbent on claimants such as myself to move quickly and without notice.

48. According to the SEC filing made in May 2022, the Second Defendant is the majority owner of the First Defendant. The Second Defendant has not revealed, in any public filing of which I am aware, the identity of those who hold a minority interest in the First Defendant. Accordingly, I do not know who else may be affected by this application nor do I know how they may be affected.

13

Scanned with CamScanner



49. Due to FTX's website having been taken down, I am not presently able to access the page that sets out the terms and conditions on which I made my investment in FTX. However, without waiving privilege, I have not been advised of any reason why these would affect my rights against the First or Second Defendants as pleaded in this claim as distinct from my rights against FTX.

## H. Conclusion

50. For the reasons set out above in this affidavit, I respectfully ask the Court to make the orders sought by me.

AFFIRMED by the within named      )

                                   )

YONATAN BEN SHIMON         )

                                   )

This 18 day of November 2022   )

                                   )

At   TEL-AVIV ISRAEL

BEFORE ME:

SHAHAR RONEN NOTARY



14

Scanned with CamScanner

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2022/

BETWEEN:

YONATAN BEN SHIMON

Claimant / Applicant

-and-

(1) EMERGENT FIDELITY TECHNOLOGIES LTD
(2) SAMUEL BENJAMIN BANKMAN-FRIED

Defendants / Respondents

---

AFFIDAVIT OF YONATAN BEN SHIMON

---

Lake, Kentish & Bennett Inc.
Temple Chambers
36 Long St
St John's
Antigua
Tel: +1 268 462 1012
Fax: +1 268 462 2568

Legal Practitioners for the Claimant

15

SHAHAR
RONEN

Scanned with CamScanner

# EXHIBIT B-13

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2022/

BETWEEN:

**YONATAN BEN SHIMON**

**Claimant / Applicant**

-and-

**(1) EMERGENT FIDELITY TECHNOLOGIES LTD
(2) SAMUEL BENJAMIN BANKMAN-FRIED**

**Defendants / Respondents**

---

**DRAFT ORDER**

---

**PENAL NOTICE**

If you **EMERGENT FIDELITY TECHNOLOGIES LTD** or **SAMUEL BENJAMIN BANKMAN-FRIED** fail to comply with the terms of this order, proceedings may be commenced against you for contempt of court and you may be liable to be imprisoned or to have an order of sequestration made in respect of your property.

Any other person who knows of this order and does anything which helps or permits the any of the Respondents to breach the terms of this order may also be held to be in contempt of court and may be imprisoned or to have an order of sequestration made in respect of their property.

**Before:** *Mr Justice Colin Williams*
**Dated:** *18 November 2022*

**Entered:**

**UPON** the ex parte application filed on 17 November 2022;

**AND UPON READING** the affirmation of Yonatan Ben Shimon dated 17 November 2022 and the exhibit thereto;

*Settled
Colin Williams
18th November 202*

1

**AND UPON HEARING** counsel for the Applicant;

**AND UPON THE APPLICANT** giving the undertakings at Schedule A hereto.

**IT IS ORDERED THAT:**

THIS ORDER

1. This is a Freezing Injunction made against Emergent Fidelity Technologies Ltd and Samuel Benjamin Bankman-Fried (the "**Respondents**") on [      ] by [      ] on the application of Yonatan Ben Shimon (the "**Applicant**"). The Judge read the affirmation of the Applicant dated 17 November 2022 and accepted the undertakings set out in Schedule A at the end of this Order.

2. This order was made at a hearing without notice to the Respondents. The Respondents have a right to apply to the court to vary or discharge the order – see paragraph 14 below.

3. There will be a further hearing in respect of this order within 28 days (the "**Return Date**"), such date to be fixed by the Registrar on the application of the Applicant.

4. References in this order to the Respondents means all of them and this order is effective against any of the Respondents on whom it is served or who is given notice of it.

FREEZING INJUNCTION

5. Until the Return Date or further order, the First Respondent must not in any way cause or permit:

   (a) the removal from Antigua and Barbuda of any of its assets which are in Antigua and Barbuda up to the value of US$10,818,600; or

   (b) the disposal of, dealing with, encumbrance or diminution of the value of any of its assets whether they are in or outside Antigua and Barbuda up to the same value.

6. Until the Return Date or further order, the Second Respondent must not in any way cause or permit:

Settled Williams J
18th November 2022

    (a)  the removal from Antigua and Barbuda of any of his equity and/or debt interests in the First Respondent which are in Antigua and Barbuda up to the value of US$10,818,600; or

    (b)  the disposal of, dealing with, encumbrance or diminution of the value of any of his equity and/or debt interests in the First Respondent whether they are in or outside Antigua and Barbuda up to the same value.

7. Paragraphs 5 and 6 apply to all of the Respondents' assets whether or not they are in the Respondents' own name, whether they are solely or jointly owned and whether the Respondents are interested in them legally or beneficially. For the purpose of this order the Respondents' assets include any asset which a Respondent has the power, directly or indirectly, to dispose of or deal with as if it were the Respondent's own. The Respondents are to be regarded as having such power if a third party holds or controls the property in accordance with the Respondents' direct or indirect instructions.

8. This prohibition includes the following assets in particular:

    (a)  The First Respondent's shares in Robinhood Markets, Inc; and

    (b)  The Second Respondent's majority ownership interest in the First Respondent.

9. (1) If the total value free of charges or other securities (the "**unencumbered value**") of a Respondent's assets in Antigua and Barbuda and subject to this Freezing Injunction exceeds US$10,818,600, that Respondent may remove any of those assets from Antigua and Barbuda or may dispose of or deal with them so long as the total unencumbered value of that Respondent's assets still in Antigua and Barbuda and subject to this Freezing Injunction remains above US$10,818,600.

(2) If the total unencumbered value of a Respondent's assets in Antigua and Barbuda and subject to this Freezing Injunction does not exceed US$10,818,600, that Respondent must not remove any of those assets from Antigua and Barbuda and must not dispose of or deal with any of them. If that Respondent has other assets outside Antigua and Barbuda, he may dispose of or deal with those assets outside Antigua and Barbuda so long as the total

unencumbered value of all his assets whether in or outside Antigua and Barbuda and subject to this Freezing Injunction remains above US$10,818,600.

PROVISION OF INFORMATION

10. (1) Unless paragraph (3) applies, the First Respondent must within 7 days of service of this order and to the best of its ability inform the Applicant's legal representatives of all its assets worldwide whether in its own name or not, whether solely or jointly owned and whether the First Respondent is interested in them legally or beneficially, giving the value, location and details of all such assets.

(2) Unless paragraph (3) applies, the First and Second Respondents must within 7 days of service of this order and to the best of their ability inform the Applicant's legal representatives of all equity and/or debt interests held by the Second Respondent in the First Respondent whether in his own name or not, whether solely or jointly owned and whether the Second Respondent holds those interests legally or beneficially, giving the value, location and details of all such assets.

(3) If the provision of any of this information is likely to incriminate the Respondents, they may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Respondents liable to be imprisoned, fined or have their assets seized.

11. Within 14 days after being served with this order, the Respondents must swear and serve on the Applicant's legal representatives affidavits setting out the above information.

EXCEPTIONS TO THIS ORDER

12. The order will cease to have effect if the Respondents:

(a) Provide security by paying the sum of US$10,818,600 into court, to be held to the order of the court; or

(b) Make provision for security in that sum by another method agreed with the Applicant's legal representatives.

4

COSTS

13. The costs of this application are reserved to the judge hearing the application on the Return Date.

VARIATION OR DISCHARGE OF THIS ORDER

14. Anyone served with or notified of this order may apply to the court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's legal representatives. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's legal representatives in advance.

INTERPRETATION OF THIS ORDER

15. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

16. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

PARTIES OTHER THAN THE APPLICANT AND RESPONDENTS

17. **Effect of this order**

    It is a contempt of court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

18. **Set off by banks**

    This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to a Respondent before it was notified of this order.

19. **Withdrawals by the Respondent**

5

No bank need enquire as to the application or proposed application of any money withdrawn by a Respondent if the withdrawal appears to be permitted by this order.

20. **Persons outside Antigua and Barbuda**

(1) Except as provided in paragraph (2) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this court.

(2) The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court:

- (a) The Respondents or their officers or agents appointed by power of attorney, and any director of the First Respondent;

- (b) any person who:

    - (i) is subject to the jurisdiction of this court;

    - (ii) has been given written notice of this order at his residence or place of business within the jurisdiction of this court; and

    - (iii) is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order; and

- (c) Any other person, only to the extent that this order is declared enforceable by or is enforced by a court in that country or state.

21. **Assets located outside Antigua and Barbuda**

Nothing in this order shall, in respect of assets located outside Antigua and Barbuda, prevent any third party from complying with:

- (a) What it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and a Respondent; and

6

(b)  Any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's legal representatives.

APPOINTMENT OF RECEIVERS

22. Until the Return Date or further order, Angela Barkhouse, of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands, and Toni Shukla, of Quantuma (BVI) Ltd, Coastal Building, Wickhams Cay II, Road Town, Tortola, British Virgin Islands (the "**Receivers**") are appointed on an interim basis, for the purpose of preserving the value of the assets over which they are appointed, as joint receivers of:

(a)  All of the First Respondent's assets, whether they are in or outside Antigua and Barbuda; and

(b)  All of the Second Respondent's equity and/or debt interests in the First Respondent, whether they are in or outside Antigua and Barbuda, including but not limited to any shares in the First Respondent registered in the name of the Second Respondent.

23. The Receivers shall have, to the exclusion of the Second Respondent, all of the powers of a receiver in equity and/or under section 24(1) of the Eastern Caribbean Supreme Court Act (CAP. 143).

24. Without prejudice to paragraph 23 above, the Receivers shall have the power to exercise any voting rights in respect of any shares in the First Respondent registered in the name of the Second Respondent, or beneficially owned and controlled by the Second Respondent, to remove any director(s) of the First Respondent and to appoint themselves or their nominee(s) as director(s) of the First Respondent, whereupon the Receivers or their nominees shall have in their capacity as director(s) of the First Respondent all powers conferred on such directors by law and by the First Respondent's Memorandum and Articles of Association.

25. The Receivers are not required to give security for their appointment.

26. The Receivers are not required to file accounts but may from time to time report to the Court in relation to the conduct of the receivership.

27. The Receivers are entitled to reasonable remuneration for their time spent in the performance of their duties as receivers and (if so appointed) as directors of the First Respondent, such remuneration to be assessed by the Court if not agreed by the parties.

28. The Receivers are entitled to be indemnified for their remuneration and expenses from the First Respondent's assets. Insofar as the Receivers' remuneration and expenses are paid by or on behalf of the Applicant, the Applicant is entitled to be indemnified for those amounts from the First Respondent's assets.

SERVICE

29. The Applicant is permitted to serve the claim form and all other documents in these proceedings on the Second Respondent out of the jurisdiction.

30. The Applicant is permitted to serve the claim form without a statement of claim.

31. The Applicant must file a statement of claim within 14 days.

32. The Second Respondent shall have 35 days from service on him of the statement of claim to file an acknowledgment of service.

33. The Second Respondent shall have 56 days from service on him of the statement of claim to file a defence.

34. The claim form and all other documents in these proceedings may be served on the Second Respondent by the alternative method of the Applicant or the Applicant's agent delivering it to the Second Respondent's US counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP.

35. The date on which service of the statement of claim shall be deemed to have been effected on the Second Respondent pursuant to paragraph 27 above shall be the date on which the Applicant or the Applicant's agent delivers it to the Second Respondent's US counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP.

36. The Applicant is permitted to enforce this order outside Antigua and Barbuda.

37. The court file in these proceedings shall be sealed, subject to the right of any person to apply to the Court for permission to inspect documents on the court file upon 7 days' notice to the Applicant's legal representatives.

COMMUNICATIONS WITH THE COURT

38. All communications to the court about this order should be sent to the court office, which is located at the Registry of the Supreme Court, High Street, Parliament Drive, St John's, Antigua; telephone +1 268 462 0609; fax +1 268 462 3929. The office is open between 8:30 a.m. and 4:30 p.m. from Monday to Friday except on public holidays.

NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVES

39. The Applicant's legal representatives are Lake, Kentish & Bennett Inc., Temple Chambers, 36 Long St, St John's, Antigua; telephone +1 268 462 1012; fax +1 268 462 2568.

**BY ORDER OF THE COURT**

_____

**REGISTRAR**

*Sealed*
*Colin Williams J*
*18th November 2022*

9

**SCHEDULE A**

1.  If the court later finds that this order has caused loss to the Respondents and decides that the Respondents should be compensated for that loss, the Applicant will comply with any order which the court may make.

2.  The Applicant will serve upon the Respondents together with this order as soon as practicable:

    (a)  Copies of the affidavit and exhibit containing the evidence relied upon by the Applicant, and any other documents provided to the court on the making of the application;

    (b)  The claim form; and

    (c)  An application notice for continuation of the order.

3.  Anyone notified of this order will be given a copy of it by the Applicant's legal representatives.

4.  The Applicant will pay the reasonable costs of anyone other than the Respondents which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the court may make.

5.  If this order ceases to have effect (for example, if the Respondents provide security) the Applicant will immediately take all reasonable steps to inform in writing anyone to whom it has given notice of this order, or who it has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

*Settled*
*John Williams +*
*18th November 2022*

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2022/

BETWEEN:

YONATAN BEN SHIMON

**Claimant / Applicant**

-and-

(1) EMERGENT FIDELITY TECHNOLOGIES LTD
(2) SAMUEL BENJAMIN BANKMAN-FRIED

**Defendants / Respondents**

---

**DRAFT ORDER**

---

Lake, Kentish & Bennett Inc.
Temple Chambers
36 Long St
St John's
Antigua
Tel: +1 268 462 1012
Fax: +1 268 462 2568

Legal Practitioners for the Claimant

# EXHIBIT B-14

**FILED**

HIGH COURT

**ANTIGUA AND BARBUDA**

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2022/

IN THE MATTER OF EMERGENT FIDELITY TECHNOLOGIES LTD
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT, CAP. 222.00

**Submitted Date:02/12/2022 12:35**

**Filed Date:02/12/2022 12:35**

**Fees Paid:**

BETWEEN:

ANGELA BARKHOUSE AND TONI SHUKLA
(AS RECEIVERS OF SHARES IN EMERGENT FIDELITY TECHNOLOGIES LTD)

**Petitioners**

-and-

EMERGENT FIDELITY TECHNOLOGIES LTD

**Respondent**

---

**PETITION**

---

To the High Court of Antigua and Barbuda:

The Petition of Angela Barkhouse, of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands, and Toni Shukla, of Quantuma (BVI) Ltd, Coastal Building, Wickhams Cay II, Road Town, Tortola, British Virgin Islands (as receivers of shares in Emergent Fidelity Technologies Ltd) (the "**Petitioners**"), shows that:

1. Emergent Fidelity Technologies Ltd, of Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St John's, Antigua (the "**Respondent**"), is a corporation incorporated under the International Business Corporations Act, Cap. 222 (the "**Act**").

2. On 18 November 2022, the Petitioners were appointed on an interim basis as joint receivers of the Respondent's worldwide assets, and of the equity and/or debt interests (including the majority shareholding) in the Respondent held by Samuel Benjamin Bankman-Fried ("**SBF**"). The order making the appointment (the "**Order**") was made in Claim No. ANUHVC2022/0456, in which a creditor of the Respondent and SBF, Yonatan Ben Shimon ("**Mr Ben Shimon**"), makes claims in equity and tort against the Respondent and SBF and proprietary claims in respect of their assets.

3. In broad terms, Mr Ben Shimon claims that:

   a. He invested funds with FTX Trading Ltd ("**FTX**"), of which SBF was a founder and director, which were improperly diverted to Emergent (of which SBF is the sole director and majority owner) in circumstances which give rise to Mr Ben Shimon having a proprietary tracing claim in respect of those funds and/or claims against the Respondent and/or SBF in knowing receipt and/or dishonest assistance; and

   b. The Respondent and SBF conspired to perform and did perform lawful and/or unlawful acts, involving the improper diversion of funds invested by Mr Ben Shimon and other investors with FTX to the Respondent, for the predominant purpose of injuring Mr Ben Shimon and other investors by expropriating those funds to the personal benefit of SBF, and thereby causing loss to Mr Ben Shimon.

4. The Respondent's sole known asset is its 7.6% shareholding in NASDAQ-listed Robinhood Markets, Inc ("**Robinhood**"), which it purchased for approximately US$650 million in May 2022. Mr Ben Shimon claims that funds which he and other investors invested with FTX, or their traceable proceeds, were used to purchase those shares.

5. On 21 November 2022, the Petitioners exercised the power granted to them in paragraph 24 of the Order by passing a written resolution of the Respondent's shareholders under s.119 of the Act, which removed the Respondent's incumbent directors (including SBF) and appointed the Petitioners in their place. The Order and the other court papers filed in Claim No. ANUHVC2022/0456 have been served on the Respondent, care of its resident agent, and on SBF, care of his attorneys, and those parties have been duly notified of the Petitioners' appointments as receivers and as directors.

6. However, the Respondent and SBF have not cooperated with the Petitioners or provided the Respondent's corporate documents, such as its registers of members and directors or its memorandum and articles of association. Without this cooperation or these documents, the Petitioners are unable to prove to the satisfaction of third parties in the United States (including to prospective legal representatives) their authority as the Respondent's directors or their rights as receivers of its assets. Consequently, the Petitioners have been unable to take control of the Respondent's shares in Robinhood. Additionally, the Respondent and SBF are in breach of their asset disclosure obligations under paragraph 10 of the Order.

7. On 28 November 2022, a cryptocurrency lender named BlockFi Inc. ("**BlockFi**") filed for Chapter 11 bankruptcy protection in the United States. The same day, BlockFi filed a

complaint in the bankruptcy proceedings against the Respondent, seeking to take possession and ownership of the Respondent's shares in Robinhood.

8. According to the complaint, on 9 November 2022 the Respondent (under SBF's directorship) allegedly agreed to pledge its shares in Robinhood to BlockFi in consideration for BlockFi forbearing from enforcing certain unspecified loans. Those loans were not made to Emergent but, rather, are understood to have been made to other parties associated with SBF, including his cryptocurrency trading firm, Alameda Research Ltd ("**Alameda**"). Having forborne for a single day, on 10 November 2022 BlockFi purported to exercise the security. The same day, the Supreme Court of the Bahamas appointed provisional liquidators to FTX. The following day (11 November 2022) SBF resigned from FTX, which immediately (under its new management) applied for Chapter 11 bankruptcy protection in the United States.

9. It is difficult to conceive of a more transparent fraud on the Respondent's creditors. FTX's financial difficulties were public knowledge when the alleged forbearance agreement was made. Despite this, it appears from the complaint that, on the eve of FTX's bankruptcy, SBF purported to encumber one of the few known valuable assets against which FTX's investors (such as Mr Ben Shimon) might seek to pursue recovery actions by way of claims against the Respondent as contingent creditors. This was done for no apparent consideration to or corporate benefit for the Respondent.

10. If this ploy succeeds, BlockFi will make a windfall from the Respondent at the expense of the Respondent's creditors. Without the appointment of liquidators to the Respondent, so that steps can be taken on the Respondent's behalf in the United States to contest BlockFi's complaint, the complaint is likely to succeed and the Respondent's creditors will be irremediably prejudiced.

11. The declaration made in support of FTX's Chapter 11 petition stated that "*Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.*" That statement was made by the man who was appointed to take control of Enron Corporation following its collapse in 2001, which was the largest bankruptcy reorganisation in United States history at that time and which saw several people convicted of criminal charges and sent to prison.

3

12. Additionally, SBF has admitted that US$8 billion of FTX's client assets (being half of all FTX's client assets) were loaned to Alameda. This is illustrative of (at minimum) a lack of probity on SBF's part. His behaviour with respect to BlockFi, as a director of the Respondent, demonstrates a similar lack probity and bears the indicia of fraud.

13. In the premises, the Respondent's business or affairs have been carried on or conducted in a manner that is oppressive or unfairly prejudicial to, and which disregards the interests of, the Respondent's creditors, such that liquidators should be appointed to the Respondent under s.301(1)(a) of the Act.

14. Alternatively, it is just and equitable for liquidators to be appointed to the Respondent under s.301(1)(b) of the Act.

15. Alternatively, liquidators should be appointed to the Respondent under the provisions of the Act on the Court's own motion, applying the principles in *Lancefield v Lancefield* [2002] BPIR 1108.

The Petitioners therefore humbly pray for Orders that:

1. Emergent Fidelity Technologies Ltd, of Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St John's, Antigua (the "**Respondent**") is put into liquidation under the provisions of the International Business Corporations Act, Cap. 222 (the "**Act**").

2. Angela Barkhouse, of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands, and Toni Shukla, of Quantuma (BVI) Ltd, Coastal Building, Wickhams Cay II, Road Town, Tortola, British Virgin Islands (the "**Liquidators**") are appointed as joint liquidators of the Respondent.

3. The Liquidators have the powers of a liquidator under s.308 of the Act to:

   (a) retain solicitors, accountants, engineers, appraisers and other professional advisers;

   (b) bring, defend or take part in any civil, criminal or administrative action or proceeding in the name and on behalf of the Defendant;

   (c) carry on the business of the Defendant as required for all orderly liquidation;

   (d) sell by public auction or private sale any property of the Defendant;

4

    (e) do all acts and execute any documents in the name and on behalf of the Defendant;

    (f) borrow money on the security of the property of the Defendant;

    (g) settle or compromise any claims by or against the Defendant;

    (h) make financial provision in respect of tile custody of the documents and records of the Defendant after is dissolution; and

    (i) do all other things necessary for the liquidation of the Defendant and the distribution of its property.

4. Without limitation, the powers of the Liquidators include the powers to:

    (a) Exercise any and all rights that the Respondent may have as a shareholder in any company, or any other rights that the Respondent may have in any other entity or business structure, including but not limited to exercising any voting rights in any subsidiary(ies) of the Respondent to appoint themselves or their nominee(s) as director(s) of any such subsidiary(ies);

    (b) Retain attorneys and act in any foreign jurisdiction on behalf of the Respondent as permitted by the applicable foreign law, including commencing legal proceedings in their own names or in the name and on behalf of the Respondent for the recognition of their appointment by this Court or for their appointment (whether or not with any co-appointee(s)) by the foreign court, or for orders in aid of the Respondent's liquidation or for the assistance of the foreign court in the carrying out of their duties as Liquidators, including but not limited to proceedings under Chapter 15 of the United States Bankruptcy Code;

    (c) Obtain funding on commercial terms for the performance of their duties, including in connection with any legal proceedings for which funding is permitted under the applicable law.

5. The Liquidators are not required to give security for their appointment.

6. The Liquidators are entitled to reasonable remuneration for their time spent in the performance of their duties, such remuneration to be assessed by the Court.

7. The Liquidators are entitled to be indemnified for their remuneration and expenses from the Respondent's assets in the order of priority set out in s.289 of the Act.

8. All claims brought against the Respondent in this jurisdiction are stayed, including Claim No. ANUHVC2022/0456, save that the orders made in those proceedings on 18 November 2022 granting a freezing injunction and appointing receivers shall continue in effect until further order. This is without prejudice to the right of any party to any such proceedings to apply to the Court to lift the stay in whole or in part.

9. The Petitioners' costs of this Petition are to be paid from the Respondent's assets as expenses of the Respondent's liquidation in the order of priority set out in s.289 of the Act.

**CERTIFICATE OF TRUTH**

I, Angela Barkhouse, certify on behalf of the Petitioners that I believe that the facts stated in this Petition are true.

Dated: 2 December 2022

Angela Barkhouse

NOTICE:

This Petition will be heard by the Judge on the          day of                    at

If you do not attend this hearing an order may be made in your absence.

The court office is located at the Registry of the Supreme Court, High Street, Parliament Drive, St John's, Antigua; telephone +1 268 462 0609; fax +1 268 462 3929. The office is open between 8:30 a.m. and 4:30 p.m. from Monday to Friday except on public holidays.

The Petitioners' address for service is C/- Lake, Kentish & Bennett Inc., Temple Chambers, 36 Long St, St John's, Antigua; telephone +1 268 462 1012; fax +1 268 462 2568.

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2022/

IN THE MATTER OF EMERGENT FIDELITY
TECHNOLOGIES LTD
AND IN THE MATTER OF THE INTERNATIONAL
BUSINESS CORPORATIONS ACT, CAP. 222

BETWEEN:

ANGELA BARKHOUSE AND TONI SHUKLA
(AS RECEIVERS OF SHARES IN EMERGENT
FIDELITY TECHNOLOGIES LTD)
                                    **Petitioners**
                    -and-

EMERGENT FIDELITY TECHNOLOGIES LTD
                                    **Respondent**

_____

PETITION

_____

Lake, Kentish & Bennett Inc.
Temple Chambers
36 Long St
St John's
Antigua
Tel: +1 268 462 1012
Fax: +1 268 462 2568

**Legal Practitioners for the Petitioners**

# EXHIBIT B-15

Filed on behalf of: the Claimants
Affidavit of: Angela Barkhouse
Affidavit number: first
Exhibit reference: AB-1
Date sworn: 2 December 2022
Date filed: 2 December 2022

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**CLAIM NO. ANUHCV2022/**

BETWEEN:

### ANGELA BARKHOUSE AND TONI SHUKLA
### (AS RECEIVERS OF SHARES IN EMERGENT FIDELITY TECHNOLOGIES LTD)

**Claimants**

-and-

### EMERGENT FIDELITY TECHNOLOGIES LTD

**Defendant**

---

### AFFIDAVIT OF ANGELA BARKHOUSE

---

I, **ANGELA BARKHOUSE**, of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands, **MAKE OATH AND SAY AS FOLLOWS**:

1. On 18 November 2022, the Honourable Mr Justice Colin Williams directed, *inter alia*, that Ms. Toni Shukla of Quantuma (BVI) Ltd and I be appointed receivers of the following, namely:

    i. All of Emergent Fidelity Technologies LTD's ("**Emergent**") assets, whether they are in or outside Antigua and Barbuda;

    ii. All of Samuel Benjamin Bankman-Fried's equity and/or debt interests in Emergent, whether they are in or outside Antigua and Barbuda, including but not

1

limited to any shares in Emergent registered in the name of Samuel Benjamin Bankman-Fried (the "**18 November Order**").

2. The order in question was made in the context of proceedings entitled 'Yonatan Ben Shimon v Emergent and Samuel Bankman-Fried, Claim No. ANUHCV 2022/0456' (the "**ANUHCV 2022/0456 Proceedings**") and the receivership was granted in support of a freezing injunction made on the same date. The court made the receivership order with the clear purpose of preserving the assets of Emergent so that they would be preserved for the benefit of its creditors. My efforts to secure the assets have been thwarted by a complete lack of cooperation of Mr. Bankman-Fried, who I understand is the majority shareholder in Emergent and, up until his removal by me under my powers as a receiver, the sole director of Emergent. In addition, the registered agent, Arthur Thomas, has been unwilling to engage with me or Ms. Shukla and provide us with the books and records of Emergent to allow me and Ms. Shukla to identify the assets so that we may preserve them.

3. Therefore, I am now seeking an urgent application before the court to be appointed with my colleague, Ms. Toni Shukla, as provisional liquidators over Emergent, so that we may secure its assets and seek bankruptcy protection in the United States, which is where I believe that the main asset of Emergent to be – the well-publicized shareholding in Robinhood Markets, Inc ("**Robinhood**"), a public traded company. The Robinhood shares are also under attack following the recent application made by BlockFi (details below) who are seeking to assert ownership over the Robinhood shares. There is a very real risk that if the court does not grant this provisional liquidation application that these shares will be lost to Emergent and the rightful creditors of Emergent will lose this valuable asset.

4. I make this affirmation in support of the winding up petition, the application to appoint provisional liquidators and certificate of urgency dated 2 December 2022 seeking the following relief, namely:

   i. That Angela Barkhouse of Quantuma (Cayman) Limited and Toni Shukla of Quantuma (BVI) Limited, are appointed as provisional liquidators of Emergent.

   ii. That leave be given to the provisional liquidators to seek protection under the US Bankruptcy Code in the United States of America.

      iii.    Consequential orders, including orders setting out the provisional liquidators' powers.

      iv.    Costs; and

      v.    Such further or other orders as the Court thinks fit.

4. I swear this affidavit on behalf of myself and my co-claimant, Ms. Toni Shukla, and I am duly authorized by Ms. Shukla to do so on her behalf.

5. Unless otherwise stated, the facts and matters deposed to in this affidavit are within my personal knowledge and I believe them to be true. Where such facts and matters are outside my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from sources to which I refer.

6. There is produced to me, exhibited hereto, and marked "**AB-1**" a paginated bundle of true copies of documents to which I refer in this affirmation. Numbers appearing in square brackets in this affirmation are references to page numbers in that bundle unless stated otherwise.

## A. Credentials and Experience

7. I am a Managing Director and the Caribbean Practice Leader for Quantuma, an independent advisory firm whose experts advise clients on business transactions, resolving business disputes, mitigating risk, and managing operational as well as financial challenges.

8. I have 20 years' experience in financial accounting, financial investigations, insolvency, and dispute resolution.  I have been appointed as Liquidator or Receiver over entities in the British Virgin Islands, the Cayman Islands and Samoa, primarily in contentious situations where I have been required to ascertain the facts, resolve financial challenges, and repatriate client losses or assets.

9. I am recognized in Who's Who Legal and Global Investigations Review as a Global Elite Thought Leader in both investigations, and asset recovery, and as a highly recommended expert in insolvency and restructuring matters.

I am a Fellow of the Association of Chartered Certified Accounts, a Certified Fraud Examiner, a member of the Restructuring and Insolvency Specialists Association (RISA) and the Cayman Islands Institute of Professional Accountants (CIIPA), is a qualified insolvency practitioner in the Cayman Islands, in Samoa and in the DIFC in the United Arab Emirates and have previously held a BVI Insolvency Practitioner License.

## B. Background

10. I was appointed as a receiver in proceedings captioned ANUHCV 2022/0456, the following documents are relevant to this application and have been exhibited to this affidavit:

    i. a copy of the claim form dated 17 November 2022 **pages 1 to 4 of AB-1**;

    ii. a copy of the application to freeze assets/appoint receivers dated 17 November 2022 **pages 5 to 10 of AB-1**;

    iii. a copy of Yonatan Ben Shimon's affirmation dated 18 November 2022 together with the exhibit thereto **pages 11 to 145 of AB-1**;

    iv. a copy of the skeleton argument dated 17 November 2022 in support of the application **pages 146 to 155 of AB-1;**

    v. a copy of the note of the hearing dated 18 November 2022 **pages 156 to 159 of AB-1;**

    vi. an approved copy of the 18 November Order **pages 160 to 170 of AB-1.**

11. The background leading up to FTX's collapse and the filing of its petition for Chapter 11 relief is set out in Mr. Ben Shimon's affirmation dated 18 November 2022 exhibited at **pages 11 to 26 of AB-1**. Moreover, the affidavit of the new CEO of FTX, John J. Ray III, dated 17 November 2022 in support of the first day motions sought by FTX in the Chapter 11 proceedings, exhibited at pages **171 to 200 of exhibit AB-1**, is highly critical of FTX's business practices and calls into question the probity and professionalism of FTX's senior executives, including Mr Bankman-Fried. At paragraph 5 of his affidavit, **page 172 of exhibit AB-1**, Mr. Ray states that:

> *"Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here.  From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."*

To put this statement in its proper context, Mr. Ray provides evidence that he has overseen, in his capacity as chief restructuring officer, some of the largest corporate failures in history, including the collapse of Enron.

12. The relationship between Samuel Benjamin Bankman-Fried and the Defendant is also set out in Mr. Ben Shimon's affirmation dated 18 November 2022 exhibited at pages **11 to 26 of exhibit AB-1**.

13. In this regard, according to filings with the US Securities and Exchange Commission ("**SEC**"), Emergent is a company incorporated in Antigua and Barbuda with its principal place of business at Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. Johns, Antigua, and its principal business being the making of investments in securities and other assets [**page 36 of exhibit AB-1**].  My legal counsel has endeavored to procure a company search to verify this information but as at the time of swearing this affidavit, it has not been possible to obtain this company search.  In addition, we have been seeking the books and records of Emergent from Mr. Arthur Thomas of Geo. W. Bennett Bryson & Co. Ltd, since our appointment. Geo. W. Bennett Bryson & Co. Ltd is Emergent's registered agent.  However, there has been a reluctance by Mr. Thomas to provide the information to allow me and Ms. Shukla to secure and protect the assets of Emergent.  A copy of the correspondence exchanged between Ms. Shukla and Mr. Thomas is exhibited at pages **201-205 of exhibit AB-1**.  Further, Mr. Kentish of Lake, Kentish & Bennett Inc has formally asked Arthur Thomas of Geo. W. Bennett Bryson & Co. Ltd, for the relevant documents [**pages 206 to 208 of exhibit AB-1**].  But as at the time of swearing this affidavit all requests made by the Receivers or Mr. Kentish for information from Mr. Thomas have been disregarded.  As the correspondence discloses, Mr. Thomas has expressed a clear preference to deal with matters via Mr. Kentish. This is less than ideal but Ms. Shukla and I would take no issue with this approach were Mr. Thomas to fulfill his obligations by furnishing the information and documents to Mr. Kentish promptly.  In this

5

regard, Mr. Kentish wrote to Mr. Thomas twice on 21 November 2022 [**pages 206 to 233 of exhibit AB-1**] and Ms. Shukla has followed up subsequently [**pages 201 to 205 of exhibit AB-1**]. Notwithstanding our multiple requests for compliance with the 18 November Order, Mr. Thomas has failed to materially engage with us thereby hindering and thwarting our efforts to protect the assets of Emergent.

14. According to the SEC filing in question, in May 2022, Emergent acquired 56,273,469 shares in Robinhood, at a cost of US$648,293,886.33. The SEC filing confirming that this acquisition was sourced from *"working capital"*. Robinhood, is a company listed on NASDAQ (Ticker: HOOD). The 56 million shares in question represent a 7.6% interest in Robinhood and at today's market prices have an approximate value of US$555,419,139 (56,273,469 at US$9.87 per share). In the SEC filing in question, Samuel Benjamin Bankman-Fried and Emergent are described as the beneficial owners of the 56 million shares in Robinhood and Mr. Bankman-Fried is described as the sole director and majority owner of the Emergent. However, the SEC filing in question does not provide a precise breakdown of Mr. Bankman-Fried's interest in the Emergent [**pages 33 to 41 of exhibit AB-1**].

15. As outlined at paragraph 30 iii. of Mr. Ben Shimon's affirmation dated 18 November 2022, exhibited at **page 14 of AB-1**, Emergent acquired a 7.6% shareholding in Robinhood for about US$690 million, possibly using funds improperly diverted from those invested by Mr. Ben Shimon and other customers of FTX. The source of the funds used to acquire the 7.6% interest in Robinhood is unknown beyond the fact that it was allegedly "working capital".

## C. Efforts to Enforce the 18 November Order – Evidence of Non-Cooperation

16. Paragraphs 23 and 24 of the 18 November Order provide as follows, namely:

> *"23. The Receivers shall have, to the exclusion of [Samuel Benjamin Bankman-Fried], all of the powers of a receiver in equity and/or under section 24(1) of the Eastern Caribbean Supreme Court Act (CAP. 143).*
>
> *24. Without prejudice to paragraph 23 above, the Receivers shall have the power to exercise any voting rights in respect of any shares in [Emergent] registered in the name of [Samuel Benjamin Bankman-Fried], or beneficially owned and controlled by the [Samuel*

6

*Benjamin Bankman-Fried], to remove any director(s) of [Emergent] and to appoint themselves or their nominee(s) as director(s) of [Emergent], whereupon the Receivers or their nominees shall have in their capacity a director(s) of [Emergent] all powers conferred on such directors by law and by [Emergent's ] Memorandum and Articles of Association."*

17. By resolution dated 21 November 2022, Ms. Shukla and I passed a resolution removing the current director of Emergent and appointing ourselves as directors instead (the **"21 November Resolutions"**).  Emergent and Mr. Bankman-Fried were notified of the appointment of receivers and the changes in the board of directors by letters dated 21 November 2022.  A copy of the covering letters dated 21 November 2022 addressed to Emergent and Mr. Bankman-Fried together with the 18 November Order and the 21 November Resolutions may be found at **pages 234 to 258 of exhibit AB-1**.

20. In our letter dated 21 November 2022, exhibited at **page 209 of exhibit AB-1**, we requested copies of the following, namely:

    i.    The register of members and directors.

    ii.    The Memorandum and Articles of Association of Emergent.

    iii.    Details of any charges registered against The Emergent.

    iv.    Any other statutory records.

    v.    Any documents or information indicating the bank accounts of Emergent, including details of funds received by you in settlement of invoices.

    vi.    Any documents or information on cash, securities and any other assets held by Emergent; and

    vii.    Any additional information which may assist the Receivers.

21. As of the date of swearing this affidavit, the requested information/documentation has not been provided by either Arthur Thomas of Geo. W. Bennett Bryson & Co. Ltd, Emergent's registered agent, or Mr. Bankman-Fried.

22. Paragraph 34 of the 18 November Order permits the claim form and all other documents in the ANUHCV 2022/0456 Proceedings to be served on Mr. Bankman-Fried by serving it on his US counsel, Paul, Weiss Rifkind, Wharton & Garrison LLP ("**Paul, Weiss**") [**page 167 of exhibit**

7

**AB-1**].  However, following the making of the 18 November Order, media reports disclosed that Paul, Weiss had ceased to act for Mr. Bankman-Fried and his new counsel team comprised Mr. Gregory Joseph of Joseph Hage Aaronson and Professor David Mills, a law professor at Stanford University Law School.  A copy of the Reuters article dated 19 November 2022 which disclosed this change in legal representation may be found at **pages 259 to 268 of exhibit AB-1**.

23.  Considering these developments, a copy of the 18 November Order was served on Paul, Weiss by email and served on Mr. Joseph and Professor Mills on 21 November 2022.  As no response was forthcoming, Ms. Shukla and I caused a further email to be sent to Mr Joseph and Professor Mills on 27 November 2022.  A copy of the emails dated 21 November and 26 November 2022 is exhibited at **pages 269 to 296 of AB-1.**  A copy of our follow-up letter addressed to Mr. Bankman-Fried dated 26 November 2022 may be found at **pages 297 to 309 of exhibit AB-1.** As of the date of swearing this affidavit, I confirm that neither Ms. Shukla nor I have received any response from Mr. Bankman-Fried or his alternative lawyers, Mr. Joseph and Professor Mills.

24.  Paragraph 10 of the 18 November Order imposes obligations on Emergent and Mr. Bankman-Fried to provide information [**page 163 of exhibit AB-1**].  As at the date of swearing this affidavit, none of the required information has been provided nor has Mr. Bankman-Fried or any purported representative of Emergent communicated to me that such information will be provided, although as outlined above, Mr. Kentish has exchanged correspondence with Mr. Thomas.

25.  The 18 November Order is clearly marked with a penal notice addressed to Emergent and Mr. Bankman-Fried [**page 160  of exhibit AB-1**] .  Accordingly, there should be no confusion on the part of Emergent or Mr. Bankman-Fried regarding the obligation to comply with the 18 November Order or the consequences for failing to do so.  Notwithstanding the foregoing and as outlined above, neither Emergent nor Mr. Bankman-Fried have cooperated with the Receivers or complied with the 18 November Order to date.  This is very concerning because without the cooperation and/or the provision of information, it is severely hampering the purpose of our appointment as receivers, which was to preserve the value of the assets over

which we were appointed. They would include Emergent's substantial shareholding in Robinhood.

**D. BlockFi Bankruptcy**

26. On 28 November 2022, a cryptocurrency lender, BlockFi Inc., and related entities applied for Chapter 11 bankruptcy protection in the United States Bankruptcy Court, District of New Jersey. The background to this bankruptcy proceeding is set out in the declaration of Mark A. Renzi in support of BlockFi's Chapter 11 petitions and first-day motions dated 28 November 2022, a copy of which is exhibited at **pages 310 to 350 of exhibit AB-1**.

27. Following the Chapter 11 application, BlockFi, BlockFi Lending LLC and BlockFi International LLC (collectively ("**BlockFi**")) commenced proceedings against Emergent, seeking to enforce an alleged pledge of the Defendant's shares in Robinhood as security for obligations owed by Mr. Bankman-Fried's cryptocurrency trading firm, Alameda Research LLC ("**Alameda**"). The pledge is alleged to have been created on 9 November 2022, which was:

    a. The day after FTX investors were prevented from withdrawing their deposits;

    b. One day before the Supreme Court of the Bahamas appointed provisional liquidators to FTX and related companies (10 November 2022); and

    c. Two days before Mr. Bankman-Fried resigned from FTX, which immediately (under its new management) applied for Chapter 11 bankruptcy protection in the United States (11 November 2022).

28. According to the BlockFi's complaint (more fully described as the "*Debtors' Adversary Complaint against Emergent Fidelity Technologies Ltd and ED&F Man Capital Markets, Inc. Case 22-19361-MBK"*) (the "**NJ Complaint**"), the pledge was allegedly created on 9 November 2022 in return for forbearance to the benefit an undisclosed borrower (which I understand to be Alameda from media reports).

29. This pledge was purportedly created despite public concerns of liquidity, and allegations of financial impropriety being made about FTX and asset management of investor deposits.

9

Nevertheless, the pledge was allegedly created, and following one day of forbearance, BlockFi purported to terminate the forbearance period on 10 November 2022 due to an event of default.   Such a default could reasonably have been foreseen by the catalogue of events that had preceded the purported creation of the pledge on 9 November 2022.   A copy of the NJ Complaint may be found at **page**s **351 to 361 of exhibit AB-1**.

29. The NJ Complaint claims that Emergent acknowledged that it would receive a direct or indirect benefit from the pledge agreement (paragraph 20 of the NJ Complaint, **page 354 of exhibit AB-1**).   However, beyond this generic statement, there is nothing to indicate that this purported pledge benefitted Emergent in any way.

30. This purported pledge and its purported enforcement on 10 November 2022 is undermined by media reports that Mr. Bankman-Fried was attempting to sell the Robinhood shares both prior to and after the presentation of the Chapter 11 bankruptcy petition in respect of FTX, see paragraph 18 of Mr. Ben Shimon's affirmation dated 18 November 2022 exhibited at **pages 16 to 17 of exhibit AB-1**.

31. Mr. Bankman-Fried has admitted that US$8 billion of FTX's client assets (being half of all FTX's client assets) were loaned to Alameda. Mr. Ben Shimon claims to have invested assets with a value exceeding US$10 million with FTX. Accordingly:

    a. In Claim No. ANUHVC2022/0456, Mr. Ben Shimon seeks (amongst other relief) to trace his investment with FTX through Emergent into the Robinhood shares. Many other investors with FTX are likely to have similar claims and I have been approached by Darsh Singh of HDAF, LLC, who like Mr. Ben Shimon, has told me that HDAF are currently owed USD 3,355,145.96 by FTX and like Mr. Ben Shimon, Mr. Singh is of the view that money he invested in FTX was transferred, on the instructions of Mr. Bankman-Fried, to Emergent and used to purchase the shares in Robinhood. Mr. Singh on behalf of HDAF has informed me that he is fully supportive of my appointment provisional liquidator over Emergent to preserve its assets so that they are available to creditors.

b.  BlockFi is now attempting to assert ownership of those Robinhood shares as security for debts allegedly owing to it by another company, Alameda, into which assets invested with FTX might also be traced.  A copy of BlockFi's motion filed on 28 November 2022, is exhibited at **pages 362 to 365 of exhibit AB-1**.  Mr. Singh has also made an important observation, namely that the purported pledge that BlockFi seeks to rely upon, was made at a time when HDAF had been told that they were unable to withdraw anymore funds from FTX. BlockFi's motion is due to be heard by the US Bankruptcy Court, the District of New Jersey on 5 January 2023.  However, any objections to BlockFi's motion must be filed at least 7 days before then.  Without waiving privilege over my communications with US attorneys, I have been informed that time is very tight to file such objections.    If the Court is minded to grant our application and appoint us provisional liquidators of Emergent, we will need to seek an emergency hearing before the US Court to recognize the provisional liquidation (and we will need to make allowance for US Court closures over the Christmas break) and then file the objections in time to comply with the relevant deadlines so that we may appear, on Emergent's behalf, at the hearing of the motion.

c.  Mr. Singh has also informed me he is also aware that the SEC filing made by Mr. Bankman-Fried in May 2022, declared that the funds used to purchase the Robinhood shares were from "working capital".  Mr. Singh has noted that Emergent was not an operating entity and that it is his strong belief that any capital injected into Emergent, were in fact funds derived from FTX.  Mr. Singh is of the view that those funds potentially can be traced into Emergent by HDAF, and in addition, much like Mr. Ben Shimon, HDAF has a claim against Mr. Bankman-Fried for the misappropriated funds

d.  It is critical that Emergent and its assets are properly administered by court-appointed professionals who will be able to defend the company independently and robustly against the claim by BlockFi, and to ensure that those assets are secured considering the likely claims that will be made against Emergent by direct and indirect/contingent creditors such as Mr. Ben Shimon and HDAF. The Court's clear intention in making the receivership order, was to protect the assets of Emergent.    That simply has not been allowed to happen, and to give effect to the Court's intention, the only way to ensure that the assets are protected from, what appear to be, unscrupulous purported creditors, is to appoint

liquidators over Emergent so that Emergent's right to these assets can be asserted and protected in the United States. In my considered view, these steps are necessary so that these assets are available to the legitimate creditors of Emergent. Such claims are, on their face, good claims, and as such they have already been recognized by the Court as sufficient to merit the granting of a freezing order over Emergent's assets in support of Mr. Ben Shimon's claim.

32. These circumstances, particularly the creation of the alleged security interest over the Robinhood shares on the eve of FTX's bankruptcy, bear the indicia of fraud on the creditors of Emergent, such as Mr. Ben Shimon. However, without Emergent's cooperation or the provision of its corporate documents, Ms. Shukla and I are unable to prove and establish to the satisfaction of third parties in the United States (including to prospective legal representatives) our authority as Emergent's directors or our rights as receivers of its assets. In addition, if we are going to assert the rights over the Robinhood shares and protect them for the benefit of the creditors of Emergent, Ms. Shukla and I need to be recognized as proper representatives in the US Courts. My understanding is that it is highly unlikely that the US Court will recognize us as receivers, but they may recognize provisional liquidators. Time is limited, because of the action being taken by BlockFi, which is why we have approached the Court on an *ex parte* basis, seeking an order for our appointment as provisional liquidators of Emergent.

## E. Other Bases for the Appointment of Liquidators

34. Additionally, I am advised (without waiving privilege) that these circumstances are such that Emergent's business or affairs may have been carried on or conducted in a manner that is oppressive or unfairly prejudicial to, and which disregards the interests of, Emergent's creditors, such that liquidators should be appointed over Emergent pursuant to s.301(1)(a) of the Act.

35. Additionally, and for the reasons outlined above at paragraph 34, I understand that it is just and equitable for liquidators to be appointed under s.301(1)(b) of the Act.

36. By virtue of his own admission in a recent television interview, Mr. Bankman-Fried has stated that he did not have proper oversight over the investor funds and that funds were transferred

from FTX to companies beneficially owned by him, including to Alameda Research. Mr. Bankman-Fried stated that he *"wasn't even trying, like, [he] wasn't spending any time or effort trying to manage risk on FTX"*. It appears to be disputed by investors that they permitted these funds to be loaned to related companies.    Further, Mr. Bankman-Fried admits that risk management at FTX was non-existent and there was no oversight to protect customer accounts.    At best this indicates breach of fiduciary duty, conflict of interest and financial misfeasance, at worst it is possible that there was fraud.  In either of these scenarios, it is both necessary and appropriate that  Emergent's assets be safeguarded pending any investigation or claims.  A copy of the Wall Street Journal article dated 1 December 2022 which summarizes Mr. Bankman-Fried's television interview may be found at **pages 366 to 369 of exhibit AB-1**.

37. There are likely to be many more potential creditors coming forward, in addition to Mr. Ben Shimon and HDAF.   These potential creditors will likely assert similar claims. Mr. Singh has informed me that he is aware of a number of creditors that are considering their options, and these claims are likely to be complex and require detailed and forensic investigation.   In these circumstances, it is imperative that provisional liquidators are appointed so that the assets can be secured, information and data preserved, and so that these claims can be addressed and the rightful creditors receive recompense from the Emergent liquidation.

38. Further, BlockFi's claim against Emergent, if successful, would render Emergent insolvent, unless it has significant other assets of which we are unaware. BlockFi's claim is for $690 million, which is more than the current value of the Robinhood (US$555,419,139).  The value of the Robinhood shares as at 9 November 2022, the date the purported pledge was created, was US$472,697,140 (56,273,469 shares at a closing price of US$8.40).   Accordingly, there is sufficient basis to consider that the company is at risk of being insolvent in any event, absent the discovery of significant additional assets.

38. In the alternative, provisional liquidators should be appointed to the Defendant of the Court's own motion, applying the principles in *Lancefield v Lancefield* [2002] BPIR 1108.  Our counsel will address the foregoing points in more detail in written and oral submissions.

39. Due to the urgency of the matter, Ms Shukla and I am of the view the appointment should be made immediately. However, a further hearing should be listed on or before Friday, 16 December 2022, so that any other interested parties (who will be notified forthwith) may have an opportunity to address the Court.

## F. Full and Frank Disclosure

40. I understand that Emergent is not one of the FTX debtor companies which is protected by the Chapter 11 proceedings commenced in Delaware on 11 November 2022. While my counsel has diligently checked the available US filings in this regard, there may be filings in the US bankruptcy of which I am unaware which would mean that Emergent is a relevant FTX debtor company and therefore covered by the worldwide moratorium.

41. There is conflicting evidence regarding the status of the 56 million Robinhood shares. The balance sheet produced at **page 91 of exhibit AB-1** suggests that the Robinhood shares in question are owned by FTX and now BlockFi has claimed that they were pledged to it on 9 November 2022. As far as I am aware, no entity has filed a further form SC 13-D with the SEC notifying it of any change in ownership and the circumstances surrounding the creation of the purported pledge on 9 November 2022 are troubling.

42. While Ms. Shukla and myself, in our capacity as receivers, have the power to vote the shares pursuant to paragraph 24 of the 18 November Order [**page 166 of exhibit AB-1**]. It does not follow that we are necessarily shareholders of Emergent with the concomitant standing to present the application. In light of the equitable rights which flow from our appointment pursuant to the 18 November Order, we have formed the view that we do have the necessary standing to apply *qua* shareholder.

43. Due to the failure/refusal to provide us with access to Emergent's books and records, we do not know whether the shares over which we were appointed are registered in Mr. Bankman-Fried's name in Emergent's register of members or are held via nominee or trust. Again, this could impact upon our standing to apply for this relief *qua* shareholder if Emergent's articles of association provide that it shall not recognize a trust or other interest in respect of its own shares. As at May 2022, Mr. Bankman-Fried was the majority owner of the shares in Emergent.

14

44. This is a very fast-moving situation and more information is being disclosed daily.  Accordingly, it is not possible, at this time, to provide the Court with a complete overview of the claims which may be made against Emergent in due course.

45. Mr. Bankman-Fried appears to have instructed new lawyers since we were last before the Court, i.e., Mr. Gregory Joseph and Professor David Mills.  As of the date of swearing this affidavit, neither Mr. Joseph nor Professor Mills have indicated that they will co-operate with us *qua* receivers but it is possible that they may do so in the future thereby obviating the need for the appointment of provisional liquidators.  In my view, the vague prospect that Mr. Bankman-Fried may co-operate at some future date is not sufficient to obviate the need for the appointment of provisional liquidators.  This is because the status of the 56 million Robinhood shares will likely be decided at motion hearing to be held on 5 January 2023 in New Jersey and there remains the allegations of financial misconduct and misappropriated assets of FTX investors which need to be addressed.

46. As this affidavit was being finalized, I was informed by my legal counsel that Mr. Bankman-Fried has instructed Dr David Dorsette to act on his behalf in the ANUHCV 2022/0456 Proceedings.  As at the time of swearing this affidavit, I do not know whether Mr. Bankman-Fried will co-operate with the Receivers now that he has Antiguan counsel and/or whether Dr Dorsette will be instructed to act in these proceedings also.  Again, in my view, the vague prospect that Mr. Bankman-Fried may co-operate at some future date is not sufficient to obviate the need for the appointment of provisional liquidators.  This is because the status of the 56 million Robinhood shares will likely be decided at motion hearing to be held on 5 January 2023 in New Jersey and there remains the allegations of financial misconduct and misappropriated assets of FTX investors which need to be addressed.

## G. Undertaking in Damages

47. Mr. Ben Shimon has previously provided an undertaking in damages in the context of the ANUHCV 2022/0456 Proceedings and I understand from my legal counsel that he is willing to extend the undertaking in the context of these proceedings also.

**H. Conclusion**

48. For the reasons set out above in this affidavit, I respectfully ask the Court to make the orders sought by me and Ms. Shukla.

SWORN by the within named                )
                                         )
ANGELA BARKHOUSE                         )
                                         )
This 2nd day of     December 2022        )
                                         )

At   GEORGE  TOWN
CAYMAN  ISLANDS

BEFORE ME:

ANNALISA   SHIBLI



**Annalisa Shibli**
Notary Public in and for the Cayman Islands
My commission expires 31 January, 20 23
**Date:** 2  December  2022

16

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2022/

BETWEEN:

ANGELA BARKHOUSE AND TONI SHUKLA
(AS RECEIVERS OF SHARES IN EMERGENT FIDELITY
TECHNOLOGIES LTD)

**Claimants**

-and-

EMERGENT FIDELITY TECHNOLOGIES LTD

**Defendant**

_____

AFFIDAVIT OF ANGELA BARKHOUSE

_____


Lake, Kentish & Bennett Inc.
Temple Chambers
36 Long St
St John's
Antigua
Tel: +1 268 462 1012
Fax: +1 268 462 2568

Legal Practitioners for the Claimants

# EXHIBIT B-16

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**CLAIM NO. ANUHCV 2022/0480**

**IN THE MATTER OF EMERGENT FIDELITY TECHNOLOGIES LTD**
**AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT, CAP. 222**

**BETWEEN:**

**ANGELA BARKHOUSE AND TONI SHUKLA**
**(AS RECEIVERS OF SHARES IN EMERGENT FIDELITY TECHNOLOGIES LTD)**

<u>**Petitioners / Applicants**</u>

**-and-**

**EMERGENT FIDELITY TECHNOLOGIES LTD**

<u>**Respondent**</u>

_____

**DRAFT ORDER**

_____

**BEFORE:**     **The Honourable Justice Darshan Ramdhani KC (Ag.)**

**DATED:**     **5 December 2022**

**ENTERED:**     **December 2022**

**UPON** the Applicants on 2 December 2022 having filed a Petition to wind up the Respondent under the provisions of the International Business Corporations Act, Cap. 222 (the "**Act**");

**AND UPON** the Applicants' application dated 2 December 2022 for an order that Angela Barkhouse and Toni Shukla be appointed as joint provisional liquidators of the Respondent, pending the determination of the Petition;

**AND UPON READING** the affidavit of Angela Barkhouse and the exhibit thereto;

**AND UPON HEARING** Kendrickson H. Kentish, counsel for the Applicants;

**IT IS ORDERED THAT:**

1.  Angela Barkhouse, of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands, and Toni Shukla, of Quantuma (BVI) Ltd, Coastal Building, Wickhams Cay II, Road Town, Tortola, British Virgin Islands (the "**Provisional Liquidators**") are appointed as joint provisional liquidators of the Respondent.

2.  The purposes of the Provisional Liquidators' appointment are to investigate the Respondent's affairs and to preserve the value of the Respondent's assets for the benefit of those entitled to them, pending the determination of the Petition to wind up the Respondent.

3.  The Provisional Liquidators have all the powers of a liquidator under s.308(1)(a)-(g) of the Act as may be necessary for these purposes, to:

    (a)  retain solicitors, accountants, engineers, appraisers and other professional advisers;

    (b)  bring, defend or take part in any civil, criminal or administrative action or proceeding in the name and on behalf of the Respondent;

    (c)  carry on the business of the Respondent as required for all orderly liquidation save that they shall not sell any property of the Respondent, or borrow money on the security of the property of the Respondent, or settle or compromise any claims by or against the Respondent without leave of the Court;

    (d)  do all acts and execute any documents in the name and on behalf of the Respondent; and

4.  Subject to paragraph 3, the powers of the Provisional Liquidators in paragraph 3 above shall include the powers to:

    (a)  Exercise any and all rights that the Respondent may have as a shareholder in any company, or any other rights that the Respondent may have in any other entity or business structure, including but not limited to exercising any voting rights in any subsidiary(ies) of the Respondent to appoint themselves or their nominee(s) as director(s) of any such subsidiary(ies);

    (b)  Retain attorneys and act in any foreign jurisdiction on behalf of the Respondent as permitted by the applicable foreign law, including commencing legal proceedings in their own names or in the name and on behalf of the Respondent for the recognition of their appointment by this Court or for their appointment (whether or not with any co-appointee(s)) by the foreign court, or for orders in aid of the Respondent's liquidation or for the assistance of the foreign court in the carrying out of their duties as Liquidators, including but not limited to proceedings under Chapter 15 of the United States Bankruptcy Code;

(c)  Subject to the prior approval of the Court, sell, realise and/or otherwise monetise the Respondent's shares in Robinhood Markets, Inc.; and

(d)  Subject to the prior approval of the Court, obtain funding on commercial terms for the performance of their duties, including in connection with any legal proceedings for which funding is permitted under the applicable law.

5.  The Provisional Liquidators are not required to give security for their appointment.

6.  The Provisional Liquidators are entitled to reasonable remuneration for their time spent in the performance of their duties, such remuneration to be assessed by the Court.

7.  The Provisional Liquidators are entitled to be indemnified for their remuneration and expenses from the Respondent's assets.

8.  No suit, action or other proceeding be commenced or continued against the Respondent or in respect of its assets, except with the leave of the Court and subject to such terms as the Court may impose.

9.  Without prejudice to paragraph 8 above, all claims brought against the Respondent in this jurisdiction are stayed, including Claim No. ANUHVC2022/0456.  This is without prejudice to the right of any party to any such proceedings to apply to the Court to lift the stay in whole or in part.

10. The application be listed for a further hearing on Tuesday 13 December 2012 at 8.30 am.

11. Anyone served with or notified of this Order may apply to the Court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicants' legal practitioners. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicants' legal practitioners in advance.

12. The costs of this application are reserved.

**BY THE COURT**

_____  **approved**


            **REGISTRAR**

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**CLAIM NO. ANUHCV 2022/0480**

**IN THE MATTER OF EMERGENT FIDELITY**
**TECHNOLOGIES LTD**
**AND IN THE MATTER OF THE INTERNATIONAL**
**BUSINESS CORPORATIONS ACT, CAP. 222**

**BETWEEN:**

**ANGELA BARKHOUSE AND TONI SHUKLA**
**(AS RECEIVERS OF SHARES IN EMERGENT**
**FIDELITY TECHNOLOGIES LTD)**
**Petitioner / Applicants**
-and-

**EMERGENT FIDELITY TECHNOLOGIES LTD**
**Respondent**

_____

**DRAFT ORDER**

_____

**Lake, Kentish & Bennett Inc.**
**Temple Chambers**
**36 Long St**
**St John's**
**Antigua**
**Tel: +1 268 462 1012**
**Fax: +1 268 462 2568**

**Legal Practitioners for the Petitioners**

# EXHIBIT B-17

FILED
HIGH COURT
ANTIGUA AND BARBUDA

The Eastern Caribbean Supreme Court
In the High Court of Justice
Antigua and Barbuda
Claim No ANUHCV2022/0456
Between

Submitted Date:12/12/2022 11:12

Filed Date:12/12/2022 11:16

Fees Paid:22.00

Yonatan Ben Shimon

Claimant

And

1. Emergent Fidelity Technologies Ltd
2. Samuel Benjamin Bankman-Fried

Defendants

Affirmation of Samuel Benjamin Bankman-Fried

I, Samuel Benjamin Bankman-Fried, of [address] AFFIRM and say as follows:

1. I make this affirmation on my own behalf, and to the extent that I am permitted to do so, on behalf of the first Defendant ("Emergent") in support of my application that the ex parte order dated 18 November 2022 made against me and against Emergent be discharged. This affirmation is filed without prejudice to my right to apply to stay the proceedings on forum non conveniens grounds.

2. Save where expressly otherwise, I make this affirmation from my own knowledge and belief. Where matters contained in this affirmation are not within my own knowledge and belief, I explain the basis of my knowledge and belief and I confirm they are true to the best of my knowledge and belief. I attach various documents to which I will refer in this affirmation as an exhibit marked as "SBF 1"

3. I have read the affirmation of the Claimant filed in support of the application. I intend to respond to some of the allegations made in that affirmation. The fact that I do not respond to every allegation that the Claimant makes is not an admission that I accept the truth of what he asserts but merely that in the time available I have not been able to respond to it. In particular I have not responded to the references to various newspapers and other publications made by the Claimant. News stories, especially in respect of a matter as complex and valuable as FTX, are notoriously unreliable and I am advised are of little probative value in this Court. What is apparent from the affidavit it that the Claimant has referred to various such articles that paint me in a bad light, ignored others that do not do so, and not made any or any proper enquires into the accuracy of what is asserted in the articles. If I were to attempt

to every false or inaccurate news story that is published about me, then it would be a full time job and I would need a large staff to assist me.

4.  Emergent did acquire 56,273,469 shares in Robinhood Markets Inc ("Robinhood") as stated by the Claimant at paragraph 7 of his affirmation, and as recorded in the SEC Filing exhibited at pages 5 -13 of the exhibit to his affirmation. The shares were acquired in tranches and I am not certain of the exact price paid for those shares – however, I believe that the total purchase price was less than the sum of $648,293,886.33 referred to by the Claimant at paragraph 7 of his affirmation.  For the reasons that I set out below, I suspect that the total acquisition costs was $546,381,737.10.

5.  The basis of the Claimant's case appears to be that the funds that were utilised by Emergent to purchase the shares in Robinhood might have represented the value of the 3,000 Ethereum that the Claimant asserts that he deposited with FTX in October 2021.  At paragraph 30(iii) of his affirmation, the Claimant states that:

> … [Emergent] acquired a 7.6% shareholding in Robinhood for about US$650 million possible using funds improperly diverted from those invested by me and other with FTX. I know nothing regarding the source of the funds used to acquire the 7.6% interest in Robinhood beyond the fact that it was allegedly "working capital".

6.  Given that Claimant accepts that he does not know anything about the source of the funds used to acquire the Robinhood shares, I propose to explain where that funding came from.

7.  Zixiao Wang ("Gary") and I agreed the incorporate Emergent in Antigua to hold the investments that we wished to make into the shares of Robinhood.

    a.  I was appointed as the sole director.

    b.  900 shares were issued to me.

    c.  100 shares were issued to Gary.

8.  I confirm that there has been no change in the shareholding and that the shares are still legally and beneficially owned as to 90% by me and 10% by Gary. It is difficult to value the shares in Emergent since there is no ready market for them, but the best value is probably the same as the value, form time to time, of the Robinhood shares. Emergent does not own any assets other than the Robinhood shares. A copy of the Register of Shareholders and the Register of Members for Emergent showing that we own the shares in those proportions and that I am/was the sole director appear at pages 2 and 3 of the exhibit to this affirmation.

9.  In order to capitalise Emergent so that it could make the investments into Robinhood, Gary and I agreed to borrow funds from Alameda Research Ltd ("Alameda").  Those funds were capitalised into Emergent and it used those funds to acquire the shares in Robinhood.  The loans that were made by Alameda to use were evidenced by four promissory notes as follows:

    a.  A promissory note dated 30 April 2022 evidencing a loan by Alameda to me in the sum of $316,667,182.50.

    b.  A promissory note dated 30 April 2022 evidencing a loan by Alameda to Gary in the sum of $$35,185,242.50.

    c.  A promissory note dated 15 May 2022 evidencing a loan by Alameda to me in the sum of $175,076,380.89.

    d.  A promissory note dated 15 May 2022 evidencing a loan by Alameda to me in the sum of $19,452,931.21.

10. The loans made by Alameda to Gary and me were not drawn down in a single amount on the dates of the promissory notes, but the promissory notes evidenced the amounts that we were borrowing. The draw down occurred in tranches before, and possibly after the dates of the promissory notes.

11. Thus, I borrowed the sum of $491,743,563.39 and Gary borrowed the sum of 54,638,173.71 from Alameda. All of the sums evidenced by the promissory notes were capitalised into Emergent as working capital so that it could purchase the shares in Robinhood. Insofar as I can recall those two amounts, summing to $546,381,737.10 with 90% provided by me and 10% provided by Gary, comprised the full amount that was capitalised by Gary and me into Emergent, and then paid by Emergent for the Robinhood shares. However, if the sums paid by Emergent for the shares exceeded $546,381,737.10 then I have not doubt that such additional sum was borrowed by Gary and I and capitalised into Emergent in the manner described above so that it could acquire the shares.

12. I confirm that no steps were taken in Antigua in connection with the acquisition of the Robinhood shares save the incorporation of Emergent. No funds flowed through Antigua, neither I nor Gary ever visited Antigua, not documents were prepared, executed or stored in Antigua. No individual in Antigua was involved in the acquisition. All relevant steps were taken in the Bahamas and/or in the United States.

13. The existence of the promissory notes has become a matter of public record following the various legal proceedings in the United States of America and the Bahamas following the collapse of the FTX related companies. Copies of each of the promissory notes, which were drafted by a US law firm, appear at pages 5 to 12 of the exhibit to this affirmation.

14. Following their appointment as Receivers of my 90% shares in Emergent, they purported to vote those shares to remove me as a director and to appoint themselves as directors. A copy of the purported resolution appears at page 4 of the exhibit.

Affirmed by the within named

Samuel Benjamin Bankman-Fried

This 11 December 2022

Before me

_____
Notary Public/Commissioner for Oaths

The Eastern Caribbean Supreme Court
In the High Court of Justice
Antigua and Barbuda
Claim No ANUHCV2022/0456
Between

Yonatan Ben Shimon

<u>Claimant</u>

And

1.  Emergent Fidelity Technologies Ltd
2.  Samuel Benjamin Bankman-Fried

<u>Defendants</u>

Exhibit SBF 1 to the Affirmation of Samuel Benjamin Bankman-Fried

I confirm that the documents attached hereto comprise Exhibit SBF 1 referred to the in the affirmation of Samuel Benjamin Bankman-Fried affirmed before me today.

Dated: 11 December 2022

Notary Public/Commissioner for Oaths

1

502

**Register of Shareholders of**

**EMERGENT FIDELITY TECHNOLOGIES LTD.**

| Name and Address of Shareholder | Share Certificate No. | Date of Issue | Transferred From | Number of Shares Held | Date Share Certificate Cancelled |
|---|---|---|---|---|---|
| **Samuel Bankman-Fried Albany, New Providence The Bahamas** | 1 | 22-Apr-22 | - | 900 | - |
| **Zixiao Wang Unit 112 West Bay Street Lot 5 & 6 New Providence The Bahamas** | 2 | 22-Apr-22 | - | 100 | - |

503

504

**Register of Directors of**

**EMERGENT FIDELITY TECHNOLOGIES LTD.**

| Name and Address of Director | Date of Appointment | Date of Resignation |
|---|---|---|
| **Samuel Bankman-Fried Albany, New Providence The Bahamas** | 22-Apr-2022 | - |

EMERGENT FIDELITY TECHNOLIGIES LTD

("the Company")

BOARD RESOLUTION

On 18 November 2022 the Eastern Caribbean Supreme Court ordered the appointment of Angela Barkhouse of Quantuma (Cayman) Limited, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands and Toni Shukla of Quantuma (BVI) Limited, Coastal Building, Wickhams Cay II, Road Town, Tortola, British Virgin Islands as Receivers of all the assets of the Company and of Samuel Benjamin Bankman-Fried's equity and/or debt interests in the Company, including the shares of the Company:

WHERE paragraph 24 of the Court Order gives the Receivers the power to change the director(s) of the Company and to appoint themselves or a nominee director, the Receivers hereby:

RESOLVE by way of written resolution to remove the current directors of the Company; and

FURTHER RESOLVE to appoint themselves, in their capacity as Receivers, as directors.


Approved: 21 November 2022




——————————
Angela Barkhouse
Joint Receiver



——————————
Toni Shukla
Joint Receiver

# **PROMISSORY NOTE**

Note Amount: $316,667,182.50

April 30, 2022

FOR VALUE RECEIVED, Samuel Bankman-Fried (the "***Borrower***"), hereby promises to pay to the order of Alameda Research Ltd (the "***Lender***"), the principal sum of $316,667,182.50, less any repayments made by the Borrower to the Lender (the "***Principal Amount***"), together with interest thereon from the date of this Promissory Note (the "***Note***").

On the five-year anniversary of the date hereof (the "***Maturity Date***"), the Borrower agrees to make a repayment under this Note to the Lender in an amount equal to the full amount of any unpaid balance of the Principal Amount and all accrued and unpaid interest. This Note may be prepaid in whole or in part prior to the Maturity Date without penalty.

Interest shall accrue annually on any unpaid principal based on an annual interest rate of 2.21%, compounded yearly.

All payments shall be made in lawful money of the United States of America at the principal office of the Borrower, or at such other place as the Lender (or its assignee) may from time to time designate in writing to the Borrower. Payment shall be credited first to the accrued and unpaid interest then due and payable and the remainder applied to the Principal Amount.

If, prior to the Maturity Date, the Borrower consummates a Deemed Liquidation Event (as defined in the Borrower's Certificate of Incorporation, as may be amended or restated from time to time), then, immediately prior to such Deemed Liquidation Event, the Borrower shall repay any amounts that remain unpaid under the Note.

In the event of: (i) the failure of the Borrower to pay when due the Principal Amount and accrued interest under this Note; (ii) the filing of a petition by or against the Borrower under any provision of the Bankruptcy Reform Act (Title 11 of the United States Code), as amended or recodified from time to time, or under any other law relating to bankruptcy, insolvency, reorganization or other relief for debtors; (iii) the appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of the Borrower; (iv) the execution by the Borrower of a general assignment for the benefit of creditors; (v) the insolvency of the Borrower or the Borrower's failure to pay its debts as they become due; or (vi) any attachment or like levy on any property of the Borrower; then immediately following the occurrence of such event, the Principal Amount and all accrued and unpaid interest on this Note shall accelerate and the Note shall be immediately payable in full.

The parties hereby expressly waive presentment, demand for payment, dishonor, notice of dishonor, protest, notice of protest, and any other formality.

**THE BORROWER:**

**SAMUEL BANKMAN-FRIED**

_Samuel Bankman-Fried_
24A1FE75CBF4440...

**THE LENDER:**

**ALAMEDA RESEARCH LTD**

By:      _Caroline Ellison_
         FF8633D9656F4A5...
Name:    Carolyn Ellison, CEO

# **PROMISSORY NOTE**

Note Amount: $175,076,380.89

May 11, 2022

FOR VALUE RECEIVED, Samuel Bankman-Fried (the "***Borrower***"), hereby promises to pay to the order of Alameda Research Ltd (the "***Lender***"), the principal sum of $175,076,380.89, less any repayments made by the Borrower to the Lender (the "***Principal Amount***"), together with interest thereon from the date of this Promissory Note (the "***Note***").

On the five-year anniversary of the date hereof (the "***Maturity Date***"), the Borrower agrees to make a repayment under this Note to the Lender in an amount equal to the full amount of any unpaid balance of the Principal Amount and all accrued and unpaid interest.  This Note may be prepaid in whole or in part prior to the Maturity Date without penalty.

Interest shall accrue annually on any unpaid principal based on an annual interest rate of 2.21%, compounded yearly.

All payments shall be made in lawful money of the United States of America at the principal office of the Borrower, or at such other place as the Lender (or its assignee) may from time to time designate in writing to the Borrower.  Payment shall be credited first to the accrued and unpaid interest then due and payable and the remainder applied to the Principal Amount.

If, prior to the Maturity Date, the Borrower consummates a Deemed Liquidation Event (as defined in the Borrower's Certificate of Incorporation, as may be amended or restated from time to time), then, immediately prior to such Deemed Liquidation Event, the Borrower shall repay any amounts that remain unpaid under the Note.

In the event of: (i) the failure of the Borrower to pay when due the Principal Amount and accrued interest under this Note; (ii) the filing of a petition by or against the Borrower under any provision of the Bankruptcy Reform Act (Title 11 of the United States Code), as amended or recodified from time to time, or under any other law relating to bankruptcy, insolvency, reorganization or other relief for debtors; (iii) the appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of the Borrower; (iv) the execution by the Borrower of a general assignment for the benefit of creditors; (v) the insolvency of the Borrower or the Borrower's failure to pay its debts as they become due; or (vi) any attachment or like levy on any property of the Borrower; then immediately following the occurrence of such event, the Principal Amount and all accrued and unpaid interest on this Note shall accelerate and the Note shall be immediately payable in full.

The parties hereby expressly waive presentment, demand for payment, dishonor, notice of dishonor, protest, notice of protest, and any other formality.

<u>**THE BORROWER**</u>:

**SAMUEL BANKMAN-FRIED**

DocuSigned by:

*Samuel Bankman-Fried*

24A1FE75CBF4440...

<u>**THE LENDER**</u>:

**ALAMEDA RESEARCH LTD**

By:
Name:    Caro

DocuSigned by:

*Caroline Ellison*

FF6633D9656F4A5...

# **PROMISSORY NOTE**

Note Amount: $35,185,242.50

April 30, 2022

FOR VALUE RECEIVED, Zixiao Wang (the "***Borrower***"), hereby promises to pay to the order of Alameda Research Ltd (the "***Lender***"), the principal sum of $35,185,242.50, less any repayments made by the Borrower to the Lender (the "***Principal Amount***"), together with interest thereon from the date of this Promissory Note (the "***Note***").

On the five-year anniversary of the date hereof (the "***Maturity Date***"), the Borrower agrees to make a repayment under this Note to the Lender in an amount equal to the full amount of any unpaid balance of the Principal Amount and all accrued and unpaid interest. This Note may be prepaid in whole or in part prior to the Maturity Date without penalty.

Interest shall accrue annually on any unpaid principal based on an annual interest rate of 2.21%, compounded yearly.

All payments shall be made in lawful money of the United States of America at the principal office of the Borrower, or at such other place as the Lender (or its assignee) may from time to time designate in writing to the Borrower. Payment shall be credited first to the accrued and unpaid interest then due and payable and the remainder applied to the Principal Amount.

If, prior to the Maturity Date, the Borrower consummates a Deemed Liquidation Event (as defined in the Borrower's Certificate of Incorporation, as may be amended or restated from time to time), then, immediately prior to such Deemed Liquidation Event, the Borrower shall repay any amounts that remain unpaid under the Note.

In the event of: (i) the failure of the Borrower to pay when due the Principal Amount and accrued interest under this Note; (ii) the filing of a petition by or against the Borrower under any provision of the Bankruptcy Reform Act (Title 11 of the United States Code), as amended or recodified from time to time, or under any other law relating to bankruptcy, insolvency, reorganization or other relief for debtors; (iii) the appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of the Borrower; (iv) the execution by the Borrower of a general assignment for the benefit of creditors; (v) the insolvency of the Borrower or the Borrower's failure to pay its debts as they become due; or (vi) any attachment or like levy on any property of the Borrower; then immediately following the occurrence of such event, the Principal Amount and all accrued and unpaid interest on this Note shall accelerate and the Note shall be immediately payable in full.

The parties hereby expressly waive presentment, demand for payment, dishonor, notice of dishonor, protest, notice of protest, and any other formality.

### THE BORROWER:

5A359B84BED847E...

### THE LENDER:

**ALAMEDA RESEARCH LTD**

By: _____

Name: Caroline Ellison    EO

FF6633D9656F4A5...

# PROMISSORY NOTE

Note Amount: $19,452,931.21

May 11, 2022

FOR VALUE RECEIVED, Zixiao Wang (the "**Borrower**"), hereby promises to pay to the order of Alameda Research Ltd (the "**Lender**"), the principal sum of $19,452,931.21, less any repayments made by the Borrower to the Lender (the "**Principal Amount**"), together with interest thereon from the date of this Promissory Note (the "**Note**").

On the five-year anniversary of the date hereof (the "**Maturity Date**"), the Borrower agrees to make a repayment under this Note to the Lender in an amount equal to the full amount of any unpaid balance of the Principal Amount and all accrued and unpaid interest.  This Note may be prepaid in whole or in part prior to the Maturity Date without penalty.

Interest shall accrue annually on any unpaid principal based on an annual interest rate of 2.21%, compounded yearly.

All payments shall be made in lawful money of the United States of America at the principal office of the Borrower, or at such other place as the Lender (or its assignee) may from time to time designate in writing to the Borrower.  Payment shall be credited first to the accrued and unpaid interest then due and payable and the remainder applied to the Principal Amount.

If, prior to the Maturity Date, the Borrower consummates a Deemed Liquidation Event (as defined in the Borrower's Certificate of Incorporation, as may be amended or restated from time to time), then, immediately prior to such Deemed Liquidation Event, the Borrower shall repay any amounts that remain unpaid under the Note.

In the event of: (i) the failure of the Borrower to pay when due the Principal Amount and accrued interest under this Note; (ii) the filing of a petition by or against the Borrower under any provision of the Bankruptcy Reform Act (Title 11 of the United States Code), as amended or recodified from time to time, or under any other law relating to bankruptcy, insolvency, reorganization or other relief for debtors; (iii) the appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of the Borrower; (iv) the execution by the Borrower of a general assignment for the benefit of creditors; (v) the insolvency of the Borrower or the Borrower's failure to pay its debts as they become due; or (vi) any attachment or like levy on any property of the Borrower; then immediately following the occurrence of such event, the Principal Amount and all accrued and unpaid interest on this Note shall accelerate and the Note shall be immediately payable in full.

The parties hereby expressly waive presentment, demand for payment, dishonor, notice of dishonor, protest, notice of protest, and any other formality.

**THE BORROWER:**

**Zixiao Wang**

_____

DocuSigned by:

5A359B84BED847E...

**THE LENDER:**

**ALAMEDA RESEARCH LTD**

By: _____
Name: EO

DocuSigned by:
Caroline Ellison
FF6633D9656F4A5...

<span style="color:red">513</span>

The Eastern Caribbean Supreme Court
In the High Court of Justice
Antigua and Barbuda
Claim No ANUHCV2022/0456
Between

Yonatan Ben Shimon

<u>Claimant</u>

And

1.  Emergent Fidelity Technologies Ltd
2.  Samuel Benjamin Bankman-Fried

<u>Defendants</u>

Affirmation of Samuel Benjamin Bankman-Fried

DAVID DORSETT, PH.D.

Watt, Dorsett, Hewlett Law

Attorneys-at-law for the Applicant

KINGSGATE CHAMBERS

55 Newgate Street

St. John's, Antigua

(T): 1-268-462-1351;

(E): david.dorsett@richards.ag

# EXHIBIT B-18

**FILED**

HIGH COURT

ANTIGUA AND BARBUDA

Filed on behalf of the Petitioners

Third Affidavit of: Angela Barkhouse

Affidavit number: Third

Submitted Date: 19/12/2022 19:11

Exhibit reference: AB-3

Date sworn: 20/12/2022

Filed on Date: 20/12/2022 08:30

Date filed: 19 December 2022

Fees Paid:22.00

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV2022/0480

BETWEEN:

### ANGELA BARKHOUSE AND TONI SHUKLA
### (AS RECEIVERS AND PROVISIONAL LIQUIDATORS OF EMERGENT FIDELITY TECHNOLOGIES LTD)

**Respondents / Petitioners**

-and-

### EMERGENT FIDELITY TECHNOLOGIES LTD

**Respondent**

-and-

### SAMUEL BENJAMIN BANKMAN-FRIED

**Applicant/Interested Party**

_____

### THIRD AFFIDAVIT OF ANGELA BARKHOUSE

_____

I, **ANGELA BARKHOUSE**, of Quantuma (Cayman) Ltd, Suite N404, Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands, make oath and say as follows:

1. I make this Third Affidavit on behalf of myself and my co-petitioner, Ms Toni Shukla, and I am duly authorised by Ms Shukla to do so on her behalf. I am the same Angela Barkhouse who swore my First Affidavit on 2 December 2022 in support of (a) our Petition to wind up Emergent Fidelity Technologies Ltd ("**Emergent**"), and (b) our application to be appointed Provisional Liquidators of Emergent. This Third Affidavit is made in response to the application made by Samuel Bankman-

Fried for a stay of the Order made on 5 December 2022 by which order Toni Shukla and I were appointed as Provisional Liquidators of Emergent, which application has been ordered to be heard on 23 December 2022.   Together, the Provisional Liquidators oppose any stay of our appointment, or any inhibition of the exercise of our powers, as Provisional Liquidators.  For the reasons explained herein, it is critically important that the provisional liquidation continues in full force pending the hearing of the Petition.

2.   Unless otherwise stated, the facts and matters deposed to in this Affidavit are within my personal knowledge and I believe them to be true.  Where such facts and matters are outside my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from sources to which I refer.  Nothing in this Affidavit or in the documents filed in opposition to this application is intended to be or should be treated as a waiver of any privilege.

3.   There is produced to me, exhibited hereto marked "**AB-3**", a paginated bundle of true copies of documents to which I refer in this Affidavit.   Page references in this Affidavit are references to page numbers in that exhibit bundle unless stated otherwise.

4.   I make this Third Affidavit in opposition to the application filed in this action by Mr Bankman-Fried (**"SBF"**), on 12 December 2022 ("**the Application**"), to stay the proceedings numbered **ANUHCV 2022/0480** (the "**PL Proceedings**") pending the determination of SBF's application for the discharge of Justice Colin Williams' order dated 18 November 2022, in the claim numbered **ANUHCV2022/0456** (Yonatan Ben Shimon v. Emergent Fidelity Technologies Ltd and Samuel Benjamin Bankman-Fried) (the "**Receivership Proceedings**").   It is my understanding that the only matter to be heard before the Court on 23 December 2023 is the question of whether there should be a stay of the PL Proceedings pending a proposed application on the part of the Applicant to discharge the receivership order in the Receivership Proceedings.

5.   No evidence was filed by SBF in support of his application dated 12 December 2022.  Neither were any evidential grounds identified in the Application as to why a stay was needed or desirable, nor what harm would be (or might be) faced by SBF by reason of the Order of 5 December 2022.  The only ground identified to support the Application was that the Applicant intended in the Receivership Proceedings to challenge the receivership order made therein.  I should make clear

that, until SBF was removed as director on 21 November 2022, he was the sole director of Emergent and he is also the 90% shareholder of the company.

6.    The structure of this Affidavit is as follows:

(1)    A summary of the evidence before the Court to support the Orders made on 18 November 2022 and 5 December 2022 (respectively in the Receivership Proceedings and the PL Proceedings).

(2)    Events since 5 December 2022.

(3)    The necessity and desirability for the provisional liquidation to continue without a stay pending hearing of the Petition.

(4)    The absence of relevant harm to SBF if the Order is not stayed.

(5)    SBF's counsel's criticism of the Order of 18 November 2022.

7.    I have already placed two other affidavits before the Court, and I will refer to those affidavits in my response to the application to stay the Petition.  Several of the documents that are relevant to my objection to the Court ordering any stay are already before the Court.  A copy of my First Affidavit, together with exhibit AB-1, is exhibited at pages **1 to 405 of exhibit AB-3**.

**(1)    A Summary of the Evidence Before the Court to Support the Orders made on 18 November 2022 and 5 December 2022**

8.    Following an application made by Mr Shimon in claim number **ANUHCV2022/0465**, Toni Shukla and I were jointly appointed as receivers, for the purpose of preserving the value of the assets over which we were appointed, namely over:

(a)    All of SBF's assets, whether in or outside Antigua and Barbuda; and

(b)    All of SBF's equity and/or debt interests in Emergent, whether in or outside Antigua and Barbuda, including but not limited to any shares in Emergent registered in the name of SBF.

3

The basis of that application is set out in Mr Shimon's Affirmation dated 17 November 2022 together with exhibit YBS-1, a copy of which is exhibited at pages **29 to 163 of exhibit AB-3**.  Mr Shimon's application was made ex parte to the Antigua Court, following his inability to access certain digital assets with a cryptocurrency exchange operated by FTX Trading Limited (**"FTX"**). The value of Mr Shimon's deposit was USD 10,818,600 on 13 October 2021 (albeit that value had reduced when the application was filed).  Mr Shimon made his application following the denial of his request to remove his Ethereum from FTX and his becoming aware through news articles that there was (at minimum) an unhealthy and questionable relationship between FTX and Alameda Research Limited and other associated Alameda entities (collectively, **"Alameda"**), which companies were apparently owned or majority-owned by SBF.  In addition, and as further set out in Mr Shimon's Affirmation, concerns were also being raised by US regulators more generally about FTX.  Ultimately FTX and 134 other (apparently associated) entities filed (or apparently filed[1]) for bankruptcy under Chapter 11 of the United States Bankruptcy Code on 11 November 2022 in Delaware.

9.   After the filing of Chapter 11 bankruptcy proceedings, Mr Shimon became aware through various news articles that FTX had purportedly loaned up to USD 8 Billion (by value) of its clients' assets (or the proceeds thereof) to companies owned by SBF, in particular Alameda, and that, further, Alameda had purportedly lent approximately USD 1 Billion to SBF personally.  Further, it appeared that there was a significant asset that was outside the scope of the estates of the entities which had filed for Chapter 11 bankruptcy, beneficially owned by SBF, which appeared to be in the form of an investment held by Emergent in a company called Robinhood Markets, Inc. ("**Robinhood**"), the funding for which investment, it was inferred by Mr Shimon, appeared likely to have derived from the assets SBF had appropriated from Alameda/FTX (and by extension, if the allegations made about SBF and FTX  are true, from FTX's customers, including Mr Shimon).  The shares were worth many hundreds of millions of US Dollars.  Emergent was a company controlled and 90% owned by SBF.  Mr Shimon did not provide FTX with consent to lend his Ethereum to Alameda (or anyone else).  Moreover, FTX's Terms of Service purported expressly to prohibit such use of customer assets.  Indeed, the sums involved, and lack of proper segregation of customer assets, suggested that these "loans" were not genuine arms-length transactions.  Emergent itself was

---

[1] I understand that questions have been raised as to the authority of the persons making the filings (or some of them), but such questions are outside the scope of this Affidavit, and I express no views on them.

only established on 22 April 2022 (see page **527 of exhibit AB-3**, where I exhibit a copy of Emergent's Certificate of Incorporation). In the last months before the implosion of FTX, Emergent had a nominal share capital of USD 5,000 (5,000 shares divided into 5,000 shares of USD 1 each) – see pages **533 to 535 of exhibit AB-3,** where I exhibit Emergent's Articles of Incorporation. Although our inquiries are continuing, it appears that SBF was the sole director of Emergent. I regret to inform the Court that SBF has yet to comply properly with the Court's orders in relation to information production, and – although I appreciate that he may have been preoccupied with other matters stemming from the collapse of FTX, his recent arrest and his pending extradition proceedings to the United States – we are nevertheless anxious to secure his cooperation to understand and secure Emergent's assets and records. Notwithstanding the paucity of information, however, it seems to be the case that Emergent was an asset-holding company, not a trading entity. The Robinhood shares appear to have been purchased on or about 13 May 2022.

10. Against this background, Mr Shimon was (and I understand remains) of the view that it was likely that SBF and Emergent were holding funds that included assets that FTX was supposed to be holding on his behalf, or their traceable proceeds, had knowingly received such assets, and had done so dishonestly and in breach of trust. His application filed on 17 November 2022, granted by Justice Colin Williams on 18 November 2022, sought and obtained a freezing order over the assets of SBF and Emergent and the appointment of receivers over the assets of Emergent for the purpose of preserving the value of the assets of Emergent, whether in or outside Antigua and Barbuda and all of SBF's equity and/or debt interest in Emergent whether in or outside Antigua and Barbuda, including but not limited to any shares in Emergent registered in the name of SBF. A copy of that order is at pages **390 to 400 of exhibit AB-3**.

11. I set out in my First Affidavit, at paragraphs 16 to 25, the details of our efforts to enforce the order of Justice Colin Williams and the evidence of SBF'S and Emergent's non-compliance (see pages **6 to 8 of exhibit AB-3**). By the Application, SBF apparently seeks to stay the Petition without addressing any of those issues (in respect of which non-compliance our position is expressly reserved).

12. In the working week following the order of 17 November 2022 we made extensive attempts to enforce the order and carry out our role as receivers.  In addition, and set out at paragraphs 26 to 32 of my First Affidavit at pages **9 to 12 of exhibit AB-1**, BlockFi Inc. (and associated entities, "**BlockFi**"), a cryptocurrency business which had also filed for Chapter 11 bankruptcy protection in the United States (in New Jersey), commenced proceedings against Emergent seeking to enforce an alleged guarantee by Emergent and an alleged pledge of the Robinhood shares, said (by BlockFi) to have been provided to it as some form of security in return for its continued forbearance from enforcing obligations said to be owed by Alameda.  I note that the pledge was said to have been created on 9 November 2022, at a time when FTX had suspended any further withdrawals of funds by its customers.  The BlockFi complaint further contends that BlockFi accelerated the alleged obligations of Emergent and purportedly notified Emergent of an event of default on 10 November 2022 (i.e. the very next day), the day before the composite FTX/Alameda Chapter 11 bankruptcy filing.  A copy of the BlockFi complaint is exhibited at pages **369 to 383 of exhibit AB-3**.

13. In addition to the failure to comply with the order of Mr Justice Williams and the BlockFi claim, there were several other bases for our appointment as Provisional Liquidators of Emergent, which are set out in paragraphs 34 to 39 of my First Affidavit, at pages **12 to 14 of exhibit AB-1**.  The grounds set out for the Court were (I suggest) compelling, and the application was made at a time where there was a strong and growing suspicion of fraud on a truly massive scale.  The grounds set out in the provisional liquidation application not only remain, but have been vindicated and fortified by subsequent events, as described below.  Furthermore, the Order of Justice Colin Williams has still not been complied with, BlockFi are still asserting a claim over the Robinhood shares (and have now appeared as an interested party in these proceedings), multiple creditors are making their interest known and are apparently considering their options against Emergent, and Emergent appears to be hopelessly insolvent on two fundamental bases: (i) if the BlockFi claim is valid, it has no known assets and vast liabilities; further or alternatively (ii) it appears in any event to have been used as a repository for assets (or their proceeds) wrongly appropriated by SBF and others.

**(2)  Events since 5 December 2022**

14.  Since the making of the Order appointing Provisional Liquidators on 5 December 2022, as outlined above, further information has come to light which both vindicates and fortifies the bases of the Court's Order.  To a high degree of probability, based on the evidence now before the Court, it is now apparent that SBF has perpetrated a vast fraud within and between (*inter alia*) FTX, Alameda and Emergent.  The interest of this Court is directly concerned with Emergent, an Antiguan company whose assets urgently need protection.  It appears that SBF was the sole controlling mind of each of these entities from establishment (Alameda in 2017, FTX in 2019 and Emergent in April 2022) until the collapse into bankruptcy of FTX in November 2022.  The fraud has been described by the US prosecutors as one of the biggest financial frauds in American history.  I refer to **page 401 of exhibit AB-3** and to an article of the Financial Times dated 16 December 2022.

15.  SBF was arrested on 12 December 2022 and is currently incarcerated in the Bahamas, pending extradition to the United States.  An extradition hearing has been fixed for 8 February 2023.  He was denied bail on the ground of him being a flight-risk, which is itself significant in the context of this application.  At pages **403 to 404 of exhibit AB-3** I exhibit the article from the Financial Times dated 16 December 2022 confirming the position.  This has been covered widely in the global press, as explained in my Second Affidavit.  Following the hearing on 12 December 2022, I prepared a Second Affidavit to bring these matters to the attention of the Court.  I exhibit a copy of my Second Affidavit at pages **406 to 498 of exhibit AB-3**.

16.  On the evening of 12 December 2022, the US Securities and Exchange Commission (the "**SEC**") filed a civil complaint in the in the U.S. District Court for the Southern District of New York (the "**SEC Complaint**").  A copy of the SEC Complaint is exhibited to my Second Affidavit and appears at pages **430 to 457 of exhibit AB-3**.

17.  On 13 December 2022, the United States Commodities Futures Trading Commission (the "**CFTC**") also filed a civil complaint in the US District Court for the Southern District of New York seeking injunctive and other equitable relief and for civil monetary penalties under the US Commodity Exchange Act and Commission Regulations (the "**CFTC Complaint**").  A copy of the CFTC Complaint appears is exhibited to my Second Affidavit and appears at **pages 458 to 497 of exhibit AB-3**.

18. On 13 December 2022, shortly after the conclusion of the recent first hearing of SBF's application to stay the Petition, it was announced that the United States Department of Justice (the **"DOJ"**) had issued a (hitherto sealed) indictment against SBF containing eight criminal charges including:

    (i)     conspiracy to commit wire fraud on customers;

    (ii)    wire fraud on customers;

    (iii)   conspiracy to commit wire fraud on lenders;

    (iv)    wire fraud on lenders;

    (v)     conspiracy to commit commodities fraud;

    (vi)    conspiracy to commit securities fraud;

    (vii)   conspiracy to commit money-laundering; and

    (viii)  conspiracy to defraud the United States and violate the campaign finance laws.

    A copy of the Indictment is exhibited to my Second Affidavit and appears at pages **416 to 429 of exhibit AB-3.**

19. The DOJ Indictment is a 14-page document, but it is worth highlighting certain issues that arise from it.  Under count 1 (conspiracy to commit wire fraud on customers) what is being alleged is that SBF, with others, misappropriated customer deposits and used the deposits to pay the expenses of Alameda and make investments: see pages **416 to 417 of exhibit AB-3.**  This was exactly the type of activity that Mr Shimon complained about in his application to the Court for a freezing order and the order appointing the receivers.  The same allegation is made with respect to count 2 – wire fraud on customers: see pages **417 to 418 of exhibit AB-1**.  Under count 5 – at pages **420 to 421 of exhibit AB-3**, conspiracy to commit commodities fraud, there is a further allegation relating to the misappropriation of customer deposits to satisfy loan obligations of Alameda.  It should also be noted that at paragraph 21 of the DOJ Indictment, at page **427 of exhibit AB-3**, there is mention of a claim to forfeiture.  If SBF is found guilty of the offences alleged in counts one, two, three and four, then it is claimed that he will be required to forfeit to the United States any and all property, real and personal, that constitutes or is derived from the proceeds traceable to the commission of those offences.  That would, on the DOJ's case, apparently extend to his interest in Emergent.

20. I also want to highlight points in the CFTC Complaint and bring them to the attention of the Court when considering the Application.  The CFTC Complaint is 40 pages long, but I want to highlight paragraph 8, at page **460 of exhibit AB-3**.  The CFTC say "SBF and other FTX executives also took hundreds of millions of dollars in poorly documented "loans" from Alameda that they used to purchase luxury real estate and property, make political donations, and for other unauthorized uses".  In contrast, SBF in his affirmation of 11 December 2022, filed with the Court on 12 December 2022, in the Receivership Proceedings, exhibited at pages **499 to 514 of exhibit AB-3**, exhibits examples of these documents and goes on to say at paragraph 8 of his affirmation, page **500 of exhibit AB-3** – "In order to capitalize Emergent so that it could make the investments into Robinhood, Gary and I agreed to borrow funds from Alameda.  These funds were capitalized into Emergent, and it used those funds to acquire the shares in Robinhood.  The loans that were made by Alameda to use were evidenced by four promissory notes."  Further, at paragraph 49, at **pages 470 to 471 of exhibit AB-3**, the CFTC goes on to say, "The use of customer funds by Alameda was not authorized by FTX customers, and FTX customers were not made aware that their funds were being used by Alameda.  To the contrary, FTX's Terms of Service expressly prohibit such use of customer funds."  SBF's contention that the funds flowed from FTX, to him via loans from Alameda, stand in contrast to the allegations of the CFTC, and his suggestion that the money used to buy the Robinhood shares comprised "legitimate loans" or "legitimate provision of working capital", is (to put it mildly) wholly contrary to the position of the US regulators.

21. We have not seen any accounting records with regards to Emergent, and therefore have not been fully able to understand the basis of the purchase of the Robinhood Shares and how the money was "capitalized" and made available to Emergent to allow it to make the purchase.  There was no apparent increase in the share capital of the company, even according to the account given by SBF in the Affidavit he has filed.  The only accounting summary I have seen appears to be that found at paragraph 19 of the CFTC compliant, at pages **462 and 463 of exhibit AB-3**, where it states "During the Relevant Period [paragraph 4 of the CTFC compliant – no later than May 2019 through to at least 11 November 2022], FTX Trading, Alameda Research, together with other entities under the majority ownership and control of SBF operated as a single, integrated common enterprise under the sole ultimate authority of SBF as their mutual owner.  They are referred to collectively in this complaint as the "FTX Enterprise."  SBF regularly exercised control over each of the component entities of the FTX Enterprise throughout the Relevant Period, including regularly

serving as signatory on core corporate agreements, as well as corporate bank accounts and trading accounts, many of which were held in the U.S.  The FTX Enterprise failed to observe corporate formalities, including the failure to segregate funds, operations, resources, and personnel, or to properly document intercompany transfers or funds and other resources.  The entities regularly shared office space, systems, accounts, and communications channels.  On information and belief, assets flowed freely between the FTX Enterprise entities, often without documentation or effective tracking."  I note that Emergent's formation and "capitalisation" took place within the "Relevant Period".

22. According to the CFTC Complaint, there were complete failures to segregate information and assets between FTX and Alameda, and wholesale misappropriation of customer funds.  Without wishing to restate the CFTC Complaint here, but for illustrative purposes, at paragraph 70 ("F. Misappropriation of Customer Funds") at page **477 of exhibit AB-3**, the CFTC says as follows – "By early 2022, Alameda had invested several billion dollars in directional, unhedged, illiquid, and/or long terms investments.  To fund these investment activities, Alameda had relied on billions of dollars of loans from digital asset lending platforms, traditional bank lines of credit, and its unlimited borrowing abilities on the FTX, including access to customer funds."  Both the SEC and the CFTC highlight that FTX customer funds were used, without the authorisation or the knowledge of the FTX customers (such as Mr Shimon), and in breach of FTX's own customer terms.  The CFTC Complaint at paragraph 3, at page **459 of exhibit AB-1**, says as follows – "On November 11, 2022, SBF'S empire abruptly collapsed.  FTX customers and the world at large discovered that FTX, through its sister-company Alameda, had been surreptitiously siphoning off customer funds for its own use – and over $8 billion customer deposits were now missing."  It is apparent that the CFTC and SEC believe that SBF, in accepting money from Alameda, would have known that the funds he was receiving from Alameda had been misappropriated from FTX's customers, and that the funds to "capitalise" Emergent were traceable proceeds.  Further, if the relief requested by the CFTC is considered realistic (at paragraph F, on page **495 of exhibit AB-3**) then (if CFTC were to obtain judgment against SBF) he will be required to "make full restitution by making whole each and every customer or investor whose funds were received or utilized by him in violation of the provisions of the Act as described herein, including pre-judgment interest."  In other words, if the CFTC makes out its claims, SBF will have to repay the money he has misappropriated.  That would potentially extend to the money that he received from Alameda for the capitalisation of

Emergent, which Emergent apparently used to purchase the Robinhood shares.  It follows that, absent his showing exactly how and where the CFTC and SEC have got it wrong, and that the BlockFi pledge is invalid, there does not appear to be any realistic scenario where SBF would (but for the receivership or provisional liquidation orders) personally retain the benefit of his equitable interest in Emergent.  His actions are difficult to explain and, given the very serious allegations of fraud, both his motivations and his explanations should obviously be treated with great caution.

**(3) The Critical Need and Desirability for the Order Appointing Provisional Liquidators to Continue Without a Stay Pending Hearing of Petition**

**The Urgent Work of the Provisional Liquidators in Securing the Robinhood Shares**

23. The central reason to appoint Provisional Liquidators is to preserve Emergent's assets and financial records such as they are.  That work must now be viewed in the context of what is now alleged to have been a massive fraud perpetrated by SBF and others.  When there is *prima facie* evidence of significant fraud, the Court will appreciate that this can only be achieved by the appointment of independent professionals, responsible to (and subject to the supervisions of) the Court.  Conversely, it would be extraordinary in such circumstances to hand the company back to the control of the alleged fraudster, whose interest in it (not only because of the alleged fraud, but also because of the alleged pledge and guarantee) is at best entirely unclear, and more likely illusory where there are plainly likely to be a significant number of creditors.

24. Following the provisional liquidation order, we continued with our work to protect the assets of Emergent and with our attempts to obtain its books and records, which remain materially incomplete.  That is particularly significant in relation to the Emergent / Robinhood / BlockFi transactions, which are of great interest to others (including but not limited to BlockFi).

25. The Court will obviously appreciate, but I should pause briefly to explain here that the powers of a provisional liquidator are wider than those of a receiver, and the nature of the office is different.  A provisional liquidator is typically appointed (and the Provisional Liquidators are in this case appointed) in a class proceeding regarding (in this case) an apparently insolvent company, and a provisional liquidator's responsibility is to preserve assets for all creditors.  A receiver, on the

other hand, is typically appointed to preserve an assets or class of assets so that there is something against which the claimant to the proceedings may enforce as a creditor having obtained judgment.   As receivers, the powers that were granted to Ms Shukla and me pursuant to the order of 18 November 2022 were limited to those required to preserve the value of the assets over which we were appointed.  By comparison, the powers conferred on us by the order of 5 December 2022 in our capacities as Provisional Liquidators are wider.  They include the power to act in any foreign jurisdiction on behalf of Emergent as permitted by applicable foreign law, including commencing legal proceedings in our own names or in the name and on behalf of Emergent for the recognition of these insolvency proceedings, or for orders in aid of these insolvency proceedings, or for the assistance of the foreign court in the carrying out of our duties, including but not limited to recognition proceedings under Chapter 15 of the United States Bankruptcy Code.   Such remedies are unavailable to receivers.   Moreover, our powers as Provisional Liquidators include the powers to exercise any and all rights that SBF might have as a director of Emergent and the powers (exercisable with the prior approval of the court) to sell, realise and/or otherwise monetise Emergent's shares in Robinhood Markets Inc., and to obtain funding on commercial terms for the performance of our duties and the funding of these proceedings.  These are powers of office holders of class action insolvency proceedings that are, pursuant to the principles of modified universalism, widely recognised by the courts here in Antigua and in (amongst other places) the United States. These powers have particular relevance in the present case, where it is necessary urgently to secure assets, financial records and defend (and potentially institute) legal proceedings to protect Emergent's interests for the benefit of its stakeholders.   I enclose at pages **515 to 524 of exhibit AB-3**, copies of the exchanges of correspondence between our US counsel, Morgan Lewis and the lawyers acting for Marex Capital Markets Inc, formerly known as ED & F Man Capital Markets Inc (**MAREX**).  The correspondence asserts our rights as Joint Liquidators and requests account information relating to the Robinhood shares.  In response, Ms Doherty, a lawyer acting for MAREX, acknowledges the appointment order, mentions the BlockFi proceedings, confirms that they are holding the Robinhood shares and that the Emergent account was frozen, and seeks confirmation from Morgan Lewis if they intend to appear in the BlockFi adversary proceedings on behalf of the of the Provisional Liquidators.  I also enclose the letter received from Corporate Trust Services dated 7 December 2022, who also reacted, following our appointment as Provisional Liquidators, and who finally provided certain corporate documents following our request as Provisional Liquidators, but who

did not do so when we sought the information as receivers. I enclose a copy of that correspondence at pages **525 to 553 of exhibit AB-3**.

26. Our work as Provisional Liquidators needs to continue at pace. If we are hindered or stopped from doing our work, then in my view it is very likely that both assets and key pieces of evidence may be lost to Emergent, and we will find it more difficult to deal with the creditors' claims. For instance, one of the key documents caches that we need to recover are the electronic records of Emergent (such as they may exist), including emails, transactional records, telephone records etc. If there is a stay of our appointment then it is very possible that these records may be lost or deleted, which is potentially very detrimental to creditors of Emergent.

27. As set out below in detail at paragraphs 29 to 35, the most urgent task appears to be the defence (if appropriate) of the BlockFi action, in which BlockFi are seeking to take control of Emergent's only identified asset. This has also been occupying a substantial amount of our time, and we have been liaising extensively with counsel in this regard. If a defence is to be filed, I understand it is due by 29 December 2022, and it is therefore imperative that Emergent (and we as Provisional Liquidators) can participate in those adversary proceedings so that we can take such steps and deploy all the defences appropriately available to Emergent to protect the asset (should we be advised to do so).

28. Without waiving privilege, we have been advised that, as Antiguan Provisional Liquidators, we are in the best position to secure and protect that asset for the creditors of Emergent. Conversely, SBF is currently in prison, and has not provided details of the guarantee and pledge, still less the assets and liabilities of Emergent.

**Potential Harm to Creditors if the Stay is Granted and Control Handed Back to SBF**

29. If the Provisional Liquidators are not permitted, on behalf of Emergent, to defend the BlockFi action (if so advised), using the full powers granted in the Provisional Liquidation Order dated 5 December, then there is a real risk that a substantial asset, which is perhaps its only asset, will be lost to Emergent and its creditors.

30. That cannot be right or fair.  As set out in my First Affidavit, it is crucial that Emergent be permitted to engage with and respond to BlockFi, see paragraph 31 b, page **11 of exhibit AB-3**.  The Court can then have confidence that – without BlockFi suffering any relevant prejudice – Emergent's interests will be properly protected for the benefit of its creditors.  By way of update, Morgan Lewis, have informed me that the hearing initially scheduled for 5 January 2023 has been moved to 9 January 2023; however the deadline to file a Defence remains 29 December 2022.

31. In its action against Emergent and MAREX, BlockFi asserts that it is the owner of the Robinhood shares and seeks to have those shares turned over to it, in addition to asserting a claim for money damages in an unspecified amount.  BlockFi's Debtors Adversary Complaint against Emergent is exhibited at pages **369 to 379 of exhibit AB-3.**  All of BlockFi's claims are based on the allegation that on 9 November 2022, as set out on pages **372 to 374 of exhibit AB-3**, Emergent entered into a certain agreement with BlockFi in which Emergent, among other things, purportedly (i) guaranteed certain loan repayment obligations of Alameda to BlockFi, (ii) pledged the shares as security for such guarantee obligations, (iii) promised to deliver the shares to BlockFi, and (iv) granted BlockFi a power of attorney to act as Emergent's counsel to enforce the alleged pledge agreement.  BlockFi asserts that the agreement was made in consideration for BlockFi entering into a certain Amendment & Forbearance Agreement (the **"Forbearance Agreement"**), dated 9 November 2022, by which BlockFi agreed to forbear from exercising certain rights and remedies under various loan documents with Alameda.  A copy of the Complaint is exhibited at pages **328 to 365 of exhibit AB-3**.

32. BlockFi further alleges (at page **373 of exhibit AB-3)** that, on 10 November 2022 (the very next day), the forbearance period ended as Alameda defaulted under the Forbearance Agreement and Emergent failed both to deliver the shares and to honour its alleged guarantee of Alameda's obligations.  BlockFi seeks to have the Robinhood shares turned over to its bankruptcy estate, as well as damages, and a declaratory judgment that it has a first priority security interest in the Robinhood shares.

33. BlockFi has also suggested to our US counsel, Morgan Lewis, that the appointment of receivers and of the Provisional Liquidators in Antigua "violates the automatic bankruptcy stay" that became effective upon BlockFi's US bankruptcy filing.  That automatic stay, which arises under US

Bankruptcy Code section 362, prohibits, among other things, "any act to obtain possession of property of the estate or to exercise control over property of the estate" of the bankrupt debtor. The contention of BlockFi is, I believe, both factually and legally incorrect. The receivership order made by Justice Williams was made on 18 November 2022. BlockFi filed for Chapter 11 bankruptcy on 28 November 2022, at a time when the control of Emergent (and its assets) was already vested under the Antiguan court order.

34. Notwithstanding this, however, I confirm that the Provisional Liquidators have made no determinations as to BlockFi's legal rights, and that no assets will be distributed to any creditor before BlockFi has had an opportunity to have its rights heard and determined under applicable law. At the moment, however, we do not have sufficient information about the facts said to underpin underlying BlockFi's claim. We note, however, that the alleged pledge agreement (which Emergent is said to have guaranteed) is said to have been formed on November 9 and accelerated on November 10, the day before the pledgor filed for Chapter 11 bankruptcy protection on November 11. All this happened at a time when FTX customers were unable to withdraw their own assets from the exchange, and there was no apparent corporate benefit to Emergent from this turn of events. Indeed, the timing of the alleged contracts suggests that they were designed to transfer assets out of the estates of various companies (including Emergent) on the eve of planned events of insolvency, to the detriment of the creditors of the various companies. The Court will obviously expect its officers to examine very carefully the circumstances in which these extraordinary transactions are said to have occurred.

35. Pending further information, we have instructed US counsel, Morgan Lewis, to take steps to defend the BlockFi action. Morgan Lewis has filed its appearance in the action on behalf of Emergent and is preparing initial pleadings and motion papers to defend the case. I understand that Emergent must file papers in the BlockFi action by 29 December 2022, both to answer BlockFi's complaint and to oppose BlockFi's motion to compel the turnover of the Robinhood shares, on which there is a hearing scheduled for 9 January 2023. Quite aside that no such restriction would appear to be justified for any other reason, any restriction on our authority, as Provisional Liquidators, to act in the best interests of Emergent in the near future to secure its assets would impair Emergent's ability to defend against BlockFi's attempt to seize Emergent's identified assets, apparently worth hundreds of millions of dollars, without having any chance to

investigate Emergent's recent history, review any corporate or financial records of Emergent, or determine the rights and obligations of Emergent vis-à-vis both BlockFi and the potentially wide body of unsecured creditors of Emergent.  Because the Robinhood shares are located in New York and claims to own the Robinhood shares are being asserted by chapter 11 debtors in proceedings in New Jersey and Delaware, it is essential that the Provisional Liquidators have continued and unfettered ability to engage lawyers and urgently to take such steps as they may be advised are appropriate in order to preserve the assets of Emergent.  I confirm that such preservative steps will not impair the ability of BlockFi, nor of other creditors of any class, to have their rights heard and determined.

36.  If a stay was granted by the Court, on the other hand, there is a real and obvious risk that Emergent would not be take such steps, that they would be unable appropriately to engage in the US proceedings instigated by BlockFi, and the asset risks being lost.  Currently Emergent, under the powers of the Provisional Liquidators, has the power to engage in those proceedings and (subject to the production of BlockFi of information that justifies its claims) take steps to defend the BlockFi proceedings, including the apparent defence that the alleged pledge and/or the alleged guarantee were in fact designed to convey assets in fraud of creditors.  Whilst the Provisional Liquidators have reached no conclusions, without waiving privilege we are informed that such arguments are eminently available to Emergent given the timing and nature of the alleged transactions.  In the meantime, it is essential that we can continue, unhindered, to gather information and documents concerning the assets of Emergent, so that these assets may be secured for the benefit of creditors.

37.  To deny Emergent the right to defend claims against its assets running to hundreds of millions of dollars, against the backdrop of allegations of very serious frauds and in circumstances where the claims themselves appear to be (at best) tenuous, and indeed potentially grounded in the same factual matrix as the frauds in respect of which SBF has now been charged and arrested, would be an extraordinary and unjustified step, to the obvious detriment of Emergent's creditors.

38.  Furthermore, the defence of BlockFi's claims arising from the alleged pledge and guarantee can obviously not be placed in the hands of SBF.  Quite aside from the obvious difficulties he would face in conducting any such defence (if indeed he were able to do so at all) from the confines of

his prison cell in the Bahamas, he would appear to be entirely conflicted in running the defence of fraudulent conveyance if and to the extent that it was a fraud in which he and his associates had connived, and (in any event) at constant risk of incriminating himself in relation to the wider criminal allegations of fraud which he is currently facing. Given the apparent insolvent status of Emergent, the Court will have primary regard to the interests of its actual and putative creditors, and it is obvious that these interests, and the interests and motivations of SBF, are (to put it mildly) unaligned. The only way the creditors' interests can be protected is if the provisional liquidation continues, and the Provisional Liquidators retain the unfettered ability to take such steps as they may be advised are appropriate to defend the BlockFi claim – steps it is wholly unrealistic to expect SBF personally to take. On the other hand, if the BlockFi claims in respect of the alleged pledge and guarantee are not defended, there is a strong possibility that the Robinhood shares will be lost to Emergent's creditors, and that would be a loss to Emergent's estate of hundreds of millions of US dollars.

**(4)  No real harm to SBF if stay refused**

39. It is hard to see what conceivable prejudice SBF would suffer if his application to stay the provisional liquidation order is refused. Nor would BlockFi suffer any relevant prejudice. The Robinhood shares are claimed by BlockFi and others but are legally held by Emergent. The issue of the validity of BlockFi's purported security interest in the Robinhood shares (and/or any other asset of Emergent) will need to be resolved but, whatever the outcome of any determination of this issue, SBF is unlikely to benefit in any material respect. If it is determined that BlockFi's claim is valid, Emergent will lose what appears to be, on SBF's apparent case, its only asset.

40. If, on the other hand, it transpires that BlockFi does not have an admissible claim to Emergent's assets and/or that its alleged interests are void or avoidable, the Robinhood shares will belong to Emergent. In such a situation, it is unlikely the Emergent shareholders would benefit in any way given the mounting claims against Emergent by the actual and contingent creditors of Emergent, SBF, FTX and Alameda. Even in the unlikely event the shareholders retained an interest, moreover, any interest SBF had in the assets of Emergent *qua* shareholder would appear likely to become the target by the United States Department of Justice, which is seeking forfeiture of the proceeds of his alleged offences or of his own assets up to that same amount: see pages **427 to**

**429 of exhibit AB-3**.  Consequently, it can be said with some confidence that, even if the BlockFi share pledge is found to be invalid, it is implausible that at some point in the future SBF might be entitled to receive a dividend distribution from Emergent.  Further, if SBF is convicted on the SEC indictment, he would almost certainly have to forfeit the gains that he has made through his fraudulent activities, which apparently include his shareholding in Emergent.  Should the Court retain any lingering doubt as to SBF's interests, it will note that, in SBF's Affirmation, when reviewed against the SEC and CFTC Complaints, the way that he characterises and describes the capitalisation of Emergent appears to be remarkably close to the way in which the allegations of fraud are now pleaded against him.

41. Finally, as noted above, SBF's ability himself to conduct in the meantime any management or direction of Emergent from his prison cell must be discounted as unrealistic.  SBF was the sole director and principal shareholder of Emergent.  No other senior executive has been identified from Emergent's internal records that we have reviewed so far.  On 15 December 2022 a letter was written to SBF's lawyers asking how, in practical terms, SBF could contribute to the management of Emergent given his current circumstances.  I enclose a copy of that letter at pages **554 to 555 of exhibit AB-3**.  To date, no response has been received.

**(5) SBF's counsel's unwarranted criticism of the grant of the Orders of 5 December 2022 and 18 November 2022**

**Order Rightly Granted in the PL Proceedings**

42. From the Application and remarks made by counsel for SBF in Court on 14 December 2022, it seems that the application for a stay of the Order dated 5 December 2022 is almost entirely based upon the suggestion that the Order dated 5 December 2022 in the PL Proceedings was wrongly made because it is said to be derivative of the Order in the Receivership Proceedings dated 18 November 2022, which is in turn alleged to have been wrongly made or obtained.

43. Although I understand that some of these matters will be addressed further in the skeleton submissions and oral argument in Court on 23 December 2022, there is no proper foundation to any of these criticisms.

18

44. First, the Order made on 5 December 2022 was properly made on the grounds set out in my First Affidavit.   It was and remains both necessary and desirable in the interests of protection of the assets of Emergent, and for the benefit of all its creditors, to appoint provisional liquidators pending the hearing of the Petition to wind up Emergent.

45. An order for provisional liquidation is justified when it is necessary for provisional liquidators to take urgent steps to protect the assets of the company pending the hearing of a Petition. Emergent is apparently insolvent (on any number of bases), and it is appropriate that a class action is undertaken in the interest of all its creditors.   Furthermore, provisional liquidators have remedies available to them, and abilities to act internationally (because of the nature of a class action insolvency proceeding c.f a receivership proceeding) that are typically unavailable to receivers.  Although the remedy is undoubtedly a drastic one, the courts of the Eastern Caribbean routinely appoint provisional liquidators where the assets of a company are in jeopardy and/or serious allegations of fraud are made concerning the management and affairs of a company, both of which features are present in the case of Emergent.

46. For the reasons outlined above, urgent steps need to be taken to protect Emergent's shareholding in Robinhood, which is the subject of proceedings brought in New Jersey.  As has already been made clear, the next hearing in New Jersey is scheduled for 9 January 2023.  I understand from my US counsel that the nature of this hearing is to determine BlockFi's "Turnover Motion" (see **pages 380 – 383 of exhibit AB-3**), and that, in order to participate, Emergent needs to have filed a Defence.

47. All this must plainly be done before there can be any disposal of SBF's opposition to the Petition itself.

48. Furthermore, there is every reason for the Court to conclude that the Petition has been properly presented.  By the Petition, the appointment of liquidators to Emergent is sought on the grounds that: (a)  Emergent's business and affairs have been carried on or conducted in a manner that is oppressive or unfairly prejudicial to, and which disregards the interests of its creditors, such that liquidators should be appointed under s.301(1)(b) of the International Business Corporations Act (the "**Act**"); (b) it is just and equitable for liquidators to be appointed under s.301(1)(b) of the Act;

and/or (c) pursuant to the Court's inherent jurisdiction to wind up a company where the circumstances are so plain, and the inevitability, appropriateness and urgency of a winding up order are so clear, that it would be a denial of justice, and a waste of time and money, for the Court to refuse to make an order there and then.  Importantly, the ability of the Court to order the winding up of Emergent does not depend on the receivers being in office since, in the circumstances that have arisen, it additionally has both the jurisdiction and power to order the winding up of Emergent of its own motion.

49. No evidence has been adduced to indicate that any of the above grounds are unfounded.  If, moreover, there was a valid and binding pledge (by way of guarantee or otherwise) of the Robinhood shares two days before the bankruptcy of FTX, then there would appear to be little by way of assets in the hands of Emergent to meet all its creditors: SBF has not identified any such assets, although I daresay there may be potential choses in action which may need to be considered.  This would add and not detract from the grounds of the Petition, not least because nobody appears now to be contending that either (i) the company is in fact solvent, or (ii) the company's former director is either in any position to manage the company or a suitable person to do so.  While I appreciate that the criminal charges are yet to be tested, it appears to be SBF's position that he was overwhelmed by issues arising from his own inability to manage the entities of which he was a fiduciary.

50. I would add that removing myself and Toni Shukla as Provisional Liquidators and replacing us with different fiduciaries would in addition have the further effect of causing yet further monies to expended in the gathering in and securing of assets, and could seriously prejudice Emergent given the very short amount of time available to understand the issues that have arisen and prepare and file a defence to the BlockFi claim.  There is no suggestion (of which I am aware) that we have acted in any way improperly in seeking to secure Emergent's assets and in seeking to defend the New Jersey proceedings.  I estimate that we have spent (as Provisional Liquidators) circa 150 hours understanding and dealing with these issues so far, and our wider team of professional advisors has worked hard and to a very tight timeline to understand the issues and take steps to protect the interests of Emergent.  We are officers of this Court, and we remain under this Court's supervision.  If at any stage any interested person was concerned about the propriety or legitimacy of any work we have undertaken, then they are of course at liberty to raise such issues

with the Provisional Liquidators and/or to make an appropriate application to this Court, to whom we are always accountable.  No such suggestion or concern has been expressed.

**Order Rightly Granted in the Receivership Proceedings**

51. I understand that SBF's counsel has made several unspecified criticisms as to the obtaining of the Orders on 18 November 2022.  I believe these criticisms are unfounded, but I would note that they are not in fact the subject of the Application.  The Receivership Proceedings have been stayed.  Moreover, it is doubtful that SBF has complied with paragraphs 10 and 11 of the Order dated 18 November 2022 in any event, and it is therefore unclear whether he would have any ability to move any application to lift the stay (without demonstrating compliance with those paragraphs), but that is beside the point: no such application has been made.

52. Nevertheless, I would like briefly to address SBF's counsel's criticism made in Court on 14 December 2022 that there was allegedly culpable material non-disclosure on 18 November 2022, and that Mr Shimon allegedly had no valid cause of action against Emergent.

53. As to the allegation of non-disclosure, it would appear from paragraphs [32] to [37] of the submissions filed by SBF's counsel on 12 December 2022 (exhibited at pages **556 to 574, and paragraphs 32 to 37 are at pages 568 to 570 of Exhibit AB-3)** that the complaint is that Mr Shimon's counsel failed to bring paragraph 30(iii) of Mr Shimon's affidavit (in particular, the statement: "*I know nothing about the source of the funds to acquire the 7.6% interest in Robinhood beyond the fact that it was allegedly 'working capital'*") expressly to the attention of the Judge at the hearing on 14 December 2022.  It is said this statement was highly material as it allegedly amounted to an admission that Mr Shimon had inadequate evidence to support his claim and, more significantly, had it been brought to the direct attention of the Judge, he would have concluded that Mr Shimon was unable to overcome the threshold hurdle of demonstrating a good arguable case for the purpose of obtaining injunctive relief.

54. Although it will be a matter for legal submissions in due course, it seems to me that this complaint is misconceived because it is predicated on the erroneous assumption that Mr Shimon could only succeed on his claim (or demonstrate a good arguable case to the required standard for injunctive relief) if he had direct knowledge of the source of the funds to acquire the Robinhood shares.  I

21

do not accept that is correct given the nature of the claims being advanced by Mr Shimon, which is essentially that his assets were stolen by SBF and others and are traceable to Emergent via Alameda.  Furthermore, it was a reasonable inference – which appears to be entirely borne out by the subsequent revelations - that Emergent was fixed with the same knowledge of the fraud as its former director SBF, and to that degree could be said to have participated in it with the same degree of culpability as SBF himself.

55. I politely suggest that this is amply sufficient to dispose of the Application for present purposes. If and to the extent SBF wishes to advance any such allegations further, however, I would contend that these should only be argued (a) after he has cured his breaches of the Order dated 18 November 2022; (b) after he has demonstrated he has standing to advance such a case in relation to Emergent;  (c) after giving notice to the Provisional Liquidators of Emergent so that Emergent can respond to it; and (d) in the proper forum and in the relevant proceedings, namely after he has obtained leave of the Court (in the PL Proceedings, in which the stay was ordered) to lift the stay in the Receivership Proceedings, and in a subsequent application in the Receivership Proceedings.  It does not arise in the Application before the Court on 23 December 2022.

56. As to the correctness of the Order made on 18 November 2022, the same remarks apply.  The cause of action against Emergent has been misstated and mischaracterised by SBF in the papers filed by his counsel in the Receivership Proceedings.

57. Mr Shimon's case, in summary, is that he placed *his* assets (i.e., Ethereum assets) with FTX.  His assets were taken unlawfully by SBF as part of a scheme to defraud Mr Shimon and, it is reasonably to be inferred, either they or their proceeds ended up in Emergent: see the affirmation of Yonaton Ben Shimon dated 17 November 2022 (paragraph 28, at page **36 of Exhibit AB-3**). Prior to the filing of the SEC Complaint and the unsealing of the criminal indictment on 12 December 2022, some of the steps in the chain may have been opaque.  Hence the remarks made in his Affidavit in the Receivership Proceedings.  The information gaps are now being filled, and they sadly appear to confirm Mr Shimon's worst fears, namely that he has been the victim of a massive fraud perpetrated by SBF and others.  It is entirely to Mr Shimon's credit (i) that he immediately took the steps to act to secure assets when he did, and (ii) that he recognises the inevitability that there will be others (in all likelihood thousands of others) potentially in his

position, and that the preservative steps he has taken in respect of Emergent should proceed as a class action on behalf of all the creditors of Emergent.

58. Without wishing to be repetitive, SBF appears to have taken assets unlawfully from FTX's customers and transferred them to Alameda, a vehicle apparently owned by and controlled by SBF.  According to SBF's own testimony paragraphs 9 to 11 of the Affirmation of SBF dated 11 December 2022 filed in the Receivership Proceedings (at pages **500 to 501 of exhibit AB-3)** Alameda transferred monies to SBF.  SBF in turn transferred monies to Emergent.

59. There are two further matters to note.  First, SBF's case is that he injected what he contends was his own capital in Emergent which was then used to purchase the Robinhood shares (see paragraph 9 of the Affirmation of SBF dated 11 December 2022 filed in the Receivership Proceedings, at page **500 of exhibit AB-3)**.  However, there is no evidence whatsoever of any independent source of wealth of SBF of the magnitude that was transferred into Emergent on 30 April 2022 and 15 May 2022.  Indeed, if such independent wealth had existed, it would beg the question why he would conceivably need or want to "borrow" one billion dollars from Alameda.  Secondly, the suggestion that there was no such independent wealth is reinforced strongly by the both the SEC and CFTC Complaints and the SEC Indictment, which allege that, systematically, SBF had been unlawfully and dishonestly looting the assets of FTX's customers for his own use.  Although we are yet to receive and review his evidence, no documentation has been provided by SBF to us to demonstrate any source of funds other than what SBF had derived from the fraudulent conduct described by the SEC and CFTC.  Thirdly, there is no evidence that we have seen of a trading business of Emergent, let alone in April 2022, other than as a recipient of third-party funds to purchase and hold a valuable shareholding.

60. As regards the strength of the case against SBF, this is not actually relevant for the purposes of the Application to be heard on 23 December 2022, but it is pertinent to note the conclusions in the SEC Complaint filed on 12 December 2022 that SBF  "directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives" (see page **432 of exhibit AB-3)**, and also the CFTC Complaint filed on 13 December 2022 that SBF and other FTX executives "took hundreds of millions of dollars in poorly documented "loans" from Alameda that they used to purchase luxury

real estate and property, making political donations, and for other unauthorized uses" and "misappropriated customer funds for their own use and benefit" (see page **460 of exhibit AB-3**).

In addition, I make these observations from the SEC and the CTFC Complaints: -

SEC Complaint (pages **430 to 457 of exhibit AB-3**).

Para 18.  "Bankman-Fried remained the ultimate decision-maker at Alameda, even after Ellison and Trabusco became co-CEOs in or around October 2021.  Bankman-Fried directed investment and operational decisions, frequently communicated with Alameda employees, and had full access to Alameda's records and databases."  Page **435 of exhibit AB-3**.

Para 21: "Bankman-Fried was the ultimate decision-maker at FTX from the platform's inception in or around May 2019 until he resigned as CEO on or about November 11, 2022."  Page **436 of exhibit AB-3**.

Para 26: "From the start, contrary to what FTX investors and trading customers were told, Bankman-Fried continually diverted FTX customer funds to Alameda and then used those funds to continue to grow his empire, using billions of dollars to make undisclosed private investments, political contributions, and real estate purchases."  Page **437 of exhibit AB-3**.

Para 47: "Throughout the Relevant Period, Bankman-Fried was directly involved in soliciting potential investors in FTX.  Bankman-Fried met, and otherwise communicated, with FTX investors including investors based in the United States.  Along with another FTX employee, Bankman-Fried was the point-person for investor relations at FTX."  Page **443 of exhibit AB-3**.

"Relevant Period" is defined as May 2019 until 11 November 2022.  Page **436 of exhibit AB-3**.

CFTC Complaint (pages **458 to 497 of exhibit AB-3**).

Para 4: "Beginning no later than May 2019 and continuing through at least November 11, 2022 ("the Relevant Period"), Bankman-Fried owned, operated, and/or controlled FTX Trading, along

with its numerous subsidiaries and related entities around the world, all doing business as FTX.com.  He also owned, operated, and/or controlled Alameda and its various subsidiaries and related entities, as well as numerous other related entities in the digital asset industry."  Page **459 of exhibit AB-3**.

Para 19: "During the Relevant Period, FTX Trading, Alameda Research, together with other entities under the majority ownership and control of Bankman-Fried operated as a single, integrated common enterprise under the sole ultimate authority of Bankman-Fried as their mutual owner. They are referred to collectively in this complaint as the "FTX Enterprise."   Bankman-Fried regularly exercised control over each of the component entities of the FTX Enterprise throughout the Relevant Period, including regularly serving as signatory on core corporate agreement, as well as corporate bank accounts and trading accounts, many of which we held in the U.S."  Pages **462 and 463 of exhibit AB-3**.

Para 29: "Even after stepping down as CEO of Alameda, Bankman-Fried continued to maintain control over Alameda.  For example, Bankman-Fried remained a signatory on Alameda Research's bank accounts and an authorized trader for Alameda's accounts with CFTC registered futures commission merchants.  Bankman-Fried also maintained direct decision-making authority over all of Alameda's major trading, investment, and financial decisions."  Page **465 of exhibit AB-3**.

61. I should re-emphasise that we are observing a picture that is fast-evolving and necessarily incomplete, but everything seen to date points to the same conclusion: a massive, extensive fraud orchestrated and perpetrated by SBF over the course of several years, including the time of Mr Shimon's use of the FTX platform and loss of his assets in the fraud.

62. In these circumstances it is imperative to safeguard the assets of Emergent, and it would be obviously inappropriate to allow SBF to be in control of Emergent, even for the short period before the hearing of the Petition.

**Provisional Liquidators are fit and proper persons**

63. The Provisional Liquidators are the officers of this Court.  We are both insolvency practitioners and directors of a respected international professional services provider, who are both personally regulated in the Caribbean, and who have significant experience in large scale, cross-border engagements.  Furthermore, the legal professionals we have engaged since our appointment are practitioners from highly respected law firms with, between them, decades of directly relevant experience of the use of complex offshore structures where there are allegations of fraud and misappropriation of assets.

64. I believe that our appointment and associated powers are crucial in this matter to safeguard the assets of Emergent for its creditors.  Given the extraordinary allegations that have, since our appointment, now been made against SBF in multiple fora, by a variety of agencies and by highly experienced professionals, the consequence that is apparently sought by SBF in his application to stay the provisional liquidation order, namely the return of Emergent to his control, simply does not bear countenancing.

**Conclusion**

65. For the reasons set out in this Affidavit the Court is invited to dismiss the Application.

SWORN by the within named )

ANGELA BARKHOUSE )

)

This 19th day of December 2022 )

At *New York, NY  USA.*

BEFORE ME:

*Deborah Persaud*

DEBORAH PERSAUD
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01PE6204002
Qualified in Queens County
Commission Expires April 13, 2025

26

# EXHIBIT B-19

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-19361-MBK |
| | . | |
| BLOCKFI INC., et al., | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
|       Debtors. | . | |
| | . | |
| . . . . . . . . . . . .. | | |
| BLOCKFI INC., et al., | . | Adversary No. 22-01382-MBK |
| | . | |
|       Plaintiffs, | . | |
| | . | |
|    vs. | . | |
| | . | |
| EMERGENT FIDELITY | . | |
| TECHNOLOGIES LTD., et al.. | | |
| | . | |
|       Defendants. | . | December 28, 2022 |
| . . . . . . . . . . . . . .. | | 1:00 p.m. |

TRANSCRIPT OF HEARING ON THE EMERGENT MOTION SEEKING
AN EXTENSION OF TIME WITH RESPECT TO ANSWERING; CONTINUING THE
JANUARY 9 TURNOVER COMPLAINT

BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:        Cole Schotz P.C.
                       By:  MICHAEL D. SIROTA, ESQ.
                       25 Main Street
                       Hackensack, NJ 07601

                       Haynes and Boone
                       By:  RICHARD D. ANIGIAN, ESQ.
                       2323 Victory Avenue, Suite 700
                       Dallas, TX 75219

Audio Operator         Luz Di Dolci

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES (Cont'd):

For Samuel Bankman-          Montgomery McCracken, LLP
Fried:                      By:  DAVID M. BANKER, ESQ.
                                 EDWARD L. SCHNITZER, ESQ.
                            437 Madison Avenue, 24th Floor
                            New York, NY 10022

For the  Liquidators        Morgan, Lewis & Bockius, LLP
of Emergent Fidelity        By:  MATTHEW C. ZIEGLER, ESQ.
Technologies, Ltd.:         1701 Market Street
                            Philadelphia, PA 19103

                            Morgan, Lewis & Bockius, LLP
                            By:  JOSHUA DORCHAK, ESQ.
                            101 Park Avenue
                            New York, NY 10178

                            Morgan, Lewis & Bockius, LLP
                            By:  DAVID K. SHIM, ESQ.
                            One State Street
                            Hartford, CT 37753

For Merricks Capital        Mintz Levin
Market:                     By:  KAITLIN R. WALSH, ESQ.
                                 THERESE M. DOHERTY, ESQ.
                            919 Third Avenue
                            New York, NY 10022

                            - - -

1          THE COURT:  Good afternoon, everyone.  This is Judge

2     Kaplan.  Thank you for appearing remotely through Zoom.  Let me

3     get myself in order.  All right.

4          I recognize many of the names that are appearing this

5     afternoon.  I'll ask for appearances when you're in a position

6     to speak or address the Court rather than at the outset.  I

7     will follow the usual format.  If you wish to be heard, please

8     use the hand raise function, if possible, otherwise, just wave.

9     We'll make sure we get you.

10          And let me turn to counsel for the JP&Ls.  It's their

11     emergent motion seeking an extension of time with respect to

12     answering and also continuing the January 9th turnover

13     complaint.  This obviously is in the BlockFi, Inc. bankruptcy

14     proceeding.  Let me hear from counsel and let me have

15     appearances on behalf of the JPLs.

16          MR. ZIEGLER:  Good afternoon, Your Honor.  Matthew

17     Ziegler of Morgan, Lewis and Bockius for the liquidators of

18     Emergent Fidelity Technologies, Limited.  The liquidators are

19     Angela Barkhouse and Toni Shukla.  I'm joined today by my

20     colleagues, Josh Dorchak and David Shim.

21          THE COURT:  All right.  Welcome.

22          MR. ZIEGLER:  Thank you, Your Honor.

23          Your Honor, would you like me to get started or are

24     you looking to get other appearances?

25          THE COURT:  No, I'll take appearances as we go along.

1          MR. ZIEGLER:  Great.

2          THE COURT:  And feel free to -- I have obviously read

3  the pleadings that have been filed, including, I believe,

4  BlockFi's response that was filed, I believe, earlier today.

5  So, let's just get into the heart of it if we can.

6          MR. ZIEGLER:  Thank you, Your Honor.

7          I'd like to start by introducing my clients.  There

8  are a couple of things that I need to address in what BlockFi

9  filed earlier today as well as a couple of updates from the

10 Antiguan Court as of just an hour ago when a hearing concluded

11 there, and then I'd like to talk a little bit about the

12 Turnover Motion.

13         I appreciate that BlockFi has stated in its papers

14 that they're not contesting our request for an extension in

15 respect of the complaint but only in respect of the turnover

16 motion, so I'd like to discuss why we still think that's

17 important and why an extension is warranted, and I'll try to be

18 efficient.

19         Your Honor, our clients are independent, court-

20 appointed fiduciaries and they are officers of the Antiguan

21 Court.  Just a little bit of background.  They were originally

22 appointed as receivers on the petition of a purported

23 petitioning creditor, however, once the receivers were in place

24 and got a look at the company, they determined that it needed

25 to be placed into provisional liquidation, and so in their

5

1  capacity as receivers, they petitioned the Antiguan Court

2  independently for the company to be wound up.  The Antiguan

3  Court agreed with their impressions and appointed them as

4  liquidators.

5       So, our clients have been appointed both as receivers

6  and as liquidators of the company.  The receivership is

7  essentially superceded by or stayed in light of the subsequent

8  liquidator appointment.  Your Honor, Mr. Bankman-Fried has

9  challenged the liquidators' appointment as well as the

10 receivership in Antigua and has sought to have Emergent and its

11 assets returned to his own control.

12      Most recently he sought to stay the provisional

13 liquidation order under which the liquidators have their

14 powers.  Earlier today, the Antiguan Court, having heard

15 evidence on the matter, agreed that Emergent should remain in

16 provisional liquidation under the liquidators' control pending

17 further notice.  So, the court rejected Mr. Bankman-Fried's

18 application to stay that proceeding just about an hour ago.

19      Your Honor, in response BlockFi just filed with this

20 Court -- it says that the provisional liquidation is an attempt

21 to bootstrap a -- their words, not mine -- a flawed

22 receivership proceeding into something more legitimate and that

23 the liquidators are purporting act on behalf of unidentified

24 creditors.

25      I want to clear this up, Your Honor.  Both of those

1  things are untrue.  The Antiguan Court independently evaluated

2  the liquidation petition and entered an order appointing the

3  liquidators.  It reaffirmed that order this morning on notice

4  to all parties, including BlockFi, and whatever BlockFi may

5  think of its merits, the order is valid and in effect.  And

6  BlockFi did confirm at the Antiguan hearing that happened this

7  morning that it does intend to raise further challenges to the

8  liquidation and has asked for a trial setting in Antigua for

9  those challenges to be heard, and we expect that that will take

10  place over the next few weeks.

11        I want to explain, Your Honor, what our clients'

12  goals are, because I think there's a lot of noise around that.

13  Our clients' only goals are to protect Emergent's assets and to

14  figure who should ultimately get the benefit of those assets.

15  Their fiduciary duties are to the Emergent estate and all of

16  its creditors, whoever those creditors may be.  Might be

17  BlockFi.  It might be FTX or Alameda.  It might be someone

18  else.

19        The liquidators are agnostic.  They don't want to

20  keep the assets for themselves.  They want to ensure that the

21  process for determining the rights to the assets is fair.  You

22  don't want one purported creditor to get any advantage over

23  others, and, Your Honor, they don't want to waste a lot of

24  money getting to that point defending claims on multiple fronts

25  that may be able to get resolved or at least narrowed with the

1  benefit of timing and (indiscernible).

2         Let's talk about what some of those issues are and

3  why they're relevant to the turnover motion.  And I want to be

4  clear, Your Honor, I'm not here to argue the merits of the

5  turnover motion.  When we are required to do so, we will do

6  that, but I do want to give the Court some insight into some of

7  the funding issues that we're evaluating that are relevant to

8  the turnover motion and I think relevant to our request for

9  more time.

10         The first and most obvious question is who owns the

11  shares.  BlockFi characterizes the turnover motion as a sort of

12  simple procedural matter, but they're trying to make an implied

13  adjudication that the shares are property of  BlockFi's estate.

14  That's the premise of a Section 542 or a 543 action.  This is

15  property of the estate, and it needs to be turned over.  And,

16  simply put, Your Honor, we need more time to take a position on

17  this.  This is the key question that everybody is fighting over

18  in at least three different jurisdictions now.

19         Your Honor, another issue is the question of

20  jurisdiction.  The apparent argument for this Court's

21  jurisdiction over Emergent and the shares is the pledge

22  agreement which appears to have been signed by Caroline

23  Ellison.  We have serious concerns about whether Ms. Ellison

24  was authorized in any way to act for Emergent.  The records we

25  have give no indication that she was an authorized signatory of

1  the company, and she also signed the agreement as, quote, co-

2  CEO.  If you look at the company's bylaws, we don't see any

3  recognition in the bylaws that there is an office of co-CEO at

4  that company.

5          I want to be clear I'm not trying to argue the merits

6  here, but this is a threshold jurisdictional question for us.

7  If Emergent never validly signed the pledge agreement, then

8  there's no colorable argument that Emergent submitted itself or

9  its assets to dispute resolution in the U.S.  Ultimately, we

10 may conclude that U.S. jurisdiction is proper or appropriate to

11 submit to voluntarily, but at present, this question is to be

12 evaluated carefully and in line with our clients' fiduciary

13 duties.  What BlockFi is seeking with the turnover motion is to

14 preordain, in some respects, this Court's jurisdiction to hear

15 that dispute as well.

16          A third issue, Your Honor, and the last one I'll

17 touch on here, is the Antiguan automatic stay which is in

18 effect right now and which was reaffirmed this morning.  Now,

19 BlockFi says in Paragraph 17 of their response that they filed

20 with Your Honor today that this automatic stay, by its terms,

21 does not apply outside of Antigua.  That's a mistake.  BlockFi

22 is referring in their papers to the original receivership order

23 not the provisional liquidation order.

24          The receivership order -- and again, Your Honor, this

25 is Paragraph 17 of their filing today.  The receivership order

1  has been superceded by the provisional liquidation order.  That

2  provisional liquidation order is exhibited at Dorchak Exhibit 2

3  with our papers.  And it says at Paragraph 8 that no suit,

4  action or other proceeding may be commenced or continued

5  against the respondent, being Emergent, or in respect to its

6  assets except with the leave of the Antiguan Court and subject

7  to such terms as the Antiguan Court may impose.

8          Now, Your Honor, I want to be clear, we are not

9  invoking that stay today, because we don't want to burden the

10  Court with resolving a potentially tough question of

11  international comity unnecessarily.  I'm raising it, because

12  this is another potential dispute that could be resolved or at

13  least narrowed with the benefit of some additional time and

14  some additional investigation.

15          Unfortunately, it seems that all of these questions

16  are things that we might have to raise before we can actually

17  respond to the turnover motion.  If we respond on the merits

18  for the turnover motion with what little information we have

19  today, BlockFi will likely argue that we've waived any argument

20  that the Court doesn't have jurisdiction.  And so, in order to

21  preserve an argument on jurisdiction, we would be forced to

22  moved to dismiss the case on the basis of lack of personal

23  jurisdiction potentially before we would be able to respond on

24  the merits.

25          We don't want to load up the Court with all of those

1 different disputes and ask Your Honor to adjudicate all of them

2 now.  We don't think it's necessary.  We think a better way is

3 for there to be a bit more time for all of us to try and come

4 up with some type of resolution, at least a protocol for how

5 the shares can be held and how these disputes can be

6 adjudicated in an orderly and efficient fashion that doesn't

7 favor any particular purported creditor.

8          So, the bottom line, Your Honor, BlockFi has not

9 shown that there's any risk to the shares so long as they

10 reside with Merricks.  BlockFi agrees with Merricks and said it

11 will hold its shares pending an order of a court of competent

12 jurisdiction.  By trying to force the turnover motion now

13 BlockFi seems to be seeking a predetermination of the shares or

14 estate property and that this is the right court to resolve

15 disputes over that.

16          If BlockFi is uncomfortable with Merricks as a

17 custodian of the shares, we'll willingly discuss with them a

18 consensual resolution that preserves everyone's right, but we

19 will not permit ourselves or other potential claimants to those

20 shares to be prejudiced on the question of who owns the shares

21 and which court has jurisdiction to resolve that question.

22          And that's all I have for you, Your Honor.  Happy to

23 answer any questions.

24          THE COURT:  All right.  Thank you.  If I have

25 questions, I'll come back at you all afterwards.

1          Let me at this point -- I see, Mr. Banker, you have a

2   raised hand.  Did you want to be heard?

3          MR. BANKER:  Good afternoon, Your Honor.  I'm David

4   Banker, Montgomery, McCracken, on behalf of Samuel Bankman-

5   Fried.  I'm here with my colleague, Edward Schnitzer, who will

6   be taking lead.  He was going to be submitting a pro hoc vice

7   application this afternoon but was unable to do it in light of

8   the emergent nature of this motion, but I would appreciate it

9   if Your Honor would consider Mr. Schnitzer's taking lead.

10          THE COURT:  I will.  Actually, I'd rather, if I may

11  -- again, maybe I should have taken appearances first just to

12  make it easier.  I'm going to come back to you all for Mr.

13  Fried.  I'd like to hear from BlockFi's counsel though, since

14  we're talking about adjourning their motion, and then I'll come

15  and also have anybody who wishes to be heard weigh in, if I

16  may?  So let me hear from -- and I'll certainly come back to

17  you all.  Let me hear from BlockFi's counsel.

18          MR. SIROTA:  Good afternoon, Your Honor.  Michael

19  Sirota, Cole Schotz, P.C., co-counsel to BlockFi, and with Your

20  Honor's permission, Mr. Anigian from Haynes and Boone will be

21  responding to the arguments just advanced.

22          THE COURT:  All right.  Thank you, Mr. Sirota.

23          Mr. Anigian?

24          MR. ANIGIAN:  Yes, Your Honor, thank you.  Rick

25  Anigian of Haynes and Boone on behalf of the three BlockFi

12

1 parties who filed the response in opposition to the motion for
2 extension.

3          First, as noted, the BlockFi parties do not have an
4 objection to an extension of the deadline to respond to the
5 adversary complaint or to the status conference on February
6 2nd.  What we do have an objection to is a 45-day extension of
7 the hearing on -- the January 9th hearing on the turnover
8 motion.  And the turnover motion seeks very limited relief.  It
9 merely seeks to have the approximate 56 million shares of
10 Robinhood stock that are owned in the name of Emergent
11 Technologies placed in the hands of a neutral third party
12 subject to further orders from this Court.

13          We believe this Court is in the best place to protect
14 the shares and to oversee the ultimate disposition of title and
15 rights to be shared between various claimants, which include
16 the BlockFi parties who, to date, are the only parties other
17 than Emergent who have any documented proof of ownership or
18 rights to the shares.  And that is as a result of a pledge
19 agreement that was dated November 9th then presented to the
20 Court as well as a filed UCC-1 financing statement that was
21 filed in Washington, D.C. in accordance with Article 9 of the
22 Uniform Commercial Code.

23          The other parties, including Mr. Shimon,  who was the
24 claimant upon which the original receivership in Antigua was
25 based, he is a -- he has a claim against FTX Trading.  It was

13

based on that potential claim against FTX Trading that the

original receivership in Antigua was granted.  While this fact

wasn't pointed out in Mr. Shimon's application, in Mr. Shimon's

affidavit, which is also before the Court, he said that he

knows nothing regarding the source of the funds used by

Emergent to acquire the 7.6 interest in the Robinhood shares.

And the receivership was based on a potential -- on a claim

that the Robinhood shares were possibly improperly -- were

acquired through improper diversion from funds invested by Mr.

Shimon and others in FTX Trading.

So, Mr. Shimon's claim against Emergent has to travel

not only from FTX Trading, then saying, okay, my funds want to

Alameda, then the funds were loaned by Alameda to Mr. Bankman-

Fried and Mr. Wang, who then contributed those funds to

capitalize Emergent, and those shares were then -- or those

funds were then used to buy the Robinhood shares.

So, at best, what Mr. Shimon has, or what the

receivership was based on, is a derivative claim that should be

brought in the FTX Trading bankruptcy and not before this

Court.  Based upon that receivership, the JPLs then seek

liquidation of Emergent as a whole in Antigua.  Now, Antigua

has, other than being the -- that is where Emergent was

incorporated, has no connection with this action.

There are no known creditors in Antigua who have

asserted some rights against Emergent, who have asserted any

1  rights to the Robinhood shares, who have otherwise appeared in

2  either the receivership or the JPL action in Antigua.

3  According to Mr. Bankman-Fried's affidavit, the shares were not

4  purchased from Antigua.  The shares, as we understand, are

5  located with Merricks in New York.

6          And so the original receivership action, that order

7  was dated November 18th, that does not provide for any relief

8  outside of Antigua with respect to the Robinhood shares at

9  issue in this action.  It was only after the adversary

10 proceeding and the turnover motion that were filed in this case

11 on November 28th that the December 5 liquidation order in

12 Antigua that was entered, and that's the order that Mr. Ziegler

13 mentioned has some stay component to it.

14          So, we believe that if there was a stay in place, the

15 first stay that was in place with respect to the Robinhood

16 shares that are held at Merricks was the stay placed by this

17 Court in its worldwide stay order that was dated November 30th

18 of this year.  The reason why we've requested that the shares

19 be moved from -- to a neutral third party from Merricks is that

20 Merricks has a pre-existing relationship both with Alameda and

21 Emergent.

22          It had pledged that it's not going to do anything

23 with the shares subject to further order of a court with

24 competent jurisdiction, but given that prior relationship and

25 the potential for claims against Merricks with respect to the

1  Robinhood shares, we believe that they are better placed with a

2  neutral third party and that that neutral third party should be

3  subject to this Court's jurisdiction.

4        As far as who owns the shares, that is a Merricks

5  issue.  We believe, as noted, that besides Emergent, the only

6  party who currently has a claim to these shares with -- that

7  has any documentation of their ownership and does not have a

8  derivative claim is BlockFi.  That's why this Court is in the

9  best place to determine rights entitled to the shares.

10       Ultimately, all parties who claim an interest in

11 these shares will be able to make whatever Merricks arguments

12 they want to in due course as to why they're entitled to or not

13 entitled to the shares, which would include the right of the

14 JPLs to contest that they're not subject to the jurisdiction of

15 this Court.

16       We see that there's no reason for granting the

17 extension.  These shares should be protected right now.  That's

18 all that we've asked for in the turnover motion.  We do not

19 believe that the efforts of the JPLs are consistent with that.

20 In fact, they continue to press their asserted rights with

21 respect to the Robinhood shares, which, under the December 5

22 liquidation order, according to them, they're authorized,

23 subject to the Antigua Court's approval, to sell, realize or

24 otherwise monetize Emergent's shares in Robinhood, which we

25 believe is improper and should not be a decision made by the

1  Court in Antigua.  Now, that's an issue that can be addressed.

2  It doesn't need to be addressed today, but we believe the

3  shares ought to be protected today.

4           Also, there was really no emergency for this.  The

5  JPLs have known of the turnover motion in the January 9th

6  hearing since at least -- or since January 7th, yet waited

7  until yesterday to file their emergency extension motion.  And

8  given the limited relief it sought, we see that there's no

9  reason to postpone the response date for the turnover motion

10 nor the hearing on January 9th.  We don't see that any harm can

11 come to any of the parties who claim an interest by simply

12 allowing a neutral third party to hold these shares subject to

13 further orders from this Court.

14          And I'll answer any questions you may have.

15          THE COURT:  All right.  Thank you, counsel.

16          Now, let me turn to Mr. Banker and Mr. Schnitzer on

17 behalf of Mr. Bankman-Fried.

18          MR. SCHNITZER:  Thank you, Your Honor.  Edward

19 Schnitzer from Montgomery, McCracken, Walker and Rhoads on

20 behalf of Samuel Bankman-Fried.  Your Honor, Mr. Bankman-Fried

21 supports the application by the JPLs for an extension of time

22 for Emergent to respond to the motion adversary complaint,

23 although I understand the extension for the adversary complaint

24 is going to be granted anyway.  In light of the pending

25 litigation in Antigua concerning the JPL's standing to speak

1  for Emergent, an extension time is warranted.

2          Your Honor, as the JPLs explained, Emergent is the

3  undisputed record holder of a certain asset in which several

4  persons have asserted an interest.  The JPLs further correctly

5  explained that the determination of who has the right to speak

6  for Emergent is currently before the High Court of Antigua, as

7  Mr. Bankman-Fried filed a petition seeking to stay the JPL

8  order, which was addressed today in the court, but also to set

9  aside the receivership order.  As a petition to set aside the

10  receivership order is presently before the High Court of

11  Antigua, Mr. Bankman-Fried submits there is cause for the

12  extension that is requested.

13          Your Honor, the only point in which we would perhaps

14  slightly disagree with the JPL is the language of their

15  proposed order.  In Paragraphs 2, 3 and 4 of their proposed

16  order they use the term the JPLs in terms of who should get the

17  extension.  We submit that that should be changed to Emergent

18  Fidelity Technologies Limited, the actual entity, and the

19  extension of time should apply to the entity, that being

20  Emergent, not solely to the JPLs.

21          In the event the Antiguan Court determines that the

22  JPLs do not have standing to speak for Emergent or were not

23  permitted to put Emergent into liquidation, the extension of

24  time should apply to Emergent as a whole so that Emergent can

25  still defend itself in the adversary complaint and the motion.

1          Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Schnitzer.

3          Is there counsel for FTX?

4                    (No audible response)

5          THE COURT:  I didn't know if they were appearing.

6          Ms. Walsh, you have your hand up?

7          MS. WALSH:  Good morning, Your Honor.  Kaitlin Walsh

8  of Mintz Levin on behalf of Merricks Capital Market formerly

9  known as ED&F Man Capital Market.  With me today is Therese

10 Doherty also of Mintz Levin.  We filed a pro hoc application on

11 behalf of Ms. Doherty yesterday, and I would respectfully

12 request that the Court allow Ms. Doherty to appear at today's

13 hearing while this application is pending.

14         THE COURT:  All right.  Absolutely.

15         Ms. Doherty, welcome.

16         MS. DOHERTY:  Thank you, Your Honor.

17         As Ms. Walsh said, we represent Merricks, and

18 Merricks has the account in the name of Emergent Fidelity.  It

19 is holding assets in that account, and since November 10th, we

20 have made very clear to all of the parties, including BlockFi,

21 the FTX debtors and the joint liquidators, that the assets are

22 being preserved and frozen, and they will not be transferred or

23 moved or placed under the control of anyone unless and until

24 ordered to do so by a court of competent jurisdiction.

25         Our goal here is not to take any position with

1 respect to the merits or a claim to the assets but to make sure

2 that all of the parties have an interest in maximizing the

3 value of these assets and placing them in the control of a

4 person under the auspices of the Court so that investment

5 decisions can be made as soon as possible.

6         We have -- in addition to shares, we have cash in the

7 account.  The shares obviously are subject to market

8 fluctuation, and, in our view, the quicker that a person is

9 placed in control under the auspices of the Court to make

10 investment decisions and to protect those assets and to

11 maximize the value of those assets for whomever at the end of

12 the day is entitled to them, that is what should be everybody's

13 interest today and going forward.

14         So, that is our position, and we're ready, willing

15 and able to do what the Court finds is in the best interest to

16 maximize those assets and protect those assets.

17         THE COURT:  All right.  Thank you, Ms. Doherty.

18         Any other counsel wish to be heard?

19               (No audible response)

20         THE COURT:  All right.  Well, what's presented to the

21 Court is a rather limited issue as to adjourning or carrying

22 the hearing scheduled for January 9th with respect to the

23 debtors' turnover application.  In essence, the turnover motion

24 and the underlying adversary proceeding, while certainly

25 addressing the merits as to ownership and entitlement to the

1  shares at issue, it seems that the parties are in agreement

2  that the January 9th hearing can, indeed, be limited to the

3  issues to whether or not there should be a turnover directed to

4  have the shares placed with a neutral custodian subject to the

5  jurisdiction and orders of this Court, at least at the outset.

6  And I am pleased to hear that the parties have agreed that the

7  merits can and should be addressed after a fuller opportunity

8  to investigate the underlying claims and analyze the various

9  jurisdictional issues.

10        What concerns the Court is the speed in which matters

11  have and continue to proceed in Antigua with limited ability to

12  place any controls.  And, certainly, it's always distasteful

13  for courts to be in a position where there is a, I wouldn't

14  call it a competition, but a concern as to which court is

15  rightly vested with the authority, jurisdiction and control

16  over assets and disputes that are brought before it.  No court

17  wishes to compete, so to speak, with other, either domestic or

18  foreign, courts.

19        But I know this Court entered an order on November

20  30th which just clarified, I thought, what the law is under the

21  Bankruptcy Code in Section 362 as to the worldwide automatic

22  stay.  The orders entered by the Antiguan Court with respect to

23  the powers of the JPLs and their authority was subsequent to

24  that order, so there's an obvious disconnect, and there's a

25  speed in which proceedings are moving in those courts which

1  concerns me.

2       I see little prejudice in continuing with the

3  scheduled January 9th hearing as to whether or not there should

4  be an order directing the placement of the shares in dispute

5  with an independent custodian.  I am comforted by the fact that

6  the -- it seems like all counsel actually agree that what's at

7  issue is securing these shares and maximizing the return for

8  the creditors, all the creditors who are impacted, and that

9  this Court is not by any means making a determination at this

10 juncture as to which court is best equipped or vested with the

11 proper authority and jurisdiction to make the determination.

12 But I certainly think there's no prejudice in entertaining that

13 discussion come January 9th at the outset.

14       And I also have confidence that with the caliber of

15 the professionals involved in this case, that for the limited

16 issue that's going to be argued on January 9th, and given what

17 has transpired in other courts and the speed in which counsel

18 have all acted in other courts, that all professionals and all

19 parties will be prepared to address the issues on January 9th

20 as to the turnover request.

21       I think in advance of that, I would be shocked if

22 counsel actually all tried, that they couldn't come up with a

23 mechanism that's satisfactory to all with respect to placement

24 of the shares in dispute without a court resolution.  But, if

25 not, that's what the Court's here for.

1       My decision is to go forward with the January 9th

2   hearing and to start the process.  Given the holiday times, I

3   understand there's a time crunch, and let me ask counsel, Mr.

4   Anigian, what is the return date for any objections now?  Was

5   it January 3rd?

6           MR. ANIGIAN:  January 3rd, Your Honor.

7           THE COURT:  Okay.  I don't have a problem, since the

8   burden always falls on me to read the materials at the end of

9   the day to allowing additional time.  And instead of January

10  3rd, which is a Tuesday -- let's see, at least move it to

11  January 5th.

12          MR. ANIGIAN:  That's actually acceptable to us.

13          THE COURT:  All right.  Just to try to squeeze out as

14  much time for it.  And this will apply to any party seeking to

15  oppose the relief sought in the debtors' motion.  And, again,

16  my intention is to limit it to the issue as to whether or not I

17  should direct the current custodian, Merricks, to place the

18  shares in a third party, subject to the Court's jurisdiction

19  and authority pending further -- it's always pending further

20  order of this Court.

21          As far as the time to answer the underlying complaint

22  and moving the pretrial that's scheduled, I believe that's

23  scheduled for February.  I know I have a February 21st date

24  scheduled for BlockFi as an omnibus date and a March -- I'm

25  going to put in -- actually, we have a January 30th date, a

1  February 21st date and a January 13th date -- I'm sorry, a

2  March 13th date that I'm going to post.  I can leave it to

3  counsel to try to come up with their own schedule for answering

4  or otherwise moving rather than setting dates now.  What would

5  be your preference?  Let me turn to --

6          MR. ANIGIAN:  Your Honor, this is Rich Anigian.  My

7  thought is that we can try to work something out amongst the

8  parties, and if we can't reach some agreement, we can certainly

9  come back to you, but, hopefully, we're able to reach an

10 agreement amongst the parties.

11         Mr. Ziegler, your thoughts?

12         MR. ZIEGLER:  We're okay with that, Your Honor.

13 Thank you.  We're happy to chat.

14         THE COURT:  All right.  And anyone else?

15         Ms. Doherty, I don't know if you want to weigh in at

16 all, or you're just observing to see what's going to happen?

17         MS. DOHERTY:  I believe -- I wholeheartedly agree

18 with what Your Honor has said, and I am hopeful that all of

19 these parties will be able to agree on a process to eliminate

20 the need to come back on January 9th.

21         THE COURT:  Fair enough.  Ultimately, I'm trying to

22 reduce everybody's burden out there on you all, and I'm

23 confident it could be done.

24         Mr. Schnitzer?

25         MR. SCHNITZER:  Yes, Your Honor, I would just ask

1  that we be included in those conversations about the deadline

2  to answer the amended complaint and the rescheduled pretrial

3  conference?

4         THE COURT:  Absolutely.  I am, as you could tell --

5  certainly, Mr. Bankman-Fried is a party to this and should be

6  involved, at least at the outset.  I guess by my question

7  before whether there was counsel for FTX, I guess I'm surprised

8  that they're not -- given the motion they filed to extend the

9  automatic stay with respect to these shares, I'm surprised

10 they're not part of this hearing or conversation, and you'll

11 tell me otherwise, but -- and maybe that will occur.

12         So, at this point, why don't I mark the Emergent

13 motion -- it's going to be denied in part, and, if you want,

14 you can come put together a scheduling order which will resolve

15 the issues as far as -- I'll mark an order to be submitted and

16 with a scheduling order for the balance of the adversary

17 proceeding, in other words, the time for -- to answer and also

18 for when to hold a pretrial.

19         I need not -- I'll let you all know, I need not have

20 a pretrial on a omnibus BlockFi day,  because there's always,

21 I'm sure, several matters I can schedule for another day.  You

22 could always contact chambers, and we'll be glad to fill in a

23 date for that.  If there's any issues, contact my chambers, my

24 law clerks, Becca Earl or Maria DeOliveira, and we'll work with

25 you.  And if we need to have a conference call, we can do that

1 as well in case you can't come to an agreement.  But,

2 otherwise, we'll proceed on January 9th with the only change

3 now is the deadline to file objections would be close of

4 business January 5th.

5          MR. ZIEGLER:  Your Honor, may I ask a clarifying

6 question?

7          THE COURT:  Yes.

8          MR. ZIEGLER:  One of the things that I mentioned a

9 moment ago and one of our concerns is we're concerned that if

10 we respond to the turnover motion on the merits, that that they

11 may create an argument that we have waived an objection on the

12 basis of jurisdiction.  We don't want to file a motion to

13 dismiss this case based on a lack of jurisdiction.  Could we

14 have Your Honor's assurance that if we engage on the merits

15 with respect to the turnover motion, that we will not be

16 prejudiced against arguing for jurisdiction.

17          THE COURT:  I respect the concern.  I am certainly

18 comfortable with parties reserving their rights in that regard,

19 to argue --

20          MR. ZIEGLER:  Thank you.

21          THE COURT:  -- given the limited nature of the issue

22 on January 9th.

23          MR. ZIEGLER:  Thank you very much.

24          THE COURT:  And, counsel -- BlockFi counsel have any

25 concerns?  Mr. Anigian?

1          MR. ANIGIAN:  We do not, Your Honor.  We believe they

2  can reserve their right to challenge jurisdiction while at the

3  same time addressing the January 9th turnover motion.

4          THE COURT:  Good.  All right.  So, and again, that

5  will hold true for all parties involved.

6          Are there any other issues or concerns anyone wishes

7  to raise for the Court?

8          MR. ANIGIAN:  Not today.

9          THE COURT:  Oh, I'm sure you'll come up with a

10 matter.

11         Going forward, folks, I'm going to try to schedule

12 these hearings by Zoom, given all of your travel schedules and

13 other pressing concerns.  If it's evidentiary hearings, in

14 other words, if we're going to take testimony, I'd rather have

15 that in court.  If it's argument, I'm more than happy to handle

16 it remotely.  Parties are always welcome to come to court.  I'm

17 lonely here in Trenton, but you need not make the venture,

18 unless the parties agree or have a desire to be here.

19         All right.  Otherwise, see you all after the New

20 Year.  Have a good holiday.  Take care.

21                          *  *  *  *  *

22

23

24

25

# **C E R T I F I C A T I O N**

I, ALYCE H. STINE, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Alyce H. Stine
ALYCE H. STINE
J&J COURT TRANSCRIBERS, INC.   DATE:  December 29, 2022

# EXHIBIT B-20

**FILED**
**HIGH COURT**
**ANTIGUA AND BARBUDA**

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

**Submitted Date:16/01/2023 14:06**

CLAIM NO. ANUHCV 2022/0480

**Filed Date:16/01/2023 14:06**

IN THE MATTER OF EMERGENT FIDELITY TECHNOLOGIES LTD
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT, CAP. 222

**Fees Paid:27.00**

BETWEEN:



ANGELA BARKHOUSE AND TONI SHUKLA
(AS RECEIVERS OF EMERGENT FIDELITY TECHNOLOGIES LTD)

**Respondents / Petitioners**

-and-

EMERGENT FIDELITY TECHNOLOGIES LTD

**Respondent**

-and-

SAMUEL BENJAMIN BANKMAN-FRIED

**Applicant/Interested Party**

---

**ORDER**

---

BEFORE:    The Honourable Justice Darshan Ramdhani KC (Ag.)

DATED:    **23 and 28** December 2022

ENTERED:    12 ~~December~~ 2022

**UPON** the petition filed by Angela Barkhouse and Toni Shuka (as receivers of Emergent Fidelity Technologies Ltd) on 2 December 2022 to wind up Emergent Fidelity Technologies Ltd (the "**Corporation**") under the provisions of the International Business Corporations Act, Cap. 222 (the "**Petition**")

**AND UPON** the Court having appointed Angela Barkhouse and Toni Shukla (the "**Provisional Liquidators**") as provisional liquidators of the Corporation by order dated 5 December 2022

**AND UPON** the Applicant/Interested Party's urgent application dated 12 December 2022 for an order that the Petition be stayed (the "**Stay Application**")

**AND UPON** the Court having read the affidavits of Samuel Benjamin Bankman-Fried and the exhibits thereto filed in support of the Stay Application and his draft proposed application (the "**Receivership/Discharge Application**") in case 0456/2022 and the first, second, third and fourth affidavits of Angela Barkhouse together with their respective exhibits

**AND UPON HEARING** David Joseph KC and Kendrickson H. Kentish, counsel for the Respondents and Dr. David Dorsett and Jarid Hewlett, counsel for the Applicant

**AND UPON BY CONSENT** the appearances of Arthur Thomas and Kelvin Johns for John Jay Ray III, the US Receiver/Trustee of the FTX Group of Companies (in Chapter 11 pursuant to the United States Bankruptcy Code) instructed by Sullivan & Cromwell, Radford Hill and Leandra Smith for the Joint Provisional Liquidators of FTX Digital Marketing Ltd (appointed by the Bahamas Court), and Lenworth Johnson instructed by BlockFi Inc, BlockFi Lending LLC and BlockFi International Ltd ("**BlockFi**")

**AND UPON** the hearing of the Stay Application on 23 December 2022

**AND UPON** the handing down of oral judgment on the Stay Application on 28 December 2022

**AND UPON NOTING** that by it its Amended Notice of Acting ("**Notice of Acting**") filed on 12 December 2022 BlockFi claims to be a creditor of the Corporation and asserts its intention to oppose the Petition herein

**IT IS ORDERED THAT:**

1.  The Applicant/Interested Party's Stay Application is dismissed.

2.  The Applicant/Interested Party do pay the Provisional Liquidators' costs of the Stay Application to be assessed if not agreed within 14 days. For the avoidance of doubt, it is considered reasonable and appropriate for the Provisional Liquidators to have instructed Leading Counsel in respect of the Stay Application.

3.  For the purposes of the presentation of the Petition as shareholders of 90% of the shares of the Corporation pursuant to the receivership order of the Court made on 18 November 2022 in Claim 0456/2022 (which proceedings remain stayed), the receivers appointed by the said order shall have standing to present the petition.

4.  The following directions are given for the prompt and urgent hearing of the Petition:

    (i)    The Petition be listed for hearing in open court on Thursday 26 or Friday 27 January 2023 with a time estimate of one day or on a date considered suitable by the judge hearing of the matter.

    (ii)   Any person wishing to oppose or support the Petition shall file and serve by noon on Monday 9 January 2023 written grounds of such opposition or support which must, in

either case, be verified by affidavit and must set out the basis of that person's interest in the Corporation.

(iii)     Any affidavit filed on behalf of BlockFi is to be filed and served by noon on 9th January 2023 and shall set out, with such supporting documentary as BlockFi may wish to rely on in relation to the alleged pledge ("**pledge**") referred to in paragraph (d) of their Notice of Acting:

   a. The terms of the pledge (which may be done by exhibiting the same);
   b. The circumstances in which the pledge was allegedly consummated by the Corporation, and by whom;
   c. How it is contended the Corporation authorised the entry into the pledge agreement;
   d. The steps taken by BlockFi to verify the said authority; and
   e. The consideration, if any, alleged to have been received by the Corporation for entering into the pledge.

If it is contended that BlockFi has any other interest in the Corporation other than that arising from the pledge, it should also be stated.

(iv)     The Respondents, whether in their capacities as Provisional Liquidators and/or petitioners, shall file and serve any evidence in response by 4pm on Monday 16th January 2023.

(v)     The parties shall file and exchange skeleton arguments together with any written authorities relied upon by 4pm on 24th January 2023.

(vi)     The requirement that the Petition be advertised be dispensed with.

(vii)     Parties at liberty to apply

**BY THE COURT**

**REGISTRAR**

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV 2022/0480

IN THE MATTER OF EMERGENT FIDELITY
TECHNOLOGIES LTD
AND IN THE MATTER OF THE INTERNATIONAL
BUSINESS CORPORATIONS ACT, CAP. 222

BETWEEN:

ANGELA BARKHOUSE AND TONI SHUKLA
(AS RECEIVERS OF SHARES IN EMERGENT
FIDELITY TECHNOLOGIES LTD)
Respondents / Petitioner

-and-

EMERGENT FIDELITY TECHNOLOGIES LTD
Respondent

SAMUEL BENJAMIN BANKMAN-FRIED
Applicant

---

DRAFT ORDER

---

Lake, Kentish & Bennett Inc.
Temple Chambers
36 Long St
St John's
Antigua
Tel: +1 268 462 1012
Fax: +1 268 462 2568

Legal Practitioners for the Petitioners

# EXHIBIT B-21

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-19361-MBK |
| | . | |
| BLOCKFI INC., et al., | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| Debtors. | . | |
| | . | |
| . . . . . . . . . . . .. | | |
| BLOCKFI INC., et al., | . | Adversary No. 22-01382-MBK |
| | . | |
| Plaintiffs, | . | |
| | . | |
| vs. | . | |
| | . | |
| EMERGENT FIDELITY | . | |
| TECHNOLOGIES LTD., et al.. | | |
| | . | |
| Defendants. | . | Monday, January 9, 2023 |
| . . . . . . . . . . . . .. | | 10:00 a.m. |

TRANSCRIPT OF HEARING ON THE EMERGENT MOTION
SEEKING AN EXTENSION OF TIME WITH RESPECT TO ANSWERING;
MOTION FOR RELIEF FROM STAY;CONTINUING THE JANUARY 9
TURNOVER COMPLAINT

BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Haynes and Boone |
| | By:  RICHARD KANOWITZ, ESQ. |
| | 30 Rockefeller Plaza, 26th Floor |
| | New York, NY 10112 |
| | |
| | Haynes and Boone |
| | By:  RICHARD D. ANIGIAN, ESQ. |
| | 2323 Victory Avenue, Suite 700 |
| | Dallas, TX 75219 |
| | |
| Audio Operator | Kiya Martin |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONTINUED):

For the Debtor:                Cole Schotz, P.C.
                               By:  FELICE R. YUDKIN, ESQ.
                               Court Plaza North
                               25 Main Street
                               Hackensack, NJ 07601

For the Official              Brown Rudnick, LLP
Committee of Unsecured         By: ROBERT J. STARK, ESQ.
Creditors:                         JEFFREY L. JONAS, ESQ.
                                   KENNETH AULET, ESQ.
                               7 Times Square
                               New York, NY 10036

                               Genova Burns, LLC
                               By: DANIEL M. STOLZ, ESQ.
                               494 Broad Street
                               Newark, NJ 07102

For the United States         Office of the United States Trustee
Trustee:                       By:  JEFFREY SPONDER, ESQ.
                                    LAUREN BIELSKIE, ESQ.
                               One Newark Center
                               Newark, NJ 07102

For George Gerro:             Gorski and Knowlton PC
                               BY: CAROL L. KNOWLTON ESQ.
                               311 Whitehorse Avenue, Suite A
                               Hamilton, NJ 08610

For Samuel Bankman-           Montgomery McCracken, LLP
Fried:                         By:  EDWARD L. SCHNITZER, ESQ.
                               437 Madison Avenue, 24th Floor
                               New York, NY 10022

For FTX Trading Ltd and       Sullivan & Cromwell LLP
Affiliated Debtors:            By: BRIAN D. GLUECKSTEIN, ESQ.
                                   JAMES L. BROMLEY, ESQ.
                               125 Broad Street
                               New York, NY 10004

For Marex Capital             Mintz, Levin, Cohn, Ferris, Glovsky
Markets, Inc.                    and Popeo, P.C.
                               By: THERESE M. DOHERTY, ESQ.
                                   KAITLIN R. WALSH, ESQ.
                               919 Third Avenue, Suite 38th Floor
                               New York, NY 10022

```
APPEARANCES (CONTINUED):

For the  Liquidators        Morgan, Lewis & Bockius, LLP
of Emergent Fidelity        By:  MATTHEW C. ZIEGLER, ESQ.
Technologies, Ltd.:         1701 Market Street
                            Philadelphia, PA 19103

                            Morgan, Lewis & Bockius, LLP
                            By:  JOSHUA DORCHAK, ESQ.
                            101 Park Avenue
                            New York, NY 10178

For Marex Capital           Mintz, Levin, Cohn, Ferris, Glovsky
Markets, Inc.:                and Popeo, P.C.
                            By:  KAITLIN R. WALSH, ESQ.
                                 THERESE M. DOHERTY, ESQ.
                            919 Third Avenue
                            New York, NY 10022

TELEPHONIC APPEARANCES:

For the Debtor:             Cole Schotz P.C.
                            By:  MICHAEL D. SIROTA, ESQ.
                            25 Main Street
                            Hackensack, NJ 07601

                            Kirkland & Ellis LLP
                            By: JOSHUA A. SUSSBERG, ESQ.
                            601 Lexington Avenue
                            New York, NY 10022

For the Official            McCarter & English, LLP
Committee of Unsecured      BY: DAVID J. ADLER, ESQ.
Creditors:                       LISA BONSALL, ESQ.
                            Four Gateway Center
                            100 Mulberry Street
                            Newark, NJ 07102

                            Paul Hastings, LLP
                            By: KEN PASQUALE, ESQ.
                            200 Park Avenue
                            New York, NY 10166

For Samuel Bankman-         Montgomery McCracken, LLP
Fried:                      By:  DAVID M. BANKER, ESQ.
                            437 Madison Avenue, 24th Floor
                            New York, NY 10022
```

4

TELEPHONIC APPEARANCES (CONTINUED):

```
For the Ad Hoc          Troutman Pepper
Committee of Wallet     By: DEBORAH KOVSKY APAP, ESQ.
Account Holders:        4000 Town Center, Suite 1800
                        Southfield, MI 48075


For Silvergate Bank:    Holland & Knight, LLP
                        By: BARBRA RACHEL PARLIN, ESQ.
                        31 West 52nd Street
                        New York, NY 10019


For the United States:  KIRBY MCINERNEY LLP
                        By: SETH SHAPIRO, ESQ.
                        250 Park Avenue, Suite 820
                        New York, NY 10177
```

- - -

1            THE COURT:  On an omnibus hearing date, I wouldn't

2  take appearances.  It would take too long.  But today since

3  it's limited parties, I think it's worthwhile.

4            Let me start with those who are in the courtroom.

5  Let me have appearances.

6            MR. STARK:  Good morning, Your Honor.  Richard

7  Kanowitz, Haynes and Boone, proposed counsel to the debtors and

8  debtors in possession.  With me is my partner, Richard Anigian.

9            MR. ANIGIAN:  Good morning.

10            THE COURT:  Good morning.

11            MS. YUDKIN:  Good morning, Your Honor.  Felice

12  Yudkin, Cole Schotz PC, proposed counsel to the debtors, as

13  well.

14            THE COURT:  Thank you.  Good morning.

15            MR. STARK:  Good morning, Your Honor.  Robert Stark.

16  I'm here with Mr. Jonas and Mr. Aulet from Brown Rudnick.

17  Also, Mr. Stolz from the Genova Burns firm.

18            THE COURT:  The gang's back.  All right.

19            MR. STARK:  The gang is back; proposed counsel for

20  the Official Committee of Unsecured Creditors.

21            THE COURT:  Welcome.

22            MR. STARK:  Thank you.

23            THE COURT:  Good morning.

24            MR. SPONDER:  Good morning, Your Honor.  Jeff Sponder

25  and Lauren Bielskie from the Office of the United States

1 Trustee.

2          THE COURT:  All right.  Good morning.

3          Ms. Knowlton, how are you?

4          MS. KNOWLTON:  Good morning, Your Honor.  Carol

5 Knowlton with Gorski and Knowlton appearing on behalf of George

6 Gerro on the Gerro matter.

7          THE COURT:  All right.  Thank you.

8          MR. SCHNITZER:  Good morning, Your Honor.  Edward

9 Schnitzer from Montgomery McCracken Walker & Rhoads on behalf

10 of Samuel Bankman-Fried.

11          THE COURT:  Good morning.

12          MR. GLUECKSTEIN:  Good morning, Your Honor.  Brian

13 Glueckstein along with James Bromley from Sullivan and Cromwell

14 on behalf of the FTX Trading and Affiliated Debtors.

15          THE COURT:  Thank you.  Good morning.

16          MR. DORCHAK:  Good morning, Your Honor.  Joshua

17 Dorchak.  With me Matthew Ziegler from Morgan, Lewis & Bockius

18 LLP on behalf of Angela Barkhouse and Toni Shukla who are the

19 joint provisional liquidators of the Emergent-FTX entity,

20 Emergent --

21          THE COURT:  Great.

22          MR. DORCHAK:  -- Fidelity Technologies, LTD.

23          THE COURT:  Thank you; mouthful.

24          MS. DOHERTY:  Good morning, Your Honor.  Therese

25 Doherty, and with me is Kaitlin Walsh from Mintz Levin on

1  behalf of the defendant Marex Capital Markets Limited, formerly

2  known as ED&F Capital Markets Limited.

3           THE COURT:  Great.

4           MS. DOHERTY:  Thank you.

5           THE COURT:  Thank you.

6           Now let me turn to those who are appearing remotely

7  if anyone wants to enter appearance.  During the course of the

8  hearing, if you're appearing remotely and wish to be heard,

9  just use the "hand raise" function.  I'll do my best with my

10 law clerks to spot you and have you be heard.

11          Let me start -- Mr. Gerro, I see your hand raised.

12          MR. GERRO:  (No audible response).

13          THE COURT:  I think you need your speaker on.

14          MR. GERRO:  (No audible response).

15          THE COURT:  I'm still not hearing.  I hope it's -- I

16 don't know if it's on my end.

17          UNIDENTIFIED SPEAKER:  We can hear you, Judge.

18          THE COURT:  Okay.

19          Well, this may be problematic.  I don't know if it's

20 Gerro, Jerro, my apologies, but I'm not hearing you.  I hear

21 others on remote.

22          Let me go back to others, and let's see if it's yours

23 or on our end.

24          Mr. Sirota, good morning.

25          MR. SIROTA:  Good morning, Your Honor.  Michael

1 Sirota, Cole Schotz, PC, co-counsel for the debtors.

2          THE COURT:  And I see Mr. Sussberg.  Good morning.

3          MR. SUSSBERG:  Good morning, Your Honor.  Joshua

4 Sussberg, Kirkland & Ellis, proposed counsel to the debtors.  I

5 would like, if Your Honor's okay with it, to provide a brief

6 status update at the outset.  And I appreciate Your Honor

7 entertaining the remote appearance.  Thank you.

8          THE COURT:  Not a problem.  I'll get to you when

9 we're ready to start.

10          Mr. Adler.

11          MR. ADLER:  Good morning, Your Honor.  David Adler

12 from McCarter & English.  With me on the phone I believe is

13 also Lisa Bonsall.  We are proposed deficiency counsel for the

14 Official Committee.

15          THE COURT:  All right.  Thank you.  Mr. --

16          MR. PASQUALE:  Good morning.

17          THE COURT:  Good morning.

18          Mr. Pasquale, if I'm pronouncing it correct.

19          THE COURT:  You are, Your Honor.  Thank you.

20          Ken Pasquale for the Official Committee of Unsecured

21 Creditors in the FTX Trading case.  I'm with the firm of Paul

22 Hastings.

23          THE COURT:  Great; thank you.  Good morning.

24          Ms. Kovsky-Apap, if -- I know I'm butchering that.

25          MS. KOVSKY APAP:  You actually got it exactly right,

1  Your Honor.  Deb Kovsky, Troutman Pepper, on behalf of an Ad

2  Hoc Committee of Wallet Account Holders.

3            THE COURT:  All right.  Great.

4            And Ms. Parlin.

5            MS. PARLIN:  Good morning, Your Honor.  Barbra

6  Parlin, Holland & Knight, for Silvergate Bank.

7            THE COURT:  Thank you.

8            Well, all right, and I think I've demonstrated why we

9  won't do that again on omnibus days.

10            All right.  So --

11            MR. SHAPIRO:  Your Honor, this is Mr. Shapiro.

12            THE COURT:  Yes.

13            MR. SHAPIRO:  Seth Shapiro.  We are not appearing in

14  the adversary proceeding on behalf of the United States today

15  because we are not a party to that proceeding.  But I did file

16  a notice of appearance in the main case, and I'm here to answer

17  whatever questions the Court might have about the notice of

18  asset seizure that we filed last week in the main bankruptcy.

19  Thank you.

20            THE COURT:  Good.  I'm glad to have your appearance.

21  I certainly think it's going to be relevant.

22            All right.  Mr. Gerro, you want to try it again?

23            MR. GERRO:  Good morning, Your Honor.  I am appearing

24  with audio via remote the phone and on video on the computer.

25  Thank you.

1           THE COURT:  All right.  Thank you.

2           Mr. Banker.

3           MR. BANKER:  Good morning, Your Honor.  David Banker,

4 Montgomery McCracken, on behalf of Samuel Bankman-Fried.  Mr.

5 Schnitzer has already appeared in person, and he's now admitted

6 pro hac.  Thank you, Your Honor.

7           THE COURT:  All right.  Thank you.

8           And I think I have everyone.

9           All right.  Let's see.  Now let me turn back to Mr.

10 Sussberg.  We can start with the status since we're here on the

11 second, our second hearing in this case.

12           MR. SUSSBERG:  Yes.  Thank you, Your Honor.

13           And, again, for the record, Joshua Sussberg from

14 Kirkland & Ellis.

15           If I could ask Your Honor to share the presenter role

16 with Mr. Jacobson from my firm, we could put the slides on the

17 screen.

18           THE COURT:  All right.  Maria?

19                         (Pause)

20           THE COURT:  Easier said than done.

21                         (Pause)

22           UNIDENTIFIED SPEAKER:  They're setting up an easel,

23 Josh.

24           MR. SUSSBERG:  The modern marvels of technology.

25           THE COURT:  Well, about 150 remote appearances, it's

1  hard find people.

2          MR. SUSSBERG:  Mr. Jacobson, you want to raise your

3  hand.

4          THE COURT:  There he is.

5          All right.  Mr. Jacobson has presenter status.  He

6  just needs to share it on his end.

7          MR. SUSSBERG:  Okay.  And, Your Honor, as you

8  mentioned, today was supposed to be our omnibus second day

9  hearing.  Unfortunately, fortunately, and not criticizing but

10  it took several weeks for the Committee to ultimately be

11  appointed and that was not until December 21st.

12          And, obviously, we want to get off to a good start

13  with our Committee.  They need some time to digest some of the

14  relief that has been sought.  Some will take more time than

15  others.  The goal here is to be as consensual as possible,

16  which I'll talk about.

17          And as a result, we moved the hearing today and much

18  of the relief that we were seeking to next week.  And we'll

19  likely be seeking another hearing from Your Honor for certain

20  relief that I'll get to in a moment.

21          THE COURT:  All right.

22          MR. SUSSBERG:  Mr. Jacobson, if you could share the

23  slides.

24          MR. JACOBSON:  My apologies.  Your Honor, the Zoom is

25  still telling me that the host has disabled participant

1  screensharing when I'm trying to share my screen.

2          THE COURT:  All right.  Do we need to take a break

3  and let's see if we have Andrew?

4          Our apologies.  We're just going to take a couple of

5  minute break, get our IT person up here.

6      (Recess at 10:10 a.m./Reconvened at 10:16 a.m.)

7          THE COURT:  All right.  We are ready to go.  I see

8  material up on the screen.

9          Mr. Sussberg, it's your podium.

10          MR. SUSSBERG:  Thank you, Your Honor.  Again, for the

11  record Joshua Sussberg, Kirkland & Ellis.

12          I wanted to provide the Court with a brief status

13  update as well as a preview of some items in our SOFAs and

14  schedules that I think are appropriately served up best in a

15  live conversation, and that's the roadmap as you'll see on

16  slide two.  And we'll get through this fairly quickly so that

17  we can get to the proposed agenda items, which there are two,

18  and Mr. Kanowitz will be handling those for the company.

19          So progress since the first-day hearing, Your Honor,

20  flipping to slide four, and I think this is important.  We

21  talked at the first-day hearing about the path forward.  And

22  obviously, we filed a Chapter 11 plan on a standalone basis on

23  the very first day of the case.  But the thesis all along has

24  been that Moelis and Company, our proposed investment bank,

25  would run a comprehensive marketing process for all,

1 substantially all, or some of the company's assets.

2        And that process is well underway.  As you see on the

3 slide, 106 different parties, both internationally and here

4 domestically, have been contacted and are at various stages of

5 signing confidentiality agreements and ultimately getting

6 access to information.  And as we note at the bottom of the

7 slide, we do intend to file the motion seeking approval of

8 bidding procedures so that we have a very strict and robust

9 process that people can understand and look to as we market

10 these assets.

11        But importantly, and as I'll come back to in the

12 context of Committee discussions, it will be incumbent upon the

13 company to demonstrate from an overall business perspective

14 that there is in fact a potential standalone option.  And the

15 only way in which we'll be able to assess a truly value-

16 maximizing path forward is to understand the viability of that

17 standalone and be able to compare it to the results of the

18 auction process, hence, the need for bidding procedures and

19 hence the need for a lot of work on the company side together

20 with the Committee.  And that will all come in due course.

21        On the next slide, Your Honor, and true to our word,

22 we filed a motion a couple of weeks after the filing to return

23 money that is in the wallet function at the company.  We

24 believe based on the terms of use that the proceeds in dollars

25 and the currency in those wallets is the customer's.  And as a

1  result, our focus is on clients and getting those clients back

2  their money.

3           And we filed that motion to put a stake in the

4  ground.  We are closely coordinating with the Committee, and

5  there are some diligence items that are important to navigate,

6  including a preference analysis assessment and making sure that

7  we're holding on to funds that otherwise should not be leaving

8  the system.

9           And so while we very much would like to have this

10 heard on an expedited basis, we absolutely respect the

11 Committee's right to better understand this, the ordinary

12 course reconciliation, and the like.  And it may be more

13 difficult than we expected to make certain distributions and

14 not fully turn on this function.

15          So we are going to continue to work through this with

16 the Committee with the goal of being before Your Honor as

17 quickly as possible so that we could put money back into

18 clients' pockets.  And we understand that there have been some

19 objections to this motion.  We will address those in due

20 course.  I think they could all be reconciled, and we're going

21 to work with all deliberate speed to get this up in front of

22 Your Honor with the Committee's support.

23          Next slide briefly, I just wanted to note we filed

24 several second-day motions as well as retention applications.

25 Many of those will be heard next week.  Others will be

1 adjourned dependent upon the Committee's diligence and where

2 they stand as far as the relief is concerned.  But I did want

3 to make sure to note for Your Honor what's to come.  There are

4 some issues where we may have a tussle or two with the United

5 States Trustee, but we are prepared to move forward on all the

6 relief that we've sought, again, on an expedited basis.

7          As I mention on the next slide, the United States

8 Trustee appointed the Clients Committee on December 21st.  Nine

9 individual clients appointed to the Committee.

10          The Committee went and quickly retained professionals

11 as you'll see on the next slide, and the Committee is being

12 represented by Brown Rudnick, M3, Elementis, and Mr. Adler who

13 I apologize I forgot his logo on this slide.

14          Mr. Stark who I know the Court is familiar with, I go

15 back a long time with Mr. Stark.  And we've had our fair share

16 of disputes and disagreements, but there's never been a time

17 where I haven't been able to get to a resolution with Mr.

18 Stark.  And we talked about this case being different than

19 Voyager and Celsius and FTX, and I think true to his word, Mr.

20 Stark is committed to working with us to make that a reality.

21 And I am happy to have him on the other side, again, someone I

22 know, respect, admire, and consider a friend.

23          And we look forward to working with the Committee

24 professionals as well as the Committee because I will not it

25 was important for our management team to be able to sit with

1 the Creditors Committee at the outset here.  And so the

2 Committee again appointed on December 21st, we had an in-person

3 meeting this past Friday at my office.  The entire Committee

4 was there, all of their professionals.

5          I think by all accounts everyone who was there

6 thought it was a very good constructive meeting, and it's the

7 beginning of what we consider a very very important

8 relationship unlike a typical committee-debtor relationship

9 because of what's at stake and how these cases work.  And at

10 the end of the day, we're serving our clients, and they sit on

11 this Committee.

12          So looking forward to working with Mr. Stark and the

13 Team.  And M3, who we know extremely well led by Mr. Meghji,

14 and of course Mr. Epp (phonetic).

15          The next section, Your Honor, is a preview of our

16 schedules and statements.  We are filing SOFAs and schedules on

17 the 11th of January.  And my style, as I told Mr. Stark

18 yesterday, is not to bury a bunch of information in thousands

19 of pages and have people go on a treasure trove hunt to try to

20 find what they may or may not think is important.  And so

21 today, Your Honor, I wanted to preview for you and for everyone

22 else, I've previewed this for Mr. Stark, some items related to

23 insiders in the SOFAs and the schedules.

24          And I think it's important because as we've seen in

25 some of the other crypto cases, these issues can become

1  lightening rods and it sure did in Celsius.  This case as we've

2  said is unlike any of those other cases, and we are a

3  completely transparent operation.  I want to walk Your Honor

4  through exactly what happens and how insiders were treated and

5  went on.

6         On the next slide, I think it's just helpful to level

7  set.  You know, this was the January to November time frame.

8  And, again, remember the company had a settlement, a historic

9  settlement with the SEC back on Valentine's Day of last year,

10  and that was then followed by the Terra Luna collapse which we

11  spent a lot of time talking about, and then the Celsius and

12  Voyager pausing of withdrawals which created mass confusion and

13  obviously contagion throughout the industry.

14         In order to avoid having to halt withdrawals, right,

15  BlockFi entered into an agreement with FTX where FTX on a

16  junior basis backstopped all of our client withdrawals.  And as

17  you'll see, that led us to the ability to process more than $3

18  billion of withdrawals between June 1st when everyone else was

19  pausing their systems and the filing of these cases.

20         The issue and the problem was FTX-related and the now

21  known fraud of FTX.  FTX got into a liquidity crunch.  It's

22  made of token, fell off the Planet Earth, and they filed for

23  bankruptcy on the 10th.  And BlockFi was not long after.

24         On the next slide, and I think this is important, and

25  obviously people could spend time with this.  This will be in

1  our schedules and statements.  And, again, this is a preview.

2  But the management team at this company deployed their personal

3  assets on the platform to trade like all other clients earned

4  interest for store currencies.

5         And what we decided to do in an effort to be

6  completely transparent is put the name of each executive and

7  show the activity in their accounts on the BlockFi system each

8  month through to the filing.  And I want to note, and I don't

9  necessarily ever like to read anything, but the point at the

10 bottom is incredibly important: No member of the BlockFi

11 management team went through any cryptocurrency from the

12 platform after October 14th, 2022.  And no member of BlockFi's

13 management team made a withdrawal greater than .2 BTC in value

14 at any time after August 17th, 2022.

15        Now for those not familiar with Bitcoin, I think the

16 way to conceptualize this if Bitcoin was trading at $20,000, .2

17 BTC would be less than $4,000.  And I think the important

18 takeaway here is that there was no situation where insiders

19 were pulling money off the platform on the eve of or anywhere

20 near this bankruptcy filing.  And that is super important.

21        One other note, and we have a footnote on this slide

22 to this point, but in April of 2022, you'll see a rather large

23 withdrawal by Mr. Prince, the CEO and founder.  That was to pay

24 taxes, and it makes sense.  It was in April, effectuated April

25 15th tax payment.  But we wanted to be crystal clear with the

1 activity and how everything else worked.

2          The rest of the chart when we talk about October and

3 August shows balances decreasing because of the value of BTC,

4 because you see on the slide how much it went down over the

5 course of the year.

6          Next slide, just briefly, I mentioned this before,

7 but all of 2022, this company processed $7.7 billion of

8 withdrawals.  And from June 1st through the platform pause,

9 again, when all the other cryptocurrencies that failed were

10 pausing withdrawals causing mass contagion, we processed $3.3

11 billion of withdrawals.

12          And to put this all in context, as we say at the top

13 of the page, the management team's withdrawals are a tenth of

14 one percent of the $7.7 billion in withdrawals.  So this is not

15 the Celsius case where management extracted value on the eve of

16 the filing.

17          Next slide, this again we talked about, this crypto

18 winner FTX and the fraud that was FTX.  Same thing happens, and

19 I experienced it directly in the Voyager case where FTX stepped

20 in to try to save Voyager only really to try to save itself.

21 But this was a deal that allowed us the ability to process

22 withdrawals for customers all summer in a very confused

23 marketplace.  And, again, this was a $400 million backstop on a

24 junior basis that, again, allowed us to process those

25 withdrawals.

1          I mention this because on the next slide the impact

2   of the FTX transaction was significant on the executives, the

3   employees, and the shareholders.  The only way to raise money

4   at the time was on a junior basis to protect the clients.  But

5   the company was in fact pursuing equity raises and could have

6   pursued senior capital on a secured basis.  But it did the

7   safest the most viable thing, and it took the FTX money which

8   would ultimately lead, as Your Honor knows, to a potential FTX

9   transaction.

10          Importantly, though, the company needed to get

11  stabilized after the FTX infusion.  And it created massive

12  uncertainty amongst the employees.  And you see the 20 percent

13  reduction in force, and you'll understand as we talk about it

14  the value that was lost for this executive team on pieces of

15  paper from an equity standpoint when this company had been

16  valued at six to eight billion just a couple of months before

17  all of this.

18          And so it became important to implement a

19  compensation structure that kept people at the company so we

20  could facilitate what we thought would be an FTX acquisition

21  here in 2023.  And, therefore, as you'll see the next bullet in

22  July of '22, the board of directors approved really a three-

23  prong strategy to help retain key employees.

24          On the next slide you'll see each of the three

25  prongs.  First, I just think it's worth noting that many

1  employees had paid out of their own pockets or otherwise got

2  financing for shares or options that were all rendered

3  worthless by the FTX transaction.  So prong one was to make

4  these people whole and in some instances, grossed up for

5  retention.

6         Number two, the board approved a retention program

7  that you see on the slide, offered an opportunity to earn cash

8  payments because, remember, most of the employees had been

9  compensated in stock or options prior to the FTX transaction.

10  And so up to 50 percent of their base salary could be earned if

11  they not only stayed at the company but met certain companywide

12  goals.

13         And as we note on the bottom, and I think this is

14  important, that retention program was discontinued.  No

15  payments were made to insiders, nor will any be made.  And no

16  insiders are included in our proposed KERP motion which the

17  Committee is in the process of (indiscernible).

18         And number three, Your Honor, BlockFi historically

19  raises compensation with Capital Markets activity, but because

20  of the impact on the FTX transaction from a personal standpoint

21  on all the U.S. employees, increases in base salaries to ensure

22  that people maintained and stayed in their seats became

23  necessary.

24         And so as you'll see on the next slide, the first

25  column is the equity, both vested and unvested, that was lost

1 at the time of the FTX transaction.  And some of the numbers

2 are obviously staggering.  And it's unfortunate, but this is

3 the reality in which we live.

4        We have a second column of 2023 retention payments

5 that were put in place as part of the FTX stabilization post-

6 December transaction. None of these payments will be made.  And

7 then we have a slide and a column talking about salary changes

8 following the FTX transaction, again, to help ensure that we

9 retain critical employees.

10        And as noted at the bottom, the KERP that we are

11 seeking approval of had absolutely no insiders included.  That

12 was by design.

13        Okay.  Slide 17, and, Your Honor, you'll remember

14 this timeline.  We'd attached it to Mr. Renzi's first-day

15 declaration.  And I think this will be helpful in putting the

16 last part of our SOFA schedule preview into appropriate

17 context.  And some of this I've covered, and I won't rehash.

18 But this timeline starts with BlockFi's success and growth back

19 in 2018 through mid-2022 and the crypto winter, if you will,

20 that led to the FTX rescue transaction and the ultimately the

21 filing of these cases.

22        And, again, I want to use this as a preview for the

23 Court and other parties in interest as they're going to see in

24 our schedules and statements certain litigation settlement

25 payments.  And this timeline, which will overlay, will help

1  illustrate those litigation payments and the settlement.

2       Because the terms of the litigation settlement that

3  I'm talking about are confidential, I'm going to refer to the

4  counterparty for the settlement as Counterparty A.  We will

5  share copies with the Committee.  Obviously, we'll share copies

6  with the United States Trustee.  But for public purposes and

7  because of confidentiality arrangements included in our

8  settlement agreements, for today, we will call it Counterparty

9  A.

10      And this timeline demonstrates BlockFi's successfully

11  raised capital via four different rounds of preferred equity

12  financing.  And in July 2021, for example, BlockFi Series E

13  offering was valued at 3.8 billion.  And as we'll talk about

14  and as I mentioned to Your Honor before, in January of 2022,

15  BlockFi received a six to eight-billion-dollar third-party

16  indicative valuation.

17      Now as is typical for companies like BlockFi, many of

18  the BlockFi executives and employees had been compensated

19  heavily in equity.  And that equity, obviously, appeared to be

20  extremely valuable, especially when you attach a six- to eight-

21  billion-dollar valuation to it.

22      So in this context, as again is typical, several

23  different investors approached the company, including

24  Counterparty A.  And they approached several members of the

25  management team and offered different transaction structures to

1  provide BlockFi executives and employees with liquidity in
2  exchange for their equity upside.

3          And as Your Honor is familiar, this is common for
4  early-stage companies, like BlockFi, and can ultimately be a
5  win-win for both sides.  So investors here like Counterparty A
6  are betting that the company will go public or be sold.  And so
7  they proposed to employees that they take some of their equity
8  off the table in exchange for liquidity.  It's also acquiring
9  the equity at a material discount so if the company IPOs or is
10 sold, the counterparty stands to make a significant profit.

11          And the employees, in turn, can reduce their exposure
12 and get some earl liquidity.  And as a result, they're willing
13 to suffer a discount that's demanded by the investor.  And so
14 these types of private security contracts are entered into
15 directly between the employees and the company, and that's
16 important.

17          So as we note and you'll see on the slide, starting
18 at the end of 2021 and then in March and April of '22,
19 BlockFi's board of directors approved -- certain current and
20 former BlockFi execs entered into the first set of private
21 securities contracts with Counterparty A.  And we call these on
22 the slide PSCs on the timeline.

23          In the private securities contracts, Counterparty A
24 promised to make immediate payments to the relevant individuals
25 in exchange for some of their future rights to payment in the

1  event of an IPO or a sale.  And as I mentioned, the first of

2  these agreements were entered into in November of 2021.

3          Again, this appeared to be a win-win for all.  And

4  this was effectively an employee benefit from the company's

5  standpoint because the company facilitated its employees

6  getting value for their equity and taking some of their assets

7  off the table.  And at the time, it appeared the employees were

8  transacting at a material discount.  In January 2022, again, a

9  major investment bank indicated a six- to eight-billion-dollar

10  valuation for the company.

11          At the same time BlockFi was seeking to raise

12  additional capital through the Series F preferred financing

13  that actually never was effectuated, more of BlockFi's current

14  and former employees negotiated PSCs with Counterparty A

15  through April of 2022.  And you'll see that on the next click.

16  And notably and obviously, all of these transactions pre-dated

17  the contagion or anyone's knowledge of what was going to happen

18  in this industry, and that ultimately caused BlockFi its

19  liquidity issues and the bankruptcy filing.

20          Now everything changed as we demonstrate on this

21  slide in May of 2022 when a material downturn in the crypto

22  market began.  The collapse of Three Arrows Capital as we

23  talked about with Your Honor and more generally the crypto

24  winter caused contagion that nobody had understood or ever

25  predicted across the sector and led to material withdrawals

1  that we were able to weather through because of the FTX

2  backstop.

3          That sector contagion, as we've talked, about really

4  began in May with the Luna collapse.  And although BlockFi

5  didn't have any direct exposure to Luna, as everybody else

6  started pausing their platforms, BlockFi had immediate requests

7  and massive withdrawals.  And it was industry wide and no one

8  was free from it.

9          The deterioration of the sector had an impact

10  obviously on BlockFi's equity value and Counterparty A's

11  investment which had been made at the end of '21 and in March

12  and April of '22.  To be very clear, and I think this is super

13  important, Counterparty A's recourse against the BlockFi

14  executives was contractually limited to BlockFi's shares

15  themselves.

16          So Counterparty A had no viable claim against anyone

17  or the employees, but it certainly could sue as a contractual

18  party because it had agreed it had no recourse again.  And so

19  what happened in June of 2022?  Counterparty came to BlockFi

20  and threatened to bring unfounded claims against the company

21  directly generally and, in our view, seeking to use expensive

22  burdensome litigation to recoup the value of Counterparty A's

23  unsuccessful investment.

24          The theories that were articulated at the time, and

25  this predates my involvement, but it's been conveyed to me that

1  the theories were vague but generally suggesting that BlockFi

2  should have disclosed more information about the damage to its

3  business caused by sector contagion than it otherwise did.  And

4  as Counterparty theorized, without evidence that BlockFi knew

5  more than it did earlier than it did.

6         But BlockFi had to assess the threats from

7  Counterparty A and at the same time, it entered into the FTX

8  transaction to backstop those customer withdrawals.  Now the

9  transaction with FTX, remember, was hugely helpful to BlockFi

10 clients but disrupted the equity holders.  FTX agreed on that

11 $400-million junior loan, but essentially backstopping the

12 company and wiping out millions and hundreds of millions of

13 dollars in proposed equity value that existed just a few months

14 before.

15        And as a result of that FTX transaction, FTX had

16 appointed an observer to BlockFi's board of directors.  And

17 from FTX's perspective, what FTX said both publicly and

18 privately, and I was witness to this in multiple different

19 arenas, a key benefit of the deal with BlockFi from FTX's

20 perspective was stabilizing not only BlockFi but the sector

21 more broadly.  And that was FTX's goal and Sam Bankman-Fried

22 has stated it over and over again he wanted to be the white

23 knight to try to save the industry when in reality, he was

24 someone in a much darker place trying to save himself.

25        But that being said, the board observer was very

1  concerned that litigation around this issue with Counterparty A

2  would be distracting and potentially impair our ability to not

3  only stabilize the business post the $400-million junior

4  funding but affect the FTX transaction.  And as a result, with

5  the money funded from the FTX transaction, the board considered

6  ways in which a settlement could be effectuated with

7  Counterparty A given that the lawsuit itself could cause harm

8  both to the business and to the employees and at the same time

9  drain resources of the company.

10            So as a result, the threats from Counterparty A were

11  resolved in a confidential settlement agreement that we note

12  was entered into on August 23rd, 2022.  It was between

13  Counterparty A, BlockFi, and each of the executives that were

14  involved.  And the settlement was brought to and approved by

15  BlockFi's then board of directors including disinterested

16  directors at the time.

17            The claims that were advanced, as I mentioned, Your

18  Honor, were directly against BlockFi and that BlockFi had

19  allegedly provided misleading information or not enough

20  information.  We all disagree and dispute.  We thought these

21  claims were specious.  But, again, Counterparty A had no

22  recourse against the individuals, and all they could do was

23  make noise.

24            Due to the structure of the settlement, certain

25  payments, Your Honor, were routed through the executives and

1  ultimately made to Counterparty A.  The payments also created

2  tax liabilities for the executives even though they did not

3  keep the funds.

4        So as you'll see on this slide, and it's essential to

5  understand this, the recipients named on this slide did not

6  keep any funds.  The company agreed to make these settlement

7  payments in some instances directly to the employee but the

8  employee then would pay the taxes associated with the amounts

9  and then distribute the rest to Counterparty A.

10       So when the schedules are filed on Wednesday, there

11 will be a spreadsheet of all payments made and some of those

12 payments will have the numbers on this slide and will say

13 litigation settlement.  The executives again themselves were

14 mere conduits of those payments to fulfill a settlement where

15 BlockFi settled claims made by Counterparty A.

16       And suffice it to say, we, the team at Haynes and

17 Boone and Cole Schotz and now together with the Committee, will

18 be looking at all recourse we have with respect to the

19 approximately $15 million of payments that were made to

20 Counterparty A.  And rest assured, Your Honor, that we will do

21 everything we can to make sure these estates are whole and

22 spared from specious litigation claims.

23       But I did think this was important enough to spend a

24 few minutes walking the Court through, walking our stakeholders

25 through, and really giving everybody a preview of what would

30

1  otherwise be buried in schedules and statements.  We think this

2  is incredibly important.  We think this case is different.  We

3  think this management team is different.

4          And case in point, I think us spending the time being

5  transparent and laying out that there really is nothing for

6  people to see when you understand and peel back the onion was

7  important from our perspective.  And, again, I appreciate Your

8  Honor allowing me the time and to appear via remotely.

9          Thank you, Your Honor.

10          THE COURT:  Thank you.

11          Bear with me.

12          Mr. Sussberg, is there anything additional on the

13  status you wish to say before I go to others in and outside of

14  the courtroom?

15          MR. SUSSBERG:  That is all, Your Honor.   Thank you.

16          THE COURT:  Okay.  Great, thank you.

17          And we'll take down the slides.

18          Thank you.

19          All right.  Let me turn to counsel who are the

20  present.  Committee counsel wish to be heard on the status?

21          MR. STARK:  Your Honor, I did have a few remarks I

22  wanted to make.  Mr. Sussberg stole a little bit of my thunder,

23  but then he went off into a whole lot of really interesting

24  things that I don't have anything to comment on about now as

25  I'm learning about them.

1          THE COURT:  As we all are.

2          MR. STARK:  As we all are.

3          Can I have a few minutes, please --

4          THE COURT:  Absolutely.

5          MR. STARK:  -- just to give you our perspective?

6          THE COURT:  Yes.

7          MR. STARK:  Thank you.

8          Again, Robert Stark, proposed counsel to the official

9   Committee of Unsecured Creditors.

10          And I do want to thank Mr. Sussberg, and I'll talk a

11   little bit more about him and their approach in a minute.  But

12   I do think that's helpful.  I'm thankful for it.

13          As Mr. Sussberg said and put on the slide, on

14   December 21, so just before the holiday week, the Official

15   Committee of Unsecured Creditors was appointed.  We do have

16   nine individuals.  They are thoughtful, intelligent individuals

17   with real-life experiences.

18          They're sophisticated on all matters related to

19   crypto.  I'm learning an awful lot from the time that -- we

20   hadn't had a lot of time together, but they're very good at

21   teaching, and I'm learning an awful lot from them already.

22          And they're varied.  They were varied in their

23   investments in terms of the currencies that they invested in

24   and the kinds of accounts they had at BlockFi.  So they're a

25   good representative group, and they are working awfully hard.

1  And I wanted to give Your Honor and, frankly, if you'll allow

2  me to use the bully pulpit.

3          THE COURT:  Yeah.

4          MR. STARK:  -- all those who are listening in, we

5  have a good representative, hardworking, intelligent committee.

6  And we're working well together.

7          And I'll continue to update the Court if there's any

8  issues, but I don't anticipate any looking at this group as I

9  have already.

10          We have an attitude or an approach to this case, and

11  again not only for Your Honor but for everyone who is

12  listening.  We're in a new industry here.  We're in a new

13  industry for bankruptcy here.  But there have been a couple of

14  crypto platform bankruptcies that are a prelude for what we're

15  doing here in BlockFi.  And we've studied them, and we've

16  learned from them.  Some are good; some are not so good.

17          One of the lessons that we have learned is that

18  financial platforms as a general matters or perhaps

19  cryptocurrency specific today, don't age well in bankruptcy

20  like a fine wine.  They can be overprocessed.

21          And so moving thoughtfully, diligently, but quickly,

22  being aware of the cost, being aware of the burden, being

23  decisive, and being efficient with the Court's resources and

24  the Chapter 11 resources may be more at a premium here than in

25  any other normal bankruptcy case that we would deal with.  And

1  that is a very significant part of our theme which is whichever

2  path we're going on, be thoughtful and diligent about it but

3  then make a decision and go with it because people are losing

4  money, by the way, and we don't intend to be stuck.

5        We met with the company, as Mr. Sussberg said, on

6  Friday.  We had a full-day meeting with them.  It's good old-

7  fashioned bankruptcy where everybody saw the whites of each

8  other's eyes and we had a very frank and very constructive

9  conversation with the management team and the professional

10 team.  It was a good kickoff meeting.

11        And they shared a great deal of information with us,

12 and they have since that.  And they're clearly being well

13 advised.  Some of the best in the business are on the BlockFi

14 side, and I have very strong personal relationships with these

15 individuals.  I've worked with them, as Mr. Sussberg said, in a

16 number of cases.  And as true to our past experiences together,

17 we're talking the way that we're supposed to in Chapter 11 and

18 we're learning.

19        And the executive team seems to share our view.

20 Thoughtful, diligent, quick, efficient, decisive.  Let's not

21 sit stuck in Chapter 11.  So we all seem to share that view,

22 and that was a theme that was replete to our meeting on Friday

23 and ever since.  We're going to have our disagreements.  That's

24 why we have a V that divides us.  And we're going to try to

25 minimize them.

1          We have a shared agreement amongst the professionals

2    and the clients that if we extrapolate litigation and fight

3    over everything, that's not going to be consistent with a

4    shared thematic approach to this Chapter 11 case.  So we're

5    going to try to resolve things where we can.

6          When we have disagreements, we're going to do it in a

7    very professional, fair, and orderly manner so that we get

8    things resolved.  And I think you saw from Mr. Sussberg today

9    the transparency idea is carrying through already.

10          For the customers who are listening in, again,

11   forgive me, Your Honor, for sizing the bully pulpit, but if

12   you'll allow me just to say a few things for those who are

13   listening.

14          THE COURT:  Sure.

15          MR. STARK:  There are many of you, many of them.  And

16   they have lose enormous amounts of money.  And I'm aware, not

17   only from my Committee but from others, that very significant

18   portions of people's own personal savings, retirement accounts

19   and wealth has gone away.  And that is a profound

20   responsibility on this Committee, and we acknowledge it.  We

21   live it every day full-time job.

22          And we're going to do everything we can to get people

23   their money back as soon and as large in dollar quantum as

24   possible and not getting stuck in the mud being decisive and

25   being efficient and keeping costs down and driving this case

1  forward to get people their maximum money.

2          We hired M3 and Elementis you saw on the screen.

3  They are experts as financial advisors and in this particular

4  industry space.  They are working very very hard to learn

5  everything they can how we got here, where we're going --

6  that's very unclear to me right now where we're going -- and

7  how soon and cost efficiently can we get there.  So we're

8  deeply -- already working deeply on that with the company.

9          We're going to be communicating with the customers.

10 We've already set up a Twitter account, and that one is a

11 little new to me so I'm going to learn from this.  We've set up

12 the website.  We are going to be delivering information to the

13 customer group overall.  It's their money, and we're going to

14 be talking to them.  And we want to deliver not only

15 information as we can -- confidentiality restrictions are very

16 important, we're going to honor them scrupulously.  But if we

17 can get information out, we will.  We'll do it timely, and

18 we'll try to be as insightful as we can so that the customer

19 community generally understands what's happening in this case

20 and how it's moving forward.  And we're always ready to speak

21 one on one with any customer who can call us 24/7 and we'll

22 respond promptly.  And we're going to answer all questions.

23          With that, Your Honor, I just open up for any

24 questions Your Honor may have for us.  But we intend to move

25 this case quickly with the other folks on the other side of the

 1  aisle in a very consensual way and try to get to resolution as

 2  Mr. Sussberg said.  We obviously have a lot to do.

 3          THE COURT:  Thank you, Mr. Stark.  Your comments were

 4  especially important for those that aren't here today.  I want

 5  to address very briefly that the Court is in receipt probably

 6  of two to three dozen individual objections that have been

 7  filed by customers and with many of them related motions for

 8  appearances.  We have done our best, besides the obvious, I

 9  read everything.  I'm trying to make that clear to all who

10  filed pleadings, they get read.  They get read by me, they get

11  read by my law clerks.

12          We are doing our best to direct individual customers

13  to the Committee now that it's been formed.  We're also

14  cognizant that there's an Ad Hoc Committee that's been formed

15  with respect to certain issues.  And I'm hoping between those

16  two committees and counsel representing those committees that

17  the concerns and issues that have been raised, often repetitive

18  -- same forms and same briefs and arguments -- can be addressed

19  and supported by counsel so that the Court need not endeavor to

20  allow individual appearances.

21          As much as I look forward to having individual

22  customers shared their views, their concerns, their arguments,

23  at this juncture, I'm asking that it be done on a written

24  platform.  And there's obviously transparency.  They are

25  welcome to watch and engage and engage with counsel for the

1  committees.  But it would just be problematic I think for all

2  of us to allow a disruption as far as the court proceedings in

3  having multiple dozens of individuals present views that are

4  shared by those that can represent their views to the Court.

5          So not really for your benefit but for those here as

6  well.  But for those that are watching, I'd like the customers

7  to understand that the Court is certainly weighing all of the

8  information that's been provided to the Court subject to

9  arguments that go back and forth.  But at this juncture, I'm

10 not authorizing any individual appearances separate and apart

11 from actual pending motion practice or adversary proceedings

12 where parties of course are -- their arguments are going to be

13 entertained.

14         So with that, I don't know, Mr. Stark, is there

15 anything else you wanted to add at this juncture?

16         MR. STARK:  Two things.

17         THE COURT:  Yes.

18         MR. STARK:  Only that we are solicitous of that.  If

19 there are customers out there who are in fact interested in

20 filing pleadings to be heard by the Court, it might be better

21 if they just call us first.  We would be very honored to

22 receive those calls and see if we can't be helpful and in turn

23 help the Court, if that's responsive to Your Honor's --

24         THE COURT:  No, I think that's the best approach and

25 that's what we've been trying to urge them to do.

1          MR. STARK:  And, second, I think I may have misstepped

2  on something earlier if you'll allow me just to correct our --

3          THE COURT:  Yes, good.

4          MR. STARK:  And when I was talking earlier about

5  returning people's money to them in sort of quantum and dollar

6  amount, I meant value.  It may be in some respects that

7  returning people in kind is better for tax and other purposes.

8  So I just wanted to make sure the record is clear on that.

9          THE COURT:  No, it's clear and an important issue.

10          MR. STARK:  Yes, Your Honor.

11          THE COURT:  Thank you.  Thank you, counsel.

12          Counsel?

13          MR. KANOWITZ:  Thank you, Your Honor.

14          Richard Kanowitz, Haynes and Boone, proposed counsel

15  for the debtors and debtors in possession.

16          We have two other items on as well as some other

17  housekeeping to discuss, but we could discuss the housekeeping

18  at the end of the hearing.

19          I would ask the Court to hear the Gerro lift-stay

20  motion first and then we could turn to the adversary proceeding

21  issues.

22          THE COURT:  That's fine.  But before we get to the

23  Gerro matter, let me just make sure with respect to the status

24  conference, I didn't know if there's any other party that

25  wanted to be heard.

39

1        Let me start in the courtroom.  I didn't know if the
2  U.S. Trustee, Mr. Sponder, did you wish to be heard on the
3  status?
4        MR. SPONDER:  Thank you, Your Honor.
5        Jeff Sponder from the Office of the U.S. Trustee.
6        Just very briefly, Your Honor, just for the record,
7  United States Trustees continues to discuss with the debtors
8  the final first-day orders, the second-day motions, as well as
9  the retention applications, and we hope to have as much
10  resolved as we can prior to the next hearings.
11        THE COURT:  All right.
12        MR. SPONDER:  Thank you, Your Honor.
13        THE COURT:  Thank you.
14        Ms. Kovsky Apap?
15        MS. KOVSKY APAP:  Good morning, Your Honor.  Deb
16  Kovsky, Troutman Pepper, for the Ad Hoc Committee of Wallet
17  Account Holders.  I would just add my thoughts as far as
18  status, there are individual customers whose interests are
19  aligned with those as the Ad Hoc Committee.  Of course, they
20  should feel free to reach out.  I'm more than happy to speak
21  with them.
22        THE COURT:  Great.  And I thank you for your
23  participation.  I think it will be important.  Anyone else
24  remotely wish to be heard on the status?
25                    (No audible response)

1          THE COURT:  All right.  Then I think we're ready.

2 We'll proceed to the Gerro stay relief motion.  Let me have

3 appearances for counsel for the movant.

4          Ms. Knowlton?

5          MS. KNOWLTON:  It's Carol Knowlton of Gorski and

6 Knowlton appearing on behalf of the movant, George Gerro.

7          THE COURT:  All right.  And I see Mr. Gerro.  Who's

8 going to be presenting argument?  Is it you or Mr. Gerro?

9          MS. KNOWLTON:  I am.

10          THE COURT:  You are?  All right.  I think -- is

11 Mr. Gerro's father counsel?

12          MS. KNOWLTON:  Yes.  Mr. Gerro's father was counsel

13 to him in the California case.

14          THE COURT:  Okay.

15          MS. KNOWLTON:  He hasn't --

16          THE COURT:  He hasn't entered --

17          MS. KNOWLTON:  -- filed anything here.  Right.

18          THE COURT:  Okay.  That's what I wanted to clarify.

19          MS. KNOWLTON:  Right.

20          MR. GERRO:  Yes, Your Honor.  I will allow

21 Mrs. Knowlton to present the argument.  I am here just in case

22 I'm called upon or if needed.

23          THE COURT:  All right.  Thank you.

24          Ms. Knowlton, proceed.

25          MS. KNOWLTON:  Yes, Your Honor.  The debtor's

41

1  attorneys have filed both an objection and a surreply.  And in

2  that, their position is we shouldn't waste the money and the

3  time going -- allowing relief from the stay for Mr. Gerro to go

4  to California to have his case heard, because it's -- because

5  there are hundreds of thousands of creditors in this case, and

6  we should just abide by the claims process.  Unfortunately, I

7  don't know that the claims process would be applicable here.

8        Mr. Gerro is -- his point is because of the fact that

9  there is a forum selection clause and a waiver of right to a

10 jury trial in the contract, he needs to go to the California

11 court to have that matter decided.  He went to the California

12 court.  And at the time of the filing of the bankruptcy, there

13 was a court of appeals order or opinion that granted him the

14 right to have his case heard in California, because to do

15 otherwise would possibly deprive him of his right to a jury

16 trial as well as some other unwaivable rights that are present

17 in California but not necessarily present in Delaware or other

18 states.

19        I understand the argument.  I see that this is an

20 enormous case, obviously.  And I heard Mr. Stark.  I heard what

21 he said about having -- have it be economical and efficient.

22 And I agree with that to some extent, except for that fact that

23 this is not an administrative or procedural issue.  This is an

24 issue about waiving his unwaivable right, his absolute right in

25 California to a jury trial on the issues of his case.

42

1  Therefore, I think that it is appropriate to grant him relief

2  from the stay in order to proceed to the Supreme Court of

3  California.

4        The debtors -- when the California Court of Appeals

5  entered their decision that it was actually California that

6  should hear the case, the debtors appealed to the Supreme

7  Court.  And that's what's pending right now.  But right now,

8  that order from the California Court of Appeals is the standing

9  order.  That's the decision.

10        And I know that in their surreply, the debtors

11  submitted hundreds of pages of pleadings.  The one noticeably

12  absent one was that order that the California Court of Appeals

13  provided.  That is already, however -- and maybe that's why

14  they didn't submit it, but it's already in the motion as

15  Exhibit 3.  The original motion that we submitted on behalf of

16  Mr. Gerro has that order in it.

17        And that indicates that the reason that they wouldn't

18  allow it to be heard in Delaware, which is what the contract

19  agreed to, is that they weren't convinced by what the debtors

20  had proposed -- or had submitted, I should say -- they weren't

21  convinced that it would guarantee that Mr. Gerro would get his

22  right to a jury trial and would get any of the other unwaivable

23  rights, that the debtors hadn't submitted enough evidence to

24  show that he would get that.

25        So I understand that we need to be efficient.  I

1 understand that things need to be heard promptly.  But the --

2 but I don't know that having it heard in New Jersey or through

3 this Court would make it more efficient or make it heard more

4 promptly.

5           On the one hand, the debtors are saying in some of

6 their papers that we should wait.  We should wait until the

7 claims process is done, that it's premature to do this.  On the

8 other hand, they're saying it would take too long to go to

9 California, because you won't be heard in California for a long

10 time.  You can't have it both ways.

11          One of the reasons Mr. Gerro wanted to file this now

12 was so that he could get started in California so that he

13 wouldn't be too late once the process here is completed and

14 also so that he wouldn't -- by going -- you know, to go through

15 the claims process, he can't then go to California.

16          So our position is that, despite the fact that there

17 are many, many creditors in this case, despite the fact that

18 it -- it's -- yes, it's going to cost money -- it would cost

19 money here.  It would cost money here, because it's going to

20 be -- because the debtors admit it's a disputed claim.  It's

21 going to be a long process.  And it's our position that his

22 right to a jury trial and the other unwaivable rights is

23 something that he shouldn't be deprived of just because there

24 are hundreds of thousands of creditors and because these are

25 procedural matters that, you know, weigh against him.

1          THE COURT:  But couldn't each of those hundred

2  thousand creditors make the same argument?  Is there a basis

3  for Mr. Gerro to opt out of the claims process that Congress

4  has implemented, the -- under 502, the allowance process?

5  Isn't this the forum that Congress selected to displace the

6  burden on debtors to litigate claims issues across the country?

7          I mean, that's what I'm struggling with.  And I

8  understand that there are jury rights that have been asserted

9  under state law.  There -- of California.  There are other

10  substantive rights.  You could point to many claims in this

11  bankruptcy in which -- that are bottomed on substantive rights

12  under state law which are at loggerheads with the scheme

13  implemented under the Code.

14          MS. KNOWLTON:  Yes, Your Honor.  I understand that.

15  The thing that's different here is that the agreement that

16  exists between BlockFi and Mr. Gerro has a clause in there --

17  has a jury waiver clause and a forum selection clause, and that

18  makes it Delaware.  And what we're worried about is that in the

19  claims process that you, as the bankruptcy judge, would have to

20  look at that agreement and have to honor that agreement.

21  Whereas the California court's saying, despite that agreement,

22  this should be heard in California.

23          I don't know if there's a solution to that.

24          THE COURT:  Why would this Court come to a different

25  resolution of a conflict of law issue?  Wouldn't that be guided

1  by the applicable law, restatement of law as we apply it to

2  which is the choice of law?  You would think all courts would

3  reach the same conclusion.  And I certainly have -- and,

4  Ms. Knowlton, you've litigated in front of me often enough

5  various state law issues, even outside New Jersey --

6             MS. KNOWLTON:  Oh, I know.

7             THE COURT:  -- issues.

8             MS. KNOWLTON:  I know that you can do that, Your

9  Honor.  I'm confident in your ability to do that.  I have been

10 in front of you many times, and I've listened to other cases

11 that you've done.

12             I think what Mr. Gerro is worried about is would you

13 have -- would you feel compelled to comply with the agreement

14 that gives it the Delaware forum.  I think if he were confident

15 that you wouldn't -- and, of course, we can't know that.  We

16 can't know that until we're there.  But if he were confident

17 that you were going to have the decision made in accordance

18 with California law, it -- he wouldn't be as concerned about

19 the fact that he's not in California.

20             THE COURT:  All right.  I interrupted.  Do you have

21 anything else?

22             MS. KNOWLTON:  No, I don't.  I wanted to keep it

23 short and sweet, because I realize that I'm taking up a lot of

24 time here.

25             THE COURT:  No.  We'll make sure it's comprehensive.

1 Thank you, Ms. Knowlton.

2          MS. KNOWLTON:  Uh-huh.

3          THE COURT:  I'll give you a chance to respond.

4          Mr. Kanowitz?

5          MR. KANOWITZ:  Thank you, Your Honor.  For the

6 record, Richard Kanowitz, Haynes and Boone, proposed counsel

7 for the debtors and debtors in possession.  I'll be very quick,

8 Your Honor.

9          There is no cause to lift the stay, whether it's a

10 3-part test, a 12-part test.  Mr. Gerro's not a creditor here.

11 There's no money owed.  He's a creditor in the broadest sense

12 of what's defined as a claim in the Bankruptcy Code, because he

13 has a unliquidated, disputed something.

14          We would just ask that Your Honor deny the lift stay

15 motion.  In fact, I think, based on the reply that they filed,

16 they are actually not seeking lift stay.  They're asking Your

17 Honor to give them certain relief and protections that they're

18 not afforded to.

19          We have a supremacy clause.  We have a claims

20 process.  To the extent that Mr. Gerro wants a distribution

21 from this estate, he needs to file a proof of claim.  That will

22 impact certain rights that he has.  We will proceed accordingly

23 at that time.

24          Everything else that he's requested in his papers is

25 premature, and we ask you not to grant it.  Thank you.

47

 1          THE COURT:  Thank you, Mr. Kanowitz.

 2          Does the Committee take a position?

 3          MR. AULET:  Your Honor, the Committee has not

 4  considered this matter at this time.  We do not take a position

 5  on this lift stay motion.

 6          THE COURT:  All right.  Is there any other party in

 7  interest taking a position?

 8          Mr. Gerro, your hand is raised.  You have counsel,

 9  but I'll give you some latitude.  Did you want to weigh in?

10  Oh, I think you're still muted.  There you go.

11          MR. GERRO:  Yes.  Thank you, Your Honor.  I just

12  wanted to note that the distinguishing factor between this

13  claim and other claims is that the case is already pending.

14  That is a relevant factor for purposes of the abstention

15  doctrines.  Both abstention doctrines apply to cases that are

16  already pending.

17          And also, the rules recognize that a case that's

18  already pending can be removed and proceed as an adversarial

19  proceeding.  So that is another distinguishing factor that

20  distinguishes this claim from the other few disputed claims in

21  this case.

22          THE COURT:  All right.  Thank you.

23          Ms. Knowlton, is there anything else you wanted to

24  add in response?

25          MS. KNOWLTON:  No, Your Honor.  I know my voice

1  doesn't carry, and it certainly didn't carry from back there.

2  No, Your Honor.  Thank you.

3              THE COURT:  Oh, all right.

4              I understand the frustrations of a creditor who is in

5  the midst of litigation having it halted as a result of a

6  bankruptcy, but those frustrations are shared in this case by

7  other parties and by creditors who are also looking to assert

8  their rights, even if they hadn't been brought before a court.

9  I am also cognizant that there is a pending litigation.

10             This is -- I am not hearing a motion for remand.  If

11 a matter has been removed at this juncture, I am not addressing

12 abstention issues.  There is certainly a large and significant

13 body of law which addresses both permission and mandatory

14 abstention if litigation is brought by removal before the

15 Court.  What I have is a -- I think Mr. Kanowitz noted, a

16 disputed, unliquidated claim or a potential -- well, I think

17 the debtor acknowledges that they're disputing a claim, and a

18 claim is very broad.  But that's all we have at this juncture.

19             In my view, it would be folly to start lawyers on the

20 path of continuing litigation in other fora -- this may have a

21 bearing down the road -- when we're not sure as to potential

22 distributions in this case.  Certainly, resolution of

23 litigation must take into account is this a 100 percent case;

24 is this a 5 percent case.  That's how you decide whether it

25 makes sense to continue litigation or reach a settlement or

1 even pursue mediation.

2          We are far removed from that stage in this case.  And
3 I appreciate all counsel wanting to get there quickly.  So does
4 the Court, by all means.  But we're not there yet.

5          To allow continued litigation, which from my
6 understanding the focal point is simply where it should be
7 litigated, not -- and no court has reached the substance of
8 the -- of Mr. Gerro's claims or the basis for any defenses.
9 And to spend time and money at this juncture on an appellate
10 process focused on where the case should be litigated where
11 there is a forum that Congress has put in place in light of the
12 Code for allowance and disallowance of claims -- and the
13 ability down the road, if I want to punt, so to speak, and send
14 it out, those options remain.  But it's far too early.

15          And I'm going to deny the motion without prejudice at
16 this juncture, the motion being for stay relief, even with
17 respect to the pending Supreme Court -- California Supreme
18 Court matter.  I am going to direct when the -- that Mr. Gerro,
19 in his discretion and with consultation -- in consultation with
20 counsel, decide whether to file a proof of claim.  And if the
21 claims are filed, we will address those claims as with all
22 claims through the Section 502 allowance process.

23          If the litigation is removed to me, God bless.  We'll
24 address that when the time arises in the appropriate fashion
25 with the appropriate body of law that's applicable.

1          At this juncture, the Court will enter an order

2  unless debtor's counsel wants to submit any specific form of

3  order.

4          MR. KANOWITZ:  It's up to you, Your Honor.  I think

5  we have a proposed form of order, but if Your Honor wants to

6  submit -- I mean, enter one by yourself, we're fine with that.

7          THE COURT:  I will look at the order.

8          Ms. Knowlton, why don't --

9          Let me ask, Mr. Kanowitz, why don't you forward a

10  copy again of the proposed order to Ms. Knowlton.  She and her

11  client can review it.  If there's an issue, we can have a

12  conference call.

13          MR. KANOWITZ:  Thank you, Your Honor.

14          THE COURT:  All right.  Thank you.

15          MS. KNOWLTON:  Yes, Your Honor.  Thank you, Your

16  Honor.

17          THE COURT:  Thank you, Mr. Gerro.

18          MR. KANOWITZ:  The next matter, Your Honor, is, in

19  fact, the --

20          THE COURT:  Oh --

21          MR. KANOWITZ:  Yeah.  Sorry.

22          THE COURT:  Oh, let me just --

23          Mr. Gerro?  Do you want to be heard?  Go ahead.  Very

24  briefly.  You need to unmute yourself.

25          MR. GERRO:  Yes.  Your Honor, I wondering if the

1  non-debtor, Scratch, that did not oppose the motion for stay

2  relief -- I was wondering if the Court would entertain allowing

3  the stay to be modified so that it can -- the case can

4  (indiscernible) Scratch only.

5          THE COURT:  I think Scratch is the agent.

6          MR. KANOWITZ:  They --

7          THE COURT:  At this juncture, there is no automatic

8  stay as to them.

9          MR. KANOWITZ:  Correct.  We have not sought to extend

10  the automatic stay, either 362 or 105, to their benefit.  And

11  there's no motion in front of you for Mr. Gerro's request.  If

12  they believe that the stay applies and, in an abundance of

13  caution, they want to make application, they can do so.  I

14  don't know until they file their papers what they put in there.

15  That may be or may not be prejudicial to the debtor's estate.

16          THE COURT:  Counsel, at --

17          MR. GERRO:  Your Honor, we believe --

18          THE COURT:  -- at this juncture, Mr. Gerro, you are

19  free to proceed as you think it's appropriate in consultation

20  with counsel as to Scratch.  It is not a debtor before me.  I

21  think that's the --

22          MR. GERRO:  Thank you, Your Honor.

23          THE COURT:  -- limit of what I can offer you at this

24  juncture.

25          MR. GERRO:  May we put that in the order denying it

1  without prejudice, so it would be granting in part, denying in

2  part without prejudice, so that way that the California Supreme

3  Court feels comfortable proceeding without violating the

4  automatic stay?

5           THE COURT:  Well, there hasn't been a motion for stay

6  relief with that entity, I don't believe.

7           MR. GERRO:  Oh, Your Honor, this motion did request

8  the stay relief for that entity.  They were served, and it's --

9  it is in the papers.  It is in the moving papers, Your Honor.

10          THE COURT:  Mr. Stark?

11          MR. STARK:  Your Honor, forgive me.

12          THE COURT:  Yes.

13          MR. STARK:  And I know that we have -- we said we

14  didn't take a position in this.  We can't possibly respond

15  about some litigation that we haven't looked at yet.  It's

16  risky to sort of go ahead and continue a litigation with a

17  co-defendant when one of your defendants, at least allegedly,

18  is a debtor.

19          And I think what I understood Mr. Kanowitz saying is

20  those are the risks you assume if you want to do that.  But we

21  as the Committee, we cannot, without even studying the

22  litigation --

23          THE COURT:  Right.

24          MR. STARK:  -- understanding it and the impacts on

25  the estate, support any sort of an order that allows for

1  anything along -- so I'll be a little bit more blunt than

2  Mr. Kanowitz.

3         MR. KANOWITZ:  Your Honor, I'm just concerned about

4  any indemnification rights between our agreement --

5         MR. STARK:  Exactly.

6         MR. KANOWITZ:  -- with Scratch.  The motion is not

7  clear that they were seeking relief against Scratch.  It was

8  against the debtors.  That's why I filed it here.  We would

9  just ask Your Honor just to deny the motion as requested.  And,

10 in fact, maybe now, Your Honor -- I revisit my statement.

11 Maybe you should enter an order so that we don't have satellite

12 litigation over the terms and conditions of what should be a

13 very simple one-page order denying without prejudice --

14        THE COURT:  Yeah.

15        MR. KANOWITZ:  -- the lift stay request.

16        THE COURT:  Well, I think you can enter -- you can

17 work on the order, and it'll be fine.  I'm not going to include

18 in the order any provision relative to Scratch.  I think that

19 if the California Supreme Court or Mr. Gerro wishes to relay

20 the -- this Court's view, I've already given my view.  It's in

21 the transcript.  And so you're free to provide a transcript to

22 the California Supreme Court with respect to my ruling.

23        MS. KNOWLTON:  Thank you, Your Honor.

24        THE COURT:  All right.  Thank you.

25        Thank you, Mr. Gerro.

1            MR. GERRO:  Thank you, Your Honor.

2            THE COURT:  You're welcome.  All right.  Let's move

3   on to the -- I think the only remaining, although significant,

4   matter is the pending turnover motion filed by the debtor with

5   the plethora of opposition that's been filed.

6            Mr. Kanowitz or --

7            MR. KANOWITZ:  Your Honor, thank you.  Mr. Anigian

8   will this --

9            THE COURT:  Mr. --

10           MR. KANOWITZ:  -- part of the hearing.

11           THE COURT:  All right.  Thank you.

12           Good morning again, Mr. Anigian.

13           MR. ANIGIAN:  Good morning, Your Honor.  For the

14  record, Rick Anigian with Haynes and Boone, proposed counsel

15  for BlockFi, Inc., BlockFi Lending and BlockFi International.

16  Your Honor, I know that you've read all the papers, so I'm not

17  going to address background facts or the procedural status of

18  this unless you have questions or want me to go into that.

19           THE COURT:  No.  Luckily, there were no football

20  games important yesterday.  Go ahead.

21           MR. ANIGIAN:  I assume you're aware of this, but the

22  collateral since our December 28th hearing has been seized by

23  the government.  What the collateral consists of is

24  approximately 55.2 million shares of Robinhood Markets Inc.

25  common stock.  And there's approximately $21 million of cash.

1 It was all seized by the government from Marex on January 4th.

2         The turnover motion originally sought to protect all

3 the parties who were claiming an interest in the collateral.

4 The collateral has now been secured.  We're not sure it's being

5 protected.  During our December 28th hearing, if you recall,

6 the parties discussed maximizing value of the property for any

7 and all constituents or -- who may ultimately benefit from the

8 funds that were seized.

9         Counsel for BlockFi, FTX, Marex, the emergent JPLs

10 and also Mr. Bankman-Fried had a discussion.  We discussed

11 having an advisor be appointed to give advice as to maximizing

12 value of the collateral.  This was somewhat interrupted by the

13 seizure.  We have had discussions with the government

14 concerning whether we should have an advisor appointed or at

15 least contemplated to give advice as to maximizing the value of

16 the collateral, which we think that's in the best interest of

17 all parties concerned.

18         No agreements have been reached.  Discussions are

19 ongoing.  And BlockFi has reserved all of its rights related to

20 the seizure with respect to actions of the government.

21         One of the purposes of today's -- or the purpose of

22 today's hearing originally was to determine whether the

23 collateral would remain at Marex or whether it would be

24 transferred to a third party, all subject to this Court's

25 jurisdiction.  Notwithstanding that the government has taken

1 possession of the collateral, we still believe there are

2 important matters for the Court to consider today.

3          And what we're asking for today is for the Court to

4 retain jurisdiction over the rights to these disputes as to

5 title, as to rights and priorities in the collateral itself.

6 We would also ask the Court to prohibit the Emergent JPLs in

7 their action in Antigua from furthering -- taking further

8 actions that would impact BlockFi's rights to this collateral.

9 We would ask that the Court prohibit the FTX debtors in their

10 bankruptcy case in Delaware from taking actions with respect to

11 their stay motion that would impact BlockFi.

12          There was also -- we have filed an objection to

13 Mr. Shim's declaration that was filed by the Emergent JPLs in

14 support of their objection, and we would ask that that

15 objection be sustained.

16          Your Honor, the worldwide stay order that you entered

17 on November the 30th has been treated as it had never existed.

18 BlockFi has been measured in not seeking any relief, but it's

19 very concerned that the worldwide stay order has been

20 disrespected.  And if need be, at the appropriate time, we'll

21 file motions for -- contempt motions if necessary.

22          Without this Court enforcing the worldwide stay

23 order, there's going to be complete chaos here as evidenced by

24 all the objections that have been filed in this case.  There

25 have been multiple filings in the FTX proceedings.  There's

57

1  multiple filings in Antigua.  And this is all in addition to
2  the actions that the government has taken in its proceeding
3  with respect to the seizure of the property.

4          At this point, we've got the following parties who
5  asserted interest in this collateral: BlockFi, the FTX debtors,
6  the Emergent JPLs, the Department of Justice,
7  Mr. Bankman-Fried, and possibly the FTX trading JPLs who have
8  filed a motion in the FTX debtors' case but not in this case.

9          BlockFi, as we said on December 28th, is the only
10 documented creditor of Emergent.  We've got a pledge agreement.
11 We've got a filed UCC-1 statement.  Those are presumed to be
12 valid.

13         The FTX debtors, the FTX trading JPLs,
14 Mr. Bankman-Fried, they're all tainted with alleged and
15 admitted fraudulent or criminal activity of Mr. Bankman-Fried,
16 of Ms. Ellison and Mr. Wang.  BlockFi is not.  The Emergent
17 JPLs, they're a creation of litigation that was filed after
18 this bankruptcy proceeding was filed.  The JPLs -- the Antiguan
19 JPLs for Emergent weren't appointed until December the 5th, and
20 their application for appointment wasn't filed until December
21 2nd.  So all of that was after the worldwide stay order was in
22 place.

23         While these claimants may have rights and assert that
24 the BlockFi interest in the collateral is invalid, these are
25 all issues that ultimately be -- need to be decided.  We think

1 they should be decided in one forum.  We believe this Court

2 should maintain jurisdiction over that.

3          We will enter into a stipulation with the government

4 that will allow it to reserve all of its rights, and we'll

5 reserve all of our rights.

6          And this Court, we believe, is entitled to maintain

7 jurisdiction, because this was the first filed action involving

8 this collateral.  Under the Princess Lida Doctrine, this Court

9 therefore has jurisdiction over the collateral.  We don't see

10 that there would be any prejudice to any of the parties who are

11 claiming an interest in the collateral from appearing in this

12 court and having this court decide amongst everyone who's

13 entitled to this in terms of priority, title, et cetera.  It

14 may be us.  It may not be us.

15          But all these issues should be decided in one place,

16 and we submit that this is the Court where it should be done.

17 The Court has the right to do this.  It should be the

18 gatekeeper.  It can -- it has these powers under Section 105.

19 It also has inherent powers to conduct proceedings before it in

20 an orderly fashion.

21          And for these issues to be decided, they don't -- we

22 don't need to be proceeding in three different fora in Antigua,

23 in Delaware and here.  In Antigua, we've got big concerns about

24 due process.  And in Delaware, we were the first filed action.

25 We've got the direct claim in these -- in the collateral and,

1  therefore, ask that the Court maintain control over the

2  collateral here.

3          THE COURT:  All right.  Would you contemplate -- we

4  have a pending adversary proceeding that ostensibly seeks

5  turnover.  The United States is not a party.  Would the debtor

6  contemplate or is the debtor contemplating amending the

7  complaint --

8          MR. ANIGIAN:  Yes, Your Honor.

9          THE COURT:  -- to add additional parties?

10          MR. ANIGIAN:  Either -- yes, we are.  We need to

11  amend the complaint just because of the actions that have been

12  taken.  We've also sought declaratory relief that BlockFi has

13  priority to the collateral.  And so we would amend that.  There

14  have been -- even in the FTX debtors' objection, they said if

15  necessary they will quickly intervene in this action.

16          THE COURT:  Right.

17          MR. ANIGIAN:  The Emergent JPLs, they can intervene

18  in this action if they want to assert rights in the collateral.

19  With respect to the government, I think we'll reserve our

20  rights.  We haven't fully analyzed whether they need to be a

21  party to this action.  We know that you have certain authority

22  as set forth in your LTL decision with respect to actions that

23  have been taken under an alleged police power.  And we continue

24  to analyze those rights as well.

25          THE COURT:  Well --

1          MR. ANIGIAN:  But our --

2          THE COURT:  Right.

3          MR. ANIGIAN:  -- complaint needs to be amended at

4    this point.  If we need to modify our schedule because of the

5    addition of new parties, we're more than happy to do that.

6          THE COURT:  I'm aware of the Committee's motion to

7    intervene into the adversary proceeding.  We could talk about

8    that when we get to scheduling or next steps.

9          Certainly, from the limited notice of seizure that

10   the Court was provided with by the Department of Justice, I

11   believe the position is that the government believes the title

12   to the property is tied to the date of the criminal activity

13   which may or may not -- I mean, I'm certainly today not making

14   any rulings on that -- but may or may not predate a pledge

15   agreement or -- and, clearly, in a two-page notice, there is

16   ample room for discussion as to the rights of third parties in

17   any such property that has been seized.  So it'll be

18   interesting.

19         And I understand Mr. Shapiro is not -- is appearing

20   remotely.  The government is not a party to the pending

21   litigation.  But he'll weigh in as appropriate.  But thank you.

22         Let me hear from then -- why don't we turn to counsel

23   for FTX.

24         MR. GLUECKSTEIN:  Good morning, Your Honor.

25         THE COURT:  Good morning.

1           MR. GLUECKSTEIN:  For the record, Brian Glueckstein,

2  Sullivan & Cromwell, for the FTX debtors.  Your Honor, we did

3  file a response to the motion opposing the actual turnover

4  motion consistent with the Court's scheduling order.  We have

5  not intervened in the adversary proceeding at this point but

6  appreciate Your Honor hearing it this morning.

7           THE COURT:  By all means.

8           MR. GLUECKSTEIN:  Your Honor, it was not entirely

9  clear to us what was going to be sought today.  I think from

10  Mr. Anigian's comments, I don't hear the debtors requesting the

11  relief that's actually contained in the turnover motion which

12  is to move the shares from what was in a neutral brokerage to

13  another brokerage account.  Given the seizure from the United

14  States government, we certainly would submit that that relief

15  is not available.

16           It sounds like what BlockFi is seeking to do is have

17  the Court affirm its jurisdiction.  Certainly there has been an

18  adversary proceeding that's been filed.  There's a schedule to

19  respond to that complaint in the adversary proceeding.

20           Our view at this point, Your Honor, is that we could

21  have a whole discussion if relief is put in front of the Court,

22  a motion put in front of the Court -- as I understand it,

23  there's no -- there's now no relief before the Court today with

24  respect to any of the stay or jurisdictional related issues.  I

25  think it's fair to say there's a difference of opinion -- and I

1  don't think it's just necessarily between us and BlockFi -- as

2  to where the ultimate decisions around interest in property

3  potentially should be decided.  I think the government has a

4  view on that that might be different from either one of us.

5          And so it certainly seems to us, Your Honor, that at

6  this point that the seizure by the government here is a very

7  significant event.  The suggestion that we're just going to

8  proceed to adjudicate rights and interests in property that we

9  don't know if the United States government is ever going to

10 release it, in what form it's going to release it, is it going

11 to still be shares, is it going to be cash, when is that going

12 to happen -- all of those are discussions that need to take

13 place.

14         We do agree with Mr. Anigian, and we had a

15 conversation, as he reported, last week about what seems to be

16 the pressing issue here which is ensuring that the value is

17 maximized for creditors.  BlockFi is a very significant

18 creditor in the FTX debtors' bankruptcy cases.  FTX -- one of

19 the FTX debtors is a significant creditor here.

20         But the question around jurisdiction and venue and

21 all of those issues seems to be putting a little bit cart

22 before the horse where the government's in possession of the

23 shares, is in possession of the cash.  We should be, in our

24 view, not litigating at this point rights in ultimate

25 distribution rights in those assets until we figure out what's

1 going to happen with them.

2          And so we do think that it makes sense to continue

3 the discussions around how to ensure that the shares are

4 maximized in value for everybody who has an interest.  But to

5 immediately have this fight around should -- you know, where

6 should evidence effectively be presented and to which court, I

7 think that is something that all of the parties would need to

8 weigh in on on appropriate papers.  And I think there is --

9 there are arguments that there are multiple courts that

10 potentially have jurisdiction.

11          I'm just not sure that all of those issues should be

12 teed up now when we have some real gating issues here that have

13 to be addressed both in terms of ensuring that the asset is

14 maximized and understanding what the government intends to do.

15 If BlockFi is intending to challenge the actions of the

16 government, they would need to, obviously, bring some sort of

17 process to do that.  And if they're seeking to return the

18 status quo to where we were a couple of weeks ago, that would

19 need to play out in front of a court, obviously of competent

20 jurisdiction.

21          So from the FTX debtors' perspective, Your Honor,

22 this is a significant asset.  We disagree with the

23 characterization of BlockFi that we simply have claims against

24 the asset.  The turnover motion and the arguments with respect

25 to the stay that BlockFi have put forward are all premised on

64

1  the idea, of course, that BlockFi has the property interest it

2  says it has.  And there are a number of gating issues there

3  that we just respectfully disagree with.

4        Certainly, we've asserted, the BlockFi -- I'm sorry,

5  the FTX debtors, that we have a direct property interest.  And

6  to the extent we're correct about that, Your Honor, the stay

7  obviously in our case would have attached which was filed three

8  or so weeks before BlockFi filed its case here.

9        So I think all of the arguments that have been put

10  before Your Honor as at least certainly with respect to the

11  competing claims between BlockFi and FTX go to the heart of the

12  merits issues.  Are merits issues ultimately going to have to

13  be resolved at some point?  Presumably yes assuming there's an

14  asset to distribute and the government isn't keeping it or

15  going to argue that it should be, you know, applied some sort

16  of penalty and going to be distributed.

17        But we think this fight around where -- potential

18  fight -- and perhaps over time issues will become clearer, and

19  perhaps processes could be agreed upon on what to do with an

20  asset.  But if we're talking about having an immediate fight,

21  we think it's premature.

22        We think there are gating issues that need to be

23  addressed with the government who is in possession of the

24  collateral.  They are not appearing certainly in this adversary

25  proceeding at this point in time.  And we think the parties

1 should take the time to do that before we unnecessarily press

2 ahead with a jurisdictional fight.

3        THE COURT:  But let me ask this.  And I appreciate

4 the concerns you've raised as far as timing.  And obviously the

5 Court -- I'm interested in hearing what the parties think the

6 next step should be.

7        But until notice of the seizure occurred by the

8 government, there was a pending action in Delaware court -- and

9 this is -- goes far beyond a turf battle among courts.  We're

10 looking at substantive issues here as to the interests and how

11 best to protect the creditors, both BlockFi and FTX's creditors

12 in this matter.  But there was -- there were efforts taken in

13 the Delaware court by your client which would seem on the

14 surface -- and I'm going to ask you to explain -- offend the

15 automatic stay in this court.

16        There is no question that I've seen that BlockFi

17 doesn't base its claim as having a lienholder interest, a

18 security interest in the shares.  Disputed, no doubt, by FTX

19 and by Mr. Bankman-Fried and by the JPL for -- in Antigua.  But

20 we're talking about a lienholder interest, a property interest.

21        And it would seem to me pretty clear under the Code

22 that a debtor's lienholder interest -- let's use simplistic

23 analogy.  If BlockFi asserted that it had a mortgage on a

24 commercial office building, certainly the office building isn't

25 property of the BlockFi estate, but that mortgage is.  And any

1    effort to prevent BlockFi from asserting its rights or any

2    pending action restricting BlockFi from fixing its rights in

3    its collateral certainly to me offends the automatic stay of

4    the debtor in this case.  It's a property interest, a security

5    interest.  Disputed, no doubt.

6           And whether it's this Court or Judge Dorsey or some

7    court in Southern District that decides it, we'll see.  But I'd

8    like to understand how -- and I would pose the same question to

9    the counsel for the JPLs -- how any effort to restrict BlockFi

10   in asserting its collateral interest to determine those

11   interests, to either prevent them -- prevent this debtor from

12   foreclosing on an interest or to seek a determination to fix

13   the extent and validity of an interest, how that doesn't run at

14   loggerheads with the automatic stay.

15          And it would seem that this Court has, under 1334,

16   certainly jurisdiction over the debtor's interest in the

17   collateral which is at issue here.  And I understand FTX takes

18   a different position.  But it seems to be that FTX -- their

19   interest in the collateral is bottomed on -- potential

20   litigation.  I understand that.

21          Mr. Bankman-Fried's interest in the collateral, I --

22   candidly, I'm not sure what it's bottomed on.  And I await to

23   hear that.

24          The liquidated -- the JPL liquidators, they're

25   there -- they're pursuing their responsibility to protect the

1 interests of Emergent's creditors, which to my understanding is

2 BlockFi and possibly FTX creditors which we have two courts

3 here in Delaware and New Jersey protecting those interests.

4 With this Court -- and this is a long-winded question.  But

5 with this Court clearly having authority and jurisdiction under

6 28 U.S.C. 1334 and the debtor having a property interest,

7 albeit disputed, a collateral interest, how are these actions

8 pending in other fora, is my question.  And what's the next

9 step, in your view?

10          MR. GLUECKSTEIN:  All right, Your Honor.  Let me

11 address that.

12          THE COURT:  I gave you a mouthful.

13          MR. GLUECKSTEIN:  There is a lot there.  So if I

14 could --

15          THE COURT:  Yeah.

16          MR. GLUECKSTEIN:  If I could unpack that a little

17 bit.  So to be clear, the motion that we filed in Delaware is

18 not asking at this juncture at all to determine the merits of

19 anything.  What we have asked is to enforce the automatic stay

20 of our debtors.

21          Because you're right, Your Honor.  There is a

22 fundamental disagreement here.  All right?  BlockFi has come

23 forward and said we have a collateral interest.  Okay?  The

24 nature of that collateral interest is not only disputed; the

25 existence of it is called into question.  All right?

68

1          And I don't want to argue the facts today, Your
2  Honor.  I don't --
3          THE COURT:  No.  I'm cognizant.
4          MR. GLUECKSTEIN:  I really don't think that's
5  appropriate.
6          THE COURT:  I've read --
7          MR. GLUECKSTEIN:  Okay.  But to be --
8          THE COURT:  -- the briefing, and I understand the
9  bases.
10         MR. GLUECKSTEIN:  Right.  But to be clear, all right,
11 what we have here is BlockFi saying we have an interest in
12 collateral that was granted 24 hours before the FTX debtors
13 filed for bankruptcy.  We have those documents signed by
14 somebody, Ms. Caroline Ellison, who has now pled guilty to
15 fraud.  We have Mr. Bankman-Friend who was involved in that
16 process now contesting whether Ms. Ellison even had the ability
17 to sign the documents that BlockFi is relying on to create that
18 interest in property.
19         Okay?  And so BlockFi is absolutely able to argue
20 those points.  And as I stated earlier, Your Honor, I do
21 believe that there are arguments that there are multiple courts
22 here that could exercise jurisdiction.  And we're not
23 suggesting that this Court is incapable of hearing these
24 issues.
25         The problem, though, Your Honor, is, again, if we're

1  correct that we have not just some avoidance claim or

2  fraudulent claim but if we're correct that the property that's

3  now been seized that BlockFi is claiming is their collateral

4  was, in fact, property of our estate when we filed for

5  bankruptcy in earlier November than BlockFi filed, then we

6  believe there's an automatic stay issue with them filing on the

7  first day of their case the adversary proceeding here which

8  Your Honor did not -- that -- those papers -- if we go back to

9  the original complaint and the turnover motion that was the

10 subject of this morning's hearing, nowhere in those papers does

11 BlockFi disclose the relationship of what this is about.  Was

12 this collection on a loan that they had outstanding to Alameda,

13 a very significant loan?  All right?

14          So and we heard this morning in the debtors' update

15 presentation all of the linkage between FTX and BlockFi.  And

16 so to suggest that this is just a collateral holder and we're

17 seeking to enforce our collateral, the facts here are much more

18 complicated than that.  And so, Your Honor, certainly to the

19 extent that the question here is, you know, competing stay

20 issues or stay violations, I -- you know, we're happy to brief

21 those issues.

22          But I do think there's a -- just a practical

23 consideration, right, which ultimately is going to be, is it

24 going to be Your Honor, is it going to be Judge Dorsey, is it

25 going to be a judge in the Southern District of New York

70

1  potentially as the government has suggested that's going to

2  decide the merits issues?  And it might very well be that the

3  parties can sit down and agree on that, ultimately, in terms of

4  putting some process around it.

5          But I think what -- our concern from the beginning

6  here was that papers were filed, you know, two hours into the

7  BlockFi case which was three-and-a-half weeks after the FTX

8  debtors had filed bankruptcy in Delaware.  We were not named as

9  a defendant in that lawsuit.  We're not even mentioned in that

10 lawsuit.  The issue, of course, now is what do we do about it?

11         And I think what's getting lost in this, Your Honor,

12 is we're talking about 55 million shares of stock and $21

13 million -- 21-or-so-odd-million dollars of stock -- of cash

14 that are in the possession of the United States government.  We

15 haven't heard anything from the United States government other

16 than the statement that they filed in this case, statement --

17 and they made a statement on the record in a status conference

18 in our case last week.

19         They certainly are in possession of those shares.  We

20 know that.  We know that they are going to safeguard them.  But

21 the issue is that Mr. Anigian started his remarks with at the

22 outset today I think -- when we think about next steps and we

23 think about what should happen, from our perspective, we should

24 not be having a dispute about jurisdiction this week or next

25 week.

1          We don't feel the need, frankly, Your Honor, for our

2  motion to go forward in Delaware that's pending if we could all

3  agree that what we're not going to be fighting about right now

4  is jurisdiction.  But what we should do is sit down and talk

5  about how to maximize the value of these assets.  Get an

6  understanding from the United States government to the extent

7  they're willing to discuss with the parties what their

8  intentions are with respect to these assets over the medium

9  term so that we can get some understanding as to whether the

10  parties can get comfortable around the process for ensuring

11  both that those assets are maximized and that when it becomes

12  necessary we have a -- see if we can reach some sort of process

13  about what to do.

14          I certainly don't believe it's in anybody's interest,

15  given that there's -- nobody's going to get possession of these

16  assets in the immediate term -- that seems clear -- to be

17  having the sorts of debates around who filed first, whose stay

18  might be implicated, and what should we do about it.  Because

19  from our perspective, that's not really in anybody's best

20  interest, Your Honor.

21          THE COURT:  Fair enough.  Thank you.

22          MR. GLUECKSTEIN:  Thank you.

23          THE COURT:  Let me hear from counsel -- well, counsel

24  approaching the podium.

25          MR. DORCHAK:  Thank you, Your Honor.  Joshua Dorchak

1 of Morgan Lewis again for the joint provisional liquidators of

2 Emergent.  I think everyone agrees, Your Honor, that the actual

3 relief sought in the motion is mooted or futile or something

4 like that, and I don't need to address it.  Am I correct on

5 that?

6         MR. KANOWITZ:  No, Your Honor.  We don't agree that

7 it's mooted.  We believe it's frustrated and maybe delayed, but

8 it's not mooted.

9         MR. DORCHAK:  Okay.  In that case, I'll start by

10 saying this, Your Honor.  My clients have no legal or practical

11 ability to move these shares that everyone is fighting over or

12 to freeze these shares that everyone is fighting over, to do

13 anything with them.  So the relief -- we can't do anything

14 about it unless the situation changes.  And that's been true

15 since the government took the shares.

16         So I -- actually turning them over to someone we

17 can't do.  So I'll just leave it at that now.  That's enough on

18 that subject.

19         THE COURT:  You can't do it, because they have been

20 seized?

21         MR. DORCHAK:  Right.  Exactly.

22         THE COURT:  Okay.  I just wanted to clarify.

23         MR. DORCHAK:  Not because we don't want to or

24 something.  The most important thing I think I need to address

25 is the idea that even though the Government's taken the shares,

1  there's some lingering wrongdoing going on out there.  I

2  certainly have to address what I think was irresponsible

3  over-the-weekend accusations that our -- my clients have been

4  sort of serially violating the automatic stay and acting in

5  contempt of Your Honor, including some comments made at the

6  last hearing.

7        So I need to address that right away, and the easiest

8  way to explain it, I think, is to tell you what's going on in

9  Antigua.  So the joint provisional liquidators were appointed

10 on December 5th.  And the order that appoints them, which is on

11 the record, says that the purposes of the provisional

12 liquidators appointment are to investigate the respondent's

13 affairs and to preserve the value of the respondent's assets

14 for the benefit of those entitled to them pending the

15 determination of the petition to wind up the respondent.

16       So the task of the JPLs is to investigate what

17 happened and to figure out how to amass the assets of the

18 company for the benefit of whoever is entitled to them.

19 There's no predetermination of who's entitled to the benefit of

20 these shares or who owns them.

21       And since being appointed, the JPLs have never asked

22 the Antigua court to make any decision -- make -- whatsoever

23 about who owns these shares or who should get the value of

24 these shares.  As we said the last time we were before you,

25 we're still trying to investigate what even happened.  And we

have not been sneaking around in the Caribbean behind your
back, Your Honor, trying to get some advantage over the BlockFi
estate when it comes to these shares.  I hope you believe me
when I'm saying that.

What's been going on since we were appointed is there
was an attack on the authority of the JPLs but -- in the first
instance by Samuel Bankman-Fried.  And then BlockFi joined that
attack to try and sort of kick my clients off the job.  And we
responded to that.  It was purely defensive.

And, again, the shares were not at issue.  The shares
were in the background, but there's -- there has been no
activity in Antigua about these shares.  And the hearing that's
scheduled toward the end of January is to get a wind up-order
out of the judge.  Again, it doesn't predetermine anything
about whose shares these are.

So my clients are fiduciaries.  They're --

THE COURT:  What is sought in the wind-up order?

MR. DORCHAK:  Pardon?

THE COURT:  What relief is sought in the wind-up
order?

MR. DORCHAK:  The wind-up order is sought to conclude
the -- to give the joint provisional liquidators the authority
to administer the estate for the benefit of stakeholders,
presumably the creditors who -- we have to first figure out who
that -- who those are, right?  And we're done.  We're holding

1  this asset, to the extent we're holding it -- the government's
2  holding it.  But our ownership of this asset in the hands of
3  these fiduciaries is for the benefit of whoever is entitled to
4  it.

5          And we've never asked for a ruling on who's entitled
6  to these shares away from this Court.  Now, we have questions
7  about where the best forum to do it is, and we've said that out
8  loud.  But we have not taken any affirmative action anywhere to
9  get some other judge besides you to decide this issue.

10          THE COURT:  But in order to effectuate the wind-up,
11  do you not need to take steps to determine the extent and
12  validity of either FTX's interest or BlockFi's interest?

13          MR. DORCHAK:  Sure.  Absolutely, Your Honor.

14          THE COURT:  So there is a competing proceeding going
15  on in another fora which affects -- which -- other fora which
16  affects the rights of this debtor -- I'm not speaking for the
17  FTX debtor, but it would seem to be parallel -- in --

18          MR. DORCHAK:  Your Honor, yes.

19          THE COURT:  -- in assets.  So we have potentially
20  three, if not four, different venues deciding --

21          MR. DORCHAK:  Beside --

22          THE COURT:  -- everybody's respective interests.

23          MR. DORCHAK:  Correct.  Your Honor, of course.  And
24  the estate can't be administered until these issues are
25  decided.  The JPLs in Antigua, as I've said, have not been

 1  asking that judge -- just as I -- I feel BlockFi's counsel sort

 2  of implied we're down there trying to take this decision away

 3  from you.  We haven't asked that judge to make that decision.

 4          We came up here as soon as -- with counsel -- by

 5  counsel for the JPLs -- came up here and contacted all the

 6  counsel for the parties in interest.  And our view was that we

 7  should talk about a most -- sort of an efficient way for

 8  everyone to get their claims on the table and hash this all

 9  out.  We also agree with various people that have said we want

10  the value of the shares to be preserved.

11          We did the opposite of trying to get this decided

12  back down in the Caribbean when nobody was looking.  We came up

13  here and said to Marex, our custodian -- because we do own the

14  shares, technically, Your Honor.  We asked our custodian to

15  freeze the shares, not to give them to us so we could go off

16  and do something with them, to freeze them so that we could

17  talk to the parties in interest.

18          And that was happening.  Now that the government has

19  them, that's changed the playing field a little bit.  We

20  haven't changed our attitude which is that the parties should

21  talk about how to work this out.  So that always has been our

22  position.

23          I want -- I just want this Court to know that there

24  hasn't been any funny business --

25          THE COURT:  No.  I appreciate that.

1          MR. DORCHAK:  -- going on.  Almost done.  There was a

2  complaint about a little clause in the order that the judge in

3  Antigua put in for BlockFi to -- if they want to appear at this

4  hearing, which they're welcome to do, at the end of January to

5  provide the Court with a summary of their position, why -- like

6  sort of why they are here.  I understand that that's a local

7  procedural thing that's common in every case.  It's not an

8  attempt to keep BlockFi out of the court in Antigua.  They're

9  welcome to come down there and say whatever they want.

10          And just as a practical matter, Your Honor, we are

11  aware that if we -- even if we did go to the judge in Antigua

12  and get that judge to say, okay, the shares belong to so and so

13  that we may have to come up and contend with all the other

14  judges up here who may have a different opinion.  And so

15  there's -- it wouldn't even have worked if we -- if that was

16  our plan.  I just want to make that clear.

17          So if you ask me what we should do next, I'm going to

18  say the same thing I said before which is we think the --

19  there's seems to be -- the government seizing the shares has

20  caused a sort of -- you know, a reset of some sort.  Okay.  If

21  it means that certain people should be impleaded into this

22  case, fair enough.  We had already asked for more time to

23  respond in this case, because we were trying to figure out

24  what's going on.

25          So it seems like the parties should continue to talk

1  about that.  And if there are rival forums -- I don't know.

2  Maybe it eventually gets litigated if it can't be negotiated.

3  But besides the issue of making the shares have their maximum

4  value, which maybe requires an advisor for a practical issue, I

5  don't think there's a legal issue that requires anything more

6  than some -- there is no legal issue at all that needs to be

7  decided in the near term.

8          I don't think that the JPLs going forward with

9  getting a winding-up order would necessarily change anything.

10  It certainly isn't going to somehow simultaneously decide the

11  outcome of the shares, which of course the -- even the judge in

12  Antigua can't convince the government to do anything with.

13          THE COURT:  Well, and --

14          MR. DORCHAK:  So there's no threat.

15          THE COURT:  So would it make sense to carve out from

16  any wind-up order steps to determine, fix or the extent the

17  validity of any interests in it?

18          MR. DORCHAK:  I can't speak for the judge in Antigua,

19  Your Honor.

20          THE COURT:  Well, no.  I'm throwing that out there.

21          MR. DORCHAK:  But it's, in my mind, perfectly

22  possible that the judge in Antigua would be open to that -- to

23  these key issues disputed amongst a bunch of people up in the

24  United States that maybe that issue should get decided there,

25  and then the affects of that issue are folded into the

1  winding-up order.  But I don't think the judge would be against

2  that.  But, of course, I can't read the judge's mind, Your

3  Honor.

4       We're actually getting a new judge, because the judge

5  that we -- has heard the case so far is --

6       THE COURT:  Good luck.

7       MR. DORCHAK:  -- to be going off the rolls, or

8  whatever the expression is, and a new judge will be coming in.

9  But either way, Your Honor, I just want to -- just -- there's

10 nothing that interesting going on in Antigua, to put it that

11 way.  So that's the main point I wanted to make, Your Honor.

12      THE COURT:  Well, all right.

13      MR. DORCHAK:  And, otherwise, I believe that the

14 motion should be denied, because my clients can't be compelled

15 to turn over something where they literally cannot do that.

16 And that we call get some extra time to talk and see if a lot

17 of people can work out a lot of these procedural issues.

18      THE COURT:  My sympathies to the new judge coming in.

19 Just very briefly -- I know my law clerks are cringing at the

20 thought of me asking this.  But the real important question, is

21 it Antiga (phonetic) or Antigua?

22      UNIDENTIFIED SPEAKER:  Antiga (phonetic).

23      MR. DORCHAK:  The --

24      THE COURT:  Antiga (phonetic).

25      UNIDENTIFIED SPEAKER:  That's what the lawyers in

1  Antigua call it.  They call it -- so I'm going to go with that.

2              MR. DORCHAK:  The --

3              THE COURT:  Oh, even that's going to be disputed.

4              UNIDENTIFIED SPEAKER:  Maybe so.

5              MR. DORCHAK:  I'm not taking a position on it myself,

6  Your Honor.  Definitely the Commonwealth community uses Antiga

7  (phonetic) and Antigan (phonetic).

8              THE COURT:  Fair enough.

9              MR. DORCHAK:  But I don't know that we have to follow

10 that.

11             THE COURT:  Thank you, counsel.

12             MR. DORCHAK:  Thank you.

13             THE COURT:  Let me -- before I -- thank you.

14             Is there any other appearances?  Counsel?

15             MR. SCHNITZER:   Thank you, Your Honor.  Edward

16 Schnitzer from Montgomery McCracken on behalf of Samuel

17 Bankman-Fried.  Your Honor, as other people have already

18 stated, we believe the motion is moot because of the seizure.

19 While the seizure was unexpected from our perspective, it did

20 happen.  It has been effectuated.  So if you just simply look

21 at what -- the relief that was requested in the motion as well

22 as the proposed order, it really can't be granted, because the

23 shares and stock are no longer in the possession of Marex.

24             I actually agree with FTX counsel, and it may be the

25 one time only in this case that I will agree with the FTX

1 counsel.  But as they said, basically the arguments advanced

2 and relief sought earlier today that you heard was not what was

3 set forth in the motion, and it should be denied.

4          Your Honor, as you saw in our papers, the reason we

5 responded is because the motion was going forward

6 notwithstanding this, so we needed to make our point with

7 respect to the standard for preliminary injunction.  We do not

8 think it's met.

9          I put that forth in our papers.  I believe the JPLs

10 also put that forth.  I won't burden you with repeating what we

11 put forth in our papers.

12          The only thing I wanted to add, Your Honor, is in

13 part of their presentation they said our position was tainted

14 by the fraud of Mr. Bankman-Fried and Ms. Ellison.  I just

15 wanted to make two points, Your Honor.  First of all, I do want

16 to remind everybody -- and, Your Honor, I believe you

17 effectually -- effectively stated this before -- it's alleged

18 fraud.

19          And Mr. Bankman-Friend, he's been accused.  He has

20 his right in court.  We will see what happens.  Ms. Ellison, on

21 the other hand, has pled guilty.  I believe there is a

22 different (sic) there.

23          Lastly, Your Honor, I know you asked, so I thought I

24 would answer the question.  You asked what is

25 Mr. Bankman-Fried's interest.  He is the 90 percent shareholder

1  of Emergent.  I don't believe anyone's disputing that.

2          So my understanding of how things work in Antigua or

3  Antiga (phonetic) -- I'm not sure either the pronunciation.  My

4  understanding of how things work there are similar to how

5  things work here in that after creditors, if there are any

6  creditors, get paid, the interest in a company do belong to

7  equity.  So that is Mr. Bankman-Fried's interest.  It is

8  contingent at this point, although I believe almost everyone's

9  interest here is contingent, because they would actually have

10 to prove they are a creditor.

11          THE COURT:  All right.  Thank you.

12          MR. SCHNITZER:  Thank you, Your Honor.

13          THE COURT:  Counsel for the Committee?

14          MR. AULET:  Good morning, Your Honor.  Kenneth Aulet

15 of Brown Rudnick, proposed counsel for the Committee.  The

16 Committee supports the debtors today.  Our view is that there

17 were two things sought in the turnover motion.  There is the

18 demand to turn over, which, you know, it is what it is today.

19 But there was also a request to enjoin the transfer or use of

20 the collateral pending the Court's resolution of the adversary

21 proceeding.

22          And that is of great importance to the Committee.

23 The Committee does not want these shares going anywhere.  Now,

24 Mr. Bankman-Fried's counsel is in the courtroom.  You can

25 imagine the view of the Committee on Mr. Bankman-Fried having

1 any say in where these shares go.

2          Beyond that, Your Honor, I'll leave it to the
3 debtors.  But we wanted to register that we join the debtors in
4 this motion.

5          THE COURT:  All right.  Thank you.

6          Mr. Shapiro, I'm going to -- oh, before I turn to
7 Mr. Shapiro, counsel for -- somebody probably wants out.  But
8 go ahead.

9          MS. DOHERTY:  Thank you, Your Honor.  Yes, we would
10 like out.  We represent Marex, and I really don't have much
11 more to add to what the counsel today has said.  But as you
12 recall, when we had the hearing before you on the 28th I made
13 very clear that Marex had froze this account on November 10th.
14 It made very clear to all of the interested parties that these
15 assets would not be moved unless and until a court ordered
16 otherwise.

17          And we did get that order by the warrant of seizure
18 on December 30th.  We made all of the parties aware of that
19 warrant before the government actually seized the assets.  And
20 on January 4, Marex fully complied with that warrant, and
21 everything is now in the hands of the government.

22          And I do think what we talked about on the conference
23 on the 28th of December was everybody's interest and the next
24 step should be to maximize the value of those assets.  And I
25 would request that we be let out of this case since we no

1   longer are a stakeholder.  And the motion should be denied.

2           THE COURT:  All right.  Thank you.

3           MS. DOHERTY:  Thank you, Your Honor.

4           THE COURT:  All right.  I'd like to turn to

5   Mr. Shapiro.  Good morning if -- yeah, it's still morning for

6   the next three minutes.  I appreciate that the government is

7   not a named party in the adversary proceeding at this juncture.

8   My understanding is that in reading the notice of the seizure

9   that I guess with a pending or contemplated in rem proceeding

10  that's coexistent with the criminal prosecution of

11  Mr. Bankman-Fried the government has seized the shares.

12          It would seem to me that there can be many months and

13  many market changes before the government gets to the point of

14  whether a forfeiture goes into effect.  And the concern that I

15  have, probably shared by every other judge who has this in

16  front of -- these issues in front of them, is that there not be

17  a loss in value of the shares during this time period until

18  ownership, entitlement, whether it be as an owner, as a

19  lienholder or on the basis of forfeiture, is determined by the

20  appropriate court.

21          What are your thoughts on working -- or reaching a

22  consensus with the stakeholders to ensure that the value for

23  the creditor body, all of the -- the retail and larger

24  institutional creditors are furthered?

25          MR. SHAPIRO:  Thank you and good morning, Your Honor.

1  As I indicated earlier, the United States is not a party to the

2  adversary proceeding, and I'm not appearing in the adversary

3  proceeding.  But I am here to answer Your Honor's questions, of

4  course, here in court.  And we would greatly appreciate the

5  opportunity to be able to submit a brief in conjunction with

6  any accusations or allegations against the government before

7  Your Honor rules at the appropriate time.

8            In the interim, Your Honor should know that we have

9  been having discussions, some confidential discussions with

10 counsel for the debtors in both this case and the FTX case as

11 well as others.  And hopefully we would be able to resolve

12 these issues.  But if we can't, there will be an appropriate

13 time, hopefully, where Your Honor can hear the arguments of the

14 government as to why we believe that what the government did

15 was appropriate.

16           And of course, ultimately, if the matter went forward

17 in New York in the Southern District, it would be a criminal

18 and/or civil asset forfeiture proceeding.

19           In the interim, as part of the discussions, to answer

20 Your Honor's direct question, that issue that Your Honor has

21 brought up has been the subject of discussions.  And we haven't

22 reached a conclusion yet, so I can't tell Your Honor what that

23 conclusion is.  But we are talking with counsel for the parties

24 about how to address Your Honor's concern.

25           THE COURT:  All right.  Thank you, Mr. Shapiro.

1        Mr. Kanowitz, I -- or Mr. Anigian?

2     (Counsel confer)

3        THE COURT:  Let me -- so I know going forward,

4  Anigian or --

5        MR. ANIGIAN:  Anigan (phonetic).

6        THE COURT:  Anigan (phonetic).

7        MR. ANIGIAN:  Easier than it looks.

8        THE COURT:  Easier than -- Anigian.  All right.

9        MR. ANIGIAN:  Your Honor, a couple of things are

10 really clear.  There's multiple parties claiming interest in

11 this property that likely will be the subject of some

12 government forfeiture action at some point in the future,

13 whether civil, whether criminal.  But before that really can go

14 forward, I mean, there needs to be a resolution of the rights

15 and interests of the parties who are claiming interest in this

16 collateral today.

17        And it's unworkable that it goes forward in these

18 multiple fora.  We filed the first action.  We think that under

19 the Princess Lida Doctrine it should stay in this court.

20        We don't know exactly what's going on in Antigua.  I

21 mean, our local counsel there asked that certain provisions of

22 the order that sets this hearing on January the 27th not be

23 included.  And that request was rejected.  So we believe or at

24 least there's some indication to us that on January 27th the

25 court in Antigua may be deciding what the rights of BlockFi are

1 pursuant to its pledge agreement with Emergent, and we don't
2 think that should go forward.

3          Now, if the Antiguan court wants to go forward with
4 appointing JPLs in some wind-up order, as long as it doesn't
5 impact BlockFi, that's fine with us.  The same in Delaware.  As
6 long as they want to go forward with their stay motion, to the
7 extent that it doesn't impact BlockFi's rights in the
8 collateral, that's okay with us.

9          But I believe they said they're willing to push off
10 that hearing on January 20th.  We don't think that should go
11 forward on that day.

12          With respect to Marex, we haven't released -- BlockFi
13 has claims against Marex, and it will continue to assert those
14 claims.  We don't see a point in waiting for resolution of any
15 criminal actions against Mr. Bankman-Fried and the ultimate
16 filing of some type of forfeiture action before some court,
17 hopefully this one, goes forward and makes some -- at least the
18 parties can move forward with whatever agreements or ultimate
19 fights they have over who's entitled to and what rights and
20 benefits and priorities we have in the collateral.

21          And for those purposes, we would ask that the Court
22 enter an order that takes control over this matter and enjoins
23 any action of the Emergent JPLs in Antigua to the extent
24 they're going to affect BlockFi and the same with respect to
25 the action in Delaware.

1          THE COURT:  All right.  Thank you.

2          I don't see if there's anything else remotely who

3 wishes to be heard on these issues.  I don't see any hands

4 raised.

5          All right.  I think all of the stakeholders and the

6 parties have argued well their respective positions.  These are

7 interesting and challenging issues that I'm sure all the judges

8 appreciate having on their respective plates.

9          At this juncture, it's clear that this Court is not

10 in a position to enter any turnover order of any type.  The

11 shares are being held by the government pursuant to a warrant

12 of seizure.  And the government is not a party to the pending

13 adversary proceeding.  The government wasn't a party to the

14 motion.  And the government -- the U.S. government's actions

15 changed the landscape for all involved here.  So the turnover

16 motion itself is going to be denied without prejudice.

17          I have a pending adversary proceeding in which I

18 would expect the complaint needs to be amended.  It provides

19 for jurisdiction by this Court, and this Court intends to

20 pursue its jurisdiction and authority in the pending adversary

21 proceeding.

22          It is always subject to a consensus, consensual

23 resolution otherwise as to the proper forum for adjudicating

24 the rights here.  But this Court has identified a property

25 interest held by this debtor, subject to dispute but still a

1  property interest under 11 U.S.C. Section 541(a), that is

2  deserving of protection under 11 U.S.C. 362(a).  And this Court

3  is well equipped -- God, that sounds awful, pretentious -- this

4  Court is equipped to handle the litigation going forward if it

5  makes sense to the parties.  And I'll certainly afford the

6  parties the opportunity to brief and argue if such assertion of

7  jurisdiction is inappropriate.

8         But right now, there's a pending adversary

9  proceeding.  I also -- there is also a pending order of this

10  Court which just implements the statutory rights under 362(a)

11  this Court's November 30th -- I think it's been referred to as

12  a worldwide order reinforcing the automatic stay.  The Court

13  intends to enforce that order with the -- either the contempt

14  powers it has or other authority under Section 105 to the

15  extent that there are violations going forward.

16         The doors are open for parties seeking the

17  appropriate relief from the automatic stay.  The Court is

18  cognizant that in this circuit we still view -- we view actions

19  taken in violation of the automatic stay as void ab initio.  I

20  don't believe there's a need to enter an order directing a

21  sister court, including Antiguan court or Delaware court, on

22  what actions they should be taking.  The law is

23  straightforward.  And if there are actions which are

24  challenged, they can be challenged in this Court or other

25  courts as appropriate.

1          But at this juncture, I think we need to move forward

2    with the adversary proceeding and motion practice in that

3    adversary proceeding as appropriate to address the needs of the

4    respective parties.

5          With respect to the Committee's motion to intervene,

6    I'm going to schedule that for the 17th.  I think that should

7    probably be resolved through a consent order.  And as to other

8    parties' actions going forward, this Court is here to address

9    the issues as needed.  But there is no specific relief today

10   that I can provide on the pending motion.

11         So, again, the pending motion for turnover is denied

12   without prejudice.  The adversary proceeding continues.  All

13   parties have their respective rights and abilities to make

14   argument wherever you all want to.  All right?

15         Any questions or concerns?

16         MR. KANOWITZ:  For the record, Richard Kanowitz on

17   behalf of the debtors' estate, Your Honor.  No.  We will speak

18   with the parties, including the FTX debtors and the JPLs, to

19   talk about how they want to proceed in the adversary

20   proceeding.

21         We also look forward to talking to them about moving

22   the January 20th hearing or completely withdrawing that motion.

23   Just so you know, January 20th is our 341 meeting in this case.

24   So we're not available that day anyway.

25         But we will discuss with them a constructive way of

1  moving the disputes forward in this Court if possible.  And we

2  will also continue talking to the government about the proper

3  way to handle the seizure and the benefit to the victims.

4          And let's be clear.  I just want to make it clear for

5  the record for everybody.  BlockFi was defrauded by FTX and its

6  affiliates and maybe the insiders of FTX and its affiliates.

7  We are a victim.  FTX is not a victim.  FTX, to the extent the

8  creditors overlap with our creditors, are the victims.

9          And we're here to protect the victims.  And Mr. Stark

10  and his team are well-equipped to assist or work with us to do

11  that.  But that is our fiduciary duty.  The gamesmanship really

12  needs to stop.  As I said to every counsel and as I said to

13  you, Your Honor at the first hearing, we are fiduciaries.  We

14  are here to protect client interest and get them the best

15  value, not to have skirmishes and litigations and gamesmanship

16  over jurisdiction, automatic stay verse automatic stay or

17  something else.

18          So we're going to try to work as cooperatively with

19  all the constituents and adversaries and objectors in this

20  case, in this adversary proceeding, and try to craft something

21  that is sensible, commercial and efficient to have the dispute,

22  as everyone has said, about whether or not BlockFi has a

23  guarantee and a pledge from Emergent and what that means for

24  this estate.  So we're going to endeavor to do that.

25          Two other points just to clean up.  The DOJ has, in

1  fact, served warrants of seizure on BlockFi for certain

2  customers who -- or clients who are obligated to the government

3  to turn over property.  So it's customer property that we're

4  holding.  We don't think we need an order from this Court to

5  actually comply with those seizure orders.

6          But I know Mr. Shapiro is on the phone, and we have

7  had communications about those.  They emanate out of the State

8  of Washington, and there's about two or three clients of ours

9  impacted.  It is client money.  It is not property of the

10 estate money.  And we are going to cooperate and do what we

11 need to do through counsel to turn over that money to the

12 government based on those seizure warrants.

13          THE COURT:  All right.  Thank --

14          MR. KANOWITZ:  Wanted to let you know that.

15          THE COURT:  Thank you.  I appreciate it.

16          MR. KANOWITZ:  And the second thing, I think, that we

17 need to address housekeeping is further dates.  Right now we

18 have January 17th.  We also have January 30th.  But we will

19 need dates, I would believe, in late February and March subject

20 to any other type of proceeding that needs to be brought before

21 Your Honor.

22          THE COURT:  We have a February 21 date already

23 included.

24          MR. KANOWITZ:  I think that --

25          THE COURT:  You think earlier or --

1           MR. KANOWITZ:  I think that a little later since we

2 have January 30th -- or it could be earlier, but that week --

3 the president's week, is vacation among other things.

4           THE COURT:  Okay.

5           MR. KANOWITZ:  So I think that that week is probably

6 not the best week to do it.

7           THE COURT:  Are we scheduling an omnibus date, you

8 think?

9           MR. KANOWITZ:  Yeah.  I think it would be an omnibus

10 date.

11           THE COURT:  Bear with me one second.  So we have

12 1/30.  I am actually away the week of the -- a good chunk of

13 the week of the 13th through the end.  The best I can offer you

14 all is the week of the 6th or, if we're basically

15 eliminating -- well, let me see here.  No.  If we're

16 eliminating the week of the 20th, and the week of -- well, the

17 week of the 13th, I believe, is the president's weekend.  Are

18 we eliminating both those weeks?

19           MR. KANOWITZ:  I think the --

20           MR. STOLZ:  President's weekend's the 20th, Your

21 Honor.

22           THE COURT:  The 20th?

23           MR. KANOWITZ:  Right.  That's why I'm saying that

24 week on the 21st --

25           THE COURT:  Oh.

94

1          MR. KANOWITZ:  -- is an issue --

2          THE COURT:  Okay.

3          MR. KANOWITZ:  -- for certain people, I think,

4 including me.

5                  (Court and clerk confer)

6          THE COURT:  Well --

7          MR. KANOWITZ:  Your Honor, why don't we do this.

8          THE COURT:  You want to --

9          MR. KANOWITZ:  Why don't we caucus the estate parties

10 and get back with chambers.  Because the prior week of the 13th

11 has issues.  The week of the 20th has issues.  And we don't

12 know what we're going to need, potentially.

13          THE COURT:  Yeah.

14          MR. KANOWITZ:  So maybe we keep the 21st.  So --

15          THE COURT:  Let's keep the 21st for now.  It looks

16 like the -- no, not even -- yeah.  Let's leave it for now.

17 We're running out of days.

18          MR. KANOWITZ:  Very good, Your Honor.

19          THE COURT:  Or I'll have to push something else.

20          MR. KANOWITZ:  Yes.  I think that concludes --

21          THE COURT:  If the Third Circuit doesn't rule in <u>LTL</u>,

22 I have a whole day I can move for them.  So we'll see.  All

23 right.  Then just reach out for chambers.

24          MR. KANOWITZ:  We will, Your Honor.  I don't believe

25 we have anything else on the agenda.

1            THE COURT:  All right.

2            MR. KANOWITZ:  So we thank you for your time.

3            THE COURT:  Thank you.

4            Mr. Stolz?

5            MR. STOLZ:  Your Honor, Daniel Stolz, proposed local

6   counsel for the Committee.  On the motion to intervene, shall

7   we submit an order shortening time listing it for the 17th?  We

8   submitted it without date, so.

9            THE COURT:  I'll just schedule it.  Let's avoid the

10  paperwork.

11           MR. STOLZ:  Okay.  And will the order -- will Your

12  Honor enter a text order --

13           THE COURT:  Yeah.

14           MR. STOLZ:  -- as to when objections will be filed?

15           THE COURT:  Yeah.  We'll do that.  We're talking

16  about having it on the 17th, correct?

17           MR. STOLZ:  Correct.

18           THE COURT:  So we'll have objections by -- oh, let's

19  see.  The 17th.  Objections by the 16th.

20           MR. STOLZ:  Okay.  And, Your Honor, just so Your

21  Honor knows, we -- the debtor has graciously consented to share

22  Kroll with us, so both the debtor and the Committee will be

23  using one noticing agent so that people won't get confused.

24           THE COURT:  I think that's great.  All right.

25           Anybody else wish to be heard on any matters?  All

1  right, folks.  Thank you for your time.

2          IN UNISON:  Thank you, Your Honor.

3          THE COURT:  Take care.

4          MR. SHAPIRO:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6                    * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **C E R T I F I C A T I O N**

2           We, DIPTI PATEL and LIESL T. SPRINGER, court approved

3   transcribers, certify that the foregoing is a correct

4   transcript from the official electronic sound recording of the

5   proceedings in the above-entitled matter, and to the best of

6   our ability.

7

8   /s/ Dipti Patel

9   DIPTI PATEL, CET-997

10

11  /s/ Liesl T. Springer

12  LIESL T. SPRINGER, CET-685

13  J&J COURT TRANSCRIBERS, INC.   DATE:  January 10, 2023

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B-22

FILED
HIGH COURT
ANTIGUA AND BARBUDA

Filed on behalf of the Petitioners
First Affidavit of: Toni Shukla
Affidavit Number: First

Submitted Date: 15/01/2023 18:16

Exhibit reference: TS-1

Filed Date: 16/01/2023 08:30

Date sworn: 13 January 2023
Date filed:  13 January 2023

Fees Paid:22.00

THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV2022/0480

IN THE MATTER OF EMERGENT FIDELITY TECHNOLOGIES LTD
AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT, CAP.222

BETWEEN:

ANGELA BARKHOUSE AND TONI SHUKLA
(AS RECEIVERS AND PROVISIONAL LIQUIDATORS OF EMERGENT FIDELITY TECHNOLOGIES LTD)

Petitioners

-and-

EMERGENT FIDELITY TECHNOLOGIES LTD

Respondent

_____

FIRST AFFIDAVIT OF TONI SHUKLA

_____

I, **TONI SHUKLA**, of Quantuma (BVI) Ltd, Coastal Building, PO Box 4741, Wickhams Cay II, Road Town, Tortola, British Virgin Islands, make oath and say as follows:

1. I make this Affidavit on behalf of myself and my co-petitioner, Ms Angela Barkhouse, and I am duly authorised by Ms Barkhouse to do so on her behalf.  I am the same Toni Shukla who authorized Ms Barkhouse to swear her First Affidavit on 2 December 2022 in support of (a) our Petition to wind up Emergent Fidelity Technologies Ltd ("**Emergent**"), and (b) our application to be appointed Provisional Liquidators of Emergent.  This Affidavit is made in support of our application for the approval of a funding arrangement with Fulcrum Distressed Partners Limited ("**Fulcrum**"), a limited company organized under the laws of the British Virgin Islands in

1

accordance with paragraph 4(b) of the Order of this Court made on 5 December 2022.  The funding arrangement is required as a matter of real urgency in order to permit necessary steps be taken to protect the position of Emergent up to and including the disposal of the Winding Up Petition due to be heard on 27 January 2023 (including any appeal) and any ancillary hearings, including (amongst other things) contested interlocutory applications and an application for leave to appeal and a stay of proceedings filed on 11 January 2023 in the Court of Appeal, in addition to obtaining legal advice and representation in the United States concerning Emergent's only identified assets.

2.   Unless otherwise stated, the facts and matters deposed to in this Affidavit are within my personal knowledge and are true.  Where such facts and matters are outside my personal knowledge, they are true to the best of my knowledge, information and belief and are derived from sources to which I refer.  Nothing in this Affidavit or in the documents filed in support of this application is intended to be or should be treated as a waiver of any privilege.

3.   There is produced to me, exhibited hereto marked "**TS-1**", a paginated bundle of true copies of documents to which I refer in this Affidavit.  Numbers appearing in square brackets in this Affidavit are references to page numbers in that bundle unless stated otherwise.

4.   The structure of this Affidavit is as follows:

    (1)  Summary of Events.

    (2)  The primary assets of Emergent and the location of those assets.

    (3)  Steps already taken to secure the assets.

    (4)  Current costs, the future costs of the stages to be taken and the need for funding.

    (5)  The structure of the funding.

    (6)  Efforts to secure alternative offers to Fulcrum

    (7)  Urgency

5.   Ms Barkhouse has filed four affidavits with the Court, and I will refer to those affidavits in support of the funding application.  I do not, however, intend to exhibit to this Affidavit the volumes of evidence that has already been filed in this action, but these documents are readily available and

accessible on the court file.  Rather, I propose to apprise the Court of the history of the matter, explain the current situation regarding both the legal proceedings and Emergent's assets, why the funding is necessary and why I believe it is in the interests of Emergent for the offer of funding from Fulcrum to be accepted.

**(1)  Summary of Events**

6.   An ex parte application was made by Mr Yonatan Ben Shimon in Claim ANUHCV2022/0456 (Yonatan Ben Shimon v (1) Emergent Fidelity Technologies LTD and (2) Samuel Benjamin Bankman-Fried).  The application was filed on 17 November 2022 and heard on 18 November 2022, by Mr Justice Colin Williams.  At the hearing, the learned judge made an order comprising freezing and information disclosure requirements, and appointing Ms Barkhouse and myself as Receivers over Emergent's assets (the **"Receivership Order"**), whether inside or outside Antigua and Barbuda and all of the equity and/or debt interests of Mr Bankman-Fried ("**SBF**") in Emergent, whether they were in or outside Antigua and Barbuda, including but not limited to and shares in Emergent registered in the name of SBF.  The order of Mr Justice Collins also included a freezing order freezing the assets of Emergent and SBF's debt or equity interest in Emergent up to USD 10,818,600.  A copy of the Receivership Order is exhibited at **pages 1 to 11 of exhibit TS-1**.

7.   Ms Barkhouse set out in her First Affidavit dated 2 December 2022, at paragraphs 2 and 16 to 25 our attempts to date to enforce the Receivership Order and the details of Emergent's and SBF's non-cooperation and the non-compliance with the order made for the provision of detailed information of assets, see paragraphs 10 and 11 of the Receivership Order exhibited at **page 4 of exhibit TS-1**.  I enclose a copy of Ms Barkhouse's First Affidavit, but not the exhibit AB-1, at **pages 12 to 28 of exhibit TS-1**.  Given our serious concerns regarding Emergent, its assets, and non-compliance with the Receivership Order an application was made (in this Claim 2022/0480, filed on 2 December 2022) to wind up Emergent and, within that claim, to appoint the Receivers as Provisional Liquidators of Emergent pending the hearing of the petition.  Our interim application was heard on 5 December 2022 by The Honourable Justice Darshan Ramdhani (Ag.), and he appointed us as Provisional Liquidators over Emergent.  I exhibit a copy of that order (the **"Provisional Liquidation Order")** at **pages 29 to 32 of exhibit TS-1**.

8. On 12 December 2022, SBF filed an application seeking to stay the hearing of the petition pending the determination of an application to challenge the Receivership Order.  In response to that application, Ms Barkhouse filed her Third Affidavit, dated 19 December 2022.  A copy of Ms Barkhouse's Third Affidavit, but not exhibit AB-3, is exhibited at **pages 33 to 58 of exhibit TS-1**.  In her Third Affidavit, Ms Barkhouse set out a summary of the evidence before the court that supported the Receivership Order and the Provisional Liquidation Order: see paragraphs 8 to 13 of Barkhouse 3, at **pages 35 to 38 of exhibit TS-1**.  Ms Barkhouse also provided to the Court details of the events since the making of the Provisional Liquidation Order, at paragraph 14 to 22 of Barkhouse 3, **pages 39 to 43 of exhibit TS-1**.  In addition, Ms Barkhouse filed a Fourth Affidavit on 22 December 2022, a copy of which is exhibited without the exhibit AB-4, at **pages 59 to 63 of exhibit TS-1.**  Ms Barkhouse's Fourth Affidavit updated the Court in relation to several important developments since the filing of her Third Affidavit on 19 December 2022.  In particular, the Court was apprised that Caroline Ellison and Zixiao (Gary) Wang (both close associates of SBF, and in the case of Mr Wang a 10% shareholder of Emergent), had both pleaded guilty in the federal criminal Courts of the Southern District of New York to several criminal charges brought by the US Department of Justice, see paragraphs 8 to 13 of Barkhouse 4, at **pages 61 to 63 of exhibit TS-1**.  Ms Barkhouse further deposed as to her belief, following an article in the Financial Times, that SBF had been extradited to the United States from the Bahamas, on a sealed indictment containing substantially similar charges to those made against his colleagues: see paragraph 14 of Barkhouse 4, at **page 62 of exhibit TS-1**.

9. On 23 December 2022, SBF's application to stay the provisional liquidation proceedings and the petition was heard by the Honourable Justice Darshan Ramdhani (Ag.).  The learned judge gave judgment on 28 December 2022, dismissing SBF's application for a stay, and in doing so he gave directions for the prompt hearing of the petition and listed the petition to be heard on 27 January 2023.  I enclose a copy of the approved order at **pages 64 to 67 of exhibit TS-1**.

   **(2)  The primary assets of Emergent and the location of those assets**

10. The primary assets of Emergent are approximately 55 million Class A common shares of Robinhood Markets, Inc (**"Robinhood"**) worth in the region of USD 440 million, and approximately USD 21 million in cash, both of which were previously held by ED&F Man Capital Markets, Inc

(now known as Marex Capital Markets, Inc (**"MAREX"**) and now held by the US government, as detailed further below at paragraphs 11 and 12.  The assets are therefore not presently available to meet the costs referred to below.  Robinhood is an American financial services company headquartered in Menlo Park, California, that facilitates commission-free trades of stocks, exchange-traded funds, and cryptocurrencies as well as individual retirement accounts via a mobile app introduced in March 2015.  Robinhood is a FINRA-regulated broker-dealer, registered with the U.S. Securities and Exchange Commission, and is a member of the Securities Investor Protection Corporation.  Robinhood's shares were publicly listed on Nasdaq on 29 July 2021.

11. Both the shares and the cash were held by MAREX and following the assertion of various competing interests in the shares, these assets were frozen by MAREX on 11 November 2022 to preserve them, pending an order issued by a court with applicable jurisdiction**.**  In very short summary,  BlockFi Inc, BlockFi Lending LLC, and BlockFi International Limited (together "**BlockFi**") assert claims against Emergent and ownership over the Robinhood shares in the United States Bankruptcy Court for the District of New Jersey by reason of an alleged pledge over the shares said to have been granted by Emergent in favour of BlockFi on 9 November 2022 to secure a guarantee for an FTX group member's alleged obligations, one day before an event of default was said to arise on the pledge and two days before the collapse of the FTX group (including the company whose obligations to BlockFi had purportedly been guaranteed) into Chapter 11 bankruptcy proceedings in Delaware.  The validity and enforceability of the pledge are contested by the Joint Provisional Liquidators of Emergent in the proceedings in the United States and a timeline has been set for filings for which Emergent needs legal representation.  In addition, the FTX group have asserted interests in the Robinhood shares in their own Chapter 11 cases in Delaware, which has required our US counsel to appear in those proceedings, as well, and will likely require further action in the Delaware bankruptcy court.  And, we have learned that, on 30 December 2022, and in connection with its criminal actions against SBF, the United States Department of Justice ("**DOJ**") initiated a civil asset forfeiture action in the United States District Court for the Southern District of New York and served a seizure warrant on MAREX requiring MAREX to deliver the Robinhood shares, and the cash held in Emergent's name to accounts by the DOJ.

12. We understand that MAREX has transferred the Emergent assets to accounts under the control of the United States government.  I enclose at **pages 69 to 71 of exhibit TS-1**, a copy of the Response and Limited Objection of MAREX dated 5 January 2022, filed in response to the BlockFi Turnover Motion, wherein MAREX confirmed the position: see internal pages 3 and 4, at **pages 70 to 71 of exhibit TS-1**.  As a result, we will almost certainly be required to defend the interests of Emergent and its creditors in the New York court where the DOJ commenced its forfeiture action, in addition to the New Jersey and Delaware courts presiding over the BlockFi and FTX group bankruptcies.

**(3)  Steps already taken to secure the assets**

13. Ms Barkhouse's Third Affidavit sets out in detail the efforts already made to secure the books and records of Emergent and securing the Robinhood shares, see Barkhouse 3 paragraph 25 at the bottom of internal page 12, **page 38 of exhibit TS-1**.  Ms Barkhouse explains the exchanges between MAREX and Morgan Lewis and MAREX's acknowledgement and confirmation of the Provisional Liquidation order and confirmation that account holding the Robinhood shares was frozen.  In addition, Ms Barkhouse details that certain corporate documents have also been provided by Corporate Trust Services, on 7 December 2022, following our appointment as Provisional Liquidators.  Ms Barkhouse notes at Barkhouse 3 paragraph 21, the absence of accounting records, see **page 41 of exhibit TS-1**.  The Robinhood shares have since been transferred to accounts under the control of the United States Government awaiting the determination in civil proceedings as to who is entitled to receive the shares or proceeds.  At Barkhouse 3 paragraph 24, MS Barkhouse notes the importance of the obtaining the books and records of Emergent, see **page 43 of exhibit TS-1**, considering the transactions between Emergent/Robinhood and BlockFi.  At Barkhouse 3 paragraphs 29 to 38, pages **45 to 49 of exhibit TS-1**, Ms Barkhouse explains the work that Morgan Lewis have been engaged with dealing with BlockFi's Debtors Adversary Complaint and Turnover Motion.  Their work is ongoing.  We are considering filing a Chapter 11 bankruptcy case for Emergent in the United States, which may be necessary for the defence of these numerous challenges in the courts of the United States.

**(4)  Current costs, the future costs of the stages to be taken and the need for further funding**

14. Given the nature and size of the estate and the various legal proceedings in the Antiguan and US Courts, we have engaged several professional firms and an English KC to assist us with our work.

    (a)  In the United States of America (New York and Philadelphia), we have engaged Morgan Lewis & Bockius LLP, an international law firm, to deal primarily with the defence of BlockFi's adversarial proceedings and turnover motion in the United States, as well as advising us generally on US primary bankruptcy procedures concerning the assets.  Their current costs are approximately USD 650,000.

    (b)  In Antigua we have engaged Lake, Kentish & Bennett Inc, and their current costs are approximately USD 76,500

    (c)  In the British Virgin Islands, we have engaged Forbes Hare as general offshore counsel and their current costs are approximately USD 780,000

    (d)  We have also engaged David Joseph KC, to act as leading counsel in Antigua and his current costs are approximately USD 130,000

15. Additionally, the administration costs of the Receivers, now the Joint Provisional Liquidators to date are approximately USD 160,000

16. As will be evident from above, these proceedings are expensive, not least in circumstances where the assets are in the United States, there are significant amounts involved, various persons are asserting ownership interests, and the proceedings and fast-developing factual matrices need to be coordinated.  We have therefore sought external funding for the proceedings, initially for the period up to and including the hearing of the petition (and any appeal) and any ancillary proceedings.  As required by our Order of Appointment, we are obliged to seek the approval of the Court for approval before entering into this agreement.

17. There is a limited market of specialist funders who, because of their active participation in distressed credit markets, are familiar with offshore litigation and bankruptcy-related work.  We spoke to several of them (as set out below) and believe that the terms and credit offered by Fulcrum offers the best value to the estate of Emergent.  Given the distressed and specialised nature of such situations, and the attendant risks to the funders, this small group of funders charge a more significant premium than might be expected in a purely domestic context where the likelihood of recovering assets might be more predictable.  Premiums charged are often expressed either as a multiple of the sums advanced (with the multiple varying with the amount of time before the sums are recovered) and/or as a percentage of recoveries.  I am satisfied that the terms offered by Fulcrum, which only allow for a recovery of a multiple of the sums advanced and not a percentage of the total recovery, are reasonable commercial terms in line with the rates and terms encountered in the market for this kind of situation, and are the best terms reasonably available, particularly considering the limited timeframe available to secure such funding.

18.  The offer of funding from Fulcrum is available to cover the period up to and including the hearing of the petition (and ancillary hearings), which is currently listed to be heard on 27 January 2023, in this Court, and any appeals.  The funding will also include the interlocutory hearings that are anticipated in advance of that hearing and ancillary hearings in Action ANUHCV2022/ 0480 and ANUHCV202/ 0456.  It is impossible to say how many hearings there will be, not least because several further applications have recently been issued both by BlockFi and SBF.  On 9 January 2022, BlockFi issued an application pursuant to CPR 26.1(2)(q) for a stay of that part of the proceedings relating to the pledge agreement that they had purportedly agreed with Emergent.  In addition, on 11 January 2023, SBF issued an application for leave to appeal against the order of the Honourable Justice Darsham Ramdhani KC (Ag.) made on 28 December 2022 and a stay of the 480 proceedings.

19. Currently there are four pending hearings: BlockFi's stay application, SBF's application to lift the stay in the **ANUHCV2022/0456** proceedings and challenge the grant of the Receivership Order the hearing of the petition itself and SBF's leave to appeal application of the order of 28 December 2022 and stay of the 480 proceedings and significant costs will be incurred in dealing with these further hearings as summarised -

(a)  BlockFi's stay application

(b)  SBF's application to lift the stay in **ANUHCV2022/0456**, and then to challenge the Receivership Order.  In addition to this SBF's application for permission to appeal the Order of Justice Ramdhani made on 28 December 2022 or at least a part of that Order and a stay pending the hearing of that appeal; and

(c)  The Petition Hearing

The costs of dealing with these hearings, and others, are likely to be significant and at this point it is impossible to provide sensible estimates for dealing with these hearings because we simply do not know what work is going to have to be completed to deal with the hearings.  All we know is that the work will be significant.

**(5)  The structure of the funding**

20.  Following our discussions with Fulcrum, they provided a term sheet, which I exhibit at **pages 72 to 76 of exhibit TS-1**.  The Definitive Agreement for signature is exhibited at **pages 77 to 112 of exhibit TS-1**.  These terms were extensively reviewed and negotiated by Ms Barkhouse and me, taking legal advice where appropriate, and as stated we believe they represent the best value for funding currently available.

21.  Although there is clearly a commercial upside for Fulcrum in consummating this agreement, we believe that not only do the terms reflect the commercial market but also represent the best funding option available now, particularly as they do not allow for recovery by Fulcrum of a percentage of the total recovery.  Further, Fulcrum's proposal is uniquely suited to the current circumstances in that Fulcrum understands that several challenges to the Respondent's ownership of the assets are pending and Fulcrum has agreed that its remuneration is conditioned upon those challenges being resolved in the Emergent's favour. I am also advised that under the governing law of the funding agreement (English Law) such funding is permitted and likewise in Antigua and in the United States of America to conduct the proceedings and hearings referred to above.

**(6)  Efforts to secure alternative offers to Fulcrum**

22.  On our behalf, Ms Barkhouse also had discussions with Drumcliffe LLC, on a named basis, and they were prepared to offer funding of USD 1 million working capital which was to be repaid at 2 times capital, <u>plus</u> they required a payment of 5% of any recovered assets.  Following some further negotiations, this was reduced to 2% of recovered assets, but that because of the requirement to be additionally paid a percentage from the recovered assets, we decided not to continue the discussions with Drumcliffe LLC.  This would have been a more expensive option than Fulcrum, and would not have provided sufficient working capital in any event. In addition, Ms Barkhouse also spoke to another funder, based in the United Kingdom, on a no names basis, but that funder did not have the expertise to deal with a case such as this and the discussions were over before any numbers were discussed.

**(7)  Urgency**

23.  The Court's approval is needed on an urgent basis.  As will be apparent, there are several hearings in the Antiguan Court and in the United States for which Emergent needs representation, and the offer of funding from Fulcrum is time limited itself.  It is of considerable importance that the Petition be heard on 27 January 2023 so that Emergent can be wound up and that steps can then be taken, albeit under the control and guidance of the Antiguan and United States Courts, to secure Emergent's assets and that the claims asserted by BlockFi and the applications of SBF can be responded to and answered in full.

**Conclusion**

24.  We are not aware of any other assets other than the Robinhood shares and the cash which are both under the control of the US Government.  Emergent does not appear to have any other substantial assets and the only way we can protect the assets for the benefit of all of Emergent's creditors is to enter into a funding agreement as set out in the draft Agreement exhibited hereto.

We therefore respectfully request that the Court grants permission to enter into the funding agreement with Fulcrum.

SWORN by the within named                    )

                                             )

TONI SHUKLA                          )

This 13th day of January 2023                )

                                             )

At  *Road Town Tortola, BVI*

BEFORE ME:

11

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**ANTIGUA AND BARBUDA**

**CLAIM NO. ANUHCV 2022/0480**

**IN THE MATTER OF EMERGENT FIDELITY**
**TECHNOLOGIES LTD**
**AND IN THE MATTER OF THE INTERNATIONAL**
**BUSINESS CORPORATIONS ACT, CAP. 222**

**BETWEEN:**

**ANGELA BARKHOUSE AND TONI SHUKLA**
**(AS RECEIVERS AND PROVISIONAL LIQUIDATORS**
**OF SHARES IN EMERGENT**
**FIDELITY TECHNOLOGIES LTD)**
**Petitioners**

**AND**

**EMERGENT FIDELITY TECHNOLOGIES LTD**
**Respondent**

_____

**FIRST AFFIDAVIT OF TONI SHUKLA**

_____

**Lake, Kentish & Bennett Inc.**
**Temple Chambers**
**36 Long St**
**St John's**
**Antigua**
**Tel: +1 268 462 1012**
**Fax: +1 268 462 2568**

**Legal Practitioners for the Petitioners**

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

ANTIGUA AND BARBUDA

CLAIM NO. ANUHCV2022/0480

IN THE MATTER OF EMERGENT FIDELITY TECHNOLOGIES LTD

AND IN THE MATTER OF THE INTERNATIONAL BUSINESS CORPORATIONS ACT, CAP.222

BETWEEN:

## ANGELA BARKHOUSE AND TONI SHUKLA

### (AS RECEIVERS AND PROVISIONAL LIQUIDATORS OF EMERGENT FIDELITY TECHNOLOGIES LTD)

**Petitioners**

-and-

### EMERGENT FIDELITY TECHNOLOGIES LTD

**Respondent**

_____

**EXHIBIT TS-1**

_____

I certify that this is the document referred to as "**TS-1**" in the First Affidavit of Toni Shukla sworn on the 13th day of January 2023.

Before me:



_____

A COMMISSIONER TO ADMINISTER OATHS/

NOTARY PUBLIC



**TERM SHEET**

Dated 13 January 2023

| | |
|---|---|
| Investor: | FULCRUM DISTRESSED PARTNERS LIMITED, a limited company organized under the laws of the British Virgin Islands (together with its designees, successors and related party assigns, including any special purpose entities created for purposes of consummating this transaction in a tax efficient manner on behalf of managed investment funds and affiliates) |
| Receiver/Liquidator: | Angela Barkhouse and Toni Shukla in their capacity as designated under Antiguan law as Joint Receivers, and/or Provisional Liquidators of EMERGENT FIDELITY TECHNOLOGIES LTD. (the "Company") and all of its related entities, including without limitation, the entities listed in Appendix A of this Term Sheet, as same may be amended in the future (collectively, the "Claimant Entities"). |
| Claims: | Any and all application, claims, rights, defences and causes of action for the appointment of receivers, and subsequently liquidators/provisional liquidators over the Company, specifically, claim number **ANUHCV2022/0465** and claim number **ANUHCV2022/0480**, and any proceedings arising out of or in connection with these claims thereafter in order to preserve the assets of the Company of assets against any and all individuals and entities responsible for the misappropriation of funds from the Claimant Entities, or in the preservation, monetization or other realization of company assets ("Proceeds"). |
| Liquidation: | The liquidation proceedings of the Company filed in the Eastern Caribbean Supreme Court, High Court of Justice for Antigua and Barbuda up to and including 27 January 2023, any adjournment, appeals or ancillary actions thereof. |
| Total Investment Amount: | Up to $2,000,000, to be invested in amounts to be determined at Investor's discretion to bring and defend claims for the preservation and/or recovery of Company Assets (as defined below). This amount may be increased at discretion of the Investor. |
| | For purposes of this Term Sheet, the term "Total Investment Amount" shall mean the sum of all amounts funded by Investor with respect the Company Assets or the Company Assets in accordance with the Definitive Agreement, as the case may be. |
| Company Assets: | The term "Company Assets" means the shares owned by the Company in Robinhood Markets Inc., and any proceeds thereof, to the full extent of the Company's interest therein, as such may be established. |

72

| | |
|---|---|
| Follow-on Fundings: | The Receivers/Joint Provisional Liquidators' obligations and the Investor's rights under this provision will survive the definitive transactional agreement (the "Definitive Agreement"). |
| Compensation to the Investor: | As compensation, the Investor shall receive from recoveries on account of, related to, or deriving from any and all Claims, howsoever realized (including through negotiated settlements) a preferred return, calculated as follows:<br><br>a.  With respect to Company Assets:<br><br>• An amount equal to 250% of its Total Investment Amount if such amounts are received within one hundred and eighty (180) days of the execution of a Definitive Agreement;<br><br>• An amount equal to 275% of its Total Investment Amount if such amounts are received between one hundred and eighty (180) and two hundred and seventy (270) days of the execution of a Definitive Agreement;<br><br>• An amount equal to 300% of its Total Investment Amount if such amounts are received between two hundred and seventy (270) and three hundred and sixty (360) days of the execution of a Definitive Agreement;<br><br>• An amount equal to 325% of its Total Investment Amount if such amounts are received after three hundred and sixty (360) days of the execution of a Definitive Agreement. |
| Exclusivity: | In consideration of the efforts to be expended by Investor in connection with due diligence and documentation of the transaction, Receivers/Joint Provisional Liquidators shall not, directly or indirectly, solicit or accept, or participate in any discussions or other communications regarding, any other investment or financing for the prosecution or defense of the Claims, whether in the form of debt, equity or otherwise, and whether or not in cash (collectively, "Competing Investments"), without the Investor's prior written consent. Receivers/Joint Provisional Liquidators represents and warrants to Investor that they are not a party to, or bound by, nor aware of, any agreement (written or unwritten) with any person related to any Competing Investment as of the date of this Term Sheet and the Definitive Agreement.<br><br>Nevertheless, should Investor withdraw from funding the Liquidation, or any of its ongoing actions, the Receivers/Joint Provisional Liquidators are permitted to seek additional funding from alternative providers. Such recoveries will be paid out to the primary funder (i.e. the Investor) for any work in progress already incurred, in priority to the secondary funder.<br><br>Further, should the Investor refuse to fund specific causes of action, the Receivers/Joint Provisional Liquidators are permitted to seek funding |

| | from alternative providers, such recoveries to be considered as separate and discreet to any ongoing litigation, and/or recoveries and vice versa. |
|---|---|
| Subordination: | The Investor shall have the first right to be repaid through the Proceeds of the Liquidation or otherwise any litigation or collection efforts funded hereunder which it has funded.  The Receivers/Joint Provisional Liquidators hereby agree that, by the date of signature of a Definitive Agreement, it will not have, nor shall it enter into any agreement with any other party that provides such party with an equal or superior claim to the Proceeds funded hereunder or otherwise impairs or subordinates the Investors' rights or investment return. |
| Governing Law and Dispute Resolution: | Any controversy or claim arising out of or relating to this Term Sheet or the Definitive Agreement shall be settled by the London Court of International Arbitration ("LCIA") under the Arbitration Rules of the LCIA.  To the extent permissible by the LCIA, the underlying law governing this Term Sheet and the Definitive Agreement shall be the laws of England and Wales. |
| Confidentiality: | The parties hereby confirm that the existence and contents of this Term Sheet, related discussions between the parties, and any ultimate transaction shall be held in the strictest confidence provided that Investor may disclose such confidential information to its investors, co-investors, and sources of funding. For the purposes of obtaining the permission from the Antiguan Court to enter into the Definitive Agreement, both the Term Sheet and the Definitive Agreement may be shared with the Antiguan Court and Legal Team. |
| Conditions to Closing: | Subject to the satisfaction of the following Conditions to Closing, this Term Sheet reflects the Parties' agreement on the material terms of the transaction, provided that consummation of the transaction is and at all times shall remain subject to (i) Investor's satisfaction with its due diligence investigation of the Claims to its sole and absolute discretion; (ii) execution of a Definitive Agreement mutually acceptable to the Parties; (iii) confirmation by the Investor of compliance under applicable law, rules, and regulations; and (iv) the sanction of the Antiguan Court with as specified in the approved order for  ANUHCV2022/0480 . |
| Transaction Costs: | Investor will retain a fee in the amount of five percent (5%) of the Total Investment Amount in connection with its due diligence, closing and other costs which shall be included in the Total Investment Amount. |
| Entire Agreement: | This Term Sheet constitutes the entire agreement by the Parties hereto as of the date hereof and supersedes any other agreement, whether written or oral.  No member, general or limited partner of Investor shall be personally liable for any obligation or liability and all obligations and liabilities of Investor pursuant hereto are enforceable solely against Investor and its assets and not against any assets of any member, general or limited partner thereof. Any argument that ambiguities are to be resolved against the drafting party is hereby expressly waived by the Parties. This Term Sheet shall be deemed to have been drafted by each of the Parties, and each of the provisions thereof shall be construed without regard to any presumption or other rule requiring construction against the Party drafting |

74

| | such provisions.  Investor does not assume any obligations or liabilities of any party in connection with the Claims. |
|---|---|

[SIGNATURE PAGE FOLLOWS]

Please sign below and return this letter by email to trading@fulcruminv.com with a copy to tbennett@fulcruminv.com.  Should you have any questions regarding this matter, please contact Fulcrum's General Counsel, Timothy C. Bennett, at (857) 444-5579.

Sincerely,

**FULCRUM DISTRESSED PARTNERS LIMITED**



By: _____
Name:  Matthew Hamilton
Title:  Authorized Signatory

Accepted and Agreed:

**ANGELA BARKHOUSE**

*In her capacity as Receiver (and future Provisional Liquidator)* of
EMERGENT FIDELITY TECHNOLOGIES LTD.

By:  _____
Name:  Angela Barkhouse
Title:   Managing Director, Quantuma Cayman Ltd

76

## LIQUIDATION FUNDING AGREEMENT

This Liquidation Funding Agreement (this "**Agreement**"), effective as of January __ 2023, (the "**Effective Date**"), is made by and between FULCRUM DISTRESSED PARTNERS LIMITED, a limited company organized under the laws of the British Virgin Islands (the "**Funder**"), and EMERGENT FIDELITY TECHNOLOGIES LTD., a limited company organized under the laws of Antigua and Barbuda (and all of its related entities, including without limitation, the entities listed in Appendix A, collectively, "**Emergent**") as represented by ANGELA BARKHOUSE and TONI SHUKLA, the JOINT PROVISIONAL LIQUIDATORS, (the "**JPLs**"). The Funder, the JPLs, and Emergent may be referred to in this Agreement collectively as the "**Parties**" or each individually as a "**Party**."

WHEREAS, the Funder is a company limited by shares that provides funds for liquidation processes and ancillary actions related to the pursuit of various litigation, arbitration, fraud, and asset recovery claims and related rights;

WHEREAS, Emergent anticipates that the Subject Claims (as hereafter defined) will be pursued by them;

WHEREAS, Emergent is a sophisticated and experienced Person and wishes to enter this Agreement because this Agreement is reasonable, necessary, and beneficial to it, carries substantial commercial and other value, and Emergent has concluded that entry into this Agreement is in its best interests;

WHEREAS, the JPLs act as the Emergent representatives in connection with this Agreement and the Subject Claims;

WHEREAS various proceedings, applications and appeals have been commenced or are being sought to be pursued both in the courts of Antigua and in the United States, including those brought by the JPLs, Samuel Bankman-Fried and BlockFi for which funding is required; and

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Defined Terms; References.

1.1    In this Agreement, unless the context otherwise requires, capitalized terms shall have the meanings set out in Schedule 1.

1.2    References to the Parties hereto include their assignees, transferees, and successors-in-title.

1.3    Headings in this Agreement are for information only and do not form part of the operative provisions of this Agreement.

77

1.4     References to Recitals, Clauses, and Schedules are to recitals to, clauses of, and schedules to this Agreement. References to this Agreement shall, unless otherwise expressly stated, include references to the Recitals and the Schedules of this Agreement.

1.5     Except where the context otherwise requires: (i) words denoting the singular include the plural and vice versa; (ii) words denoting any gender include all genders; (iii) "include" and "including" mean "including without limitation"; and (iv) "or" is inclusive, not exclusive, so "X or Y" means "X or Y or both" and "A, B, or C" means "one or more of A, B, and C."

1.6     References in this Agreement to any agreement, deed, or document shall be deemed to include references to such agreement, deed, or document as varied, amended, modified, novated, supplemented, or replaced by any other documents, deeds, instruments, or agreements from time to time whether as part of an insolvency or bankruptcy proceeding or otherwise.

2.     The Subject Claims. The Parties have executed a Term Sheet, dated December 21, 2022, and attached as Schedule 4, to provide liquidation funding, asset recovery and other services (as the same may be amended, the "**Term Sheet**") supporting Emergent in its liquidation and asset recovery efforts, more fully described and identified in the Statement of Subject Claims, attached as Schedule 2 to this Agreement (hereafter, the "**Subject Claims**").

3.     Right to Proceeds in the Subject Claims. Subject to the terms and conditions of this Agreement, Emergent desires to obtain certain funds to facilitate its pursuit of the Subject Claims, and the Funder agrees to make certain Claims Payments (as defined below) to fund the pursuit of the Subject Claims in exchange for a certain portion of the Proceeds (as defined below) from the Subject Claims pursuant to this Agreement.

(c)     Non-Recourse; Characterization of Transaction.

4.1     Non-Recourse. In the event that no Proceeds are ever paid to or received by Emergent or the JPLs, the Funder shall have no right of recourse or right of action against Emergent or the JPLs, or any of its respective property, assets, or undertaking, except as provided in Sections 7.1 and 12.4(a)(i) of this Agreement. If (i) Proceeds are paid to or received by Emergent or the JPLs; (ii) such Proceeds are promptly applied or distributed by Emergent or the JPLs (as applicable) or on their behalf in accordance with the terms of this Agreement; and (iii) the amount received by the Funder as a result thereof is not sufficient to pay all of the Recovery Percentage (see Section 7.4 below) and all other amounts due to the Funder under this Agreement, then (provided that all of the Proceeds which the Funder will ever be entitled to have been paid to or received by the Funder), the Funder shall have no right of recourse or action against Emergent or the JPLs, or any of their property, assets, or undertakings, except as provided in Sections 7.1 and 12.4(a).

4.2     Characterization of Transaction. The Parties acknowledge and agree that:

(a)     this Agreement does not in any way constitute the purchase or sale of the Subject Claims, but rather constitutes a purchase and sale of a portion of the Proceeds (if any) arising from the Subject Claims as set forth in this Agreement;

(b)    the Funder is purchasing from Emergent and the JPLs, and Emergent and the JPLs are selling to the Funder, the right to a portion of the Proceeds resulting from the Subject Claims; and

(c)    Emergent and the JPLs is relinquishing each of their ownership rights to a portion of the Proceeds in favor of the Funder, and the Funder is accepting those rights that Emergent and the JPLs each is relinquishing in favor of the Funder.

5.    <u>Payments to Emergent or the JPLs</u>.

5.1    <u>Claims Payments</u>. Subject to the provisions of this Agreement, in exchange for its interest in Proceeds resulting from the Subject Claims or other payment pursuant to <u>Section 7</u> of this Agreement, the Funder agrees to make payments to Emergent or the JPLs or on its behalf (the "**Claims Payments**") for the purpose of funding Fees and Expenses (as hereafter defined) regarding the Subject Claims. The Funder shall make Claims Payments to Emergent or the JPLs or on its behalf in an amount up to Two Million        and 00/100 United States Dollars (USD $2,000,000) (the "**Maximum Investment Amount**"), incrementally and at the Funder's sole discretion, subject to increase as Funder may later agree to in writing.

5.2    <u>Exclusive Funding Source</u>. Except as set forth in <u>Section 5.4</u>, <u>Section 5.10</u>, and any other arrangements expressly agreed to in writing from time to time between the Funder, on the one hand, and Emergent and the JPLs, on the other hand, Emergent and the JPLs, Emergent and the JPLs each agrees that the Funder shall be the sole source of funding for the Fees and Expenses of the Subject Claims, and Emergent and the JPLs shall obtain funding for the Fees and Expenses of the Subject Claims only as set forth in this <u>Section 5</u>. Notwithstanding anything to the contrary in this Agreement, neither Emergent nor the JPLs shall be entitled to self-fund the Fees and Expenses of the Subject Claims, except as provided in Section 5.4. For the avoidance of doubt, the foregoing restriction also applies to Funder and/or the JPLs funding Fees and Expenses from Proceeds previously received by them with respect to the Subject Claims.

5.3    <u>Funding Request</u>. Subject to the terms of this Agreement, if Emergent and/or the JPLs requires funds to pay for the Fees and Expenses related to the Subject Claims, Emergent and/or the JPLs shall submit a request by delivery of a written notice that includes: (i) a description of the Fees and Expenses that require immediate funding; (ii) the amount of the proposed Claims Payment; (iii) the number and location of the account to which the funds are to be disbursed; (iv) the proposed payment date; (v) an estimate of Fees and Expenses projected for the next three (3) months; and (vi) any other information reasonably requested by the Funder (a "**Funding Request**"). The Funding Request must be received by the Funder at least five (5) Business Days prior to the requested payment date. If the Funder agrees to fund a Claims Payment, the Funder shall wire transfer to such account an amount in immediately available funds equal to the amount of the Funding Request on the payment date specified in the Funding Request. the Parties will endeavor to ensure that Funding Requests are consistent with the associated Costs Plan submitted to the Funder by Emergent and/or the JPLs for the Subject Claims in accordance with <u>Section 11.1</u> below, which shall be updated from time to time as the circumstances warrant. At its

sole discretion, the Funder may agree or decline to fund any Funding Request made by Emergent and/or the JPLs.

5.4     Failure to Fund on the Merits; Right of First Refusal. If, prior to funding Claims Payments in an amount equal to the Maximum Investment Amount, the Funder declines to fund a Claims Payment requested pursuant to a Funding Request which in the Funder's sole judgment does not warrant funding based on the Subject Claims' ultimate likelihood of not producing adequate Proceeds or based on the legitimacy of the underlying Fees and Expenses or Funder fails to deliver notice of its agreement to fund such Claims Payment within the five (5) day period described in Section 5.3 ("**Failure to Fund on the Merits**"), then Emergent and/or the JPLs may negotiate and enter into agreements with one or more third parties ("**Additional Funders**") to provide funding equivalent to the requested Claims Payment; provided that the Funder shall be given fifteen (15) days written notice of the intent to enter into agreements with Additional Funders and shall be given an opportunity to fund the Claims Payment itself during this fifteen (15) day period. Moreover, the Funder will have an opportunity to compete in all respects in a fair and equitable manner, and within the same time periods, with all third parties participating in the process to provide such funding on new terms. Any right Funder, JPLs and/or Additional Funders to receive Proceeds shall be dealt with in accordance with Section 5.10. the Funder's rights to Proceeds in the event of a Failure to Fund on the Merits are dealt with in Section 7.3.For the avoidance of doubt, this section shall be applicable only to the Subject Claims and up to any actions taken by the JPLs in the US, where the JPLs are obligated to deal with funding under the relevant US process.

5.5     No Liability for Other Expenses. Except for the payment of the Fees and Expenses as duly submitted in Funding Requests in an aggregate amount not to exceed the Maximum Investment Amount, the Funder shall have no obligation to fund any fees, expenses, or other sums in relation to the Subject Claims, and all such other fees, expenses, or other sums shall be the sole responsibility of Emergent and the JPLs. In particular, and without implying limitation, the Funder shall have no obligation to pay any sums awarded against the insolvent estate, including any costs orders or awards against the estate, Emergent or the JPLs.   Where there is risk of an adverse cost award, the JPLs can seek ATE insurance out of the funding being provided or independently.

5.6     No Commitment for Additional Financing. Emergent and the JPLs each acknowledges and agrees that the Funder has not made any representation, undertaking, commitment, or agreement to provide or assist Emergent and the JPLs in obtaining any financing, investment, or other assistance, other than as set forth in this Agreement. In addition, Emergent and the JPLs each acknowledges and agrees that an obligation, commitment, or agreement to provide or assist Emergent and the JPLs in obtaining any financing or investment other than by way of this Agreement may only be created by a separate written agreement, signed by the Parties, setting forth the terms and conditions of such additional financing or investment and stating that the Parties intend for such writing to be a binding obligation or agreement.

5.7     Follow-On Funding; Right of First Refusal. Upon the Funder making Claims Payments to Emergent or its designees (including the JPLs) in an aggregate amount equal

80

to the Maximum Investment Amount, the Funder shall have the option to continue funding the Fees and Expenses in relation to the Subject Claims, up to any action taken by the JPLs in the US, where the JPLs are obligated to deal with funding under the relevant US process, on the same terms and conditions provided in this Agreement. the Funder must exercise its option to continue funding in writing, within thirty (30) days after the JPLs has made a written request to Funder that includes a budget and requested dollar amount of additional follow-on funding. If the Funder exercises its option to continue funding, the Parties shall attempt in good faith to amend this Agreement to provide the Funder with the right to provide at the Funder's discretion funding in excess of the Maximum Investment Amount, in an amount up to the greatest amount that may then be reasonably expected to be committed for investment in the Subject Claims. If the Funder declines to exercise its option, Emergent and the JPLs may negotiate and enter into agreements with Additional Funders to provide funding, which Additional Funders' right to receive Proceeds shall be dealt with in accordance with Section 5.10. For the avoidance of doubt, Funder's refusal to fund Claims Payments in excess of the Maximum Investment Amount shall not be considered a Failure to Fund on the Merits subject to the remedy in Section 7.3. Instead, in such a case, Funder shall be entitled to Proceeds in accordance with Section 7.4.

      5.8    Closing Fees. The Funder shall retain a one-time closing fee in the amount of Seventy-Five Thousand and 00/100 United States Dollars ($75,000) (the "**Closing Fees**") in connection with due diligence and other administrative and transaction costs incurred by the Funder prior to and in furtherance of execution of this Agreement. the Closing Fee shall be credited to the Funder by increasing the total amount of Claims Payments subject to the distribution of Proceeds in Section 7 by $75,000. However, the Closing Fees shall not be subject to the multiples in favor of the Funder set forth in Section 7, which are applicable to other Claims Payments. the Closing Fees shall be payable back to the Funder only once. they shall not be payable by Emergent under Sections 7.3 or 7.4(b).

      5.9    Administration Fees. For each of the first five (5) years following the Effective Date, the Funder shall withhold an administration fee equal to five percent (5%) of the Maximum Investment Amount) (the "**Administration Fee**" and together with Claims Payments (or, if applicable, the Failure to Fund on the Merits Amount) and Closing Fees, "**Total Payments**"). the Administration Fee for any particular year shall be credited to the first Claims Payment to be made by the Funder during such year. For the avoidance of doubt, the Administration Fee shall be considered funded and therefore part of the aggregate Claims Payments made by the Funder.

      5.10    Treatment of Additional Funding; Self-Funding.

      (a)    If, for a specific Subject Claim, the JPLs, Funder, or Additional Funders are permitted to provide funding pursuant to Section 5.4, and Funder has not made any Claims Payments relating to such Subject Claim, any Proceeds relating to such Subject Claim attributable to the Claims Payments made by, as applicable, the JPLs, Funder, or Additional Funders shall be disregarded entirely for the purpose of Section 7 and shall be the subject of such separate agreement as is reached between the JPLs, Funder and/or Additional Funder.

      (b)    If, for one or more Subject Claims, the JPLs, Funder, or Additional Funders are permitted to provide funding pursuant to Section 5.4, and the Claims Payments

81

relating to such Subject Claim(s) have been funded partially by, on the one hand, Funder, and, on the other hand, the JPLs, Funder and/or an Additional Funder, Proceeds received relating to such Subject Claim(s) shall be payable to Funder in accordance with Section 7 based on the amount of Claims Payments made by the Funder prior to any payment with respect to such Subject Claim(s) being made to, as applicable, the JPLs, Funder or Additional Funders.

6.   <u>Management of Subject Claims; Fees and Expenses</u>.

6.1   <u>Funder's Passive Role</u>. The Funder is not, and does not by virtue of entering into this Agreement become, a party to the Subject Claims nor does the Funder have any rights as to the direction, control, settlement, or other conduct of the Subject Claims <u>provided</u> the JPLs agree that any such decisions shall be made in good faith and using best efforts to maximize the value of the Subject Claims and minimize the time for the collection thereof. the JPLs and its counsel will keep Funder and its counsel informed of all material developments, provide Funder and its counsel with copies of all material pleadings and reasonable opportunity to review and provide comment, and discuss strategy decisions that reasonably could materially affect the Subject Claims and Funder's interests far enough in advance of implementing any such strategy to allow for an amount of discussion appropriate under the circumstances.

6.2   <u>Use of Claims Payments; Payment of Fees and Expenses</u>. Emergent or the JPLs shall request and disburse Claims Payments in order to pay Fees and Expenses as may be incurred and approved from time to time by the Funder. Emergent and the JPLs shall keep the Funder reasonably informed of all Fees and Expenses. the Funder may also disburse Claims Payments to pay Fees and Expenses as may be incurred with the prior approval of Emergent or the JPLs.

6.3   <u>Common Purpose</u>. The Parties acknowledge and mutually represent to each other that it is their common purpose in concluding this Agreement to enable Emergent (acting through the JPLs) to pursue the Subject Claims. the Parties further agree that this common purpose and all steps and actions required to achieve this common purpose, including but not limited to any and all steps and actions required in accordance with Emergent and the JPLs' obligation to cooperate with the Funder as set forth herein, are of the essence of this Agreement.

6.4   <u>Monetary Settlement of Subject Claims; Relationship between Funder and the JPLs</u>. The Parties acknowledge that their common interest is served by settling the Subject Claims for a commercially reasonable amount, however, it is further acknowledged between the Parties that this is ultimately at the discretion of the JPLs, with, where required by law, further authorization from the Courts governing the Subject Claims. In furtherance of the foregoing, Emergent authorizes Funder and the JPLs to (i) undertake all acts necessary to achieve the Parties' common interest and carry out the transactions contemplated by this Agreement and (ii) communicate with each other directly (without the involvement of Emergent) in connection with the transactions contemplated by this Agreement. the Funder is entitled to assume (without the need to independently verify) that notices or other communications received from the JPLs also constitute the notices or communications of Emergent. Except as expressly required in this Agreement, notice to or the prior written consent of Emergent is not required prior to taking (or

deciding not to take) a specific course of action. All obligations imposed upon, and representations and warranties given by, the JPLs and/or Emergent under this Agreement are joint and several.

7.    Receipt and Distribution of Proceeds.

7.1    Receipt of Proceeds; Claims Escrow Account.

(a)    If, at any time, Emergent, the JPLs or each of their respective Affiliates or Representatives receives any Proceeds, resulting from the Subject Claims, Emergent and/or the JPLs shall: (i) give immediate notice by email to the Funder of such receipt of Proceeds (together with all other material details related to such Proceeds); and (ii) deposit the entire amount of Proceeds into the Escrow Account. Emergent and the JPLs shall ensure, and cause their respective Affiliates and Representatives to ensure, that all Proceeds received are as soon as practicable, but in any event within two (2) Business Days, deposited into the Escrow Account and not into any other account.

(b)    If Emergent, the JPLs or any of their respective Affiliates or Representatives receives any Proceeds, Emergent and/or the JPLs will hold those Proceeds in trust (or the local law equivalent elsewhere in the world where those Proceeds are received) and shall cause Proceeds to be promptly paid or delivered to the Escrow Account for distribution in accordance with this Agreement; and Emergent and/or the JPLs will instruct each of their respective Affiliates or Representatives to hold all Proceeds received by such Affiliates or Representatives in trust and to make that payment or delivery to the Escrow Account.

(c)    If, at any time, Emergent, the JPLs or any of their respective Affiliates or Representatives receives any Proceeds in the form of tangible or intangible real or personal property ("**In-Kind Proceeds**"), Emergent and/or the JPLs and the Funder shall use their best professional efforts to reach a mutually agreeable written agreement for the liquidation of the In-Kind Proceeds and the distribution of the resulting liquid proceeds in accordance with Section 7.4 of this Agreement. If the parties are unable to do so, then the parties will refer the matter to mediation pursuant to requirements of Section 20.2 and agree to liquidate the In-Kind Proceeds in accordance with the outcome of such mediation.

7.2    Escrow Account. Emergent and the JPLs each hereby irrevocably covenant to take all steps necessary to ensure that any and all Proceeds are paid or delivered into the Escrow Account. the Parties acknowledge and agree that this covenant (or local law equivalent elsewhere in the world where any Proceeds are received) is of the essence of this Agreement and is a condition thereof and that any material variation by Emergent or the JPLs will entitle the Funder to terminate this Agreement.

7.3    Distribution of Proceeds in the Event of Failure to Fund on the Merits. Solely in the event that the Funder ceases making Claims Payments for Failure to Fund on the Merits in accordance with Section 5.4 of this Agreement within the first ninety (90) days from the date of this Agreement, the Funder shall be entitled only to receive the total sum of the Claims Payments it has made to Emergent and/or the JPLs under this Agreement, *multiplied* by two hundred percent (200%) (the "**Failure to Fund on the Merits Amount**"), subject to Emergent

83

and/or the JPLs receiving Proceeds. On each Distribution Date triggered by a Proceeds Recipient's receipt of Proceeds, Emergent and/or the JPLs shall make from the Escrow Account first priority distributions of Proceeds to the Funder until the Failure to Fund on the Merits Amount has been paid to the Funder in full. For the avoidance of doubt, in the event of Failure to Fund on the Merits, no other payments shall be made by Emergent and/or the JPLs to the Funder under this Agreement apart from the Failure to Fund on the Merits Amount.

      7.4    <u>Distribution of Proceeds</u>. Except as described in <u>Section 7.3</u> of this Agreement, on each Distribution Date triggered by a Proceeds Recipient's receipt of Proceeds from the Escrow Account, distributions of Proceeds in accordance with the following priority of payments, on a first dollar out basis:

      (a)    First, to the Funder, until the cumulative amount distributed to the Funder under this <u>Section 7.4(a)</u> equals one hundred percent (100%) of the amount of Total Payments made by or amounts payable to the Funder under this Agreement;

      (b)    Second, to the Funder the recovery percentage ("**Recovery Percentage**") and amounts as follows depending on the time of receipt by Funder:

      (i)    in the event a Distribution of Proceeds to Funder occurs within one hundred and eighty (180) days of the date this Agreement, one hundred and fifty percent (150%) of the amount of Total Payments made by the Funder under this Agreement,

      (ii)    in the event a Distribution of Proceeds to Funder occurs between one hundred and eighty (180) and two hundred and seventy (270) days of the date this Agreement, one hundred and seventy-five percent (175%) of the amount of Total Payments made by the Funder under this Agreement,

      (iii)    in the event a Distribution of Proceeds to Funder occurs between two hundred and seventy (270) and three hundred and sixty (360) days of the date this Agreement, two hundred percent (200%) of the amount of Total Payments made by the Funder under this Agreement,

      (iv)    in the event a Distribution of Proceeds to Funder occurs after three hundred and sixty (360) days of the date this Agreement, two hundred and twenty-five percent (225%) of the amount of Total Payments made by the Funder under this Agreement,

      (c)    thereafter, all remaining Proceeds to Emergent and the JPLs for use in the Proceedings.

As an example, and purely used as a basis of illustration and not for any other purpose, if the total amount of Claims Payments made by the Funder equal $1,000,000 and the date of payment occurs within 180 days of this Agreement, then the Funder shall be entitled to a sum total of $2,500,000 pursuant to <u>Section 7.2(a)-(b)(i))</u>.

7.5    <u>Reasonableness of Recovery Percentage</u>. Emergent and the JPLs each acknowledge and agree that the Recovery Percentage and the amounts due to the Funder hereunder are commercially reasonable in nature and amount given the complexity, uncertainty and risk involved with the pursuit of the Subject Claims. Emergent and the JPLs' obligations and the Funder's rights under <u>Section 7.3</u> and <u>Section 7.4</u> shall survive the termination of this Agreement.

7.6    <u>Payments by Wire</u>. On the Distribution Date, Emergent and the JPLs shall pay or cause to be paid any sum due to the Funder by wire transfer from the Escrow Account to the bank account specified in writing by the Funder. If any obligation is to be satisfied by delivery of assets (and satisfaction by delivery of assets is approved in writing by the Funder), Emergent and the JPLs shall deliver any necessary transfer instruments and documents of title, or otherwise effect delivery of such, to an account in the name of or under the control of the Funder forthwith.

7.7    <u>No Withholding</u>. All payments to be made hereunder by Emergent and/or the JPLs shall be made without set-off or counterclaim and free and clear of, and without deduction for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions, withholdings, or restrictions or conditions of any nature whatsoever now or hereafter imposed, levied, collected, withheld, or assessed against Emergent and/or the JPLs.

7.8    <u>Late Payments</u>. Other than as set forth in <u>Section 12</u>, payments or distributions to the Funder pursuant to this <u>Section 7</u> not made when due shall bear interest at a rate of 2.5% per month, compounded annually, or the maximum rate permitted by law, whichever is lower, until received by the Funder. the interest shall not apply if Emergent or the JPLs proves it has taken steps to order the wire transfer and due to no fault of its own the transfer is not completed.

8.    <u>Secured Transaction</u>.[1]

8.1    <u>Security</u>. Emergent and the JPLs each hereby recognizes the Funder's priority right, title, and interest in any Proceeds, including against any available Collateral to secure its obligations under this Agreement, which security interest shall be first in priority as against all other security interests in the Proceeds. Emergent and the JPLs each acknowledges and agrees to execute and authorize the filing of a financing statement or similar and to take such other actions in such other jurisdictions as the Funder, in its sole discretion, deems necessary and appropriate to perfect such security interest.

8.2    <u>Further Assurances</u>. Emergent and the JPLs shall promptly take all steps and provide such assistance as the Funder may reasonably request, for the purpose of perfecting the Funder's charge in the Collateral, including the entering into agreements and the making of any filings or notifications necessary or desirable in connection therewith.

8.3    <u>Obligations Unaffected by Insolvency</u>. All obligations of Emergent and the JPLs under this Agreement, including this Agreement and any documents provided by way of

---

[1] NTD – Standalone security agreement w/ related filings in relevant jurisdictions

security, are intended to survive the insolvency or liquidation of Emergent or the JPLs, including any Insolvency Proceeding.

9.      Representations and Warranties of the Funder. the Funder hereby represents and warrants to Emergent and the JPLs that as of the Effective Date:

9.1     the Funder has the full power and authority to enter into this Agreement, the execution, delivery, and performance of this Agreement has been authorized by all requisite corporate or equivalent action, and this Agreement is the legal, valid, and binding obligation of the Funder; and

9.2     the Funder's execution, delivery, and performance of this Agreement does not and will not conflict with or result in a violation of the Funder's governing documents or any statute, law, order, rule, or regulation of any relevant Governmental Authority applicable to the Funder.

10.     Representations and Warranties of Emergent and the JPLs. Emergent and the JPLs each hereby jointly and severally represents and warrants to the Funder that as of the Effective Date:

10.1    Emergent and the JPLs each has full power and authority to enter into this Agreement, the execution, delivery, and performance of this Agreement has been authorized by all requisite action on behalf of Emergent and the JPLs, and this Agreement is the legal, valid, and binding obligation of Emergent and the JPLs;

10.2    Emergent and the JPLs' execution, delivery, and performance of this Agreement does not and will not conflict with or result in a violation of Emergent and the JPLs' governing documents, any statute, law, order, rule, or regulation of any relevant Governmental Authority applicable to Emergent and/or the JPLs, or any agreement to which Emergent and/or the JPLs is a party or by which it is bound or to which any of its assets are subject;

10.3    no registration with, or additional consent or approval of, or any other action by any Governmental Authority or other Person is required in connection with the execution, delivery, and performance of any of this Agreement by Emergent and/or the JPLs;

10.4    the JPLs is the authorized legal representative of the Emergent for the Subject Claims and the Proceedings;

10.5    neither Emergent nor the JPLs nor, to the knowledge of Emergent or the JPLs' officers and directors, any of their Representatives has made or entered into any prior assignment, trust arrangement, security, sale, transfer or sub-participation or local law equivalent of its right, title, or interest in the Subject Claims;

10.6    neither Emergent nor the JPLs nor, to the knowledge of Emergent or the JPLs' officers and directors, any of its Representatives has taken any steps or executed any documents which would materially or adversely affect the Subject Claims;

86

10.7    neither Emergent nor the JPLs nor, to the knowledge of Emergent or the JPLs' officers and directors, any of its Representatives has set-off or agreed to set-off any amounts against the Subject Claims or the Proceeds and no rights of set-off or similar rights against Emergent and/or the JPLs exist which will permit any set-off of or counterclaim against the Subject Claims;

10.8    other than the challenges to the appointments as either Receivers or JPLs to which the claim specifically relates, neither Emergent nor the JPLs nor, to the knowledge of Emergent or the JPLs' officers and directors, any of its Representatives has received any written notice or is otherwise aware that the Subject Claims or any portion thereof are subject to any Subject Claims Impairment or are otherwise invalid or void;

10.9    each of Emergent and the JPLs has disclosed or caused to be disclosed to the Funder all material documentation and other information in its possession or control relevant to the Subject Claims, in its true, complete, and correct form, and there is no information in the knowledge, possession, or control of Emergent or the JPLs or its respective Legal Representatives that is or is reasonably likely to be material to the Funder's assessment of the Subject Claims that has not been disclosed to the Funder, and Emergent or the JPLs believes (and does not have, and has not been informed by any of its respective Legal Representatives of, any belief to the contrary) that the Subject Claims are meritorious and likely to prevail;

10.10    no proceedings of or before any Governmental Authority have been commenced by or against or, to the best of Emergent or the JPLs' Legal Representatives' knowledge, are threatened against Emergent or the JPLs, which are reasonably likely to affect the Subject Claims materially and adversely;

10.11    except for this Agreement, there are no agreements (whether in writing or oral) between Emergent and/or the JPLs and another Person to grant a contingent interest in, or to grant a right to payment determined by reference to, the Subject Claims or the Proceeds thereof in favor of any Person nor are there any agreement with any other Person that provides such Person with an equal or superior claim to the Subject Claims or otherwise impairs or subordinates the Funder's rights or return contemplated hereunder;

10.12    the JPLs has the full power and authority to pursue on behalf of the Emergent the Subject Claims under its Engagement Agreement and has received from Emergent a valid and binding power of attorney to pursue the Subject Claims under its Engagement Agreement;

10.13    neither Emergent nor the JPLs have failed to disclose to the Funder any fact or facts of which it (or its respective Legal Representatives) is aware that would, if the Funder had been so advised, be reasonably expected, individually or in the aggregate, to have led the Funder not to enter into this Agreement;

10.14    to the best of Emergent or the JPLs' knowledge, the Subject Claims are not barred by the statute of limitations of any applicable jurisdiction;

10.15    the Term Sheet and this Agreement and the transactions contemplated herein have been approved under the laws of Antiguan as specified in the approved order for ANUHCV2022/0480;

10.16    Fees and Expenses, including all engagement and fee agreements with counsel and all payments made or required to be made to the counsel in connection with the Subject Claims have been disclosed to Funder and are fair and reasonable under applicable law; and

10.17    each of the JPLs and Emergent agrees that (a) no member, general or limited partner of Funder shall be personally liable for any obligation or liability under this Agreement, and (b) all obligations and liabilities of Funder pursuant to this Agreement are enforceable solely against Funder and its assets and not against any assets of any member, general or limited partner of Funder.

11.    Covenants and Obligations.

11.1    Costs Plans. Within thirty (30) calendar days of the Effective Date, Emergent or the JPLs shall develop and deliver to the Funder a budget for the estimated costs for the Subject Claims, which is acceptable to the Funder in its sole discretion (each, a "**Costs Plan**"), it being understood that (i) any Costs Plan may be amended from time to time with the prior written consent of the Funder, and (ii) any Claims Payments made hereunder will be conditioned on such Claims Payments being in compliance with the Costs Plan. Emergent or the JPLs shall keep the Funder informed as to any changes in the costs budgeted in the Costs Plan and the Funder must approve any expenditure that deviates materially from the Costs Plan. the Parties will jointly review Costs Plans on a quarterly basis.

11.2    Representative. Representative shall designate one of its employees or agents as set forth on Schedule 3 attached hereto to serve as its primary contact with respect to this Agreement and to act as its authorized representative with respect to matters pertaining to this Agreement, relating to Emergent and Representative (the "**Authorized Representative**"), with such designation to remain in force unless and until a successor Authorized Representative is appointed, in Representative's reasonable discretion, and Representative notifies the Funder of such change in writing in accordance with Section 23.5. the Authorized Representative shall be responsible for all notices and reporting obligations under this Agreement.

11.3    Duty to Cooperate. Emergent and the JPLs shall pursue the Subject Claims zealously and in a commercially reasonable manner. Emergent hereby irrevocably instructs the JPLs to keep the Funder fully and continually informed of all material developments (including the matters set out below) and to provide the Funder with copies of all Documents material to the Subject Claims and reasonably available to Emergent or the JPLs. Emergent and the JPLs shall:

88

(a)     cooperate with the Funder in all material matters pertaining to the Subject Claims and devote sufficient time and attention as is reasonably necessary to conclude the Subject Claims;

(b)     provide to the Funder all material Documentation and Confidential Information and comply with this Agreement; and

(c)     (i) do nothing that is reasonably likely to prejudice the benefits, rights, or causes of action provided for herein, and (ii) engage in no conduct or commercial arrangements that are reasonably likely to have a material adverse impact in any way on the Subject Claims or the value of the Proceeds.

the Parties acknowledge and agree that Emergent and the JPLs' obligation to cooperate as set out in this <u>Section 11.3</u> is of the essence of this Agreement and is a condition thereof and a continuing obligation and that any uncured material breach thereof that has a material adverse impact on the value of the Subject Claims or the Proceeds shall entitle the Funder to terminate this Agreement pursuant to <u>Section 12.2</u>.

11.4    <u>Additional Covenants</u>.

(a)     Neither Emergent nor the JPLs may dispose of, transfer, assign, or cause or permit the imposition of any Encumbrance on any of its right, title, or interest in or relating to the Subject Claims, the Proceeds, or its beneficial interest in the foregoing in whole or in part.

(b)     Emergent and the JPLs shall meet the Reporting Requirement at all times until this Agreement expires or is otherwise terminated and shall keep the Funder fully and promptly apprised of any material developments in relation to Subject Claims. Emergent and the JPLs shall respond fully and promptly to any request by the Funder for non-privileged information regarding Subject Claims.

(c)     Emergent and the JPLs each agrees and undertakes that neither it nor any of its respective Affiliates or Representatives (i) will institute any action, suit, or arbitration separate from the Subject Claims arising from the same facts, circumstances, or law giving rise to the Subject Claims without the Funder's knowledge and consent, which consent may be withheld in the Funder's sole discretion; (ii) will take any step reasonably likely to have a materially adverse impact on the Subject Claims or the Funder's share of any Proceeds; or (iii) will take any step that would give any Person or entity an interest in the Subject Claims or potential Proceeds except as otherwise permitted by this Agreement.

(d)     Emergent and the JPLs each covenant to cooperate in the prosecution of the Subject Claims, including by promptly and fully assisting its Legal Representatives as reasonably necessary to conduct and conclude the Subject Claims.

(e)     Neither Emergent nor the JPLs shall negotiate for or accept any other third-party investment, financing, or funding of any type (including, but not limited to, debt, equity, or otherwise), from whatever source, and whether or not in cash, in connection with the

89

Subject Claims without the prior written consent of the Funder, which consent may be withheld in the Funder's sole discretion, except after following the procedures of <u>Section 5.4</u> and <u>Section 5.7</u>, as applicable.

(f)      Emergent and the JPLs shall immediately disclose to the Funder any material information related to any actual or potential conflicts of interests arising out of Emergent and/or the JPLs' interests in Subject Claims and any material information known to Emergent or the JPLs related to any actual or potential conflicts of interests arising out of any interests in Subject Claims.

(g)      Emergent and the JPLs shall each use reasonable care to manage all Fees and Expenses and review all invoices relating thereto to ensure that they are reasonable.

(h)      Emergent and the JPLs shall each ensure that no Proceeds are or will be released except in accordance with this Agreement.

(i)      Neither Emergent nor the JPLs shall modify its Engagement Agreement without the prior written consent of the Funder, nor accept payment for less than what its Engagement Agreement provides for.

11.5    <u>Cooperation on Insurance Matters</u>. the Parties shall cooperate with each other to obtain adverse costs, political risk, or similar insurance, if deemed necessary and desirable in the reasonable discretion of the Funder.

12.    <u>Term and Termination</u>.

12.1    <u>Term</u>. This Agreement expires on the date upon which all amounts owing by Emergent and/or the JPLs to the Funder pursuant to this Agreement have been satisfied and paid in full to the Funder, or (ii) the date upon which both Parties agree to terminate this Agreement in writing.

12.2    <u>Termination by the Funder</u>. the Funder may terminate this Agreement by providing thirty (30) calendar days written notice to Emergent and the JPLs after the occurrence of any of the following events. the notice shall reasonably describe the alleged breach which is the basis of such termination and clearly state the Funder's intent to terminate this Agreement if the alleged breach is not cured within thirty (30) calendar days of Emergent and the JPLs' receipt of the notice; provided, however, that the Funder may terminate this Agreement immediately upon written notice to the JPLs after a breach of this Agreement by the JPLs that, in the reasonable judgment of the Funder, is not capable of being cured.

(a)      Any representation or warranty given by Emergent and/or the JPLs was untrue in any material respect as of the Effective Date of this Agreement;

(b)      Any breach by Emergent and/or the JPLs of a material provision of this Agreement that has a material adverse effect on the value of the Subject Claims or the Proceeds or a breach of <u>Section 5.2</u>;

(c)     An event, circumstance, or condition has occurred or been discovered after the Effective Date of the Agreement which would reasonably be expected to render it unlikely that Proceeds will be sufficient to pay the amounts corresponding to Section 7.4 of this Agreement, as applicable, including the occurrence of any event or development with respect to the Subject Claims that has resulted or could reasonably be expected to result in the dismissal, discontinuation, or denial of any material portion of the Subject Claims or the relief sought thereunder; or

(d)     the gross negligence or willful misconduct of the JPLs in the pursuit of the Subject Claims.

(e)     JPLs are no longer able or permitted to act or is removed as the representative of Emergent.

12.3    Termination by Emergent or the JPLs. Emergent or the JPLs may terminate this Agreement by providing thirty (30) calendar days written notice to the Funder after the occurrence of any of the following events. the notice shall reasonably describe the alleged breach which is the basis of such termination and clearly state Emergent or the JPLs' intent to terminate this Agreement if the alleged breach is not cured within thirty (30) calendar days of the Funder's receipt of the notice.

(a)     any breach by the Funder of a material provision of this Agreement that has a material adverse effect on the value of the Subject Claims or the Proceeds; or

(b)     an Insolvency Proceeding has been commenced by or against the Funder.

12.4    Effect of Termination.

(a)     Upon termination of this Agreement by the Funder pursuant to Section 12.2:

(i)     if such termination is due to a breach of the duty to cooperate under Section 11.3, Section 12.2(a)-(d) or Section 14.4, or of the exclusive funding source requirement under Section 5.2, then within ten (10) days of such termination notice, Emergent and/or the JPLs (or its successor, as provided in Section 23.1) shall pay the Funder an amount (such amount, the "**Damage Amount**") equal to the greater of: (i) one hundred percent (100%) of payments due to the Funder under Section 7 in respect of assets already frozen or Subject Claims in the course of recovery, after such assets or Subject Claims have become paid to Emergent and/or the JPLs; or (ii) the aggregate amount of all Claims Payments *multiplied by* three hundred percent (300%); provided, however, that under no circumstances shall the Damage Amount be less than $1,000,000. the Funder's right to payment of the Damage Amount exists regardless of whether any Claims Proceeds have been received. If Emergent and/or the JPLs fails to pay the Damage Amount, the unpaid portion of the Damage Amount shall bear interest at a rate of fifteen percent (15%) per annum, accruing daily, and compounded monthly on December 31st of each calendar year, until paid; or

91

(ii)    if such termination is due to any other reason (including termination for convenience in accordance with Section 12.2), Emergent and/or the JPLs shall pay the Funder from the Proceeds of any Subject Claims to this Agreement, if and only if Emergent and/or the JPLs receives Proceeds, an amount equal to one hundred percent (100%) of the Claims Payments made as of the date of such termination plus ten percent (10%) interest, accruing daily and compounded annually on December 31st of each calendar year, until paid (provided, however, that if such termination is for convenience in accordance with Section 12.2, then no such interest rate will apply); and the payment obligations of Emergent and/or the JPLs under Section 7 shall not apply.

(b)    Upon a termination of this Agreement by Emergent and/or the JPLs pursuant to Section 12.3, Emergent and/or the JPLs, within ten (10) days of the termination of this Agreement, shall pay the Funder an amount (such amount, the "**Termination Amount**") equal to the total amount of all Claims Payments made through the date of termination. If Emergent and/or the JPLs fails to pay the Termination Amount, the unpaid portion of the Termination Amount shall bear interest at a rate of fifteen percent (15%) per annum, accruing daily, and compounded annually on December 31st of each calendar year, until paid.

(c)    Following termination of this Agreement, the Funder shall be entitled, in order to protect its own interest in relation to this Agreement, to keep copies of the Documentation, including Confidential Information provided to it by Emergent and/or the JPLs.

(d)    Termination of this Agreement shall be without prejudice to the right of the Funder to any Proceeds or other payments under this Agreement (including pursuant to Section 7) or to claim damages in relation to this Agreement, except as otherwise specifically provided for in this Agreement.

13.    Mutual Covenants Regarding Confidential Information.

13.1    Exclusive Ownership of Information by Disclosing Party. the Recipient (as defined in Schedule 1) agrees and acknowledges that all Confidential Information provided to it is and shall remain at all times the exclusive property of and owned by the Disclosing Party or its Representatives, as the case may be, and that the Recipient's use or awareness of such Confidential Information shall create no rights, at law or in equity, in the Recipient in or to such information, or any aspect or embodiment thereof. Neither the execution of this Agreement, nor the furnishing of any Confidential Information hereunder, shall be construed as granting, whether expressly or by implication, estoppel, or otherwise, any license to distribute or title to any patent, trademark, copyright, service mark, business and trade secret, or other proprietary right to such Confidential Information, or to use such Confidential Information for any purpose other than as specified in this Agreement or to constitute a waiver of any attorney-client privilege or work product protection.

13.2    Non-Disclosure of Confidential Information and Common Interest Material. the Recipient shall not for any reason, during the term of this Agreement and for a period of five (5) years following expiration or termination of this Agreement, disclose, use, reveal, report, publish, transfer, or make available, directly or indirectly, to any Person other than its

92

Representatives who are authorized pursuant to this Agreement, any Confidential Information or Common Interest Material provided to it except in connection with the performance of its obligations under this Agreement.

13.3    <u>Confidentiality Procedures</u>. the Recipient shall ensure that the Confidential Information it receives is not divulged or disclosed to any Person except its Representatives who have a "need to know" such information. the Recipient shall ensure its Representatives' compliance with the provisions of this Agreement and shall be solely responsible for any failure by it or its Representatives to so comply.

13.4    <u>Judicial and Official Disclosure Requests</u>. If the Recipient is requested in any judicial or administrative proceeding or by any Governmental Authority to disclose any Confidential Information, then the Recipient shall (so far as practicable and lawful) promptly provide the Disclosing Party with written notice of such request prior to disclosing such Confidential Information, so that the Disclosing Party may seek an appropriate protective order. the Recipient shall cooperate with the Disclosing Party in seeking such a protective order. If, in the absence of a protective order, the Recipient determines it is obliged to disclose such Confidential Information, the Recipient may, without liability hereunder, furnish only that portion of such Confidential Information that the Recipient has determined it is obliged to furnish and shall exercise reasonable efforts to obtain assurance from the applicable court, administrative agency, Governmental Authority, or other Person to whom disclosure is being made that confidential treatment will be accorded such Confidential Information to the maximum extent contemplated by this Agreement.

13.5    <u>Non-Circumvention</u>. the Recipient agrees that it shall not directly or indirectly interfere with, circumvent, or attempt to circumvent, avoid, by-pass, or obviate the interest of the Disclosing Party in the businesses or relationships referred to in the disclosures contemplated hereby that constitute Confidential Information of the Disclosing Party. Recipient shall be responsible for any losses incurred as a result of a breach of this <u>Section 13.5</u>.

14.    <u>Information and Privilege</u>.

14.1    In addition to the other requirements in this Agreement relating to the sharing of information by the JPLs to Funder, including the Reporting Requirement under Section 11.4(b), Emergent and/or the JPLs shall provide to the Funder upon request copies of any and all material Documentation together with all material Confidential Information, that the Emergent and/or the JPLs may receive at any time while engaged by the Emergent and/or the JPLs in support of the Subject Claims, or from any third party in relation to the Subject Claims save insofar as such Documentation is already in the possession or control of the Funder. In addition,  Emergent and/or the JPLs shall as soon as reasonably possible (but in any event within five (5) calendar days for the matters at sub-clause (a), (b) and (d) and ten (10) calendar days in respect of (c)):

(a)    notify the Funder of any material verdict, award, settlement, discontinuance, or ending with respect to the Subject Claims;

(b)     notify the Funder of any material change in the merits of the Subject Claims

(c)     respond to reasonable requests for material information from the Funder; and

(d)     call the Funder prior to any delivery or payment to the Funder to verify the amount due to the Funder under this Agreement.

14.2    the Parties agree that they have a "common legal interest" in the Subject Claims, this Agreement, and any discussion, evaluation, and negotiation and other communications and exchanges of information relating thereto.

14.3    Notwithstanding any other contrary provision of this Agreement to the contrary, the Parties agree that any Common Interest Material shall at all times remain subject to all applicable privileges and protections from disclosure, including the attorney-client privilege or any similar privilege in any jurisdiction including, for the avoidance of doubt, legal professional privilege or litigation privilege, common interest privilege, work-product immunity doctrine, and any applicable rules of professional secrecy in any jurisdiction, it being the express intent of the Parties and their Representatives to preserve intact to the fullest extent applicable, and not to waive, by virtue of this Agreement, any action contemplated under this Agreement, or otherwise, in whole or in part, any and all privileges and immunities to which Common Interest Material, or any part of it, are, may be subject or may become subject in the future. It is the good faith belief of the Disclosing Party that common interest privilege attaches to the Common Interest Material. No disclosure of the Common Interest Material would occur without the protection of that privilege.

14.4    the Parties further acknowledge and agree that Emergent and the JPLs' undertakings set out in this Section 14 are continuing and are part of its duty to cooperate with the Funder and are of the essence of the Agreement and a condition thereof and that any material breach of such undertakings shall entitle the Funder to terminate this Agreement in accordance with Section 12.2.

14.5    Notwithstanding any other contrary provision of this Agreement to the contrary, the Parties agree that Emergent and the JPLs shall have no obligations to make, and Emergent and the JPLs may not make, any disclosure or deliveries under or in respect of this Section 14 or otherwise unless such disclosure or delivery, as applicable, is made in furtherance of the common interest and does not adversely affect in any way the confidentiality of such privileged information.

14.6    the Funder may operate under and contract with an affiliated law firm for work in pursuit of recoveries of the Subject Claims, and all information regarding such Subject Claims shared between such law firm, the Funder, Emergent, the JPLs and their respective Representatives shall constitute work product.

15.    Relationship of the Parties.

15.1    Independent Actors. the Funder, on the one hand, and Emergent and the JPLs, on the other hand, are independent actors. This Agreement does not create any joint venture,

partnership, or any other type of affiliation, nor does it create a joint interest in the Subject Claims, for any purpose, including for U.S. federal, state, and local income tax purposes.

15.2    No Practice of Law. the Funder, its Affiliates, and their investment advisers are engaged in an investment business that has as its principal focus assets that are connected to fraud, asset recovery, litigation, arbitration, or mediation. the Funder and its Affiliates and their investment advisers are not law firms and are not engaged in the practice of law with respect to the Subject Claims or otherwise. Emergent and the JPLs each agrees that it shall not rely on the Funder, its Affiliates, or their investment advisers for legal or other professional advice. Notwithstanding the foregoing, the Funder may engage law firms to provide the Funder with legal advice from time to time relating to the Subject Claims.

15.3    No Other Relationship. the Parties agree that nothing in this Agreement shall give rise to or be construed to create a fiduciary, lawyer-client, agency, or other non-contractual relationship between the Parties.

15.4    Tax Treatment. To the extent applicable, the Parties shall elect out of partnership treatment for United States federal income tax purposes pursuant to Section 761(a) of the United States Internal Revenue Code of 1986, as amended (the "**Code**"). the Parties intend that the transactions set forth in this Agreement shall be treated for income tax purposes as a prepaid forward contract and not as indebtedness, and each Party agrees to report these transactions on its income tax returns in a manner consistent with such intention and to pay any applicable taxes in a similar fashion. This Agreement creates rights and obligations on the part of the Parties. the Parties intend that any rights or obligations created as a consequence of this Agreement shall terminate (within the meaning of Section 1234A of the Code) upon Funder's receipt of the full portion of Proceeds to which it is entitled pursuant to this Agreement. To the maximum extent permitted by law, the payment of the portion of Proceeds to which the Funder is entitled pursuant to this Agreement shall be treated as the disposition of any assets created or transferred to Funder as a result of this Agreement. This Agreement shall be deemed to effect an absolute and unconditional sale (and not an assignment) of the portion of Proceeds to which the Funder is entitled pursuant to this Agreement for the purpose of collection and satisfaction, and shall not be a transfer to or assumption by the Funder of any obligation or liability under or in connection with the Subject Claims. the Parties acknowledge and agree that it is the express intent of the Parties that the transactions contemplated hereunder be, and be treated for all purposes as, a true sale, thereby providing Funder with the full risks and benefits of beneficial ownership of the of the portion of Proceeds to which the Funder is entitled pursuant to this Agreement, and neither party will take a position on any financial statement, tax return or other document, whether before any governmental agency, in any judicial proceeding, or otherwise, that is in any way inconsistent with the treatment of the transaction contemplated hereby as a true sale. Funder may buy, sell hold additional interests in claims asserted against, or provide additional financing to Emergent or any parties related to or affiliated with FTX and/or Samuel Bankman Fried and/or any proceedings related thereto for its own account or for the account of others.

16.    Indemnification.

16.1    Indemnification of the Funder by Emergent and the JPLs. Emergent and the JPLs each agrees to indemnify, defend, and hold the Funder and its Representatives ("**Funder**

95

**Indemnitees**") free and harmless from and against any and all actions, losses, costs, charges, damages, claims, sanctions, penalties, and expenses (including attorneys' fees and costs of experts and advisors) (collectively, "**Losses**") which any Funder Indemnitee has sustained or may sustain at any time for reason of: (a) ) the breach of, inaccuracy of, or failure to comply with, or the existence of any facts resulting in the inaccuracy of, any of the warranties, representations, or covenants of Emergent and/or the JPLs contained in this Agreement or in any exhibits or documents, delivered by Emergent and/or the JPLs pursuant to or in connection with this Agreement or the Subject Claims; (b) any costs, sanctions, awards, or penalties assessed or awarded against the Funder Indemnitees in connection with this Agreement or the Subject Claims; (c) any claim by any agent or broker for compensation on account of the transactions contemplated by this Agreement, unless otherwise agreed in writing by the Parties; or (d) any legal proceedings connected with the Subject Claims brought against the Funder.

16.2    <u>Indemnification of Emergent and the JPLs by the Funder</u>. the Funder agrees to indemnify, defend, and hold Emergent, the JPLs, and their respective Representatives ("**Emergent Indemnitees**") free and harmless from and against any and all Losses which any Emergent Indemnitee has sustained or may sustain at any time for reason of: (a) the breach of, inaccuracy of, or failure to comply with, or the existence of any facts resulting in the inaccuracy of, any of the warranties, representations, or covenants of the Funder contained in this Agreement or in any exhibits or documents, delivered by the Funder pursuant to or in connection with this Agreement or the Subject Claims; or (b) any claim by any agent or broker for compensation on account of the transactions contemplated by this Agreement, unless otherwise agreed in writing by the Parties.

16.3    <u>Indemnification Procedures</u>. Any Party that seeks, or who receives notice of a third-party claim that seeks, indemnification ("**Indemnified Party**") hereunder shall promptly notify the Party from which the Indemnified Party will seek indemnification ("**Indemnifying Party**") of such claim in writing. the Indemnifying Party shall have the right to assume the defense of such action at its cost with counsel reasonably satisfactory to the Indemnified Party but shall not have the right to settle or compromise any claim or action for anything other than monetary payments without prior written consent of the Indemnified Party. the Indemnified Party shall have the right to participate in such defense with its own counsel at its cost.

16.4    <u>Additional Obligations of Emergent and the JPLs; Related Indemnity</u>. Except as provided in <u>Section 5.4</u> and <u>Section 5.7</u>, neither Emergent nor the JPLs shall hereafter enter into any engagement agreement providing for or otherwise granting a contingent interest in the Subject Claims or the Proceeds thereof with any Person. Emergent and the JPLs each agrees to indemnify the Funder to the extent necessary to ensure that the amount actually received by the Funder in respect of payments due from Emergent and/or the JPLs equals the amount which the Funder would have received if all of the Persons with a contingent interest in the Subject Claims or Proceeds other than the Funder had not held such contingent interest.

17.    <u>Limitation of Liability</u>.

17.1    Subject to <u>Section 18.2</u>, the liability of the Funder under this Agreement is limited to payment of the Fees and Expenses pursuant to a Funding Request in accordance with

the provisions of this Agreement not to exceed the Maximum Investment Amount. the Funder shall have no obligation to pay any sums awarded against, or penalties incurred by, Emergent and/or the JPLs including any costs, orders, awards, interest, damages, expenses, or penalties against Emergent and/or the JPLs in relation to any Subject Claims or defending any enforcement or other proceedings against Emergent and/or the JPLs.

17.2    there shall be no other liability of the Funder under this Agreement or related to it, or related to its activities in connection with this Agreement, except for gross negligence or fraud, in each case that has a material adverse effect on the Subject Claims or Emergent. This limitation of liability is absolute and excludes liability, by way of illustration and not limitation, for negligence, and for any damages that may constitute compensatory damages, lost profit, punitive, special, or indirect damages or otherwise. This limitation of liability extends to the Funder and its Affiliates and Representatives and their successors and assigns.

17.3    Any claim by Emergent and/or the JPLs against the Funder in breach of the limitation of liability provided by this Section 18 constitutes a breach of contract entitling the Funder to recovery of damages and its costs and expenses incurred in relation thereto.

18.    Certain International Provisions.

18.1    Government Authorizations. Emergent and the JPLs each represents and warrants to the Funder that it has obtained all consents, licenses, authorizations, and approvals of, or exemptions from, any Governmental Authority that are necessary or advisable for (a) the execution, delivery, and performance by Emergent and the JPLs of the terms of this Agreement and (b) the enforceability of this Agreement. Emergent and the JPLs each represents and warrants to the Funder that it is not necessary for the Funder to be authorized by any Governmental Authority, including the JPLs or in the Proceedings generally, to make the Claims Payments or to enforce the Funder's rights under this Agreement.

18.2    Recordation; Registration. Emergent and the JPLs each represents and warrants to the Funder that to ensure the legality, validity, enforceability, priority, or admissibility in evidence of this Agreement in the British Virgin Islands, or any other jurisdiction related to the Subject Claims, it is not necessary that this Agreement be registered, recorded, enrolled, or filed with any Governmental Authority, or be notarized or consularized, or that any documentary stamp or similar Tax, imposition or charge of any kind be paid on or in respect of the Agreement. the Funder is aware that official copy of this Agreement is required for its admissibility in the Antiguan Court.

18.3    English Language. This Agreement is to be executed and delivered by the Parties thereto in the English language. In the event that it is necessary for this Agreement to be translated into any language other than English for purposes of complying with any requirements of any Governmental Authority, the English language version of this Agreement shall prevail in any dispute as to the terms and conditions of this Agreement among the Parties. Emergent and the JPLs each hereby waives any defense to the nonperformance of this Agreement based on the expression of this Agreement in the English language.

97

18.4    <u>Commercial Transaction</u>. This Agreement and the transactions contemplated hereby represent commercial activities. Emergent and the JPLs each agrees to be subject to and be bound by any judicial or arbitral proceedings in respect of any matter arising out of or relating to this Agreement. Emergent and the JPLs each further agrees not to assert immunity from execution of judgment or from the enforcement therein of any judgment on the grounds of sovereignty or otherwise in respect of any matter arising out of or relating to this Agreement.

19.    <u>Governing Law and Dispute Resolution</u>.

19.1    <u>Governing Law</u>. This Agreement and all disputes and other matters (whether in contract, tort, or otherwise), shall be governed by the laws of England and Wales, without giving effect to its conflict of law rules to the extent they would require application of the law of another jurisdiction.

19.2    <u>Mediation</u>. the Parties will make a good faith effort to resolve among themselves any dispute, controversy, or claim (collectively, a "<u>Dispute</u>") arising out of or relating to this Agreement for a period of at least thirty (30) Business Days. If, after thirty (30) Business Days, the Parties have not resolved such Dispute, the Parties agree to try to settle the Dispute, including any potential claims, counterclaims, defenses, and counterclaims, by mediation initiated and conducted in accordance with the then existing JAMS mediation process. the Dispute shall be heard by a single, neutral mediator. To select the mediator, the Parties will request a list of five (5) neutral mediators from JAMS, each having experience litigating, adjudicating, or mediating complex business disputes. Each Party will then rank the mediators and the mediator with the highest ranking will serve as the neutral mediator. the place of mediation shall be London, England. or such other place as mutually agreed by the Parties. the language of the mediation shall be English.

19.3    <u>Arbitration</u>. This agreement is subject to binding arbitration. Any dispute arising out of or in connection with this agreement, including any question regarding its formation, existence, validity, interpretation, performance, breach, or termination, not resolved through mediation prior to the date that is seventy-five (75) business days after the dispute first arose, shall (to the exclusion of any other forum) be referred to and finally resolved by the London Court of International Arbitration ("**LCIA**") under the arbitration rules of the LCIA (the "**Rules**"), except to the extent any such rules conflict with the express provisions of this <u>section 19.3</u>. Any attempt by emergent and/or the JPLs, or the funder to seek relief or remedies in any forum other than the forum required above shall constitute a breach of this agreement and entitle the funder to damages, equitable relief, and full indemnification against all costs and expenses incurred in connection therewith. Emergent, Funder and the JPLs each expressly agrees that its agreement to arbitrate, and any resulting award, falls under the united nations convention on the recognition and enforcement of foreign arbitral awards, and the federal arbitration act, and agrees that this agreement has a reasonable relation to a foreign state, envisages performance outside the United States, and relates to property outside the United States.

19.4    <u>Procedure for Arbitration</u>.

(a)    the arbitral tribunal (the "**Tribunal**") shall consist of three arbitrators. Each Party shall appoint one arbitrator and the two arbitrators appointed by the Parties shall, within thirty (30) days of the appointment of the second Party-appointed arbitrator, agree upon and appoint a third arbitrator who shall act as Chair of the Tribunal. If any of the three arbitrators are not appointed within the time period prescribed above, the LCIA Court shall appoint the arbitrator(s).

(b)    the seat, or legal place, of arbitration shall be London, England and all proceedings shall occur there.

(c)    the language to be used in the arbitral proceedings shall be English.

(d)    For any expert witness, the proponent must furnish their *curriculum vitae*, a list of prior testimony and publications for the preceding four (4) years, and a summary and basis of any opinions.

20.5    <u>Confidentiality</u>. the Parties agree that any proceedings under this <u>Section 20</u> as well as any documents and filings produced or exchanged in connection with those proceedings, shall remain confidential, except as may be necessary to prepare for or conduct such proceedings or to enforce or vacate a resulting award unless otherwise required by applicable law. the Parties shall not disclose either the contents of any proceedings hereunder, or the result thereof, without the express written consent of all Parties, except as required by applicable law, or to the extent necessary in connection with any financial audit or insurers.

20.6    <u>Injunctive Relief</u>. Notwithstanding anything in this Agreement to the contrary, each Party shall be entitled to seek interim injunctive relief or interim equitable relief whenever the circumstances permit such Party to seek such relief in a court of competent jurisdiction.

20.7    <u>Exclusive Remedy</u>. Mediation and Arbitration as set forth above shall be the exclusive remedy of the Parties for resolving disputes under this Agreement. Any attempt by either Party to seek relief or remedies in a forum other than the forum required above shall constitute a breach of this Agreement and entitle the other Party to damages, equitable relief, and full indemnification against all costs and expenses incurred in connection therewith.

20.8    <u>Waiver of Defenses</u>. Emergent and the JPLs, each being a sophisticated professional Person, irrevocably waives and forever and unconditionally releases, discharges, and quitclaims any claims, counterclaims, defenses, causes of action, remedies, or rights that it has or may have in the future arising from any doctrine, rule, or principle of law or equity that this Agreement or the relationships and transactions contemplated by this Agreement (a) are against the public policy of any relevant jurisdiction; (b) are unconscionable or contravene any laws relating to consumer protection; (c) are usurious or call for payment of interest at a usurious rate; or (d) constitute champerty, maintenance, barratry, or any impermissible transfer or assignment of property or choses in action. the Parties specifically agree that any issues concerning the scope or

validity of the foregoing waiver shall be within the exclusive jurisdiction of the mediator or Tribunal, as applicable.

20.9    <u>Waiver of Trial by Jury</u>. Each of the Parties hereby waive trial by jury in any action or proceeding to which they may be parties, arising out of or in any way pertaining to this Agreement (other than with respect to the Subject Claims). It is agreed and understood that this waiver constitutes a waiver of trial by jury of all claims against all parties to such actions or proceedings, including claims against parties who are not parties to this Agreement. This waiver is knowingly, willingly, and voluntarily made by each of the Parties, and each of the Parties hereby represent that no representations of fact or opinion have been made by any individual to induce this waiver of trial by jury or to in any way modify or nullify its effect. the Parties further represent that they have had the opportunity to be represented in the signing of this Agreement and in the making of this waiver by independent legal counsel, selected of their own free will, and that they have had the opportunity to discuss this waiver with counsel.

21.    <u>Change in Law or Policy</u>. If any change in Law or Policy renders the funding, prosecution, or recovery of the Subject Claims unlawful, or contrary to policy, the Funder may terminate this Agreement in accordance with <u>Section 12.2</u>. the Funder's rights under this Agreement shall survive any Change in Law or Policy.

22.    <u>Miscellaneous Provisions</u>.

22.1    <u>Entire Agreement; Binding Effect; Assignment</u>. This Agreement, together with its schedules and each Statement of Subject Claims executed by the Parties, shall constitute the entire agreement between the Parties, and shall supersede all prior agreements, understandings, and negotiations between the Parties with respect to the subject matter thereof. To the extent that the Parties entered into any earlier confidentiality or other agreements, those agreements are hereby terminated and this Agreement shall solely govern the Parties' relationship. This Agreement shall inure to the benefit of, and shall be binding upon, the Parties hereto and their respective successors, assigns, and legal representatives. Except as otherwise provided herein, neither this Agreement, nor any rights, interests, obligations, or duties arising hereunder, may be assigned or otherwise conveyed by Emergent or the JPLs without the express consent in writing of the Funder. the Funder may assign its rights and obligations under this Agreement without the consent of Emergent or the JPLs and may also appoint a servicing entity to administer this Agreement. Any argument that ambiguities are to be resolved against the drafting Party is hereby expressly waived by the Parties. This Agreement shall be deemed to have been drafted by each of the Parties, and each of the provisions thereof shall be construed without regard to any presumption or other rule requiring construction against the Party drafting such provisions.

22.2    <u>Amendments; Waivers</u>. Any amendment or modification of any provision of this Agreement must be in writing and bear the signature of a duly authorized representative of each Party. No term or provision of this Agreement may be waived except in a written instrument that bears the signature of a duly authorized representative of each Party. No delay on the part of either Party in exercising any right, power, or remedy under this Agreement shall operate as a waiver thereof, and no single or partial exercise of any right, power, or remedy by any Party hereunder shall preclude any further exercise thereof.

100

22.3    <u>Survival</u>. the provisions of this Agreement relating to representations and warranties, confidentiality, indemnity, tax, limitation of liability, and dispute resolution shall survive termination or expiration of this Agreement, as shall a general obligation to pay any Proceeds pursuant to the terms of this Agreement.

22.4    <u>Severability</u>. If any term, provision, covenant or condition of this Agreement, or the application thereof to any Person, place, or circumstance, shall be held to be invalid, unenforceable, or void, the remainder of this Agreement and such term, provision, covenant, or condition as applied to other Persons, places, and circumstances shall remain in full force and effect.

22.5    <u>Notices</u>. All notices, reports, legal service, and other communications (a "**Notice**") required or permitted under this Agreement shall be in writing. Notices shall be delivered by hand, internationally recognized overnight air courier service, fax, or email to the Parties at their addresses and numbers indicated on <u>Schedule 3</u> to this Agreement or at such other addresses or numbers as may be specified hereafter in writing by a Party to the other Party in accordance with this <u>Section 23.5</u>. Any Notice shall be deemed to have been delivered and received (a) on the date delivered, if delivered personally by hand or sent by internationally recognized overnight air courier or (b) on the date sent if sent by fax or email. Any Notice that is sent by fax or email must be confirmed by sending, within one (1) Business Day of transmission of the electronic communication, a hard paper copy thereof to the recipient by hand delivery or by internationally recognized overnight air courier; <u>provided</u>, <u>however</u>, that the effective date of such notice shall be as specified in clause (b) above, and if the recipient actually receives the fax or email, then the Notice shall be deemed to have been given and delivered as of the date sent even if the recipient never receives a hard copy as called for in this clause.

22.6    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which, taken together, shall constitute one agreement binding on all Parties. Copies of executed counterparts may be exchanged by facsimile, email, or other electronic transmission, and such an exchange shall constitute effective delivery by the Parties of their respective executed counterparts.

22.7    <u>Force Majeure</u>. Any delay or failure of either Party to perform its obligations under this Agreement will be excused to the extent that the delay or failure was caused directly by an event beyond such Party's control, without such Party's fault or negligence and that by its nature could not have been foreseen by such Party or, if it could have been foreseen, was unavoidable (which events may include natural disasters, embargoes, explosions, riots, wars, or acts of terrorism) (each, a "**Force Majeure Event**"). Each Party shall give the other Party prompt written notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event, and the anticipated duration of such Force Majeure Event. the Parties shall use all diligent efforts to end the Force Majeure Event, ensure that the effects of any Force Majeure Event are minimized, and resume full performance under this Agreement. Notwithstanding the foregoing, in no event will a Force Majeure Event excuse a breach by Emergent and/or the JPLs of their obligations with respect to the Proceeds or payments owed to the Funder under this Agreement.

101

*(Remainder of Page Left Intentionally Blank)*

102

**SIGNATURE PAGE TO**
**LIQUIDATION FUNDING AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the Effective Date.


FUNDER:


By:_____
Name:
Title:


EMERGENT:


By:_____
Name:
Title:


THE JPLs:


By:_____
Name:
Title:


103

## SCHEDULE 1
DEFINITIONS

"**Additional Funders**" has the meaning set forth in Section 5.4 with respect to a Failure to Fund on the Merits and Section 5.7 with respect to a follow-on funding.

"**Administration Fee**" has the meaning set forth in Section 5.9.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person. For purposes of this definition, in the context of a commercial entity, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to vote a majority of the securities having voting power for the election of directors or managers (or other Persons acting in similar capacities) of such Person or otherwise to direct or cause the direction of the management and policies of such Person through the ownership of voting securities, by contract or otherwise.

"**Bankruptcy Law**" means the federal Bankruptcy Code, Title 11 of the United States Code, as amended from time to time.

"**Business Day**" means any day other than (i) a Saturday or Sunday, or (ii) a day on which banks are required or authorized by law to close in New York, New York, USA.

"**Claims Payments**" has the meaning set forth in Section 5.1.

"**Closing Fees**" has the meaning set forth in Section 5.8.

"**Collateral**" means the Subject Claims, any Proceeds therefrom, and any accounts, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter of credit rights and money (each of the foregoing as defined in the Uniform Commercial Code), contracts, copyright, patents, and trademarks, in each case, giving rise to or otherwise relating to, any Subject Claim or any part thereof.

"**Common Interest Material**" means any Confidential Information that is the work product of qualified legal advisers or attorney work product, protected by the attorney-client privilege or any similar privilege in any jurisdiction including, for the avoidance of doubt, legal professional privilege or litigation privilege, or that is protected by any rules of professional secrecy in any jurisdiction, including: (i) information prepared by a party to the Subject Claims or their Representatives; and (ii) information prepared by the Funder, its Representative, or their respective investment advisers in connection with a Subject Claims or this Agreement, including legal and factual memoranda, case analyses, and evaluations.

"**Confidential Information**" means any non-public, confidential, or proprietary information relating to: (i) the Funder and its Representatives, including the existence or terms of this Agreement and the discussions and negotiations related thereto and information provided by them about their business and operations or the structures and economic arrangements they use in their

business (except the tax treatment and tax structure); (ii) the Subject Claims, including the names of the parties and potential other parties to such claims, the factual, legal, technical, economic and financial background of such claims, and the procedural status, theories, strategies and tactics for the prosecution or defense of such claims; (iii) billing arrangements, rates, financial, or fee arrangements; (iv) any financial statements, accounts, or other similar information or materials; (v) business or financial information, business plans and relationships, marketing, or product data; (vi) algorithms, computer data bases, computer programs, computer software and systems, intellectual property, trade secrets, and trademarks; (vii) research, scientific data, specifications, technical data, techniques, and technology; and (viii) other proprietary or non-public information, data, or material; in all cases regardless of whether such information is (A) written or oral, irrespective of the form or storage medium, and (B) specifically identified as "Confidential." Confidential Information does not include information that (i) was or becomes generally available to the public other than as a result of a disclosure by the Recipient; (ii) was available to the Recipient on a non-confidential basis prior to its disclosure; or (iii) was developed independent of the information derived from the Confidential Information.

"**Costs Plan**" has the meaning set forth in <u>Section 11.1</u>.

"**Disclosing Party**" means the Party to this Agreement disclosing or providing Confidential Information.

"**Distribution Date**" means, with respect to any Proceeds, the date that is five (5) Business Days following any date on which a Proceeds Recipient deposits such Proceeds into the Escrow Account.

"**Documentation**" means any and all material information relating to the Subject Claims, including any and all Confidential Information and Common Interest Material, in the possession or control of Emergent or the JPLs, as applicable in whatever form, and includes any document including copies, records, electronic files (including without limitation any correspondence), or any other way of representing or recording information which contains or is derived or copied from such, but excludes information given orally unless committed to writing.

"**Encumbrance**" means any (i) mortgage, pledge, lien, charge, hypothecation, adverse claim, right of set-off or counterclaim, security interest or other encumbrance, security agreement, or trust securing any obligation of any Person or arrangement of any kind; (ii) purchase or option agreement or arrangement; (iii) subordination agreement or arrangement; and (iv) agreements to create or effect any of the foregoing or which have a similar or analogous nature or effect.

"**Escrow Account**" means an escrow account (whether a bank account, securities account, or other similar account) maintained by Funder with the approval of the JPLs, such approval not to be unreasonably withheld, established by and in the sole control (other than control for the purposes of perfection under the laws of the United States) of Funder and used solely to hold in trust the Proceeds in accordance with this Agreement, such account to be established in the United States with GLAS or another mutually agreeable financial institution.

"**Failure to Fund on the Merits**" has the meaning set forth in <u>Section 5.4</u>.

"**Fees and Expenses**" means:

(a)      all reasonable and documented costs incurred in the investigation, pursuit, prosecution, or enforcement of the Subject Claims, including the fees and expenses associated with this Agreement and the reasonable and documented fees and expenses of Legal Representatives;

(b)      all reasonable and documented internal personnel costs for dedicated litigation support, and out of pocket expenses incurred by Emergent or the JPLs in the investigation pursuit, prosecution, or enforcement of the Subject Claims; and

(c)      all other expenses required to be paid by Emergent or the JPLs in the investigation, pursuit, prosecution, or enforcement of the Subject Claims and other amounts in respect of other appropriate uses, each as approved in advance by the Funder in its sole discretion, including without limitation, incentive compensation plans and similar arrangements that Emergent or the JPLs deems necessary to institute in connection with the investigation, pursuit, prosecution, or enforcement of the Subject Claims. the Parties acknowledge that Fees and Expenses may include professional fees and costs incurred by the Funder or Affiliates of the Funder, including fees for legal services provided to the Funder in pursuit and negotiation of this transaction.

"**Funding Request**" means a written request by Emergent or the JPLs for funding of Fees and Expenses, referenced in Section 5.3 of this Agreement. It shall consist of an invoice or other official accounting of Fees and Expenses, delivered to the Funder.

"**Governmental Authority**" means any national, federal, state, provincial, county, municipal, regional, or local government, foreign or domestic, or any other political subdivision thereof, and any entity, agency, department, bureau, commission, court, tribunal, arbitrator(s), or similar instrumentality or quasi-governmental body exercising executive, legislative, judicial, regulatory, or administration functions of or pertaining to any government or other political subdivision thereof.

"**Insolvency Proceeding**" means, with respect to any Party, (i) any receivership, administration, liquidation, bankruptcy, appointment of a provisional the JPLs, winding-up, dissolution, voluntary arrangement, a compromise of debts, moratorium or creditor action, statutory stay, an assignment for the benefit of creditors, or any other action or procedure under the Bankruptcy Law or any law of any jurisdiction having a similar or analogous nature or effect, in each case, affecting such Party or its assets or (ii) an admission by such Party in writing of its inability to pay its debts generally as they become due or (iii) the taking of any action by such Party in furtherance of any of the foregoing.

"**Legal Representative**" means, with respect to Emergent or the JPLs regarding the Subject Claims, any Person that is legally authorized to represent Emergent or the JPLs in connection with such Subject Claims and act on behalf of Emergent or the JPLs in connection with all proceedings related to such Subject Claims, including without limitation, any Person acting as attorney, legal counsel, collection agent, legal consultant, or any other similar agent of Emergent or the JPLs regarding such Subject Claims.

"**Person**" means any natural person, corporation, partnership, limited liability company, joint stock company, joint venture, association, company, estate, trust, or other organization whether or not a

legal entity, custodian, trustee-executor, administrator, nominee, or entity in a representative capacity and any government or agency or political subdivision thereof.

"**Proceedings**" has the meaning set forth in Schedule 2.

"**Proceeds**" means, with respect to the Subject Claims and owing to Emergent and/or the JPLs under the terms of its Engagement Agreement: (i) any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value recovered by or on behalf of (or reduced to a debt owed to) Emergent and/or the JPLs on account or as a result or by virtue of (directly or indirectly) the Subject Claims, including any recoveries that may result from Emergent and/or the JPLs criminal proceedings, whether by negotiation, arbitration, mediation, diplomatic efforts, lawsuit, settlement, criminal penalties, or otherwise, and includes all of Emergent and/or the JPLs' legal or equitable rights, title and interest in or to any of the foregoing, whether in the nature of ownership, lien, security interest or otherwise; plus (ii) any recovered interest, penalties, attorneys' fees and costs in connection with any of the foregoing; plus (iii) any consequential, actual, punitive, exemplary or treble damages awarded or recovered on account thereof; plus (iv) any interest awarded or later accruing on any of the foregoing; plus (v) any recoveries against attorneys, accountants, experts, officers or other related parties in connection with any of the foregoing. For the avoidance of doubt, Proceeds includes (without limitation) cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities, claims, refunds, and any other rights to payment of cash or transfer(s) of things of value or other property (including property substituted therefor), whether delivered or to be delivered in a lump sum or in installments, in relation to any claim or negotiation with any Person in relation to the Subject Claims, and shall include any award of rescissionary, punitive, consequential, treble, or exemplary damages or penalties assessed against any adverse party from time to time. Proceeds also includes (without limitation) any value conveyed to any Person in connection with the Subject Claims or the resolution or termination thereof, to the extent Emergent and/or the JPLs is entitled to a share thereof. Regardless of Emergent and/or the JPLs' actual recovery, the amount of the Proceeds shall not be reduced by a set-off for any reason, including counterclaims, or as a result of a costs order against Emergent and/or the JPLs or as result of any other quantifiable order. Proceeds shall include in-kind Proceeds.

"**Proceeds Recipient**" means, with respect to any Proceeds, Emergent, the JPLs any Legal Representative of Emergent or the JPLs, or any other Person that receives such Proceeds on behalf of Emergent or the JPLs.

"**Recipient**" means the Party to this Agreement receiving Confidential Information.

"**Recovery Percentage**" has the meaning set forth in Section 7.4(b).

"**Reporting Requirement**" means (x) a quarterly written report ("**Quarterly Report**") provided promptly after at the end of each calendar quarter by Emergent or the JPLs to the Funder as to (i) the status of the Subject Claims and any meaningful developments during the quarter, including copies of any court filings or similar documents and (ii) Emergent and the JPLs' billings and accrued expenses attributable to such calendar quarter in respect of the Subject Claims, or (y) a

monthly conference call between the JPLs and the Funder (or a Representative of the Funder) covering topics that are substantially similar to the topics covered by a Quarterly Report but with respect to the calendar month preceding the month in which the conference call takes place.

"**Representatives**" means, with respect to any Person (other than an individual) such Person's directors, officers, managers, members, partners, principals, employees, shareholders, Affiliates, related entities, agents, reinsurers, lawyers, accountants, consultants, advisors, and independent contractors. Where applicable, the term Representatives includes Legal Representatives.

"**Subject Claims**" has the meaning set forth in <u>Section 2</u>.

"**Subject Claims Impairment**" means: (i) any right or interest of any Person or authority whatsoever in respect of the Subject Claims or the Proceeds or any part thereof, the effect of which is or would be to reduce, impair or otherwise materially or prejudicially affect the Subject Claims or the Proceeds or any part thereof; (ii) any claim or action of any Person or authority whatsoever in respect of the Subject Claims or the Proceeds or any part thereof, the effect of which, if determined adversely, is or would be to reduce, impair or otherwise materially and prejudicially affect the Subject Claims or the Proceeds or any part thereof; or (iii) any right of set-off, counterclaim, cross claim or impairment of any person in respect of the Subject Claims or the Proceeds.

"**Tax**" means any tax, duty, contribution, impost, withholding, levy, or other charge or withholding of a similar nature (including use, sales and value added taxes), whether domestic or foreign, and any fine, penalty, surcharge, or interest in connection therewith.

"**Total Payments**" has the meaning set forth in <u>Section 5.9</u>.

## SCHEDULE 2
STATEMENT OF SUBJECT CLAIMS

"**Subject Claims**" means any and all claims, rights, defenses and causes of action for the appointment of receivers, and subsequently provisional liquidators and liquidators over the legal proceedings and claims in the matter of, or in connection with, Emergent, such proceedings filed in the Eastern Caribbean Supreme Court, High Court of Justice for Antigua and Barbuda up to and including 27 January 2023, any adjournment thereof, specifically, claim numbers ANUHCV2022/0465 and ANUHCV2022/0480, and any proceedings arising out of or in connection with these claims thereafter, including any appeals, in order to preserve the assets of Emergent (including but not limited to any shares of Robinhood Markets Inc.) against any and all individuals and entities responsible for the misappropriation of funds from Emergent, or in the preservation, monetization or other realization of Emergent's assets.

the Subject Claims shall include but not be limited to:

(i)     any and all related pre and post-trial proceedings or processes in or in connection with the Subject Claims ("**Proceedings**"), including the pursuit of attorneys' fees, costs or post-judgment remedies, and including for purposes of clarity any foreign proceedings (i.e., US Chapter 11 or Chapter 15 proceedings);

(ii)    all appellate or annulment proceedings and proceedings on remand, as well as enforcement, ancillary, parallel or alternative dispute resolution proceedings and processes arising out of or related to the acts or occurrences alleged in the Subject Claims (including without limitation arbitration, conciliation, or mediation);

(iii)   re-filings or parallel filings of the Subject Claims and any other legal, diplomatic, or administrative proceedings or processes founded on the underlying facts giving rise to or forming a basis for the Subject Claims and involving one or more adverse parties, in which any defendant or any defendant's successor(s) in interest or assigns or affiliates is a party;

(iv)    ancillary or enforcement proceedings related to the facts or claims alleged from time to time or that could have been alleged in the Subject Claims at any time; and

(v)     all arrangements, settlements, negotiations, or compromises made between Emergent or the JPLs and any adverse party having the effect of resolving any of Emergent's claims against any adverse party that are or could be or could have been brought in the Subject Claims.

**SCHEDULE 3**
AUTHORIZED REPRESENTATIVES

Funder's Address for Notices:

111 Congress Avenue, Suite 2550
Austin, Texas 78701-4044
Attn: Mireya Lizarazo
Telephone Number:  512-852-3103
Email:  mireya@fulcruminv.com with copies to mhamilton@fulcruminv.com and
tbennett@fulcruminv.com

JPL's Address for Notices:

10 Market St
#1174 Camana Bay
Grand Cayman
Cayman Islands
KY1-9006111
Telephone Number:  +1 345 746 5260
Email: angela.barkhouse@quantuma.com and toni.shukla@quantuma.com

Buyer's Wire Instructions:

| | |
|---|---|
| Beneficiary Bank: | First Caribbean International Bank (Cayman) Ltd |
| BIC/SWIFT | FCIBKYKYXXX |
| Beneficiary account number: | 10486152 |
| Beneficiary account name: | Quantuma (Cayman) Ltd. Retainer Acct |
| Beneficiary address: | Flagship Building, 142 Seafarers Way, George Town, Grand Cayman, Cayman Islands |
| Correspondent Bank: | Wells Fargo Bank, New York |
| SWIFT Code: | PNBPUS3NNYC |
| ABA Code: | 026005092 |

110

## SCHEDULE 4
EXECUTED TERM SHEET

[INSERT]

## **APPENDIX A**

[INSERT

# EXHIBIT B-23

The Eastern Caribbean Supreme Court

In The Court of Appeal

Antigua and Barbuda

ANUHCVAP2023/0002

BETWEEN:

Samuel Benjamin Bankman-Fried

Applicant

and

(1) Angela Barkhouse And Toni Shukla (As Receivers Of<br>Emergent Fidelity Technologies Ltd)<br>(2) Emergent Fidelity Technologies Ltd

Respondents

**ORDER**

**CHAMBERS**

**BEFORE HER LADYSHIP, THE HON. MDE. MARGARET PRICE-FINDLAY, JUSTICE OF APPEAL JUSTICE** on the **27**th day of **January** 2023 -

**UPON READING** the notice of application filed by the applicant on 11th January 2023 for leave to appeal the order of Justice Darshan Ramdhani KC [Ag.] made on 28th December 2022 and a stay of proceedings in the matter of ANUHCV2022/0480;

**UPON READING** the order of Justice Darshan Ramdhani KC [Ag.] made on 28th December 2022;

**UPON READING** the submissions filed on 11th January 2023 by the applicant in support of the application for leave and a stay;

**UPON READING** the affidavit of service of Annie Bowen filed on 18th January 2023;

**UPON READING** the affidavit in support filed on 20th January 2023 by the applicant in support of the application for leave and a stay;

**UPON NOTING** the notice of opposition filed by the respondents on 19th January 2023;

**UPON READING** the notice of application filed by the applicant on 20th January 2023 with affidavit in support, for an urgent hearing of the application for leave to appeal and for a stay;

**UPON CONSIDERING** the principles for the grant of leave to appeal as stated in **Othneil Sylvester v Faelleseje** Civil Appeal No. 5 of 2005 (delivered 20th February 2006, unreported);

**AND UPON BEING OF THE VIEW** that the applicant has shown a realistic prospect of success on appeal and has met the threshold for the grant of leave to appeal;

**UPON CONSIDERING** the principles on which a stay is granted as enunciated in **C-Mobile Services Limited v Huawei Technologies Co Limited** BVIHCMAP2014/0017 (delivered 2nd October 2014, unreported), including;

(i) the party seeking a stay must provide cogent evidence that its appeal will be stultified or rendered nugatory unless a stay is granted; (ii)the exercise of the court's discretion to grant a stay will depend on all the circumstances of the case, and (iii) the essential question is whether there is a risk of injustice to one or both parties if a stay is granted or refused;

**AND UPON BEING MINDFUL** that the appeal will be stultified or rendered nugatory unless a stay is granted;

**IT IS HEREBY ORDERED THAT:**

1. **The application for leave to appeal the order of Justice Darshan Ramdhani KC [Ag.] made on 28th December 2022 is granted.**

2. **The applicant shall file and serve a notice if appeal within 21 days of the date of this order.**

3. **A stay of the proceedings in the matter ANUHCV2022/0480 is granted pending the hearing and determination of the appeal.**

Date the **27th** day of **January** 2023.

**BY THE COURT**

...........................

**DEPUTY CHIEF REGISTRAR**

# EXHIBIT B-24

**The Eastern Caribbean Supreme Court**

### In the Court of Appeal

**Antigua and Barbuda**

**ANUHCVAP2023/0002**

**BETWEEN:**

### Samuel Benjamin Bankman-Fried

Appellant

### and

### [1] Angela Barkhouse and Toni Shukla
### (As Receivers of Emergent Fidelity Technologies Limited)
### [2] Emergent Fidelity Technologies Limited

Respondents

### <u>ORDER</u>

**ON PAPER**

**BEFORE HER LADYSHIP, THE HON. DAME JANICE M. PEREIRA, DBE, CHIEF JUSTICE, HER LADYSHIP, THE HON. MDE. VICKI-ANN ELLIS, JUSTICE OF APPEAL AND HIS LORDSHIP, THE HON. MR. TREVOR WARD, JUSTICE OF APPEAL** on the **3rd** day of **February**, 2023 -

**UPON READING:**

(i)    the notice of application filed by the applicants, Angela Barkhouse and Toni Shukla (as receivers/provisional liquidators of Emergent Fidelity Technologies Limited), on 31st January 2023 seeking: (i) an order that paragraph 3 of the order of the single judge of the Court dated 27th January 2023 be set aside wholly or in part; (ii) confirmation that paragraph 3 of the said order is not intended to and does not: (a) affect the exercise of the powers and duties of the receivers/provisional liquidators under the order of Ramdhani J [Ag.] dated 5th December 2022; and (b) prevent the judgment being delivered on the winding up petition heard by Forrester J [Ag.] on 27th January 2023; and (iii) an order that costs of the application be reserved ("the Application");

(ii)    the affidavit of R. Ebony David-Rattigan filed on 31st January 2023 in support of the Application, together with the exhibit thereto;

(iii)    the order of the single judge of the Court dated 27th January 2023 staying the proceedings in claim no. ANUHCV2022/0480 (the "Proceedings");

(iv)    the letter dated 29th January 2023 from Lake, Kentish & Bennett, legal practitioners for the applicants, to the Chief Registrar seeking the lifting of the stay granted by the single judge on an urgent basis;

(v)    the material which was placed before the single judge; and

(vi)    the written submissions filed in support of and in opposition to the Application.

**UPON THE COURT BEING COGNISANT** of rule 62.16A of the **Civil Procedure Rules 2000** (the "CPR") which provides that any order, direction or decision made by a single judge of the Court may be varied, discharged or revoked by the Full Court in any case;

**AND UPON THE COURT BEING SATISFIED** that the stay of Proceedings granted by the single judge on 27th January 2023 should be lifted, having taken into consideration the following matters and legal principles relevant to the determination of the Application:

(a)    Firstly, rule 62.16 of the CPR limits the power of a single judge of the Court of Appeal to grant a stay to the granting of stays of execution of any judgment or order against which an appeal has been filed pending appeal. There is no general power of a single judge to stay proceedings in the court below. The power to stay proceedings under rule 26.1(q) of the CPR is reserved to the Full Court or the court below to exercise in appropriate cases. Accordingly, the Court considers that the single judge had no jurisdiction to stay the Proceedings.

(b)    Secondly, and in any event, in treating with the application for a stay of proceedings the applicants/respondents would have been entitled to be heard thereon as clearly contemplated in the original listing of the matter for 31st January 2023. The Court is satisfied that the applicants/respondents were not afforded that opportunity at the hearing of the matter on 27th January 2023.

(c)    Thirdly, by the time the order of the single judge was delivered, the hearing of the Proceedings before Forrester J [Ag.] had already taken place. In these circumstances, the Court considers that there would have been no useful purpose in staying the Proceedings. In **Telecommunications Regulatory Commission v Caribbean Cellular Telephone Limited** BVIHCVAP2015/0015 (delivered on 16th December 2015, unreported), the Court of Appeal cited the dictum of Lord Oliver in the Privy Council decision of **Minister of Foreign Affairs, Trade and Industry v Vehicles and Supplies Limited and Another** [1991] 1 WLR 550 on the nature of a stay of proceedings thus:

> "A stay of proceedings is an order which puts a stop to the further conduct of proceedings in court or before a tribunal at the stage which they have reached, the object being to avoid the hearing or trial taking place...It simply means that the relevant court or tribunal cannot, whilst the stay endures,

effectively entertain any further proceedings except for the purpose of lifting the stay and that, in general, anything done prior to the lifting of the stay will be ineffective."

It follows that there being no ongoing proceedings upon which a stay could take effect, the grant of a stay of the Proceedings was not appropriate in the circumstances of this case. Indeed, the stay would now serve only to prevent Forrester J [Ag.] from delivering judgment in the Proceedings and would prevent either party from taking any consequential steps thereafter. The Court discerns no good reason for delaying the delivery of that judgment.

(d) Fourthly, having considered the principles relative to the grant of a stay of proceedings and the evidence filed in support of the application, the Court is satisfied that in any event the application does not disclose a sufficient basis warranting a stay of proceedings.

**IT IS HEREBY ORDERED THAT:**

1. **The stay of proceedings is lifted and paragraph 3 of the order of the single judge dated 27th January 2023 is set aside.**
2. **Costs of the Application are reserved.**

Dated the **3rd** day of **February**, 2023

BY THE COURT



…………...……………………

**DEPUTY CHIEF REGISTRAR**

# EXHIBIT B-25

**The Eastern Caribbean Supreme Court**

## In the Court of Appeal

**Antigua and Barbuda**

**ANUHCVAP2023/0002**

**BETWEEN:**

### Samuel Benjamin Bankman-Fried

Appellant

**and**

### 1.  Angela Barkhouse and Toni Shukla
### (As Receivers of Emergent Fidelity Technologies Ltd)

### 2.  Emergent Fidelity Technologies Ltd

Respondents

### DIRECTIONS FOR HEARING OF INTERLOCUTORY APPEAL

**BEFORE HER LADYSHIP, THE HON DAME JANICE M. PEREIRA, DBE, CHIEF JUSTICE** on the **30th day** of **January ,** 2023;

**UPON READING** the notice of appeal filed on 30th  January, 2023;

**UPON NOTING** that in accordance with CPR 62.10(1) the appellant has filed the relevant appeal bundle of documents on 30th January 2023;

**UPON NOTING** the appellants have filed submissions and authorities on 30th January 2023;

**UPON NOTING** that service of the interlocutor appeal, apple bundle of documents and submissions was effected via the E-Litigation Portal

**IT IS HEREBY ORDERED AND DIRECTED PURSUANT TO CPR 62.10(6) AND SUBJECT TO THE ENDORSEMENT BELOW THAT:**

**This interlocutory appeal shall be heard by way of oral hearing at the**

sitting of the Court for Antigua and Barbuda during the week commencing Monday, 6th March , 2022.

Dated the **3rd**  day of  **February,** 2023



**BY THE COURT**

………………………………

**DEPUTY CHIEF REGISTRAR**

**NOTICE**

**The direction given above shall NOT be deemed to be or be interpreted by any    party as curing any noncompliance with any rule, order or practice direction.**

# EXHIBIT B-26

Darren Azman
Joseph B. Evans
**MCDERMOTT WILL & EMERY LLP**
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

Charles R. Gibbs (admitted *pro hac vice*)
Grayson Williams (admitted *pro hac vice*)
**MCDERMOTT WILL & EMERY LLP**
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098

*Counsel to the Official Committee of*
*Unsecured Creditors of Voyager Digital Holdings, Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| VOYAGER DIGITAL HOLDINGS, INC., et al., | ) | Case No. 22-10943 (MEW) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF JOSEPH B. EVANS IN SUPPORT OF THE OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PROOFS OF CLAIM NOS. 11206, 11209, AND 11213**

I, Joseph B. Evans, hereby declare pursuant to section 1746 of title 28 of the United States Code:

1.      I am a partner at McDermott Will & Emery LLP. I am an attorney in good standing of the bar in the State of New York and the bars of the United States District Courts for the Southern and Eastern Districts of New York.

2.      I submit this declaration[2] in support of the Objection of the Official Committee of Unsecured Creditors to Proofs of Claim Nos. 11206, 11209, and 11213 (the "<u>Objection</u>").

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of the Voyager Digital Holdings, Inc.'s and Voyager Digital Ltd.'s principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003. Voyager Digital, LLC's principal place of business is 701 S. Miami Ave, 8th Floor, Miami, FL 33131.

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

3.     Attached as <u>Exhibit 1</u> is a true copy of *In re FTX Trading Ltd.*, *et al.*, No. 22-11068, Docket No. 24, Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings (Bankr. D. Del. Nov. 17, 2022), and which is referred to in the Objection as the Ray Decl.

4.     Attached as <u>Exhibit 2</u> is a true copy of *Securities and Exchange Commission v. Samuel Bankman-Fried*, No. 22-10501, Docket No. 1, Compl. (S.D.N.Y. Dec. 13, 2022), and which is referred to in the Objection as the SEC Compl.

5.     Attached as <u>Exhibit 3</u> is a true copy of *Commodity Futures Trading Commission v. Samuel Bankman-Fried, et al.*, No. 1:22-10503, Docket No. 1, Compl. (S.D.N.Y. Dec. 13, 2022), and which is referred to in the Objection as the CFTC Compl.

6.     Attached as <u>Exhibit 4</u> is a true copy of *In re FTX Trading Ltd., et al.*, No. 22-11068, Docket No. 176, Motion of the U.S. Trustee for Entry of an Order Directing the Appointment of an Examiner (Bankr. D. Del. Dec. 1, 2022), and which is referred to in the Objection as the UST Examiner Mot.

7.     Attached as <u>Exhibit 5</u> is a true copy of *United States v. Caroline Ellison*, No. 22-cr-673, Dec. 19, 2022 Plea Transcript.

8.     Attached as <u>Exhibit 6</u> is a true copy of *United States v. Samuel Bankman-Fried a/k/a "SBF,"* No. 1:22-cr-673, Docket No. 1 (S.D.N.Y. Dec. 9, 2022).

9.     Attached as <u>Exhibit 7</u> is a true copy of Voyager Digital Ltd., Managements' Discussion and Analysis for the Quarter Ending December 31, 2021 (filed Feb. 14, 2022).

10.    Attached as <u>Exhibit 8</u> is a true copy of the loan agreement dated June 21, 2022 between Voyager Digital Holdings, Inc., as borrower, Voyager Digital Ltd., as guarantor, and

Alameda Ventures Ltd., as lender, and which is referred to in the Objection as the Alameda Loan Agreement.

11.     Attached as <u>Exhibit 9</u> is a true copy of the joint proposal dated July 22, 2022 to enter into a Customer Liquidity and Asset Purchase Agreement from FTX Trading Ltd., West Realm Shire Inc., and Alameda Ventures Ltd. to Voyager Digital Holdings, Inc., and which is referred to in the Objection as the Joint Proposal.

12.     Attached as <u>Exhibit 10</u> is a true copy of the email from counsel for AlamedaFTX to the Debtors' professionals, dated July 29, 2022 at 2:38 pm ET.

13.     Attached as <u>Exhibit 11</u> is a true copy of the bid letter dated September 11, 2022 and revised asset purchase agreement sent from West Realm Shires Inc. and Alameda Ventures Ltd. to the Debtors' professionals.

14.     Attached as <u>Exhibit 12</u> is a true copy of the email from counsel for AlamedaFTX to the Debtors' professionals, dated July 27, 2022 at 2:36 pm ET.

15.     Attached as <u>Exhibit 13</u> is a true copy of the email from AlamedaFTX Counsel to Committee Counsel, dated November 7, 2022 at 1:55 pm ET.

16.     Attached as <u>Exhibit 14</u> is a true copy of the email from counsel for AlamedaFTX to Darren Azman, dated November 8, 2022 at 9:34 am ET.

17.     Attached as <u>Exhibit 15</u> is a true copy of the December 18, 2022 Caroline Ellison Guilty Plea Letter.

18.    Attached as <u>Exhibit 16</u> is a true copy of the December 18, 2022 Gary Wang Guilty

Plea Letter.


New York, New York                          **MCDERMOTT WILL & EMERY LLP**
Dated: January 31, 2023


                                            <u>/s/ Joseph B. Evans</u>
                                            Joseph B. Evans
                                            One Vanderbilt Avenue
                                            New York, NY 10017-3852
                                            Telephone: (212) 547-5400
                                            Facsimile: (212) 547-5444
                                            E-mail: jbevans@mwe.com


                                            *Counsel to the Official*
                                            *Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

       I hereby certify that on this 1st day of February 2023, I caused a true and correct copy of the foregoing *Declaration of Joseph B. Evans in Support of the Objection of the Official Committee of Unsecured Creditors to Proofs of Claim Nos. 11206, 11209 and 11213* to be served on (1) the party listed below by e-mail and electronic notification pursuant to the CM/ECF system for the United States Bankruptcy Court for the Southern District of New York ("ECF Notification") and (2) the Service List via (x) ECF Notification or (y) e-mail as indicated in the attachment hereto.

                                 */s/ Darren Azman*_____
                                    Darren Azman

Alameda Ventures Ltd.
c/o Sullivan & Cromwell LLP
Attn:   Andrew G. Dietderich
        Brian D. Glueckstein
        Benjamin S. Beller
125 Broad Street
New York, New York 10004
E-mail: dietdericha@sullcrom.com (via ECF and e-mail)
        gluecksteinb@sullcrom.com (via ECF and e-mail)
        bellerb@sullcrom.com (via e-mail only)

22-10943-mew   Doc 937   Filed 02/01/23   Entered 02/01/23 00:45:39   Main Document

Pg 6 of 7

**SERVICE LIST**

| Name | Attention | Address 1 | Address 2 | City | State | Zip | Country | Email | Method of Service |
|---|---|---|---|---|---|---|---|---|---|
| DISTRICT OF COLUMBIA | OFFICE OF THE ATTORNEY GENERAL | 400 6TH STREET NW | | WASHINGTON | DC | 20001 | | OAG@DC.GOV | VIA E-MAIL |
| FRANCHINE DE SOUSA | C/O 9SKINDS LLP | ATTN: ANTHONY O'BRIEN | 100 LOMBARD STREET SUITE 302 | TORONTO | ON | M5C1M3 | | ANTHONY.OBRIEN@9SKINDS.COM | VIA E-MAIL |
| FRANCHINE DE SOUSA | C/O 9SKINDS LLP | ATTN: MICHAEL O. ROBB & GARETT M. HUNTER | 275 DUNDAS STREET UNIT 1 | LONDON | ON | N6B3L1 | | MICHAEL.ROBB@9SKINDS.COM GARETT.HUNTER@9SKINDS.COM | VIA E-MAIL |
| GOOGLE, LLC | | 1600 AMPHITHEATRE PKWY | | MOUNTAIN VIEW | CA | 94043 | | COLLECTIONS@GOOGLE.COM | VIA E-MAIL |
| OFFICE OF THE UNITED STATES TRUSTEE | FOR THE SOUTHERN DIST OF NEW YORK | ATTN RICHARD C. MORRISSEY, ESQ. AND MARK BRUH, ESQ. | 201 VARICK STREET, ROOM 1006 | NEW YORK | NY | 10014 | | RICHARD.MORRISSEY@USDOJ.GOV MARK.BRUH@USDOJ.GOV | VIA E-MAIL VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | | 100 F STREET NE | | WASHINGTON | DC | 20549 | | SECBANKRUPTCY-OGC-ADO@SEC.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | 100 PEARL STREET SUITE 20-100 | | NEW YORK | NY | 10004-2616 | | NYROBANKRUPTCY@SEC.GOV | VIA E-MAIL |
| SECURITIES & EXCHANGE COMMISSION | NEW YORK REGIONAL OFFICE | ATTN: ANDREW CALAMARI REGIONAL DIRECTOR | 200 VESEY STREET SUITE 400 | NEW YORK | NY | 10281-1022 | | BANKRUPTCYNOTICESCHR@SEC.GOV | VIA E-MAIL |
| STATE OF ALABAMA | OFFICE OF THE ATTORNEY GENERAL | 501 WASHINGTON AVE | | MONTGOMERY | AL | 36104 | | CONSUMERINTEREST@ALABAMAAG.GOV | VIA E-MAIL |
| STATE OF ALASKA | OFFICE OF THE ATTORNEY GENERAL | 1031 W 4TH AVE, STE 200 | | ANCHORAGE | AK | 99501 | | ATTORNEY.GENERAL@ALASKA.GOV | VIA E-MAIL |
| STATE OF ARIZONA | OFFICE OF THE ATTORNEY GENERAL | 2005 N CENTRAL AVE | | PHOENIX | AZ | 85004 | | AGINFO@AZAG.GOV | VIA E-MAIL |
| STATE OF ARKANSAS | OFFICE OF THE ATTORNEY GENERAL | 323 CENTER ST, STE 200 | | LITTLE ROCK | AR | 72201 | | OAG@ARKANSASAG.GOV | VIA E-MAIL |
| STATE OF CALIFORNIA | OFFICE OF THE ATTORNEY GENERAL | PO BOX 944255 | | SACRAMENTO | CA | 94244-2550 | | XAVIER.BECERRA@DOJ.CA.GOV | VIA E-MAIL |
| STATE OF COLORADO | OFFICE OF THE ATTORNEY GENERAL | RALPH L. CARR JUDICIAL BUILDING | 1300 BROADWAY 10TH FL | DENVER | CO | 80203 | | CORA.REQUEST@COAG.GOV | VIA E-MAIL |
| STATE OF CONNECTICUT | OFFICE OF THE ATTORNEY GENERAL | 165 CAPITOL AVENUE | | HARTFORD | CT | 06106 | | ATTORNEY.GENERAL@CT.GOV | VIA E-MAIL |
| STATE OF FLORIDA | OFFICE OF THE ATTORNEY GENERAL | THE CAPITOL, PL01 | | TALLAHASSEE | FL | 32399 | | ASHLEY.MOODY@MYFLORIDALEGAL.CO | VIA E-MAIL |
| STATE OF HAWAII | OFFICE OF THE ATTORNEY GENERAL | 425 QUEEN STREET | | HONOLULU | HI | 96813 | | HAWAIIAG@HAWAII.GOV | VIA E-MAIL |
| STATE OF IDAHO | OFFICE OF THE ATTORNEY GENERAL | 700 W. JEFFERSON ST. SUITE 210 | PO BOX 83720 | BOISE | ID | 83720 | | LAWRENCE.WASDEN@AG.IDAHO.GOV AGWASDEN@AG.IDAHO.GOV | VIA E-MAIL |
| STATE OF ILLINOIS | OFFICE OF THE ATTORNEY GENERAL | JAMES R. THOMPSON CENTER | 100 W. RANDOLPH ST | CHICAGO | IL | 60601 | | INFO@ILSAMADIGAN.ORG | VIA E-MAIL |
| STATE OF IOWA | OFFICE OF THE ATTORNEY GENERAL | HOOVER STATE OFFICE BUILDING | 1305 E. WALNUT STREET | DES MOINES | IA | 50319 | | CONSUMER@AG.IOWA.GOV | VIA E-MAIL |
| STATE OF KANSAS | ATTN: ATTORNEY GENERAL DEREK SCHMIDT | 120 SW 10TH AVE, 2ND FLOOR | | TOPEKA | KS | 66612 | | DEREK.SCHMIDT@AG.KS.GOV | VIA E-MAIL |
| STATE OF LOUISIANA | DEPT. OF JUSTICE - ATTORNEY GENERAL'S OFFICE | 300 CAPITOL DRIVE | | BATON ROUGE | LA | 70802 | | ADMININFO@AG.STATE.LA.US | VIA E-MAIL |
| STATE OF MAINE | OFFICE OF THE ATTORNEY GENERAL | 6 STATE HOUSE STATION | | AUGUSTA | ME | 04333 | | ATTORNEY.GENERAL@MAINE.GOV | VIA E-MAIL |
| STATE OF MARYLAND | OFFICE OF THE ATTORNEY GENERAL | 200 ST PAUL PLACE | | BALTIMORE | MD | 21202 | | OAG@OAG.STATE.MD.US | VIA E-MAIL |
| STATE OF MINNESOTA | OFFICE OF THE ATTORNEY GENERAL | 445 MINNESOTA ST, STE 1400 | | ST. PAUL | MN | 55101 | | ATTORNEY.GENERAL@AG.STATE.MN.US | VIA E-MAIL |
| STATE OF MISSOURI | OFFICE OF THE ATTORNEY GENERAL | SUPREME COURT BUILDING | 207 W HIGH ST | JEFFERSON CITY | MO | 65101 | | CONSUMER.HELP@AGO.MO.GOV | VIA E-MAIL |
| STATE OF MONTANA | OFFICE OF THE ATTORNEY GENERAL | JUSTICE BUILDING, 3RD FLOOR | 215 N SANDERS, PO BOX 201401 | HELENA | MT | 59602 | | CONTACTDOJ@MT.GOV | VIA E-MAIL |
| STATE OF NEW HAMPSHIRE | OFFICE OF THE ATTORNEY GENERAL | NH DEPARTMENT OF JUSTICE | 33 CAPITOL ST | CONCORD | NH | 03301 | | ATTORNEYGENERAL@DOJ.NH.GOV | VIA E-MAIL |
| STATE OF NEW MEXICO | OFFICE OF THE ATTORNEY GENERAL | 408 GALISTEO STREET | VILLAGRA BUILDING | SANTA FE | NM | 87501 | | HBALDERAS@NMAG.GOV | VIA E-MAIL |
| STATE OF NORTH DAKOTA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 600 E | DEPT. 125 | BISMARCK | ND | 58505 | | NDAG@ND.GOV | VIA E-MAIL |
| STATE OF OKLAHOMA | OFFICE OF THE ATTORNEY GENERAL | 313 NE 21ST ST | | OKLAHOMA CITY | OK | 73105 | | QUESTIONS@OAG.OK.GOV | VIA E-MAIL |
| STATE OF OREGON | OFFICE OF THE ATTORNEY GENERAL | 1162 COURT ST NE | | SALEM | OR | 97301-4096 | | ELLEN.ROSENBLUM@DOJ.STATE.OR.US ATTORNEYGENERAL@DOJ.STATE.OR.U | VIA E-MAIL VIA E-MAIL |
| STATE OF RHODE ISLAND | OFFICE OF THE ATTORNEY GENERAL | 150 S MAIN ST | | PROVIDENCE | RI | 02903 | | AG@RIAG.RI.GOV | VIA E-MAIL |
| STATE OF UTAH | OFFICE OF THE ATTORNEY GENERAL | UTAH STATE CAPITOL COMPLEX | 350 NORTH STATE ST STE 230 | SALT LAKE CITY | UT | 84114 | | UAG@UTAH.GOV | VIA E-MAIL |
| STATE OF VERMONT | OFFICE OF THE ATTORNEY GENERAL | 109 STATE ST. | | MONTPELIER | VT | 05609 | | AGO.INFO@VERMONT.GOV | VIA E-MAIL |
| STATE OF VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | 202 N. NINTH ST. | | RICHMOND | VA | 23219 | | MAIL@OAG.STATE.VA.US | VIA E-MAIL |
| STATE OF WEST VIRGINIA | OFFICE OF THE ATTORNEY GENERAL | STATE CAPITOL, 1900 KANAWHA BLVD. | BUILDING 1 RM E-26 | CHARLESTON | WV | 25305 | | CONSUMER@WVAGO.GOV | VIA E-MAIL |
| TORONTO STOCK EXCHANGE | | 100-70 ADELAIDE ST. W | | WEST TORONTO | ON | M5H 1S3 | | WEBMASTER@TSX.COM | VIA ECF |
| KELLEHER PLACE MANAGEMENT, LLC | MORWOOD MARCUS & BERK CHARTERED | 500 W. MADISON ST | SUITE 3700 | CHICAGO | IL | 60661 | | AHAMMEF@HMBLAW.COM NOELMAN@HMBLAW.COM | VIA ECF VIA E-MAIL |
| METROPOLITAN COMMERCIAL BANK | BALLARD SPAHR LLP | 2000 IDS CENTER | 80 SOUTH 8TH STREET | MINNEAPOLIS | MN | 55402-2119 | | SINGERG@BALLARDSPAHR.COM | VIA E-MAIL |
| METROPOLITAN COMMERCIAL BANK | WACHTELL, LIPTON, ROSEN & KATZ | 51 WEST 52ND STREET | | NEW YORK | NY | 10019-6150 | | ROMASON@WLRK.COM ARWOLF@WLRK.COM AMGBRANG@WLRK.COM | VIA E-MAIL VIA ECF VIA E-MAIL |
| JASON RAZNICK | | 27777 FRANKLIN ROAD | SUITE 2500 | SOUTHFIELD | MI | 48034 | | RAZNICK@BENZINGA.COM | VIA E-MAIL |
| STEVE LARD | JAFFE RAITT HEUER & WEISS, P.C. | 777 MAIN STREET | SUITE 3550 | FORT WORTH | TX | 76102 | | BFORSHEY-FORSHEYPROSTOK.COM | VIA ECF |
| ORACLE AMERICA, INC. | FORSHEY & PROSTOK LLP | 555 CALIFORNIA STREET | SUITE 500 | SAN FRANCISCO | CA | 94105 | | CHRISTIANDO@BUCHALTER.COM | VIA E-MAIL |
| ALAMEDA RESEARCH LLC & AFFILIATES | SULLIVAN & CROMWELL LLP | 125 BROAD STREET | | NEW YORK | NY | 10004 | | DIETDERICHA@SULLCROM.COM GLUECKSTEINB@SULLCROM.COM | VIA E-MAIL VIA E-MAIL |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL. | KIRKLAND & ELLIS LLP KIRKLAND & ELLIS INTERNATIONAL LLP | 601 LEXINGTON AVENUE | | NEW YORK | NY | 10022 | | JSUSSBERG@KIRKLAND.COM CMARCUS@KIRKLAND.COM CHRISTINE.OKIKE@KIRKLAND.COM ALLYSON.SMITH@KIRKLAND.COM | VIA E-MAIL VIA E-MAIL VIA E-MAIL VIA E-MAIL |

| Name | c/o | Attn | Address | City | State | Zip | Email | Method |
|---|---|---|---|---|---|---|---|---|
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O GOLDSTEIN & MCCLINTOCK LLLP | ATTN: MATTHEW K. MCCLINTOCK, HARLEY GOLDSTEIN AND STEVE YACHIK | 111 W WASHINGTON STREET SUITE 1221 | CHICAGO | IL | 60602 | MATTM@GOLDMCLAW.COM; HARLEYG@RESTRUCTURINGSHOP.COM; STEVEY@GOLDMCLAW.COM | VIA E-MAIL, VIA E-MAIL, VIA E-MAIL |
| EMERALD OCEAN ISLE, LLC, AMANO GLOBAL HOLDINGS, INC., SHINGO LAVINE, AND ADAM LAVINE | C/O LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C. | ATTN: DOUGLAS T. TABACHNIK | 63 WEST MAIN STREET SUITE C | FREEHOLD | NJ | 07728-2141 | DTABACHNIK@DTTLAW.COM | VIA ECF |
| MATTHEW EDWARDS | C/O LIZ GEORGE AND ASSOCIATES | ATTN: LYSBETH GEORGE | 8101 S. WALKER SUITE F | OKLAHOMA CITY | OK | 73139 | GEORGELAWOK@GMAIL.COM | VIA ECF |
| TEXAS STATE SECURITIES BOARD | OFFICE OF THE ATTORNEY GENERAL OF TEXAS | ATTN: ABIGAIL RYVAN, LAYLA D MILLIGAN & JASON B BINFORD | BANKRUPTCY & COLLECTIONS DIVISION PO BOX 12548 | AUSTIN | TX | 78711-2548 | ABIGAIL.RYAN@OAG.TEXAS.GOV; LAYLA.MILLIGAN@OAG.TEXAS.GOV; JASON.BINFORD@OAG.TEXAS.GOV | VIA ECF, VIA E-MAIL, VIA E-MAIL |
| OFFICE OF THE ATTORNEY GENERAL OF TEXAS | | ATTN: ROMA N. DESAI | BANKRUPTCY & COLLECTIONS DIVISION PO BOX 12548 | AUSTIN | TX | 78711-2548 | ROMA.DESAI@OAG.TEXAS.GOV | VIA ECF |
| OFFICE OF THE ATTORNEY GENERAL | BANKRUPTCY DIVISION | ATTN: MARVIN E. CLEMENTS, JR | BANKRUPTCY DIVISION P O BOX 20207 | NASHVILLE | TN | 37202-0207 | AGBANKNEWYORK@AG.TN.GOV | VIA ECF |
| VERMONT DEPARTMENT OF FINANCIAL REGULATION | ASSISTANT GENERAL COUNSEL | ATTN: JENNIFER ROOD | 89 MAIN STREET THIRD FLOOR | MONTPELIER | VT | 05620 | JENNIFER.ROOD@VERMONT.GOV | VIA ECF |
| ROBERT SNYDERS &LISA SNYDERS | C/O JOHNSON, POPE, BOKOR, RUPPEL, & BURNS, LLP | ATTN: ANGELINA E. LIM | 401 E. JACKSON STREET SUITE 3100 | TAMPA | FL | 33602 | ANGELINAL@JPFIRM.COM | VIA ECF |
| MICHAEL LEEG | C/O MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO | ATTN: ROBERT R. KRACHT & NICHOLAS R. OLESKI | 1111 SUPERIOR AVENUE EAST SUITE 2700 | CLEVELAND | OH | 44114 | RRK@MCCARTHYLEBIT.COM; NRO@MCCARTHYLEBIT.COM | VIA E-MAIL, VIA ECF |
| MICHAEL GENTSCH | C/O BARSHI LAW PLC | ATTN: CHRIS D. BARSHI | 9375 E. SHEA BLVD - STE 100 | SCOTTSDALE | AZ | 85260 | CBARSHI@BARSHILAW.COM | VIA ECF |
| ILLINOIS SECRETARY OF STATE | C/O OFFICE OF THE ATTORNEY GENERAL | ATTN: JOHN P. REDING | 100 W. RANDOLPH ST FLOOR 13 | CHICAGO | IL | 60601 | JOHN.REDING@ILAG.GOV | VIA ECF |
| GEORGIA DEPARTMENT OF BANKING AND FINANCE | | ATTN: NATHAN HOVEY, ASSISTANT ATTORNEY GENERAL | DEPARTMENT OF LAW 40 CAPITOL SQUARE SW | ATLANTA | GA | 30334 | NHOVEY@LAW.GA.GOV | VIA ECF |
| WELLS FARGO BANK, N.A. | C/O ALDRIDGE PITE, LLP | ATTN: GREGORY WALLACH | FIFTEEN PIEDMONT CENTER 3575 PIEDMONT ROAD, N.E. | ATLANTA | GA | 30305 | GWALLACH@ALDRIDGEPITE.COM | VIA ECF |
| JON GIACOBBE | C/O ALDRIDGE PITE, LLP | ATTN: A. MANNY ALEJANDRO | 11 BROADWAY, SUITE 615 | NEW YORK | NY | 10004 | MANNY@ALEJANDROLAWOFFICE.COM; JOHN.THOMPSON@AKERMAN.COM; JOANNE.GELFAND@AKERMAN.COM | VIA ECF, VIA E-MAIL, VIA E-MAIL |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: DAVID M. POSNER & KELLY E. MOYNIHAN | THE GRACE BUILDING 1114 AVENUE OF THE AMERICAS | NEW YORK | NY | 10036 | DPOSNER@KILPATRICKTOWNSEND.COM; KMOYNIHAN@KILPATRICKTOWNSEND.COM | VIA ECF |
| AD HOC GROUP OF EQUITY INTEREST HOLDERS | C/O KILPATRICK TOWNSEND & STOCKTON LLP | ATTN: PAUL M. ROSENBLATT | 1100 PEACHTREE STREET NE SUITE 2800 | ATLANTA | GA | 30309 | PROSENBLATT@KILPATRICKTOWNSEND.COM | VIA E-MAIL |
| PIERCE ROBERTSON | C/O PACHULSKI STANG ZIEHL & JONES LLP | ATTN: RICHARD M. PACHULSKI, ALAN J. KORNFELD, DEBRA I. GRASSGREEN, AND JASON H. JOHN | 10100 SANTA MONICA BLVD 13TH FLOOR | LOS ANGELES | CA | 90067 | RPACHULSKI@PSZJLAW.COM; AKORNFELD@PSZJLAW.COM; DGRASSGREEN@PSZJLAW.COM; JJOHN@PSZJLAW.COM | VIA E-MAIL, VIA E-MAIL, VIA E-MAIL, VIA E-MAIL |
| STATE OF WASHINGTON | OFFICE OF ATTORNEY GENERAL | ATTN: STEPHEN MANNING, ASSISTANT ATTORNEY GENERAL | GOVERNMENT COMPLIANCE AND ENFORCEMENT DIVISION | OLYMPIA | WA | 98504-40110 | STEPHEN.MANNING@ATG.WA.GOV | VIA ECF |
| MARCUM LLP | MINTZ & GOLD LLP | ATTN: ANDREW R. GOTTESMANN | 600 THIRD AVENUE 25TH | NEW YORK | NY | 10016 | GOTTESMAN@MINTZANDGOLD.COM | VIA ECF |
| U.S. SECURITIES & EXCHANGE COMMISSION | | ATTN: THERESE A. SCHEUER | 100 F STREET, NE | WASHINGTON | DC | 20549 | SCHEUERT@SEC.GOV | VIA E-MAIL |
| NEW JERSEY STATE DEPARTMENT OF FINANCIAL SERVICES | CONSUMER PROTECTION AND FINANCIAL ENFORCEMENT | ATTN: KEVIN R. PUVALOWSKI, LINDA DONAHUE, JASON D. ST. JOHN | ONE STATE STREET | NEW YORK | NY | 10004 | KEVIN.PUVALOWSKI@DFS.NY.GOV; LINDA.DONAHUE@DFS.NY.GOV; JASON.STJOHN@DFS.NY.GOV | VIA E-MAIL, VIA E-MAIL, VIA E-MAIL |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: VIRGINIA T. SHEA | 1300 MT KEMBLE AVENUE PO BOX 2075 | MORRISTOWN | NJ | 07075 | VSHEA@MDMC-LAW.COM | VIA ECF |
| NEW JERSEY BUREAU OF SECURITIES | C/O MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP | ATTN: NICOLE LEONARD | 225 LIBERTY STREET, 38TH | NEW YORK | NY | 10281 | NLEONARD@MDMC-LAW.COM | VIA ECF |
| USIO, INC. | PULMAN, CAPPUCCIO & PULLEN, LLP | ATTN: RANDALL A. PULMAN | 2161 NW MILITARY HIGHWAY SUITE 400 | SAN ANTONIO | TX | 78213 | RPULMAN@PULMANLAW.COM | E-MAIL |
| CELSIUS NETWORK LLC | AKIN GUMP STRAUSS HAUER & FELD, LLP | ATTN: MITCHELL P. HURLEY, DEAN L. CHAPMAN JR. | ONE BRYANT PARK | NEW YORK | NY | 10036 | MHURLEY@AKINGUMP.COM; DCHAPMAN@AKINGUMP.COM | VIA ECF, VIA E-MAIL |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | PAUL HASTINGS LLP | ATTN: ADAM M. GOLDBERG, NACIF TAOUSSE, JONATHAN J. WEICHSELBAUM | 200 PARK AVENUE | NEW YORK | NY | 10166 | ADAMGOLDBERG@PAULHASTINGS.COM; NACIFTAOUSSE@PAULHASTINGS.COM; JONGKANFIELD@PAULHASTINGS.COM | VIA ECF, VIA E-MAIL, VIA E-MAIL |
| BAM TRADING SERVICES INC. D/B/A BINANCE.US | PAUL HASTINGS LLP | ATTN: ANDREW V. SORKIN | 555 ELEVENTH STREET, NW SUITE 1000 | WASHINGTON | DC | 20004 | ANDREWSORKIN@PAULHASTINGS.COM | VIA E-MAIL |
| ATTORNEY FOR THE STATES OF ALABAMA, ARKANSAS, CALIFORNIA, DISTRICT OF COLUMBIA, HAWAII, MAINE, NORTH DAKOTA, OKLAHOMA, AND SOUTH CAROLINA | CONSTITUTIONAL ASSOCIATION OF ATTORNEYS GENERAL | ATTN: KAREN CORDRY, BANKRUPTCY COUNSEL | 1850 M ST. NW 12TH FLOOR | WASHINGTON | DC | 20036 | KCORDRY@NAAG.ORG | VIA E-MAIL |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL. | RUSKIN MOSCOU FALTISCHEK, P.C. | ATTN: SHERYL P. GIUGLIANO | 1425 RXR PLAZA, 15TH FLOOR | UNIONDALE | NY | 11556 | SGIUGLIANO@RMFPC.COM | VIA ECF |
| VOYAGER DIGITAL HOLDINGS, INC., ET AL. | PAUL HASTINGS LLP | ATTN: MATTHEW M. MURPHY, MICHAEL C. WHALEN | 71 SOUTH WACKER DRIVE SUITE 4500 | CHICAGO | IL | 60606 | MATTMURPHY@PAULHASTINGS.COM; MICHAELWHALEN@PAULHASTINGS.COM | VIA E-MAIL, VIA E-MAIL |

# EXHIBIT 13

**From:** Dietderich, Andrew G. <dietdericha@sullcrom.com>
**Date:** Monday, Nov 07, 2022, 1:55 PM
**To:** Azman, Darren <Dazman@mwe.com>
**Subject:** RE: [EXTERNAL] Re: Town Hall

That's just Binance silliness.  FTX is rock solid, doesn't use customer funds or take credit risk at all.  It cannot have "liquidity" issues because it doesn't lend.

I'll get back to you on town hall.  Discussing calendar and sequence for closing with debtor later this week.

**From:** Azman, Darren <Dazman@mwe.com>
**Date:** Monday, Nov 07, 2022, 1:09 PM
**To:** Dietderich, Andrew G. <dietdericha@sullcrom.com>
**Subject:** RE: [EXTERNAL] Re: Town Hall

We are getting a lot of inbounds regarding liquidity issues at FTX/Alameda.  We also had a lot of leftover questions from the last town hall.  I'm thinking we'd like to do another one next week and would like you for your team to be a part of it.  We can't be silent on these issues and I don't want to speak for FTX.  Let me know your thoughts on timing and who on your side would be best to join and handle FTX-related questions.

DARREN AZMAN
Partner
**McDermott Will & Emery LLP**  One Vanderbilt Avenue, New York, NY 10017-3852
**Tel** +1 212 547 5615   **Mobile** +1 410 409 7591   **Email** dazman@mwe.com
Biography [mwe.com] [nam10.safelinks.protection.outlook.com] | Website [mwe.com] [nam10.safelinks.protection.outlook.com] | vCard [dynasend.com] [nam10.safelinks.pro

# EXHIBIT B-27

John C. Goodchild, III (Bar No. 024031994)
Matthew C. Ziegler (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5020
Email: john.goodchild@morganlewis.com
Email: matthew.ziegler@morganlewis.com

Joshua Dorchak (admitted *pro hac vice*)
David K. Shim (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6700
Email: joshua.dorchak@morganlewis.com
Email: david.shim@morganlewis.com

*Special Counsel for Emergent Fidelity Technologies Ltd*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Jointly Administered<br><br>Case No. 22-19361 (MBK) |
| BLOCKFI INC., BLOCKFI LENDING LLC AND BLOCKFI INTERNATIONAL LLC,<br><br>Plaintiffs,<br><br>v.<br><br>EMERGENT FIDELITY TECHNOLOGIES LTD AND ED&F MAN CAPITAL MARKETS, INC.,<br><br>Defendants. | Adv. Pro. No. 22-01382 (MBK) |

## EMERGENCY MOTION FOR EXTENSION OF TIME
## TO RESPOND TO COMPLAINT AND TURNOVER MOTION
## AND FOR CONTINUANCE OF HEARING AND PRETRIAL CONFERENCE

---

[1] The Debtors in these chapter 11 cases (the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

The duly appointed Joint Provisional Liquidators (the "JPLs") of Emergent Fidelity

Technologies Ltd ("Emergent"), by their undersigned counsel, hereby submit this motion (the

"Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A** (the

"Proposed Order"), (i) granting a 45-day extension of the deadline for responding to the Complaint

[Dkt. No. 1] and continuing the February 2, 2023 pretrial conference to accommodate such 45-day

extension; and (ii) granting a 45-day extension of the deadline for responding to the *Debtors'*

*Motion for Entry of an Order Pursuant to Sections 105(a), 542, and 543 of the Bankruptcy Code*

*(I) Directing the Collateral Be Transferred to a Neutral Broker or Escrow under the Court's*

*Supervision or (II) Enjoining the Defendants from Transferring or Using the Collateral Pending*

*Final Resolution of the Turnover Claims* (the "Turnover Motion") [Dkt. No. 2] and continuing the

January 9, 2023 hearing on the Turnover Motion to accommodate such 45-day extension.  In

support of this Motion, the JPLs rely on and incorporate by reference the declaration of Joshua

Dorchak (the "Dorchak Declaration") attached hereto as **Exhibit B**, and respectfully state as

follows:

## PRELIMINARY STATEMENT

1.      The JPLs ask this Court for a brief extension of the deadlines for their initial

responses to the Complaint and the Turnover Motion, in order to ensure that they may perform

their duties as fiduciaries for the benefit of Emergent's stakeholders in an informed and efficient

manner.  Emergent is the undisputed record holder of a certain asset in which several persons,

including BlockFi in this Adversary Proceeding, have claimed a beneficial interest.  Emergent and

its assets are the express beneficiaries of a universal litigation stay issued by order of the High

Court of Antigua.  That order and a prior related order are being challenged in that court variously

by Samuel Bankman-Fried ("SBF") and by BlockFi itself.  The pending challenge to the court

order that appointed the JPLs and imposes the litigation stay is one of several grounds for this Motion. Another is the JPLs' lack of access to Emergent's books and records. Yet another is the fact that a different chapter 11 debtor, Alameda Research Ltd, has asserted a property interest in Emergent's asset and has asserted that this Adversary Proceeding violates <u>its</u> automatic stay. This Motion does not prejudice any party in interest, as the disputed asset is being held pending a court order directing its disposition. For these reasons, the JPLs respectfully request that the Court grant the Motion.

## **<u>BACKGROUND</u>**

<u>Activities in This Court</u>

2.    On November 28, 2022, BlockFi Inc., BlockFi Lending LLC and BlockFi International LLC (collectively, "<u>BlockFi</u>") commenced the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>") against Emergent and ED&F Man Capital Markets, Inc., which is now known as Marex Capital Markets Inc. ("<u>Marex</u>"). In the Adversary Proceeding, BlockFi asserts that certain securities held by Marex as custodian for Emergent (the "<u>Shares</u>," described in detail below) are property of BlockFi's bankruptcy estates and seeks both turnover of these securities and money damages in an unspecified amount.

3.    BlockFi's essential allegation is that on November 9, 2022 Emergent entered into a certain pledge agreement (the "<u>Pledge Agreement</u>") with BlockFi in which Emergent, among other things, purportedly (i) guarantied an unspecified borrower's loan repayment obligations to BlockFi, (ii) pledged the Shares to BlockFi as security for the guaranty, (iii) promised to deliver the Shares to BlockFi, and (iv) granted BlockFi a power of attorney to act in Emergent's place to enforce the Pledge Agreement. BlockFi alleges that Emergent executed the Pledge Agreement in consideration for BlockFi entering into a certain Amendment & Forbearance Agreement with the

unspecified borrower (the "<u>Forbearance Agreement</u>"), also dated November 9, 2022, by which BlockFi agreed to forbear from exercising certain rights and remedies under various unspecified loan documents.

4.      BlockFi further alleges that on November 10, 2022 (the next day), the forbearance period ended as the unspecified borrower defaulted in an unspecified manner under the Forbearance Agreement and Emergent failed both to deliver the Shares and to honor its guaranty.

5.      Based on the foregoing allegations, BlockFi asserts a property interest in the Shares and asks this Court to compel Emergent to turn over the Shares to BlockFi, in addition to asking this Court for a declaratory judgment that it has a first priority security interest in the Shares, and asking this Court for an unspecified amount of money damages.

6.      On the same day as it filed the Adversary Proceeding, BlockFi filed the Turnover Motion, which seeks the short-term transfer of the Shares from Marex to BlockFi or a neutral third party pending resolution of the Adversary Proceeding.

7.      On December 9, 2022, the undersigned counsel to the JPLs on behalf of Emergent filed a notice of appearance with this Court.  Dkt. No. 7.  In their notice of appearance, and in connection with this Motion, the JPLs reserve their rights and defenses, including with respect to personal jurisdiction.  *See id.*

8.      On December 19, 2022—three weeks after filing this suit—BlockFi filed additional exhibits to the Turnover Motion, including the purported Pledge Agreement and Forbearance Agreement upon which all of its claims are premised.  These exhibits included foundational corporate documents of Emergent that had not been made available to the JPLs previously.  The newly filed exhibits show that the previously unspecified borrower at issue in the Adversary Proceeding is Alameda Research Ltd. ("<u>Alameda</u>").  *See* Dkt. Nos. 14 and 15.  Alameda is (and

was already when the Adversary Proceeding and Turnover Motion were filed) one of the chapter 11 debtors in the jointly administered proceedings styled *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD), pending in the Bankruptcy Court for the District of Delaware.[2]   The exhibits also appear to indicate that one of SBF's associates, Caroline Ellison, signed the Pledge Agreement on Emergent's behalf.   It is not known whether—and the JPLs have seen no indication that—Ms. Ellison was an authorized signatory of Emergent.

9.     The defendants' deadline for responding to the Complaint currently is December 29, 2022, and a pretrial conference is scheduled for February 2, 2023.   The deadline for responses to the Turnover Motion currently is January 3, 2023, with a hearing scheduled for January 9, 2023.[3]

<u>Activities in the Antiguan Court</u>

10.     Emergent is a company formed under the laws of Antigua and Barbuda.   Dorchak Decl. ¶ 6.   Emergent is 90% owned by SBF and 10% owned by Zixiao "Gary" Wang.   *Id.* ¶ 7. SBF is also reported to be the ultimate majority owner of the FTX group of companies, most of which were founded by SBF and Mr. Wang.   As has been widely reported, SBF was recently indicted by the U.S. authorities and charged with, among other things, conspiring and committing wire fraud, commodities fraud, securities fraud, money laundering, and other related offenses against the customers, lenders and investors of FTX and Alameda, and the United States government.

---

[2] On November 11 and 14, 2022, FTX Trading Ltd. ("<u>FTX</u>") and 101 affiliates, including Alameda (collectively, the "<u>FTX Debtors</u>"), filed voluntary chapter 11 petitions in the Delaware bankruptcy court, jointly administered in the case number 22-11068.   This Court may take judicial notice of matters of public record, including the FTX Stay Motion and its supporting declaration as described herein.   *See In re Washington Mut. Inc.*, 741 F. App'x 88, 89 n.1 (3d Cir. 2018) (citing *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) and taking judicial notice of documents, "including matters of public record and judicial opinions")).

[3] The notice form attached to the Turnover Motion (the "<u>Notice</u>") [Dkt. No. 2] provides that the respond deadline is "no later than seven (7) days before the hearing date . . . ."   Notice at 3.   A hearing on the Turnover Motion is set for January 9, 2023.   *See* unmarked docket entry dated December 5, 2022.   January 2, 2023 is a federal holiday; therefore, the response deadline is January 3, 2023, pursuant to Fed. R. Bankr. P. 9006(1).

11.     To the JPLs' knowledge, Emergent's only material asset is the Shares: approximately 56 million Class A common shares of Robinhood Markets, Inc., whose market value of the date of this Motion is believed to be about $440 million.  Dorchak Decl. ¶ 7.

12.     On November 18, 2022, the Eastern Caribbean Supreme Court in the High Court of Justice of Antigua and Barbuda (the "<u>Antiguan Court</u>") entered an order appointing Angela Barkhouse and Toni Shukla as receivers (in such capacity, the "<u>Receivers</u>") over the equity of Emergent (the "<u>Receivership Order</u>").  *Id.* ¶ 6.  A true copy of the Receivership Order is attached to the Dorchak Declaration as **Exhibit 1**.  On December 2, 2022, the Receivers filed a petition to wind up Emergent under the provisions of the International Business Corporations Act, Cap. 222. On December 5, 2022, the Antiguan Court entered an order appointing the Receivers as the JPLs (the "<u>JPL Order</u>").  *Id.* ¶ 8.  A true copy of the JPL Order is attached to the Dorchak Declaration as **Exhibit 2**.

13.     The JPL Order authorizes the JPLs to "[d]efend or take part in any civil . . . action or proceeding in the name and on behalf of [Emergent]," and provides that "[n]o suit, action or other proceeding be commenced or continued against [Emergent] or in respect of its assets, except with the leave of the [Antiguan] Court and subject to such terms as the Court may impose."  JPL Order ¶¶ 3(b), 8.  Despite SBF's and BlockFi's challenges, this Order remains in effect.

14.     The JPL Order further authorizes the JPLs to "[e]xercise any and all rights that [Emergent] may have as a shareholder in any company, or any other rights that [Emergent] may have in any other entity or business structure," and "[s]ubject to the prior approval of the [Antiguan] Court, sell, realise and/or otherwise monetise [the Shares]."  JPL Order ¶¶ 4(a), 4(c).

15.     On the day of his arrest, December 12, 2022, SBF petitioned the Antiguan Court to stay the JPL Order in order to permit SBF to petition the same court to set aside the Receivership

Order, arguing that the Receivers were improperly appointed. Dorchak Decl. ¶ 9. True copies of the SBF's petitions to stay the JPL Order and set aside the Receivership Order, as filed, are attached to the Dorchak Declaration as **Exhibit 3** and **Exhibit 4**, respectively.

16.    In support of his petitions, SBF submitted affidavits attesting to numerous facts essential to the dispute over the Shares but previously unknown to the JPLs. Dorchak Decl. ¶ 10. For example, SBF avers that in or about May 2022 he and Gary Wang borrowed $546,381,737.10 from Alameda, and used those funds to capitalize Emergent and to fund Emergent's purchase of the Shares on the open market. *See id.* A true copy of the SBF's affidavit, as filed, is attached to the Dorchak Declaration as **Exhibit 5**.

17.    On the same day that SBF filed his petitions, BlockFi filed its appearance in the Antiguan Court as a purported creditor of Emergent, indicating that BlockFi also intends to challenge the JPLs' appointment. Dorchak Decl. ¶ 11. A true copy of BlockFi's appearance, as filed, is attached to the Dorchak Declaration as **Exhibit 6**. It is unclear to the JPLs whether BlockFi and SBF are coordinating their efforts in the Antiguan Court.

18.    Between December 12, 2022 and December 23, 2022, several hearings were held in the Antigua Court. Dorchak Decl. ¶ 12. At the most recent hearing, the Antiguan Court reserved judgment on the issue whether the JPL Order should be stayed and scheduled a further court conference for December 28. *Id.* The JPLs expect that the Antiguan Court will reaffirm their authority at this court conference, but it is possible that the Antiguan Court will restrict or even revoke the JPLs' authority, which would in turn lead to a dispute over the JPLs' authority in their separate capacity as Receivers, which could take some time to resolve. *Id.* To the extent any disputes in the Antiguan Court remain unresolved after December 28, the JPLs understand those disputes will be assigned to a different judge in Antigua. *Id.*

<u>Activities in the Delaware Bankruptcy Court</u>

19.     On December 22, 2022, the FTX Debtors moved the Delaware Bankruptcy Court
to enforce or extend the automatic stay to the BlockFi Adversary Proceeding (the "<u>FTX Stay</u>
<u>Motion</u>").  *See In re FTX Trading LTD*., Case 22-11068-JTD, Dkt. No. 291 (Bankr. D. Del. Dec.
22, 2022).  A true copy of the FTX Stay Motion, as filed, is attached to the Dorchak Declaration
as **Exhibit 7**.[4]  The FTX Stay Motion is based on the premise that Alameda and/or other FTX
Debtors have a property interest in the Shares.

20.     The declaration filed by the FTX Debtors in support of the FTX Stay Motion
contains various exhibits and information, such as emails and spreadsheets regarding the Shares,
much of which was previously unavailable to the JPLs.  Dorchak Decl. ¶ 13; *see In re FTX Trading*
*LTD*., Case 22-11068-JTD, Dkt. No. 292 (Bankr. D. Del. Dec. 22, 2022).

<u>Communications Among Counsel to Interested Parties</u>

21.     Prior to filing this Motion, the JPLs' counsel reached out to BlockFi's and Marex's
counsel to ask if they would consent to the extensions sought herein.  Dorchak Decl. ¶ 14.  Marex's
counsel does not oppose the extensions.  *Id.*  BlockFi's counsel declined to consent.  *Id.*

22.     Marex's counsel has also indicated to the JPLs (and, the JPLs understand, to the
other parties to this dispute) that Marex will not release the Shares until it is directed to do so by a
court of competent jurisdiction.  *Id.* ¶ 15.  A true copy of Marex's counsel's statement is attached
to the Dorchak Declaration as **Exhibit 8**.

---

[4] Due to the voluminous nature of the exhibits attached to the declaration filed in support of the FTX Stay Motion,
such documents are not attached to the Dorchak Declaration.  The JPLs respectfully request that the Court take judicial
notice of such documents as noted in footnote 2.

## RELIEF REQUESTED

23.     The JPLs seek entry of an order, substantially in the form attached hereto as **Exhibit**

**A**, (i) granting a 45-day extension of the deadline for responding to the Complaint [Dkt. No. 1]

and continuing the February 2, 2023 pretrial conference to accommodate such 45-day extension;

(ii) granting a 45-day extension of the deadline for responding to the Turnover Motion and

continuing the January 9, 2023 hearing on the Turnover Motion to accommodate such 45-day

extension, without prejudice to the JPLs' right to seek further extensions.

## BASIS FOR RELIEF

24.     Pursuant to Fed. R. Bankr. P. 9006(b)(1), when an act is required to be done within

a specific period by order of the Court, the Court may enlarge the time "for cause shown" at any

time before the period has expired.

25.     Cause plainly exists here.  Multiple parties have asserted an interest in the Shares,

all of which are in separate bankruptcy or liquidation proceedings with stays purportedly

applicable to the same asset.  The JPLs act for Emergent, which is the undisputed nominal holder

of the Shares, and the JPLs have been and intend to continue working in good faith and under court

supervision to determine the rightful ownership and/or interests in the Shares.  However, the JPLs

have been appointed for less than six weeks, and this case merges both an extraordinary degree of

complexity with a paucity of dependable information.  Moreover, the JPLs' very standing to

defend this case is being actively challenged by both SBF and BlockFi itself in the Antiguan Court.

Meanwhile, Marex has repeatedly made clear that it has no intention of releasing the Shares to

anyone absent order of a court of competent jurisdiction.

26.     BlockFi's insistence that the JPLs respond to the Complaint and the Turnover Motion now, when the JPLs lack key information and when their own standing to represent Emergent has been challenged by BlockFi itself, is therefore unreasonable.

27.     Furthermore, this is a complex multi-party or multi-jurisdictional dispute over the ownership of the Shares.  FTX has made it clear that it believes Alameda or another FTX Debtor either owns the Shares outright or to has compelling claims against them.  Needless to say, this cannot comport with the claims BlockFi makes in this proceeding.  Forcing the JPLs to take a position on Emergent's behalf now will not further the fairness or efficiency of adjudicating this multi-party dispute.

28.     Finally, BlockFi will not be prejudiced by a further extension of time.  Based on Marex's representations to the various parties to this dispute that it will hold the Shares until a court of competent jurisdiction determines the Shares' ownership, the Shares are at no risk of being dissipated in the meantime.

29.     The JPLs are serving this Motion on BlockFi and Marex simultaneously with filing. The JPLs respectfully submit that such notice is sufficient for this Motion.

30.     No prior request for the relief sought herein has been made to this or any other Court.

## RESERVATION OF RIGHTS

31.     The JPLs submit this Motion without prejudice to or waiver of any rights or defenses, including, without limitation, defenses based on lack of personal jurisdiction of the JPLs and/or Emergent, and without prejudice to seek further extensions.

WHEREFORE, the JPLs respectfully request that the Court grant the relief requested

herein, substantially in the form attached hereto as **Exhibit A**, and grant such other relief as is just

and appropriate.

Dated: December 27, 2022
Philadelphia, Pennsylvania

Respectfully submitted,

By: /s/ *John C. Goodchild, III*
John C. Goodchild, III (Bar No. 024031994)
Matthew C. Ziegler (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5020
Email: john.goodchild@morganlewis.com
Email: matthew.ziegler@morganlewis.com

- and -

Joshua Dorchak (admitted *pro hac vice*)
David K. Shim (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6700
Email: joshua.dorchak@morganlewis.com
Email: david.shim@morganlewis.com

*Special Counsel for Emergent Fidelity*
*Technologies Ltd*

# EXHIBIT B-28

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FTX Trading LTD., *et al.*, | ) | Jointly Administered |
|  | ) |  |
| Debtors.[1] | ) | Case No. 22-11068 (JTD) |
|  | ) |  |

## RESPONSE OF JOINT PROVISIONAL LIQUIDATORS OF EMERGENT
## TO DEBTORS' MOTION TO ENFORCE OR EXTEND THE AUTOMATIC STAY

The Joint Provisional Liquidators (the "**JPLs**") of Emergent Fidelity Technologies Ltd ("**Emergent**"), by their undersigned special counsel, respectfully submit this response to the Debtors' *Motion to Enforce the Automatic Stay or, in the Alternative, Extend the Automatic Stay* (the "**Motion**") [Docket No. 291].[2]

1.     The JPLs do not oppose the relief requested in the Motion.  The JPLs submit this response to the Motion to inform the Court regarding their role as the representatives of Emergent—the owner of the assets subject to the Motion—and certain events that have transpired since the Motion was filed.

2.     Emergent is a corporation organized under the laws of Antigua and Barbuda.  The JPLs are the lawful representatives of Emergent, having been duly appointed as Joint Provisional Liquidators of Emergent on December 5, 2022 by order of the High Court of Justice of Antigua

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

and Barbuda.  The JPLs are officers of the Antiguan Court and fiduciaries for all of Emergent's creditors.

3.      As the Debtors note in the Motion, Samuel Bankman-Fried challenged the JPLs' appointment and sought to stay the provisional liquidation, but on December 28, the Antiguan Court rejected Mr. Bankman-Fried's application and affirmed the JPLs' authority.

4.      Emergent is the owner of the approximately 55 million Class A common shares of Robinhood Markets Inc. and approximately $21 million in proceeds of the sale of such shares (the "**Emergent Assets**") that are the focus of the BlockFi Adversary Proceeding and the Motion. Emergent acquired the Emergent Assets in the first half of 2022, and from May 11, 2022 through yesterday (January 4, 2023) the Emergent Assets were held for the benefit of Emergent in an account in Emergent's name by its custodian, EDFM (now known as "**Marex**").

5.      Yesterday, at a status conference in this chapter 11 case, a government representative reported to this Court that the Department of Justice was in the process of seizing the Emergent Assets.  Later yesterday, Marex reported that it had transferred the Emergent Assets to an account identified by the DOJ in compliance with the DOJ's instructions.  This transfer appears to moot the alternative relief sought in the Motion, namely, to extend the stay to freeze Emergent's account at Marex.

6.      The JPLs are investigating the transactions by which Emergent was capitalized and acquired the Emergent Assets.  The JPLs are also investigating the transactions underlying the assertions of property interests in, and claims against, the Emergent Assets being made by several persons in several forums, including BlockFi in the BlockFi Adversary Proceeding and the Debtors in the Motion.  Ultimately a court will have to decide which interested party has the superior interest in the Emergent Assets.  The JPLs have no view yet as to which party this will be (or which

court should make this determination), although the JPLs believe that BlockFi's asserted property interest is avoidable on several grounds, as the JPLs note in papers filed today in the BlockFi Adversary Proceeding.

7.      Once the JPLs have completed their investigation, they wish to have the various claims to the Emergent Assets adjudicated equitably and efficiently.  The JPLs do not believe the BlockFi Adversary Proceeding suits this goal.  For this reason, the JPLs do not oppose the Motion, to the extent the Debtors seek to stay the BlockFi Adversary Proceeding.

8.      The JPLs also do not dispute that the Debtors have shown an arguable or colorable property interest in the Emergent Assets.  For the avoidance of doubt, however, the JPLs do not interpret the Motion as seeking an ultimate determination on the merits of the Debtors' (or anyone else's) interests in the Emergent Assets at this time, and the JPLs deny that the Debtors (or anyone else) have shown a superior interest to Emergent's ownership interest in the Emergent Assets at this time.

9.      The JPLs have been cooperating, and will continue cooperating, subject to their duties as fiduciaries for Emergent's creditors and as officers of the Antiguan Court, with the Debtors and other interested parties about how best to resolve the disputes surrounding the Emergent Assets.  That said, the JPLs' investigation is ongoing, and accordingly the JPLs on behalf of Emergent reserve all rights as to jurisdiction, merits, and procedural issues in this matter.

Dated: January 5, 2023
Wilmington, DE

**MORGAN, LEWIS & BOCKIUS LLP**

 /s/ *Jody C. Barillare*
Jody C. Barillare (Bar No. 5107)
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Telephone: (302) 574-3000
Email: jody.barillare@morganlewis.com

- and -

John C. Goodchild, III (admitted *pro hac vice*)
Matthew C. Ziegler (admitted *pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Email: john.goodchild@morganlewis.com
Email: matthew.ziegler@morganlewis.com

- and -

Joshua Dorchak (admitted *pro hac vice*)
David K. Shim (admitted *pro hac vice*)
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Email: joshua.dorchak@morganlewis.com
Email: david.shim@morganlewis.com

*Counsel to the Joint Provisional Liquidators*
*of Emergent Fidelity Technologies Ltd*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 5th day of January 2023, a true and correct copy of the foregoing

*Emergent's Response to Debtors' Motion to Enforce or Extend the Automatic Stay* was sent via

ECF Noticing to all parties receiving ECF Notices in these chapter 11 cases.

<u>/s/ Jody C. Barillare</u>
Jody C. Barillare, Esq. (#5107)

# EXHIBIT B-29

John C. Goodchild, III (Bar No. 024031994)
Matthew C. Ziegler (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5020
Email: john.goodchild@morganlewis.com
Email: matthew.ziegler@morganlewis.com

Joshua Dorchak (admitted *pro hac vice*)
David K. Shim (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6700
Email: joshua.dorchak@morganlewis.com
Email: david.shim@morganlewis.com

*Special Counsel for Emergent Fidelity Technologies Ltd*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Jointly Administered<br><br>Case No. 22-19361 (MBK) |
| BLOCKFI INC., BLOCKFI LENDING LLC AND BLOCKFI INTERNATIONAL LLC,<br><br>Plaintiffs,<br><br>v.<br><br>EMERGENT FIDELITY TECHNOLOGIES LTD AND ED&F MAN CAPITAL MARKETS, INC.,<br><br>Defendants. | Adv. Pro. No. 22-01382 (MBK) |

**OPPOSITION OF JOINT PROVISIONAL LIQUIDATORS OF EMERGENT**
**FIDELITY TECHNOLOGIES LTD TO BLOCKFI TURNOVER MOTION**

---

[1] The Debtors in these chapter 11 cases (the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

**<u>TABLE OF CONTENTS</u>**                                                              **<u>Page</u>**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................... 2

    Activities in This Court.................................................................................................. 2

    Activities in the Antiguan Court .................................................................................. 4

    Activities in the Delaware Bankruptcy Court .............................................................. 4

    The Information Available Suggests BlockFi Does Not Own the Emergent Assets........ 5

    The Emergent Assets ................................................................................................... 8

ARGUMENT..................................................................................................................... 9

    I.        BlockFi Is Not Entitled to Turnover Pursuant to Section 542 or 543.................... 9

    II.      BlockFi Is Not Entitled to a Preliminary Injunction........................................... 11

            A.      BlockFi Has Not Shown a Reasonable Probability of
                   Success on the Merits.................................................................... 12

            B.      BlockFi Has Not Shown Irreparable Harm................................. 13

            C.      Granting the Injunction Would Result in Greater Harm to
                   Emergent ...................................................................................... 15

            D.      Granting the Injunction Would Not Be in the Public
                   Interest......................................................................................... 16

            D.      An Injunction Merely Freezing the Emergent Assets is
                     Unnecessary ................................................................................. 16

    CONCLUSION............................................................................................................ 17

## TABLE OF AUTHORITIES

CASES                                                                                                    PAGE(S)

*Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*,
    543 B.R. 78 (Bankr. S.D.N.Y. 2016) ...................................................................................2, 10

*Bennington Foods, LLC v. St. Croix Renaissance, Grp., LLP*,
    528 F.3d 176 (3d Cir. 2008)............................................................................................13, 14

*C.F.T.C. v. Samuel Bankman-Fried*,
    1:22-cv-10503 (PKC), D.I. 1 (S.D.N.Y. Dec. 13, 2022) ........................................................4

*Edge v. Pierce*,
    540 F. Supp. 1300 (D.N.J. 1982) ........................................................................................13

*Geron v. Peebler (In re Pali Holdings, Inc.)*,
    488 B.R. 841 (Bankr. S.D.N.Y. 2013) .................................................................................11

*Guiliano v. Fairfield Grp. Health Care Ctrs., L.P. (In re Lexington Healthcare Grp., Inc.)*,
    363 B.R. 713 (Bankr. D. Del. 2007) ...................................................................................10

*H-1 Auto Care, LLC v. Lasher*,
    2022 WL 13003468 (D.N.J. Oct. 1, 2022)..........................................................................15

*Holland v. Rosen*,
    895 F.3d 272 (3d Cir. 2018)................................................................................................13

*In Doris Behr 2012 Irrevocable Tr. v. Johnson & Johnson*,
    2019 WL 1519026 (D.N.J. Apr. 8, 2019) ...........................................................................13

*In re Continental Airlines*,
    203 F.3d 203 (3d Cir. 2000)................................................................................................11

*In re Dwek*,
    2011 WL 1601285 (Bankr. D.N.J. Apr. 27, 2011) .........................................................10, 11

*In re Forever 21, Inc.*,
    623 B.R. 53 (Bankr. D. Del. 2020) .....................................................................................11

*In re FTX Trading LTD.*,
    Case 22-11068-JTD, D.I. 291 (Bankr. D. Del. Dec. 22, 2022) .................................................4

*In re Gill*,
    326 B.R. 611 (Bankr. E.D. Va. 2005) .................................................................................11

*In re Joubert*,
    411 F.3d 452 (3d Cir. 2005)................................................................................................11

*In re Lehman Bros. Holdings Inc.*,
    591 B.R. 153 (Bankr. S.D.N.Y. 2018) ..................................................................................11

*In re N. Am. Refractories Co.*,
    542 B.R. 350 (Bankr. W.D. Pa. 2015) ..................................................................................12

*In re Phila. Entm't & Dev. Partners, L.P.*,
    549 B.R. 103 (Bankr. E.D. Pa. 2016), *aff'd*, 569 B.R. 394 (E.D. Pa. 2017), *rev'd on other
    grounds*, 879 F.3d 492 (3d Cir. 2018) ..................................................................................10

*In re Student Fin. Corp.*,
    335 B.R. 539 (D. Del. 2005) ..................................................................................................10

*In re Uniflex, Inc.*,
    319 B.R. 101 (Bankr. D. Del. 2005) ......................................................................................12

*In re Washington Mut. Inc.*,
    741 F. App'x 88 (3d Cir. 2018) ...............................................................................................3

*In re Whitehall Jewelers Holdings, Inc.*,
    No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008) .................................9

*In re Willis*,
    2014 WL 2890429 (Bankr. D. Colo. June 25, 2014) .............................................................10

*J.T. Moran Fin. Corp. v. American Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.)*,
    124 B.R. 931 (S.D.N.Y. 1991) ...............................................................................................10

*Miller v. Greenwich Capital Fin. Prods., Inc.*,
    361 B.R. 747 (Bankr. D. Del. 2007) ......................................................................................10

*S.E.C. v. Samuel Bankman-Fried*,
    Case No. 1:22-cv-10501 (PKC), D.I. 1 (S.D.N.Y. Dec. 13, 2022) ............................................4

*Sea Star Line, LLC v. Emerald Equip. Leasing, Inc.*,
    2006 WL 214206 (D. Del. Jan. 26, 2006) ..............................................................................10

*Shugrue v. Blackwall Green Ltd. (In re Ionosphere Clubs, Inc.)*,
    1994 WL 132236 (S.D.N.Y. Apr. 14, 1994) ...........................................................................10

*Sovereign Bank v. Schwab*,
    414 F.3d 450 (3d Cir. 2005) .....................................................................................................9

*United States v. Caroline Ellison*,
    Case No. 1:22-cr-00673-LAK-3 (S.D.N.Y. Dec. 19, 2022) .......................................................5

*United States v. Inslaw, Inc.*,
    932 F.2d 1467 (D. C. Cir. 1991) ............................................................................................10

*United States v. Samuel Bankman-Fried*,
    Case No. 1:22-cr-00673 (LAK), D.I. 1 (S.D.N.Y. Dec. 9, 2022) .............................................4

*United States v. Zixiao (Gary) Wang*,
    Case No. 1:22-cr-00673-LAK-2 (S.D.N.Y. Dec. 19, 2022) .......................................................5

*Ven-Mar Int'l Inc. v. Hancock (In re Ven-Mar Int'l Inc.)*,
    166 B.R. 191 (S.D. Fla. 1994) .................................................................................................10

*Warner Lambert Co. v. McCrory's Corp.*,
    718 F. Supp. 389 (Bankr. D.N.J. 1989) ..................................................................................15

*Weinstein v. Schwartz*,
    422 F.3d 476 (7th Cir. 2005) .....................................................................................................9

*Welded Constr., L.P. v. The Williams Cos., Inc. (In re Welded Constr., L.P.)*,
    609 B.R. 101 (Bankr. D. Del. 2019) ..................................................................................10, 11

*Wilmington Savings Fund Soc'y v. Otieno-Ngoje*,
    2016 WL 6821086 (D.N.J. Nov. 17, 2016) ............................................................................14

## STATUTES

11 U.S.C. §§ 105(a), 542, and 543 ...............................................................................................1

11 U.S.C. §§ 542 and 543 ................................................................................................... *passim*

Uniform Commercial Codes ......................................................................................................3, 7

## OTHER AUTHORITIES

Fed. R. Bankr. P. 7010 ..................................................................................................................1

Fed. R. Civ. P. 10(c) .....................................................................................................................1

iv

The duly appointed Joint Provisional Liquidators (the "JPLs") of Emergent Fidelity Technologies Ltd ("Emergent"), by their undersigned special counsel, hereby submit this brief in opposition (the "Opposition") to the *Debtors' Motion for Entry of an Order Pursuant to Sections 105(a), 542, and 543 of the Bankruptcy Code (I) Directing the Collateral Be Transferred to a Neutral Broker or Escrow under the Court's Supervision or (II) Enjoining the Defendants from Transferring or Using the Collateral Pending Final Resolution of the Turnover Claims* (the "Motion") [D.I. 2].[2]  In support of this Opposition, the JPLs rely on and incorporate by reference the declaration of David K. Shim (the "Shim Declaration") attached hereto as **Exhibit A**, and respectfully state as follows.[3]

## PRELIMINARY STATEMENT

1.    BlockFi seeks turnover of approximately 55 million Class A common shares of Robinhood Markets, Inc. (the "Shares") and any proceeds thereof in Emergent's account at Marex (together with the Shares, the "Emergent Assets") under sections 542 and 543 of the Bankruptcy Code and, in the alternative, by a mandatory preliminary injunction under section 105(a).  The Motion reads as if it were a foregone conclusion that the Emergent Assets are BlockFi's property and exist for the benefit of BlockFi's creditors.  But BlockFi's interests, if any, are an open question:  the Adversary Proceeding has barely commenced.  Based on the actual current record, the Emergent Assets are owned by Emergent and there is no property of BlockFi's estate to turn over or protect – the Motion has no legitimate object.

---

[2] With leave of this Court and consent of BlockFi, the JPLs submit this Opposition without prejudice to or waiver of any rights or defenses based on lack of personal or *in rem* jurisdiction.  Joint Scheduling Order ¶ 3 [D.I. 31].

[3] Pursuant to Fed. R. Civ. P. 10(c), made applicable to adversary proceedings by Fed. R. Bankr. P. 7010, the JPLs incorporate by reference the extension motion filed by the JPLs on December 27, 2022 (the "Extension Motion") [D.I. 19] and the attachments thereto as if fully set forth herein.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Extension Motion.

2.      Sections 542 and 543 do not support the relief sought for two reasons.  First, sections 542 and 543 only relate to the debtor's property, and the Emergent Assets are not BlockFi's property; they are Emergent's property, even assuming the validity of BlockFi's alleged security interest.  Second, sections 542 and 543 cannot be used where there is a legitimate dispute over the debtor's interest in the subject property, and the JPLs here raise four distinct legitimate disputes, not to mention challenges from other parties in interest.

3.      Section 105(a) does not support the relief sought for two reasons.  First, section 105(a) must be used in furtherance of some other section of the Bankruptcy Code, and the only other sections invoked by BlockFi, sections 542 and 543, are inapplicable.  Second, the four preliminary injunction factors require a factual showing, and BlockFi fails to provide anything other than conclusory assertions in support of likelihood of success, irreparable harm, or the other factors.

4.      For these reasons, the Motion should be denied in its entirety.[4]

## **BACKGROUND**

Activities in This Court

5.      On November 28, 2022, BlockFi commenced the above-captioned adversary proceeding against Emergent and Marex (the "Adversary Proceeding").  On the same day, BlockFi filed the Motion seeking the short-term transfer of the Shares held by Marex as part of the

---

[4] The fact that the Emergent Assets are not undisputedly property of the estate deprives this Court of *in rem* jurisdiction over the Assets and also renders the entire Adversary Proceeding, including the Motion, a non-core matter.  *See*, *e.g.*, *Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016) ("Where the turnover power is properly invoked, it is simply an effort to recover property—or on property—that is already property of the estate.  That invokes the court's *in rem* jurisdiction over the bankruptcy *res*.").  For purposes of the Motion, while reserving its rights otherwise, Emergent is not disputing this Court's "related to" jurisdiction and is not pressing for this Court to abstain or otherwise decline to rule on the Motion.

Emergent Assets from Marex to BlockFi or a neutral third-party pending resolution of the Adversary Proceeding.

6.      BlockFi alleges that on November 9, 2022, Emergent entered into the Pledge Agreement with BlockFi in which Emergent, among other things, guarantied an unspecified borrower's loan repayment obligations to BlockFi and pledged the Shares to BlockFi as security for the guaranty.  BlockFi alleges that Emergent executed the Pledge Agreement in consideration for BlockFi entering into the Forbearance Agreement with the unspecified borrower, also dated November 9, 2022, by which BlockFi agreed to forbear for just one week from exercising certain rights and remedies under various unspecified loan documents.

7.      BlockFi further alleges that on November 10, 2022 (the next day), the forbearance period ended as the unspecified borrower defaulted in an unspecified manner under the Forbearance Agreement and Emergent failed both to deliver the Shares and to honor its guaranty.  At some subsequent point, believed to be November 10, 2022, BlockFi filed a UCC Form 1 purporting to register its security interest in the Shares in the District of Columbia.

8.      On December 19, 2022—three weeks after filing this Adversary Proceeding—BlockFi filed additional exhibits to the Motion, including the purported Pledge Agreement and Forbearance Agreement upon which all of its claims are premised.  The newly filed exhibits show that the previously unspecified borrower at issue in the Adversary Proceeding is Alameda Research Ltd. ("Alameda").  *See* D.I. 14.  Alameda is (and was already when the Adversary Proceeding and the Motion were filed) one of the FTX Debtors.[5]

---

[5] This Court may take judicial notice of matters of public record, including the FTX Debtors' chapter 11 cases in the Delaware bankruptcy court, jointly administered under case number 22-11068.  *See In re Washington Mut. Inc.*, 741 F. App'x 88, 89 n.1 (3d Cir. 2018) (citing *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) and taking judicial notice of documents, "including matters of public record and judicial opinions")).

<u>Activities in the Antiguan Court</u>

9.      Emergent is a company formed under the laws of Antigua and Barbuda.  Emergent is 90% owned by Samuel Bankman-Fried ("<u>SBF</u>")[6] and 10% owned by Zixiao "Gary" Wang.  To the JPLs' knowledge, Emergent's only material assets are the Emergent Assets, namely, (i) the Shares whose market value of the date of this Opposition is believed to be about $440 million; and (ii) and approximately $21 million in cash.  Shim Decl. ¶ 6.

10.      On December 5, 2022, the Antiguan Court entered an order appointing the Receivers as the JPLs (the "<u>JPL Order</u>").  The JPL Order provides that "[n]o suit, action or other proceeding be commenced or continued against [Emergent] or in respect of its assets, except with the leave of the [Antiguan] Court and subject to such terms as the Court may impose."  JPL Order ¶ 8.  Despite SBF's and BlockFi's challenges in the Antiguan Court, this Order remains in effect.  A true copy of the JPL Order was attached as **<u>Exhibit 2</u>** to the Dorchak Declaration filed in support of the Extension Motion [D.I. 19].

<u>Activities in the Delaware Bankruptcy Court</u>

11.      On December 22, 2022, the FTX Debtors moved the Delaware Bankruptcy Court to enforce or extend the automatic stay to the Adversary Proceeding (the "<u>FTX Stay Motion</u>").  *See In re FTX Trading LTD*., Case 22-11068-JTD, D.I. 291 (Bankr. D. Del. Dec. 22, 2022).  A true copy of the FTX Stay Motion, as filed, was attached to the Dorchak Declaration as **<u>Exhibit</u>**

---

[6] As has been widely reported, SBF was recently indicted by the U.S. authorities and charged with, among other things, conspiring and committing wire fraud, commodities fraud, securities fraud, money laundering, and other related offenses against the customers, lenders and investors of FTX and Alameda, and the United States government. *See*, *e.g.*, *United States v. Samuel Bankman-Fried*, Case No. 1:22-cr-00673 (LAK), D.I. 1 (S.D.N.Y. Dec. 9, 2022); *S.E.C. v. Samuel Bankman-Fried*, Case No. 1:22-cv-10501 (PKC), D.I. 1 (S.D.N.Y. Dec. 13, 2022); *C.F.T.C. v. Samuel Bankman-Fried*, 1:22-cv-10503 (PKC), D.I. 1 (S.D.N.Y. Dec. 13, 2022).  The JPLs respectfully request that the Court take judicial notice of these proceedings as noted in footnote 5.

**7**.[7]  The FTX Stay Motion is based on the premise that Alameda and/or other FTX Debtors have a property interest in the Shares.

<u>The Information Available Suggests BlockFi Does Not Own the Emergent Assets</u>

12.    Based on their review of the information made available to date and BlockFi's own factual allegations, the JPLs are of the preliminary view that BlockFi does not have a valid ownership or other interest in the Emergent Assets for four specific reasons beyond the legal point noted above (i.e., that a security interest plus default does not equate to an ownership of collateral). Shim Decl. ¶ 7.

13.    <u>Lack of Authorization</u>.  The crucial Pledge Agreement was apparently signed for Emergent by its supposed "Co-CEO" Caroline Ellison, *see* Prince Supp. Decl. Ex. D-6 [D.I. 14], who recently confessed to massive fraud and commingling of assets at Alameda (of which she was the CEO).[8]  Gary Wang, a 10% equity holder of Emergent and FTX co-founder, has also pleaded guilty to defrauding the customers of FTX and commingling of FTX funds with Alameda.[9]

14.    To the best of the JPLs' knowledge, Ms. Ellison was not the Co-CEO of Emergent, there was no Co-CEO position at Emergent, and Ms. Ellison was not an authorized signatory for Emergent.  Shim Decl. ¶ 8.[10]  The JPLs further believe that BlockFi could or should have been aware that Ms. Ellison, as opposed to SBF, did not have the authority to bind Emergent.  Shim

---

[7] Due to the voluminous nature of the exhibits attached to the declaration filed in support of the FTX Stay Motion, such documents were not attached to the Dorchak Declaration.  The JPLs respectfully request that the Court take judicial notice of such documents as noted in footnote 5.

[8] Dec. 19, 2022 Minute Entry, *United States v. Caroline Ellison*, Case No. 1:22-cr-00673-LAK-3 (S.D.N.Y. Dec. 19, 2022) (Ms. Ellison pleaded guilty to two counts of wire fraud, two counts of conspiracy to commit wire fraud, and conspiracy to commit commodities fraud, securities fraud and money laundering).

[9] Dec. 19, 2022 Minute Entry, *United States v. Zixiao (Gary) Wang*, Case No. 1:22-cr-00673-LAK-2 (S.D.N.Y. Dec. 19, 2022) (Mr. Wang pleaded guilty to wire fraud and conspiracy to commit wire fraud, securities fraud and commodities fraud).

[10] Section 11.7 of the Emergent By-Laws attached as **<u>Exhibit E-3</u>** to the declaration of the Turnover Motion [D.I. 15] refers to a **single** Chief Executive Officer, whereas Section 11.8 refers to the possibility of **multiple** Vice Presidents.

Decl. ¶ 8.  Thus, the JPLs believe that the Pledge Agreement, and by extension all of BlockFi's

asserted interests in the Emergent Assets, fails for lack of authorization.  *Id.* ¶ 8.

       15.    <u>Lack of Consideration</u>.  The JPLs have identified no consideration that flowed to

Emergent in exchange for its alleged guaranty of Alameda's obligations to BlockFi and, by

extension, no consideration supporting Emergent's alleged entry into the Pledge Agreement.  Shim

Decl. ¶ 9.  There is no evidence of any benefit flowing from BlockFi to Emergent for suddenly (i)

incurring a $1 billion plus guaranty obligation backing a primary obligor with no liquid assets and

(ii) encumbering its only assets, worth about half a billion dollars, in support of this gratuitous

guaranty.  Due to this failure of consideration, the Pledge Agreement, including the guaranty and

pledge within it, is voidable and unenforceable, even if it was validly signed on Emergent's behalf.

       16.    <u>Avoidability as Fraudulent Transfer</u>.  Even assuming the Pledge Agreement was

duly authorized and executed, the JPLs believe that both Emergent's incurrence of the guaranty

obligation as to Alameda's loan and Emergent's pledge of the Emergent Assets as collateral for

that guaranty obligation are avoidable as fraudulent transfers under applicable law.  Shim Decl.

¶ 10.  One day after FTX cut off access to its accounts and two days before Alameda filed its

chapter 11 petition, Emergent went from having zero exposure to BlockFi to putting itself on the

hook for more than a billion dollars of loans that Emergent knew Alameda could not repay, and

pledging its only asset, worth over half a billion dollars at the time, to support that inevitable

repayment, for the plainly illusory consideration of BlockFi forbearing for one week (in the event,

it was one day) before inevitably pursuing Emergent's affiliate Alameda.  As the emails between

BlockFi's CEO and Ms. Ellison, copying SBF, show, this was an attempt by Ms. Ellison and

possibly SBF to transfer the only substantial asset in the FTX universe that seemed free and clear

to a favored counterparty, to the frustration of all of the other creditors in that universe.  *Id.* ¶ 11.

True copies of the relevant emails attached to the declaration in support of the FTX Stay Motion are also attached to the Shim Declaration as **Exhibit 1**.

17. Based on the documents on the record, the transaction rendered Emergent insolvent in exchange for no real consideration and is a textbook constructive fraudulent transfer. Subject to further factual inquiry, this transaction also appears to be a textbook intentional fraudulent transfer. To the extent the pledge is found to postdate the guaranty, the former is also plainly a preferential transfer under applicable law. The JPLs believe that the Pledge Agreement should be avoided for these reasons. Shim Decl. ¶¶ 7-12.

18. <u>BlockFi's Failure to Perfect</u>. As BlockFi itself has emphasized, the Pledge Agreement required Emergent to deliver the Shares to BlockFi even absent a default by Alameda. Motion ¶¶ 12-14 [D.I. 2]. The JPLs assume that BlockFi was attempting to perfect its purported security interest in the Shares by possession. Shim Decl. ¶ 12. But BlockFi never obtained the Shares, and subsequently attempted to perfect its security interest by filing a UCC Form 1 in the District of Columbia. Prince Supp. Decl. Ex. D-7 [D.I. 14]. Based on their investigation to date— including analysis of sections 8(b) and 9 of the Pledge Agreement and sections 9-301 and 9-307 of the Delaware and New York Uniform Commercial Codes—the JPLs believe that BlockFi recorded its security interest in the wrong location—DC, rather than Antigua, Bahamas, New York, or Illinois—and thus failed to perfect it prior to the Antiguan Court imposing a worldwide stay in favor of Emergent's assets on December 5, 2022. Shim Decl. ¶ 12. The JPLs may uncover further infirmities in BlockFi's UCC Form 1 after further investigation. *Id.* ¶ 12.

19. The JPLs are considering pursuing these remedies and defenses for the benefit of Emergent's creditors in this Adversary Proceeding and otherwise, as necessary. For purposes of

the Motion, however, the JPLs need only show that they have a "legitimate dispute" with BlockFi

over BlockFi's asserted ownership right to the Emergent Assets.

### The Emergent Assets

20.    Marex's counsel informed this Court at the December 28, 2022 hearing, and

previously had informed BlockFi, the FTX Debtors and the JPLs that Marex will not release the

Emergent Assets until it is ordered to do so by a court of competent jurisdiction.  Shim Decl. ¶ 13.

A true copy of Marex's counsel's statement was attached to the Dorchak Declaration as **Exhibit**

**8**.

21.    On January 3, 2023, the JPLs' counsel learned from Marex's counsel that the

Department of Justice (the "DOJ") had served a warrant and seizure notice upon Marex, seeking

to seize the Emergent Assets, subject to logistical issues, in connection with an *in rem* proceeding

commenced by the DOJ against the Emergent Assets.  Shim Decl. ¶ 14.  On January 4, 2023, at a

status conference in the FTX chapter 11 case, a government representative reported that the DOJ

was in the process of seizing the Emergent Assets.  *Id.* ¶ 15.  Later the same day, Marex's counsel

reported to the JPLs' counsel that it had transferred the Emergent Assets to an account identified

by the DOJ in compliance with the warrant and seizure notice.  *Id.* ¶ 15.

22.    On January 3, 2023, BlockFi's counsel told the JPLs' counsel that BlockFi does not

believe that the DOJ's seizure of the Emergent Assets moots the Motion.  *Id.* ¶ 16.  To avoid being

prejudiced, the JPLs have filed this Opposition, while noting that to the extent BlockFi continues

to seek to compel **Emergent** to turn over the Emergent Assets, the JPLs have no ability to cause

the DOJ to take any action or other ability to control the Emergent Assets.

## **ARGUMENT**

23.    The Motion for turnover under section 542 or 543 should be denied because those sections only apply to a debtor's property and do not apply where the debtor's interest in the property is legitimately disputed.  Here, the Emergent Assets are simply not property of BlockFi, and in any event BlockFi's alleged property interest in the Emergent Assets is legitimately disputed on four separate grounds by the JPLs and is challenged by several other parties in interest.  The Motion for turnover by preliminary injunction under section 105(a) should be denied because there is no other statute that section 105(a) could be legitimately serving here, and in any event because all four of the typical factors weigh against the relief sought.

## I.    **BlockFi Is Not Entitled to Turnover Pursuant to Section 542 or 543**

24.    The Emergent Assets are not property of BlockFi.  Even accepting at face value the facts and documents relied upon by BlockFi, BlockFi has contractual rights in the Pledge Agreement and a security interest in the Emergent Assets, and Emergent is in breach.  But Emergent still owns the Emergent Assets, because a "secured party does not acquire ownership of pledged collateral simply because the debtor defaults on a loan."  *See Weinstein v. Schwartz*, 422 F.3d 476, 479 (7th Cir. 2005).  Thus, BlockFi is wrong that "BlockFi had superior rights to the [Emergent Assets] as of the Petition Date" or today, for that matter.  *See id.; cf.* Motion ¶ 30.  Because the Emergent Assets themselves are not BlockFi's property, BlockFi cannot seek turnover of those assets under sections 542 and 543.  *See*, *e.g.*, *In re Whitehall Jewelers Holdings, Inc.*, No. 08-11261 (KG), 2008 WL 2951974, at *4 (Bankr. D. Del. July 28, 2008) (under section 363, referenced in section 542, "bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the property is property of the estate"); *Sovereign Bank*

9

*v. Schwab*, 414 F.3d 450, 454 (3d Cir. 2005) (section 543 explicitly requires that "the property is property of the debtor").

25.     Even if BlockFi had articulated a *prima facie* basis for considering the Emergent Assets to be its property, the Motion still must be denied.  It is well settled—in more than a dozen decisions—that "[a]n action for turnover is not appropriate where there is a legitimate dispute about the ownership of property the [debtor] seeks to recover."  *Welded Constr., L.P. v. The Williams Cos., Inc. (In re Welded Constr., L.P.)*, 609 B.R. 101, 125 (Bankr. D. Del. 2019); *In re Dwek*, 2011 WL 1601285, at *4 (Bankr. D.N.J. Apr. 27, 2011) ("If title to property is in dispute, then a trustee must have an independent legal basis for proving his entitlement to that property.").[11]

26.     The JPLs have raised four legitimate disputes as to the validity of BlockFi's rights under the Pledge Agreement:

    (i)     the Pledge Agreement is avoidable because it was apparently signed by a person who lacked signatory authority, using a title that did not exist, and who later confessed to fraud, commingling, and mismanagement, *see* Shim Decl. ¶ 8;

---

[11] *See, e.g.*, *In re Phila. Entm't & Dev. Partners, L.P.*, 549 B.R. 103, 143 (Bankr. E.D. Pa. 2016), *aff'd*, 569 B.R. 394 (E.D. Pa. 2017), *rev'd on other grounds*, 879 F.3d 492 (3d Cir. 2018) ("If a legitimate dispute as to ownership of the property exists, § 542(a) relief is unavailable."); *Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016) ("Where the turnover power is properly invoked, it is simply an effort to recover property—or *on* property—that is *already* property of the estate.") (citing *Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841 (Bankr. S.D.N.Y. 2013)); *In re Willis*, 2014 WL 2890429, at *1-3 (Bankr. D. Colo. June 25, 2014) (dismissing turnover claims where ownership of property was in disputed); *Guiliano v. Fairfield Grp. Health Care Ctrs., L.P. (In re Lexington Healthcare Grp., Inc.)*, 363 B.R. 713, 716 (Bankr. D. Del. 2007) ("Where there is a legitimate dispute about the ownership of property a trustee seeks to recover, turnover under section 542 is not appropriate."); *Miller v. Greenwich Capital Fin. Prods., Inc.*, 361 B.R. 747, 761 (Bankr. D. Del. 2007) (dismissing turnover count because trustee's right to collect hinged upon obtaining judgment in his favor); *Sea Star Line, LLC v. Emerald Equip. Leasing, Inc.*, 2006 WL 214206, at *7 (D. Del. Jan. 26, 2006) ("Active disputes over the amount owed take an action outside the realm of a turnover action."); *In re Student Fin. Corp.*, 335 B.R. 539, 554 (D. Del. 2005) ("[T]o state a claim for turnover of property under § 542, a plaintiff must allege that transfer of the property has already been avoided or that the property is otherwise the undisputed property of the bankruptcy estate."); *Shugrue v. Blackwall Green Ltd. (In re Ionosphere Clubs, Inc.)*, 1994 WL 132236, *2 (S.D.N.Y. Apr. 14, 1994) (action in which there was legitimate dispute over property was not turnover action); *Ven-Mar Int'l Inc. v. Hancock (In re Ven-Mar Int'l Inc.)*, 166 B.R. 191, 192 (S.D. Fla. 1994) ("Section 542 allows trustees to recover property which is clearly debtor's property"); *J.T. Moran Fin. Corp. v. American Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.)*, 124 B.R. 931, 942 (S.D.N.Y. 1991) ("Where, as here, the court must resolve whether or not the debt claimed is due, the action to collect the disputed funds cannot be regarded as a turnover proceeding under the core jurisdiction of the bankruptcy court."); *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D. C. Cir. 1991) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.").

    (ii)     the Pledge Agreement is avoidable for lack of consideration flowing to Emergent, *see id.* ¶ 9;

    (iii)    the purported guaranty and pledge are avoidable as constructive fraudulent transfers based on BlockFi's recitation of the facts and also potentially as intentional fraudulent transfers effected by the same confessed fraudster, *see id.* ¶ 7-13; and

    (iv)    BlockFi's purported security interest was possibly not perfected before the Emergent Assets became protected by a court-imposed stay, *see id.* ¶ 12.

Other parties in interest have asserted challenges to BlockFi's interest in the Emergent Assets: for example, the FTX Debtors assert that this Adversary Proceeding violates their automatic stay. These disputes will be resolved in due course in the Adversary Proceeding or elsewhere.

27.     Unless and until these disputes are resolved in BlockFi's favor, however, BlockFi cannot seek turnover of the Emergent Assets under sections 542 and 543. *See*, *e.g.*, *Welded Constr.*, 609 B.R. at 125; *Dwek*, 2011 WL 1601285, at *4; *see also Pali Holdings*, 488 B.R. at 852 n.39 ("the turnover power can be improperly invoked, especially . . . when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable").

## II.    <u>BlockFi Is Not Entitled to a Preliminary Injunction</u>

28.     BlockFi bases its request for a preliminary injunction on section 105(a). *See* Motion ¶¶ 36-37. It is well settled that section 105(a) cannot operate in a vacuum and must be employed in furtherance of some other section of the Bankruptcy Code. *E.g.*, *In re Forever 21, Inc.*, 623 B.R. 53, 63-64 (Bankr. D. Del. 2020) ("[S]ection 105(a) has a limited scope. It does not create substantive rights that would otherwise be unavailable under the Bankruptcy Code. Instead, the bankruptcy court's powers under section 105 (a) can only be used in furtherance of other provisions of the Code.").[12] Here, the only sections of the Bankruptcy Code that BlockFi has cited

---

[12] *See, e.g., In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) (cited in *Forever 21*); *In re Joubert*, 411 F.3d 452, 455 (3d Cir. 2005); *In re Lehman Bros. Holdings Inc.*, 591 B.R. 153, 163 (Bankr. S.D.N.Y. 2018)

besides section 105(a) are sections 542 and 543, and as demonstrated above, those sections do not properly apply to the Motion. Accordingly, section 105(a) is not available to BlockFi to support a preliminary injunction or any other relief in respect of the Emergent Assets.

29.    Even if the Court were to permit BlockFi to invoke section 105(a) in the air, the preliminary injunction should be denied. BlockFi fails "the traditional four-factor test" because its purported support is entirely conclusory, as demonstrated below. *See* Motion ¶ 37.

### A.    <u>**BlockFi Has Not Shown a Reasonable Probability of Success on the Merits**</u>

30.    BlockFi cannot show a reasonable probability of success on the merits of its claims in this Adversary Proceeding because, as shown above, (i) BlockFi cannot show an ownership interest in the Emergent Assets even based on its own factual assertions, and (ii) BlockFi is facing at least four legitimate defenses (lack of authority, lack of consideration, avoidance of fraudulent transfer and preference, failure to perfect) from Emergent, not to mention the challenges being raised by other parties in interest. *In re Uniflex, Inc.*, 319 B.R. 101, 104 (Bankr. D. Del. 2005) ("To establish a likelihood of success on the merits, the Debtor must show that it would be entitled to relief under the law on which the claims are based."); *In re N. Am. Refractories Co.*, 542 B.R. 350, 363 (Bankr. W.D. Pa. 2015) (preliminary injunction denied where agreements at issue were susceptible of reasonable but conflicting interpretations and intention of parties needed to be developed more fully).

31.    To the extent the relevant issue is a reasonable likelihood of success in **reorganizing**, as BlockFi proposes, BlockFi asserts only that it has filed chapter 11 cases "to

---

("[S]ection 105(a) does not operate on a stand-alone basis; it does not authorize a court to create substantive rights that are otherwise unavailable under applicable law"); *In re Gill*, 326 B.R. 611, 644 (Bankr. E.D. Va. 2005) ("the court may not exercise its powers under Section 105 (a) in a vacuum. Instead, the court must adhere to the principle that the bankruptcy court may only exercise its equitable powers within the confines of the Bankruptcy Code.") (citing *Nw. Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)).

reorganize its business . . . and to emerge as a viable going concern." *See* Motion ¶ 38.  BlockFi

provides literally no evidence that it is likely to succeed in this endeavor. *See id.*  However low

the bar may allegedly be for this factor, it cannot be the case that it is automatically satisfied by

the mere filing of a chapter 11 petition seeking to reorganize rather than liquidate. *See id.*  BlockFi

is not entitled to a presumption of the success of its chapter 11 case and thus has failed to satisfy

the first factor of the test.

### B.   <u>BlockFi Has Not Shown Irreparable Harm</u>

32.    BlockFi has neglected to mention that it faces a heightened burden on second factor

of the test.  "Where the relief ordered by the preliminary injunction is mandatory and will alter the

status quo, the party seeking the injunction must meet a higher standard of showing irreparable

harm in the absence of an injunction." *Bennington Foods, LLC v. St. Croix Renaissance, Grp.,*

*LLP*, 528 F.3d 176, 179 (3d Cir. 2008); *In Doris Behr 2012 Irrevocable Tr. v. Johnson & Johnson*,

2019 WL 1519026, at *3 (D.N.J. Apr. 8, 2019) (citing *Bennington Foods*); *Edge v. Pierce*, 540 F.

Supp. 1300, 1303 (D.N.J. 1982) ("where the plaintiff is seeking a mandatory injunction, as

opposed to a prohibitory injunction, the burden is accordingly greater; such mandatory injunctions

are generally disfavored") (citing *Punnett v. Carter*, 621 F.2d 578 (3d Cir. 1980)).  In the context

of a mandatory injunction, the low-bar standard cited by BlockFi, "the mere risk of a potential

adverse impact," does **not** apply.  *See id.; cf.* Motion ¶ 39.  In this context, BlockFi should have

the higher "burden of proving a **clear showing** of **immediate** irreparable injury."  *See Juul Labs,*

*Inc. 4X PODS.*, 439 F. Supp. 3d 341, 358 (D.N.J. 2020) (emphasis added); *see Holland v. Rosen*,

895 F.3d 272, 285 (3d Cir. 2018) ("clear showing" required).

33.    On this factor, BlockFi asserts only that "the lack of control over and ability to

access and/or use the [Emergent Assets] will interfere with BlockFi's reorganization." *See* Motion

¶ 40.  The word "will" betrays the absence of any **immediate** harm.  More importantly, BlockFi

"will" **not** be entitled to "control" or "access" or "use" the Emergent Assets unless and until

BlockFi prevails on the merits in the Adversary Proceeding.  Today, BlockFi does not have those

rights.  It cannot be irreparable harm for BlockFi not to be able to exercise rights today that it does

not have today.  *See*, *e.g.*, *Bennington Foods*, 528 F.3d at 179; *Juul Labs*, 439 F. Supp. 3d at 358.

BlockFi is not entitled to a presumption of the success of this Adversary Proceeding and thus has

failed to satisfy the second factor of the test.

34.    To the extent BlockFi is implying that there is risk that the Emergent Assets "will"

not be there for it when and if it actually acquires a right to "control" or "access" or "use" the

Emergent Assets, that potential harm is eliminated by the Emergent Assets being held pending a

court order or the equivalent directing their disposal.  BlockFi does not, and cannot, allege that the

Emergent Assets have been dissipated thus far, while in the custody of Marex.  *Cf. Wilmington*

*Savings Fund Soc'y v. Otieno-Ngoje*, 2016 WL 6821086, at *2 (D.N.J. Nov. 17, 2016) (finding

showing of irreparable harm based on prior dissipation of disputed assets).  BlockFi does not, and

cannot, allege that SBF or some other person might abscond with the Emergent Assets, because

the Emergent Assets are locked down about as well as they could be.  *See Juul Labs*, 439 F. Supp.

3d at 358 ("demonstrating irreparable harm requires a showing that plaintiffs are likely to become

entitled to the encumbered funds upon final judgment and a showing that without the preliminary

injunction, plaintiffs will probably be unable to recover those funds").

35.    The JPLs understand that the DOJ has seized the Emergent Assets in connection

with an *in rem* proceeding commenced by the DOJ.  Shim Decl. ¶ 14.  To the best of the JPLs'

knowledge, BlockFi will have the right to appear in that proceeding and assert whatever interests

in the Emergent Assets it sees fit.  *Id*. ¶ 15.  The DOJ's actions may have created an extra step that

BlockFi would prefer not to take, but it does not clearly present an immediate irreparable harm. *See, e.g.*, *Bennington Foods*, 528 F.3d at 179; *Juul Labs*, 439 F. Supp. 3d at 358; *cf. Wilmington Savings Fund Soc'y*, 2016 WL 6821086, at *2 (holding, upon finding that disputed funds had already been dissipated, that "irreparable harm would occur absent an asset freeze is even more apparent where the very assets subject to a potential judgment will likely be dissipated without entry of the order").

36.    From any perspective, BlockFi falls far short of its heightened burden of clearly showing immediate irreparable harm if the Motion is not granted—and irreparable harm has been called "the most important of the four elements." *See, e.g.*, *Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 393 (Bankr. D.N.J. 1989) ("Of all the prerequisites for the issuance of a preliminary injunction, a demonstration that the movant is likely to suffer irreparable harm is perhaps the most important."); *H-1 Auto Care, LLC v. Lasher*, 2022 WL 13003468, at *4 (D.N.J. Oct. 1, 2022) ("Demonstrating irreparable harm is perhaps the single most important prerequisite for issuing a preliminary injunction. The party seeking injunctive relief must demonstrate irreparable harm by a clear showing of immediate irreparable injury.") (citing *Donlow v. Garfield Park Acad.*, Civ. No. 09-6248, 2010 WL 1381010, at * 1 (D.N.J. Apr. 1, 2010)).

### C.    <u>Granting the Injunction Would Result in Greater Harm to Emergent</u>

37.    The balance of harms does not favor BlockFi in this multi-debtor dispute, because BlockFi's claims on the Emergent Assets are weaker than Emergent's. BlockFi simply asserts that it "needs" the Emergent Assets, but that does not prove that BlockFi is entitled to them, and if BlockFi is not entitled to them, it is not harmed by not having them. *See* Motion ¶ 41. Even leaving aside that BlockFi's interests are potentially subject to avoidance on several grounds, Emergent is the undisputed record holder of the beneficial ownership interest in the Emergent

15

Assets, and Emergent is also a debtor in a court-supervised insolvency proceeding with the benefit of a court-imposed stay protecting its assets.   Shim Decl. ¶¶ 7-14.   The JPLs submit that Emergent's interests in the Emergent Assets, which are based on objective facts, outweigh BlockFi's interests in the Emergent Assets, which (again) are based on a presumption of success in this Adversary Proceeding.   Thus, the current record does not support altering the status quo so as to favor BlockFi.   On the current record, BlockFi has failed to satisfy the third factor of the test.

### D.    Granting the Injunction Would Not Be in the Public Interest

38.    BlockFi argues that the injunction they seek is in the public interest because "promoting a successful reorganization is one of the most important public interests." *See* Motion ¶ 42.   This is the same conclusory argument as above.   The actual question is not whether, presuming BlockFi owns the Emergent Assets, it is in the public interest for BlockFi to use those assets to reorganize.   The actual question is whether it is in the public interest for the Emergent Assets to be transferred from where they are to a new custodian, pending a determination whether **or not** BlockFi has any enforceable interest in the Emergent Assets.   BlockFi has not addressed the actual question.   BlockFi asserts that an injunction **against** transferring the Emergent Assets "will support a uniform, timely and equitable resolution," but this point weighs **against** a mandatory injunction.

### D.    An Injunction Merely Freezing the Emergent Assets is Unnecessary

39.    To the extent BlockFi requests, in the alternative, that this Court enjoin Marex— and now, apparently, the Department of Justice—from transferring the Emergent Assets until this Adversary Proceeding is resolved, that relief is entirely superfluous, as neither of the Defendants is seeking to transfer the Emergent Assets and there is no risk that whatever entity is holding the funds will dissipate them.

## **CONCLUSION**

WHEREFORE, the JPLs respectfully request that the Court deny the Motion in its

entirety and grant such other relief as is just and appropriate.

Dated: January 5, 2023                           Respectfully submitted,
Philadelphia, Pennsylvania

                                                 By: /s/ *John C. Goodchild*
                                                 John C. Goodchild, III (Bar No. 024031994)
                                                 Matthew C. Ziegler (admitted *pro hac vice*)
                                                 **MORGAN, LEWIS & BOCKIUS LLP**
                                                 1701 Market Street
                                                 Philadelphia, PA 19103
                                                 Telephone: (215) 963-5020
                                                 Email: john.goodchild@morganlewis.com
                                                 Email: matthew.ziegler@morganlewis.com

                                                 - and -

                                                 Joshua Dorchak (admitted *pro hac vice*)
                                                 David K. Shim (admitted *pro hac vice*)
                                                 **MORGAN, LEWIS & BOCKIUS LLP**
                                                 101 Park Avenue
                                                 New York, NY 10178
                                                 Telephone: (212) 309-6700
                                                 Email: joshua.dorchak@morganlewis.com
                                                 Email: david.shim@morganlewis.com

                                                 *Special Counsel for Emergent Fidelity*
                                                 *Technologies Ltd*

## EXHIBIT A

**Shim Declaration**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>                  Debtors.[1] | Chapter 11<br><br>Jointly Administered<br><br>Case No. 22-19361 (MBK) |
| BLOCKFI INC., BLOCKFI LENDING LLC AND BLOCKFI INTERNATIONAL LLC,<br><br>                  Plaintiffs,<br><br>v.<br><br>EMERGENT FIDELITY TECHNOLOGIES LTD AND ED&F MAN CAPITAL MARKETS, INC.,<br><br>                  Defendants. | Adv. Pro. No. 22-01382 (MBK) |

**DECLARATION OF DAVID K. SHIM IN SUPPORT OF**
**OPPOSITION OF JOINT PROVISIONAL LIQUIDATORS OF**
**EMERGENT FIDELITY TECHNOLOGIES LTD TO BLOCKFI TURNOVER MOTION**

I, David K. Shim, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury

as follows:

    1.     I am over 18 years of age and competent to testify to the matters herein.

    2.     I am an associate at the law firm Morgan, Lewis & Bockius LLP with offices

located at One State Street, Hartford, Connecticut 06103-3178.

---

[1] The Debtors in these chapter 11 cases (the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

3.       I am in good standing before the courts in which I am admitted, and I have not been disbarred, suspended or disciplined by any court or administrative body.

4.        I am authorized to and hereby submit this declaration on behalf of the JPLs.  The information contained in this Declaration is based on my personal knowledge or is derived from discussions with the JPLs' professionals and/or my review of the files in this Adversary Proceeding, the Antiguan proceedings, and the FTX Debtors' chapter 11 cases.

5.       I submit this Declaration in support of the *Opposition of Joint Provisional Liquidators of Emergent Fidelity Technologies Ltd to BlockFi Turnover Motion* (the "Opposition"), filed contemporaneously herewith and incorporated herein by reference.[2]  To the best of my knowledge and belief, the assertions made in the Opposition are accurate.

6.       The JPLs believe that Emergent is 90% owned by Samuel Bankman-Fried and 10% owned by Zixiao "Gary" Wang.  To the JPLs' knowledge, Emergent's only material assets are the Emergent Assets, namely, (i) the Shares whose market value of the date of this Opposition is believed to be about $440 million; and (ii) and approximately $21 million in cash.

7.       Based on their review of the information made available to date and BlockFi's own factual allegations, the JPLs are of the preliminary view that BlockFi does not have a valid ownership or other interest in the Emergent Assets.

8.       To the best of the JPLs' knowledge, Caroline Ellison was not the Co-CEO of Emergent, there was no Co-CEO position at Emergent, and Ms. Ellison was not an authorized signatory for Emergent.  The JPLs further believe that BlockFi could or should have been aware that Ms. Ellison, as opposed to SBF, did not have the authority to bind Emergent.  Thus, the JPLs

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Opposition.

believe that the Pledge Agreement, and by extension all of BlockFi's asserted interests in the Emergent Assets, fails for lack of authorization.

9.      The JPLs have identified no consideration that flowed to Emergent in exchange for its alleged guaranty of Alameda's obligations to BlockFi and, by extension, no consideration supporting Emergent's alleged entry into the Pledge Agreement.  There is no evidence of any benefit flowing from BlockFi to Emergent for suddenly (i) incurring a $1 billion plus guaranty obligation backing a primary obligor with no liquid assets and (ii) encumbering its only assets, worth about half a billion dollars, in support of this gratuitous guaranty.

10.     Even assuming the Pledge Agreement was duly authorized and executed, the JPLs believe that both Emergent's incurrence of the guaranty obligation as to Alameda's loan and Emergent's pledge of the Emergent Assets as collateral for that guaranty obligation are avoidable as fraudulent transfers under applicable law.

11.     The emails between BlockFi's CEO and Ms. Ellison, copying SBF, concerning the Emergent Assets are attached to the declaration in support of the FTX Stay Motion are also attached hereto as **Exhibit 1**.

12.     By contracting to have Emergent deliver the Shares to BlockFi even absent a default by Alameda.  Motion ¶¶ 12-14 [D.I. 2].  The JPLs assume that BlockFi was attempting to perfect its purported security interest in the Shares by possession.  Based on their investigation to date— including analysis of sections 8(b) and 9 of the Pledge Agreement and sections 9-301 and 9-307 of the Delaware and New York Uniform Commercial Codes—the JPLs believe that BlockFi recorded its security interest in the wrong location—DC, rather than Antigua, Bahamas, New York, or Illinois – and thus failed to perfect it prior to the Antiguan Court imposing a worldwide

stay in favor of Emergent's assets on December 5, 2022.  The JPLs may uncover further infirmities in BlockFi's UCC Form 1 after further investigation.

13.     Marex's counsel informed this Court at the December 28, 2022 hearing, and previously had informed BlockFi, the FTX Debtors and the JPLs that Marex will not release the Emergent Assets until it is ordered to do so by a court of competent jurisdiction.  A true copy of Marex's counsel's statement was attached to the Dorchak Declaration as **Exhibit 8**.

14.     On January 3, 2023, the JPLs' counsel learned from Marex's counsel that the Department of Justice (the "DOJ") had served a warrant and seizure notice upon Marex, seeking to seize the Emergent Assets, subject to logistical issues, in connection with an *in rem* proceeding commenced by the DOJ against the Emergent Assets.

15.     On January 4, 2023, at a status conference in the FTX chapter 11 case, a government representative reported that the DOJ was in the process of seizing the Emergent Assets.  Later the same day, Marex's counsel reported to the JPLs' counsel that it had transferred the Emergent Assets to an account identified by the DOJ in compliance with the warrant and seizure notice.  To the best of the JPLs' knowledge, BlockFi will have the right to appear in any forfeiture proceeding related to the Emergent Assets and assert whatever interests it sees fit to assert.

16.     On January 3, 2023, BlockFi's counsel told the JPLs' counsel that BlockFi does not believe that the DOJ's seizure of the Emergent Assets moots the Motion.

*[remainder of page left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: January 5, 2023
        Hartford, CT

Respectfully submitted,

By: _____
David K. Shim

## EXHIBIT 1

**To:** sam ██████
**Cc:** Flori Marquez
**From:** Zac Prince
**Sent:** Thur 11/10/2022 8:09:00 AM (UTC)
**Subject:** Re: loan repayment

Yes, talking w Caroline at 9 and will revert w other potential next steps

On Thu, Nov 10, 2022 at 2:31 AM Sam Bankman-Fried < ██████ > wrote:

I think this was signed now -- right?

—
Sam Bankman-Fried
.

On November 9, 2022 at 9:46 PM EST zac██████ wrote:

Hi Sam,

Yes we also sent to Caroline but haven't received a signature or response from her yet.

Our preference would be if you could sign since you are online

Zac

On Wed, Nov 9, 2022 at 9:33 PM Sam Bankman-Fried ██████ wrote:

Hey realy sorry about the delay -- did this get singed? If not could you also send one to Caroline to docusign?

—
Sam Bankman-Fried
.

On November 9, 2022 at 7:24 PM EST flori██████ wrote:

Thanks for the quick response - just sent via docusign. Zac is signing.

**Flori Marquez**
Founder, COO

On Wed, Nov 9, 2022 at 7:10 PM Sam Bankman-Fried ██████ wrote:

Can you send via DocuSign?

—
Sam Bankman-Fried
.

On November 9, 2023 at 7:03 PM, Zac wrote:

Sam - sharing the documents that we sent to Caroline regarding signatures for the pledge of trust shares and Hood stock. She confirmed over email. Please let us know if you are able to review / sign.

Zac



**Zac Prince**
CEO

---------- Forwarded message ---------
From: <usec.rho                    >
Date: Wed, Nov 9, 2022 at 6:56 PM
Subject: RE: loan repayment
To: Flori Marquez                    , Zac Prince                    , <caroline
                    >
Cc: Amit Cheela                    , Yuri Mushkin                    

Caroline,

Attached please find the following agreements:

1. Amendment and Forbearance Agreement between BF Lending, BF International and Alameda.
   a. BF forbears exercising remedies in return for additional pledge and payments made per the payment schedule in Exhibit B

2. Pledge Agreement between BF Lending, BF International, and Alameda
   a. Pledges GBTC, ETHE, and BITW Shares. **We need the Number of Shares filled in Schedule A**

3. Pledge Agreement between BF Lending, BF International and Emergent Fidelity Technologies Ltd (who we assume holds HOOD shares, please confirm)
   a. Pledges HOOD Shares. **We need Notice information on page 8, and the number of shares in Schedule A**

Please note that we are in the process of setting up a brokerage account to accept the additional collateral. The Pledge Agreements contemplate that the shares will be transferred to the account upon notice from BlockFi that set up is done.



**From:** Flori Marquez
**Sent:** Wednesday, November 9, 2022 6:47 PM
**To:** Zac Prince
**Cc:** caroline                              ; Amit Cheela                    ; Yuri Mushkin                         ;
Usec Rho
**Subject:** Re: loan repayment

+Usec Rho docs incoming caroline.



**Flori Marquez**
Founder, COO

On Wed, Nov 9, 2022 at 5:14 PM Zac Prince                    wrote:

Got it - any commentary you can give us on next steps re timing for the

remaining 75M for today or payments for tomorrow? We have our next board
session at 630 and would love to speak before then if you are available



**Zac Prince**
CEO

On Wed, Nov 9, 2022 at 4:35 PM Caroline Ellison ███████████████ wrote:

Hi sorry, hearing that we can do another 75m today. One of our exchange
accounts that we were counting on just got frozen so we aren't able to withdraw.

Sorry if this makes things tougher with the board

—

Caroline Ellison

.

On November 9, 2022 at 3:14 PM EST flori███████ wrote:

Hey Caroline,

Thank you for completing the first repayment. We're meeting with
the board again tonight because at the time of the meeting we had
not received the $50M. Can you give us an estimate on timing for
the $150M so that we can communicate that to them? Does 5PM
EST work?

Best,

Flori



**Flori Marquez**
Founder, COO

On Wed, Nov 9, 2022 at 11:06 AM Zac Prince [redacted] wrote:

Hi Caroline - we just heard from our trading team that Terence communicated that you would only be able to send 50M USDT by 12 ET. Is that correct? We have critical decisions and regulatory conversations happening starting at 12 so an update would be appreciated.



**Zac Prince**
CEO

On Wed, Nov 9, 2022 at 10:30 AM Zac Prince [redacted] wrote:

Hi Caroline - one small adjustment we need to make to the repayment schedule would be the timing - 5 PM is a bit too late, could we move that to 9 (preferred) or 12 ET for each repayment?



**Zac Prince**
CEO

On Wed, Nov 9, 2022 at 7:15 AM Zac Prince ██████████████wrote:

>  Sounds good, just sent an invite

>  On Wed, Nov 9, 2022 at 6:59 AM Caroline Ellison
>  ███████████████████████wrote:

>  Great news, sounds good!

>  A call at 9 am ET sounds good; feel free to invite me and I can
>  add whoever is relevant from our side.

>  On Wed, Nov 9, 2022 at 7:56 PM Zac Prince
>  ████████████████ wrote:

>  Hi Caroline,

>  Thanks for sharing this information.  We should be able to
>  make the repayment schedule work if we can get the
>  HOOD/GBTC/ETHE/BITW shares pledged and the first
>  payment done today.  Ideally before 12 ET.

>  Would a call at 9 or 10 ET work? if we are agreed on what
>  needs to happen it could maybe just be a call w lawyers to
>  make sure the paperwork is in order.

>  Don't hesitate to ping / call us anytime and thanks for the
>  attention here.

>  Best,

>  Zac

>  On Wed, Nov 9, 2022 at 4:21 AM Caroline Ellison

_____ wrote:

We've put together a spreadsheet of our liquid assets and our outstanding loans

We have $1.1b of shares in HOOD+GBTC+ETHE+BITW that we could post as collateral.

Here's a proposed repayment schedule: would this work?

—

Caroline Ellison

.

--



**Zac Prince**
CEO

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities  To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

--

**Zac Prince**

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment
products or other financial product or service, an official confirmation of any transaction, or an
official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a
specifically indicated offer, such offer shall be immediately terminated upon the occurrence of
either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time
of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade
secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized
individuals to review, use, copy, disclose, or disseminate confidential information  If you have
received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688
or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other
financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its
affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately
terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours
from the time of offer.
This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly
confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy,
disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender
immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or
service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail
contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the
value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.
This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information
belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If
you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and
promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

--



**Zac Prince**
CEO

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

--



**Zac Prince**
CEO

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

**To:** Samuel Bankman-Fried
**From:** Zac Prince
**Sent:** Thur 11/10/2022 3:30:37 PM (UTC)
**Subject:** Fwd: loan repayment

Case 23-10140-JTD   Doc 82-1 Filed 02/16/23   Page 438 of 466   Desc
Exhibit A - Shim Declaration   Page 17 of 27



**Zac Prince**
CEO

Twitter:

---------- Forwarded message ---------
From: **Zac Prince**
Date: Thu, Nov 10, 2022 at 10:30 AM
Subject: Re: loan repayment
To: Yuri Mushkin
Cc: <caroline                          Amit Cheela                    Flori Marquez                    ,
usec.rho

payment instructions for anything coming over:

**Zac Prince**
CEO

Twitter:

On Thu, Nov 10, 2022 at 5:07 AM Yuri Mushkin                          wrote:

Hi Caroline

Are you guys able to make some incremental pay-downs, in meantime, eg 75m to complete
yesterdays 200m amount

A few quick questions on HOOD, a)would that be the pledged shares in EDF account, b)  how many shares are there in
total in EDF, c) what do you think would be estimated proceeds ?  d)  any ballpark on timing for potential buyer

since EDF HOOD shares are pledged as collateral, just need to double check how that works   ( eg maybe buyer could
settle with blockfi directly? )

On Thu, 10 Nov 2022 at 00:49, Caroline Ellison ███████████████████ wrote:

great thanks!

we are talking to a couple buyers interested in buying the remaining HOOD OTC. if that comes through, would it work to just use the proceeds from that to repay the loan?

I think that would get a majority of the remaining loan notional though it would be in USD and not BTC

—
Caroline Ellison
.

> On November 10, 2022 at 12:04 PM GMT+8 yuri.██████████████ wrote:
>
> Thanks a lot Caroline , acknowledging signed pledges.
>
> We are up - if you want to sync up on  anything , or if we can help in any way.
>
> Our team is working with ED&F so that ACA can be setup for the pledges.
>
>
>
>> On Wed, 9 Nov 2022 at 19:13, Yuri Mushkin ██████████████ wrote:
>>
>> hi Caroline,  we heard Binance is holding your funds, another idea (after signing the pledge) is to give us instructions to sell some of the pledged collateral ( or other ED&F collateral which you have listed)  and we can use proceeds for loan repayment.
>> Yuri
>>
>>> On Wed, Nov 9, 2022 at 5:59 PM Flori Marquez ██████████████ wrote:
>>>
>>> Caroline,
>>> Are you able to sign this tonight?



>>> **Flori Marquez**
>>> Founder, COO

>>>> On Wed, Nov 9, 2022 at 6:56 PM <usec.rho██████████ wrote:
>>>>
>>>> Caroline,

Attached please find the following agreements:

1. Amendment and Forbearance Agreement between BF Lending, BF International and Alameda.
   a. BF forbears exercising remedies in return for additional pledge and payments made per the payment schedule in Exhibit B

2. Pledge Agreement between BF Lending, BF International, and Alameda
   a. Pledges GBTC, ETHE, and BITW Shares. **We need the Number of Shares filled in Schedule A**

3. Pledge Agreement between BF Lending, BF International and Emergent Fidelity Technologies Ltd (who we assume holds HOOD shares, please confirm)
   a. Pledges HOOD Shares. **We need Notice information on page 8, and the number of shares in Schedule A**

Please note that we are in the process of setting up a brokerage account to accept the additional collateral. The Pledge Agreements contemplate that the shares will be transferred to the account upon notice from BlockFi that set up is done.



◆ BlockFi

Usec Rho

Deputy General Counsel

---

**From:** Flori Marquez
**Sent:** Wednesday, November 9, 2022 6:47 PM
**To:** Zac Prince
**Cc:** caroline                    Amit Cheela                    Yuri Mushkin
Usec Rho
**Subject:** Re: loan repayment



**Flori Marquez**
Founder, COO

On Wed, Nov 9, 2022 at 5:14 PM Zac Prince ⬛⬛⬛⬛⬛ wrote:

Got it - any commentary you can give us on next steps re timing for the remaining 75M for today or payments for tomorrow?  We have our next board session at 630 and would love to speak before then if you are available



**Zac Prince**
CEO

On Wed, Nov 9, 2022 at 4:35 PM Caroline Ellison ⬛⬛⬛⬛⬛ wrote:

Hi sorry, hearing that we can do another 75m today. One of our exchange accounts that we were counting on just got frozen so we aren't able to withdraw.

Sorry if this makes things tougher with the board

—

Caroline Ellison

On November 9, 2022 at 3:14 PM EST flori ▮▮▮▮▮▮▮ wrote:

Hey Caroline,

Thank you for completing the first repayment. We're meeting with the board again tonight because at the time of the meeting we had not received the $50M. Can you give us an estimate on timing for the $150M so that we can communicate that to them? Does 5PM EST work?

Best,

Flori



**Flori Marquez**
Founder, COO

On Wed, Nov 9, 2022 at 11:06 AM Zac Prince ▮▮▮▮▮▮▮ wrote:

Hi Caroline - we just heard from our trading team that Terence communicated that you would only be able to send 50M USDT by 12 ET.  Is that correct?  We have critical decisions and regulatory conversations happening starting at 12 so an update would be appreciated.



**Zac Prince**
CEO

On Wed, Nov 9, 2022 at 10:30 AM Zac Prince ⬛⬛⬛⬛⬛ wrote:

> Hi Caroline - one small adjustment we need to make to the repayment schedule would
> be the timing - 5 PM is a bit too late, could we move that to 9 (preferred) or 12 ET for
> each repayment?



**Zac Prince**
CEO

On Wed, Nov 9, 2022 at 7:15 AM Zac Prince ⬛⬛⬛⬛ wrote:

> Sounds good, just sent an invite

>> On Wed, Nov 9, 2022 at 6:59 AM Caroline Ellison ⬛⬛⬛⬛⬛
>> wrote:

>> Great news, sounds good!

>> A call at 9 am ET sounds good; feel free to invite me and I can add whoever is
>> relevant from our side.

>> On Wed, Nov 9, 2022 at 7:56 PM Zac Prince ⬛⬛⬛⬛ wrote:

>> Hi Caroline,

>> Thanks for sharing this information.  We should be able to make the repayment
>> schedule work if we can get the HOOD/GBTC/ETHE/BITW shares pledged and the
>> first payment done today.  Ideally before 12 ET.

Would a call at 9 or 10 ET work? if we are agreed on what needs to happen it could maybe just be really a way to make sure the paperwork is in order.

Don't hesitate to ping / call us anytime and thanks for the attention here.

Best,

Zac

On Wed, Nov 9, 2022 at 4:21 AM Caroline Ellison ██████████████
████████████ wrote:

We've put together a spreadsheet of our liquid assets and our outstanding loans

We have $1.1b of shares in HOOD+GBTC+ETHE+BITW that we could post as collateral.

Here's a proposed repayment schedule; would this work?

—

Caroline Ellison

.

--



**Zac Prince**
CEO

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

--



**Zac Prince**
CEO

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

**To:**      caroline
**Cc:**      Jonathan Mavers                                                                        ; Joe
Hickey                                    ; Brian Oliver                    ; Zac Prince                    ; Terence
Choo                                    ; Richard Chang                        Richard Chang
**From:**    Yuri Mushkin
**Sent:**    Wed 11/9/2022 4:45:34 PM (UTC)
**Subject:**  Re: BlockFi synch

hi Caroline,  @Terence Choo
thank you!. could we ask alameda ops team to fill out the units (e.g., #HOOD shares) and include a pdf /copy of statements in another tab in ghsheet here from the EDF account.
Alameda Pledge - Google Sheets
tvm,

On Wed, Nov 9, 2022 at 10:37 AM Caroline Ellison                                    wrote:

confirmed!

—

Caroline Ellison
.

> On November 10, 2022 at 12:33 AM GMT+8 jonathan                    wrote:
>
> Hi Caroline,
> Please confirm by way of reply to this email that you have the power to and do pledge on behalf of Alameda Research Limited, all of the HOOD shares held in EDF account                    COMBINED as well as all of the assets in EDF is account                    COMBINED including, but not limited to, all of the GBTC, ETHE and BITW held therein to BlockFi Lending LLC and BlockFi International as Collateral under their respective Master Loan Agreements and the Loans thereunder.   This pledge will be binding upon acceptance by reply to this email and will later be further memorialized via documentation.
>
> Best,
>
> Jonathan

On Wed, Nov 9, 2022 at 11:20 AM Yuri Mushkin                                    wrote:

yes pledge all of it works.
+ Zac and Jonathan

On Wed, Nov 9, 2022 at 10:18 AM Caroline Ellison                                    wrote:

ah I don't think I have edit access, but:

- HOOD in EDF account                    COMBINED
- other two EDF is account                    COMBINED
- amount pledged: can do all of it?

—

Caroline Ellison
.

> On November 10, 2022 at 12:04 AM GMT+8 yuri.                    wrote:
>
> @Terence Choo @Richard Chang @Caroline Ellison  pls see below, could you add

accounts/how much is being pledged -
tvm!

[Alameda Pledge - Google Sheets](#)

On Wed, Nov 9, 2022 at 9:56 AM Yuri Mushkin ███████████████ wrote:

\+ Kit ( we are adding columns to your gsheet, to let you specify account numbers/and
quantity you are pledging )

On Wed, Nov 9, 2022 at 8:55 AM Terence Choo ████████████████████ wrote:

Hey Joe,

Sorry for the delay. Will give you a ring later.

On Wed, Nov 9, 2022 at 10:30 PM Joe Hickey ███████████████ wrote:

Hi Terence -
Let me know when is good to synchronize and what medium

Thank you.

--



**Joseph Hickey, CFA, FRM**

Managing Director, Global Head of Trading

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or
service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-
mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1%
movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.
This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential
information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate
confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-
9688 or by return email and promptly delete this message from your system

For more information, please see [BlockFi's Terms of Service](#).

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or
service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail
contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the
value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.
This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential

information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

Unless specifically indicated, this e-mail is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of BlockFi Inc or its affiliated entities. To the extent this e-mail contains a specifically indicated offer, such offer shall be immediately terminated upon the occurrence of either (i) a 1% movement in the value of the relevant cryptocurrency or (ii) 48 hours from the time of offer.

This e-mail is meant only for the intended recipient of this transmission, and may contain trade secrets and strictly confidential information belonging to the sender. It is unlawful for unauthorized individuals to review, use, copy, disclose, or disseminate confidential information. If you have received this e-mail in error, please notify the sender immediately by telephone at (646) 779-9688 or by return email and promptly delete this message from your system

For more information, please see BlockFi's Terms of Service.

# EXHIBIT B-30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :
                                  :        **SEALED INDICTMENT**
        - v. -                    :
                                  :        22 Cr. ____
                                  :
SAMUEL BANKMAN-FRIED,             :
    a/k/a "SBF,"                  :        22 CRIM 673
                                  :
        Defendant.                :
                                  :
- - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Commit Wire Fraud on Customers)

The Grand Jury Charges:

1.     From at least in or about 2019, up to and including in
or about November 2022, in the Southern District of New York, and
elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and
others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit wire fraud, in violation of Title 18, United States Code,
Section 1343.

2.     It was a part and object of the conspiracy that SAMUEL
BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and
unknown, knowingly having devised and intending to devise a scheme
and artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, would and did transmit and cause to be transmitted by
means of wire, radio, and television communication in interstate

and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BANKMAN-FRIED agreed with others to defraud customers of FTX.com by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda Research, BANKMAN-FRIED's proprietary crypto hedge fund, and to make investments.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud on Customers)

The Grand Jury further charges:

3.    From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BANKMAN-FRIED, along with others, engaged in a scheme to defraud customers of FTX.com by misappropriating those customers' deposits, and using those

2

deposits to pay expenses and debts of Alameda Research, BANKMAN-FRIED's proprietary crypto hedge fund, and to make investments.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Conspiracy to Commit Wire Fraud on Lenders)

The Grand Jury further charges:

4.    From at least in or about June 2022, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Sections 1343.

5.    It was a part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BANKMAN-FRIED agreed with others to defraud lenders to Alameda

Research, BANKMAN-FRIED's proprietary crypto hedge fund, by providing false and misleading information to those lenders regarding Alameda Research's financial condition.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Wire Fraud on Lenders)

The Grand Jury further charges:

6.  From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BANKMAN-FRIED, along with others, engaged in a scheme to defraud lenders to Alameda Research, BANKMAN-FRIED's proprietary crypto hedge fund, by providing false and misleading information to those lenders regarding Alameda Research's financial condition.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
### (Conspiracy to Commit Commodities Fraud)

The Grand Jury further charges:

7.     From at least in or about 2019, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1.

8.     It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, willfully and knowingly, would and did, directly and indirectly, use and employ, and attempt to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (a) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (b) making, and attempting to make, an untrue and misleading statement of a material fact and omitting to state

5

a material fact necessary in order to make the statements made not untrue and misleading; and (c) engaging, and attempting to engage in an act, practice, and course of business, which operated and would operate as a fraud and deceit upon a person, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), to wit, BANKMAN-FRIED agreed with others to defraud customers of FTX.com trading or intending to trade swaps by misappropriating those customers' deposits and using those deposits to pay expenses and debts of Alameda Research, BANKMAN-FRIED's proprietary crypto hedge fund, and to make investments.

9. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: in or about June 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others misappropriated FTX.com customer deposits in order to, among other things, satisfy loan obligations owed by Alameda Research.

(Title 18, United States Code, Section 371.)

## COUNT SIX
### (Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

10. From at least in or about May 2022, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant,

6

and others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit an offense against the United States, to wit, securities
fraud in violation of Title 15, United States Code, Sections 78j(b)
and 78ff, and Title 17, Code of Federal Regulations, Section
240.10b-5.

11.   It was a part and an object of the conspiracy that SAMUEL
BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and
unknown, willfully and knowingly would and did, directly and
indirectly, by use of a means and instrumentality of interstate
commerce and of the mails, and of a facility of a national
securities exchange, use and employ, in connection with the
purchase and sale of a security registered on a national securities
exchange and any security not so registered, a manipulative and
deceptive device and contrivance, in violation of Title 17, Code
of Federal Regulations, Section 240.10b-5, by: (a) employing a
device, scheme, and artifice to defraud; (b) making an untrue
statement of material fact and omitting to state a material fact
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in an act, practice, and course of business which
operated and would operate as a fraud and deceit upon a person, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff, to wit, BANKMAN-FRIED agreed with others to engage in a

7

scheme to defraud investors in FTX.com by providing false and misleading information to those investors regarding FTX.com's financial condition.

12. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: on or about September 18, 2022, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, caused an email to be sent to an FTX investor in New York, New York that contained materially false information about FTX's financial condition.

(Title 18, United States Code, Section 371.)

## COUNT SEVEN
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

13. From at least in or about 2020, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957(a).

14. It was a part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, in an offense in and affecting interstate and foreign

8

commerce, knowing that the property involved in a financial transaction, to wit, one or more monetary transfers, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud alleged in Count Two of this Indictment, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

15.   It was a further part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, within the United States, would and did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, the wire fraud alleged in Count Two of this Indictment, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

9

## COUNT EIGHT
### (Conspiracy to Defraud the United States and Violate the Campaign Finance Laws)

The Grand Jury further Charges:

16. From at least in or about 2020, up to and including in or about November 2022, in the Southern District of New York, and elsewhere, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to defraud the United States, in violation of Title 18, United States Code, Section 371, and willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States by engaging in violations of federal law involving the making, receiving, and reporting of a contribution, donation, or expenditure, in violation of Title 52, United States Code, Sections 30109(d)(1)(A) & (D).

17. It was part and an object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did defraud the United States, and an agency thereof, by impairing, obstructing, and defeating the lawful functions of a department and agency of the United States through deceitful and dishonest means, to wit, the Federal Election Commission's function to administer federal law concerning source and amount restrictions in federal elections, including the prohibitions applicable to corporate contributions and conduit

10

contributions, in violation of Title 18, United States Code, Section 371.

18. It was a further part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did knowingly and willfully make contributions to candidates for federal office, joint fundraising committees, and independent expenditure committees in the names of other persons, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A) & (D).

19. It was a further part and object of the conspiracy that SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, and others known and unknown, would and did knowingly and willfully make contributions to candidates for federal office and joint fundraising committees by a corporation, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30118 and 30109(d)(1)(A).

20. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere: in or about 2022, SAMUEL BANKMAN-FRIED a/k/a "SBF," the defendant, and one or more other conspirators agreed to and did make corporate contributions to candidates and committees in the Southern District of New York that were reported in the name of another person.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

21. As a result of committing the offenses alleged in Counts One, Two, Three, and Four of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

22. As a result of committing the offense alleged in Count Seven of this Indictment, SAMUEL BANKMAN-FRIED, a/k/a "SBF," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property,

12

real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

23.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section  853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

> (Title 18, United States Code, Section 982;
> Title 21, United States Code, Section 853; and
> Title 28, United States Code, Section 2461.)

FOREPERSON

Damian Williams

DAMIAN WILLIAMS
United States Attorney

13

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

SAMUEL BANKMAN-FRIED,
a/k/a "SBF,"

Defendant.

## SEALED INDICTMENT

22 Cr. \_\_\_\_

(Title 7, United States Code, Sections
9(1) and 13(a)(5); Title 17, Code of
Federal Regulations, Section 180.1; Title
15, United States Code, Sections 78j(b) and
78ff; Title 17, Code of Federal
Regulations, Section 240.10b-5; Title 18,
United States Code, Sections 371, 1343,
1349, 1956, and 1957; Title 52, United
States Code, Sections 30118, 30122 and
30109(d)(1)(A) & (D).)

DAMIAN WILLIAMS
United States Attorney

**A TRUE BILL**

Foreperson

12-9-2022 Filed Sealed Indictment - Arrest Warrant issued

Valerie Figueredo
US MJ

# EXHIBIT B-31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
UNITED STATES OF AMERICA,                                   :
:
        - v. -                                                  :
:
                                      :       GOVERNMENT'S
SAMUEL BANKMAN-FRIED                                         :       FORFEITURE BILL
        a/k/a "SBF,"                                         :       <u>OF PARTICULARS</u>
:
                 Defendant.                               :       22 Cr. 673 (LAK)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Pursuant to *United States* v. *Grammatikos*, 633 F.2d 1013, 1024 (2d Cir. 1980), the

Government respectfully gives notice that the property subject to forfeiture as a result of the

offenses described in Counts One through Four and Seven of Indictment 22 Cr. 673 (LAK) against

SAMUEL BANKMAN-FRIED, and as alleged in the forfeiture allegations and/or substitute asset

provision therein, includes the following:

    a.   55,273,469 shares of the stock of Robinhood Markets Inc. from Account
         Number 499-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held
         in the name of "Emergent Fidelity Technologies," seized by the Government
         on or about January 4, 2023;

    b.   $20,746,713.67 in United States currency formerly on deposit in Account
         Numbers 499-30500 and 429-30500 at ED&F Man Capital Markets, Inc.,
         a/k/a "Marex," held in the name of "Emergent Fidelity Technologies" seized
         by the Government on or about January 4, 2023;

    c.   $49,999,500 in United States currency formerly on deposit in Account
         Number 9000-1924-02685 at Farmington State Bank d/b/a "Moonstone Bank"
         held in the name of "FTX Digital Markets" seized by the Government on or
         about January 4, 2023;

    d.   $5,322,385.32 in United States currency formerly held on deposit in Account
         Number 0000005090042549 at Silvergate Bank held in the name of "FTX
         Digital Markets" seized by the Government on or about January 11, 2023;

1

    e.  $719,359.65 in United States currency formerly on deposit in Account Number 0000005090042556 at Silvergate Bank held in the name of "FTX Digital Markets" seized by the Government on or about January 11, 2023;

    f.  $1,071.83 in United States currency formerly on deposit in Account Number 0000005090042564 at Silvergate Bank held in the name of "FTX Digital Markets" seized by the Government on or about January 11, 2023;

    g.  $94,570,490.63 in United States currency formerly on deposit in Account Number 0000005091010037 at Silvergate Bank held in the name of "FTX Digital Markets" seized by the Government on or about January 19, 2023;

    h.  Any and all monies, assets, and funds contained in Binance account number 94086678;

    i.  All monies, assets, and funds contained in Binance.us account number 35000066; and

    j.  All monies, assets, and funds contained in Binance.us account number 35155204;

Dated: New York, New York
      January 20, 2023

                    Respectfully Submitted,

                    DAMIAN WILLIAMS
                    United States Attorney

              By:  <u>/s Samuel Raymond</u>
                    Samuel Raymond
                    Danielle Kudla
                    Thane Rehn
                    Andrew Rohrbach
                    Danielle R. Sassoon
                    Nicolas Roos
                    Assistant United States Attorneys
                    Telephone: (212) 637-6519